IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | Criminal No. 4:15-CR-103-JAJ-HCA |
| v. | ) | |
| | ) | GOVERNMENT'S OPPOSITION TO |
| JESSE R. BENTON, | ) | DEFENDANT JOHN F. TATE'S MOTION |
| JOHN TATE, and | ) | TO DISMISS FOR ALLEGED |
| DIMITRIOS N. KESARI | ) | PROSECUTORIAL MISCONDUCT (DKT. 415) |
| | ) | |
| Defendants. | ) | **FILED UNDER SEAL** |

Defendant John F. Tate seeks dismissal of the Superseding Indictment on the ground that "[t]he Government [p]resented [k]nowingly [b]aseless [t]estimony [t]o the [s]econd [g]rand [j]ury" (Dkt. 415-1 at 2), alleging that a prosecutor and federal law enforcement agent "purposefully misled the Grand Jury" (*id.* at 3) as part of a "[d]eliberate [a]ttempt by the Government to [f]ill [o]bvious [g]aps in its [w]eak to [n]on-[e]xistent [c]ase [a]gainst Mr. Tate" (*id.* at 7). In fact, no false testimony was presented to the grand jury. Much like defendant Tate's motion to strike surplusage (Dkt. 367), this motion, laden with unsupportable misconduct allegations and citations to factually and legally inapposite caselaw, is a premature effort to mount a factual defense in a Rule 12 motion rather than at trial. Stripped of that hyperbole and inapposite caselaw, defendant Tate's motion is merely an effort offer an alternative interpretation of e-mails exchanged amongst the co-conspirators—an interpretation he will have a full and fair opportunity to present at trial. The motion is meritless and should be denied.

I.   **LEGAL STANDARD**

Defendant Tate's motion to dismiss fails to meaningfully engage the legal standard governing a motion to dismiss based on grand jury abuse and prosecutorial misconduct. Notably, defendant Tate fails to advise the Court that it is well-settled that facially valid indictments are

entitled to a presumption of regularity. *See Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974); *Costello v. United States*, 350 U.S. 359, 363 (1956); *see also United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987) ("Grand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden."). Indeed, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence . . . ." *United States v. Calandra*, 414 U.S. 338, 345 (1974); *see also id.* at 344-45 ("The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered."); *Costello*, 350 U.S. at 363 (holding that a court may not look behind the indictment to determine if the evidence upon which it was based is sufficient). "Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." *United States v. Wadlington*, 233 F.3d 1067, 1073 (8th Cir. 2000). At a minimum, this requires the defendant to show that the alleged misconduct "'substantially influenced the grand jury's decision to indict,'" or that there is "'grave doubt' that the decision to indict was free from the substantial influence of [the alleged misconduct]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). (quoting and adopting *United States v. Mechanik*, 475 U.S. 66, 78 (1988) (O'Connor, J., concurring)); *see also United States v. Morrison*, 449 U.S. 361, 365 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.").

**II.     ARGUMENT**

The gravamen of defendant Tate's motion is that paragraph 29(d) of the Superseding Indictment (Dkt. 322), which alleges the overt act that, "[o]n or about February 7, 2012, KESARI

2

obtained permission by e-mail from BENTON and TATE to cause [the 2012 Ron Paul Presidential Campaign Committee (RPPC)] to pay Senator [Kent] Sorenson," is unsupported by any evidence, and that the grand jury approved it based on false testimony interpreting e-mails between the co-conspirators (Dkt. 415-1 at 2-5). Defendant Tate additionally argues, essentially, that the remaining allegations in the Superseding Indictment flow directly from this alleged overt act and the testimony underpinning it, and therefore that the remaining allegations were functionally the result of false and misleading testimony (*see id.* at 5-6; *see also id.* at 7 ("The false testimony presented to the Grand Jury is a major portion, if not the linchpin, of the Government's case against Mr. Tate.")). He also claims that the Government's grand jury presentation in this case is part of a pattern of prosecutorial misconduct (*see id.* at 6-7, 9-10). These contentions are factually and legally baseless and should be rejected.

### A. The Testimony Presented to the Grand Jury Was Fulsome, Transparent, and Truthful.

Defendant Tate's contention boils down to a dispute over the interpretation of e-mails exchanged between the co-conspirators. Defendant Tate is correct that the allegation in paragraph 29(d) of the Superseding Indictment, that defendant Kesari "obtained permission by e-mail" from defendants Tate and Benton on February 7, 2012, to cause the RPPC to pay Sorenson, is moored to e-mail exchanges from that day—specifically, an exchange between defendants Kesari and Tate, and a separate exchange between defendants Kesari and Benton, which occurred contemporaneously (*see* GJ Ex. 68; GJ Ex. 69).[1] In his part of the exchange, which is set forth

---

[1] The grand jury exhibits cited in this pleading are attached. They are referenced in the electronic case filing system under the same exhibit number they were assigned in the grand jury and are attached in numerical order. An excerpt from one witness' grand jury testimony, which does not have a grand jury exhibit number, is attached as Exhibit A – the final exhibit to this pleading.

below, defendant Tate does not explicitly approve a payment to Sorenson; but it is evident from the facts and circumstances under which the e-mail was sent, that his part of the exchange amounted to tacit approval to do so. Defendant Tate's motion wholly ignores the facts and circumstances supporting that inference.

The e-mail exchanges constituting defendants Benton's and Tate's February 7, 2012, approval of the Sorenson payment, in the order they occurred, are as follows. At 5:19 p.m., defendant Tate wrote to defendant Tate:

> Did Jesse get kent paid?
>
> He said he would handle it and kent is texting me today.

GJ Ex. 68. Approximately one hour later, at 6:31 p.m., while still awaiting a response from defendant Tate, defendant Kesari separately e-mailed defendant Benton, asking:

> Did you get kent paid?
>
> Or should I submit the payment and pay him?

GJ Ex. 69. At 7:22 p.m., before defendant Benton sent any reply to defendant Kesari's 6:31 p.m. e-mail, defendant Tate replied to defendant Kesari's 5:19 p.m. e-mail, stating:

> No idea. Ask him.

GJ Ex. 68. Less than 15 minutes after defendant Tate responded to defendant Kesari, at 7:35 p.m., defendant Benton explicitly instructed defendant Kesari:

> Yo handle.

GJ Ex. 69. Neither defendant Tate nor defendant Benton were copied on defendant Kesari's exchanges with the other—these exchanges occurred contemporaneously, but separate from each other.

Apart from the February 7, 2012, e-mails themselves, the grand jury was presented substantial other evidence to support the inference that defendant Tate's instruction to defendant Kesari to check with defendant Benton on whether Sorenson had been paid—as opposed to questioning how much the payment was for or what it was for, inquiring who "Kent" was, objecting to paying Sorenson, or expressing any confusion about the cause or purpose of defendant Tate's question—constituted defendant Tate's approval of making the payment. For example:

- GJ Ex. 53: A December 28, 2011, e-mail in which defendant Kesari, copying defendants Tate and Benton, informs the RPPC's controller that he (defendant Kesari) "will need a wire for 25,000 first thing in the morning"—two days after he had given Sorenson a $25,000 check drawn on his wife's jewelry store account—to which defendant Tate interjects, "Yep approved." (*See also* Dkt. 415-2 at 12-15.)

- GJ Ex. 59: A December 29, 2011, e-mail in which defendant Tate, on the heels of Michele Bachmann's allegation that the RPPC paid Sorenson for his endorsement, informs the RPPC's controller that "[t]here will not be the 25k dimitri wire *for now*" (emphasis added) and to "[w]ipe it off the books." (*See also* GJ Ex. 58 (attached as Ex. E); Dkt. 415-2 at 15-20.)

- GJ Ex. 70: An April 3, 2012, e-mail from defendant Tate to the RPPC controller explicitly approving a payment to ICT, the pass through used to facilitate the Sorenson payments. (*See also* Dkt. 415-2 at 37-38.)

- GJ Ex. 72: A May 29, 2012, e-mail from defendant Tate to the RPPC controller explicitly approving another payment to ICT. (*See also* Dkt. 415-2 at 42-43.)

- GJ Exs. 73, 74, 75: An e-mail exchange between defendant Kesari and defendant Tate on June 25, 2012, in which defendant Kesari reminds defendant Tate that the payments to ICT reflect "payment for kent Sorenson" and "[t]he deal jesse agreed to with kent," two minutes after which—without seeking clarification or registering an objection—defendant Tate explicitly authorizes the RPPC controller to make a payment to ICT. (*See also* Dkt. 415-2 at 44-49.)[2]

---

[2] In a footnote, defendant Tate contends that, because the e-mail in which defendant Kesari reminds him that the ICT payments are intended for Sorenson (GJ Ex. 73) was recovered from defendant Kesari's personal computer rather than the RPPC server, "[t]he Government cannot demonstrate that Mr. Tate either received or read the message" (Dkt. 415-1 at 5 n.2). As FBI Special Agent Gunnar Demarco testified at the previous trial, and will testify again at this trial, the forensic evidence underlying this e-mail gives no indication that it was not properly transmitted to

5

- Grand jury testimony from the RPPC controller that it was necessary for him and/or field staff to obtain authorization from defendants Tate or Benton for significant campaign expenditures, and indicating that the payments in the amounts made to Sorenson through ICT would qualify as such expenditures (*see, e.g.*, Grand Jury Testimony of Fernando Cortez (excerpt attached as Exhibit A), July 22, 2014, at 41-43).

The Government closed the loop on the inference that the February 7, 2012, e-mail exchanges constituted e-mail approval for the Sorenson payment through the following testimony:

> Q: Am I correct that on February 7th, 2012, in the e-mails we just saw, Mr. Kesari attained permission by e-mail from Mr. Benton and Mr. Tate to cause the Ron Paul Campaign to pay Senator Sorenson?
>
> A: That's correct.

(Dkt. 415-2, Grand Jury Testimony of Frank D'Amico, Nov. 19, 2015, at 35:7-11.) Defendant Tate contends that this testimony is false, because, apart from the above-quoted e-mail exchanges, "[t]here are no other e-mail messages by Mr. Tate, to Mr. Tate, or copying Mr. Tate," on February 7, 2012; therefore, he contends, "Mr. Tate's 'No idea' response cannot be reasonably construed as an approval of anything" (Dkt. 415-1 at 3).

As outlined above, there was more than sufficient record evidence from which Special Agent D'Amico could testify—and from which the grand jury could find probable cause—that the February 7, 2012, e-mail exchange constituted defendant Tate's approval of paying Sorenson. The testimony reflected a reasonable inference based on the evidence and appropriately articulated the Government's theory of the case. Nowhere did Special Agent D'Amico or the prosecutor suggest that the testimony was based on some other e-mail or document not presented to the grand jury or mislead the grand jury about what evidence the testimony relied upon. In fact, through his

---

defendant Tate and the RPPC server. As with any e-mail to which there is not a reply, it cannot be established with certainty whether it was read by the recipient. The fact that GJ Ex. 73 is missing from the RPPC server, however, is consistent with it having been deleted by the sender and recipient. (*See* Expert Notice, Dkt. 440.)

questioning, the prosecutor explicitly connected Special Agent D'Amico's testimony to the February 7 e-mails, making clear what evidence the approval inference was based on. Moreover, the grand jury had the opportunity to examine the e-mails themselves and make an independent determination about how to interpret them. Special Agent D'Amico's testimony was transparent, fulsome, truthful, and perfectly appropriate in the context of a grand jury presentation. *See United States v. R. Enterprises*, 498 U.S. 292, 298 (1991) ("The same rules that, in an adversary hearing on the merits, may increase the likelihood of accurate determinations of guilt or innocence do not necessarily advance the mission of a grand jury, whose task is to conduct an *ex parte* investigation into whether or not there is probable cause to prosecute a particular defendant."); *see also United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985) (perceiving "no error in the prosecution's use of leading questions before the grand jury") (citations omitted).

Defendant Tate contends that this case is "similar to the situation presented in *Bragg v. Norris*, 128 F. Supp. 2d 587, 605-05 (E.D. Ark. 2000)" (Dkt. 415-1 at 8), a district court opinion upholding a collateral attack of a state conviction. But the facts and legal principles underlying *Bragg* bear no resemblance to this case. There, the prosecution's central case agent and eyewitness to a drug transaction was found to have perjured himself at trial concerning virtually every material fact about which he was called to testify, including: (1) lying to the jury about whether he had viewed photographs in the process of attempting to exclude another suspect; (2) misleading the jury about whether the suspect he had excluded as a perpetrator early in his investigation was the same person as the defendant (concerning which the prosecutor suppressed contemporaneous notes); (3) misleading the jury about identifying the defendant through a license plate; (4) misleading the jury about when—and if at all—he viewed photographs from which he could identify the defendant; and (5) lying about what another witness had seen during a transaction.

7

128 F. Supp. 2d at 595-99. Moreover, the agent admitted to having known that most of his testimony was false at the time he gave it, and confessed to destroying some of his original police reports and replacing them with ones in which he changed material facts. *Id.* at 597. Because "the State's case against [the defendant] was based entirely on the testimony of [the agent,]" *id.* at 603, and it was almost entirely false, the district court vacated the conviction, *id.* at 605, 608-09.

Here, unlike in *Bragg*, defendant Tate's challenge is to the grand jury proceeding—for which there is a robust presumption of regularity—not to a trial proceeding. Stripped of hyperbole, defendant Tate's argument is merely that the evidence supports a different inference than the one advanced by the Government—not that it is false. Defendant Tate will have a full and fair opportunity to advance his own interpretation of the February 7, 2012, emails in the adversarial arena of a trial. Moreover, unlike in *Bragg*, the Government's case against defendant Tate does not rise and fall on the testimony of a single investigative agent; rather, it is anchored to defendant Tate's own words and deeds, as evidenced in e-mails that he sent to and received from his co-defendants contemporaneous to the offenses they are alleged to have committed. And, unlike in *Bragg*, no documents were fabricated, altered, or destroyed. To the contrary, the grand jury was shown the February 7 e-mails, had the opportunity to examine them and their context, and neither the prosecutor nor Agent D'Amico suggested that the interpretation advanced in his testimony was based on some other evidence not before the grand jury. In sum, this case is nothing like *Bragg*. Neither the prosecutor nor Agent D'Amico misrepresented or fabricated evidence—their presentation was transparent, fulsome, and truthful.

Notably, defendant Tate fails to cite any factually apposite case resulting in the dismissal of an indictment; in fact, defendant Tate does not cite single case in which the final reviewing court affirmed the drastic step of dismissing an indictment on the ground that allegedly false

testimony was presented to the grand jury. *See, e.g.*, *Bank of Nova Scotia*, 487 U.S. 250, 260-61 (1988) (affirming Tenth Circuit's reversal of district court's dismissal of indictment based on alleged prosecutorial misconduct, even though "IRS agents gave misleading and inaccurate summaries to the grand jury just prior to the indictment," because the record revealed no prosecutorial misconduct related to the summaries and "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment") (citation omitted) (cited at Dkt. 415-1 at 8); *United States v. Hastings*, 461 U.S. 499, 502, 506-07, 510-12 (1974) (reversing Seventh Circuit's reversal of a *conviction*—not dismissal of an indictment under Rule 12—where alleged prosecutorial misconduct of violating defendants' Fifth Amendment rights in closing argument was harmless) (cited at Dkt. 415-1 at 8); *United States v. Cavallo*, 790 F.3d 1202, 1220 (11th Cir. 2015) (affirming district court's denial of prosecutorial misconduct claim for allegedly sponsoring false testimony before grand jury, where defendants "failed to demonstrate that the agent intentionally made a false statement, or that the prosecutor would so interpret his testimony" and "there was ample evidence to indicate that [the defendant] had, in fact, signed [the] document" that was the object of a charge of causing false statements in a loan document) (cited at Dkt. 415-1 at 8); *United States v. Martin*, 59 F.3d 767, 770-71 (8th Cir. 1995) (affirming district court's denial of prosecutorial misconduct claim that prosecutor sponsored false testimony from trial witness, where witness merely gave prior inconsistent statements or was contradicted by other evidence) (cited at Dkt. 415-1 at 8). Put simply, the law does not support defendant Tate's claim.

Defendant Tate's contention that the Superseding Indictment was obtained through false and misleading testimony is factually and legally baseless.

## B. There is No Prosecutorial Misconduct, Let Alone a Pattern of Misconduct.

Defendant Tate alleges that the Government engaged in a pattern of misconduct dating back to its presentation of defendant Tate's proffer-protected statements to the grand jury that returned the original indictment (Dkt. 415-1 at 9-10). Just as there is no basis for his contention that the Government presented false testimony to the grand jury, there is no basis for contending that there exists a pattern of misconduct warranting dismissal of the Superseding Indictment. In fact, the basis of this contention is thread together by a disingenuous interpretation of this Court's order dismissing the original indictment (Dkt. 256) and misleading reliance on inapplicable caselaw. Defendant Tate's contention exposes his motion as an effort to distract attention from the powerful evidence of his culpability.

Defendant Tate insinuates that this Court sanctioned the Government for presenting false testimony, arguing that "the Government falsely alleged that Mr. Tate had lied during an August 2014 proffer session" and representing in his pleading papers that, "[b]ecause the Government had breached Mr. Tate's proffer agreement *in making that false allegation*, the Court dismissed the case against him" (*id.* at 6, citing Dkt. 256) (emphasis added). That is not what this Court held; this Court did not hold that the Government made a false allegation before the grand jury. Rather, this Court held that the parties' proffer agreement prohibited the use of defendant Tate's proffer-protected statements before the grand jury related to offenses other than false statements, obstruction of justice, or perjury (*see* Dkt. 256 at 6-7).

Just as defendant Tate divined an interpretation of this Court's prior order to suit his litigation narrative, he liberally cites inapposite caselaw to leave the misleading impression that there is legal authority underpinning his claim. Nowhere is this more apparent than on page 9 of his brief, where he represents that *White v. Smith*, 696 F.3d 740, 754-59 (8th Cir. 2012) stands for

the principle that, "[w]hen a pattern of conduct by prosecutors violates a defendant's due process rights, a Court may dismiss the charges," and parenthetically describes the holding as: "(systematic and intentional coaching of witnesses to provide false testimony is prosecutorial behavior that is an "abuse of official power" that "shocks the conscience" of the court and is grounds for dismissal)." While the Government does not contest that proposition, it is not the legal principle for which *White* stands, nor is it that case's holding.

*White* was a civil action under 42 U.S.C. § 1983, in which the plaintiff, a pardoned inmate exonerated by DNA evidence, sued the defendant-sheriff's department that had investigated him, contending that it had fabricated evidence, coerced confessions and inculpatory testimony, and purposely manipulated the investigation in order to secure the plaintiff's arrest and conviction—facts far afield from defendant Tate's misconduct allegations, even viewed in the light most favorable to him. The Eighth Circuit affirmed the district court's denial of summary judgment based on qualified immunity, because, among other reasons, the evidence involving the sheriff department's misconduct constituted an "abuse of official power" that sufficiently "shocked the conscience" to make out a Due Process claim—a holding which, based on *White*'s record facts, we take no issue with.

*White,* however, has absolutely nothing to do, factually or legally, with this case. It is not even a criminal case. *White* does not involve a federal investigation or prosecution; it does not address conduct by any prosecutor, much less a federal prosecutor; it does not evaluate the integrity of an indictment or discuss the legal principles applicable to a pretrial dismissal of an indictment for grand jury abuse (in fact, neither the word "dismiss" nor "dismissal" appears anywhere in Eighth Circuit's 19-page opinion); and it is completely silent on a district court's supervisory or

11

other authority to dismiss an indictment. *White* lends no legal authority applicable to defendant Tate's claim or the proposition of law for which he cites to it.

Defendant Tate's erroneous representation of the *White* holding and the legal principle for which it stands, particularly coupled with his revisionist interpretation of this Court's order dismissing without prejudice the original indictment, is emblematic of his haste to repeatedly lob unsubstantiated ad hominin attacks upon the prosecutors and law enforcement agents that investigated this case, rather than lock horns with the substantial objective evidence underpinning the charges that he participated in a conspiracy to conceal the Sorenson payments from the Federal Election Commission. There is simply no basis in law or fact for claiming that the grand jury process was abused by prosecutorial misconduct, let alone that there exists a pattern of prosecutorial misconduct.

## III.  CONCLUSION

Defendant Tate's prosecutorial misconduct allegation is baseless. The testimony presented to the grand jury was not false or misleading; rather, it was well-rooted in record evidence, complete, and entirely truthful. What is more, the caselaw defendant Tate cites to support his claim is so factually and legally inapposite as to expose the frivolousness of his dismissal request. Indeed, this motion to dismiss is a blatant effort to distract attention from defendant Tate's own words and deeds, memorialized in contemporaneous e-mail exchanges, which powerfully demonstrate his culpability. The motion should be denied.

Respectfully submitted,

RAYMOND N. HULSER
Chief, Public Integrity Section

By:   /s/ J.P. Cooney
Richard C. Pilger
Director, Election Crimes Branch
J.P. Cooney
Deputy Chief
Public Integrity Section
Criminal Division
United States Department of Justice
Criminal Division
Tel. (202) 514-1412 (office)
Fax: (202) 514-3003
E-mail: richard.pilger@usdoj.gov
joseph.cooney2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record by:

____U.S. Mail  _____ Fax  _____Hand Delivery

__X__ECF/Electronic filing    __X__Other means (e-mail)

RAYMOND N. HULSER
Chief, Public Integrity Section

By:    /s/  J.P. Cooney
Richard C. Pilger
Director, Election Crimes Branch
J.P. Cooney
Deputy Chief
Public Integrity Section
Criminal Division
United States Department of Justice