IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :     Criminal No. 4:15-103
                           :
      vs.                  :
                           :
JESSE R. BENTON,           :     TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and   :          VOLUME II
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X



                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Wednesday, April 27, 2016
                         8:30 a.m.




BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.











                  Terri L. Martin, CSR, RPR, CRR
                  United States Court Reporter
                   Room 189, U.S. Courthouse
                    123 East Walnut Street
                    Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:               JOSEPH P. COONEY, ESQ.
                                 RICHARD C. PILGER, ESQ.
                                 Public Integrity Section
                                 Criminal Division
                                 U.S. Department of Justice
                                 1400 New York Avenue NW
                                 Suite 12100
                                 Washington, D.C.  20005

For Defendant Benton:            ANGELA L. CAMPBELL, JR., ESQ.
                                 Dickey & Campbell Law Firm
                                 301 East Walnut, Suite 1
                                 Des Moines, Iowa  50309

For Defendant Tate:              DAVID A. WARRINGTON, ESQ.
                                 LAURIN H. MILLS, ESQ.
                                 LeClair Ryan
                                 2318 Mill Road, Suite 1100
                                 Alexandria, Virginia  22314

                                 JESSE LINEBAUGH, ESQ.
                                 Faegre Baker Daniels
                                 801 Grand Avenue, 33rd Floor
                                 De Moines, Iowa  50309-8011

For Defendant Kesari:            JESSE R. BINNALL, ESQ.
                                 Harvey & Binnall
                                 717 King Street
                                 Suite 300
                                 Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

  For the Government:

| Fernando Cortes | 115 | 174 Linebaugh 216 Binnall 224 Campbell | 245 | 262 Linebaugh 265 Binnall 267 Campbell |
| Karen LoStracco | 269 | | | |

E X H I B I T S

GOVERNMENT'S EXHIBIT NUMBERS:                    OFFERED   RECEIVED

(See Page 375 for exhibits.)

P R O C E E D I N G S

1
2          (In open court, out of the presence of the jury.)
3          THE COURT:  Please be seated.
4          You had something you wanted to take up this morning?
5          MR. BINNALL:  Just briefly, Your Honor, just what we
6   talked about last night.  What I anticipate doing today, I have
7   a motion that I would like to file under seal that will be
8   available to everyone under seal, along with a brief.  And then
9   I think the probably efficient thing to do, if it would be
10  acceptable to the court, we talked about having the actual
11  privileged documents in camera.  I would also like to file a
12  memorandum along with that in camera that explains the
13  importance of some of them.
14          THE COURT:  Yes.
15          MR. BINNALL:  If that's acceptable.
16          THE COURT:  Yes, absolutely.
17          MR. BINNALL:  And I'm hoping to have the initial
18  filings done by hopefully tonight at some point.
19          THE COURT:  Fine.
20          MR. BINNALL:  And the other thing, just to make sure
21  I've included every subject, I think there are some other
22  motions that are outstanding, and I just wanted to see if that's
23  still on the court's radar.
24          THE COURT:  It is.
25          MR. BINNALL:  I'm not talking about the motion I filed

1  two days ago, but Mr. Kesari still has a motion to dismiss for

2  prosecutorial misconduct and there's some motions in limine.

3          THE COURT:  Yes, I'm aware.

4          MR. BINNALL:  Thank you, Your Honor.

5          THE COURT:  Anything from anybody else before 9:00?

6          Thanks.

7          See you at 9:00.

8          (Recess at 8:35 a.m., until 9:00 a.m.)

9          (In open court, in the presence of the jury.)

10          THE COURT:  Please be seated.

11          Members of the jury, good morning.

12          We're continuing on in the matter of the United States

13  versus Benton, Tate and Kesari.  Mr. Pilger or Mr. Cooney, call

14  your next witness, please.

15          MR. PILGER:  The United States calls Fernando Cortes.

16          THE COURT:  Come forward, sir.

17          THE CLERK:  Please raise your right hand.

18          FERNANDO CORTES, GOVERNMENT'S WITNESS, SWORN

19          THE CLERK:  Please be seated.

20                       DIRECT EXAMINATION

21  BY MR. PILGER:

22  Q.  Good morning, sir.

23  A.  Good morning.

24  Q.  Please state your full legal name for the record.

25  A.  Fernando Cortez-Lira.

1  Q.  And spell your last name, please.

2  A.  C-O-R-T-E-Z hyphen L-I-R-A.

3  Q.  And do you usually go by Fernando Cortes?

4  A.  With an S, correct.

5  Q.  Just getting right to the point, turning your attention to

6  spring of 2011 to summer of 2012, how were you employed?

7  A.  In the spring of 2011 to the summer of 2012, I was employed

8  by the Ron Paul 2012 Presidential Campaign Committee, Inc.

9  Q.  And, to your knowledge, was Ron Paul a candidate for an

10  office?

11  A.  Yes.

12  Q.  What office was that at that time?

13  A.  He was running for the presidential nomination for the

14  Republican Party.

15  Q.  And what position did you hold with the committee supporting

16  that campaign?

17  A.  I was the assistant controller and national Hispanic

18  outreach director.

19  Q.  Had you previously served the Paul Campaign -- or rather

20  another Paul Campaign for President of the United States?

21  A.  Yes.

22  Q.  And when was that?

23  A.  Approximately summer 2007 to summer of 2008.

24  Q.  And what was your title then?

25  A.  I was the controller.

1  Q.  So the Ron Paul Campaign hired you to work in the business

2  of being controller and assistant controller in two different

3  campaigns, right?

4  A.  That is correct.

5  Q.  In the 2012 campaign, you started working on that in 2011;

6  is that right?

7  A.  Yes.

8  Q.  And were you familiar with who the leadership of the

9  campaign was?

10 A.  At the time, yes.

11 Q.  And do you know who Jesse R. Benton is?

12 A.  I do.

13 Q.  Do you see him in the courtroom?

14 A.  I do.

15 Q.  Can you point him out?

16 A.  (Indicating).

17        MR. PILGER:  May the record reflect the identification

18 of defendant Benton, Your Honor?

19        THE COURT:  I leave that as a factual question for the

20 jury.

21 BY MR. PILGER:

22 Q.  And what role did Mr. Benton have in the campaign for

23 President in the 2012 election?

24 A.  He was the chairman of the campaign.

25 Q.  Do you know John Tate?

1  A.  I do.

2  Q.  Do you see him in the courtroom today?

3  A.  I don't believe I do.

4  Q.  You can stand up if you need to see over me.

5  A.  I do, yes.

6  Q.  Can you point him out and describe him by an article of

7  clothing he's wearing?

8  A.  Sure.  He's wearing a suit, a dark suit, blue shirt and a

9  blue tie.

10  Q.  And just for the record, where is he sitting relative to me?

11  A.  Behind you.

12  Q.  And what was his role in the campaign?

13  A.  He was the campaign manager.

14  Q.  In connection with Ron Paul's 2012 campaign effort, were you

15  familiar with Dimitri Kesari?

16  A.  I was, yes.

17  Q.  And did he have a role in the campaign?

18  A.  Yes.

19  Q.  What was that?

20  A.  Deputy campaign manager.

21  Q.  Is he in the courtroom today?

22  A.  He is.

23  Q.  Could you point him out and describe him by an article of

24  clothing?

25  A.  Sure.  He's behind you wearing a dark suit, a light blue

1  shirt and dark blue tie.

2  Q.  When you were serving in the 2012 campaign, where were you

3  physically located?

4  A.  2012, headquarters in Springfield, Virginia.

5  Q.  And tell the jury, what were your duties as the

6  controller -- I'm sorry, as the assistant controller in 2012?

7  A.  As the assistant controller, I was responsible for a lot of

8  the internal functions, accounting functions, accounts payable,

9  accounts receivable and also dealing with staff volunteers.  The

10  headquarters, the day-to-day logistics of offices around the

11  country, including headquarters.

12  Q.  Try to keep your voice up, Mr. Cortes, because the whole

13  courtroom needs to hear you.  You might pull the microphone a

14  little closer.

15           So you worked in HR, correct?

16  A.  Correct.

17  Q.  And you also worked on financial matters, correct?

18  A.  Correct.

19  Q.  And we're not talking about all your duties.  You mentioned

20  Hispanic outreach, other things I haven't asked you about,

21  correct?

22  A.  Correct.

23  Q.  Now, just focusing for a minute on HR, what does that

24  entail?  What went into your work in HR on the 2012 Paul

25  Campaign?

1  A.   When we would hire -- the company would hire someone, they

2  would come to my office to get paperwork to sign W-2s to get

3  basically on board paperwork.

4  Q.   Did you do anything in HR concerning nondisclosures?

5  A.   Yes.

6  Q.   What's a nondisclosure?

7  A.   A nondisclosure, it's an agreement between, in this case, a

8  campaign or staffer or consultant with regards to what each

9  party can talk about the dealings with each other.

10 Q.   And, to your knowledge, when you worked on hires, did

11 everyone have to sign a nondisclosure?

12 A.   Yes.

13 Q.   You talked also about having financial duties.  I want to

14 focus there next, okay; yes?

15 A.   Okay, yes.

16 Q.   So were you responsible for any part of the process of the

17 campaign recording and reporting expenditures?

18 A.   Can you repeat that, sir?

19 Q.   Did you participate in the process of the campaign recording

20 expenditures -- let's talk first about internally.

21 A.   Yes.

22 Q.   And did you have a role or not in transmitting that

23 information on for further processing?

24 A.   Within the campaign, yes.

25 Q.   Okay.  Were you aware that FEC reports would be generated

1  concerning expenditures?

2  A.  Yes.

3  Q.  Do you know how often those reports were generated?

4  A.  Yes, I do.  To my knowledge, it was quarterly.

5  Q.  And in the course of your duties, did the timing of the FEC

6  disclosures play a role in when you would have to be active or

7  less active?

8  A.  Yes.

9  Q.  Can you explain that?

10  A.  Towards the end of the quarter, we would try and get all of

11  the expenditures that had been done during that quarter so that

12  we could actually report it.

13  Q.  And to be clear, were you the person who pressed the button

14  to send reports to the FEC or was that someone else?

15  A.  That was someone else.

16  Q.  And who would do that, to your knowledge?

17  A.  To my knowledge, it would either be Lori Pyeatt or Deana

18  Watts.

19  Q.  And who is Lori Pyeatt?

20  A.  Lori Pyeatt is the treasurer of the campaign.

21  Q.  Do you know if she's related to anybody else in the

22  campaign?

23  A.  Yes.  She's also the daughter of Dr. Ron Paul.

24  Q.  And you said Deana Watts.  Where was she located?

25  A.  Deana was located in Texas, Clute, Texas.

1　Q.　Is that also where Lori Pyeatt was?

2　A.　That's correct.

3　Q.　So either one of those two people could send the report to

4　the FEC, to your knowledge?

5　A.　Correct.

6　Q.　Did you prepare particular records of the campaign for the

7　purpose of causing those reports to the FEC?

8　A.　Yes.

9　Q.　And did you forward such reports to Ms. Watts and/or

10　Ms. Pyeatt?

11　A.　Yes.

12　Q.　Did you have a routine or a practice of making records

13　inside the campaign concerning expenditures?

14　A.　Yes.

15　Q.　Can you describe that to the jury?

16　A.　For invoices, we would -- an invoice would be sent to my

17　office.  I would have either myself or my assistant review it

18　for what kind of expense it was, how much it was, and then I

19　would either approve it or deny it.  If it was approved, it

20　would be moved up to John Tate where he would approve it or

21　deny.  And then if that was approved, then it would be moved up

22　to Deana Watts and Lori Pyeatt for final approval and payment.

23　Q.　You mentioned an assistant.  Who was your assistant?

24　A.　Katie -- well, I had two.  At the beginning of the campaign,

25　it was -- her name is Ann, and then towards the end was Katie

1  Koerber.

2  Q.  Could you spell Koerber for the court reporter?

3  A.  Sure.  K-O-E-R-B-E-R.

4  Q.  And the two assistants, Katie Koerber and Ann, did they work

5  for you in Virginia or somewhere else?

6  A.  In Virginia.

7  Q.  So just walk us through the process of how an expenditure

8  would come in and become a record of the campaign.

9  A.  There were two types of expenditures that I dealt mainly

10  with.  One would be invoice for a company for services rendered

11  such as, let's say, if you bought toilet paper or pens for the

12  office, that would be one kind of invoice.  Another invoice

13  kind -- or rather expenditure would be the expenditure

14  reimbursements for the individuals in the campaign, where an

15  individual would be out in the field in a state spending money

16  on hotels for accommodations, spending on meals, and then they

17  would compile that information into a report which would be sent

18  to my office.

19  Q.  And then what?

20  A.  We would verify that it had the components that would be for

21  an FEC report.

22  Q.  Now, when you say verify, let's explore that for a second.

23  Would you verify it by, for example, calling a hotel and making

24  sure the person stayed there?

25  A.  No.

1    Q.  What do you mean by verify?

2    A.  For the -- like expenditures from employees, we would ask

3    them to accompany each line item that they would want to be

4    reimbursed by a receipt.

5    Q.  And would those items come to you in the first instance or

6    to your assistants, or both?

7    A.  Oftentimes it would be both, but sometimes it would come to

8    her or other times it would come to me; but at some point both

9    of us had the information.

10   Q.  Tell us a little bit more about verifying.  What do you mean

11   by that?

12   A.  We had -- for the expenditures we had a certain number of

13   requirements that we needed in order to send to Texas.  So, for

14   example, we needed to know the name of the vendor, the address

15   of the vendor, the amount that was expensed, the type of expense

16   that it was and match with a receipt that would to us indicate

17   that it was an expense that we would consider reimbursing.

18   Q.  Thank you.

19            If the expenditure came in to you, information about

20   an expenditure came in to you and it lacked one of the things

21   that you talked about, for example, if the amount was missing or

22   if an invoice was missing or if any of those things were

23   missing, what would you do?

24   A.  If there was a missing item, we would basically go back to

25   that individual and ask them if they could provide that missing

1  information.

2  Q.  If the purpose of the expenditure was missing, if there was

3  no indication of the purpose, would you go back to the

4  individual?

5  A.  Not all the time.  If it was an expenditure that -- for

6  example, if it said a hotel chain, we would know that was a

7  lodging expense.  So not always.

8  Q.  If you had any question about the purpose, would you go back

9  to the person?

10 A.  If we didn't know, we would go back and ask.

11 Q.  Would you go beyond asking the person to do any

12 investigation with the vendor?

13 A.  Not that I remember.  We would ask them to give us an

14 explanation as to why they spent the money, but we wouldn't ask

15 to.

16 Q.  You lost me in there.  Who's the "they"?

17 A.  Whoever submitted the expense.

18 Q.  So to be clear, you would ask the person from the campaign

19 submitting information, right?

20         MR. BINNALL:  Objection; leading.

21         THE COURT:  It is leading.

22         Pose a new question.

23 BY MR. PILGER:

24 Q.  Let me go back to my original question.  Let me come at it

25 this way because I know there's a point here.

1              Would you ever talk to vendors concerning how payments

2    should be formatted, made and processed?

3    A.  Unless it was a small business, small owned personal

4    business, they usually had their own invoices already set up;

5    but in the very rare instances that they did not, we gave them

6    the information that we would need for an invoice, such as the

7    usual information that is in most invoices.

8    Q.  If you had that information already from a campaign

9    employee, would you need to do that?

10   A.  No.  We would rarely go back and check that because there

11   are too many expenses to go individually.

12   Q.  Yeah.  Can you give an estimate -- can you describe for the

13   jury the volume of expenditures that you're processing?

14   A.  On an average for an employee out in the field -- we had

15   close to, if I can remember right, maybe over 80 employees that

16   were submitting reports on a bimonthly -- I'm sorry, biweekly

17   cycle, and each one could contain up to 300 different line

18   items.

19   Q.  So if you printed all of that out, it would fill a big book,

20   right?

21   A.  Yes.

22   Q.  See those books over there behind counsel table, those big

23   black binders?

24   A.  Okay.  Yes, I do.

25   Q.  So reporting of expenses, if you printed out all of the

1  expenses, might it fill out one of those binders?

2  A.  At least one, yes.

3  Q.  Now, here is what I want to get to.  Was it sometimes the

4  case that a payment snagged because there was a problem with,

5  say, routing numbers for banks or accounting numbers, that kind

6  of thing?

7  A.  Yes, several times.

8  Q.  Okay.  And then what would happen?

9  A.  If an invoice had been cleared and properly approved and

10 sent to Texas for payment, if there was a snag at the exchange

11 between our bank and their bank because of a routing number,

12 what would happen is the bank of the vendor would send

13 notification to our bank which would then send a notification to

14 Lori Pyeatt and Deana Watts.  They would notify me that the

15 payment didn't go through, or vice versa, before that happened,

16 a vendor would call me or the employee they were working with

17 and that employee would call me and say, hey, this vendor did

18 not receive the money or the funds.

19 Q.  Okay.  So we talked about few situations so far.  So there's

20 a situation where the employee submits the information about the

21 expenditure and that gets processed, right?

22 A.  Correct.

23 Q.  And we've talked about a situation where you might need in

24 some instances to talk to a vendor, and that would include if

25 there's a problem with the banking information, right?

1  A.  Correct.

2  Q.  Okay.  As to that second category where you might end up

3  talking to the vendor, how often did that happen?  For the big

4  books full of expenses, did that happen, you know, all the time,

5  every page, very rarely, what?  You describe it.

6  A.  Very --

7          MR. BINNALL:  Object; compound.

8          THE COURT:  Overruled.

9          You can answer the question.

10  A.  Very rarely would I contact the vendor, and it would be

11  rare -- or it would happen several times where we would go back

12  to the employee or staffer to then go back and talk to the

13  vendor.

14  BY MR. PILGER:

15  Q.  So if you identified an issue, your first step would be to

16  go to the employee to solve it, correct?

17  A.  Correct.

18  Q.  Were you busy?

19  A.  During the campaign?

20  Q.  Yes.

21  A.  Yes, very, very much so.

22  Q.  And was it your job to process the expenditure information

23  among other duties?

24  A.  Correct.

25  Q.  And it was your job to process those expenditures as a

1   priority and efficiently or could you take your time and do it

2   whenever you wanted?

3   A.  It was a priority.

4   Q.  To your knowledge, did Mr. Benton and Mr. Kesari and

5   Mr. Tate, did they all have expenses?

6   A.  Yes.

7   Q.  Did Mr. Benton and Mr. Tate and Mr. Kesari, did they submit

8   their expenses through your process?

9   A.  Yes.

10  Q.  To your knowledge, did they provide the information that was

11  required so that you could properly report up to Texas?

12  A.  Yes.

13  Q.  I guess that's down to Texas.

14       You talked about approvals, and I believe you

15  mentioned approvals by Mr. Tate.  Can you describe when and how

16  you would get approvals for expenses?

17  A.  Once my assistant and I had verified the expenditures, then

18  we would compile the packets of expense reports or invoices that

19  needed to be approved and then we would either, if he was in the

20  office, physically walk over to have him sign off on them or

21  send an e-mail indicating that it had been approved by the

22  process and awaiting his approval.

23  Q.  Was Mr. Tate more or less involved in approving the

24  financial expenditures by the Paul Campaign?

25  A.  I'm sorry?

1 Q.  Did he get involved in this?  Was he paying attention, to

2 your knowledge, to the expenditures?

3 A.  To my knowledge, he was paying attention to them, yes.

4 Q.  Did he pay more attention to bigger expenditures?

5 A.  Yes.

6 Q.  Now, we talked a little bit about how you had to have the

7 purpose of the expenditure, right?

8 A.  Correct.

9 Q.  And sometimes you could tell that just from the invoice,

10 right; it's a hotel.  What could you tell about the purpose?

11 A.  If it was from a hotel, it would likely be lodging and given

12 the amount it would be lodging expense.

13 Q.  And in such an instance, would you bother the employee to

14 give you more information about that?

15 A.  No.

16 Q.  At times, though, did the employees send you information and

17 specify the purposes of the expenditure to help you get this

18 processed?

19 A.  Yes.  If -- especially in the expense reimbursement forms,

20 it was one of the line items that was required.

21 Q.  And did the campaign have an internal reporting system that

22 relied on a coding?

23 A.  Yes.

24 Q.  And by that -- well, you explain that.  What's the coding

25 process?

1   A.  To my knowledge, the coding -- we coded them with a number

2   correlating from an expense, type of expense.  So, for example,

3   if it was a lodging expense, it had a corresponding number to

4   it, that then would be submitted as part of the report to Texas

5   where they would then compile those expenses by category and

6   submit to the FEC according to by expenses.

7   Q.  And the numbers, the code numbers that you would apply, did

8   you have a list of those?

9   A.  Yes, I did.

10  Q.  And where did you get that list?

11  A.  From Deana Watts.

12          MR. PILGER:  One moment, Your Honor.

13          (Pause.)

14  BY MR. PILGER:

15  Q.  So, Mr. Cortes, let's talk a little bit about some exhibits,

16  okay.  So you're going to see them on the screen, and we'll talk

17  about them a little bit as a preliminary matter.

18          So showing you Government's Exhibit 77 for

19  identification, which is not in evidence.  Do you recognize

20  that?

21  A.  I do.

22  Q.  Is this an e-mail string that starts, reading from the

23  bottom up, on the first page with an e-mail from

24  SonnyIzon@aol.com to Dimitri Kesari, to DKesari@aol.com?

25  A.  That's correct.

1  Q.  Does it concern invoices for service -- or an invoice, I

2  should say?

3  A.  Yes.

4  Q.  Okay.  And the address DKesari@aol.com, to your knowledge,

5  who used that address?

6  A.  Dimitri Kesari.

7        MR. PILGER:  We would offer Government's 77 into

8  evidence, Your Honor.

9                           (Government Exhibit 77 was

10                             offered in evidence.)

11       MS. CAMPBELL:  Your Honor, we would object as to

12  Mr. Benton that he's not on the e-mail.

13       THE COURT:  Overruled.

14       77 is received.

15                          (Government Exhibit 77 was

16                            received in evidence.)

17  BY MR. PILGER:

18  Q.  So we'll just wait for the exhibit to come up for everybody.

19       Ms. Draughn, if you could just focus in on the bottom

20  of page 1.

21       Can you read that, sir?

22  A.  Pardon?

23  Q.  Can you see that okay?

24  A.  Oh, yes, I can see it.

25  Q.  Okay.  So this is an e-mail message from SonnyIzon@aol.com,

1  right?

2  A.  Right.

3  Q.  And it was on February 5, 2012, right?

4  A.  Correct.

5  Q.  And it was to Dimitri Kesari, right?

6  A.  Correct.

7  Q.  What's the subject?

8  A.  Production services invoice.

9  Q.  Okay.  Did you write that?

10  A.  I did not.

11  Q.  Okay.  And then read the text, "Hi Dimitri."

12  A.  Hi Dimitri.

13        Attached is the production services invoice we

14  discussed.  Let me know if you need anything else.  By the way,

15  the web site for my latest holocaust documentary is up.  Please

16  check it out when you come up for air.

17  Q.  And then there's a link to a web site, right?

18  A.  Correct.

19  Q.  Okay.  Now, moving up the e-mail chain, there's a message

20  from Dimitri Kesari -- I think we went past it.  The other way,

21  Ms. Draughn, please.  A little more.  Can you just get that

22  down -- there we go, right there.

23        Can you read that, Mr. Cortes?

24  A.  I can.

25  Q.  Is this an e-mail from Dimitri Kesari dated February 8,

1    2012, to you?

2    A.   Yes.

3    Q.   And what's the subject say?

4    A.   Forward:  Production services invoice.

5    Q.   Is this Dimitri Kesari forwarding the e-mail we just talked

6    about lower in the string?

7    A.   Yes.

8    Q.   And, Ms. Draughn, if you could go up to the top.

9              This is the last e-mail in the string, right?

10   A.   Correct.

11   Q.   And this is the header.  This is an e-mail from you, right?

12   A.   Correct.

13   Q.   And it's sent Wednesday, February 8, 2012, at 11:08 in the

14   morning, right?

15   A.   Correct.

16   Q.   And who did you send it to?

17   A.   Lori Pyeatt, Deana Watts.

18   Q.   Who did you copy it to?

19   A.   Katie Koerber, Dimitri Kesari.

20   Q.   Again, just to remind the jury, Katie Koerber is who?

21   A.   She's my assistant.

22   Q.   And what's the subject?

23   A.   Forward:  Production services invoice.

24   Q.   Is there an attachment?

25   A.   There is.

1  Q.  And just read out the title of that attachment?

2  A.  INVDKesari.xls.

3  Q.  So that has the name "Kesari" in the attachment name, right?

4  A.  Correct.

5  Q.  Okay.  Let's go down a little bit, and I'm going to ask you

6  to read the e-mail text until you get to the banking and routing

7  information and then stop.

8  A.  Okay.

9  Q.  Go ahead and read that out loud, Mr. Cortes.

10  A.  This is for Ron Paul 2012 PCC.

11          Lori and Deana.

12          Please wire the following to Interactive Communication

13  Technology.

14          Amount:  $38,125.

15          Code 60110.

16          Wire to.

17  Q.  And then after "wire to," it identifies who's going to

18  receive the money, right?

19  A.  Correct.

20  Q.  If we could scroll -- yeah, we're good.

21          And the recipient of the money is listed there as ICT,

22  Incorp, right?

23  A.  Right.

24  Q.  And what bank?

25  A.  Bank of America.

1  Q.  And there's a routing number?

2  A.  Correct.

3  Q.  There's an account number?

4  A.  Yes.

5  Q.  And then it says the branch, right?

6  A.  Correct.

7  Q.  Where is the branch?

8  A.  College Park, Maryland, MD.

9  Q.  If we could go to page 3 of this exhibit.

10        What is that, Mr. Cortes?  We'll focus in on pieces,

11  but hopefully you can see enough to tell the jury what it is.

12  A.  This is the invoice that was attached to the e-mail.

13  Q.  Okay.  So if we could, Ms. Draughn, focus on the top third

14  before the description.

15  A.  Okay.

16  Q.  Ms. Draughn, if you could get the letterhead in there, too,

17  please.  There we go.

18        Okay.  Who is this invoice from?

19  A.  The invoice is from Interactive Communication Technology,

20  Inc.

21  Q.  And is it from an address in Hyattsville, Maryland?

22  A.  It is.

23  Q.  And is a customer listed that ICT is invoicing?

24  A.  Yes.

25  Q.  What's the name of the customer on the invoice?

1  A.  Ron Paul PCC Inc., attention Dimitri Kesari.

2  Q.  And is there a date on this invoice over to the right?

3  A.  Yes.

4  Q.  Can you read that out to the jury?  I'm not sure they could

5  all see that.

6  A.  February 2, 2012.

7  Q.  Okay.  Ms. Draughn, if you could scroll down to the

8  description box.

9          Is there one line item of description in this invoice?

10  A.  Yes.

11  Q.  And what is it?

12  A.  Quantity 1, production services, and then a unit price of

13  38,125, a total of $38,125.

14  Q.  And, Ms. Draughn, if you could keep scrolling down.

15          When was that due?

16  A.  I'm sorry, due upon receipt.

17  Q.  And, Ms. Draughn, if you would keep scrolling down.

18          What's the total amount of this invoice?

19  A.  $38,125.

20  Q.  Thank you, Mr. Cortes.

21          Turning your attention to Government's Exhibit 76,

22  which is not yet in evidence.

23          Tell me when you can see that.

24  A.  I can see it.

25  Q.  Okay.  As a preliminary matter, is this an e-mail string

1  involving Sonny Izon, Dimitri Kesari, and yourself?

2  A.  Yes.

3  Q.  And does it concern the invoice we were just talking about?

4  A.  Yes.

5  Q.  Is that invoice attached?

6        And, Ms. Draughn, could you scroll down and show the

7  second page.

8  A.  Oh, yes.

9  Q.  Okay.  And then going back to the first page --

10        MR. PILGER:  The government will offer 76 into

11  evidence at this time.

12                          (Government Exhibit 76 was

13                           offered in evidence.)

14        MS. CAMPBELL:  Your Honor, defendant Benton objects as

15  hearsay to him since he is not on this e-mail.

16        THE COURT:  Overruled.

17        76 is received.

18                          (Government Exhibit 76 was

19                           received in evidence.)

20        MR. PILGER:  We're just waiting for it to come up on

21  the big screen.

22  BY MR. PILGER:

23  Q.  So, Ms. Draughn, if you could focus in on the first e-mail

24  that starts in the middle of the page.

25        That's the original e-mail from Government's 77 that

1  we already talked about, right?

2  A.  Correct.

3  Q.  This is an e-mail from Sonny Izon to Dimitri Kesari saying,

4  attached is the production services invoice we discussed,

5  correct?

6  A.  Correct.

7  Q.  And then if we can move up, Ms. Draughn, there's an e-mail

8  from Dimitri Kesari to you, right?

9  A.  Yes.

10  Q.  And Dimitri Kesari e-mailed you on February 8, 2012, at

11  11:29, right?

12  A.  Correct.

13  Q.  And the subject was forwarding:  Production services

14  invoice, right?

15  A.  Correct.

16  Q.  And what did Mr. Kesari tell you?

17  A.  It says, please wire tomorrow morning.

18        This is approved by Jesse.

19  Q.  And is that what Dimitri Kesari told you in this e-mail?

20  A.  Yes.

21  Q.  Turning your attention to Government's Exhibit 59 for

22  identification, which is not yet in evidence.

23        Do you recognize this?

24  A.  Yes.

25  Q.  Is this an e-mail from yourself to John Tate, Jesse

1 Benton -- John Tate and Jesse Benton on February 22, 2012?

2 A.  Yes.

3 Q.  Does it concern expenses?

4 A.  Yes.

5          MR. PILGER:  And, Your Honor, may I approach?  I

6 believe you don't require us to ask each time, correct?

7          THE COURT:  Correct.

8 BY MR. PILGER:

9 Q.  Showing you Government's 59, there's a front page that

10 you're seeing on the screen and then there's a voluminous report

11 attached to it; is that correct?

12 A.  That is correct.

13 Q.  You've previously reviewed that report, correct?

14 A.  Yes.

15 Q.  And it concerned -- it contains information concerning that

16 $38,000 invoice that we were just talking about, doesn't it?

17 A.  Correct.

18          MR. PILGER:  We offer Government's 59 into evidence.

19                         (Government Exhibit 59 was

20                          offered in evidence.)

21          MR. LINEBAUGH:  Your Honor, no objection provided the

22 entire exhibit is admitted.  There's a large attachment in this

23 e-mail.  We want to make sure everything is included.

24          THE COURT:  Received.

25

1                    (Government Exhibit 59 was

2                    received in evidence.)

3    BY MR. PILGER:

4    Q.  So Government's Exhibit 59, as you just said, is -- I need

5    to wait for it to come up on the big screen, but let's just talk

6    while we're waiting.

7           There's an e-mail from you to John Tate and Jesse

8    Benton on February 22nd, correct?

9    A.  Correct.

10   Q.  What's the subject?

11   A.  Expenses since January 1, 2012.

12   Q.  And is there an attachment as you testified?

13   A.  Yes.

14   Q.  Is it approximately 77 pages?

15   A.  Approximately.

16   Q.  Please read the body to the jury.

17   A.  John and Jesse.

18          Here is the full breakdown of the expenses since

19   January 1, 2012.

20          The 8,000 at the bottom, parentheses, one million in

21   Am Ex, covers events/car rentals/et cetera, end parentheses.

22          I can send the other breakdown if you want but I'll be

23   away from a comp until later tonight, parentheses, 11-on, end

24   parentheses.

25   Q.  And when you say, "I will be away from a comp," what do you

1  mean?

2  A.  Computer, access to a computer.

3  Q.  You're letting them know you're going to be away from a

4  computer, correct?

5  A.  Correct.

6  Q.  Was this a regular part of your duties to submit expense

7  reports in this detail to John Tate and Jesse Benton?

8  A.  When asked, yes.

9  Q.  And did that happen often or not often or what?

10  A.  Not to this degree of reporting, but from time to time.

11  Q.  Okay.  So did you generate this in response to a request?

12  A.  To my knowledge or to my recollection, yes.

13  Q.  Okay.  And you sent it again to John Tate and Jesse Benton,

14  correct?

15  A.  Correct.

16  Q.  Let's just look at the first page.  And I'm sorry, to be

17  clear, the first page was the e-mail, the first page of Exhibit

18  59; but now we're looking at the first page of the attachment,

19  correct?

20  A.  Correct.

21  Q.  And if you go down to the bottom category, 60110

22  Ms. Draughn, if you could enlarge that for us.

23          Bear with us, Mr. Cortes.

24          Now, Ms. Draughn, if you could go to the bottom third.

25  There we go.

1      Can you see that, Mr. Cortes?

2  A.  I can.

3  Q.  Okay.  The second-to-last line item on the first page of

4  this document, what does it say?

5  A.  It's a line item.  It says check, February 8, 2012, EFT

6  Interactive Commu, 11100 FNBL, 38,125, and last line $55,520.34.

7  Q.  So let's just go through that and make sure everybody

8  understands each part of it.

9      First of all, at the top of that section of the

10 report, there's that code, 60110, right?

11 A.  Correct.

12 Q.  And it says audio/visual expenses, right?

13 A.  Correct.

14 Q.  And this is in the report that you sent on request to John

15 Tate and Jesse Benton, right?

16 A.  Correct.

17 Q.  And as you move across the line item, which is the second to

18 last and very hard I'm sure for the jury to see, there's a date

19 of February 8, 2012, you said, right?

20 A.  Correct.

21 Q.  And you said it says EFT.  Just in case anyone doesn't know,

22 what's that mean?

23 A.  Electronic funds transfer; in other words, a wire.

24 Q.  And then on this printout it says, "Interactive Commu..."

25      Can you explain why it got cut off?

1  A.  The program that's used to generate these reports would cut

2  off the information.  The information is still there.  It's just

3  a matter of the cell not being expanded to cover the entire

4  line.

5  Q.  From the amount of the second-to-the-last column, the amount

6  of $38,125, do you recognize and recall what Interactive Commu

7  stood for?

8  A.  Yes.

9  Q.  What was that?

10  A.  Interactive Communication.

11  Q.  And then scanning across there's a category called split

12  that says 11100 FNBL and then it continues.  What is that about?

13  A.  I'm not entirely sure.  I don't know.

14  Q.  Was that generated by the software or by you?

15  A.  I'm assuming the software.

16  Q.  Not by you?

17  A.  Not by me.

18  Q.  But the coding, the decision to put it in 60110, is that a

19  decision made by you?

20  A.  Yes, in conjunction with the invoice.

21  Q.  Continuing on across, you have the amount of 38,125, right?

22  A.  Correct.

23  Q.  And then the last thing is a balance.  It may be obvious,

24  but just explain to the jury, why is there a balance column?

25  A.  The balance column, it's a running tab of the expenses

1    within the category.  So once you add that line of $38,125 to

2    previous line of $17,395.34, it gives you a running total of

3    55,520.34.

4    Q.  And then, Ms. Draughn, if you could zoom out to show that

5    entire first page again.

6         I know the jury can't see all of those line items, but

7    can you, Mr. Cortes?

8    A.  Yes, I can.

9    Q.  Okay.  On this document -- and I'm going to ask you to

10   explain this because I'm not sure the jury can see these

11   numbers, but they'll have this exhibit later.  If you could tell

12   the jury how many dollar amounts are listed that are over --

13   that are five figures or over?

14   A.  Just on the amount column, there's only three, not including

15   the total.

16   Q.  Not including the total, fair point.

17        And two of those are under advertisement, and they're

18   both to Saber Communicati, right?  It's cut off?

19   A.  Right.

20   Q.  And the last one is to Interactive Communication, right?

21   A.  Correct.

22   Q.  And the other expenses are smaller, right?

23   A.  Significantly.

24   Q.  Let me just approach and I'll just flip to a couple of pages

25   at random.  Are almost all of the expenditures listed under a

1  hundred dollars?

2  A.  Yes.

3  Q.  If we could turn now to Government's Exhibit 84b, which is

4  not yet in evidence.

5          Do you see that, Mr. Cortes?

6  A.  Yes.

7  Q.  Do you know what it is?

8  A.  Yes.

9  Q.  Is it an e-mail involving, reading from the bottom up, Sonny

10 Izon and Dimitri Kesari at first?

11 A.  Yes.

12 Q.  Does it concern invoicing?

13 A.  Yes.

14 Q.  And then looking up at the next e-mail in the string, is

15 there an e-mail from Dimitri Kesari to you?

16 A.  Yes.

17 Q.  And then reading up in the string, is there an e-mail from

18 you to John Tate and a response?

19 A.  Yes.

20          MR. PILGER:  I would offer 84b in evidence, Your

21 Honor.

22                              (Government Exhibit 84b was

23                               offered in evidence.)

24          MS. CAMPBELL:  Objection as to Jesse Benton, Your

25 Honor, as he is not on this e-mail, so it's hearsay.

1      THE COURT:  Overruled.

2      84b is received.

3                            (Government Exhibit 84b was

4                            received in evidence.)

5      MR. PILGER:  Okay.  Ms. Draughn, if we could start at

6  the bottom where it says original message at the end.  Right,

7  thank you.

8  BY MR. PILGER:

9  Q.  Can you see that, Mr. Cortes?

10 A.  Yes.

11 Q.  To be clear, this is an e-mail from Sonny Izon, Wednesday,

12 March 21, 2012, right?

13 A.  Correct.

14 Q.  And it's to Dimitri Kesari at the e-mail address you

15 recognized, right?

16 A.  Correct.

17 Q.  What's the subject?

18 A.  February invoice.

19 Q.  And please read the text.

20 A.  Hey Dimitri.

21      Attached is the invoice for services rendered in

22 February.  Let me know if you need anything else.

23      Best, Sonny.

24 Q.  And is there an attachment listed on this at the very bottom

25 of this page?

1  A.  Yes.

2  Q.  And just read out the title of that attachment.

3  A.  INVDKesari3.xls.

4  Q.  So the name "Kesari" is in the title of that document,

5  right?

6  A.  Correct.

7  Q.  And then, Ms. Draughn, if you could move up to the next

8  message where it says forwarded message down to the word

9  "Jesse."  If you could zoom in on that.

10        Did I flip the e-mail -- I'm sorry, did Dimitri Kesari

11  flip the e-mail that he had received from Sonny Izon to you on

12  April 3rd?

13  A.  He had forwarded it, yes.

14  Q.  Yeah.  I said -- okay.  That's better.  Forwarded the e-mail

15  to you on April 3rd of 2012, correct?

16  A.  Correct.

17  Q.  And did Mr. Kesari say anything to you when he forwarded

18  that e-mail from Sonny Izon?

19  A.  Yes.

20  Q.  What did he say?

21  A.  Approved by Jesse.

22  Q.  Okay.  And, Ms. Draughn, if you would go to the last e-mail

23  in the chain -- or the last two, I should say, from the very top

24  to the question mark.

25        I think you're going to need to make it a little

1  smaller, Ms. Draughn, and zoom out.  There we go.

2         The next e-mail reading up is on April 3, 2012, at

3  11:59 a.m., correct?

4  A.  Correct.

5  Q.  You, Fernando Cortes, wrote what?

6  A.  Approved, question mark.

7  Q.  Who did you address that to?

8  A.  John Tate.

9  Q.  And then going to the very top, did John Tate send you a

10  response on April 3rd within minutes to you?

11  A.  Yes.

12  Q.  And what was the subject of his response?

13  A.  Subject regarding -- or Re, regarding, February invoice.

14  Q.  And what did it say?

15  A.  Approved.

16  Q.  Thank you.

17         Turning your attention to Government's Exhibit 85 not

18  yet in evidence.

19         You can see that, right?

20  A.  Yes.

21  Q.  Okay.  So some preliminary questions.

22         This is another e-mail, right?

23  A.  Correct.

24  Q.  And reading from the bottom up, this starts as an e-mail

25  from Sonny Izon to Dimitri Kesari again, correct?

1  A.  Correct.

2  Q.  Does it concern an invoice?

3  A.  Yes.

4  Q.  And then moving further up in the e-mail, there is a message

5  from Dimitri Kesari forwarding that to you, right?

6  A.  Correct.

7  Q.  And referencing Jesse, correct?

8  A.  Correct.

9  Q.  And then there is a communication with John Tate about the

10  invoice, correct?

11  A.  Correct.

12          MR. PILGER:  We offer 85 into evidence.

13                            (Government Exhibit 85 was

14                            offered in evidence.)

15          MS. CAMPBELL:  Your Honor, same objection; hearsay as

16  to defendant Benton.

17          THE COURT:  Overruled.

18          85 is received.

19                            (Government Exhibit 85 was

20                            received in evidence.)

21          MR. PILGER:  Same drill, Ms. Draughn, if you could

22  focus on the bottom e-mail first and work our way up.

23  BY MR. PILGER:

24  Q.  So the first e-mail here is from Sonny Izon to you, right?

25  A.  No.

1  Q.  I'm sorry, from Sonny Izon to Dimitri Kesari?

2  A.  Correct.

3  Q.  I stand corrected.  Sonny Izon e-mailed Dimitri Kesari on

4  March 26, 2012, correct?

5  A.  That is correct.

6  Q.  What's the subject?

7  A.  March invoice.

8  Q.  And what's the text say?

9  A.  Hi Dimitri.

10         Here is the invoice for March.

11         Peace, Sonny.

12  Q.  And, Ms. Draughn, if you could move up in the e-mail chain,

13  please, to forwarded message ending Jesse.  Can we zero in on

14  that?

15         On April 3, 2012, Dimitri Kesari forwarded what he had

16  received from Sonny Izon to you, correct?

17  A.  Correct.

18  Q.  And what did he say when he did that?

19  A.  Approved by Jesse.

20  Q.  Moving to the top two e-mails starting with from and ending

21  with a question mark, Ms. Draughn.

22         And this last e-mail or two e-mails again has at the

23  bottom of the box we're looking at a message from you, right?

24  A.  Correct.

25  Q.  And was that on April 3rd?

1  A.  Yes.

2  Q.  The same date, correct?

3  A.  Correct.

4  Q.  That's the same date as you got the message from Dimitri

5  Kesari below?

6  A.  Yes.

7  Q.  Processed it right away, right?

8  A.  Yes.

9  Q.  So on April 3rd at 12 o'clock, you wrote, approved, question

10  mark, right?

11  A.  Correct.

12  Q.  And who did you send that to?

13  A.  John Tate.

14  Q.  And what was the response from John Tate?

15  A.  Approved.

16  Q.  And that was on the e-mail with the subject line regarding

17  March invoice, correct?

18  A.  Correct.

19  Q.  Turning your attention to Government's Exhibit 88 for

20  identification, not yet in evidence.

21          THE COURT:  Why don't you just offer this one.

22          MR. PILGER:  We offer it in evidence, Your Honor.

23                          (Government Exhibit 88 was

24                          offered in evidence.)

25          THE COURT:  Received.

1                    (Government Exhibit 88 was

2                    received in evidence.)

3   BY MR. PILGER:

4   Q.  While we're waiting for it to come up on the big screen,

5   let's just start talking to the jury a little bit about this.

6   There's an e-mail and there's an attached invoice, correct?

7   A.  Correct.

8   Q.  Ms. Draughn, could you just show him that invoice.  That's

9   okay.  Yeah, there we go.

10          And then I'm going to take you back to the e-mail.

11  Ms. Draughn, sorry.  This is an exchange that we'll zero in on

12  the bottom first, please, Ms. Draughn.

13          So here we have Sonny Izon writing to someone.  Who's

14  he writing to?

15  A.  To Dimitri Kesari.

16  Q.  On what date?

17  A.  May 2, 2012.

18  Q.  What's the subject?

19  A.  April invoice.

20  Q.  And what did Sonny Izon say to Dimitri Kesari?

21  A.  Hey Dimitri.

22          Here's the production services invoice for April 2012.

23  Hope you are doing well.

24          Peace, Sonny Izon.

25  Q.  There's a phone number, and I'll stop at that for the

1  record.

2          Moving up to the top e-mail in this string, Dimitri

3  Kesari forwarded that to someone.  Who was that?

4  A.  To me.

5  Q.  And is the subject forward:  April invoice?

6  A.  Yes.

7  Q.  Is the attachment -- does the attachment have a title that

8  includes the word "Kesari"?

9  A.  Yes.

10 Q.  And what's the text of the message that came to you from

11 Dimitri Kesari?

12 A.  Approved by Jesse.

13 Q.  And then if we can just briefly look at the invoice again,

14 Ms. Draughn.

15         Is this another invoice from Interactive Communication

16 Technology?

17 A.  Yes, it is.

18 Q.  And I'm just going to call that ICT.  Do you understand

19 that's what that means, Interactive Communication Technology,

20 right?

21 A.  Yes.

22 Q.  So ICT invoiced the Ron Paul Campaign again, right?

23 A.  Yes.

24 Q.  If you could zero in on the top, Ms. Draughn.

25         To whose attention was this invoice directed?

1  A.  Ron Paul PCC Inc., attention Dimitri Kesari.

2  Q.  Proceeding down the invoice, is there one line item listed?

3  A.  Yes.

4  Q.  And what is that?

5  A.  Quantity 1, production services April, unit price, 8,850,

6  total $8,850.

7  Q.  And that's the total for the entire invoice, correct?

8  A.  That is correct.

9  Q.  Turning your attention to Government's Exhibit 89, which is

10  not yet in evidence.

11        MR. PILGER:  We'll offer it in evidence, Your Honor.

12                         (Government Exhibit 89 was

13                          offered in evidence.)

14        THE WITNESS:  I'm sorry, could I get a glass?

15        MR. PILGER:  Oh, yes.  I'm sorry.

16        THE COURT:  Received.

17                         (Government Exhibit 89 was

18                          received in evidence.)

19  BY MR. PILGER:

20  Q.  So this is in evidence now and it's on the screen in front

21  of you.  This e-mail, unlike the other ones, reads

22  chronologically from the top down, correct?

23  A.  Correct.

24  Q.  So the first e-mail is actually at the top helpfully.

25        Let's zero in on that.

1          Is this an e-mail from Dimitri Kesari to you?

2  A.  Yes.

3  Q.  On what date?

4  A.  Wednesday, May 2, 2012.

5  Q.  And what does the e-mail text say?

6  A.  Approved by Jesse, and then it's a forwarded message.

7  Q.  And we're going to talk about the forwarded message which is

8  below it.  So we scroll down a little bit or we look down a

9  little bit and we see a message from whom?

10  A.  From SonnyIzon@aol.com.

11  Q.  Do you need a second to take a drink?  I hear you getting

12  hoarse.  Just let us know.

13  A.  All right.

14  Q.  And the forwarded message was from Sonny Izon to Dimitri

15  Kesari, correct?

16  A.  Correct.

17  Q.  And it concerned a subject April invoice?

18  A.  Yes.

19  Q.  Did the text say, hey, Dimitri.

20          Here's the production services invoice for April 2012.

21  Hope you are doing well?

22  A.  Yes.

23  Q.  And then there's the invoice -- I'm sorry, then there's an

24  e-mail at the very bottom.  We'll just wait for the scroll.

25  There we are.  Right there.  Where there's a message from --

1   e-mail message from yourself, Fernando Cortes, to Katie Koerber,

2   and you said, please prepare for wire, right?

3   A.   Right.

4   Q.   And you did that the same day you received the message from

5   Dimitri Kesari, right?

6   A.   Correct.

7   Q.   And what does it mean to prepare something for wire?

8   A.   That instruction refers to Ms. Koerber preparing text, being

9   prepared for -- that outlines what the expense is, who it was

10  from and what it was for as far as coding and how much it was

11  for, and once that preparation was made, that e-mail was

12  prepared, then I would send that to be approved and then

13  ultimately, if approved, send that information down to Texas.

14  Q.   And then there's an attachment that's the same invoice that

15  we talked about before, right?

16  A.   Correct.

17  Q.   Turning your attention to Government's Exhibit 93 not yet in

18  evidence.

19            MR. PILGER:   The government offers 93, Your Honor.

20                              (Government Exhibit 93 was

21                               offered in evidence.)

22            THE COURT:   Received.

23                              (Government Exhibit 93 was

24                               received in evidence.)

25  BY MR. PILGER:

1  Q.  So this is -- I'll wait until the jury can see.

2        This is an e-mail from Dimitri Kesari on May 24, 2012,

3  to yourself, correct?

4  A.  Correct.

5  Q.  What's the subject?

6  A.  Forward:  May invoice.

7  Q.  Is there an attachment with the word "Kesari" in the title?

8  A.  There is.

9  Q.  And what's the text say?

10 A.  This should be the last one.

11 Q.  Dimitri Kesari wrote that to you, right?

12 A.  Correct.

13 Q.  And then looking at the invoice, this is another invoice

14 from ICT, correct?

15 A.  Correct.

16 Q.  And the invoice is directed at the Ron Paul Campaign,

17 attention Dimitri Kesari, right?

18 A.  Correct.

19 Q.  Is there one line item in this invoice?

20 A.  Yes.

21 Q.  What does the line item say?

22 A.  Quantity 1, production services, parenthesis May, unit price

23 $8,850, total $8,850.

24 Q.  And that's the total for the entire invoice, right?

25 A.  Correct.

1  Q.  Turning your attention to Government's 93 not yet in

2  evidence -- I'm sorry; 95 not yet in evidence.

3        MR. PILGER:  The government offers 95, Your Honor.

4                        (Government Exhibit 95 was

5                         offered in evidence.)

6        THE COURT:  Received.

7                        (Government Exhibit 95 was

8                         received in evidence.)

9  BY MR. PILGER:

10  Q.  We're just waiting until the jury can see, Mr. Cortes.

11        Is this an e-mail chain?

12  A.  Yes.

13  Q.  And this goes bottom up, correct?

14  A.  Correct.

15  Q.  So if we could just focus in on the first e-mail,

16  Ms. Draughn.  If we could just move up and get the header there.

17        Thank you.

18        This is a message from Katie Koerber, correct?

19  A.  Correct.

20  Q.  And to remind the jury, she's your assistant, right?

21  A.  Correct.

22  Q.  It's May 29th; yes?

23  A.  Yes.

24  Q.  And what's the subject?

25  A.  Wire - Interactive Communication Technology, Inc.

1  Q.  And who is this to?

2  A.  To me.

3  Q.  Go ahead and read the body of this e-mail until you get to

4  the routing information.

5  A.  This is for Ron Paul 2012 PCC.

6           Lori and Deana.

7           Please wire the following to Interactive Communication

8  Technology, Inc.

9           Amount:  $8,850.

10          Code 60110.

11          Invoice number 201205 --

12 Q.  You don't have to read the invoice number.

13          Moving down, the account that the wire is to be sent

14 to is for what company?

15 A.  ICT, Incorp.

16 Q.  And is that at a Bank of America branch in College Park,

17 Maryland?

18 A.  Yes.

19 Q.  Okay.  So is this an example of -- tell the jury whether or

20 not this is an example of what would happen when Katie Koerber

21 prepared something for a wire?

22 A.  Yes.  This would be an accurate preparation of an invoice.

23 Q.  And is this the kind of internal campaign record made and

24 kept in the ordinary course of your business?

25 A.  Yes.

1   Q.   Okay.   Moving up the e-mail chain.   Ms. Draughn, if you

2   could -- you're good.   Thank you, Ms. Draughn.

3         There's two more e-mails here, right?

4   A.   Correct.

5   Q.   You wrote to John Tate on the 29th, the same day you got the

6   message from Katie Koerber, right?

7   A.   Correct.

8   Q.   And the subject was Forward:   Wire - Interactive

9   Communication Technology, Inc., right?

10   A.   Correct.

11   Q.   And what did you say?

12   A.   Approved, question mark.   Dimitri said it is the last one.

13   Q.   And did John Tate respond to you on that same day later that

14   morning?

15   A.   Yes.

16   Q.   And what did he say?

17   A.   Approved.

18   Q.   Turning your attention to Government's 98.

19       MR. PILGER:   The government offers 98, Your Honor.

20                     (Government Exhibit 98 was

21                     offered in evidence.)

22       THE COURT:   Received.

23                     (Government Exhibit 98 was

24                     received in evidence.)

25   BY MR. PILGER:

1   Q.  So while we're waiting for it to come up, 98 is another

2   e-mail attaching another invoice, correct?

3   A.  Correct.

4   Q.  Let's start with the -- this is another bottom up e-mail.

5   Let's start at the bottom where it says original message down to

6   Sonny.

7          This is a message from Sonny Izon to Dimitri Kesari,

8   right?

9   A.  Correct -- oh, yes, yes.

10  Q.  Take your time.  Let's get it right.

11         It's to Dimitri Kesari, correct?

12  A.  Yes.

13  Q.  From Sonny Izon?

14  A.  Correct.

15  Q.  And that's on Monday, June 18, 2012, right?

16  A.  Correct.

17  Q.  What's the subject?

18  A.  June invoice.

19  Q.  And then read the body, please.

20  A.  Hi Dimitri.

21         Hope you are well.  Since I will be on travel for most

22  of the rest of the month, I'm sending you the June invoice.

23         Peace, Sonny.

24  Q.  You skipped over a sentence.  Oh, it's redacted.  Never

25  mind, never mind.  Don't worry about that.

1    Moving up the e-mail chain.  Can you see that?

2  A.  I can see that, yes.

3  Q.  Okay.  So that message -- bear with me a moment.

4    That message is June 25th, so it's approximately seven

5  days later than the one we just talked about, right?

6  A.  Correct.

7  Q.  And it is also a message from Sonny Izon to Dimitri Kesari,

8  correct?

9  A.  Correct.

10 Q.  And the subject is still June invoice, right?

11 A.  Forward:  June invoice.

12 Q.  Right.  So this e-mail forwarded the one we just talked

13 about and then added a new message, correct?

14 A.  Correct.

15 Q.  And Sonny Izon is talking to Dimitri Kesari again about a

16 week later?

17 A.  Yes.

18 Q.  And what did Sonny Izon say?

19 A.  Hey Dimitri.

20    Here it is.  Thanks for everything.

21 Q.  If we go to the top of the e-mail string just to round this

22 out.

23    Dimitri Kesari forwarded that string to you, right?

24 A.  Correct.

25 Q.  He forwarded both messages that he had received from Sonny

1  Izon, right?

2  A.  Correct.

3  Q.  And on June 25th that message was sent to you and included

4  an attachment, right?

5  A.  Correct.

6  Q.  The attachment had the name "Kesari" in the title, right?

7  A.  Yes.

8  Q.  And what was the text?

9  A.  This is the last one.

10  Q.  Okay.  And then let's take a brief look at the invoice

11  that's attached.

12          Is this an ICT invoice?

13  A.  Yes.

14  Q.  Is it another invoice to the Ron Paul Campaign, attention

15  Dimitri Kesari?

16  A.  Yes.

17  Q.  Is there one line item for production services, June?

18  A.  Yes.

19  Q.  And is the amount of that line item $8,850?

20  A.  Yes.

21  Q.  Is that the total amount on this invoice?

22  A.  Yes.

23  Q.  Turning your attention to Government's 100.

24          Is this another e-mail involving Katie Koerber and

25  yourself and John Tate?

1  A.  Correct.

2          MR. PILGER:  We would offer 100, Your Honor.

3                          (Government Exhibit 100 was

4                          offered in evidence.)

5          THE COURT:  Received.

6                          (Government Exhibit 100 was

7                          received in evidence.)

8  BY MR. PILGER:

9  Q.  So this goes bottom up, right?

10 A.  Yes.

11 Q.  So if we could start with forwarded message down to thank

12 you.

13         Katie Koerber on June 25th sent you an e-mail with a

14 subject, right?

15 A.  Correct.

16 Q.  What's the subject?

17 A.  Wire - Interactive Communication Technology, Inc.

18 Q.  To you, right?

19 A.  Yes.

20 Q.  And read out the body of that e-mail until you get to the

21 routing information.

22 A.  This is for Ron Paul 2012 PCC.

23         Lori and Deana.

24         Please wire the following to Interactive Communication

25 Technology, Inc.

1           Amount:  $8,850.

2           Code 60110.

3           Invoice --

4   Q.  And there's a number for the invoice, right?

5   A.  Yes.

6   Q.  And there's wiring directions to a particular company.

7           Is that ICT?

8   A.  Yes.

9   Q.  At a Bank of America branch in College Park, Maryland?

10  A.  Yes.

11  Q.  And then if we could go up to the next e-mail which starts

12  on June 25, 2012 and ends in 8k.

13          Can you see that all right, Mr. Cortes?

14  A.  Yes, I can see that.

15  Q.  Okay.  Then the next e-mail is from you.  It says on June

16  25, 2012, the same day as Katie Koerber sent a message to you,

17  you wrote:  According to Dimitri is this the last one, again in

18  parenthesis.

19          Approved, question mark.  8k.

20          Did you write that?

21  A.  Yes.

22  Q.  And who did you send it to?

23  A.  John Tate.

24  Q.  Did you get a response?

25  A.  I did.

1  Q.  If we could scroll up.

2          What did John Tate say to you that day?

3  A.  I will find out what it is.

4  Q.  And that's within about ten minutes of when you sent the

5  message, right?

6  A.  Correct.

7  Q.  Now, turning your attention to Government's 104.  That's

8  another e-mail exchange, and it concerns the e-mail we were just

9  talking about, right?

10 A.  Correct.

11 Q.  It's another string, I should say.

12         MR. PILGER:  We offer 104, Your Honor.

13                              (Government Exhibit 104 was

14                               offered in evidence.)

15         THE COURT:  Received.

16                              (Government Exhibit 104 was

17                               received in evidence.)

18 BY MR. PILGER:

19 Q.  So if we could focus in on the top, Ms. Draughn, starting at

20 the word "from" and going down to 8k.

21         The bottom part of this is what we just talked about

22 where you asked Mr. Tate, is this approved, right?

23 A.  Correct.

24 Q.  And the top is John Tate responding to you on the same day

25 at 6:24, right?

1  A.  Correct.

2  Q.  So approximately a half hour after you asked him for the

3  approval, right?

4  A.  Correct.

5  Q.  And what did he say?

6  A.  Approved.

7  Q.  Okay.  If we could take that down, Ms. Draughn.

8        Mr. Cortes, I want to turn your attention ahead in

9  time.  We've been talking about the year 2012.  Now we're going

10  to jump forward to 2013, all right?

11  A.  Okay.

12  Q.  Turning your attention to August of 2013, were you still

13  employed by the campaign?

14  A.  No.

15  Q.  Had the campaign wound up, the election was over?

16  A.  To my knowledge, yeah, most of the employees had been let

17  go.

18  Q.  And without saying what the content was, were you aware of

19  some newspaper articles concerning the campaign?

20        MR. BINNALL:  I'm going to object as to relevance.

21        THE COURT:  Overruled.

22        Answer the question.

23  BY MR. PILGER:

24  Q.  Were you aware of some newspaper articles concerning the

25  campaign?

1  A.  Online newspaper, yes.

2  Q.  Fair enough, online as opposed to print.  And did seeing

3  those articles cause you to do something?

4  A.  Yes.

5  Q.  Did it specifically cause you to communicate with Jesse

6  Benton?

7  A.  Yes.

8  Q.  Turning your attention to Government's 62, unredacted,

9  Ms. Draughn.  I'm sorry, redacted.

10          Ms. Draughn, I'm sorry, it's all me; unredacted.

11          Can you see that, Mr. Cortes?

12  A.  Yes.

13  Q.  Is that the e-mail that you sent to Jesse Benton in 2013?

14  A.  Yes.

15          MR. PILGER:  Offer that into evidence, Your Honor.

16                          (Government Exhibit 62 was

17                          offered in evidence.)

18          MR. BINNALL:  Objection, Your Honor.  And I would like

19  to be heard at bench conference if we could.

20          THE COURT:  You can describe your objection more

21  generically.

22          MR. BINNALL:  It's unfairly prejudicial.  There's a

23  lot of stuff in here that's just not simply relevant to the

24  case, especially the case that we have here today, and rules

25  404, 405, rule 403.

1      THE COURT:  Overruled.

2      62 is received.

3                          (Government Exhibit 62 was

4                          received in evidence.)

5      MR. BINNALL:  Your Honor, could we discuss any

6 redactions?  I point the court to -- well, the bottom.

7      THE COURT:  No.  It's received.

8 BY MR. PILGER:

9 Q.  Just waiting for it to come up on the big screen,

10 Mr. Cortes.  Do you have enough water?  I can't see if you have

11 any left.

12 A.  Yes.  Thank you.

13 Q.  Okay.  Is this an e-mail that you sent to Jesse Benton and

14 copied Lori Pyeatt and Deana Watts?

15 A.  Yes.

16 Q.  And just in case the jury has forgotten because it's been a

17 minute, who are Lori Pyeatt and Deana Watts?

18 A.  Lori Pyeatt is the treasurer of the campaign and Deana Watts

19 is the controller of the campaign.

20 Q.  And remind the jury, are they the ones who send the forms to

21 the FEC or is that you?

22 A.  They are.

23 Q.  And this is a message to you at the top from Jesse Benton,

24 right?

25 A.  Correct.

1 Q. And it thanks you for the e-mail that comes behind that,

2 that comes first?

3 A. Correct.

4 Q. I muddled that. Let me just cover that a little more

5 clearly. We'll work that from the bottom up. I apologize, Your

6 Honor.

7         The first message that gets sent is from you on

8 August 17, 2013, at 7:57 a.m., right?

9 A. Correct.

10 Q. Ms. Draughn, could you just focus on that for a minute, just

11 take the top part off.

12         So you wrote to Jesse, Lori, and Deana on that day,

13 right?

14 A. Correct.

15 Q. And what did you say?

16 A. I said, Jesse, Lori, and Deana.

17         Given recent articles, attached are

18 conversations/e-mail chains you were left out of during the

19 campaign (even though Dimitri in some of them made it seem like

20 you were - others were big expenses without Jesse in the chain)

21 and were inconsistent to me.

22         Dennis is not a good guy. (He is hurting Ron, Jesse,

23 and any progress for the future of liberty candidates) but

24 neither is Dimitri IMO - but then again I don't know it all so I

25 leave it to you.

1          New cell for me is --

2  Q.  You don't have to give that phone number.

3  A.  -- if you have questions.

4          The last attachment is an e-mail (sorry for the

5  lewdness) I got about a month ago - not sure who it's from - my

6  two guesses - Dennis or Dimitri using dummy accounts.

7          Fernando.

8  Q.  And then there's a bunch of attachments, right?

9  A.  Correct.

10  Q.  And two of the attachments concern ICT, right?

11  A.  Correct.

12  Q.  Who is Dennis?

13  A.  The Dennis I'm referring to here is Dennis Fusaro.

14  Q.  And then you say Dimitri IMO?

15  A.  In my opinion.

16  Q.  But then -- you say something in your opinion.  Then you say

17  but then again I don't know it all, so I leave it to you,

18  correct?

19  A.  Correct.

20  Q.  And then it says thanks Fernando, right?

21  A.  I'm sorry?

22  Q.  Go to the next e-mail, the top of the page, Ms. Draughn.

23          There's an e-mail back to you from Jesse Benton,

24  right?

25  A.  Correct.

1  Q.  And copies Lori Pyeatt and Deana Watts?

2  A.  Correct.

3  Q.  It's the same day in the afternoon, right?

4  A.  Correct.

5  Q.  And it just says, thanks, Fernando, correct?

6  A.  Correct.

7  Q.  Mr. Cortes, during your employment by the Ron Paul Campaign

8  in 2011 and 2012, did you hear about a man named Kent Sorenson?

9  A.  Yes.

10  Q.  What context did you hear about him in?  Don't say what you

11  heard yet, if at all.  Just say what context you heard of him

12  in.

13  A.  Through news media and our own press releases.

14  Q.  Okay.  Other than news media and your own press releases,

15  did anyone in the campaign communicate with you about Kent

16  Sorenson?

17  A.  No.

18  Q.  Did anyone communicate to you that he was an employee of the

19  campaign?

20  A.  No.

21  Q.  Did anyone communicate to you that he was receiving a salary

22  for services?

23  A.  No.

24        MR. PILGER:  No further questions.

25        THE COURT:  Thanks.

1        We'll take our mid-morning recess and begin promptly

2   at 10:45.  See you ready to go then.

3        (Recess at 10:25 a.m., until 10:45 a.m.)

4        THE COURT:  Please be seated.

5        Why don't you introduce yourself again.  They just met

6   you briefly during jury selection.

7        MR. LINEBAUGH:  Yes.  Thank you.

8        My name is Jesse Linebaugh with the law firm of Faegre

9   Baker Daniels here in Des Moines and I'm one of the lawyers for

10  Mr. Tate.

11       THE COURT:  Go ahead.  You may cross-examine him.

12       MR. LINEBAUGH:  Your Honor, just a quick

13  clarification.  I have some questions that are outside the scope

14  of direct.  In my past experience with you, I assume you want us

15  to do all of those now as opposed to recalling the witness.

16       THE COURT:  Yes.  We'll see if we get an objection,

17  but that would be my preference.

18       MR. LINEBAUGH:  Okay.  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20  BY MR. LINEBAUGH:

21  Q.  First we'll look at Exhibit 63 if there's no objection for

22  speed, Government's Exhibit 63.

23       MR. PILGER:  No objection.

24       THE COURT:  Are you offering it?

25       MR. LINEBAUGH:  I'm offering it, yes, Your Honor.

1                              (Government Exhibit 63 was

2                              offered in evidence.)

3          THE COURT:  Isn't it in?

4          MR. LINEBAUGH:  It's not yet.

5          THE COURT:  Okay.  63 is received.

6                              (Government Exhibit 63 was

7                              received in evidence.)

8   BY MR. LINEBAUGH:

9   Q.  Mr. Cortes, do you recognize that e-mail?

10  A.  I do.

11  Q.  And this exhibit consists of two e-mails actually.  The

12  bottom is a December 28, 2011 and the top is a December 29,

13  2011.

14          Do you see that?

15  A.  I only see the 29th.

16  Q.  Okay.  And the 28th is right in the middle there.  December

17  28th?

18  A.  Oh, okay.

19  Q.  From you to --

20  A.  Yes.

21  Q.  Okay.  And the subject of the e-mail is wire needed.

22          Do you see that?

23  A.  Yes.

24  Q.  And the first e-mail, the one from Mr. Kesari, is dated

25  December 28, 2011, correct?

1   A.  Correct.

2   Q.  And the e-mail states that Mr. Kesari will need a wire for

3   $25,000 first thing in the morning.

4          Do you see that?

5   A.  Yes.

6   Q.  And nowhere in this e-mail does it state what the $25,000

7   wire is for, does it?

8   A.  It does not.

9   Q.  And Mr. Kesari did not attach an invoice to back up his

10   $25,000 request, did he?

11   A.  No, he did not.

12         MR. PILGER:  Your Honor, if this is a direct, we ask

13   that he conduct direct.

14         THE COURT:  It's not direct.  It's cross.

15         MR. PILGER:  All right.

16   BY MR. LINEBAUGH:

17   Q.  Now, the campaign normally requires an invoice before it

18   would pay a bill, right?

19   A.  Correct.

20   Q.  In fact, you requested an invoice but never received one?

21   A.  For this specific one?

22   Q.  If you recall.

23   A.  I recall there never being a payment in the first place.

24   Q.  Okay.

25   A.  No invoice as well.

1  Q.  And Mr. Kesari states that he will get you the wire

2  information later that night, correct?

3  A.  Correct.

4  Q.  And Mr. Kesari never sent you that wire information, did he?

5  A.  No.

6  Q.  He also never sent you an invoice to support the wire

7  request, did he?

8  A.  No.

9  Q.  The e-mail also says, quote, Jesse has approved, end quote.

10         Do you see that?

11 A.  Yes.

12 Q.  Now you understood the Jesse referenced to be Mr. Jesse

13 Benton?

14 A.  Correct.

15 Q.  If you look at the top of Exhibit 63, you'll see that

16 Mr. Tate approves the wire transfer on December 29th at 1:30 in

17 the morning, so later that night.

18         Do you see that?

19 A.  Yes.

20 Q.  Mr. Kesari never told you what the wire was for, did he?

21 A.  No.

22 Q.  And you have no idea what Mr. Kesari told Jesse the wire was

23 for, do you?

24 A.  No.

25         MR. LINEBAUGH:  Okay.  I would like to offer now

1    Government Exhibit 64, which has not yet been admitted.

2                              (Government Exhibit 64 was

3                                 offered in evidence.)

4              THE COURT:  Received.

5                              (Government Exhibit 64 was

6                                 received in evidence.)

7              MR. LINEBAUGH:  Could you publish that?

8    BY MR. LINEBAUGH:

9    Q.  Okay.  Mr. Cortes, Exhibit 64 is from the same day,

10   December 29th, and also concerns the $25,000 wire.

11             Do you see that?

12   A.  Yes.

13   Q.  Now, the first e-mail in the string is you e-mailing

14   Mr. Kesari about 12:30 p.m. and asking about the status of the

15   wire.

16             Do you see that?

17             Could you pull that up there on the bottom?

18   A.  Yes.

19   Q.  And effectively you're reminding him that if the wire is

20   going to go out the deadline is at 3 o'clock, right?

21   A.  Correct.

22   Q.  And you get no response, so you e-mail him again at 2:20 and

23   remind him that there's only 40 minutes left until the deadline.

24             Do you see that?

25   A.  Correct.

1  Q.  And then a couple of hours later at 4:00 Central, Mr. Kesari

2  e-mails you, Mr. Tate, and Mr. Benton.

3         Do you see that?

4  A.  I'm sorry.  It's hard to follow.  You said Mr. Kesari?

5  Q.  Yes.  So Mr. Kesari e-mails you, Mr. Tate, and Mr. Benton.

6         Do you see that?

7  A.  Not on this, no.  Not on what's highlighted.

8  Q.  Pull up to the top, Mr. Mills, to the top of that e-mail.

9         Let me try again so you're looking at the right thing.

10  Sorry about that, Mr. Cortes.

11         Then a couple of hours later, at 4:00 Central,

12  Mr. Kesari e-mails you and Mr. Tate and Mr. Benton.

13         Do you see that?

14  A.  Yes.

15  Q.  And Mr. Kesari simply states, we are holding till after the

16  filing.

17         Do you see that?

18  A.  Yes.

19  Q.  Mr. Kesari never explains why he wanted to hold the wire,

20  does he?

21  A.  No.

22  Q.  And when you read the term "filing," do you understand it to

23  mean filing a report with the FEC?

24  A.  Yes.

25  Q.  And you earlier described that one of your roles as the

1  controller was to protect the budget.

2          Is that a fair assessment?

3  A.  I basically reported a snapshot of where our budget was.

4  Q.  Okay.  And you also monitored monthly campaign cash burn

5  rates; is that correct?

6  A.  I reported to John Tate.

7  Q.  Okay.  And when I say cash burn rates, does that indicate

8  the speed with which the campaign was spending money?

9  A.  Yes.

10  Q.  So, therefore, you would agree that the monthly cash levels

11  were always a concern of the campaign; is that correct?

12  A.  Always, yes.

13  Q.  And cash level effectively indicates the staying power of a

14  campaign?

15  A.  Not necessarily, but for the most part, yes.

16  Q.  Now, this time period, December 29, 2011 in this exhibit

17  we're looking at, was right before the Iowa caucuses, correct?

18  A.  Yes.

19  Q.  In fact, the Iowa caucuses that year were, like, January 3,

20  2012, so literally just a few days?

21  A.  Around that time, yes.

22  Q.  So it's particularly important right before the Iowa

23  caucuses that the campaign looks strong financially?

24  A.  That's more -- that's a different kind of decision that I

25  wouldn't be privy to.

1  Q.  Okay.  Was it not unusual for the Ron Paul Campaign to hold

2  off paying invoices so the campaign cash levels could look

3  better on certain FEC reports?

4  A.  Could you repeat that question?

5  Q.  Sure.  In your experience, was it not unusual for the Ron

6  Paul Campaign to hold off paying invoices so the campaign cash

7  levels could look better on certain FEC reports?

8  A.  Our concern was mainly holding money for paying vendors on

9  time, at least that was on my end.  I can't speak to that -- if

10  that was a concern of people above me.

11      MR. LINEBAUGH:  Sure.  I would like to offer

12  Government Exhibit 58 if there's no objection.

13                              (Government Exhibit 58 was

14                               offered in evidence.)

15      MR. PILGER:  One moment, please.

16      No objection.

17      THE COURT:  58 is received.

18                              (Government Exhibit 58 was

19                               received in evidence.)

20      MR. LINEBAUGH:  Mr. Mills, if you want to blow up the

21  bottom two-thirds to start off, it might make the most sense,

22  start with that header, beginning with Mr. Cortes.

23  BY MR. LINEBAUGH:

24  Q.  As you see, Mr. Cortes, this is an e-mail string between you

25  and Mr. Tate on February 16, 2012.

1          Do you see that?

2   A.  Yes, and other people as well.

3   Q.  Yes.  And if you look at the e-mail at the bottom of the

4   page, starting about a third of the way down, I should say,

5   you're basically listing out major bills that the campaign needs

6   to pay by the end of February.

7          Do you see that?

8   A.  Yes.  That's the snapshot I was referring to.

9   Q.  Yeah.  Effectively you've got an invoice there for

10  MPrinting, American Express, just outstanding invoices at that

11  time, correct?

12  A.  Correct.

13  Q.  So now if we could go to the top of that e-mail, Mr. Mills.

14          Now, the top of this e-mail on the same day -- your

15  original e-mail was a little earlier in the morning -- this is

16  at 12:47, Mr. Tate responds to you only.

17          Do you see that?

18  A.  Yes.

19  Q.  He notes that he just authorized one million in mail.

20          Do you see that?

21  A.  Yes.

22  Q.  He also just authorized $750,000 in TV ads, correct?

23  A.  Correct.

24  Q.  He also says, quote, hold off paying whatever invoices we

25  can hold off on, end quote.

1          Do you see that?

2  A.  Yes.

3  Q.  He also writes, quote, Cando can wait, end quote.

4          Do you see that?

5  A.  Yes.

6  Q.  He also writes, Wentzel can wait?

7  A.  Yes.

8  Q.  He also writes, Dumas can wait?

9  A.  Yes.

10  Q.  He writes, I think MPrinting can wait, correct?

11  A.  In the form of a question, yes.

12  Q.  He writes, Valkyrie can wait, correct?

13  A.  Yes.

14  Q.  And he also writes, quote, don't know what Interactive

15  Communication Technology is, end quote, right?

16  A.  Correct.

17  Q.  So as of February 16, 2012, Mr. Tate does not even know what

18  Interactive Communication Technology is?

19          MR. PILGER:  Objection; argument.

20          THE COURT:  Sustained.

21          MR. LINEBAUGH:  Let me rephrase.

22  BY MR. LINEBAUGH:

23  Q.  So according to this e-mail as of February 16, 2012,

24  Mr. Tate is telling you that he does not know who Interactive

25  Communication Technology is, correct?

1   A.   That's what he wrote here.

2   Q.   So on this e-mail string on February 16th of 2012, Mr. Tate

3   does not provide you with any instructions about paying

4   Interactive Communication Technology, does he?

5   A.   In this chain, no.

6   Q.   Let's look back at Exhibit 64 that we just looked at,

7   Mr. Mills.

8            In Exhibit 64, Mr. Cortes, Mr. Kesari does not give

9   any indication that he wants to hide the potential wire from the

10  FEC once the payment is made, does he?

11  A.   No.

12  Q.   And you were not aware of any agreement to hide the payment

13  of the wire from the FEC once the payment is made?

14  A.   No.

15  Q.   And to reiterate, the campaign never made this $25,000 wire

16  transfer in December of 2011, did it?

17  A.   No, it did not.

18  Q.   As a result, because this expenditure was not made, it was

19  not reported to the FEC pursuant to rules, correct?

20  A.   Correct.

21  Q.   It was never the practice of the Ron Paul Campaign to report

22  to the FEC payments that the Ron Paul Campaign did not make,

23  correct?

24  A.   To my knowledge, that is correct.

25  Q.   Again, one of your jobs in the campaign was to code payments

1    so that the campaign could make correct reporting to the FEC,

2    right?

3    A.  Based on employees and vendor information, yes.

4    Q.  And you never coded that wire transfer for reporting

5    purposes, did you?

6    A.  Never had an invoice, no.

7    Q.  There's no need to code it because no $25,000 wire transfer

8    ever occurred, correct?

9    A.  Correct.

10   Q.  And, again, no invoice to support the wire; you just

11   mentioned that?

12   A.  Correct.

13   Q.  And, again, you even had no information as to what the

14   cancelled wire was even for, did you?

15   A.  No.

16           MR. LINEBAUGH:  I would like to offer Government

17   Exhibit 67 if there's no objection.

18                              (Government Exhibit 67 was

19                                offered in evidence.)

20           MR. PILGER:  One moment.

21           No objection.

22           THE COURT:  Received.

23                              (Government Exhibit 67 was

24                                received in evidence.)

25   BY MR. LINEBAUGH:

1  Q.  Mr. Cortes, this is an e-mail exchange on December 29, 2011,

2  between you and Mr. Tate.

3          Do you see that?

4  A.  Yes.

5  Q.  And, Mr. Mills, if you just want to expand basically where

6  there's writing, I think that will help the jury see.

7          Now, on the first message you mention a $180,000 Am Ex

8  bill, correct?

9  A.  Oh, on this message, yes.

10 Q.  Now, Am Ex means American Express?

11 A.  Correct.

12 Q.  You state that the Am Ex bill can be paid after January 1.

13          Do you see that?

14 A.  Yes.

15 Q.  Now, by paying after January 1, that means the Am Ex charges

16 would not show up in the campaign's FEC reports for the fourth

17 quarter of 2011 because they weren't paid in 2011, correct?

18 A.  To my knowledge, any expense that was done within a quarter

19 would have to be reported for that quarter.  If we made a

20 payment after that quarter, we would have to make an adjustment

21 on a future filing, which I had no part of.

22 Q.  Okay.

23 A.  To my understanding, that was our procedure.  It was

24 anything that we spent within that quarter needed to be reported

25 that quarter or, if it was paid in subsequent quarters, amended

1   to the report so it showed when it was actually paid.

2   Q.   And that wasn't your job, though, doing that?

3   A.   No, it was not.

4   Q.   Okay.  So are you speculating on that or is that firsthand

5   knowledge?

6   A.   That was my understanding of what our campaign practices

7   were.

8   Q.   Okay.  But this payment to American Express was not reported

9   in 2011, was it, or do you know?

10  A.   I don't recall if -- I don't recall if this particular -- if

11  it was paid, then it would have been hopefully amended or

12  reported accurately.

13  Q.   Okay.  You don't think you were doing anything wrong in this

14  e-mail by recommending that the American Express bill be paid

15  after January 1, do you?

16  A.   No.  If we didn't have the funds to pay it, you wouldn't be

17  able to pay it.

18  Q.   And you didn't think you were part of a conspiracy to

19  defraud the United States by making that recommendation?

20  A.   No.

21  Q.   Now, in this same e-mail, the bottom line, you make

22  reference to Dimitri's, quote, mystery wire, end quote.

23          Do you see that?

24  A.   Yes.

25  Q.   So at this time you don't know what the wire was for, do

1  you?

2  A.  I still don't.

3  Q.  Mr. Mills, can you blow up the top portion of that e-mail,

4  please, on Exhibit 67.

5        At the top of this e-mail, Mr. Tate responds and says,

6  quote, there will not be the 25,000 Dimitri wire for now, end

7  quote.  Wipe it off the books.

8        Do you see that?

9  A.  Yes.

10  Q.  So the campaign did not make the $25,000 wire transfer in

11  2011, did it?

12  A.  It did not.

13  Q.  And, again, you never received an invoice justifying the

14  wire?

15  A.  Correct.

16  Q.  And, therefore, you never had to wipe any wire request off

17  the campaign books, did you?

18  A.  No.

19  Q.  That's because without an invoice it was never on the books,

20  correct?

21  A.  Correct.

22  Q.  Now I would like to pull up Government's Exhibit 98, which

23  has already been admitted.

24        Mr. Mills, if you want to go to the second page of the

25  invoice itself and just blow up the main portion of the invoice,

1  including the description.

2         Mr. Cortes, you looked at this before.  This is an

3  e-mail attaching an invoice from Interactive Communication

4  Technology to the campaign, correct?

5  A.  Correct.

6  Q.  The invoice is dated June 18, 2012?

7  A.  I can't see it, but -- yes, that's correct.

8  Q.  And the invoice itself says it's for, quote, production

9  services, June, end quote.

10        Do you see that?

11  A.  Yes.

12  Q.  Now, you were responsible for coding this invoice for FEC

13  recording purposes, right?

14  A.  I was responsible, yeah, to code it for the campaign, yes.

15  Q.  But you didn't code it as for production services, did you?

16  A.  Production services of audiovisual company, yes.

17  Q.  Okay.  So you gave it the code 60110, correct?

18  A.  Correct.

19  Q.  That is the code for audiovisual?

20  A.  Correct.

21  Q.  Now, John Tate did not tell you to use the code 60110, did

22  he?

23  A.  No.

24  Q.  John Tate did not tell you that ICT was providing

25  audiovisual services to the campaign, did he?

1  A.  No.

2  Q.  In fact, John Tate had nothing to do with how the invoices

3  were coded for FEC reporting purposes, did he?

4  A.  If he submitted invoices himself, he would have to let us

5  know what those expenses were for.

6  Q.  But he had nothing to do with this invoice?

7  A.  No.

8  Q.  You and John Tate both worked at Ron Paul headquarters in

9  Virginia in 2012, correct?

10  A.  That is correct.

11  Q.  John Tate was the campaign manager; is that accurate?

12  A.  Yes.

13  Q.  And the Ron Paul Campaign competed in literally every

14  primary and caucus in 2012?

15  A.  Correct.  To my recollection, yes.

16  Q.  Did business in all 50 states across the country?

17  A.  Yes.

18  Q.  And in the District of Columbia?

19  A.  Yes, and some territories.

20  Q.  And John Tate was literally in charge of all of that; is

21  that accurate?

22  A.  For the most part, yes, that is accurate.

23  Q.  And in your experience in working with Mr. Tate, he was on

24  the phone a lot, correct?

25  A.  He was very busy.

1  Q.  And he sent hundreds of e-mail messages every day?

2  A.  I would assume.

3  Q.  And, again, to be specific, Mr. Tate had nothing to do with

4  how the ICT invoices were coded, correct?

5  A.  How they were coded, no.

6  Q.  Now, when we talk about ICT or Interactive Communication

7  Technology, you had no direct dealing with that company,

8  correct?

9  A.  Not as far as I recall, no.

10  Q.  And you never visited ICT in your job experience?

11  A.  I did not.

12  Q.  You never dealt with any ICT employees?

13  A.  No.

14  Q.  Make sure I understand.  So ICT would send an invoice to

15  Mr. Kesari; is that correct?

16  A.  Yes.

17  Q.  And Mr. Kesari would then forward the ICT invoice to you

18  with an approval to pay, correct?

19  A.  Correct.

20  Q.  And what you did was technically process the payments; is

21  that a fair way to say it?

22  A.  Yes.

23  Q.  And as part of that process, again, you make sure that it

24  was coded properly?

25  A.  Correct.

1  Q.  And as part of that process, you make sure that the payment

2  of the invoice was approved, correct?

3  A.  That it went through the approval channels, yes.

4  Q.  At times you asked Mr. Tate to approve an ICT invoice?

5  A.  Yes.

6  Q.  And, again, on one of the occasions when you asked Mr. Tate

7  to approve an ICT invoice, he responded, quote, I don't know

8  what Interactive Communication Technology is, end quote.

9        Do you recall looking at that in Exhibit 58?

10 A.  It wasn't an approval process.  It was more of a snapshot,

11 but he did say that in that e-mail.

12 Q.  And let's pull back up Exhibit 58 again if we could,

13 Mr. Mills.  Do we still have it on?  Good.

14        Let's go to the second page of Exhibit 58, Mr. Mills,

15 and let's blow up the text there, the top third.

16        Again, in this e-mail exchange, Mr. Cortes, you were

17 seeking Mr. Tate's approval to pay certain invoices, correct?

18 A.  Right.  It was a list of the outstanding expenses.

19 Q.  Outstanding as of this date of this e-mail, correct?

20 A.  Correct.

21 Q.  And one of the e-mails was from ICT for $38,000.

22        Do you see that?

23 A.  Yes.

24 Q.  And below that is an invoice from DGI for 26,000.

25        Do you see that?

1  A.  Yes.

2  Q.  Now, DGI stands for Designer Goldsmiths, Inc.  Is that

3  accurate, or do you recall?

4  A.  I don't recall that.

5  Q.  Do you understand that that's the jewelry store that was

6  owned by Mr. Kesari's wife?

7  A.  I did not know that he owned a jewelry store or his wife.

8  Q.  Do you know that now or didn't know it then?

9  A.  I didn't know that then.

10  Q.  But sitting here today, you understand that to be the

11  jewelry store owned by his wife?

12  A.  I have been previously told that, yes.

13  Q.  Now, the DGI line has a parenthetical notation after it.

14         Do you see that?

15  A.  Yes.

16  Q.  The parenthetical says, this item is for, quote, list

17  rentals Nevada, Minnesota, Maine, state consulting, per

18  Dimitri/Jesse, end quote.

19         Do you see that?

20  A.  Yes.

21         MR. LINEBAUGH:  I would like to offer Defendant Tate

22  Exhibit 14 if there's no objection.

23                        (Defendant's Exhibit T14 was

24                         offered in evidence.)

25         MR. PILGER:  One moment, Your Honor.

1          THE COURT:  I can't read it.  Can you blow it up a

2   little bit?

3          MR. LINEBAUGH:  We're going to want to go to the

4   second page, too, Mr. Mills.  That's the e-mail we're focusing

5   on for the judge.

6          THE COURT:  That one I can see.

7          MR. PILGER:  Bear with us a moment, Your Honor.  I was

8   catching up.

9          No objection.

10          THE COURT:  Received.

11                              (Defendant's Exhibit T14 was

12                              received in evidence.)

13  BY MR. LINEBAUGH:

14  Q.  Mr. Cortes, we're on the second page of defendant Tate

15  Exhibit 14.  This is an e-mail message sent from yourself to

16  Ms. Pyeatt and Ms. Watts on February 16, 2012, at 1:04 p.m.

17          Do you see that?

18  A.  Yes.

19  Q.  And, again, we're now further -- earlier we looked at some

20  e-mails that were in the late 2011 time frame.  We're now in

21  February of 2012, and you were instructing Ms. Pyeatt and

22  Ms. Watts to wire 25,657 to DGI.

23          Do you see that?

24  A.  Yes.

25  Q.  Now, you would agree that the 25,657 wire is pretty close to

1  that 25,000 wire that Mr. Kesari requested on December 28, 2011,

2  correct?

3          MR. PILGER:  Object to the relevance, "pretty close."

4          THE COURT:  Overruled.

5          Answer the question.

6  A.  Can you repeat that?

7  BY MR. LINEBAUGH:

8  Q.  Sure.  You would agree that the $25,657 wire request as

9  shown in Tate Exhibit 14 is pretty close to the $25,000 wire

10  that Mr. Kesari requested on December 28, 2011, correct?

11  A.  25,000 and 25,657 are close relatively.

12  Q.  And the December 28, 2011 wire request from Mr. Kesari as we

13  discussed didn't include an invoice, right?

14  A.  Correct.

15  Q.  And this amount of 25,657, again, it's very close to the

16  $25,000 wire request from Mr. Kesari that the campaign did not

17  pay in late December?

18  A.  Again, 25,000 is pretty close to the number 25,657.

19  Q.  And it's very close, of course, to the same amount that

20  Mr. Tate said to wipe off the books?

21          MR. PILGER:  Asked and answered.

22          THE COURT:  Sustained.

23          Pose a new question.

24  BY MR. LINEBAUGH:

25  Q.  But this invoice on Tate Exhibit 14 just six weeks later on

1  February 16, 2012, it was, in fact, accompanied by an invoice,

2  correct?

3  A.  I'm sorry?

4  Q.  Now, this e-mail, Tate Exhibit 14, just six weeks later

5  on February 16, 2012, it is accompanied by an invoice,

6  correct?

7  A.  I believe two.

8  Q.  Okay.  Let's turn to page RP1086, Mr. Mills.  It's the first

9  invoice.

10         And you mentioned two invoices, Mr. Cortes.  This is

11 the first.  This is an invoice for 5,792 from DGI, correct?

12 A.  Correct, DGI invoice for $5,792.

13 Q.  And the description is for, quote, targeted list rentals in

14 Nevada, Minnesota and Maine, end quote.

15         Do you see that?

16 A.  Yes.

17 Q.  Let's go to the next invoice, Mr. Mills.

18         This is an invoice from DGI for 19,865, correct?

19 A.  Yes.

20 Q.  And this invoice is for, quote, consulting, political

21 strategy state targeting, end quote.

22         Do you see that?

23 A.  Yes.

24 Q.  And you assign two separate codes to the payment of these

25 invoices; is that accurate?

1  A.  That's correct.

2  Q.  And because the invoices are for different things, that's

3  why you did that?

4  A.  Correct.

5  Q.  Let's flip back to Exhibit 58, Mr. Mills.  We're going to go

6  to the second page of that, Mr. Mills, and blow up the top

7  third.

8         Now, Mr. Cortes, we've talked about this exhibit.

9  This, again, is the outstanding invoices as of this date, and on

10 the second page I'm going to direct your attention again to the

11 line item for Interactive Communication Technology.

12        Do you see that?

13        MR. PILGER:  Excuse me, Your Honor.  We can't see the

14 date.  Could we specify the date here?

15        MR. LINEBAUGH:  I will state for the record that

16 Government Exhibit 58 is dated February 16, 2012.  This is the

17 second page of your exhibit.

18        MR. PILGER:  Yeah, we're looking at the screen.

19 BY MR. LINEBAUGH:

20 Q.  Now, you don't tell Mr. Tate what kind of company ICT is, do

21 you?

22 A.  I do not.

23 Q.  You don't send him that invoice we just looked at, do you?

24 A.  Not in this snapshot, no.

25 Q.  You never told him how ICT's services are described on the

1  invoice, do you?

2  A.  Not on this snapshot.

3  Q.  You didn't even characterize ICT services in this

4  February 16, 2012 e-mail, did you?

5  A.  No, I did not.

6  Q.  You never tell Mr. Tate in this e-mail that ICT

7  characterized its services as, quote, production services, end

8  quote, do you?

9  A.  No.

10  Q.  You simply listed the vendor and the requested payment

11  amount, correct?

12  A.  Like the other expenses, correct.

13  Q.  And, again, this is the e-mail -- if you want to flip to the

14  first page again, Mr. Mills, at the top.

15          And this is the e-mail on that same day where Mr. Tate

16  writes back to you and says he doesn't know what ICT is,

17  correct?

18          MR. PILGER:  Asked and answered.

19          THE COURT:  Overruled.

20          Answer the question.

21  A.  That is what he wrote down, yes.

22  BY MR. LINEBAUGH:

23  Q.  So Mr. Tate's response on top of Exhibit 58 is not approving

24  payment of the ICT invoice that we looked at, correct?

25  A.  He's not approving anything.

1  Q.  And this e-mail string on Exhibit 58 dated February 16th,

2  that wasn't the last time that you and Mr. Tate wondered what

3  ICT was, was it?

4  A.  No.

5  Q.  I would like to look at Government Exhibit 84b, which has

6  already been admitted.

7        Let's look at the e-mail on the bottom half of the

8  page, Mr. Mills.

9        At the bottom of this e-mail exchange, there's a

10  message from Mr. -- I might pronounce his name wrong; I

11  apologize -- Sonny Izon to Mr. Kesari.

12        Do you see that?

13  A.  Yes.

14  Q.  It's dated March 21, 2012?

15  A.  Yes.

16  Q.  Now, this message attaches an invoice for services rendered

17  by ICT in February of 2012, correct?

18  A.  Correct.

19  Q.  Mr. Kesari then forwarded that e-mail invoice to you on

20  April 3rd at 11:58 a.m. and told you that it was approved by

21  Mr. Benton.

22        Do you see that?

23  A.  Yes.

24  Q.  And if you want to pull up -- yeah, there -- the top half.

25  There we go.

1          And one minute later you sent it to Mr. Tate and

2    wrote, approved, question mark.

3          Do you see that?

4    A.   Correct.

5    Q.   You're inquiring of Mr. Tate whether it needs to be

6    approved, correct?

7    A.   Whether it's approved.

8    Q.   Okay.  Four minutes later Mr. Tate responds that it is

9    approved, correct?

10   A.   Correct.

11   Q.   Let's now show Exhibit -- Government's Exhibit 95 which has

12   already been admitted.  You can probably start, Mr. Mills, with

13   the e-mail in the middle from Ms. Koerber.

14          Mr. Cortes, this is a May 29, 2012, e-mail exchange,

15   correct?

16   A.   Yes.

17   Q.   This is a request to wire $8,850 to ICT, correct?

18   A.   Correct.

19   Q.   You write to Mr. Tate asking if it is approved -- actually

20   let's now look -- I apologize for asking.  Let's show it.  Let's

21   look at the top two e-mails, Mr. Mills.

22          So the e-mail on the bottom was at 9:28 a.m., the

23   e-mail in the middle was ten minutes later at 9:38, and you

24   write to Mr. Tate asking if it is approved and inform him that,

25   quote, Dimitri said it is the last one, end quote.

1          Do you see that?

2   A.   Yes.

3   Q.   Later that morning, only about an hour-and-a-half later,

4   Mr. Tate approves it.

5          Do you see that?

6   A.   Yes.

7   Q.   Now, there's no indication from Government Exhibit 95 that

8   anything was attached to that e-mail, correct?  Do you want to

9   pull back, Mr. Mills, and let him look at the whole e-mail?

10  A.   It does not appear, no.  There's no attachment attached to

11  this e-mail.

12  Q.   Mr. Mills, let's go back to Government's Exhibit 98 that we

13  just looked at.

14         Now this, again, is an e-mail message dated June 25,

15  2012, correct?

16  A.   Correct.

17  Q.   And in this e-mail Mr. Kesari forwarded you a June invoice

18  for ICT and he tells you that, quote, this is the last one, end

19  quote.

20  A.   Correct.

21  Q.   Do you see that?

22  A.   Yes.

23  Q.   However, he told you that the May invoice on Exhibit 95 that

24  we just looked at was also the, quote, last one.

25         Do you recall that?

1  A.  Yes.

2  Q.  And you told that to Mr. Tate on both occasions?

3  A.  Yes.

4  Q.  But now Mr. Kesari is telling you that this June invoice is

5  the last one, right?

6  A.  Correct.

7  Q.  Let's look at Government Exhibit 100, which has already been

8  admitted.

9         Now, this is a June 25, 2012, e-mail string you are

10  involved in, correct?

11  A.  Correct.

12  Q.  In fact, in this e-mail you ask Mr. Tate to approve another

13  payment to ICT, correct?

14  A.  Correct.

15  Q.  And you state, quote, according to Dimitri this is the last

16  one and in parentheses again, end parentheses, correct?

17  A.  It states, according to Dimitri, is this the last one.

18  Q.  Okay.

19  A.  Parentheses, again, parentheses.

20  Q.  Okay.  And 11 minutes later Mr. Tate writes back and says,

21  quote, I will find out what it is, end quote.

22         Do you see that?

23  A.  Yes.

24  Q.  So as of June 25, 2012, you did not know what the ICT

25  invoice was for, did you?

1  A.  The ICT invoices?

2  Q.  Again, so as of June 25, 2012, you personally did not know

3  what the ICT invoice was for, did you?

4  A.  Sure I did; production services from ICT.

5  Q.  Okay.  And as of June 25, 2012, Mr. Tate didn't know what

6  they were for, did he?

7  A.  According to this, it just says he was going to find out

8  what it is.  So I don't know if he did or did not.

9  Q.  I would like to show now Defendant Tate Exhibit 18, which I

10  believe is the same as government Exhibit 59, if that helps you

11  guys.

12            MR. PILGER:  Thank you.

13  BY MR. LINEBAUGH:

14  Q.  For convenience, Mr. Cortes, with this large attachment, I'm

15  just going to hand you a paper copy.  I think it may be easier

16  for convenience to have it that way.

17            MR. LINEBAUGH:  Are we able to publish, Mr. Mills?

18            I would like to move Tate Exhibit 18.

19                           (Defendant's Exhibit T18 was

20                           offered in evidence.)

21            MR. PILGER:  I just want to clarify, we have two

22  identical exhibits now.  We have no objection to that.  If it's

23  different, we want to know how it's different.

24            MR. MILLS:  It's not.

25            MR. LINEBAUGH:  I think it's the exact same one.

1          THE COURT:  Received.

2                              (Defendant's Exhibit T18 was

3                              received in evidence.)

4     BY MR. LINEBAUGH:

5     Q.  Mr. Cortes, this was shown to you earlier under a different

6     exhibit number, but we have it loaded under our Exhibit 18, but

7     you looked at it earlier as Government Exhibit 59.

8          The e-mail in the front appears to be an e-mail

9     message you sent to Mr. Tate and then to Mr. Benton on

10    February 22, 2012, correct?

11    A.  Correct.

12    Q.  And in this e-mail you're attaching a breakdown of campaign

13    expenses since January 1, 2012, correct?

14    A.  Correct.

15    Q.  So effectively about a month-and-a-half worth of

16    expenditures?

17    A.  Correct.

18    Q.  And you turn to the second page of the exhibit, that is

19    where the actual spreadsheet begins.

20         Do you see that?

21    A.  Yes.

22    Q.  Mr. Mills, if you just want to blow up the header of the

23    heading column of the columns at the top -- I should say the

24    titles of the columns.

25         So the first column that is listed is labeled,

1  correct?  I'm sorry; the first column on this list is labeled

2  "Type."

3          Do you see that?

4  A.  Yes.

5  Q.  And type indicates whether the payment was made by check,

6  paycheck or some other method; is that correct?

7  A.  I believe it probably just indicates that expenses were -- I

8  believe the software was Turbo -- put into a Turbo, so it

9  indicates it probably came from a checking account.

10 Q.  Okay.  And the next column labeled "Date" indicates the date

11 that payment was made, correct?

12 A.  Correct.

13 Q.  The third column gives the check number or it indicates that

14 the payment was mailed via EFT.

15          Do you see that?

16 A.  Yes.

17 Q.  Now, when we say "EFT," for the jury that means electronic

18 funds transfer; is that accurate?

19 A.  Yes.  Otherwise how we categorized it was a wire.

20 Q.  Okay.  So it's the same thing as a wire transfer?

21 A.  Yes.

22 Q.  So this is a list of the payments that the campaign has made

23 to date in calendar year 2012, not 2011 payments, correct?

24 A.  Yes, only 2012.

25 Q.  This is not a list of accounts that are still payable.

1  These are accounts that have already been paid, right?

2  A.  Correct.

3  Q.  By sending this list, you were not asking Mr. Tate or

4  Mr. Benton to approve anything, were you?

5  A.  No.

6  Q.  This is because the payments again had already been made?

7  A.  And approved, correct.

8  Q.  So this was just for informational purposes?

9  A.  Yes.

10  Q.  Now, you have the actual hard copy exhibit in front of you,

11  but if you flip through it, it's pretty long, right, 77 pages?

12          Do you see that?

13  A.  Yes.

14  Q.  And if we look at the first page, which is actually up for

15  the jury, I mean that alone has approximately 29 or 30 line

16  items.  It's pretty long, correct?

17  A.  Yes.

18  Q.  And as you flip through, fair to say that many of the pages

19  even have more line items than page 1?

20  A.  Correct.

21  Q.  And I just did a little math.  If each page has 30 line

22  items, that means the total report has something along the lines

23  of, like, 2,300 line items; is that accurate?

24  A.  If the math checks out, sure.

25  Q.  And pretty small type on this report, type face?

1   A.   Smaller than 12.

2   Q.   Now, Mr. Mills, do you want to go to the last page, 77 of

3   the spreadsheet.  And if you just want to put up the column

4   totals at the bottom.

5           Thank you, Mr. Mills.

6           So, on this last page of the exhibit, it indicates

7   that the Ron Paul Campaign had made over 7.8 million dollars in

8   payments during the first seven weeks of 2012 alone, correct?

9   A.   That is correct.

10  Q.   And I don't want to get this wrong, is it fair to say that

11  the Ron Paul Campaign actually spent in its existence over 40

12  million dollars, something along those lines?

13  A.   To the best of my recollection, it was somewhere around that

14  figure.

15  Q.   Okay.  A fair approximation?

16  A.   Uh-huh.

17  Q.   Now, let's go back to page 1, Mr. Mills, and let's blow up

18  the bottom third.  Let's go to one of the spreadsheets.  Thank

19  you, the bottom third of that.

20          And the last, second-to-last line item on the bottom

21  of page 1 references a payment to a vendor listed as, quote,

22  Interactive Commu, end quote.

23          Do you see that?

24  A.   Yes.

25  Q.   So the full name of ICT is not even spelled out on this

1  report, correct?

2  A.  The full name is not.

3  Q.  And this line indicates that Interactive Commu was paid

4  $38,125 on February 8th of 2012 via EFT, correct?

5  A.  That is correct.

6  Q.  And based on the numbers on the last page, the payment of

7  $38,125 would represent a tiny fraction of the overall

8  expenditures that the Ron Paul Campaign had made to date in

9  2012, correct?

10  A.  That is correct.

11  Q.  And the government showed you this exhibit and asked you if

12  many of the pages only had $100 expenses on them.

13          If you just want to flip to page 2, the very next page

14  of the report -- it might be easier on your hard copy -- there

15  are many expenditures there that are over a hundred dollars,

16  correct?

17  A.  On page 2, that is correct.

18  Q.  And I'm just going to randomly flip in here.  Go to page 45.

19  Virtually every expense in there is over a hundred dollars,

20  correct?

21  A.  On this page, correct.

22  Q.  Page 46, the same?

23  A.  Yes.

24          MR. LINEBAUGH:  I would like to now offer Defendant

25  Tate Exhibit 16.  I believe for your record it is the same as

1    Defendant's Exhibit 77 (sic)?

2                              (Defendant's Exhibit T16 was

3                              offered in evidence.)

4         MR. PILGER:  Government Exhibit 77?

5         MR. LINEBAUGH:  Yes.

6         MR. PILGER:  No objection.

7         THE COURT:  Received.

8                              (Defendant's Exhibit T16 was

9                              received in evidence.)

10   BY MR. LINEBAUGH:

11   Q.  Now, this is an e-mail exchange dated February 8, 2012,

12   between yourself, Ms. Pyeatt and Ms. Watts.

13        Do you see that?

14   A.  Yes.

15   Q.  Do you want to blow up the bottom half of this, Mr. Mills.

16        Now, Mr. Kesari is forwarding you this e-mail on

17   February 8, 2012.

18        Do you see that?

19   A.  Yes.

20   Q.  And your name is on this e-mail exchange and Mr. Kesari's,

21   correct?

22   A.  Yes.

23   Q.  And do you want to blow up the top half of this e-mail,

24   Mr. Mills.

25        So on the top half, additionally Ms. Pyeatt, Ms. Watt

1  and Ms. Koerber are also copied on this e-mail exchange,

2  correct?

3  A.  Yes.

4  Q.  And this e-mail concerns a wire transfer to Interactive

5  Communication in the amount of $38,125 on February 8, 2012,

6  correct?

7  A.  Correct.

8  Q.  And on February 8, 2012, you asked Ms. Pyeatt and Ms. Watts

9  to wire that amount to ICT, correct?

10 A.  That is correct.

11 Q.  And your message at the top of this e-mail already has the

12 code 60110, correct?

13 A.  It has it, yes.

14 Q.  And Mr. Tate is not copied on this e-mail, Exhibit 16, is

15 he?

16 A.  Not in this e-mail, no.

17 Q.  And Mr. Benton is not copied on e-mail Exhibit 16, is he?

18 A.  Not on this e-mail.

19 Q.  Mr. Mills, could you pull back up Exhibit 58.  Let's just go

20 to the bottom third of that right now, Mr. Mills, the one

21 beginning at 2:12 a.m. from Mr. Cortes when he begins listing

22 out the expenses.

23         Just start actually at the top where it says Fernando

24 Cortes to John Tate and just go through the rest of the page,

25 the bottom two-thirds of the page.  Just get all of it, that

1    would be fine.

2               Yeah, that would be just fine.

3               So we just looked at an e-mail from you dated

4    February 8, 2012, where you were instructing a wire transfer to

5    be made.  This e-mail is dated February 16, 2012, eight days

6    later.

7               Do you see that?

8    A.  Yes.

9    Q.  And on the second page of this very e-mail -- do you want to

10   go to the second page, Mr. Mills.

11              On the second page of this e-mail dated February 16,

12   2012, you're asking Mr. Tate to approve a $38,000 invoice to

13   Interactive Communication Technology, correct?

14   A.  I'm not asking him for approval in this e-mail.  I'm giving

15   him a snapshot of the outstanding expenses.

16   Q.  Okay.  So you're giving him a snapshot of unpaid invoices as

17   of February 16, 2012?

18   A.  Correct.

19   Q.  And your testimony is you're not seeking his approval to pay

20   it?

21   A.  Not individually.

22   Q.  Go back to the top third of that, please, on the first page,

23   Mr. Mills.

24              Of the first page, Mr. Mills.

25              So on February 16, 2012, Mr. Tate responds to you

1  after you provide a list of outstanding invoices and states, to

2  you only, I just authorized one million in mail and 750,000 in

3  TV adds.  Of course, not all payable now, or even this week.

4  But let's keep in mind, hold off paying whatever invoices we can

5  hold off on.  Cando can wait.  Wentzel can wait.  Dumas can

6  wait.  I think MPrinting can wait?  Valkyrie can wait.  Don't

7  know what Interactive Communication Technology is.

8           Is it your testimony you were not asking Mr. Tate for

9  approval of these outstanding invoices on February 16th of 2012?

10 A.  With regards to certain invoices, the approval process also

11 had an individual approval chain.  So some of these may have

12 already been approved or sent individually.  This was a snapshot

13 of the entire expenses.  So it was more of an approval as far as

14 how -- what order to pay, like what would take priority to pay

15 first.

16 Q.  Okay.

17 A.  Because these were all outstanding expenses we would have to

18 pay.

19 Q.  But you agree that eight days earlier, on February 8, 2012,

20 you instructed Ms. Watts to make payment to ICT via wire

21 transfer?

22 A.  Correct.

23 Q.  Correct?

24 A.  That is correct.

25 Q.  And you admit that eight days earlier that payment was made

1 via wire transfer, correct?

2 A.  That's when I had sent it.  I don't know if -- I don't

3 recall if it had gone through that day.

4 Q.  Okay.  So eight days later, on February 16th, you're then

5 listing it as an outstanding invoice to your superior, Mr. Tate?

6 A.  That's correct.

7          MR. LINEBAUGH:  I would like to offer Government

8 Exhibit 145.

9                              (Government Exhibit 145 was

10                              offered in evidence.)

11          MR. PILGER:  One moment, please.

12          No objection.

13          THE COURT:  Received.

14                              (Government Exhibit 145 was

15                              received in evidence.)

16 BY MR. LINEBAUGH:

17 Q.  Do you recognize these FEC reports, Mr. Cortes?

18 A.  I've been shown something similar to it, yes.

19 Q.  Let's go to the second page, Mr. Mills, if we could.  Let's

20 blow up the section C if possible.

21          So, again, this is an FEC report, correct?

22 A.  If that's what you're saying.

23 Q.  Do you not recognize it as one in your experience?

24 A.  I've been shown it to be one.

25          MR. PILGER:  That's asked and answered.  If he wants

1  to publish it to the witness, we don't object, but he doesn't

2  know about it.

3              THE COURT:  Well, he just asked him that question.

4  There's no objection here.

5              Go ahead.

6  BY MR. LINEBAUGH:

7  Q.  Now, this portion of the FEC report, Government Exhibit 145,

8  it indicates that ICT was paid 38,125 on February 8, 2012,

9  correct?

10  A.  I guess reading it it says it was a disbursement for the

11  period, 38,125.

12  Q.  I want to make sure your testimony is clear on this.  So

13  eight days later, on February 16, 2012, had you forgotten that

14  the ICT payment had already been made?

15              MR. PILGER:  Objection; facts not in evidence that he

16  even knew about it in this report.

17              THE COURT:  He said he doesn't know about this report.

18              MR. LINEBAUGH:  Okay.

19              THE COURT:  So lack of personal knowledge.

20  BY MR. LINEBAUGH:

21  Q.  Now referring to Exhibit 16.  Publish Exhibit 16, please.

22              There it is.  Thank you, Mr. Mills.

23              Let me ask you a question based off of this exhibit.

24  This is you, eight days prior to February 16, 2012, you are

25  instructing a wire transfer to be made in the amount of $38,000,

1  correct?

2  A.  That is correct.

3  Q.  Do you have personal knowledge of this?

4  A.  Of this e-mail?

5  Q.  Yes.

6  A.  Yes.

7  Q.  So my question to you is the same question.  On February 16,

8  2012, you indicated to your superior that ICT was an unpaid

9  invoice?

10 A.  On the e-mail it was listed under an outstanding expense,

11 yes.

12 Q.  Okay.  Thank you.

13        But you knew it had been paid because you instructed

14 it to be paid on February 8 of 2012, correct?

15 A.  If it was the same one, then it would have been correlated

16 to this one eight days prior.

17        MR. LINEBAUGH:  One moment, Your Honor.

18        THE COURT:  Yes.

19        (Pause.)

20        MR. LINEBAUGH:  Nothing further.

21        THE COURT:  Mr. Binnall.

22        THE WITNESS:  Would you like this back, sir?

23        THE COURT:  No.  Just leave it there.  He'll take it

24 if he wants it.

25

1                    CROSS-EXAMINATION

2    BY MR. BINNALL:

3    Q.  Good morning, Mr. Cortes.  Jesse Binnall representing

4    Mr. Kesari.

5            Mr. Cortes, there was a code assigned to invoices

6    before their approval, correct?

7    A.  That is correct.

8    Q.  And you went through an awful lot of invoices in order to

9    code them, didn't you?

10   A.  Invoices and expense reports, receipts.

11   Q.  And these codes, they're internal codes based on FEC expense

12   categories, correct?

13   A.  Yes.

14   Q.  And Ms. Deana Watts is the one who gave you the codes,

15   right?

16   A.  That is correct.

17   Q.  And you were actually the one in charge of training your

18   assistants in how to code the invoices, right?

19   A.  That would be accurate.

20   Q.  And you actually are the one, you are the one, along with

21   your assistants, who picked the codes that were assigned to

22   invoices, correct?

23   A.  If the employee or staffer or consultant had not already

24   provided it.  We would then question them if we had a question

25   as to what the expense was.

1  Q.  All right.  Thank you.

2          And you were in charge of making sure that the

3  invoices had the correct information on it to send it on to the

4  controller and treasurer in Texas, correct?

5  A.  Correct.

6  Q.  And you're the one who knew that the information -- strike

7  that.

8          You knew that the information that you would give to

9  the controller would end up on FEC reports, right?

10  A.  Yes.

11  Q.  Could we get Exhibit 77?

12          All right.  Could we highlight the top?

13          Mr. Cortes, this is the e-mail that you've been shown

14  a couple of times now on February the 8th of 2012, correct?

15  A.  Correct.

16  Q.  And the code in there is 60110?

17  A.  Correct.

18  Q.  And the invoice that's attached, that's an invoice that's

19  forwarded to you from Mr. Kesari, right?

20  A.  That is correct.

21  Q.  Mr. Cortes, there was an employee handbook for the Paul

22  Campaign, correct?

23  A.  That is correct.

24  Q.  And you don't remember anything in that handbook having

25  anything about FEC requirements, correct?

1    A.  There may have been the one stating that all expenses that

2    we would reimburse employees, that they would need to be

3    legitimate expenses.  I don't recall the exact verbiage.

4    Q.  Mr. Cortes, you previously testified --

5             If the court would indulge me for just one second.

6             MR. PILGER:  Your Honor, on this foundation, we never

7    did lay the ground rules on prior proceeding.  I guess that's

8    the right term.

9             MR. BINNALL:  I don't intend to use that.

10   BY MR. BINNALL:

11   Q.  Mr. Cortes, you previously testified in front of a grand

12   jury in this matter, correct?

13   A.  In a related matter, yes.

14   Q.  And I'm on page 97 of the grand jury testimony.  In that

15   testimony you were asked about the manual, correct?

16   A.  I don't recall.  If I could be refreshed.

17            MR. BINNALL:  Could I have the Elmo just for the

18   witness?

19            MR. PILGER:  So if he's refreshing him, he shouldn't

20   publish.

21            THE COURT:  He said just for the witness.

22            MR. BINNALL:  Just for the witness.

23   BY MR. BINNALL:

24   Q.  Mr. Cortes, it's going to be two pages, and you can start --

25   just read that and let me know when you're done.

1          (Pause.)

2     A.  Okay.  Can you slide it down a little?

3     Q.  I'm sorry, just through line 3.

4     A.  Okay.

5     Q.  So, Mr. Cortes, isn't it true that you don't recall anything

6     in the manual about the Federal Election Commission other than

7     providing expense reports on time, right?

8     A.  Right.  And part of the explanation for expense reports

9     would have included the expenses to be coded in the proper way,

10    but the manual itself --

11    Q.  You never told that to the grand jury, did you?

12    A.  I'm sorry?

13    Q.  You never told that to the grand jury, did you?

14    A.  Not in the testimony that you just showed me.

15    Q.  Mr. Cortes, Mr. Kesari didn't work under you, correct?

16    A.  He did not.

17    Q.  And you didn't report to him either, right?

18    A.  I did not.

19    Q.  He was on the political side of the campaign?  You've heard

20    it referred to that way?

21    A.  Yes.  In some aspects he did logistics.

22    Q.  And then you were on the compliance side of the campaign,

23    except for your Hispanic outreach part, right?

24    A.  Define compliance.

25    Q.  Well, have you heard it referred to as compliance before?

1  A.  I more referred to it as the operational aspect.

2  Q.  I'm sorry?

3  A.  I refer to it as the operational aspect, logistics and HR.

4  Q.  And it's things like accounting and reports and stuff like

5  that, correct?

6  A.  Accounts receivable, accounts payable.

7  Q.  Accounts receivable, yeah, thank you.

8       You talked with Mr. Pilger about nondisclosure

9  agreements, right?

10  A.  He asked about it, yes.

11  Q.  And not everybody on the campaign or that did work on behalf

12  of the campaign had a nondisclosure agreement, correct?

13  A.  I -- the assumption was that everybody had signed.  I'm not

14  sure if, in fact, everybody did get one in.

15  Q.  Do you know if Kirk Shelly -- do you know who Kirk Shelly

16  is?

17  A.  I do know Kirk Shelly.

18  Q.  Do you know if he had one?

19  A.  I don't recall.  He may have, but I don't recall.

20  Q.  Do you know who Mike Rothfeld is?

21  A.  I do.

22  Q.  And do you know if he had one?

23  A.  I don't recall.

24  Q.  Do you know if the campaign hired at one point a law firm

25  called Bronley & Binnall?

1    A.  I'm sorry?

2    Q.  A law firm called Bronley & Binnall?

3    A.  I'm sorry, I don't know.

4    Q.  The campaign hires a lot of people, right?

5    A.  If they're employees, yes.

6    Q.  And on top of employees, other people that do work on behalf

7    of campaigns that aren't employees, right?

8    A.  Contractors yet.

9    Q.  Do you know if any lawyers at Bronley & Binnall had an NDA?

10   A.  I don't recall.

11   Q.  There's a lot of people that did work on behalf of the

12   campaign and some of them you don't know one way or the other if

13   they had NDAs; isn't that correct?

14   A.  If they were employees, they should have received one and

15   they should have sent one in.

16   Q.  If they're employees; but if they were not employees doing

17   work on behalf of the campaign, then it wasn't -- you don't

18   know; is that right?

19   A.  The campaign paid them directly as contractors/employees,

20   yes.  Otherwise we would not.

21   Q.  All right.  Then why don't you know about Kirk Shelly?

22          MR. PILGER:  I didn't hear that question exactly.  I

23   think there might be an objection.

24          THE COURT:  Could you repeat your question?

25   BY MR. BINNALL:

1  Q.  Yeah.  Then why don't you know whether or not Kirk Shelly

2  had an NDA?

3  A.  I just don't recall.  I don't have the records in front of

4  me.  I could look easily and see if there was one or not.

5  Q.  Was Kirk Shelly an employee of the campaign?

6  A.  I don't remember him being one, no.

7  Q.  Was Mike Rothfeld an employee of the campaign?

8  A.  His company was consulting to the campaign.

9  Q.  His company was, correct?  So Mike Rothfeld never worked for

10  the campaign; he worked for a company that was paid by the

11  campaign?

12          MR. PILGER:  Objection in commenting if things are

13  correct.  Just ask the witness questions.

14          THE COURT:  That's okay.

15          Go ahead.

16  A.  Could you repeat the question?

17  BY MR. BINNALL:

18  Q.  Yes.  It's right for me to say that Mike Rothfeld didn't

19  work directly for the campaign, he worked for a company that was

20  paid by the campaign; isn't that right?

21  A.  I believe that was the arrangement, yes.

22  Q.  Mr. Cortes, one of your duties was to serve as a liaison

23  with the campaign lawyers; isn't that right?

24  A.  One of the functions, yes.

25  Q.  And you sent out an e-mail to all of the employees of the

1  campaign advising them not to go directly to the campaign

2  lawyers with their legal questions; isn't that right?

3  A.  That is correct.

4  Q.  You told them to go directly to you instead?

5  A.  Yes.

6        MR. BINNALL:  The court's indulgence for just one

7  moment, please.

8        (Pause.)

9        MR. BINNALL:  No further questions.

10        THE COURT:  We'll start again at 1:15.  See you ready

11  to go then.

12        (Recess at 11:55 a.m., until 1:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION  1:15 p.m.

2              (In open court, in the presence of the jury.)

3              THE COURT:  Please be seated.

4              Ms. Campbell.

5                        FERNANDO CORTES,

6    resumed his testimony as follows:

7                        CROSS-EXAMINATION

8    BY MS. CAMPBELL:

9    Q.  Mr. Cortes, my name is Angela Campbell, and I represent

10   Jesse Benton.

11             In 2011, heading towards the end of the year, did you

12   send out mass e-mails to all of the staff?

13   A.  From time to time, yes.

14   Q.  And was one of the things that you were reminding the staff

15   is to get you expenses for their expense reports in December?

16   A.  That is correct.

17   Q.  And, in fact, you had sent deadlines for when you needed

18   expense reports; is that right?

19   A.  That is correct.

20   Q.  And you were doing that because you needed to have all of

21   the expenses that were going on expense reports to you in

22   December for the FEC filings, right?

23   A.  Right.  Prior to any close of quarter, we would want all of

24   the expenditures done in that quarter.

25   Q.  Do you recall in 2011 what the day was that you were asking

1  for people to get their expenditures to you by?

2  A.  I don't recall the exact date, but it would have been near

3  the end of the month.

4  Q.  Would it refresh your recollection to review the e-mail

5  blast you sent out?

6  A.  Yes.

7        MS. CAMPBELL:  May I approach, Your Honor?

8        THE COURT:  You don't have to ask.

9  BY MS. CAMPBELL:

10  Q.  Does that refresh your recollection?

11  A.  Of one of them, yes.

12  Q.  And in 2011, what was the deadline you were trying to get

13  the staff to get you expense reports by?

14  A.  We wanted it to be in by December 27th as it would take us

15  some time to process.

16  Q.  Okay.  So you were telling all the staff to get their

17  expenditure reports in by December 27, 2011?

18  A.  That is correct.

19  Q.  So you had enough time to process it for the end of the

20  year?

21  A.  That's correct.

22  Q.  Now, is there a difference between an expenditure report and

23  a vendor third-party bill?

24  A.  Yes.

25  Q.  Okay.  Well, an expenditure report in some ways is more

1  important for you to get by the end of December; is that right?

2  A.  I think both would be as important, but they have

3  different -- there's a different process for which they get

4  approved.

5  Q.  Let me rephrase it this way.  If you hold pay a vendor bill

6  past the deadline and then you pay it in January, you don't have

7  to report that in the December 2011 filing; is that right?

8  A.  To my understanding, it would not be reported initially

9  since it was not paid.  However, if it had been paid for that

10 period, an amendment would have to be made thereafter.

11 Q.  Okay.  And you weren't the one making -- doing the FEC

12 reports; is that right?

13 A.  I was not.

14 Q.  And part of the purpose of getting all of the expenditures

15 that were happening in December of 2011 to you was so that you

16 could cut down on the number of amendments you have to file; is

17 that right?

18 A.  That and to report what we had expended.

19 Q.  Okay.  And when you file the FEC reports, you're aware that

20 sometimes they're then amended; is that right?

21 A.  Correct.

22 Q.  Now, just so we're clear, December 27, 2011, was your

23 deadline that you came up with to help your staff?

24 A.  Correct.  Towards the end of that month, specifically the --

25 a lot of the staff was traveling out in the field.  So in order

1  for us to process money for them and also get it to them in time

2  before -- a lot of these employees were basically living

3  paycheck to paycheck or expense report -- expense reimbursement

4  to expense reimbursement, so we wanted to get them as quickly as

5  possible.

6  Q.  Now, I want to show you what has been previously admitted as

7  I believe both Tate's Exhibit 7 and Government's Exhibit 57 so

8  if we could pull up Tate Exhibit 7, which I believe has already

9  been admitted.

10         I believe if you could zoom in on the bottom part.

11  Yeah, thank you.

12         On December 29, 2011, you're reporting the status of

13  the finances; is that right?

14  A.  Correct.

15  Q.  And COH means cash on hand?

16  A.  That is correct.  That's -- yes, that's correct.

17  Q.  So on that day you had cash on hand -- so money that you

18  could spend; is that right?

19  A.  Correct.

20  Q.  -- of $135,000?

21  A.  Yes.

22  Q.  And you had reserves, which is separate from cash on hand,

23  right?

24  A.  Correct.

25  Q.  That's already been sort of allocated; is that right?

1  A.  Yes.

2  Q.  Of 400,000?

3  A.  Roughly, yes.

4  Q.  Approximately.  And that's to cover credit card fees and

5  payroll; is that right?

6  A.  Yes.

7  Q.  And then you have outstanding invoices; is that right?

8  A.  That is correct.

9  Q.  Fair to say even if you add the cash on hand and the

10 reserves together, you can't cover your outstanding invoices?

11 A.  That is correct.

12 Q.  And so you have to do triage; is that right?

13 A.  I just report and it's up to other people to decide that.

14 Q.  Okay.  But you're reporting this is, we're in the red,

15 right?

16 A.  We have outstanding invoices.

17 Q.  If we could pull up what I believe was Government's Exhibit

18 58 from February 16.

19          And this is your communications with John Tate again

20 about finances, right?

21 A.  Correct.

22 Q.  Same sort of thing, right, as we just looked at in Tate

23 Exhibit 7?

24 A.  Yes.

25 Q.  Wanting to make sure that you don't, for lack of a better

1  term, bounce a check, right?

2  A.  Yeah.  That would be very bad.

3  Q.  So only paying as much money as you have?

4  A.  Giving them the information and letting them decide what to

5  do.

6  Q.  Okay.  And so you're keeping the checkbook for the campaign?

7  A.  I would address it as I'm keeping the campaign abreast of

8  the snapshot of where our finances are.

9  Q.  And, again, at risk sort of here of not having as much in as

10  what needs to go out; is that fair?

11  A.  Correct.  On hand, according to this specific report, we

12  only had 13,000.

13  Q.  So holding off on paying things when you don't have the

14  money to pay them until you get more money?

15  A.  Correct.

16  Q.  Okay.  Now, there are different types of campaigns, right?

17  You're aware of that?

18  A.  There's many campaigns.

19  Q.  And there's grassroots campaigns.  Are you familiar with

20  that term?

21  A.  It can vary from definition to definition, but I've heard

22  the term.

23  Q.  And establishment campaigns; is that a phrase?

24  A.  Yes.  A lot of people have different opinions of what that

25  is.

1  Q.  And you weren't involved with the money coming in to the Ron

2  Paul Campaign, were you?

3  A.  No, I was not.

4  Q.  That was a different group of people?

5  A.  That is correct.

6  Q.  Not your office?

7  A.  That is correct.

8  Q.  And are you aware of the number of donors?

9  A.  I knew that we had a significant number of smaller

10  donations, but I was not -- I can't tell you the exact number,

11  no.

12  Q.  Not your job to keep track of it?

13  A.  No, it is not.

14  Q.  Do you know whether or not it broke records at the time?

15          MR. PILGER:  Objection; relevance.

16          THE COURT:  What is the relevance of that?

17          MS. CAMPBELL:  We're talking about money coming in,

18  money going out.  We're talking about who -- how much each

19  expenditure is coming in, what is the financial status of the

20  campaign, why they're holding invoices, why they are paying

21  certain invoices on certain days, the fact that they --

22          THE COURT:  Overruled.

23          Go ahead.

24  A.  Can you repeat the question, please?

25  BY MS. CAMPBELL:

1  Q.  Maybe.  At least one similar.  Were you aware that at the

2  time they were breaking records on numbers of donors coming in?

3  A.  To the best of my recollection, I don't remember if there

4  was a reported number, but it was a significant number of small

5  donations.

6  Q.  Okay.  And is that considered grassroots?

7  A.  In the definition, yes, it would be, if the majority of

8  donations are from small donors rather than to a small number of

9  donors.

10  Q.  So small donors, so donors -- lots of them donating small

11  amounts of money to the campaign generally in your knowledge is

12  a grassroots campaign?

13  A.  Some would classify it as that.

14  Q.  And this was a grassroots campaign, the Ron Paul Campaign?

15  A.  It was defined as that by several people.

16  Q.  Now, those donors all have to be reported, don't they?

17  A.  To my understanding, yes.

18  Q.  Now, when you -- you said you got the codes, the number

19  codes that correspond with the expenditures.  I believe you said

20  you got those from Deana Watts?

21  A.  That is correct.

22  Q.  Do you know -- and only tell me if you know -- where she got

23  them from?

24  A.  I don't know specifically where.

25  Q.  Okay.  Was it related to the accounting software, do you

1  know?

2  A.  To my understanding, we used accounting software and it was

3  linked in some way.  I'm not sure exactly how.

4  Q.  Okay.  And do you know how or if the accounting software --

5  if you don't know, just say you don't know -- how or if the

6  accounting software was linked to FEC reporting?

7  A.  I don't know how exactly it was linked.

8  Q.  Now, do you know how -- whether or not audiovisual was used

9  on other expenditures?

10  A.  For the campaign?

11  Q.  Yes.

12  A.  Yes.  That code was to be used to identify other expenses.

13  Q.  Okay.  And were you always the person coding?

14  A.  It was either myself or my assistant.

15  Q.  And so you used the code on other expenditures?

16  A.  Yes, I believe so.  And also employees who used that code in

17  their expense report reporting.

18  Q.  Do you know Nick Spanos?

19  A.  Yes, I do know him.

20  Q.  Do you know what he did for the campaign?

21  A.  To the best of my understanding, he worked on field dealing

22  with voter outreach through phones.  That's as best as I can

23  describe what he did.

24  Q.  Like phone bank?

25  A.  I believe so, yes.

1  Q.  Do you know what his company's name was?

2  A.  Off the top of my head, no, I do not.

3  Q.  Do you know how his bills for phone outreach were coded?

4  A.  I don't recall.

5  Q.  Would you have been the one recording them -- coding them?

6  A.  It would either be myself or my assistant.

7  Q.  And do you know how you would code expenditures for a phone

8  bank?

9  A.  I believe we used telecommunications, but I'm not entirely

10  sure.  If you have something that would refresh my memory, I

11  would love to see it.

12  Q.  Well, I mean, do you have any independent recollection of

13  that?

14  A.  I believe that would have fallen under either telecom or

15  something similar.

16  Q.  How about audiovisual?

17  A.  I don't think so.

18  Q.  Are you sure?

19  A.  I'm not entirely sure if that was ever used for his company.

20  Q.  Were you the one that coded his bills specifically?

21  A.  If it didn't have a code along with it, then yes.  Either

22  myself or my assistant.

23  Q.  Do you know the company Public Appeal, Incorporated?

24  A.  Not off the top of my head.

25  Q.  So you're not able to tell us whether Public Appeal,

1  Incorporated, was Nick Spanos's company?

2  A.  Again, not off the top of my head, I don't know that.

3  Q.  So it would likely not refresh your recollection to see how

4  Public Appeal's were coded, expenditures were coded?

5  A.  I would have to see the invoice.  Most of how we code things

6  are based off the invoice itself, what type of expense is listed

7  on the invoice.

8  Q.  And you're not involved then in actually entering the data

9  into the FEC report?

10  A.  Correct.

11  Q.  Someone else does that?

12  A.  That is correct.

13  Q.  But you would put a code on the invoice that went to them to

14  put it into the FEC report?

15  A.  Correct.

16  Q.  Now, did the coding process, to your recollection, ever

17  change during the campaign?

18  A.  I think a few times some new category -- a new category

19  would be added because there was a significant increase in

20  volume of an expense that we had previously lumped with another

21  expense.

22  Q.  So as the campaign got bigger, more categories were added;

23  is that correct?

24  A.  At times some would be added.

25  Q.  And who made that decision?

1    A.  It would be --

2           MR. PILGER:  Objection; relevance.

3           THE COURT:  Overruled.

4           Answer the question.

5    A.  It would be Deana Watts.

6    BY MS. CAMPBELL:

7    Q.  Specifically was Jesse Benton the one changing how to code

8    invoices?

9    A.  No.

10   Q.  Now, there were people that were paid as staff, right?

11   A.  Employees, W-2 employees, correct.

12   Q.  And then there were people that paid with -- that would not

13   be considered employees but would be considered independent

14   contractors; is that right?

15   A.  Contractors, you have 1099s for them.

16   Q.  So you're not only having to follow these election

17   regulations, but you also have to file some taxes and stuff,

18   right?

19   A.  Yes, like any other business.

20   Q.  So some people got W-2s, right?

21   A.  Correct.

22   Q.  And some got 1099s?

23   A.  That's correct.

24   Q.  And some companies got 1099s?

25   A.  If they met the threshold, yes.

1  Q.  And there's an amount of money that you have to meet in

2  order to get the 1099?

3  A.  That's correct.

4  Q.  So if they -- do you know what the threshold is?

5  A.  I believe at the time it was $600, but I'm not sure what it

6  is now.

7  Q.  So if a vendor got paid from the campaign, the campaign

8  would send the vendor a 1099; is that right, over $600?

9  A.  Ideally.  I was not in charge of that, but that's what

10  should have been.

11  Q.  Someone else was doing that as well, right?

12  A.  That's correct.

13  Q.  And do you know, do you remember who all was on salary

14  versus who was a 1099 employee?

15  A.  I had spreadsheets indicating who's what; but off the top of

16  my head, I can -- I wouldn't be able to recite all 120-plus

17  employees or contractors.

18  Q.  Okay.  So there were a lot, right?

19  A.  There were a lot.

20  Q.  And if you had the paper, you could tell us; but if someone

21  just asked you, you wouldn't know, right?

22  A.  That is correct.

23  Q.  Now, I want to talk to you about -- and I apologize, I know

24  you've done a lot of dates; but first was Jesse Benton making

25  the coding decisions for the ICT invoices?

1  A.  No, he was not.

2  Q.  Can we pull up exhibits, side by side, Government's Exhibits

3  76 and 77 previously admitted.

4        And so even though they're actually numbered 76 and

5  then 77, let's start with 77 so we can go chronologically.  Yes,

6  blow up that top one there.  Yes, there you go.

7        So this is you, 77, you forwarding on February 8 at

8  11:08 a.m. to Lori Pyeatt, Deana Watts, Katie Koerber, and

9  Dimitri Kesari the payment for ICT, right?

10  A.  That is correct.

11  Q.  And now let's look at 76, and you can just hit the arrow and

12  it will back it up.  Let's look at 76 this time there.

13        11:29 a.m., after you've already sent it to everybody

14  to get paid, right?

15  A.  Correct.

16  Q.  Can you pull that one up, too, so they can see both dates,

17  pull up 77, too.

18  A.  It shows a time of 11:29, February 8, 2012.

19  Q.  So after you forwarded it for payment, right?

20  A.  That is what it shows.

21  Q.  Okay.  And so when Dimitri Kesari gets your e-mail

22  forwarding it for payment, he then tells you this is approved by

23  Jesse after it goes to all of these other people; is that right?

24  A.  According to the time line on this, correct.

25  Q.  And Jesse is not -- Jesse Benton is not on either of these

1  e-mails, is he?

2  A.  He is not.

3  Q.  And you took the man at his word that it was approved by

4  Jesse; fair?

5  A.  That is correct.

6  Q.  Do you know what Jesse approved personally?

7  A.  The indication is that he would have approved this invoice.

8  Q.  I'm asking you what you know.  Do you know what Jesse Benton

9  did?

10  A.  No, I do not.

11  Q.  Do you know if he approved the amount?

12  A.  No, I do not.

13  Q.  Do you know if he approved the method of payment?

14  A.  No.  It was standard -- it was the standard understanding

15  when somebody said Jesse approved it that he knew what it was.

16  Q.  At the time that was standard, right?

17  A.  Yes.

18  Q.  We'll come back to those.

19         Now, how about, let's do -- well, this has not been

20  offered yet, so can we do it not publicly, Government's Exhibit

21  87c.

22         Do you see that e-mail, sir?

23  A.  I do.

24  Q.  Are you on that e-mail?

25  A.  I am not.

1  Q.  Is it an e-mail from an e-mail address you recognize?

2  A.  I'm sorry?

3  Q.  Who is it from, do you recognize?

4  A.  It says it's from Dimitri Kesari.

5  Q.  And who is it to?

6  A.  Jesse Benton.

7  Q.  And what's the date?

8  A.  Wednesday, May 2, 2012.

9  Q.  And you are not on this e-mail; is that right?

10  A.  That is correct.

11  Q.  Have you seen this e-mail before?

12  A.  Not to my -- I mean, I may have been shown it; but I don't

13  recall it specifically, no.

14  Q.  And at the time you wouldn't have gotten it because you're

15  not on the e-mail header; is that right?

16  A.  That's correct.

17          MS. CAMPBELL:  We would offer Government's Exhibit

18  87c.

19                              (Government Exhibit 87c was

20                              offered in evidence.)

21          MR. PILGER:  No objection.

22          THE COURT:  Received.

23                              (Government Exhibit 87c was

24                              received in evidence.)

25          MS. CAMPBELL:  Can we publish?  Can you blow up the

1    part where Jesse Benton responds?  Go down to the part Kent's

2    bill.

3    BY MS. CAMPBELL:

4    Q.  This is May 2, 2012, Dimitri Kesari asking whether to pay

5    Kent's bill.

6                Do you see that?

7    A.  That's the bottom, yes.

8    Q.  And Jesse Benton says, yes, last time.

9                Do you see that?

10   A.  Yes.

11   Q.  Now, let's do a side by side of 87c next to Government's

12   Exhibit 88 previously admitted.

13                Now, do you see here -- can you blow up the header

14   there, yeah, for 88.

15                This is Dimitri Kesari e-mailing you on the same date

16   after he got last time.

17                Do you see that?

18   A.  He e-mailed me, that is correct, May 2nd.

19   Q.  And he just said approved by Jesse, right?

20   A.  Correct.

21   Q.  Did he tell you Jesse Benton said last time?

22   A.  No.

23   Q.  Did he forward you that e-mail where Jesse Benton says last

24   time?

25   A.  No.

1    Q.  Did he forward you that e-mail where Jesse Benton is told

2    that's Kent's bill?

3    A.  No.

4    Q.  Instead, he e-mails you approved by Jesse; is that right?

5    A.  This is what he sent.

6    Q.  Now, that's May 2, 2012, right?

7    A.  Correct.

8    Q.  And we now can -- let's pull up now what's previously been

9    admitted as Government's Exhibits 93 and 95.  I believe they are

10   previously admitted.

11           Now, this is now May -- can you blow up on 93?

12           This is an e-mail to you from Dimitri Kesari on

13   May 24, 2012, saying this is the last one, right?

14   A.  Correct.

15   Q.  Does it say it's the last one, except that Jesse said the

16   last one was the last one?

17   A.  No.

18   Q.  Did it tell you that Jesse Benton had already said last one?

19   A.  No.

20   Q.  Did you know that, sir?

21   A.  I did not.

22   Q.  Did you know that when you got these?

23   A.  I did not.

24   Q.  Had you known it, would you have done something different?

25   A.  Yes.

1  Q.  Let's pull up -- let's compare that then to G 95.

2          This is where you tell John Tate that Dimitri said

3  it's the last one, right?

4  A.  Correct.

5  Q.  But not Jesse Benton, right?

6  A.  Correct.

7  Q.  So Jesse Benton is not on these e-mails from the end of

8  May of 2012 talking about the last one, right?

9  A.  He wasn't in the other ones, so no.

10  Q.  So he -- let's go to what's the June -- maybe 100, something

11  like that.  That's probably right, previously admitted.

12          That's where you say -- we're now on June 25th, so now

13  we're on the third one is the last one is the last one; but this

14  time because you were told it was the last one in May you say to

15  Tate, this is the last one again, right?

16  A.  Correct.

17  Q.  And you still -- sir, do you still not know that Jesse

18  Benton has told them -- I'm sorry, told Dimitri Kesari last one

19  for April?

20  A.  I still do not know.

21  Q.  You can take those off.

22          Now, at some point, sir, I believe you pulled them all

23  and sent them to Mr. Benton; is that right?

24  A.  I pulled several e-mails and sent them to Jesse, Lori, and

25  Deana.

1  Q.  And that's Government's Exhibit 62 previously admitted, I

2  believe.

3        Now, this is August 17, 2013; is that right?

4  A.  Yes, it is.

5  Q.  Is it fair to say in 2011 things are pretty busy when you're

6  doing the campaign?

7  A.  Yes.

8  Q.  In fact, I believe the phrase you used at one of the e-mails

9  was when you have time to come up for air; is that right?

10  A.  I don't think I used that, no.  I saw it on a previous

11  e-mail, but I don't think I used it.

12  Q.  Okay.  Everyone was really busy, right?

13  A.  I would assume.

14  Q.  Lots of e-mails?

15  A.  Assumed.

16        MR. PILGER:  Your Honor, just for clarity, are we in

17  2011 or '13 now?

18        MS. CAMPBELL:  We're in 2011.

19        THE COURT:  Go ahead.

20  BY MS. CAMPBELL:

21  Q.  Does that include Jesse Benton?

22  A.  As the chairman of the campaign, I assume he was much more

23  busier than the rest of us, and we were all pretty busy.

24  Q.  And you were really busy; is that right?

25  A.  Yes.

1   Q.  And he was even more busy is your understanding?

2   A.  My assumption, yes.

3   Q.  But now with the benefit of reflection, August 17, 2013, you

4   send him all of the invoices and correspondence, is that right,

5   involving ICT?

6   A.  On 8/17, yes, in response to me saying information regarding

7   the campaign.

8   Q.  And your message was, this seems like a problem, I pulled

9   these and sent them to you, right?

10  A.  The exact thing I said was, given recent articles, attached

11  are conversations/e-mail chains you were left out of during the

12  campaign.  Even though Dimitri in some of them made it seem like

13  you were, others were big expenses without Jesse in the chain

14  and were inconsistent to me.

15  Q.  So you went back and looked?

16  A.  That's correct.

17  Q.  And you thought Jesse Benton is not on these, right?

18  A.  Upon my looking at them, I noticed that Jesse was left off.

19  Q.  In 2013?

20  A.  In 2013.

21  Q.  And that's when you sent them to him?

22  A.  That's correct.

23          MS. CAMPBELL:  I don't have anything further, Your

24  Honor.

25          THE COURT:  Mr. Pilger?

1      MR. PILGER:  May it please the court.

2                    REDIRECT EXAMINATION

3  BY MR. PILGER:

4  Q.  I think you were on cross longer than direct, so I'm not

5  going to go over every single thing.  Don't worry.

6           Let's take up where Ms. Campbell left off.  She was

7  talking to you about the 2013 e-mail -- I believe that's

8  Government's Exhibit 62 if you pull that up -- that you sent to

9  Jesse Benton?

10  A.  Okay.

11  Q.  And she said -- Ms. Campbell said, her words were upon

12  benefit of reflection, you decided to send this.  Was there

13  actually a very specific reason she didn't allude to that you

14  sent this?

15  A.  I don't know if there was a specific reason; but I had one,

16  yes.

17  Q.  Is it in the letter that there's a specific reason?

18  A.  Yes, given recent articles.

19  Q.  Okay.  So we're going to get into that in a little bit.  It

20  wasn't you reflecting; it was the articles, right?

21  A.  That is correct.

22  Q.  And it caused you to send this?

23  A.  That is correct.

24  Q.  What did the articles say?

25           MS. CAMPBELL:  Objection, Your Honor; hearsay.

1       MR. PILGER:  She opened the door here, and I'm not

2  asking for not for the truth of the matter asserted but why he

3  did what he did after she got into that on her cross.

4       THE COURT:  Sustained.

5       Pose a new question.

6  BY MR. PILGER:

7  Q.  Just reading from the exhibit, why did you send this?

8       MS. CAMPBELL:  Objection, Your Honor; asked and

9  answered.

10      THE COURT:  It is sustained.

11 BY MR. PILGER:

12 Q.  And when you sent this to Jesse Benton, what was his

13 response to you?

14 A.  He said, thanks, Fernando.

15 Q.  Did he say anything to you like, I don't know what these are

16 about?

17 A.  No, he did not.

18 Q.  Did he say that I think this is crazy, something wrong has

19 happened?

20 A.  No, he did not.

21 Q.  Did he take the opportunity to say anything like that to you

22 in an e-mail?

23 A.  During this time, no.

24 Q.  Did he call you up and say, this is crazy, I don't know what

25 this is?

1  A.  No.

2  Q.  Now, Ms. Campbell was asking you about the e-mail blast you

3  sent out asking people to get their reports in by the 27th of

4  December of 2011.

5          Do you remember that?

6  A.  Yes, I do.

7  Q.  And that was so you could get ahead of the reporting

8  requirements, right?

9  A.  Correct.  With a large number of staff getting 70 or 80

10  reports all on December 29th or 30th would have been a nightmare

11  for us to get it all in, so we wanted to get ahead of it.

12  Q.  So as preliminary to me asking you if things came in -- if

13  expenses were made between the 27th and the 31st, would you

14  still collect the data and report that or not?

15  A.  We would ask everybody in good faith to submit it if

16  possible, and if they weren't able to do that, it would get

17  reported on the next amendment for that quarter.

18  Q.  So when you're asking people to report by the 27th, is it

19  fair to say that you still know there's going to be expenditures

20  in those last few days that you have to deal with, or not?

21  A.  Yes.  If we can get them in, we would have dealt with them,

22  yes.

23  Q.  Ms. Campbell had some exhibits up, 76 and 77, side by side

24  and was contrasting the date -- I'm sorry; the time stamp for

25  when Dimitri Kesari corresponded with you asking for the money,

1  correct?

2  A.  Correct.

3  Q.  And the time stamp is going to depend on what time zone

4  Dimitri Kesari was in, correct?

5  A.  Correct.

6  Q.  Do you know what time zone Dimitri Kesari was in?

7  A.  I remember -- what I recall is Mr. Kesari was working on the

8  west coast, Nevada.  I don't know exactly the time, but that

9  would have been a reason for that change.

10 Q.  So a lot of questions were asked about the -- by various

11 counsel about the amount of money that the campaign was

12 handling.  Ms. Campbell asked you about reserves.  I think

13 Mr. Linehouse (sic) asked you about a total spending of

14 $4,000,000.

15         Do you remember all of that?

16 A.  Yes.

17 Q.  Okay.  Now, is your job or was your job in this campaign to

18 set policy to the spending?

19 A.  In what way?

20 Q.  Were you a strategist?  Would you make strategic decisions

21 about where money should be spent and how much?

22 A.  No.

23 Q.  And your superiors were Jesse Benton, John Tate, and Dimitri

24 Kesari, right?

25 A.  That is correct.

1    Q.  Were they strategists?

2    A.  To my knowledge, yes, they would be the ones doing that.

3    Q.  And repeatedly throughout the cross-examinations you kept

4    saying, I was giving them a snapshot of the expenses.

5           Do you recall that?

6    A.  Yes.

7    Q.  Is that because -- is your role to decide whether the

8    campaign should take more or less risk on paying something at a

9    given time?  Is that your job?

10   A.  No.  My job was mainly to inform them of what was due and

11   when it was due.

12   Q.  So you informed them so they know and you know, but who

13   makes the decisions?

14   A.  In that chain of command, I would have said that John Tate

15   is usually the person I would take direction from.

16   Q.  You were just the accounting guy, right, on the expenditure

17   side?

18   A.  I was in charge of getting basically information in and

19   reporting it to them, essentially compiling accounts receivable,

20   accounts payable, nothing as minute as, like, appreciation or

21   general accounting procedures per se.

22   Q.  I understand.  I don't mean to be insulting.  You had a job

23   and you were busy, right?

24   A.  That's correct.

25   Q.  But your job wasn't to decide what risks to take on the burn

1  rate; it was just a report?

2          MR. BINNALL:  I'm going to object to the leading.

3          MR. LINEBAUGH:  Yes.

4          THE COURT:  Sustained.

5          Pose a new question.

6  BY MR. PILGER:

7  Q.  Was your job to decide on the risk associated with the burn

8  rate or simply to report the burn rate?

9  A.  Simply report.

10 Q.  You talked about noncompetes a little bit, and that went

11 round and round; but in the end, can you tell the jury whether

12 or not, to your knowledge, everyone who worked for the campaign

13 should have had a noncompete?

14 A.  I think you're referring to a nondisclosure.

15 Q.  I'm sorry; nondisclosure.  I'm sorry, excuse me.

16 A.  To my knowledge, everybody that was on the campaign should

17 have had a nondisclosure agreement, and I would have been the

18 one to have sent it and collected it.

19 Q.  So if you were pulled into the process of hiring someone,

20 you would have addressed that?

21 A.  That is correct.

22 Q.  And does that apply to both employees and contractors, if

23 you were pulled into the process?

24 A.  Yes.

25 Q.  Were you ever pulled into the process of hiring someone

1   named Kent Sorenson?

2   A.   No.

3   Q.   You were asked some questions about Michael Rothfeld and a

4   company called Saber.

5            Do you recall that?

6   A.   Yes.

7   Q.   Saber got a lot of money from the campaign; is that right?

8   A.   That is correct.

9   Q.   To your knowledge, did Saber do actual work for the campaign

10  or not?

11  A.   To my knowledge, they did a lot of direct mail fund-raising.

12  That was the primary invoices that they submitted.

13  Q.   And you were asked a lot of questions about coding.  I have

14  one general question to start with.  Was the coding very hard or

15  not?

16  A.   It was not.

17  Q.   The code list, was that some very specialized thing that

18  only the financial people had or was that widely distributed?

19  A.   It was widely distributed.  Every employee who submitted

20  expense reimbursements had codes.

21  Q.   I believe Mr. Linehouse (sic) spent some time talking

22  about -- this is a defense exhibit -- Tate Exhibit 14.  If we

23  could pull that up.

24           I'm sorry, Judge, we don't have that loaded so I'll

25  switch to the Elmo.

1          So I made a circle on here, which I'm not going to ask

2     you; but that circle is up around the date mark for this

3     particular e-mail, right?

4     A.  Correct.

5     Q.  And what's the date of this e-mail?

6     A.  February 16, 2012.

7     Q.  Okay.  Now, Mr. Linehouse (sic) asked you about the amount

8     being 25,657, right?

9     A.  Correct.  I think he was -- yes, yes, he did.

10    Q.  And he characterized that as close to the number 25,000.

11    You remember him doing that, right?

12    A.  Several times, yes.

13    Q.  He didn't ask you, though, about the date being close to the

14    Christmas period of 2011 or not?

15    A.  That is correct.

16    Q.  And that's actually -- this e-mail is clearly in a different

17    quarter, right?

18    A.  I'm sorry?

19    Q.  It's in a different financial quarter?

20    A.  Yes.

21    Q.  It's not in December of 2011; it's in February of 2016

22    (sic), right?

23    A.  Correct.

24          MR. BINNALL:  I think you misspoke.

25          MR. PILGER:  Yes.

1          MR. BINNALL:  Your Honor, just to correct the record,

2    he said 2016 and it's 2012.

3          MR. PILGER:  That's right.  I'll ask again for

4    clarity.

5    BY MR. PILGER:

6    Q.  This e-mail was not actually in December of 2011, it was

7    actually in mid February of 2012; is that right?

8    A.  That is correct.

9          MR. PILGER:  Court's indulgence.

10          (Pause.)

11          Let's bring up Government's Exhibit 63 in evidence.

12          So if we could magnify just the top part down to about

13   the middle of the page.

14   BY MR. PILGER:

15   Q.  So in Government's 63, you can see Dimitri Kesari saying he

16   needs $25,000 first thing in the morning?

17   A.  Yes, that's correct.

18   Q.  And then what happened?

19   A.  There's another e-mail from this.

20   Q.  And did John Tate write that e-mail?

21   A.  Yes.

22   Q.  And did he write it to Dimitri and copy you?

23   A.  Myself and Jesse Benton.

24   Q.  Yeah, I'm sorry.  Did he write to Dimitri Kesari, yourself

25   and copy Jesse Benton?

1   A.   That is correct.

2   Q.   And did he approve the $25,000 payment?

3   A.   Yes.

4   Q.   Okay.  Now let's go to Government's Exhibit 67 and let's

5   just focus in on that last e-mail at the top and make that as

6   big as possible, please.  No; the top.

7           John Tate wrote on December 29th to you, there will

8   not be the 25k Dimitri wire for now.  Wipe it off the books.

9           Correct?

10  A.   That is correct.

11  Q.   So if someone tells you that a $25,000 expenditure that's

12  been put on your plate should be wiped off the books, are you

13  going to do anything more to make that happen?

14  A.   To my -- how I understand it is that the matter is dead, so

15  no.

16  Q.   So the questions you were asked about whether that got

17  coded, whether that got sent in for the wiring, and so on, would

18  that make any sense to you or not, given that John Tate told you

19  to wipe it off the books?

20  A.   No.  There would have been no -- without an invoice, there's

21  no way we could begin the process, or other information.

22  Q.   Let's expand Government Exhibit 67 and get lower in the

23  e-mail.

24          So this is an e-mail from you to Mr. Tate, correct?

25  A.   That is correct.

1  Q.  And you characterized the 25k dollars as Dimitri's mystery

2  wire, right?

3  A.  Correct.

4  Q.  Was that because it was a mystery to you or to someone else

5  who told you to call it that?

6  A.  It was a mystery to me.

7  Q.  You don't know what other people knew about it, right?

8  A.  Correct.

9  Q.  And so just like Ms. Campbell showed you, there's e-mail

10  going on that you're not on the chain, right?

11  A.  That is right.

12  Q.  And you don't know what's in those kind of e-mails, right?

13  A.  Correct.

14  Q.  And people made phone calls to each other during the

15  campaign, too, right?

16  A.  Yes.

17  Q.  And if you weren't on that call, you don't know what

18  happened?

19  A.  Correct.

20  Q.  So if this wasn't a mystery to someone else, you can't tell

21  us about that?

22  A.  Correct.

23  Q.  Ms. Draughn, can you do side by sides of 95 and 93?

24       Ms. Draughn has just blown up the header on 93, and

25  that's an e-mail from Dimitri Kesari to you, right?

1  A.  Right.

2  Q.  With an attachment, right?

3  A.  Correct.

4  Q.  And if you look over to the left on the last e-mail --

5  Ms. Draughn, if you would blow that up, too.  I'm sorry, the top

6  e-mail chronological left.

7          A couple of days later, five days later, according to

8  this, John Tate approved that expenditure, correct?

9  A.  Correct.

10  Q.  And as to the invoices -- bear with me a moment.

11          Bear with me a moment.

12          (Pause.)

13          All of the e-mails we've talked about bear indications

14  of the attachments as we forward them on, correct?

15  A.  I'm sorry, could you repeat that one more time?

16  Q.  So we've seen a bunch of e-mail strings where an e-mail will

17  come in to you from Dimitri Kesari and then you forward it,

18  correct?

19  A.  Correct.

20          MR. BINNALL:  Object to foundation.

21          THE COURT:  Overruled.

22  BY MR. PILGER:

23  Q.  And so when you would forward those e-mails, that indication

24  would still be there?

25  A.  Yes.

1  Q.  Okay.  And to the extent we have covered invoices that were

2  forwarded, you can talk about that.  To the extent we haven't,

3  that would be for another witness, correct, whether you

4  forwarded the invoice to John Tate or not?

5  A.  Yeah.  If I had forwarded or been copied on it, I would

6  know.

7  Q.  Other than the ones you testified about, whether or not the

8  invoice went on to John Tate, you can't testify to that?

9  A.  Correct.  If I was not involved in the e-mail chain,

10 correct.

11 Q.  Even if you're in the chain, if we haven't talked about an

12 invoice going to John Tate, that doesn't necessarily mean it

13 didn't go, but another witness would have to establish that?

14 A.  I wouldn't know what John had received or not received.

15 Q.  But you know what you sent?

16 A.  I know what I sent, yes.

17 Q.  And do you know that you sent forward invoices in some

18 cases?

19 A.  Yes.

20 Q.  To John Tate?

21 A.  Correct.

22 Q.  And then he went on to approve them?

23 A.  That's correct.

24 Q.  And without going through all of the documents again, do you

25 recall that he specifically approved the February invoice?

1  A.  Yes.

2  Q.  And he specifically approved the March?

3  A.  Yes.

4  Q.  And the June?

5  A.  Yes.

6  Q.  And anytime you questioned these expenses, like the time

7  Ms. Campbell brought up where it was the last time twice or you

8  just sent approved, question mark, anytime you did that, was

9  there ever a time, ever even once that John Tate came back and

10  said, no, don't pay it?

11  A.  There may have been.  I don't recall exactly, but if -- I

12  don't recall if there was a specific instance.

13          THE COURT:  Excuse me one second.  Apparently I'm the

14  only judge in the building, and something has to happen right

15  now.

16          MR. PILGER:  Yes, sir.

17          THE COURT:  It's going to take me one minute.  I'll be

18  right back.  And there's going to be another event this

19  afternoon where I just have to leave for just one second.  Just

20  stand still for just a second.  I'll be back.

21          (Pause.)

22          THE COURT:  Okay.  Continue.

23          MR. PILGER:  Thank you.

24  BY MR. PILGER:

25  Q.  Mr. Cortes, let me ask you a more specific question.

1          Were you aware of any instance in which you questioned

2    or asked for approval on an ICT invoice where Mr. Tate came back

3    and said, no, don't pay that?

4    A.   There was none.

5    Q.   There were times where he said -- he questioned, he said

6    what's this about or I'll find out, things like that, right?

7    A.   That is right.

8    Q.   And in those occasions what would he always come back and

9    do?

10   A.   In the one instance, he came back and approved it.

11   Q.   He approved it, right?

12   A.   Approved it, correct.

13   Q.   And whatever happened between him and anyone else, if

14   anything, that led him to approve it, you don't know, right?

15   A.   I'm not aware of it.

16   Q.   Do you recall mentioning at some point that Dimitri Kesari

17   told you these expenses concerned video?

18          MR. BINNALL:  Objection; leading, Your Honor.

19          THE COURT:  That one wasn't.

20          Go ahead and answer the question.

21   A.   I don't recall a specific instance, but I vaguely remember

22   him mentioning a video.

23   BY MR. PILGER:

24   Q.   Bear with me a moment.

25          (Pause.)

1      I'm going to show you something and see if it

2 refreshes your recollection.  I don't want you to read it aloud.

3 I want you to look at the place where I'm going to indicate, I

4 want you to read it and then look up at me when you're done.

5          (Pause.)

6      Does that refresh your recollection about whether

7 Dimitri Kesari talked to you about video in connection with

8 these expenditures?

9 A.  Yes.

10 Q.  And what do you recall?

11 A.  That at some point the word "video" was used by Mr. Kesari.

12 Q.  By whom?

13 A.  By Mr. Kesari.

14 Q.  In fairness, do you remember exactly when or where that was?

15 A.  I do not.

16 Q.  Let's talk about Exhibit 59 for a little bit.

17          If we could go to page 2.

18          So as you testified a couple of times, this is a

19 lengthy document, approximately 77 pages, correct?

20 A.  Correct.

21 Q.  You were asked about this quite a bit, though, during the

22 cross-examinations, and I want to spend a little time on it.

23 Under the category audiovisual expenses for this period, what is

24 the highest expenditure made by the campaign?

25 A.  The highest expenditure would be the electronic funds

1    transferred to Interactive Communication at $38,125.

2    Q.  Can you speak up a little bit?  I'm having trouble hearing

3    you.

4    A.  Sure.  The highest expense in this category for this time

5    period is Interactive Communication, an electronic funds

6    transfer for $38,125.

7    Q.  And this is the entire category of audiovisual expenses

8    reported.  We don't have to go to page 2 for that; that's all of

9    it, right?

10   A.  For the time period from January 1st until February 8th,

11   that is correct.

12   Q.  I'm going to do a little bit more with this, not much.  This

13   is in evidence.  Let's look through a couple of these pages.  So

14   I'm just on page 2.  How many five-figure expenses are on there?

15   A.  One.

16   Q.  Page 3, are there any?

17   A.  No.

18   Q.  Are there any four-figure expenses?

19   A.  A few.

20   Q.  Where?

21   A.  (Indicating).

22   Q.  Oh, the total?

23   A.  Yeah.  So maybe one.

24   Q.  The majority of these are under a hundred?

25   A.  Yes.  The majority of all of our expenses were under a

1    hundred dollars.

2    Q.   And examining this in detail would show that, correct?

3    A.   That is correct.

4    Q.   Finally on 58, who decided this should be prepared?  Did you

5    or does someone ask you for it?

6    A.   If I remember somebody asked me to do that.

7    Q.   Okay.  Who is that?

8    A.   I don't remember exactly who.

9    Q.   Who did you send it to?

10   A.   I sent it to Jesse Benton and John Tate and Dimitri Kesari.

11              MR. PILGER:  Nothing further, Your Honor.

12              THE COURT:  Mr. Linehouse, you didn't object so I --

13              MR. LINEBAUGH:  It's on the record now.  I've been

14   called worse.

15              MR. PILGER:  I'm sorry.  Did I get his name wrong?

16              THE COURT:  That's okay.

17                         RECROSS-EXAMINATION

18   BY MR. LINEBAUGH:

19   Q.   Good afternoon again, Mr. Cortes.

20   A.   Good afternoon.

21   Q.   Very briefly.  On the long exhibit that you have in front of

22   you, the spreadsheet that's 70-some pages there, I think it's

23   our Exhibit 18, their Exhibit 59, the government's, you don't

24   know if anybody examined that in detail, do you?  You don't have

25   personal knowledge of that?

1    A.   I don't know.

2    Q.   And then I want to focus in on one area.  You testified to

3    the jury, Mr. Pilger ran through a few expenses for you and

4    asked if Mr. Tate approved an expense in February and March, and

5    he ran through some dates.

6            Do you recall that?

7    A.   Yes.

8    Q.   And you testified that Mr. Tate approved the ICT expense in

9    February.

10           Do you recall that?

11   A.   Yes.

12   Q.   If you could turn to Tate Exhibit 16, please, Mr. Mills.

13   And if you could blow up the top half of that, Mr. Mills.

14           Mr. Cortes, again, this is you on February 8th

15   instructing Ms. Pyeatt and Ms. Watts to pay this $38,125

16   invoice, correct?

17   A.   Correct.

18   Q.   If you could turn now to Government Exhibit 58, Mr. Mills.

19   And if we go to the second page, Mr. Mills, blow up that top

20   third.

21           And, Mr. Cortes, again, this is eight days later, on

22   February 16th, and you are e-mailing Mr. Tate and showing him

23   what unpaid invoices are outstanding, correct?

24   A.   That's correct.

25   Q.   And you list on that eight days after you instructed it to

1  be paid, you list it as an unpaid invoice, a $38,000 invoice to

2  Interactive Communication Technology.

3        Do you see that?

4  A.  Yes, it's listed there.

5  Q.  Let's go back to the first page, Mr. Mills, and blow up the

6  top e-mail from Mr. Tate.

7        And while that's coming up, Mr. Cortes, I'll just ask

8  the question if you've already seen this document.  This is

9  Government's Exhibit 58.  On this same e-mail string -- Mr.

10  Mills will pull that up now, the very top -- you on the lower

11  half of this e-mail are listing the unpaid invoices eight days

12  after you've instructed it to be paid, and on that same day,

13  eight days later, Mr. Tate responds to you.  Nowhere in this

14  e-mail is he approving that invoice, correct?

15  A.  That is correct.

16  Q.  Okay.  So your testimony to Mr. Pilger where you stated

17  Mr. Tate approved the February invoice, that was not correct

18  testimony, correct?

19  A.  He said the invoice he approved in March would have been the

20  one for February.

21  Q.  That's why you testified the way that you did?

22  A.  That's correct.

23        MR. LINEBAUGH:  I have nothing further.

24        THE COURT:  Anything else, Mr. Binnall?

25        MR. BINNALL:  Yes, sir.

1           RECROSS-EXAMINATION

2  BY MR. BINNALL:

3  Q.  Mr. Cortes, I think I just heard you tell Mr. Pilger that on

4  Government's Exhibit 59, the e-mail with the expenses --

5  A.  Which one?  There were a couple of them.  I'm sorry.

6  Q.  Yeah, it's --

7           Can I get Exhibit 59?  There we go.  Okay.

8           Do you see it there now?

9  A.  Yes.

10  Q.  I think I heard you tell Mr. Pilger that Mr. Kesari was on

11  that e-mail?

12  A.  Yes.  I misspoke.  That is correct.

13  Q.  He's not on this e-mail?

14  A.  He is not on this e-mail, that's correct.

15  Q.  I think there was another issue similar to that.  You told

16  Mr. Pilger that Mr. Kesari was your superior; but when we talked

17  earlier today, you told me that Mr. Kesari was not your

18  superior, correct?

19  A.  For certain functions, that is correct.  The way for the

20  operational aspect, John Tate was the superior.  For political

21  aspects and sending out staff to different places, he was the

22  superior in that matter.

23  Q.  So you mentioned that you did the Hispanic outreach work,

24  for instance, correct?

25  A.  Sure.

1  Q.  But that was more on the political side, and for that

2  Mr. Kesari was your superior?

3  A.  In that regards, yes.

4  Q.  But on the operational side, he was not?

5  A.  That is correct.

6  Q.  Mr. Cortes, you had the e-mail address for Sonny Izon at

7  ICT, correct?

8  A.  The one listed in the invoices?

9  Q.  Yes.

10  A.  Okay.  Yes.

11  Q.  You never e-mailed him to find out what the purpose was, did

12  you?

13  A.  Not to my recollection.

14  Q.  And, likewise, his phone number is on all of those invoices?

15  A.  I'm sorry?

16  Q.  His phone number is on all of those invoices?

17  A.  A phone number was listed there.

18  Q.  And you never called that phone number?

19  A.  To my recollection, no.

20  Q.  And you never raised any concerns about the February 2012

21  invoice from ICT, correct, not until you sent that e-mail to

22  Mr. Benton and others in 2013, correct?

23  A.  I'm sorry, there's so much different ones.  I apologize.

24  Q.  I understand.  Well, I'll put it this way.  About all the

25  ICT invoices, you never raised any concerns with anybody about

1  any of those until the summer of 2013, correct?

2  A.  Well, apart from it being a duplicate last one, no.

3  Q.  Right.  And thank you for bringing that up.

4  A.  It was not standard procedure to do that for most invoices.

5  Q.  Mr. Cortes, you wouldn't consider yourself friends with

6  Mr. Kesari, would you?

7  A.  I do not.

8  Q.  You actually don't like him very much, do you?

9  A.  I have an opinion of him that's not -- that's much lower

10  than when we worked together.

11            MR. BINNALL:  Sir, thank you.

12            THE COURT:  Anything else?

13            MS. CAMPBELL:  Just briefly, Your Honor.

14            Could you put out 76 and 77 of the government's side

15  by side?

16                    RECROSS-EXAMINATION

17  BY MS. CAMPBELL:

18  Q.  I believe, Mr. Cortes, you were asked whether or not the

19  time dates on here were the result of a time zone change from

20  where Mr. Kesari was.

21            Do you remember that?

22  A.  I remember there being discussion about it, yes.

23  Q.  Do you actually know that to be the case?

24  A.  That we discussed this earlier today?

25  Q.  No; the fact that it looks like there were two different

1  e-mails actually had something to do with a time zone change and

2  the time of that e-mail, do you know?

3  A.  Oh, right.  So I said that would be a possible explanation

4  as to why the two.

5  Q.  You don't know that, do you?

6  A.  Given proper records to review, I could probably notify you

7  and let you know where he was; but at this exact moment, I can't

8  tell you for certain.

9  Q.  But I'm more interested in the times how they show up on

10 e-mails and e-mail date time stamps.  Are you an e-mail guy?

11 Are you able to tell us how the e-mails show up for time zones?

12 A.  I could not.

13 Q.  Okay.  And, in fact, we can see that these are different

14 e-mails, right?

15        You can blow up -- yeah, just do that, there to there.

16 That's perfect.  And compare it to the one where it says sent

17 from my iPad down at the middle of 77, right there.

18        I mean, they're two different e-mails, right?

19 A.  The top portion and bottom portion?

20 Q.  Yes.

21 A.  It would appear so, different time stamps.

22 Q.  Different time stamps.  One says sent from my iPad, one

23 doesn't; is that right?

24 A.  That is correct.

25 Q.  All on the same day, right?

1  A.  Correct.

2  Q.  All from Mr. Kesari, right?

3  A.  Right.

4  Q.  Who probably didn't change time zones within eight minutes

5  of each other or whatever it is, right?

6  A.  Again, if there was a time zone change, I don't know.

7          MS. CAMPBELL:  Nothing further.

8          Thank you.

9          THE COURT:  Thank you, sir.  You're excused.

10                              (Witness excused.)

11          THE COURT:  Call your next witness, please.

12          MR. COONEY:  The United States calls Special Agent

13  Karen LoStracco.

14          THE COURT:  Come forward, ma'am.

15          THE CLERK:  Please raise your right hand.

16          KAREN LOSTRACCO, GOVERNMENT'S WITNESS, SWORN

17          THE CLERK:  Please be seated.

18                      DIRECT EXAMINATION

19  BY MR. COONEY:

20  Q.  Good afternoon, Agent LoStracco.

21  A.  Good afternoon.

22  Q.  If you could bear with me a little bit, I'm struggling with

23  a little bit of a cold.

24          But if you could please state and spell your name for

25  the record.

1   A.   Yes.  It's Karen LoStracco, L-O capital S-T-R-A-C-C-O.

2   Q.   Where are you employed?

3   A.   I'm employed with the Federal Bureau of Investigation in the

4   Boston field office.

5   Q.   How long have you been with the FBI?

6   A.   I've been with the FBI just over 12 years.

7   Q.   What is your current assignment with the FBI?

8   A.   I'm a supervisory special agent in the inhouse legal office

9   in Boston.

10  Q.   When did you start that assignment?

11  A.   In April of 2015.

12  Q.   Prior to April of 2015, what was your assignment?

13  A.   My assignment was at the Washington field office.  We were

14  actually located in northern Virginia, and I was on the public

15  corruption squad there, which investigated public corruption

16  matters involving Capitol Hill, public officials and federal

17  employees.

18  Q.   Did there come a time when you became involved in the

19  investigation that leads us to this trial today?

20  A.   Yes.

21  Q.   About when did you become involved in that investigation?

22  A.   It was very early in 2013.

23  Q.   What was your role in that investigation?

24  A.   Case agent.

25  Q.   For the benefit of the jury, can you just explain to them

1  what a case agent is?

2  A.  Sure.  So a case agent is typically the person who opens the

3  investigation.  That can happen if a supervisor comes to you

4  with a complaint and assigns it to you as a case agent or it can

5  happen on the agent's own initiative by finding something they

6  feel needs to be investigated.  You are the lead agent as the

7  case agent on that case, which basically means you're the main

8  contact between what's going on with the investigation within

9  the FBI, with the Department of Justice or with another U.S.

10 Attorney's office, and you are also the person who coordinates

11 with any other agents that are also assigned to the case, as

12 well as financial analysts, intelligence analysts, anybody doing

13 any computer forensics work for the FBI, that type of thing.

14 You are also the person who typically leads the investigation in

15 terms of determining who's to be interviewed, documents to be

16 obtained and compiling all of that information.

17 Q.  And as part of your role as the case agent, do you conduct

18 some of those interviews?

19 A.  Yes.

20 Q.  Are you also involved in the collection of documents?

21 A.  Yes.

22 Q.  All right.  And I want to talk about that, but before I do,

23 you mentioned the type of squad you were on.  Let me ask you a

24 very specific question about that.  Does the FBI have

25 jurisdiction to investigate campaign finance violations?

1  A.  Yes, it does.

2  Q.  All right.  Now, as part of your investigation, did you go

3  about collecting documents, in fact, some of the documents we've

4  already seen here in court today?

5  A.  Yes.

6  Q.  What are some of the ways you went about collecting those

7  documents?

8  A.  So there's several ways.  Sometimes when you sit down and

9  interview a witness, they will provide documents to you.  I also

10 talk to people on the phone and then subsequently follow up

11 through e-mail or other means of providing me with documents.  I

12 get documents through subpoenas, grand jury subpoenas and also

13 through the grand jury process.

14        Those are just some of the ways that we get documents.

15 We also get them through search warrants if we have a search

16 warrant for a particular computer or a home or a business.

17 Q.  And in this particular investigation, did you collect

18 documents in all of those means -- through all of those means?

19 A.  Yes.

20 Q.  Now, why is it in an investigation that you might go about

21 collecting documents from a number of different sources rather

22 than just one or two?

23 A.  Well, people have different ways of retaining things, so if

24 in somebody's course of business they wouldn't normally hold on

25 to documents, they may shred them, for example, somebody else

1  may have a copy of that document.  So it's always best to get it

2  from multiple sources.  So, for example, with computers,

3  somebody may delete their e-mails regularly or someone else may

4  retain those.  Getting them through a server such as Gmail or

5  AOL could probably give you a more overall broader caption of

6  what was in that person's e-mail versus their computer.

7  Q.  All right.  Now, let's talk about some of the specific

8  categories of documents you gathered in this case.  Specifically

9  was a grand jury subpoena served on the 2002 -- excuse me, the

10  2012 Ron Paul Presidential Campaign?

11  A.  Yes.

12  Q.  Did you collect documents from the Ron Paul Campaign in

13  response to that subpoena?

14  A.  Yes.

15  Q.  All right.  And was a grand jury subpoena also served on one

16  of the defendants, Jesse Benton?

17  A.  Yes.  Yes, that's correct.

18  Q.  And did he provide documents in response to that grand jury

19  subpoena?

20  A.  Yes, he did.

21  Q.  And just for the jury's benefit, can you tell them briefly

22  what a grand jury subpoena is?

23  A.  So it's, in essence, a legal document requiring an

24  individual or company to either appear for testimony or provide

25  documents, and sometimes it can require both.

1  Q.  And in these particular instances, those subpoenas required

2  the production of documents; is that right?

3  A.  Yes.  In the subpoena that you're referring to, yes.

4  Q.  Now, in addition, did you also obtain documents through

5  search warrants for specific e-mail accounts?

6  A.  Yes.

7  Q.  And was one of those the e-mail account

8  jesserbenton@gmail.com?

9  A.  Yes, it was.

10  Q.  And did Gmail or Google provide documents in response to

11  that search warrant?

12  A.  Yes, they did.

13  Q.  Was another search warrant for an AOL account registered to

14  a Dimitri Kesari?

15  A.  Yes.

16  Q.  And did AOL provide documents in response to that search

17  warrant?

18  A.  Yes, they did.

19  Q.  Did there come a time where you actually obtained a computer

20  and a cell phone belonging to or that was provided to you by

21  Dimitri Kesari?

22  A.  Yes, that's correct.

23  Q.  How is it that you obtained those things?

24  A.  We asked Mr. Kesari if he would provide those to us, and I

25  think it was about five or so days later he did.

1  Q.  All right.  Do you remember the date that he provided you

2  those two items on?

3  A.  I believe it was January 17th of 2013.

4  Q.  All right.  Now, are you sure about that date?

5  A.  No.  I'm not a hundred percent certain, no.

6  Q.  All right.  Is there anything that might refresh your

7  recollection of that date?

8  A.  Yes.  When we obtain something like a computer or cell phone

9  from someone, we will write out what's called a receipt of

10  property which is detailing what exactly we obtained from them.

11  We, you know, have them sign and hand them a copy as well as we

12  keep a copy for our case file.

13  Q.  All right.  And when you obtain, say, a cell phone or

14  computer from someone like you did in this case from Mr. Kesari,

15  do you write down the serial numbers of those items?

16  A.  Yes.

17  Q.  As you sit here today, do you remember the serial number of

18  Mr. Kesari's computer or of the cell phone that he provided to

19  you?

20  A.  No.

21  Q.  All right.  Did you write it down, though, at the time that

22  you collected it?

23  A.  Yes.

24  Q.  When you wrote it down, did you write it down correctly as

25  you recall?

1  A.  Yes.

2  Q.  Ms. Draughn, would you please pull up Government's Exhibit

3  135 only for the witness.

4         And I'm going to ask you a couple of questions about

5  this document if you would look at it, Agent LoStracco.

6         And, first of all, I'm just going to ask you if the

7  serial number to the computer provided by Mr. Kesari is recorded

8  on this form?

9  A.  Yes.

10  Q.  And actually could you just state for the record what

11  Government's Exhibit 135 is?

12  A.  Yes.  This is the standard form that we give for receipt of

13  property that I was just referring to when we receive property

14  from an individual.  And we fill this out as detailed as we

15  possibly can.  I was assigned as the person receiving the items,

16  and then the person who is giving them to me would also sign the

17  bottom.  It's a carbon copy form still, and they are provided a

18  copy and we keep a copy for our records.

19  Q.  All right.  Can you simply for the record read out what you

20  recorded that day as the serial number for the computer that

21  Mr. Kesari provided?  And if you need it blown up, please let us

22  know and we can do that.

23  A.  The serial number on the computer is C02JG3N6DKQ2.

24  Q.  All right.  And is the serial number for the phone that you

25  obtained from Mr. Kesari listed on this property receipt form?

1   A.   Yes.

2   Q.   What is that serial number?

3   A.   C39HL2XNDTC1.

4   Q.   All right.  And, Ms. Draughn, could you please blow up that

5   entire property receipt for Agent LoStracco, please.

6           And, Special Agent LoStracco, this is my next question

7   for you.  Does looking at that document refresh your

8   recollection about the date that you obtained the computer and

9   the cell phone from Dimitri Kesari?  Simply a "yes" or "no."

10  A.   Yes.

11  Q.   All right.  And what is that date?

12  A.   January 15, 2014.

13  Q.   All right.  Now, Agent LoStracco, what I would like to do is

14  talk to you about a number of the documents that you collected

15  in this case now and actually go through them and present them

16  to the jury.  Two things:  First of all, those categories that

17  we talked about a moment ago, the Jesse Benton e-mail account,

18  the Dimitri Kesari e-mail account, the computers, the grand jury

19  subpoenas, are those the only sources that you obtained

20  documents from in this investigation?

21  A.   No.  We obtained documents from a wide variety of sources.

22           MR. COONEY:  All right.  Your Honor, may I approach

23  the witness without asking permission?

24           THE COURT:  Yes.

25  BY MR. COONEY:

1    Q.  Agent LoStracco, I'm just going to hand you now for your

2    reference a binder containing Government's Exhibits 1 to 100,

3    not all of which have been admitted into evidence and not all of

4    which will be; but I'm simply giving you that there for your

5    reference.  We'll continue to do what we've been doing in court,

6    which is to present them up on the monitors; but it's helpful to

7    you when we look at an exhibit if the hard copy version is there

8    if that makes things go a little smoother for you.  Is that all

9    right?

10   A.  Yes.  Thank you.

11   Q.  And when we talk about these documents, Agent LoStracco, I'm

12   going to ask you to simply read the document e-mail, typos and

13   all, for the jury.  Is that all right?

14   A.  Yes.

15           MR. COONEY:  Great.

16           Ms. Draughn, could you please put up Government's

17   Exhibit 4, which has not been admitted into evidence yet.

18           And I think I'm just going to follow past practice and

19   as these come up offer them, Your Honor, and if there's

20   objections we can lay foundation; but I'm going to go ahead and

21   offer Government's Exhibit 4.

22                              (Government Exhibit 4 was

23                              offered in evidence.)

24           THE COURT:  Received.

25

1                    (Government Exhibit 4 was

2                    received in evidence.)

3          MR. COONEY:  You can publish that, Ms. Draughn.

4    BY MR. COONEY:

5    Q.  And while that is coming up, Agent LoStracco, can you tell

6    the jury what this document is?

7    A.  Yes.  This is an e-mail exchange between Jesse Benton, John

8    Tate and Dimitri Kesari, and it looks like it's on June 15,

9    2011.

10   Q.  And I want to draw your attention first to -- let me see if

11   this is working just so we have a reference here.  This is

12   just -- I'm just trying to see if this works.  I'm drawing an

13   arrow.  If that's helpful you can use that, too.

14   A.  All right.

15   Q.  Let's start with the first e-mail from Dimitri Kesari to

16   Jesse Benton to John Tate.  Subject:  IA.  Sent on June 15,

17   2011, at 7:06 p.m.

18          Can you please read that to the jury?

19   A.  We may be able to get Kent Sorenson to jump ship and join

20   us.

21          What do you think?

22          Any thoughts and conditions?

23   Q.  Was there a reply to that e-mail?

24   A.  Yes.  John Tate replied.

25   Q.  Can you read that?

1  A.  Why would we switch?  Are you sure about this?  Let's talk

2  tomorrow.

3  Q.  Who did he send that reply to?

4  A.  He sent that reply to Dimitri Kesari and Jesse Benton.

5  Q.  All right.  I would like to move ahead on that.  Again, the

6  date on this was June 15, 2011; is that right?

7  A.  Yes, that's correct.

8  Q.  I would like to move ahead to an e-mail in December of 2011.

9          Ms. Draughn, could you please put up Government's

10  Exhibit 29.

11          MR. COONEY:  And I'm offering Government's Exhibit 29.

12                          (Government Exhibit 29 was

13                           offered in evidence.)

14          THE COURT:  Received.

15                          (Government Exhibit 29 was

16                           received in evidence.)

17          MR. COONEY:  You can go ahead and publish that,

18  Ms. Draughn.

19          Your Honor, while that is coming up, that is a

20  redacted exhibit, and there have been some redactions shown to

21  the court.  I don't know if the jury has been instructed about

22  redactions.

23          THE COURT:  Yeah.  These black marks, sometimes

24  they're just things that are absolutely irrelevant.  Sometimes

25  they're very personal things, like if they're going to talk

1  about a fishing trip or something like that.  A lot of times

2  there are personal identifiers, and we have court rules saying

3  never display someone's telephone number, their home address,

4  their Social Security number and things like that.  So you

5  shouldn't take it like we're hiding anything from you.  You

6  should just understand that some things are completely

7  irrelevant but sensitive to other people, and that's why we

8  redact.

9        I don't think the word "redact" is in the dictionary.

10  But that's a word lawyers use saying we're removing it from

11  sight.

12  BY MR. COONEY:

13  Q.  All right.  Agent LoStracco, this is an e-mail dated

14  December 23, 2011, at 3:51 p.m.; is that right?

15  A.  Yes, correct.

16  Q.  Could you please tell the jury who's on this e-mail?

17  A.  Mir@saberinc.net, and it is from Jesse Benton and cc'ing

18  John Tate, Trygve Olson and Doug Stafford.

19  Q.  Do you know who Trygve Olson is?

20  A.  He was an employee or consultant with the Ron Paul Campaign.

21  Q.  What about Doug Stafford?

22  A.  Doug Stafford I believe worked for Rand Paul, but was

23  more sort of an informal consultant with the Ron Paul Campaign.

24  Q.  What about mir@saberinc.net?

25  A.  That is Mike Rothfeld.

1  Q.  Who is Mike Rothfeld?

2  A.  He had a company called Saber, Inc., and Saber, Inc., did a

3  lot of work for the Ron Paul Campaign.

4  Q.  All right.  Could you please read this December 23, 2011

5  e-mail to the jury?

6  A.  Stick a fork in Michelle BTW.  Sorenson is endorsing Ron on

7  Monday.  We have his statement already.

8  Q.  All right.  Agent LoStracco, what I would like to do now is

9  back up and present to you some e-mails between those two dates,

10  the one that we just looked at in Exhibit 4 and now the one that

11  we just looked at in Exhibit 29.

12        MR. COONEY:  Ms. Draughn, could you please put up

13  Government's Exhibit 5.

14        I'm offering Government's Exhibit 5.

15                              (Government Exhibit 5 was

16                               offered in evidence.)

17        THE COURT:  Received.

18                              (Government Exhibit 5 was

19                               received in evidence.)

20        MR. COONEY:  You can publish that to the jury, please,

21  Ms. Draughn.

22        And while that's happening, I'll just point out for

23  the jury --

24        MR. BINNALL:  I'm sorry.  Your Honor, I would ask for

25  the same limiting instruction that you previously gave to this

1   jury that this doesn't come in against Mr. Kesari on the time

2   frame on this because it's in October 2011.

3           THE COURT:  Yeah.  I told the jury that e-mails prior

4   to December of 2011, the statements made in them come in only

5   against the person who made them.

6   BY MR. COONEY:

7   Q.  All right.  Now, if we could start with the bottom e-mail,

8   Special Agent LoStracco.  On October 28, 2011, at 10:54 a.m.,

9   where I just managed to make a black splotch which is to draw

10  everyone's attention to it, could you please read the entire

11  e-mail chain and just let the jury know who's on the e-mail

12  chain as you do it.

13  A.  From Jesse Benton to John Tate and to Jedd Coburn.

14          If we worked out things with Kent fast enough we could

15  do a press conference tomorrow in Des Moines with Ron.

16  Q.  And can you go ahead and just complete the chain read up?

17  A.  Yes.  John Tate responds to Jesse Benton and Jedd Coburn,

18  okay, I will work on.

19          MR. COONEY:  All right.  Why don't we move to

20  Government's Exhibit 6, and I'll offer Government's Exhibit 6.

21                              (Government Exhibit 6 was

22                                offered in evidence.)

23          THE COURT:  Received.

24                              (Government Exhibit 6 was

25                                received in evidence.)

1          MS. CAMPBELL:  Objection, Your Honor, for Jesse

2    Benton.  He's not on the e-mail.

3          THE COURT:  I'm not going to do it every time.  I've

4    told them twice now.

5          MS. CAMPBELL:  I mean on hearsay.

6          THE COURT:  Overruled.

7    BY MR. COONEY:

8    Q.  All right.  We're moving into -- let's start with the bottom

9    e-mail on October 28, 2011, at 10:46 p.m.  And just for the

10   benefit of the jury, Special Agent LoStracco, can you remind

11   them, was that the same day as the exhibit we just looked at a

12   moment ago?

13   A.  Yes.

14   Q.  All right.  And can you just go ahead and read up the chain?

15   A.  Yes.  On October 28, 2011, johnt@ronpaul2012.com wrote:

16          Please stop immediately any effort to contact Kent and

17   set up a meeting.  No more tries.  No more attempts.  Will

18   explain in more detail at a later time.  Thanks.

19          Dimitri Kesari responds to John Tate, okay.

20   Q.  All right.  I would like to briefly show the jury what's

21   already been admitted into evidence as Government's Exhibit 7.

22          And, Special Agent LoStracco, if you could just help

23   center the jury, this is an e-mail that was presented in court

24   yesterday by Aaron Dorr; is that right?

25   A.  Yes, that's correct.

1  Q.  All right.  And what is the date of this e-mail that Aaron

2  Dorr sent to John Tate and Jedd Coburn?

3  A.  It's October 29, 2011.  It's the day after the e-mails that

4  we just -- that I just read.

5  Q.  All right.  Why don't we move on to Government's Exhibit 8.

6          MR. COONEY:  Offer Government's Exhibit 8, Your Honor.

7                              (Government Exhibit 8 was

8                               offered in evidence.)

9          THE COURT:  Received.

10                             (Government Exhibit 8 was

11                              received in evidence.)

12  BY MR. COONEY:

13  Q.  All right.  Agent LoStracco, could you please read this

14  e-mail chain between -- or on October 30, 2011, at 11:50 a.m.,

15  starting with the very top of the chain.

16  A.  Yes.  This is John Tate forwarding Aaron Dorr's proposal

17  e-mail on October 29th, sending this on October 30th to Mike

18  Rothfeld, Doug Stafford and cc'ing Jesse Benton.

19          Doug and Mike.

20          Please see the attached proposal from Aaron Dorr.

21          Jesse and I have discussed a few times, and both of us

22  are of the same general agreement that this is insulting and

23  offensive, unethical and a very telling indictment of the

24  character of these guys.

25          That said, we are trying to figure out our next steps.

1  We have discussed everything from some sort of reasonable

2  counter proposal (not likely), a simple response to Aaron of "no

3  thank you," or even releasing their proposal to the press, which

4  I believe would destroy the Bachmann Campaign, Kent and possibly

5  Aaron.

6        Jesse will weigh in with some more detailed thoughts

7  as well, but he and I wanted to get your thoughts on this before

8  we take any action.

9        At this point we are not looking to act too hastily.

10  We will certainly not do anything before tomorrow.

11        I would also ask, (probably implied but just want to

12  make sure) that this is not shared with anyone at all.  Would

13  like to keep all of this between the four of us.  However, Jedd

14  is aware of all of this as he was talking directly with Aaron

15  and was cc'd on the proposal.

16        Thanks.

17        John.

18  Q.  Now, if it helps, you can look at the notebook in front of

19  you; but is there an attachment to this e-mail, Government's

20  Exhibit 8?

21  A.  Yes.  This is the Aaron Dorr proposal.

22  Q.  Is that the same proposal that was sent the day before,

23  Government's Exhibit 7, from Aaron Dorr to John Tate and Jedd

24  Coburn?

25  A.  Yes, that's correct.

1    Q.  All right.  Let's move ahead to Government's Exhibit 9.

2             MR. COONEY:  And we would offer Government's Exhibit

3    9.

4                            (Government Exhibit 9 was

5                             offered in evidence.)

6             THE COURT:  Received.

7                            (Government Exhibit 9 was

8                             received in evidence.)

9             MR. COONEY:  Ms. Draughn, if you would go ahead and

10   begin to pull that up.

11            And could you actually -- you know, Ms. Draughn, we're

12   going to -- well, actually let's do this.  The top e-mail, if

13   you could go ahead and isolate that, Ms. Draughn.

14   BY MR. COONEY:

15   Q.  All right.  That is an e-mail from Jesse Benton to John Tate

16   dated October 30, 2011, at 3:19 p.m., correct?

17   A.  Yes.

18   Q.  All right.  And is that before or after the e-mail that we

19   just looked at in Government's Exhibit No. 8?

20   A.  It's after, a few hours after.

21   Q.  All right.  And, in fact, if you want to look at the hard

22   copy in that book, Government's Exhibit 9, if you could just

23   tell the jury, is this in response to the same e-mail chain that

24   we just looked at?

25   A.  Yes.  This is responding to John Tate forwarding the

1    proposal to Mike Rothfeld, Doug Stafford and cc'ing Jesse Benton.

2    Q.  All right.  If you could scroll down some, Ms. Draughn.

3    That's enough.  If you could scroll up just a little bit.

4           And could you please read, Agent LoStracco, what Jesse

5    Benton responded to John Tate?

6    A.  Here is what I say we say.

7    Q.  All right.  Ms. Draughn, could you please put up

8    Government's Exhibit 9 and Government's Exhibit 10, which has

9    already been admitted into evidence, side by side.

10          All right.  And just to recenter the jury from

11   yesterday, Special Agent LoStracco, is Government's Exhibit 10

12   the response from Jesse Benton to Kent Sorenson and Aaron Dorr

13   in response to the proposal that Aaron Dorr sent on October 30,

14   2011?

15   A.  Yes, correct.

16   Q.  All right.  Now, the response that was sent on October 30th

17   in Government's Exhibit 10, that's the one on the right-hand

18   side --

19   A.  October 31st.

20   Q.  Excuse me, October 31st.  Thank you for correcting me.

21          Is it essentially the same as the draft that he sent

22   to John Tate on October 30th of 2011?

23   A.  Yes.  There are a few minor changes.  For example, there's a

24   line added about Dr. Paul and John and I would like to welcome

25   your support and the considerable talent it brings.  And then

1 there are a few typos that I believe are fixed as well.

2 Q.  All right.  Can we go back to Government's Exhibit 9 alone,

3 Ms. Draughn?  And could you center in on the text.

4          And could you please read the first four paragraphs of

5 Government's Exhibit 9, what Jesse Benton wrote to John Tate,

6 here is what I say we say.

7 A.  Aaron, Kent and Chris.

8          We are glad to hear you are no longer happy supporting

9 Michelle Bachmann and want to throw your support behind

10 Dr. Paul.

11          The proposal you sent us was, however, surprising.  It

12 appeared that you were trying to sell Kent's endorsement for

13 hundreds of thousands of dollars and other in-kind support for

14 future political ventures.  That would be unethical and illegal.

15 Dr. Paul, nor I, would never engage in such dealings.

16          We have no interest in hurting any of you and plan to

17 keep your proposal confidential, but if details were to get out

18 it would no doubt be damaging to all three of you.

19          That said, we would be pleased to have your support.

20 If you join our team and lend your efforts to our campaign, we

21 would be happy to employ you at fair market value.  Michelle

22 Bachmann has set that value at 8k per month Kent and 5k per

23 month for Chris Dorr.  We would plan to keep you on retainer for

24 the duration of the Paul Campaign, however long that may be.  We

25 would expect you both to lend your considerable talents to our

1  wing team in Iowa and, post caucus, in other states across the

2  country.

3  Q.  Okay.  Thank you, Agent LoStracco.

4          And, again, just to recenter the jury, the slightly

5  modified response to Aaron Dorr went to Mr. Dorr at what time --

6  or excuse me, on what date?

7  A.  The response to Mr. Dorr --

8  Q.  In Government's Exhibit 10.

9  A.  The response to Mr. Dorr and Kent Sorenson went on

10  October 31, 2011.

11  Q.  At what time?

12  A.  At 3:31 p.m.

13          MR. COONEY:  Ms. Draughn, can you please bring up

14  what's not been admitted into evidence as Government's Exhibit

15  11.

16          Offer Government's Exhibit 11.

17                          (Government Exhibit 11 was

18                           offered in evidence.)

19          THE COURT:  Received.

20                          (Government Exhibit 11 was

21                           received in evidence.)

22  BY MR. COONEY:

23  Q.  All right.  And if we could start with the first e-mail at

24  the bottom from Dimitri Kesari to John Tate, subject:  Kent, on

25  October 31, 2011, at 7:58 p.m.  Would you please read the text

1  of that e-mail, Agent LoStracco?

2  A.  Kent texted me tonight apologizing for not meet for dinner

3  last week but wants to have me over next week when I come back

4  to Des Moines.  I said okay.

5          No other conversation.

6  Q.  Is there any response from Dimitri Kesari to John Tate?

7  A.  Yes.

8  Q.  Can you please scroll down or scroll up?  Thank you, Ms.

9  Draughn.  You can keep going all the way to the top e-mail.

10         What does Dimitri Kesari respond to John Tate?

11  A.  Do you want me to read John Tate's response first?

12  Q.  Excuse me.  I'm sorry, I got ahead of myself.  I apologize.

13  That's why I should let you do that, Agent LoStracco.

14         Can you blow that -- or can you give us the whole

15  thing, Ms. Draughn.

16  A.  Okay.  Thank you.

17  Q.  All right.  So I'm sorry, the e-mail that you just read was

18  sent from who to who?

19  A.  From Dimitri Kesari to John Tate.

20  Q.  All right.  Was there a response from John Tate?

21  A.  Yes.  John Tate wrote approximately six or seven minutes

22  later, okay.  Don't firm up anything yet.

23  Q.  And is there a response to that e-mail from Dimitri Kesari?

24  A.  Yes.  Dimitri Kesari responded approximately an hour later,

25  I won't.

1    Q.  All right.  I would like to move ahead to some e-mails a few

2    weeks later in November.

3            If you could please, Ms. Draughn, put up Exhibit 14.

4    And you can go ahead and blow it up, Ms. Draughn.

5            MR. COONEY:  And I would offer Government's Exhibit

6    14.

7                            (Government Exhibit 14 was

8                            offered in evidence.)

9            THE COURT:  Received.

10                           (Government Exhibit 14 was

11                           received in evidence.)

12   BY MR. COONEY:

13   Q.  Special Agent LoStracco, what is Government's Exhibit 14?

14   A.  This is an e-mail exchange between Jesse Benton, John Tate

15   and Dimitri Kesari.

16   Q.  All right.  Can you start with the bottom e-mail and inform

17   the jury of the date and go ahead and read the entire chain up

18   and who's involved?

19   A.  On November 13, 2011, at 8:57 p.m. Jesse Benton wrote:

20           Since Michelle decided to take cheap shot at Ron on

21   Saturday night, I seriously considering dropping the Aaron Dorr

22   shakedown e-mail to Politico on Tuesday.  Thoughts?

23           John Tate then responded to Jesse Benton cc'ing

24   Dimitri Kesari, regarding Sorenson.

25           You should contact Aaron first and see if a decision

1    is forthcoming from Kent.  Ask how the leadership vote went.

2    Seems to me we would still want to get a Sorenson endorsement.

3            John.

4    Q.  All right.  Ms. Draughn, can you please put up Government's

5    Exhibit 16.

6            And, again, if you would blow that up, Ms. Draughn.

7            MR. COONEY:  And I offer Government's Exhibit 16.

8                            (Government Exhibit 16 was

9                            offered in evidence.)

10           THE COURT:  Received.

11                           (Government's Exhibit 16 was

12                           received in evidence.)

13   BY MR. COONEY:

14   Q.  All right.  Now, Special Agent LoStracco, first on

15   Government's Exhibit 16, when it comes up here for the jury, I

16   would like to draw your attention to the bottom e-mail dated

17   November 13, 2011.  When I say the bottom, I mean down here

18   where I've drawn that line.

19           Was that the first e-mail in the chain that you just

20   read in Government's Exhibit 14?

21   A.  Yes, correct.  That's the e-mail from Jesse Benton on

22   November 13, 2011.

23   Q.  All right.  Can you please now pick up the chain in

24   Government's Exhibit 16.

25   A.  Yes.  Dimitri Kesari responded to Jesse Benton and cc'ing

1  John Tate, regarding Sorenson.

2          Before we do it let me try Kent and his wife one last

3  time.

4          Jesse Benton then responded to John Tate cc'ing

5  Dimitri Kesari:  Okay.  I'll e-mail him tonight -- I'm sorry; I

6  missed an e-mail.  Let me go back.

7          Dimitri Kesari to Jesse Benton cc'ing John Tate:

8  Before we do it let me try Kent and his wife one last time.

9          John Tate then wrote:  No.  Should be Jesse contacting

10 Aaron.  Not you contacting Kent!

11 Q.  If I could interrupt you because I want to point out to the

12 jury where this is because these things are clumped up.  The

13 e-mail you just read is right here (indicating) where I'm

14 pointing; is that correct?

15 A.  Yes, that's correct.

16 Q.  And I'm sorry, what was John Tate's response to Dimitri

17 Kesari's e-mail to him and Jesse Benton stating about before we

18 do that, let me try Kent and his wife one last time?

19 A.  His response was:  No.  Should be Jesse contacting Aaron.

20 Not you contacting Kent, exclamation point.

21 Q.  Was there a response in the chain to that?

22 A.  Yes.  Jesse Benton responded to John Tate, cc'ing Dimitri

23 Kesari:  Okay.  I'll e-mail him tonight.

24          And then Dimitri Kesari responded to both Jesse Benton

25 and John Tate:  Any news, question mark.  And that was the

1    following day.

2    Q.  All right.  When you say "the following day," what date?

3    A.  November 14, 2011.

4    Q.  And just to center the jury on Government's Exhibit 14 and

5    Government's Exhibit 16, were those essentially responses all

6    between the same people but up different sides of the chain?

7    A.  Yes.

8            MR. COONEY:  All right.  Let's move now, Ms. Draughn,

9    to Government's Exhibit 17.

10           And you can blow that up, please, Ms. Draughn.

11           And I offer Government's Exhibit 17.

12                              (Government Exhibit 17 was

13                               offered in evidence.)

14           THE COURT:  Received.

15                              (Government Exhibit 17 was

16                               received in evidence.)

17           MR. COONEY:  All right.  Ms. Draughn, could you

18   please -- oh, you've got it.

19   BY MR. COONEY:

20   Q.  All right.  I'm starting here now, Agent LoStracco -- well,

21   actually why don't you just tell the jury overall what

22   Government's Exhibit 17 is.

23   A.  This is an e-mail exchange between Jesse Benton, Dimitri

24   Kesari, and John Tate.

25   Q.  All right.  And I want to start with the bottom e-mail.  And

1  just to point it out to the jury, what's the date of that

2  e-mail?

3  A.  November 15, 2011.

4  Q.  When was that in relation to the exhibit that we just looked

5  at in Government's Exhibit 16?  And if you need to refer back,

6  please do.

7  A.  So this was two days after Jesse Benton had sent the e-mail

8  about Michelle had decided to take the cheap shot against Ron

9  and that they were considering dropping the whole deal and they

10  were talking about -- I'm sorry, Dimitri Kesari had said let me

11  try Kent and his wife one last time.  And then Dimitri Kesari on

12  November 14th had asked, any news?  This is the day after that,

13  November 15th, 2011.

14  Q.  And why don't you go ahead and read up the November 15th

15  chain starting with that bottom e-mail from Dimitri Kesari.

16  A.  November 15, 2011, Dimitri Kesari wrote:  Any word on

17  Sorenson?

18       Jesse Benton responded to Dimitri Kesari:  No

19  response.

20  Q.  And just so that we're clear about who's on the e-mail and

21  who's not on the e-mail, that e-mail that you just read at 2:59

22  p.m. on November 15, 2011, from Jesse Benton to Dimitri stating

23  no response, is John Tate on that e-mail?

24  A.  Not that I can see.

25  Q.  All right.  Now if you go up and continue reading in the

1  chain.

2  A.  Ms. Draughn, could you go down a little bit more?  Sorry.

3  Oh, even further.  There's one more e-mail.

4        Okay.  So on November 15th, that same day, Dimitri

5  Kesari wrote:  Am I free to meet him and his wife, question

6  mark.

7        Jesse Benton then responded:  Yes.

8        John Tate then wrote:  Dimitri, make sure you talk to

9  Jesse about how we want to do this and what you are supposed to

10  say.  We need to be very careful.

11        John.

12  Q.  And continue, please, Ms. Draughn.

13  A.  Dimitri Kesari then responded to John Tate, cc'ing Jesse

14  Benton:  Okay.

15  Q.  Let's actually scroll down one -- I'm sorry, I'm not sure --

16  I might have been trying to play with these controls -- whether

17  you will read this, but the November 15, 2011, at 5:03 p.m.

18  e-mail from John Tate.

19  A.  Do you want me to read that again?

20  Q.  If you could, please.

21  A.  Yes.

22        Dimitri, make sure you talk to Jesse about how we want

23  to do this and what you are supposed to say.  We need to be very

24  careful.

25        John.

1  Q.  All right.  And then if you go up to the top, please.  Is

2  there a response?

3  A.  Dimitri Kesari responds to John Tate and cc'ing Jesse

4  Benton:  Okay.

5  Q.  Now, real quick so that we're clear, this last e-mail in the

6  chain responding okay to the November 15, 2011, 5:03 p.m. e-mail

7  from John Tate, who is on that response e-mail that Dimitri

8  Kesari sent?

9  A.  Dimitri Kesari's e-mail is to John Tate cc'ing Jesse Benton.

10 Q.  All right.  Just from looking at those e-mails below --

11 Ms. Draughn, if you could bring it out just a little bit.

12 That's great.  Thank you.

13         -- are you able to tell exactly when people were added

14 to the chain?

15 A.  No.  There's not enough header information.

16 Q.  All right.  But were John Tate, Dimitri Kesari and Jesse

17 Benton all on that last e-mail that says okay?

18 A.  Yes.

19 Q.  This particular e-mail, from where did you obtain it?

20 A.  This e-mail was obtained from the Ron Paul Campaign.

21 Q.  All right.  And how was it that you were able to tell that

22 just from looking at the document itself?

23 A.  Well, a lot of times when we receive documents, the person

24 providing the documents, if it's from an attorney's office

25 especially, will provide a Bates stamp is what it's called, an

1    identifying number at the bottom of the document, and this has a

2    Bates stamp at the bottom of RP0236.

3    Q.  All right.  And I pointed -- when you say the Bates stamp,

4    is that what I just pointed to here at the bottom of the

5    exhibit?

6    A.  Yes, that's correct.

7    Q.  Beginning with RP?

8    A.  Yes.

9    Q.  And, Special Agent LoStracco, these e-mails that we're

10   looking at today from the Ron Paul Campaign and, for that

11   matter, from the other sources that you obtained documents, are

12   we looking at that in the same format that they were obtained?

13   A.  Yes.

14   Q.  All right.  Let's move on to Government's Exhibit 18,

15   please.

16          MR. COONEY:  And if you could just blow that up, Ms.

17   Draughn.

18          But I'll go ahead and offer Government's Exhibit 18.

19                         (Government Exhibit 18 was

20                          offered in evidence.)

21          THE COURT:  Received.

22                         (Government Exhibit 18 was

23                          received in evidence.)

24   BY MR. COONEY:

25   Q.  And while that's being published to the jury, Special Agent

1  LoStracco, could you please, when it comes up for the jury, read

2  this e-mail from Dimitri Kesari to Kent Sorenson on November 15,

3  2011.

4  A.  Yes.  The subject is:  Dinner?

5        We doing dinner this week?

6        Let me know what night and I will cook for the family.

7        Dimitri.

8  Q.  All right.  Now, Ms. Draughn, could you please just expand

9  this so we can see the entire page.  We don't need to see the

10 exhibit label, but if you could zoom in just around the text,

11 all of the text, including the metadata down at the bottom

12 there.

13        All right.  Just to kind of inform the jury of a few

14 things here, Special Agent LoStracco, where did you obtain this

15 document from?

16 A.  This was obtained from Dimitri Kesari's computer that he

17 provided to us.

18 Q.  How is it that you know that?

19 A.  When we were able to print out items from the computer, this

20 is how they printed out.  They contained this metadata at the

21 bottom of the document, and there's no Bates stamp at the bottom

22 either.

23 Q.  Now, the document that we just looked at from the Ron Paul

24 Campaign, was that provided to you in a format like this or was

25 it provided to you in what's known as a PDF?

1  A.  I don't remember if it was in a PDF, but it was not provided

2  in this format.

3  Q.  All right.  Now, Ms. Draughn, could you please put up

4  Government's Exhibit 18 side by side with Government's Exhibit

5  17.

6       All right.  And I just want to center the jury on the

7  time frame here.  This e-mail chain that you looked at just a

8  moment ago in Government's Exhibit 17 -- and, Ms. Draughn, if

9  you could put all of the texts just so the jury can see it a

10  little bit more.

11       In Government's Exhibit 17 in which John Tate

12  instructs Dimitri Kesari, Dimitri, make sure you talk to Jesse

13  about how we want to do this and what you are supposed to say,

14  we need to be very careful, and Jesse Benton responds okay, can

15  you just compare the dates and the times --

16       MS. CAMPBELL:  Objection, Your Honor; misstates the

17  exhibit.  Jesse Benton didn't respond.

18       MR. COONEY:  Excuse me; Dimitri Kesari.  That is

19  right, Jesse Benton did not respond okay.  Dimitri Kesari

20  responded to John Tate's e-mail okay.  I apologize.

21  BY MR. COONEY:

22  Q.  What is the date and time at the end of the e-mail chain in

23  Government's Exhibit 17 and the e-mail that Dimitri Kesari sent

24  to Kent Sorenson in Government's Exhibit 18?

25  A.  So Dimitri Kesari responds to John Tate on November 15th at

1    5:17 p.m.

2         Dimitri Kesari e-mails Kent Sorenson about dinner on

3    November 15th about 11:15 p.m.

4    Q.  Let's move to an e-mail the next day, Government's Exhibit

5    19.

6         MR. COONEY:  I'm offering Government's Exhibit 19.

7                        (Government Exhibit 19 was

8                         offered in evidence.)

9         THE COURT:  Received.

10                       (Government Exhibit 19 was

11                        received in evidence.)

12   BY MR. COONEY:

13   Q.  Special Agent LoStracco, I'm going to draw your attention to

14   the first e-mail in this chain that's blown up here.  Can you

15   please --

16        No.  Go back down, please, Ms. Draughn.  You had it.

17        Thank you.

18        All right.  Can you please tell the jury about this

19   e-mail, who it's from, who it was sent to and what it says?

20   A.  Yes.  This is from Jesse Benton to Dimitri Kesari.  This was

21   on the next day at 8:05 p.m.  What up with Sorenson, question

22   mark.

23   Q.  All right.  And if you could please move up.

24        Is there a reply to this?

25   A.  Yes.  Dimitri Kesari responds to Jesse Benton the same day,

1  November 16, 2011, we talked for a min today.  He was with

2  others and could not talk.

3          He is going to give me a call later tonight after a

4  fellow senator's fundraiser.

5          I will send you an e-mail after we talk.

6  Q.  All right.  Let's move to Government's Exhibit 20.

7          MR. COONEY:  I'll offer Government Exhibit 20.

8          THE COURT:  Received.

9          MR. COONEY:  Hold on one second.  I don't believe

10 that's Government's Exhibit 20.  That's Government's Exhibit 23.

11 I'll do this one on the Elmo if I could.

12         MR. COONEY:  I move Government's Exhibit 20 in.

13         MS. CAMPBELL:  Or 23?  I'm confused.

14         MR. COONEY:  You've got it.  Let me show this real

15 quick to the defense.  I think there's some confusion.  My

16 error.

17         If you would pass that back.

18         Let's see what you have.  No, that's the wrong one.

19         Sorry about the confusion.  All right.  I'm going to

20 move Government's Exhibit 20 into evidence.

21                              (Government Exhibit 20 was

22                               offered in evidence.)

23         THE COURT:  Received.

24                              (Government Exhibit 20 was

25                               received in evidence.)

1      MR. COONEY:  All right.  Thank you.

2  BY MR. COONEY:

3  Q.  Agent LoStracco, are you able to read that?

4  A.  Yes.

5  Q.  All right.  First of all, who is the e-mail from and to and

6  on what date?

7  A.  It's from Dimitri Kesari to Jesse Benton and John Tate on

8  November 17, 2011, 11:58 a.m.

9  Q.  All right.  What is the subject of this e-mail?

10  A.  Kent Sorenson.

11  Q.  Can you go ahead and read it, please.

12  A.  I talked with Kent briefly last night.  He was almost home

13  when we connected.

14      Looks like his time with Bachmann is ending by January

15  since he is meeting with Chuck Laudner, former IA GOP ED, and

16  Steve King about raising money for his PAC.

17      He is going to call me back today about dinner tonight

18  or tomorrow night.  It will either be tonight or tomorrow night

19  with his family.

20  Q.  What is the date of that e-mail again?

21  A.  November 17, 2011.

22  Q.  All of these e-mails that we just looked at in the last few,

23  what is the time frame they're all in?

24  A.  I believe it's in and around November 15th to November 17th

25  of 2011.

1          THE COURT:  Before we go on, let's take our mid

2    afternoon recess.  We've been going almost two hours.  We'll

3    come back at 3:30.

4          (Recess at 3:10 p.m., until 3:30 p.m.)

5          THE COURT:  Please be seated.

6          MR. COONEY:  Could we please switch back to the

7    computer?

8          Thank you.

9    BY MR. COONEY:

10   Q.  Ms. Draughn, if you could put up Government's Exhibit 21,

11   which I'm going to offer; but while that's coming off, just to

12   recenter the jury on where we left off, Agent LoStracco, if you

13   could look -- actually you can't look at your binder because you

14   have the wrong one; but it's Government's Exhibit 20, and this,

15   was it not, a November 17, 2011 e-mail from Dimitri Kesari to

16   Jesse Benton and John Tate that -- with the subject:  Kent

17   Sorenson; is that right?

18   A.  Yes, correct.

19   Q.  Can you remind the jury what the last line of that e-mail

20   was?

21   A.  He's going to call me back today about dinner tonight or

22   tomorrow night.  It will be either tonight or tomorrow night

23   with his family.

24          MR. COONEY:  All right.  And I'm offering Government's

25   Exhibit 21.

1                              (Government Exhibit 21 was

2                              offered in evidence.)

3          THE COURT:  It's received.

4                              (Government Exhibit 21 was

5                              received in evidence.)

6    BY MR. COONEY:

7    Q.  All right.  That's going to come up with the jury in just a

8    minute.

9    A.  She hasn't put 21 up yet.

10   Q.  And if you could blow up Government's Exhibit 21, please,

11   Ms. Draughn, to the bottom e-mail.  This is the one from Dimitri

12   Kesari.  Great.  Thank you.

13          All right.  Special Agent LoStracco, could you please

14   read this e-mail to the jury and start with the header

15   information, with the date and who it's from and whatnot?

16   A.  Yes.  From Dimitri Kesari, November 21, 2011, to John Tate,

17   Jesse Benton.  Subject:  Kent.

18          I had dinner with Kent, his wife and his family last

19   night.  He does want to come over but wants to do it in a way

20   that is the least mean to Bachmann.  He also does not want to

21   look disloyal but kept reiterating all his friends are with Ron.

22   Not just hacks but they're close personal friends.

23          The three of us had a long talk.  I got back around

24   11:30 last night.

25          He is now looking for his future and not just the next

1  few months.  Bachmann has offered to him to be her chief of

2  staff.  His wife does not want to move and Bachmann might not

3  run again.  King asked him to raise money for his PAC but he is

4  not too excited about King.  RTW asked him if he was interested

5  in doing tour.  I gave him some information about that.

6          I will be talking with him later tonight or tomorrow

7  about their conversation.

8  Q.  All right.  And above this is there any response to this

9  e-mail?

10          Thank you, Ms. Draughn.

11          Go ahead, Special Agent LoStracco, and read the

12  response.

13  A.  Yes.  John Tate replies to Dimitri Kesari and Jesse Benton,

14  same date, November 21, 2011, regarding Kent.

15          Seems to me, next step is to make him an offer, in

16  person, not in writing, and give him a firm but polite deadline.

17          In my view we would want it to occur after Christmas,

18  a few days before caucus.

19          John.

20  Q.  What day was the caucus in January 2012?

21  A.  January 3, 2012.

22  Q.  All right.  Let's move on to Government's Exhibit 24, and

23  this is jumping ahead a little bit of time.

24          MR. COONEY:  Offer Government's Exhibit 24.

25

1                          (Government Exhibit 24 was

2                          offered in evidence.)

3          THE COURT:  Received.

4                          (Government Exhibit 24 was

5                          received in evidence.)

6    BY MR. COONEY:

7    Q.  All right.  Special Agent LoStracco, while that's coming up

8    for the jury, if you need to look back at Government's Exhibit

9    21, can you just give them a sense of about how long after this

10   e-mail that we just looked at this one is?

11   A.  So Government Exhibit 21 was on November 21st.  This e-mail,

12   the first one on this chain is December 7th.  So it's a couple

13   of weeks after the last e-mail.

14   Q.  All right.  And if we could start with the e-mail at the

15   bottom of the chain and if you would go ahead and just read the

16   chain to the jury.

17   A.  From Jesse Benton, sent December 7, 2011, to John Tate.

18   Subject:  Kent.

19          What's up?  Any chance he'll come over Friday?

20          John Tate responds to Jesse Benton on December 7, 2011

21   regarding Kent.

22          Dimitri left him two messages, will try again tonight.

23   We should have an answer tonight or tomorrow morning I think.

24          I tried to take from Dimitri but he said he wanted to

25   handle and will get Kent in touch with you or me if needed.

1          John.

2   Q.   All right.  Let's go ahead and put up Government's Exhibit

3   25, please.

4          MR. COONEY:  I'm offering Government's Exhibit 25.

5                        (Government Exhibit 25 was

6                         offered in evidence.)

7          THE COURT:  Received.

8                        (Government Exhibit 25 was

9                         received in evidence.)

10  BY MR. COONEY:

11  Q.   All right.  Now, the last e-mail chain that we looked at,

12  Special Agent LoStracco, can you just remind the jury -- you can

13  look at Government's Exhibit 24 in the notebook if you need

14  to -- the approximate time and who it was between, just the

15  thread of the chain and who it was between?

16  A.   So the previous e-mail chain was between Jesse Benton and

17  John Tate on December 7, 2011, around 5:15 and 5:45 p.m.

18  Q.   All right.  And so was Dimitri Kesari on that last chain,

19  the last one, Government's Exhibit 24?

20  A.   No.

21  Q.   All right.  If we could blow up Government's Exhibit 25 just

22  a little bit more, Ms. Draughn.

23          Who is this e-mail chain between, Special Agent

24  LoStracco?

25  A.   This is between John Tate and Dimitri Kesari.

1  Q.  What date and time approximately is this chain between?

2  A.  This is between -- this is on December 7, 2011, between 5:36

3  p.m. and 5:55 p.m.

4  Q.  So how does that relate approximately to Government's

5  Exhibit 24?

6  A.  It is occurring somewhere in the middle of when this is

7  occurring between John Tate and Jesse Benton and a little bit

8  after.

9  Q.  All right.  Could we go in and start at the bottom e-mail

10  and read up on this December 7, 2011 chain between John Tate and

11  Dimitri Kesari?

12  A.  Yes.  John Tate wrote:  When are you going to talk to Kent?

13  Jesse is chomping at the bit.  He actually wants to try and do

14  Friday.

15       John.

16       Dimitri Kesari responds to John Tate, subject:

17  Regarding Kent.

18       I left him two messages today.  I will talk with him

19  tonight.

20       John Tate responds to Dimitri Kesari on December 7,

21  2011, regarding Kent.

22       Thanks.  Keep me posted.

23  Q.  Just so we're clear, Jesse Benton is not on these e-mails,

24  correct?

25  A.  Not that I can see, no.

1  Q.  This is strictly between Mr. Tate and Mr. Kesari?

2  A.  Correct.

3  Q.  All right.  Let's move on to Government's Exhibit 26.

4          MR. COONEY:  I will offer Government's Exhibit 26.

5                          (Government Exhibit 26 was

6                          offered in evidence.)

7          THE COURT:  Received.

8                          (Government Exhibit 26 was

9                          received in evidence.)

10 BY MR. COONEY:

11 Q.  All right.  As this is coming up, Agent LoStracco, if you

12 could just tell the jury what date Government's Exhibit 26 is.

13 A.  Yes.  This is December 9, 2011.  It's approximately two days

14 after the last e-mail exchange that we just looked at.

15 Q.  Who is this e-mail exchange between?

16 A.  It's from John Tate to Dimitri Kesari.

17 Q.  Could you go ahead and read this to the jury?

18 A.  Did you talk to him again last night?

19          What is status?  Can we get him before the debate or

20 not?

21          Thanks.

22          John.

23 Q.  Could you point out to the jury what the subject of this

24 e-mail is?

25 A.  Yes.  The subject is Kent.

1    Q.  Are you aware of whether there was a debate around that time

2    in Iowa?

3    A.  Yes, I believe there was the following day, I believe.

4    Q.  And by "debate," I mean a debate between Republican

5    presidential candidates?

6    A.  Correct.

7    Q.  Let's move on to Government's Exhibit 27.

8              MR. COONEY:  And when that comes up, I'm offering

9    Government's Exhibit 27 as redacted.

10                                   (Government Exhibit 27 was

11                                    offered in evidence.)

12             THE COURT:  Received.

13                                   (Government Exhibit 27 was

14                                    received in evidence.)

15   BY MR. COONEY:

16   Q.  All right.  If you go ahead and blow that up, Ms. Draughn.

17             And while it's coming up, Agent LoStracco, what is the

18   date of this e-mail chain?

19   A.  December 20, 2011, approximately 11 days after the last

20   e-mail exchange.

21   Q.  And can you go ahead and -- and who is this e-mail exchange

22   between according to the top e-mail?

23   A.  Jesse Benton, John Tate, and Dimitri Kesari.

24   Q.  So can you start reading from the bottom?

25   A.  Yes.  On December 20, 2011, John Tate wrote:  Do we even

1  want Kent's endorsement?

2         Jesse Benton responded to John Tate, cc'ing Dimitri

3  Kesari.  Subject:  Regarding Kent Sorenson.

4         Yes, we still do.

5  Q.  All right.  Let's move on a couple of days ahead to

6  Government's Exhibit 28.

7         And if you could blow that up, Ms. Draughn.  And while

8  you're doing that, I'm offering Government's Exhibit 28.

9                           (Government Exhibit 28 was

10                           offered in evidence.)

11         THE COURT:  Received.

12                           (Government Exhibit 28 was

13                           received in evidence.)

14  BY MR. COONEY:

15  Q.  All right.  Now, Agent LoStracco, while that's coming up,

16  what's the date of that e-mail exchange?

17  A.  This is Friday, December 23, 2011, approximately three days

18  later.

19  Q.  And who is that e-mail exchange between?

20  A.  Dimitri Kesari and Kent Sorenson.

21  Q.  Can you read what Dimitri Kesari sent to Kent Sorenson on

22  December 23?

23  A.  Yes.  From Dimitri Kesari to Kent Sorenson, subject:  So

24  what did your wife say?

25         Can you send over the draft press release?

1  Q.  Now I would like to move to Government's Exhibit 29, which

2  has already been admitted into evidence.

3        All right.  This is an e-mail that you previously read

4  into evidence from Jesse Benton, copying John Tate and other

5  individuals?

6  A.  Yes, correct.

7  Q.  And what does this e-mail say again?

8  A.  Stick a fork in Michelle BTW.  Sorenson is endorsing Ron on

9  Monday.  We have his statement already.

10  Q.  What time on December 23, 2011 was this e-mail sent?

11  A.  3:51 p.m.

12  Q.  And we just looked at Government's Exhibit 28 a second ago

13  from Dimitri Kesari to Kent Sorenson.  Can up send over the

14  draft press release?

15        What date and time was that e-mail sent at?

16  A.  It was also December 23, 2011, and it was at 8:50 that

17  morning.

18  Q.  All right.  I would like to turn now to Government's Exhibit

19  30.

20        MR. COONEY:  I'm offering Government's Exhibit 30.

21                     (Government Exhibit 30 was

22                      offered in evidence.)

23        THE COURT:  Received.

24                     (Government Exhibit 30 was

25                      received in evidence.)

1  BY MR. COONEY:

2  Q.  Special Agent LoStracco, what is Government's Exhibit 30?

3  A.  This is an e-mail exchange between Dimitri Kesari and Kent

4  Sorenson and it's the following day, actually very late in the

5  night on December 24th, Christmas Eve, 2011.

6  Q.  What is the subject?

7  A.  Merry Christmas.

8  Q.  What does Dimitri Kesari write to Kent Sorenson?

9  A.  And don't forget the press release.

10  Q.  All right.  Let's talk for a minute about Christmas Day.

11  Special Agent LoStracco, in front of you is that exhibit binder.

12  Could you please take a look and just thumb through Government's

13  Exhibits 105 to 132?

14  A.  Sure.  I need the next binder.

15  Q.  I'm sorry?

16  A.  I need the next binder.

17  Q.  Oh, I apologize.  Here you go.

18  A.  Thank you.

19  Q.  If you could just take a moment to orient yourself with

20  Government's Exhibits 105 through 132, and once you've just kind

21  of thumbed through them for a moment, just look up.  And if you

22  had an opportunity to look at them before, Agent LoStracco, you

23  don't have to look at each one; but I just want to make sure you

24  know which ones we're talking about before I ask you questions.

25  A.  Yes.

1  Q.  All right.  What are Government's Exhibits 105 to 132?

2  A.  These are a series of e-mails that took place between

3  Dimitri Kesari, John Tate, Jesse Benton and others on Christmas

4  Day of 2011.

5  Q.  Are all of those e-mails between Government's Exhibits 105

6  and 132 dated December 25?

7  A.  Yes.

8  Q.  Have you reviewed those e-mails?

9  A.  Yes.

10  Q.  What is the topic of those e-mails?

11  A.  The topic is switch statement just in case.  Basically it's

12  Kent Sorenson's statement about switching from the Michelle

13  Bachmann Campaign to the Ron Paul Campaign.

14  Q.  And when you say "his statement," what is going on between

15  the people who are exchanging e-mails in this thread between 105

16  and 132?

17  A.  In essence, Kent Sorenson is coming up with a statement that

18  he would be presenting for his reasons from switching from the

19  Bachmann Campaign to the Ron Paul Campaign, and members of the

20  Ron Paul Campaign are editing and providing comment on that.

21  Q.  And when you say "a statement," do you mean a press

22  statement?

23  A.  Correct.

24      MR. COONEY:  All right.  Move Government's Exhibits

25  105 to 132 in evidence.

1              (Government Exhibits 105 to 132

2              were offered in evidence.)

3        MS. CAMPBELL:  Your Honor, I need some time to look

4   through each.  Sorry.

5        THE COURT:  Take your time.

6        MR. COONEY:  I'm happy to move along and come back to

7   the admission of them.

8        MS. CAMPBELL:  I'm sure I don't have a problem, but I

9   just want to double-check.

10       MR. COONEY:  No, I understand, whatever you need.  I'm

11  happy to stop and I'm also happy to keep asking questions.

12       MS. CAMPBELL:  Keep going and I'll --

13       MR. COONEY:  All right.

14  BY MR. COONEY:

15  Q.  Special Agent LoStracco, these e-mail exchanges, are there

16  e-mails exchanges that -- can you give a sense of John Tate,

17  Jesse Benton, and Dimitri Kesari's role and how they show up in

18  these e-mail threads?

19  A.  Sure.  There's several e-mail threads in which all three,

20  John Tate, Jesse Benton, and Dimitri Kesari, are all on in some

21  capacity, whether it's to, from, or cc'd.  John Tate sends

22  e-mails and responds to e-mails.  Dimitri Kesari sends e-mails

23  and responds to e-mails.  Jesse Benton I believe only sends one

24  e-mail on this day that I could see related to this topic.

25  Q.  All right.  I'm going to go ahead and move on and happy to

1  come back to the admission.

2          So I would like to shift gears just a little bit to

3  the next day, December 26, 2011, and show you Government's

4  Exhibit 31.

5          MR. COONEY:  And I'll offer in Government's Exhibit

6  31.

7                              (Government Exhibit 31 was

8                              offered in evidence.)

9          THE COURT:  Received.

10                             (Government Exhibit 31 was

11                             received in evidence.)

12         MR. COONEY:  All right.  And if you could go ahead,

13 Ms. Draughn, and blow up the last e-mail in that chain and we're

14 going to go over a few things here.

15 BY MR. COONEY:

16 Q.  So, Special Agent LoStracco, before we get started, if you

17 need to look at the hard copies to see if you can orient the

18 jury, but what is generally Government's Exhibit 31 -- or excuse

19 me, what kind of e-mail exchange is this?  Who is it between?

20 A.  All right.  So the e-mail chain is between John Tate,

21 Dimitri Kesari, Jesse Benton, and Jedd Coburn.

22 Q.  All right.  Let's start --

23 A.  Sorry.  There were a few other people from the Ron Paul

24 Campaign on there as well.

25 Q.  Let me make sure we have the first one up.  Can you go ahead

1    with the bottom e-mail dated December 26, 2011, at 8:28 a.m., I

2    believe.  Is that the first one in the chain?

3    A.  Yes.

4    Q.  All right.  Would you go ahead and read that e-mail,

5    including who sent it?

6    A.  Yes.  On December 26, 2011, John Tate wrote:  What is status

7    of Sorenson statement?  Did Kent approve new version yet?

8    John.

9    Q.  All right.  So we're clear, this e-mail thread, this e-mail

10   that was sent in this thread, this is the day after Government's

11   Exhibits 105 through 132 that you just summarized, right?

12   A.   Right, the day after the series of e-mails on Christmas Day.

13          MS. CAMPBELL:  No objection to 105 through 132.

14          MR. COONEY:  Thank you very much.

15   BY MR. COONEY:

16   Q.  Why don't we keep moving up the thread, Ms. Draughn.

17   A.  So on December 26, 2011, Jesse Benton wrote:  Dimitri, was

18   let me know.

19          John Tate then responded:  Dimitri?

20          Dimitri Kesari responded to John Tate, cc'ing Jesse

21   Benton, Matt Hawes, Jedd Coburn.  Subject:  Regarding Sorenson.

22          I just landed in Chicago.

23          Kent wants to talk with me first.

24          Will update as soon as I know something.

25          John Tate then wrote:  Well hurry.  This is supposed

1    to go today.  Right?

2             And Dimitri Kesari then responded to John Tate, cc'ing

3    Jesse Benton, Matt Hawes, Jedd Coburn.  Subject:  Regarding

4    Sorenson.

5             I just spoke with him.  He wants to meet with me when

6    I land.  I get in at 1:30 Central Time.

7             He would like his reason for switching put back in his

8    statement.

9             He just needs a little hand holding.  I will make this

10   happen.

11            Sorry for the delay.  He took yesterday off to be with

12   his family.

13            Will keep you up to date.

14   Q.  All right.  And I think maybe -- I could be wrong, but I

15   think this is the first time we've seen the name "Matt Hawes."

16            Do you recognize that name?

17   A.  Yes.  He was someone that worked within the campaign,

18   possibly involving the media, I believe.

19   Q.  All right.  And I just want to bring one thing to the jury's

20   attention here.

21            Ms. Draughn, could you please scroll down to where in

22   the message at the bottom of what you have now where it says,

23   original message, and below is from Dimitri Kesari.  So where

24   you had it just a second ago.  You were almost there.  Up from

25   there where it says -- that right there, yep.

1          You can give me a little bit more than that, please.

2          Sorry.  If you can go from there where you are right

3   now down to the bottom of the page.  That's perfect.

4          That's great.  Thank you very much.

5          All right.  Now, this e-mail, December 26, 2011, from

6   Dimitri Kesari to John Tate, Jesse Benton, Matt Hawes and Jedd

7   Coburn, what time was that sent at?

8   A.  11:47 a.m.

9   Q.  Now I want to move just down the thread and point something

10  out here.  Two below this, so this one here, December 26, which

11  I can't make a circle, I'm sorry.  I can just point.

12  December 26, 2011, at 11:19 a.m., do you see that?

13  A.  Yes.

14  Q.  All right.  Now, is there a response to Jesse Benton's

15  e-mail at 11:19 a.m.?

16  A.  Yes, from John Tate.

17  Q.  And what time does it say this one was sent at from John Tate?

18  A.  10:44 a.m.

19  Q.  All right.  So it says, according to this, the response was

20  a half hour before Jesse Benton's e-mail; is that right?  If you

21  read it on its face, that's what it looks like?

22  A.  Correct.

23  Q.  All right.  Special Agent LoStracco, where do you live?

24  A.  I live in Massachusetts.

25  Q.  All right.  What time zone is Massachusetts in?

1  A.  Eastern.

2  Q.  How did you get to Des Moines for this trial?

3  A.  I flew on an airplane.

4  Q.  When you flew, did you bring your computer and your cell

5  phone?

6  A.  Yes; my cell phone, correct.

7  Q.  When -- let's just deal with your cell phone.  When you were

8  in Boston, what time zone did your cell phone read?

9  A.  Eastern Time.

10      MS. CAMPBELL:  Objection; irrelevant.

11      THE COURT:  Overruled.

12      Answer the question.

13  A.  Eastern Time.

14  BY MR. COONEY:

15  Q.  When you landed in Des Moines, did the time zone that your

16  cell phone read change?

17  A.  Yes.  It changed to Central Time.

18  Q.  For example, have you sent e-mails from your cell phone?

19  A.  Yes.

20  Q.  Have you sent text messages from your cell phone?

21  A.  Yes.

22  Q.  Made calls from your cell phone?

23  A.  Yes.

24      MR. BINNALL:  Your Honor, I would like the limiting

25  instruction just because that's the way it worked for her, this

1  isn't expert testimony, and she's essentially giving expert

2  testimony there.

3          THE COURT:  Overruled.

4  BY MR. COONEY:

5  Q.  All right.  Let's move on now to Government's Exhibit 32.

6          And if you would go ahead and blow that up,

7  Ms. Draughn.

8          MR. COONEY:  I'm going to offer Government's Exhibit

9  32.

10                          (Government Exhibit 32 was

11                           offered in evidence.)

12  BY MR. COONEY:

13  Q.  All right.  I'm going to draw your attention to the last

14  e-mail in the chain's or excuse me, the first e-mail in the

15  chain at the bottom of the document.

16          It's December 26, 2011, at 3:44 p.m., from Matt Hawes;

17  is that right?

18  A.  Yes, correct.

19  Q.  Now, real quick, if you need to look back at Government

20  Exhibit 31, please do; but what time was the last e-mail in that

21  chain, the one from Dimitri Kesari to Tate, Benton, Hawes and

22  Coburn saying I just spoke with him?  What time was that again?

23  A.  12:08 p.m.

24  Q.  All right.  Can you go ahead and just read up this chain?

25  A.  Yes.  On December 26, 2011, at 3:44 p.m., Matt Hawes wrote:

1  Any update?  Curious to know what happened.

2          Dimitri Kesari replied to Matt Hawes, cc'ing John

3  Tate, regarding Sorenson, sent December 26th at 5:04 p.m.:

4  Still working on it.  Meeting now.

5          John Tate responded to Dimitri Kesari and Matt Hawes

6  also on December 26, 2011:  I will be flying for next few hours.

7  Please keep Jesse updated and get a final statement done that

8  both he and we can accept.

9  Q.  All right.  I would like to step away from the e-mails for

10  just a moment.

11          Actually I think you all know what this is, but let me

12  just show it just in case.

13          Special Agent LoStracco, have you ever seen

14  Government's Exhibit 133 before?

15  A.  Yes.

16  Q.  What is Government's Exhibit 133?

17  A.  It's a check.

18  Q.  Where did you obtain that check?

19  A.  From a representative or attorney of Kent Sorenson's.

20  Q.  When did you obtain that check?

21  A.  We obtained this check -- I'm trying to remember exactly.  I

22  believe it was in --

23  Q.  Approximately?

24  A.  I believe it was approximately in the fall of 2014.

25  Q.  Was this sometime after your investigation had begun?

1    A.  Oh, yes.

2            MR. COONEY:  All right.  Moving Government's Exhibit

3    133 into evidence.

4                            (Government Exhibit 133 was

5                             offered in evidence.)

6            MS. CAMPBELL:  Objection for the reasons stated in our

7    motion in limine, Your Honor.

8            MR. BINNALL:  We join, Your Honor.

9            MR. WARRINGTON:  Objection.

10           THE COURT:  Overruled.  It's received.

11                           (Government Exhibit 133 was

12                            received in evidence.)

13   BY MR. COONEY:

14   Q.  All right.  Ms. Draughn, could you please put up on the

15   monitor a copy of Government's Exhibit 133.  And if you could

16   blow it up, please, Ms. Draughn.

17           All right.  Now, first of all, Special Agent

18   LoStracco, is what you see up on Government's Exhibit 133, is

19   that a copy of what you have in front of you as Government's

20   Exhibit 133?

21   A.  Yes, with the exception of the redaction of the account

22   number at the bottom and the government exhibit sticker on the

23   side.

24   Q.  And so we're clear, the government -- the one that I handed

25   you a moment ago that you're holding, is that the actual check,

1  the original check that you obtained from Kent Sorenson?

2  A.  Yes.

3  Q.  Just for the jury's benefit, what is that that it is in?

4  What's that called?

5  A.  This is a heat-sealed envelope.  So basically any valuable

6  evidence that we obtain, jewelry, cash, checks are considered

7  negotiable, we put it in this see-through packet and it's

8  heat-sealed with a label put over it, and it's then witnessed by

9  two agents, so there's a sealing agent and a witnessing agent,

10  and the date is marked on here.  So the date we seized it was

11  August 27, 2014, and it was sealed on September 2, 2014, and

12  that's because we were traveling back from Iowa.  So we didn't

13  seal it until we got it back to the evidence room to be able to

14  do that.

15  Q.  Now, you can go ahead and look at whatever you're more

16  comfortable with, the copy of Government's Exhibit 133 on the

17  screen or the actual.  I'm going to ask you a few questions

18  about it.

19        First of all, what is the date of this check?

20  A.  December 26, 2011.

21  Q.  And the e-mails that we were just looking at a moment ago,

22  what is the date of those e-mails?

23  A.  December 26, 2011.

24  Q.  How much is this check written for?

25  A.  $25,000.

1   Q.  Who is the check made payable to?

2   A.  Grassroots Strategies.

3   Q.  And who is the payor on the check?  What I mean by that is,

4   in the upper left hand-other corner above pay to the order of,

5   who does it say the check is from?

6   A.  Designer Goldsmiths, Inc.

7   Q.  Have you had an opportunity to investigate who the

8   registered agent of Designer Goldsmiths is?

9   A.  Yes.

10  Q.  Who is it?

11  A.  Dimitri Kesari.

12          THE COURT:  To be clear on the earlier exhibits, 32 is

13  received, 105 to 132 are received.

14          MR. COONEY:  Thank you, Your Honor.

15                              (Government Exhibits 32 and 105

16                               through 132 were received in

17                               evidence.)

18  BY MR. COONEY:

19  Q.  What is Designer Goldsmiths, Inc.?

20  A.  It's a jewelry store.

21  Q.  Have you been there before?

22  A.  Yes.

23  Q.  What does it look like?

24  A.  It's a small business.  I would describe it as in a sort of

25  strip with other businesses.  It's kind of a small, one-level

1    brick building, and I believe it's on the far left of that

2    building.  It's in Leesburg, Virginia.

3    Q.  Let's move now to Government's Exhibit 33.

4         If you could blow that up, Ms. Draughn.  And while you

5    do, I'm going to offer Government's Exhibit 33.

6                        (Government Exhibit 33 was

7                         offered in evidence.)

8         THE COURT:  Received.

9                        (Government Exhibit 33 was

10                        received in evidence.)

11   BY MR. COONEY:

12   Q.  All right.  What is Government's Exhibit 33, Agent

13   LoStracco?

14   A.  This is an e-mail exchange between Jedd Coburn, Dimitri

15   Kesari, James Barcia, and Gary Howard.

16   Q.  And actually I want to draw your attention first if we could

17   get to the bottom of the e-mail chain --

18   A.  Yes.

19   Q.  -- who is that e-mail chain between?

20   A.  Jedd Coburn and Dimitri Kesari.

21   Q.  All right.  And can you read that e-mail exchange between

22   Jedd Coburn and Dimitri Kesari?

23   A.  Yes.  The subject is:  Sorenson statement.

24         I repeated one line in the beginning and the end,

25   which I've fixed.  Please have him use this version.

1  Q.  Now, moving up, are more people added to that e-mail?

2  A.  Actually this is Dimitri Kesari.  Jedd Coburn is not on the

3  top e-mail.  It's Dimitri Kesari forwarding that Sorenson

4  statement to James Barcia and Gary Howard.

5  Q.  And what is it that Dimitri Kesari writes to Mr. Barcia and

6  Gary H. on December 26, 2011, at 8:56 p.m.?

7  A.  The deal is done.

8          Please draft a press release and send to me and Jesse.

9  Q.  Can you remind the jury the date of that check that we just

10  looked at was?

11  A.  December 26, 2011.

12  Q.  Is there an attachment to this e-mail?

13  A.  Yes.

14  Q.  If we could move to page 2 of this exhibit, please.  And if

15  you could blow that up.  If you could actually blow up just the

16  first three paragraphs, along with the header, please.

17          Thank you, Ms. Draughn.

18          Have you had an opportunity to review this entire

19  attachment?

20  A.  Yes.

21  Q.  Can you summarize for the jury what this attachment is?

22  A.  In essence, it's Sorenson's statement again on why he's

23  switching from the Michelle Bachmann campaign to the Ron Paul

24  Campaign.

25  Q.  And can you just read the second paragraph?

1  A.  Today, I am switching my support from Michelle Bachmann to

2  Ron Paul for the 2012 Iowa Caucuses and the Presidency of the

3  United States.

4  Q.  All right.  Let's move to the next day, December 27, 2012.

5          MR. COONEY:  Ms. Draughn, can you please put up

6  Government's Exhibit 34.  And if you could blow that up.

7          I'm offering Government's Exhibit 34.

8                              (Government Exhibit 34 was

9                               offered in evidence.)

10         THE COURT:  Received.

11                             (Government Exhibit 34 was

12                              received in evidence.)

13  BY MR. COONEY:

14  Q.  While that comes up, what is the date of this e-mail,

15  December 27, 2011?  Excuse me, what is the date of this e-mail,

16  Agent LoStracco?

17  A.  December 27, 2011.  It's the day after the e-mail exchange

18  that we were just reading -- or I was just reading.

19  Q.  Pardon me.  What time is this e-mail exchange?

20  A.  8:37 a.m.

21  Q.  All right.  Agent LoStracco, could you please read this

22  e-mail exchange, including to and from and the subject line?

23  A.  This is from Dimitri Kesari to John Tate, Jesse Benton,

24  jared@ronpaul2012.com, and Gary Howard.

25          Subject:  Kent is getting cold feet.

1          Hold the release.

2          Kent is getting cold feet.  He wants to meet with me

3   in about two hours.  Any advice?

4          Damn, I was afraid of this.

5   Q.  All right.  And I think there may be some people on this

6   e-mail that I have not asked you about before.  Do you know who

7   Gary Howard is?

8   A.  Gary worked on press with the Ron Paul Campaign.

9   Q.  And what about jared@ronpaul2012.com?

10  A.  Jared Gamble was a staffer with the Ron Paul Campaign, as I

11  understand it, mostly worked with Mr. Kesari.

12  Q.  And there's one other name that I didn't ask you about that

13  showed up on Government's Exhibit 33.  That was the last one

14  that Dimitri Kesari sent to James Barcia and Gary H, the deal is

15  done.  Who is James Barcia?

16  A.  James Barcia I believe also worked on media issues with the

17  Ron Paul Campaign.

18  Q.  All right.  Let's move ahead now to Government's Exhibit 35.

19          MR. COONEY:  And I'm offering Government's Exhibit 35.

20                          (Government Exhibit 35 was

21                           offered in evidence.)

22          THE COURT:  Received.

23                          (Government Exhibit 35 was

24                           received in evidence.)

25  BY MR. COONEY:

1  Q.  First, the e-mail at the bottom of the Government's Exhibit

2  35, Agent LoStracco, that is the December 27, 2011, e-mail from

3  Dimitri Kesari stating to hold the release; is that right?

4  A.  That is correct.

5  Q.  So is this a response to that e-mail?

6  A.  Yes.

7  Q.  All right.  Can you read up from after the hold the release

8  e-mail.  Let me just make sure that the jury is centered.  This

9  is the hold the release e-mail there; is that right?

10  A.  Yes, correct.

11  Q.  All right.  Can you read up from there, please.

12  A.  Yes.  John Tate responded on December 27, 2011:  Why is he

13  getting cold feet?  What can we do, say to help him?  What time

14  are you meeting him, and where?

15       Jesse Benton then responded to John, cc'ing Dimitri

16  Kesari, Jared Gamble, Gary Howard.  Subject:  Regarding Kent is

17  getting cold feet.

18       Fuck him.  This is absurd.

19  Q.  All right.  And this e-mail where Jesse Benton writes F him,

20  this is absurd, this is not just sent to John Tate and Dimitri

21  Kesari; is that right?

22  A.  No.  This is also sent to Gary Howard.

23  Q.  And jared@ronpaul2012?

24  A.  Oh, yes, I'm sorry, and Jared Gamble, correct.

25  Q.  All right.  Now let's move to Government Exhibit 36.

1    MR. COONEY: And I'm offering Government's Exhibit 36.

2                        (Government Exhibit 36 was

3                        offered in evidence.)

4    THE COURT: Received.

5                        (Government Exhibit 36 was

6                        received in evidence.)

7  BY MR. COONEY:

8  Q.  All right.  And, Agent LoStracco, this is another e-mail of

9  the same thread we were just looking at; is that right?

10  A.  Correct.

11  Q.  All right.  So the last one we read was the F him, this is

12  the absurd e-mail; is that right?

13  A.  Yes.

14  Q.  All right.  Can you read the next e-mail in the chain?

15          And Ms. Draughn, if you can actually, before you do,

16  if you can highlight just the top e-mail.

17          All right.  Go ahead, Agent LoStracco.

18  A.  Yes.  John Tate responds to Jesse Benton, subject:

19  Regarding Kent is getting cold feet.

20          Yep.  I am going to tell Dimitri to very nicely tell

21  Kent it's a yes or no today.  We are not going to keep doing

22  this, no good for anyone.

23          Unless you disagree of course.

24          John.

25  Q.  According to this e-mail that you just read, John Tate took

1    the other individuals who were on the last e-mail off of this

2    reply, right?

3    A.   Yes.  It looks like it was just to Jesse Benton.

4    Q.   Let's move on to Government's Exhibit 37.

5              MR. COONEY:   I'm offering Government's Exhibit 37.

6                             (Government Exhibit 37 was

7                             offered in evidence.)

8              THE COURT:   Received.

9                             (Government Exhibit 37 was

10                            received in evidence.)

11   BY MR. COONEY:

12   Q.   Now, Special Agent LoStracco, while this is coming up, the

13   bottom e-mail on this is December 27, 2011, from Dimitri Kesari,

14   the hold the release e-mail that we've looked at already; is

15   that right?

16   A.   Yes, that's correct.

17   Q.   So -- I apologize I interrupted you.

18   A.   That's okay.  It was confirming.  Yes, this is the

19   December 27 e-mail from Dimitri Kesari about holding the release

20   because Kent is getting cold feet.

21   Q.   All right.  This is another e-mail in that thread, is that

22   right, the top e-mail?

23   A.   Yes.

24   Q.   And, Ms. Draughn, if you can go ahead and blow that up.

25              And then, Agent LoStracco, if you could read that

1  e-mail.

2  A.  Yes.  This is from Jesse Benton to Dimitri Kesari, cc'ing

3  John Tate, Jared Gamble, Gary Howard.  Subject:  Kent is getting

4  cold feet.

5        I am not interested in this game anymore.  Dimitri,

6  pull the offer.  If we can't depend on him, I don't want him

7  involved.

8  Q.  All right.  And on this e-mail, this includes the people who

9  were on the original hold the release e-mail; is that right?

10  A.  Yes, that's correct.

11  Q.  I would like to move now to Government's Exhibit -- oh,

12  pardon me.  One more question about that.

13        What time did Jesse Benton send that e-mail to Dimitri

14  Kesari, John Tate, and the others?

15  A.  At 10:38 a.m.

16  Q.  All right.  Let's move on now to Government Exhibit 38.

17        MR. COONEY:  I'm offering Government's Exhibit 38.

18                        (Government Exhibit 38 was

19                        offered in evidence.)

20        THE COURT:  Received.

21                        (Government Exhibit 38 was

22                        received in evidence.)

23  BY MR. COONEY:

24  Q.  All right.  Agent LoStracco, what time is Government's

25  Exhibit 38?

1  A.  12:38 p.m., approximately two hours after the last e-mail.

2  Q.  And who is involved in that e-mail thread?

3  A.  From Jesse Benton to Dimitri Kesari and John Tate.

4  Q.  What does Jesse Benton write to Dimitri Kesari and John

5  Tate?

6  A.  And I will read it with the typos.

7           "In all seriousness, I am nto sure what to do about

8  this.

9           "The DMR has his statement, I sent last night since

10 Kent said H wads comfortable.  Mary Stegmier won't check e-mail

11 until 12/28, but she has it."

12 Q.  Is there a newspaper here in Des Moines?

13 A.  Yes.

14 Q.  What's it called?

15 A.  There's one called the Des Moines Register.  There may be

16 more.

17 Q.  Are you familiar with who Mary Stegmier is?

18 A.  She's a reporter or at least was a reporter at that time

19 with the Des Moines Register.

20 Q.  Let's move to Government's Exhibit 39.

21           MR. COONEY:  I'm offering Government's Exhibit 39.

22                          (Government Exhibit 39 was

23                           offered in evidence.)

24           THE COURT:  Received.

25

1                              (Government Exhibit 39 was

2                              received in evidence.)

3  BY MR. COONEY:

4  Q.  Now, Agent LoStracco, if you take a look while it's coming

5  up, the bottom e-mail in this thread, is that the e-mail that we

6  just looked at?

7  A.  Yes.

8  Q.  December 27, 2011, the in all seriousness e-mail?

9  A.  Yes.

10 Q.  All right.  Let's move then to the top e-mail.  And can you

11 walk the jury through that, including the time it was sent?

12 A.  Yes.  Jesse Benton sends this December 27, 2011, 12:39 p.m.,

13 so just two minutes later, to Dimitri Kesari and John Tate.

14 Subject:  Regarding Kent.

15              I am tempted to say this is hard ball tie.  Either he

16 honors his commitment or we have to expose him as the

17 money-grubbing shakedown artist that he is.

18 Q.  Let's move now to Exhibit 40.

19              MR. COONEY:  I'm offering Government's Exhibit 40.

20                              (Government Exhibit 40 was

21                              offered in evidence.)

22              THE COURT:  Received.

23                              (Government Exhibit 40 was

24                              received in evidence.)

25 BY MR. COONEY:

1  Q.  What is Government's Exhibit 40?

2  A.  This is an e-mail from Dimitri Kesari to Kent Sorenson,

3  December 27th, that same date, about 3:38 p.m.

4  Q.  How does that relate in time to the e-mails that we just

5  looked at approximately?

6  A.  So it's that same day.  In fact, the time, it is

7  approximately three hours later.

8  Q.  All right.  Can you read what Dimitri Kesari sent to Kent

9  Sorenson?

10  A.  It is now 3:36.

11        I have not talked with you since this morning and you

12  have talked with many others since then.

13        I have tried to give you space but come on not calling

14  back is not right.

15        What are you going to tell Mary from the Des Moines

16  Register?

17        Jesse gave her the story last night after we talked

18  about you talking with her.

19        Call me.

20  Q.  All right.  I would like to take a break from e-mails for

21  just a second and would like to show you simply for

22  identification purposes Government's Exhibit 182 and

23  Government's Exhibit 183.  And first I'll just say that

24  Government's Exhibit 182 for the record, there's a stipulation

25  between the parties that these reflect cell phone records

1  obtained from Verizon for the phone number (515) 681-4255.

2  THE COURT:  Members of the jury, I told you in the

3  preliminary instructions that among the things that constitute

4  evidence are testimony from a witness, documents and other

5  tangible things received as exhibits and stipulations, which are

6  agreements between the attorneys -- or between the parties.

7  Sometimes the agreement is that certain testimony if

8  presented would be as follows, and you must accept that

9  stipulation that the testimony would be that.  Sometimes a

10  stipulation is that something is true, and you must follow that.

11  And here the stipulation is that what?

12  MR. COONEY:  Simply that these are records obtained

13  from Verizon for the phone number (515) 681-4255.

14  THE COURT:  So you must accept that as true because

15  all parties agree that that's true.

16  BY MR. COONEY:

17  Q.  All right.  Agent LoStracco, these are records that you

18  obtained from Verizon pursuant to a subpoena; is that right?

19  And why don't you just take your time here.

20  A.  Yes.  Those are the records pertaining to Kent Sorenson's

21  number, correct.

22  Q.  And that's what I was going to ask you is, what do the

23  records reflect about who (515) 681-4255 is registered to?

24  A.  That it is registered to Kent Sorenson.

25  Q.  All right.  Now I'm going to show you Government's Exhibit

1   183, and without identifying any names or anything, can you just

2   state what Government's Exhibit 183 is?  Or actually, if I may,

3   I'm just going to walk you through this.  Are these records that

4   you obtained from Verizon for a different phone number

5   (703) 626-8704?

6   A.  Yes, that's correct.

7   Q.  And when you obtained these from Verizon, did you obtain

8   what is referred to as a declaration of records for regularly

9   conducted business activity?

10  A.  Yes.

11  Q.  All right.  Could you please go ahead and read that

12  declaration to the jury?

13  A.  Declaration of records of regularly conducted business

14  activity.  I, Siaka Sesay, am employed by Verizon Wireless as

15  records custodian.  In that capacity I'm either the custodian of

16  records for that business or I have knowledge of the systems and

17  procedures used by that business to create and maintain the

18  records being certified by this declaration.

19          I reviewed and attached 200 plus pages of records to

20  this declaration, and based upon my knowledge of the regular

21  business practices of that business, I know that:

22          A, the attached records were made at or near the time

23  of the occurrence of the matters set forth by or from

24  information transmitted by a person with knowledge of those

25  matters.

1          B, the attached records were kept in the course of the

2    regularly conducted activity of that business.

3          And, C, it was the regular practice of that business

4    to make the attached records.

5          I declare and certify under penalty of perjury that

6    the foregoing is true and correct.

7          Executed on April 12, 2016, and then there's a

8    signature.

9    Q.  All right.  And was that declaration, was that included with

10   the records that you obtained from Verizon?

11   A.  I believe we obtained the declaration via fax.

12   Q.  For the records that you're looking at right here?

13   A.  Correct.

14         MR. COONEY:  All right.  Move Government's Exhibit

15   183, not all the records ultimately redacted for relevance, but

16   into evidence.

17                         (Government Exhibit 183 was

18                          offered in evidence.)

19         THE COURT:  Received.

20                         (Government Exhibit 183 was

21                          received in evidence.)

22   BY MR. COONEY:

23   Q.  All right.  One more question.  And also I guess I should

24   say for the record -- well, no, that's all right.

25         Who do the records reflect that phone number

1  (703) 626-8704 is registered to?

2  A.  Dimitri Kesari.

3  Q.  All right.  Ms. Draughn, can you please put up Government's

4  Exhibit 183a, and this is an excerpt of the records from

5  Government's Exhibit 183, and you can go ahead and blow that up.

6        All right.  Now there's some highlights on these

7  calls -- or excuse me, on these records; is that right?

8  A.  Yes, that's correct.

9  Q.  All right.  Just so we're clear, are these highlights that

10  came from the records from Verizon or are these highlights that

11  were put on subsequently by the government?

12  A.  No.  These are highlights that were subsequently put on by

13  the government.

14  Q.  Again, whose records are we looking at?

15  A.  These are Dimitri Kesari's records.

16  Q.  These highlighted, whose phone is Dimitri Kesari's phone

17  exchanging calls with here?

18  A.  In the highlighted portions, it's exchanging calls with

19  (515) 681-4255, which is Kent Sorenson's phone number.

20  Q.  All right.  What date are these highlighted calls?

21  A.  December 27, 2011.

22  Q.  All right.  Now the e-mail we just looked at a minute ago,

23  you can just look in your book, Government's Exhibit 40, about

24  what time was that e-mail sent?

25  A.  That was sent on December 27th around 3:38 p.m.

1  Q.  All right.  If you just look at these records on this --

2  this page, the first call here is at 2:50 p.m., according to

3  these records on 12/27; is that right?

4  A.  Correct.

5  Q.  And we go down here to 12/27 at 7:58 at the bottom; is that

6  right?

7  A.  Yes.

8  Q.  How many calls are there in that time frame?

9  A.  Seven.

10  Q.  All right.  And how many of them are reflected as incoming,

11  meaning a call coming in to Dimitri Kesari's phone?

12  A.  One.

13  Q.  Ms. Draughn, can we go to the next page.

14          So that would be -- just to summarize, that would be

15  six outgoing calls; is that right?

16  A.  Right.

17  Q.  Let's stay here and where I've just put the arrow at.  I may

18  have to clear that so I don't block the time; but right here, is

19  that the last call on December 27th in Dimitri Kesari's records?

20  A.  Yes, correct.

21  Q.  So up from there, how many calls are there to Kent

22  Sorenson's phone?

23  A.  Just what I can see or total from what I --

24  Q.  Just on this page, just what you can see on this page.

25  A.  Oh, just on this page there are five.

1  Q.  All right.  And how many of those are incoming as opposed to

2  outgoing?

3  A.  None.

4  Q.  And you said that there were six outgoing on the other page?

5  A.  I believe there were seven, I think.  I can recount.

6  Q.  Give or take?

7  A.  Sure.

8  Q.  Six plus five is what?

9  A.  Eleven.

10 Q.  All right.  So about 11, but maybe give or take one based on

11 your count.  You don't need to be that precise.  But about 11 or

12 12 outgoing calls from Dimitri Kesari's phone to Kent Sorenson's

13 between about 2:50 in the afternoon until 11:56 p.m. at night;

14 is that right?

15 A.  Yes.  There were six outgoing calls if that's what you're

16 asking.

17 Q.  And if you're looking at these just on this page, what are

18 the length of these calls?

19 A.  They're all a minute long.

20 Q.  Ms. Draughn, can you go back to the last page real quick?

21 No; I'm sorry.  When I said the last, that's my fault.  The

22 prior page, so page 1, I'm sorry.

23       These calls here between 2:50 p.m. on December 27th

24 and 7:58 on page 1, what's the longest call within that frame?

25 A.  Nine minutes.

1    Q.  At what time?

2    A.  At 4:15 p.m.

3    Q.  Was that the incoming call?

4    A.  Yes, correct.

5    Q.  All of those other ones, how long are they?

6    A.  One minute.

7    Q.  All right.  Let's get back to some e-mails.

8              Government's Exhibit 41, please, Ms. Draughn.

9              MR. COONEY:  Offering Government's Exhibit 41.

10                             (Government Exhibit 41 was

11                              offered in evidence.)

12             THE COURT:  Received.

13                             (Government Exhibit 41 was

14                              received in evidence.)

15   BY MR. COONEY:

16   Q.  All right.  What is Government's Exhibit 41?

17   A.  This is an e-mail exchange between Jesse Benton, Dimitri

18   Kesari, and John Tate.

19   Q.  Could you go ahead and read this to the jury?

20   A.  Yes.  On December 27, 2011, at 6:06 p.m., Jesse Benton

21   wrote:  "I can put them off for a dew hours, but that is it.  My

22   story will have to be that he wanted too much money."

23             From John Tate to Jesse Benton, cc'ing Dimitri Kesari.

24   Subject:  Regarding DMR just called me on Kent.

25             Status?

1  Q.  What time was that e-mail sent?

2  A.  That was sent at 8:49 p.m.

3  Q.  All right.  Let's move to Government's Exhibit 42, please.

4         MR. COONEY:  I'm offering Government's Exhibit 42.

5                         (Government Exhibit 42 was

6                         offered in evidence.)

7         THE COURT:  Received.

8                         (Government Exhibit 42 was

9                         received in evidence.)

10 BY MR. COONEY:

11 Q.  What's Government's Exhibit 42?

12 A.  This is an e-mail between Dimitri Kesari and Kent Sorenson

13 also on December 27, 2011.

14 Q.  All right.  What time is this e-mail sent by Dimitri Kesari?

15 A.  This is sent at, what, 10:21 approximately.

16 Q.  Military time, is that 9:21?

17 A.  9:21, thank you.  I did my math wrong.

18 Q.  All right.  Can you read that e-mail please?

19 A.  Yes.  Call me ASAP.

20         Need to talk now.

21 Q.  Please go to Government's Exhibit 43.

22         MR. COONEY:  I'm offering Government's Exhibit 43.

23                         (Government Exhibit 43 was

24                         offered in evidence.)

25         THE COURT:  Received.

1                    (Government Exhibit 43 was

2                    received in evidence.)

3  BY MR. COONEY:

4  Q.  All right.  Now, first, Agent LoStracco, on Government's

5  Exhibit 43, the bottom e-mail, that is an e-mail we looked at

6  just a minute ago, right, I believe Government's Exhibit 41 from

7  Benton to Kesari and Tate?  I can put them off for a few hours;

8  is that right?

9  A.  Yes, correct.

10 Q.  All right.  Can you read up?  So is the rest of this just

11 another part of this thread?

12 A.  Yes.

13 Q.  So can you read up from there then?

14 A.  Yes.  It's 6:06 p.m., also on December 27, 2011, John Tate

15 wrote:  LOL.

16       Jesse Benton then replied to John Tate, cc'ing Dimitri

17 Kesari.  Time is up.  I'm calling the Register back in 15

18 minutes -- mins; sorry.

19 Q.  Let's move to Government's Exhibit 44.

20       MR. COONEY:  I'm offering Government's Exhibit 44.

21                    (Government Exhibit 44 was

22                    offered in evidence.)

23       THE COURT:  Received.

24                    (Government Exhibit 44 was

25                    received in evidence.)

1  BY MR. COONEY:

2  Q.  All right.  Now that last e-mail that we looked at in

3  Government's Exhibit 43 was sent by Jesse Benton around 10:18

4  p.m.; is that right?

5  A.  Yes.

6  Q.  All right.  If we now move to the bottom e-mail in this

7  chain, this is also December 27, 2011; is that right?

8  A.  Yes.

9  Q.  What time is this first e-mail in this chain?

10  A.  9:20 p.m.

11  Q.  All right.  And just to center the jury, who does the -- the

12  e-mail at the very top, who does it reflect the chain was

13  between?

14  A.  John Tate, Dimitri Kesari, Jesse Benton, and Jedd Coburn.

15  Q.  All right.  Can we start with the bottom e-mail and just go

16  ahead and read up the chain?  Just for the jury's benefit, I'm

17  just going to point to -- probably they'll know, but we're

18  starting down here at the bottom where I pointed to.

19  A.  On December 27, 2011, at 9:20 p.m., Jesse Benton wrote:  I

20  assume he forwarded a draft of his statement to y'all from his

21  e-mail account.  Please forward that e-mail to me right away.

22        Thanks.

23        John Tate then responded:  I never got it from him.

24  Where are we on this Dimitri, question mark.

25        Dimitri Kesari then wrote:  It was from a ghost e-mail

1  account.

2         He is sitting in the Bachmann office waiting to talk

3  with her.  He has been texting me from there.

4         John Tate then responded to Dimitri Kesari, cc'ing

5  Jesse Benton and Jedd Coburn.  Subject:  Regarding Sorenson.

6         Okay.  But Jesse is talking to the press now.  So Kent

7  needs to say yes or no, right now.  We are done.  No more

8  waiting.  Jesse will either tell them Kent has changed, or

9  explain why it didn't happen.

10        Now.  Not five minutes from now, now.

11        John.

12 Q.  Again, what was the subject line in this e-mail?

13 A.  Regarding Sorenson.

14 Q.  Let's move now ahead to Government's Exhibit 45.

15        MR. COONEY:  Now, Government's Exhibit 45, I'm

16 offering that into evidence.

17                         (Government Exhibit 45 was

18                          offered in evidence.)

19        THE COURT:  Received.

20                         (Government Exhibit 45 was

21                          received in evidence.)

22 BY MR. COONEY:

23 Q.  All right.  Can you start with the bottom e-mail, please,

24 Agent LoStracco, and read up from there?

25 A.  Yes.  This is from A.J. Spiker on December 27, 2011, to John

1  Tate.  Subject:  Question mark.

2          Any news on Kent?

3          And it's signed A.J. Spiker, Iowa Vice Chairman, Ron

4  Paul for President.

5          John Tate forwarded to Jesse Benton and Dimitri Kesari

6  that message on December 28, 2011.

7          So, what was the outcome, question mark.

8  Q.  And what date did -- excuse me.  What date and time did John

9  Tate send that e-mail, send that forward?

10 A.  John Tate forwarded that on December 28, 2011, at 12:45 a.m.

11 Q.  All right.  Let's move forward to Government's Exhibit 46.

12          MR. COONEY:  Offering that.

13                          (Government Exhibit 46 was

14                          offered in evidence.)

15          THE COURT:  Received.

16                          (Government Exhibit 46 was

17                          received in evidence.)

18 BY MR. COONEY:

19 Q.  All right.  What is Government's Exhibit 46, Agent

20 LoStracco?

21 A.  This is an e-mail exchange between John Tate, Dimitri

22 Kesari, and Jesse Benton.

23 Q.  All right.  And if you could start at the bottom and read

24 up.

25 A.  On December 28, 2011, at 8:05 a.m., John Tate wrote:  "What

1  was the final exult with Kent?"

2      On December 28, 2011, Dimitri Kesari wrote:  No answer

3  from.

4      John Tate then responded:  So, are we done then?

5  Jesse did you talk to Des Moines Register?

6      Dimitri Kesari responded to John Tate, cc'ing Jesse

7  Benton.  Subject:  Regarding Kent, question mark.

8      I presume we are done.

9      I did shoot a text over to him this morning.  But now

10  back to the real work.

11  Q.  All right.  Ms. Draughn, could you please put back up

12  Government's Exhibit 183a, page 2.

13      And while she's doing that, Agent LoStracco, what time

14  did Dimitri Kesari send an e-mail to John Tate and Jesse Benton

15  stating, I presume we are done?

16  A.  That was at 9:16 a.m. on December 28th.

17  Q.  Now, I would like to go back.  These are the phone records

18  that you identified before?

19  A.  Yes.

20  Q.  And now I would like to look at December 28, 2011.

21      Do you see that -- and, Ms. Draughn, can you go ahead

22  and highlight these on December 28, 2011?

23      What do these calls reflect or what do these records

24  reflect?

25  A.  These highlighted records reflect calls to and from Kent

1  Sorenson from Dimitri Kesari's phone.

2  Q.  All right.  Between what times and on what date?

3  A.  On December 28, 2011, between the times of 8:16 a.m. and

4  10:27 a.m.

5  Q.  All right.  What is the longest call in that time frame?

6  A.  Nine minutes.

7  Q.  What time is that at?

8  A.  8:50 a.m.

9  Q.  All right.  Can you go and back up to the full page, please?

10         All right.  Now on this page, are there any more

11  records -- excuse me, calls between the phone registered to Kent

12  Sorenson and the phone registered to Dimitri Kesari between this

13  time at the bottom, 10:27 a.m., and whatever time is at the

14  bottom of the page?

15  A.  If we could just bring up the full page again, Ms. Draughn.

16  Thank you.

17         No, there's no further calls between Dimitri Kesari's

18  phone and Kent Sorenson's phone on that page.

19  Q.  All right.  Can you go to the next page, please?

20         All right.  Is there another call on that day,

21  December 28, between Dimitri Kesari's phone and Kent Sorenson's

22  phone?

23  A.  Yes.  There are two more calls.

24  Q.  What time is the next call?

25  A.  7:02 p.m.

1  Q.  How -- and was that an incoming call to Dimitri Kesari's

2  phone or outgoing call?

3  A.  That was an incoming call from Kent Sorenson to Dimitri

4  Kesari's phone.

5  Q.  Is there another call?

6  A.  Yes.  At 7:10 p.m., there's an outgoing call to Kent

7  Sorenson's phone.

8  Q.  Between that last one we looked at, ten something in the

9  morning, 10:24, I could be wrong, and this one at 7:02 p.m., are

10 there any other calls reflected in Mr. Kesari's phone records

11 between him and Kent Sorenson?

12 A.  No.

13 Q.  All right.  I would like to take a look at a different type

14 of record now.

15         Agent LoStracco, as part of your investigation, were

16 you able to obtain any video footage of a Paul Campaign event

17 that occurred on December 28, 2011?

18 A.  Yes.

19 Q.  From where did you obtain it?

20 A.  From the C-SPAN web site.  If you go to their web site, they

21 have an archive video library where you can search for

22 particular videos.

23 Q.  And were you able to download the video footage from that

24 library?

25 A.  Yes, that's correct.

1  Q.  Is there a date and time stamp on that video footage?

2  A.  Yes, there is.

3  Q.  What did that date and time stamp reflect?

4  A.  The date and time stamp reflected the date which the video

5  was taken, which was December 28, 2011, and the time stamp

6  reflected the real-time of the event both in Eastern Time and in

7  Pacific Time.

8  Q.  All right.  Were you able to confirm the authenticity of

9  that date and time stamp?

10 A.  Yes.

11 Q.  I would like to put up Government's Exhibit 170i for Agent

12 LoStracco.  I'm sorry, 170i.

13       All right.  How is it -- just putting that up for your

14 benefit, Agent LoStracco, trying to cut to the chase, how was it

15 you were able to confirm that authenticity?

16 A.  We issued a subpoena to C-SPAN in order to get a

17 certification that the date time stamp were authentic and

18 accurate.

19 Q.  So we're clear, were you at that event on December 28, 2011?

20 A.  No.

21 Q.  Were you able to watch all of that video footage?

22 A.  Yes.

23 Q.  Approximately how long is the video footage?

24 A.  It's about an hour and 40 minutes.

25 Q.  Have you watched all of the footage?

1  A.  Yes.

2  Q.  The date and time stamp that's there, what is the time zone

3  that is reflected?

4  A.  It reflects both Eastern time zone and Pacific time zone.

5  It goes back and forth between the two.

6  Q.  What time zone is Des Moines in?

7  A.  Central Time.

8  Q.  What's the difference between Eastern Time and Central Time?

9  A.  Central Time is one hour behind Eastern Time.

10  Q.  All right.  So if it's 6 o'clock Eastern Time, what time is

11  it Central Time?

12  A.  5 o'clock.

13  Q.  And what about Pacific, what's the difference between

14  Pacific and Central?

15  A.  So Pacific would be two hours behind Central Time.

16  Q.  When you watched that video footage of the Paul Campaign

17  rally from December 28, 2011, were you able to recognize any

18  individuals in it?

19  A.  Yes.

20  Q.  Were you able to recognize those individuals based on your

21  own personal knowledge?

22  A.  Yes.

23  Q.  Who is it that you saw and recognized in that video footage?

24  A.  I recognized Dr. Ron Paul, Kent Sorenson, Dimitri Kesari,

25  John Tate, Jesse Benton, and there were a few others from the

1  campaign.

2  Q.  After looking at that video footage, did you ever have an

3  opportunity to show it to Kent Sorenson?

4  A.  Yes.

5  Q.  Was he able to identify any of those individuals there?

6  A.  Yes.

7  Q.  And before you showed it to him to see if he could identify

8  those individuals, did you tell him anything about the video or

9  who was in it?

10  A.  No.

11  Q.  From that video footage, have you taken some still

12  photographs?

13  A.  Yes.  Well, they're screen shots.

14  Q.  All right.  I would like to show Agent LoStracco what has

15  not been admitted into evidence yet, Government's Exhibit 170a.

16          All right.  Do you recognize Government's Exhibit

17  170a?

18  A.  Yes.

19  Q.  What is Government's Exhibit 170a?

20  A.  This is a screen shot of the video of that event held on

21  December 28, 2011.

22  Q.  All right.  And is that a fair and accurate depiction of the

23  screen shot from the video footage that you obtained from

24  C-SPAN?

25  A.  Yes.

1      MR. COONEY:  Move Government Exhibit 170a into

2  evidence.

3                          (Government Exhibit 170a was

4                           offered in evidence.)

5      THE COURT:  Received.

6                          (Government Exhibit 170a was

7                           received in evidence.)

8  BY MR. COONEY:

9  Q.  All right.  Now, first of all, who is depicted in

10 Government's Exhibit 170a?

11 A.  Kent Sorenson.

12 Q.  And according to the date and time stamp, what time is that

13 photograph of Kent Sorenson at?

14 A.  8:20 p.m. Eastern Time.

15 Q.  And what time would that be Central?

16 A.  7:20 p.m.

17 Q.  Now, without stating anything about what was said on the

18 video, can you just describe for the jury what is happening at

19 that time?

20 A.  Kent Sorenson arrived at the event and subsequently went on

21 stage and switched his -- publicly switched his endorsement from

22 Michelle Bachmann to Ron Paul.

23 Q.  Right.  And is that happening at 7:20 in this video?

24 A.  Yes, correct.

25 Q.  Do you recall about how long Kent Sorenson spoke at that

1    event, according to the video?

2    A.   I believe it was -- it wasn't very long.  Maybe ten to

3    fifteen minutes if I recall.

4    Q.   All right.  Now, let's move to Government's Exhibit 170b.

5             All right.  Do you recognize Government's Exhibit

6    170b?

7    A.   Yes.

8    Q.   What is Government's Exhibit 170b?

9    A.   This is another screen shot of the event that happened on

10   December 28, 2011.

11   Q.   All right.  And is this a fair and accurate depiction of a

12   screen shot from that video footage?

13   A.   Yes.

14   Q.   All right.  Is there anything different, though, about

15   what's on this screen shot that's been altered about it or put

16   onto it?

17   A.   Yes.  There's a yellow circle.

18             MR. COONEY:  All right.  And I'm going to go ahead and

19   move Government's Exhibit 170b into evidence.

20                                  (Government Exhibit 170b was

21                                   offered in evidence.)

22             THE COURT:  Received.

23                                  (Government Exhibit 170b was

24                                   received in evidence.)

25   BY MR. COONEY:

1  Q.  All right.  What is depicted in Government's Exhibit 170b?

2  A.  This is after Kent Sorenson had finished his speech.  He's

3  exiting the stage off to the right-hand side where the yellow

4  circle is.

5  Q.  All right.  Do you see, what is in that yellow circle?

6  A.  So there's Kent Sorenson who's starting to go down the

7  stairs of the stage, and then in the background there's Dimitri

8  Kesari and John Tate.  There are a few other, I believe, media

9  individuals in the front and bottom of the circle.

10 Q.  When you saw this video, did you recognize John Tate and

11 Dimitri Kesari in it?

12 A.  Yes.

13 Q.  When you showed this video to -- or excuse me, did you show

14 this still photograph to Kent Sorenson?

15 A.  I did, without the yellow circle.

16 Q.  When you showed it to him, did he recognize any --

17       MR. BINNALL:  Objection; hearsay.

18       THE COURT:  A statement identifying an individual is

19 not hearsay.  Overruled.

20       Answer the question.

21 A.  Yes.  He identified himself, Dimitri Kesari, and John Tate.

22 BY MR. COONEY:

23 Q.  And did he express any hesitation when he did that?

24 A.  No.

25 Q.  And just so we're clear, can you just -- because it is hard

1  to see on the screen for the jury, can you describe generally

2  where John Tate is and where Dimitri Kesari is?

3  A.  Sure.  I don't know if I can write on this.

4  Q.  If you actually press that button up top there.  There you

5  go.  Press the black line.  There you go and you can see if you

6  can do it.

7  A.  Okay.  So this individual -- it doesn't really work.  You

8  can't see it.  So within the circle, on the left-hand side of

9  the circle is Kent Sorenson.  He's sort of the largest figure in

10  that picture.  And then after to the right in the middle is John

11  Tate, and then to the far right is Dimitri Kesari.  You can sort

12  of see a little bit of a reflection there on his glasses.

13  Q.  Let's show Agent LoStracco Government's Exhibit 1 -- oh,

14  excuse me.

15          And what time is this photograph from?

16  A.  This is at 8:21 p.m. Eastern Time.  So it would be 7:21 p.m.

17  Central Time.

18  Q.  Let's move to Government's Exhibit 170c.

19          All right.  What is Government's Exhibit 170c?

20  A.  This is also a screen shot of that same event.

21  Q.  Is it a fair and accurate depiction of the screen shot from

22  the video footage?

23  A.  Yes, again with the exception of the yellow circle.

24          MR. COONEY:  Move Government's Exhibit 170c into

25  evidence.

1                              (Government Exhibit 170c was

2                              offered in evidence.)

3          THE COURT:  Received.

4                              (Government's Exhibit 170c was

5                              received in evidence.)

6    BY MR. COONEY:

7    Q.  All right.  Agent LoStracco, can you describe -- first of

8    all, what time is this from?

9    A.  This is at 5:22 p.m. Pacific Time, so 7:22 p.m. Central

10   Time.

11   Q.  So about a minute after what we just looked at in Government

12   Exhibit 170b; is that right?

13   A.  Correct.

14   Q.  What is in that yellow circle?

15   A.  There are two individuals in that yellow circle.

16   Q.  Who are they?

17   A.  John Tate, I believe, and Dr. Ron Paul.

18   Q.  Were you able to recognize them when you saw them on the

19   video?

20   A.  Yes.

21   Q.  Did you show this still shot to Kent Sorenson?

22   A.  Yes.

23   Q.  With or without the yellow circle?

24   A.  Without the yellow circle.

25   Q.  Was he able to recognize Dr. Paul and John Tate?

1    A.   Yes.

2    Q.   Did he have any hesitation in that?

3    A.   No.

4    Q.   And can you just center the jury in terms of, because you've

5    watched the video footage, not saying what's on the video, not

6    what's being said, but what's happening, what's about to happen?

7    A.   What's about to happen is Ron Paul is about to take the

8    stage and give the speech at the event.

9    Q.   And this is just about a minute within the last screen shot

10   that we looked at, correct?

11   A.   Correct.

12   Q.   All right.  Let's look at Government's Exhibit 170d.

13           What is Government's Exhibit 170d?

14   A.   Again, this is another screen shot of the event that

15   happened on December 28th of 2011.

16   Q.   Is this a fair and accurate depiction of the screen shot of

17   the video that you looked at?

18   A.   Yes.

19           MR. COONEY:  Move into evidence Government's Exhibit

20   170d.

21                             (Government Exhibit 170d was

22                             offered in evidence.)

23           THE COURT:  Received.

24                             (Government Exhibit 170d was

25                             received in evidence.)

1  BY MR. COONEY:

2  Q.  What is Government's Exhibit 170d?

3  A.  This is a picture from the video of Kent Sorenson standing

4  next to Dimitri Kesari.

5  Q.  Can you just describe for the jury where Kent Sorenson is,

6  what he's wearing?

7  A.  Kent Sorenson is sort of in the middle of the photograph.

8  He's wearing a blue button down shirt with a collar and a

9  jacket, and Dimitri Kesari is standing -- or looking at him

10  standing to the left with a bow tie and glasses.

11  Q.  Did you show this still photograph to Kent Sorenson?

12  A.  Yes.

13  Q.  Was he able to recognize Dimitri Kesari?

14  A.  Yes, and himself.

15  Q.  What time was this photograph?

16  A.  8:23 p.m. Eastern Time, so 7:23 Central Time.

17  Q.  So about a minute after the last still that we just looked

18  at; is that correct?

19  A.  Correct.

20  Q.  Let's move ahead a few minutes.  Let's look at Government's

21  Exhibit 170e, please.

22          What is Government's Exhibit 170e?

23  A.  This is a screen shot again of the event that took place on

24  December 28, 2011.

25  Q.  Is it a fair and accurate depiction of the screen shot from

1    the video footage?

2    A.  Yes.

3            MR. COONEY:  Move Government's Exhibit 170e into

4    evidence.

5                            (Government Exhibit 170e was

6                            offered in evidence.)

7            THE COURT:  Received.

8                            (Government Exhibit 170e was

9                            received in evidence.)

10   BY MR. COONEY:

11   Q.  All right.  What is Government's Exhibit 170e?

12   A.  Again, this is a screen shot.  This is when Dr. Ron Paul was

13   on the stage speaking.  Addressing the crowd.

14   Q.  According to the date and time stamp, what time was this

15   taken at?

16   A.  8:36 p.m. Eastern Time, so 7:36 p.m. Central Time.

17   Q.  And that's about 13 minutes after the last photograph we

18   just looked at?

19   A.  Correct.

20   Q.  And who is in that last photograph that we looked at?

21   A.  Dimitri Kesari and Kent Sorenson.

22   Q.  All right.  Let's look at an e-mail, what's already been

23   admitted into evidence I believe, Government's Exhibit 63.

24           Can you please focus, Ms. Draughn, on the e-mail, the

25   first e-mail, original message down?

1          MR. WARRINGTON:  Objection, Your Honor; cumulative and

2     lack of foundation.

3          THE COURT:  Overruled.

4     BY MR. COONEY:

5     Q.  First of all, who's this e-mail between?

6     A.  This e-mail is between Dimitri Kesari, Fernando Cortes,

7     Jesse Benton, and John Tate.

8     Q.  What time was this e-mail sent at?

9     A.  This is on December 28, 2011, at 7:36 p.m.

10    Q.  What time was that photograph of Dr. Paul speaking?

11    A.  Can I look back at the photograph?  I'm sorry.

12    Q.  We'll go back to it in a second.  That's all right.

13          Can you go ahead with this e-mail?

14    A.  Yes.  I will need a wire for 25,000 first thing in the

15    morning.  Jesse has approved.

16          I will get you the wire info tonight.

17    Q.  Who sent that e-mail?

18    A.  Dimitri Kesari.

19    Q.  Who was it to?

20    A.  Fernando Cortes, cc'ing Jesse Benton and John Tate.

21    Q.  Ms. Draughn, can you please split screen Government's

22    Exhibit 170 -- the last one we looked at, which I think was

23    170e.

24          What time was that photograph taken?

25    A.  The photograph was taken at 7:36 p.m. Central Time.

1  Q.  What time was the e-mail from Dimitri Kesari to Fernando

2  Cortes, cc'ing Jesse Benton and John Tate, I will need a wire

3  for $25,000?

4  A.  7:36 p.m.

5  Q.  Government's Exhibit 133 that you looked at earlier, the

6  check, how much was that check for?

7  A.  $25,000.

8  Q.  Let's move to Government's Exhibit 170f.

9         Do you recognize Government's Exhibit 170f?

10  A.  Yes.

11  Q.  What is Government's Exhibit 170f?

12  A.  Again, it's a screen shot from the event on the night of

13  December 28, 2011, without the yellow circles.

14  Q.  So other than that -- I take it from what you're saying is

15  the jury can't see it, there's yellow circles on it?

16  A.  Right.

17  Q.  Other than the circles, is a fair and accurate screen shot

18  of that video footage?

19  A.  Yes, it is.

20         MR. COONEY:  Move Exhibit 170f into evidence.

21                        (Government Exhibit 170f was

22                         offered in evidence.)

23         THE COURT:  Received.

24                        (Government Exhibit 170f was

25                         received in evidence.)

1   BY MR. COONEY:

2   Q.  First of all, Agent LoStracco, what time is this photograph

3   from?

4   A.  6:06 Pacific Time, so it's 8:06 p.m. Central Time.

5   Q.  So about 30 minutes after the e-mail and the other

6   photograph we just looked at?

7   A.  Correct.

8   Q.  Let's start with the first yellow circle on the left-hand

9   side.

10          Do you recognize that individual?

11  A.  Yes.

12  Q.  Who is that?

13  A.  John Tate.

14  Q.  Were you able to recognize him the first time you looked at

15  that photograph?

16  A.  Yes.

17  Q.  Without the yellow circles?

18  A.  Yes.

19  Q.  What's going on in the other yellow circle on the right-hand

20  side?

21  A.  So in the other yellow circle on the right-hand side to the

22  far left is Dimitri Kesari again with the glasses and bow tie.

23  In the middle is Kent Sorenson, and then sort of in the

24  forefront is Jesse Benton.  He appears to be on his phone or

25  some electronic device.

1  Q.  Were you able to recognize those individuals when you looked

2  at this without the yellow circles?

3  A.  Yes.

4  Q.  Did you show this photograph to Kent Sorenson?

5  A.  Yes, without the yellow circles.

6  Q.  Was he able to identify all of the individuals that you just

7  listed?

8  A.  Yes.

9  Q.  Did he have any hesitation in that?

10  A.  No.

11  Q.  Let's go to Government's Exhibit 170g.

12          What is Government's Exhibit 170g?

13  A.  Again, it's a still -- or screen shot of the event that was

14  happening on December 28, 2011 on C-SPAN.

15  Q.  Is that a fair and accurate depiction?

16  A.  Yes.

17          MR. COONEY:  Move Government's Exhibit 170g into

18  evidence.

19                              (Government Exhibit 170g was

20                               offered in evidence.)

21          THE COURT:  Received.

22                              (Government Exhibit 170g was

23                               received in evidence.)

24          MR. COONEY:  Your Honor, on time I just have one more

25  photograph and one more document.  I can keep going, but thank

1    you.

2    BY MR. COONEY:

3    Q.  Agent LoStracco, what -- first of all, what time is this

4    photograph at?

5    A.  6:30 p.m. Pacific Time, which is 8:30 p.m. Central Time.

6    Q.  Do you recognize anyone in this photograph?

7    A.  Yes.

8    Q.  Who?

9    A.  Dr. Ron Paul and John Tate and Jesse Benton.

10   Q.  And can you just describe for the jury where John Tate and

11   Jesse Benton are?

12   A.  John Tate and Jesse Benton are over to the right of the

13   screen shot.

14   Q.  Let's move now to Government's Exhibit 170h.

15          Do you recognize Government's Exhibit 170h?

16   A.  Yes.

17   Q.  What is Government's Exhibit 170h?

18   A.  Again, without the yellow circles, it's a fair and accurate

19   depiction of a screen shot of the event that was happening on

20   December 28, 2011, recorded by C-SPAN.

21          MR. COONEY:  Pardon me.  I'm sorry, Agent LoStracco.

22   I move Exhibit 170h into evidence.

23                              (Government Exhibit 170h was

24                               offered in evidence.)

25          THE COURT:  Received.

1                    (Government Exhibit 170h was

2                    received in evidence.)

3    BY MR. COONEY:

4    Q.   First of all, what time is this at?

5    A.   9:31 Eastern Time, which is 8:31 p.m. Central Time.

6    Q.   So about a minute after the last photograph we just looked

7    at?

8    A.   Correct.

9    Q.   Let's first look at the yellow circle on the left-hand side.

10           Do you recognize the person who that circle is around?

11   A.   Yes; Kent Sorenson.

12   Q.   Were you able to recognize that the first time you looked at

13   it?

14   A.   Yes.

15   Q.   Without the yellow circle?

16   A.   Yes.

17   Q.   What about Kent Sorenson, was he -- did you show him this

18   photograph?

19   A.   Yes.  We showed Kent Sorenson this photograph without the

20   yellow circle, and he was able to identify both himself and the

21   very top of Dimitri Kesari's head.

22   Q.   Where is that in relation to -- can you just describe in

23   that circle, I can see right in the middle there's a bald head

24   there.

25   A.   Correct.  That's Kent Sorenson.  And if you're looking at

1    the circle to the left, there's a Ron Paul sign.  A portion of

2    that is in the circle.  Just at the edge of that sign, there's

3    a -- you can just see the top of someone's head, and Kent

4    Sorenson said that that is Dimitri Kesari because Dimitri Kesari

5    was behind him the whole time this was going on off to the side.

6    Q.  And how about the circle on the right-hand side?

7    A.  The circle on the right-hand side, there's John Tate with

8    the dark blue shirt on and dark tie and Jesse Benton who's

9    facing the camera on the far right with the white shirt and dark

10   suit.

11   Q.  Were you able to recognize that without the yellow circles?

12   A.  Yes.

13   Q.  When you showed it to Kent Sorenson, was he able to

14   recognize it?

15   A.  Yes.

16            MR. COONEY:  I actually have two documents, Your

17   Honor, and then I'm at a good breaking point if that's all

18   right.

19   BY MR. COONEY:

20   Q.  I would like to move to Government's Exhibit 47.

21            MR. COONEY:  I'm offering Government's Exhibit 47.

22                           (Government Exhibit 47 was

23                            offered in evidence.)

24            THE COURT:  Received.

25

1          (Government's Exhibit 47 was

2          received in evidence.)

3    BY MR. COONEY:

4    Q.  And, Ms. Draughn, if on this you could quickly isolate the

5    from and to up there and then all the way down through the --

6    actually above that, I'm sorry.  Thank you.  Keep going down,

7    down, down.  That's good, right there.

8          Thank you.

9          Agent LoStracco, what is Government's Exhibit 47?

10   A.  This is an e-mail exchange between Gary Howard and

11   drewi@ronpaul2012.com, and it's subject:  Iowa State Senator

12   Kent Sorenson endorses Ron Paul for President.

13   Q.  What is contained in the text of this e-mail?

14   A.  It's a press release.

15   Q.  Can you just read what's in the center there of the press

16   release contained in this e-mail sent at 8:41 p.m.?

17   A.  Iowa State Senator Kent Sorenson endorses Ron Paul for

18   President.  Former Iowa Chairman for U.S. Representative

19   Michelle Bachmann pivots to Paul camp citing, quote, Ron Paul

20   has established himself as the clear choice, end quote.

21          Ankeny, Iowa, 2012 Republican --

22   Q.  That's fine.  I didn't mean to interrupt you.  I just wanted

23   to get the headline there.

24          Ms. Draughn, could you please put up on the split

25   screen Government's Exhibit 170h?

1          Again, Agent LoStracco, what time was that e-mail sent

2   with that press release?

3   A.  I believe it was at 8:30 p.m.

4   Q.  Do you want to take a look at it?

5   A.  Yes.

6   Q.  It's actually right there in the binder, too, Government

7   Exhibit 47.

8   A.  So the press release was circulated at 8:31 p.m.

9   Q.  What time is that photograph, Government's Exhibit 170h,

10  that we just looked at?

11  A.  9:31 Eastern Time, 8:31 p.m. Central Time.

12  Q.  So the same time as that e-mail?

13  A.  Yes.

14  Q.  Last exhibit, Government's Exhibit 63, which is already in

15  evidence.

16          You already read the 7:36 p.m. e-mail from Dimitri

17  Kesari to Fernando Cortes copying Jesse Benton, John Tate at

18  7:36 p.m., I will need a wire for $25,000.

19          In Government's Exhibit 63, is there a reply to that

20  e-mail?

21  A.  Yes.

22  Q.  Can you go ahead and read it to the jury, including who it

23  was sent from and to?

24  A.  Yes.  John Tate responds to Dimitri Kesari, Fernando Cortes,

25  cc'ing Jesse Benton, sent December 29, 2011, at 1:38 a.m., yep

1    approved.

2           MR. COONEY:  Your Honor, I'm happy to keep going

3    but --

4           THE COURT:  Nope.  This is a good time to break for

5    today.  Okay.  You can step down, ma'am.

6           So, members of the jury, go home tonight.  Come back

7    at 9 o'clock in the morning.  In the meantime, remember the

8    cautions I've already given you not to discuss this case with

9    anyone or remain within earshot of anyone discussing it.  Don't

10   do any investigation on your own.  Don't use social media and

11   look forward to seeing you ready to go at 9 o'clock in the

12   morning.

13          Thank you.

14          (Recess at 5:00 p.m., until 8:30 a.m., Thursday,

15   April 28, 2016.)

16          (See next page for exhibit list.)

17

18

19

20

21

22

23

24

25

E X H I B I T S

GOVERNMENT EXHIBIT NUMBERS:                    OFFERED    RECEIVED

| Exhibit | Offered | Received |
|---|---|---|
| 4 - | 278 | 278 |
| 5 - | 282 | 282 |
| 6 - | 283 | 283 |
| 8 - | 285 | 285 |
| 9 - | 287 | 287 |
| 11 - | 290 | 290 |
| 14 - | 292 | 292 |
| 16 - | 293 | 293 |
| 17 - | 295 | 295 |
| 18 - | 299 | 299 |
| 19 - | 302 | 302 |
| 20 - | 303 | 303 |
| 21 - | 306 | 306 |
| 24 - | 308 | 308 |
| 25 - | 309 | 309 |
| 26 - | 311 | 311 |
| 27 - | 312 | 312 |
| 28 - | 313 | 313 |
| 29 - | 280 | 280 |
| 30 - | 314 | 314 |
| 31 - | 318 | 318 |
| 32 - | 323 | 327 |
| 33 - | 328 | 328 |
| 34 - | 330 | 330 |
| 35 - | 331 | 331 |
| 36 - | 333 | 333 |
| 37 - | 334 | 334 |
| 38 - | 335 | 335 |
| 39 - | 336 | 337 |
| 40 - | 337 | 337 |
| 41 - | 345 | 345 |
| 42 - | 346 | 346 |
| 43 - | 346 | 347 |
| 44 - | 347 | 347 |
| 45 - | 349 | 349 |
| 46 - | 350 | 350 |
| 47 - | 371 | 372 |
| 58 - | 181 | 181 |
| 59 - | 140 | 141 |
| 62 - | 169 | 170 |
| 63 - | 175 | 175 |
| 64 - | 178 | 178 |
| 67 - | 185 | 185 |
| 76 - | 138 | 138 |
| 77 - | 132 | 132 |

E X H I B I T S (Continued)

GOVERNMENT EXHIBIT NUMBERS:                    OFFERED    RECEIVED

84b -                                           146        147
85 -                                            150        150
87c -                                           239        239
88 -                                            152        153
89 -                                            155        155
93 -                                            157        157
95 -                                            159        159
98 -                                            161        161
100 -                                           165        165
104 -                                           167        167
105 -                                           317        327
106 -                                           317        327
107 -                                           317        327
108 -                                           317        327
109 -                                           317        327
110 -                                           317        327
111 -                                           317        327
112 -                                           317        327
113 -                                           317        327
114 -                                           317        327
115 -                                           317        327
116 -                                           317        327
117 -                                           317        327
118 -                                           317        327
119 -                                           317        327
120 -                                           317        327
121 -                                           317        327
122 -                                           317        327
123 -                                           317        327
124 -                                           317        327
125 -                                           317        327
126 -                                           317        327
127 -                                           317        327
128 -                                           317        327
129 -                                           317        327
130 -                                           317        327
131 -                                           317        327
132 -                                           317        327
133 -                                           325        325
145 -                                           213        213
170a -                                          357        357
170b -                                          358        358
170c -                                          361        361
170d -                                          362        362
170e -                                          364        364

E X H I B I T S (Continued)

GOVERNMENT EXHIBIT NUMBERS:                    OFFERED    RECEIVED

170f -                                           366        366
170g -                                           368        368
170h -                                           369        370
183 -                                            341        341

E X H I B I T S (Continued)

<u>DEFENDANT'S EXHIBIT NUMBERS:</u>

```
T14 -                                        193      194
T16 -                                        209      209
T18 -                                        203      204
```