IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
          Plaintiff,       :      Criminal No. 4:15-103
                           :
       vs.                 :
                           :
JESSE R. BENTON,           :      TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and   :         VOLUME III
DIMITRIOS N. KESARI,       :
                           :
          Defendants.      :
- - - - - - - - - - - - - -X



                    Second Floor Courtroom
                    United States Courthouse
                    123 East Walnut Street
                    Des Moines, Iowa  50309
                    Thursday, April 28, 2016
                    8:40 a.m.




BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.









                Terri L. Martin, CSR, RPR, CRR
                 United States Court Reporter
                  Room 189, U.S. Courthouse
                   123 East Walnut Street
                   Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                JOSEPH P. COONEY, ESQ.
                                  RICHARD C. PILGER, ESQ.
                                  Public Integrity Section
                                  Criminal Division
                                  U.S. Department of Justice
                                  1400 New York Avenue NW
                                  Suite 12100
                                  Washington, D.C.  20005

For Defendant Benton:             ANGELA L. CAMPBELL, JR., ESQ.
                                  Dickey & Campbell Law Firm
                                  301 East Walnut, Suite 1
                                  Des Moines, Iowa  50309

For Defendant Tate:               DAVID A. WARRINGTON, ESQ.
                                  LAURIN H. MILLS, ESQ.
                                  LeClair Ryan
                                  2318 Mill Road, Suite 1100
                                  Alexandria, Virginia  22314

                                  JESSE LINEBAUGH, ESQ.
                                  Faegre Baker Daniels
                                  801 Grand Avenue, 33rd Floor
                                  De Moines, Iowa  50309-8011

For Defendant Kesari:             JESSE R. BINNALL, ESQ.
                                  Harvey & Binnall
                                  717 King Street
                                  Suite 300
                                  Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For Defendant Tate:** | | | | |
| Ron Paul | 3889 | 400 Campbell | | |
| | | 416 Cooney | | |
| | | | 424 | |
| | | 426 Binnall | | |
| **For the Government:** | | | | |
| Karen LoStracco | 428 | | | |
| (Resumed) | 602 | 614 Campbell | | |
| Michael Hartsock | 540 | 547 Mills | | |
| | | 557 Campbell | 569 | 576 Campbell |
| Pavlo Kesari | 577 | 595 Binnall | | |
| | | 598 Warrington | | |
| | | 600 Campbell | 601 | |

E X H I B I T S

GOVERNMENT'S EXHIBIT NUMBERS:                    OFFERED    RECEIVED

| | OFFERED | RECEIVED |
|---|---|---|
| 48 | 429 | 430 |
| 49 | 432 | 432 |
| 50 | 433 | 433 |
| 51 | 434 | 435 |
| 52 | 440 | 440 |
| 53 | 440 | 440 |
| 54 | 441 | 441 |
| 55 | 443 | 443 |
| 56 | 458 | 458 |
| 57 | 459 | 459 |
| 64 | 445 | 445 |
| 65 | 448 | 448 |
| 68 | 467 | 467 |
| 69 | 470 | 470 |
| 70 | 472 | 472 |
| 71 | 473 | 473 |
| 72 | 587 | 587 |
| 74 | 461 | 461 |
| 75 | 462 | 462 |
| 78 | 482 | 482 |
| 79 | 483 | 483 |
| 80 | 485 | 485 |
| 81 | 486 | 486 |
| 82 | 488 | 488 |
| 83 | 490 | 490 |
| 86 | 501 | 501 |
| 87a | 503 | 503 |
| 87b | 506 | 506 |
| 90 | 511 | 511 |
| 91 | 515 | 515 |
| 92 | 513 | 513 |
| 94 | 518 | 518 |
| 97 | 522 | 522 |
| 99 | 526 | 526 |
| 101 | 530 | 530 |
| 102 | 531 | 532 |
| 103 | 534 | 534 |
| 143 - 148 | 467 | 467 |
| 150 | 452 | 452 |
| 159 | 536 | 537 |
| 160 | 464 | 466 |
| 161 | 464 | 466 |
| 170 | 412 | 413 |

DEFENDANT'S EXHIBIT NUMBERS:        OFFERED    RECEIVED

| DEFENDANT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| B27 | 562 | 562 |
| T2 | 556 | 557 |

(See exhibit list on docket for descriptions)

P R O C E E D I N G S

(In open court, out of the presence of the jury.)

THE COURT: Sorry I'm late. Be seated. That's all right.

Do you have some matters you wish to take up before court?

MR. MILLS: Yes, Your Honor. Last night, as per agreement with the parties, we were supposed to give each other the batting order for witnesses, and the batting order we were told is that Dr. Ron Paul is in town, they flew him up here and they were going to seek permission to interrupt the examination of Agent LoStracco and put Dr. Paul on so he could get back to Texas. He has a commitment tomorrow in Texas.

This morning they told us that they no longer wish to call Dr. Paul. He's on our witness list. He's someone we would like to call. We see no reason to fly an 80-year-old man up and down across the country multiple times for this trial. It will be a relatively short witness, and we seek permission to interrupt the examination of Agent LoStracco, put Dr. Paul on. And since he was subpoenaed, I would also like permission to treat him as adverse and lead him, Your Honor.

THE COURT: Mr. Pilger.

MR. PILGER: Mr. Cooney will argue.

MR. COONEY: First, with respect to the background, we informed the defense this morning that, in fact, we did change

1  our mind.  I informed them so that he would be available to

2  them, and we do not object to interrupting the case if he would

3  be called as a witness.

4      Two things with respect to that, though.  We do object

5  to him simply because he's under a government subpoena being

6  treated as an adverse witness by the defense.  If they want to

7  put him on, they're going to have to put him on direct

8  examination or lay a foundation for his adversity under the

9  federal rules.

10     Second, though, we would also move in limine on two

11 issues with respect to Dr. Paul's testimony.  First, I reached

12 out to Dr. Paul vis-a-vis his counsel several weeks before

13 trial, in fact, repeatedly in an effort to obtain a preparation

14 session with Dr. Paul, which, of course, he does not have to

15 give the government, and he refused to counsel to meet.  I've

16 not had an opportunity to sit down with Dr. Paul to instruct him

17 about, for example, references to the prior trial, and Your

18 Honor has since issued an order about that, and that is an issue

19 that I think Dr. Paul needs to be instructed on.

20     Second, at the prior trial, if Your Honor will

21 remember, there was an instance during his cross-examination in

22 which he in a nonresponsive manner went off on a long tangent

23 about how upset he was about the timing of the indictment, in

24 his view that it was in relation to his son's presidential run.

25 As we have outlined in our supplemental trial brief, arguments

1  concerning or evidence concerning allegations of selective

2  prosecution are inadmissible, they're not a valid defense, and

3  we're of the view that Dr. Paul should be instructed that issues

4  like that have no place in this courtroom.  And if that's the

5  purpose for putting him on by the defense -- I don't know what

6  the purpose of putting him on in their case is -- we're

7  obviously going to object to that line of questioning.  So if

8  it's about the facts of this case, his knowledge of the

9  campaign, his personal knowledge of the circumstances, then, of

10  course, that's all fair game; but allegations about timing and

11  conspiracy theories and things like that are not.

12          THE COURT:  Mr. Mills.

13          MR. MILLS:  Your Honor, I don't have any problem with

14  him being instructed about reference to earlier proceedings.  I

15  understand and I think that makes sense.  With respect to

16  whatever he answers, I don't know how you're going to instruct

17  the man.  I don't plan to elicit conspiracy theories or anything

18  like that.

19          THE COURT:  Yeah.  My recollection was that it was in

20  response to a government question saying you're not happy about

21  being here and then he went off.  I don't care why it was, but

22  it was completely irrelevant and it was maybe cathartic to him,

23  but it just didn't have anything to do with the trial.

24          So, yeah, he should be instructed not to refer to the

25  fact that there was a prior trial.  And when examining someone

1   concerning a prior statement, you can just say, you previously

2   testified about this matter on October 14, 2015, didn't you, and

3   at that time you said... So that's the way to handle that.

4   He's not an adverse witness to the defense. He'll be handled on

5   direct examination with nonleading questions, and I think that

6   handles it.

7         MR. MILLS: Thank you, Your Honor.

8         THE COURT: So he'll go right on at 9 o'clock?

9         MR. MILLS: Yes.

10        THE COURT: All right.

11        MR. BINNALL: Your Honor, there's one more witness

12  issue that has come to my attention I would like to bring to the

13  court's, and that is my client's brother, Pavlo Kesari, was

14  brought in town being told that he was testifying today.

15  Tomorrow in the Orthodox tradition is Good Friday. It's one of

16  the holiest days of the year in the Orthodox Church as it is in

17  most churches, and it's important for him to be with his family.

18  On top of that, he has an important obligation back in D.C. If

19  we're interrupting witnesses, I would ask that Mr. Kesari, Pavlo

20  Kesari, be able to testify today.

21        THE COURT: Are you going to call him?

22        MR. PILGER: We are going to call him. We're not sure

23  if it's going to be today or tomorrow. We've been in touch with

24  Mr. Pavlo Kesari's counsel on this. I don't know exactly where

25  Mr. Binnall is getting his information. We understand Mr. Pavlo

1    Kesari has a business obligation on Friday.  He's here.  We may

2    be able to get him on today.  We're trying to accommodate

3    everyone's need as out-of-town witnesses, but it might go on to

4    tomorrow.

5              THE COURT:  Well, I take it that if you and his

6    counsel are making arrangements, then we don't need other

7    advocacy for him.  It would be nice if it is that --

8              MR. BINNALL:  But his counsel isn't here, Judge, to

9    refute anything that the government says, which is --

10             THE COURT:  Try to get him on today.

11             All right.  What else before 9 o'clock?

12             All right.  We'll see you at 9:00 with Dr. Ron Paul.

13   Have him in the courtroom, please.  When we start a session, the

14   witness should be here so we're not waiting the first minute.

15   It just looks good for the jury if we're ready to go when we

16   call them.

17             Thanks.

18             (Recess at 8:45 a.m., until 9:00 a.m.)

19             (In open court, in the presence of the jury.)

20             THE COURT:  Please be seated.

21             Members of the jury, we're continuing in the matter of

22   the United States versus Benton, Tate and Kesari.

23             From time to time, mostly to accommodate an

24   out-of-town witness, we suspend the examination of what's going

25   on and take someone out of turn.  Dr. Ron Paul is from out of

1  town and the defendants are going to call him, and we're going

2  to suspend the testimony of Agent LoStracco and take his

3  testimony a little bit out of order, but we do this to

4  accommodate mostly people from out of town.

5          Call your next witness, please.

6          MR. MILLS:  Your Honor, defendant Tate calls Dr. Ron

7  Paul.

8          THE COURT:  If you would stand, she'll administer your

9  oath, sir.

10          THE CLERK:  Please raise your right hand.

11          RON PAUL, DEFENDANT TATE'S WITNESS, SWORN

12          THE CLERK:  Please be seated.

13                    DIRECT EXAMINATION

14  BY MR. MILLS:

15  Q.  Good morning, Dr. Paul.

16  A.  Good morning.

17  Q.  Can you please just state your name for the record?

18  A.  Pardon me?

19  Q.  Can you state your name for the record, please?

20  A.  Ron Paul.

21  Q.  And how old are you, Dr. Paul?

22  A.  Do I have to tell?  Eighty.

23  Q.  And where do you live?

24  A.  Lake Jackson, Texas.

25  Q.  And how are you currently employed?

1  A.  Well, sort of independent.  I have a lot of projects in

2  educational activities, but I work in education and also

3  Internet broadcasting to promote what I've been doing for a lot

4  of years now, and that is promoting the cause of liberty.

5  Q.  Could you briefly summarize your educational background for

6  the jury?

7  A.  Well, I guess I can start with my college background.  I

8  went to a small Lutheran college in Pennsylvania, Gettysburg,

9  Pennsylvania, and from there I went to medical school at Duke

10 University, and then I spent a couple of years at the Henry Ford

11 Hospital in internal medicine, and then Uncle Sam came and

12 tapped me on the shoulder during the Cuban Crisis and I was

13 drafted.

14         So I went into the military, then trained medically to

15 become a flight surgeon, and I remained a flight surgeon for

16 five years.  But then -- so after a little delay, then I went

17 back to studying obstetrics and gynecology at the University of

18 Pittsburgh, and then I started my medical practice in Lake

19 Jackson, Texas, in 1968.

20 Q.  And your career as an obstetrician, how many babies did you

21 deliver?

22 A.  It's around 4,000, but it could be plus or minus 15.

23 Q.  That's a sizeable portion of Lake Jackson?

24 A.  Yes.  And some actually claimed that it was a political

25 advantage.

1   Q.   Have you ever held elected political office?

2   A.   Pardon me?

3   Q.   Have you ever held any elected political office?

4   A.   I have.

5   Q.   And what offices have you held?

6   A.   I was a member of Congress for, I guess it's 12 terms.

7   Q.   And have you ever run for the office of President of the

8   United States?

9   A.   I have.

10  Q.   How many times?

11  A.   Three times.

12  Q.   The first time you ran, what year was that?

13  A.   In '88.

14  Q.   And what party did you run with?

15  A.   That was in the Libertarian Party.

16  Q.   When was the next time you ran for President of the United

17  States?

18  A.   It would have been 2008 and then 2012.

19  Q.   Did you run as a Republican in those years?

20  A.   As a Republican, and I was always elected as a Republican to

21  Congress.

22  Q.   Let's focus on the 2012 campaign.  At what point in time,

23  did you decide to run for President in the 2012 election?

24  A.   I can't be precise.  I had run in '08.  And then there was a

25  lot of pressure on me to announce again in 2010, 2011.  And I

1  was not anxious to do it.  So I do recall that in the early part

2  of 2011, there was more and more pressure, so I would guess in

3  the early part of spring of 2011, something like that that I

4  made an official announcement.

5  Q.  Are you familiar with a man named John Tate?

6  A.  Pardon me?

7  Q.  Are you familiar with a man named John Tate?

8  A.  John Tate?

9  Q.  Yes.

10  A.  Yes, of course, I am.

11  Q.  Was he your campaign manager for the 2012 campaign?

12  A.  He was the campaign manager, correct.

13  Q.  And had he worked for you before on another presidential

14  campaign?

15  A.  He was working in the -- he worked somewhat toward the end

16  of 2008, and then at the end of that, I was in need of somebody

17  to help me with my educational activities and promotion of

18  certain ideas, dealing with the Federal Reserve and our monetary

19  policy.  So he became, I guess it was the CEO or the chief

20  executive officer of the Campaign for Liberty, which was

21  designed to promote certain issues to try to get the attention

22  of the Congress on such issues as audit the Federal Reserve,

23  which became very successful.

24  Q.  And he still works for the campaign?

25  A.  And he still works for the campaign, right.

1  Q.  In Mr. Tate's role as the campaign manager in your 2012

2  campaign, did he have anything to do with filing reports for the

3  Federal Election Commission?

4  A.  I don't think so.  There would be no reason to.  I guess if

5  there was a problem, he might have heard about it.  There was

6  never a problem, so -- the reports were filed near my home.  We

7  had an office adjacent to Lake Jackson.  My daughter was the

8  treasurer, and we had a CPA that worked very closely with my

9  daughter, Lori, and that's when I would at times go into the

10  office late at night and, you know, when the reports were due,

11  the reports were humongous, and they would be putting them out

12  to get them out in time.

13        So I always made the assumption those two -- and they

14  did frequently remind me that other campaigns as big as ours had

15  a lot more than two people at 11 o'clock at night filling out

16  all of those reports, but they knew what type of campaign I was

17  running, so it went okay.

18  Q.  So it's your testimony that your campaign filed the reports

19  with the Federal Election Commission from your office in Texas;

20  is that correct?

21  A.  That is correct.

22  Q.  Do you ever recall discussing FEC reports with John Tate?

23  A.  Discussing FEC reports?

24  Q.  Yes.

25  A.  No, I do not recall.  The only thing I might ask you,

1    though, are you talking about ever or while the campaign was

2    going on?

3    Q.  I'm sorry, I asked a bad question.  2012.

4    A.  In 2012, I would never have during a campaign, but after,

5    you know, there was some problems developing at least in the

6    media, I might have asked him then about FEC reports, you know,

7    to find out in more details the legalese of sending in reports;

8    but, no, there's no discussion with John and myself about filing

9    reports during the campaign.

10   Q.  In your long relationship with Mr. Tate, have you ever known

11   him to lie to you or to mislead you?

12   A.  He wouldn't have been working for me.  He's not -- he's

13   working for me now, so no.

14   Q.  Now, during the course of your 2012 campaign, how frequently

15   were you in contact with Mr. Tate?

16   A.  How would I stay in contact with him?

17   Q.  How frequently?  How frequently were you in contact with

18   him?

19   A.  Frequent?  It's hard to say.  It was frequent, but not

20   daily; on numerous occasions.  It was infrequent, but maybe

21   every other day, once a week, something like that, depending on

22   the activities.  And sometimes he would be on the road, you

23   know, he would come out if we were doing a debate, he would come

24   to events like that or a major rally he may come.  So, like, I

25   would see him then, but that was generally not doing business.

1    He had his job to do in the organization, but he and I didn't

2    have a lot of business to discuss even when I saw him on the

3    road.

4    Q.  In 2012, did you ever have any discussions with Mr. Tate

5    about a man named Kent Sorenson?

6    A.  No.  Not that I recall, no.  That name wouldn't have even

7    rung a bell for me at that time.

8    Q.  Now, you're aware at the end of 2011, Kent Sorenson endorsed

9    you for President?

10   A.  I am aware of that.

11   Q.  Okay.  Did you do anything to put pressure on your staff to

12   obtain Senator Sorenson's endorsement?

13   A.  No, never, because I've never put any pressure on my staff

14   to get an endorsement of anybody because they were unimportant

15   to me.

16   Q.  In your career as a politician, have you ever sought an

17   endorsement?

18   A.  Never what?

19   Q.  Have you ever sought an endorsement from anybody?

20   A.  No political endorsement.

21   Q.  How about a nonpolitical endorsement?

22   A.  Well, you know, if you understand the context of it, I had

23   been in office for three terms, six years, and then I went back

24   to my medical practice for 12 years.  And I still thought, you

25   know, things aren't straightened out yet, so in '96 I decided to

1  run again, but the Republicans did not want me back because they

2  knew I voted on principle, if the Republicans did the wrong

3  thing, I voted against them because I was by myself, and they

4  weren't interested in that.  So they ganged up on me.  They had

5  a President, a Governor, two Senators, Gingrich and 40-some

6  Republican house members endorsing the opposition.

7          So I got to thinking, well, I don't believe much in

8  this and I thought I would get an endorsement because one of my

9  constituents was my friend and he had come to my barbecues, and

10  most of people knew him in Texas.  His name is Nolan Ryan, and

11  he played baseball one time.  So he endorsed me.  And I always

12  kidded, I said, you guys had 50 endorsements, I had one, but I

13  had the right one.

14  Q.  In your district Nolan Ryan actually has a highway named

15  after him in his district, doesn't he?

16  A.  Pardon me?

17  Q.  Nolan Ryan actually has a highway named after him, right?

18  A.  Oh, yeah, that's right, right through the district.

19  Q.  And did you win that election?  Did you win the election?

20  A.  Yes.  We won the election, and it sort of solidified my

21  point.  I never thought a lot about it, was never anxious.

22          The only other thing that came close to it, most of

23  people in politics thought it was silly because I got an

24  endorsement from Milton Freeman.  Lot of people thought what are

25  you messing with Milton Freeman?  Of course, economics is what I

1  was interested in.  But when it came to these endorsements, I

2  had no interest in it.  I thought it was a good lesson for me.

3  That was never a part of my campaign, the more endorsements you

4  have the better.  Besides I was in this for the business of

5  promoting a philosophy, and it wasn't just to get a political

6  system going.  I was trying to change people's attitudes about

7  economics and foreign policy and privacy and all of these

8  things.  So that wasn't relevant to just getting somebody's name

9  up there that didn't endorse all of those views.

10  Q.  Now, after Senator Sorenson endorsed you, were you aware

11  that news stories came out that Sorenson endorsed you because he

12  was being paid by your campaign?

13  A.  Well, I don't remember the news stories until maybe a little

14  bit later, but I guess the news story that was sort of planted,

15  because I considered it a dirty trick, and that was shortly

16  after he came, you know, had come in to one of our rallies and

17  said he was endorsing me, a short time after that Wallace on

18  Fox, you know, at the end of an interview sort of popped up and

19  said, don't you know that Congressman Bachmann insinuates that

20  there was some things going on there.  And that was the first

21  time I really was aware of anything going on.  And I thought,

22  you know, her campaign was falling apart, and this to me was

23  just a dirty trick to try and get our campaign on the defense

24  because we were really having a lot of momentum, and I just

25  dismissed it.  I said you believe money was paid for this?  And

1  I said, no, I don't believe that.  I don't think I thought about

2  it much until months later when more of these stories appeared

3  in the media.

4  Q.  So when you -- when Chris Wallace interviewed you, had you

5  done anything to investigate those allegations?

6  A.  Not before, of course, because I hadn't heard of it and not

7  afterwards until about three months or four months, then I did.

8  Q.  Now, your campaign lasted all the way until the 2012

9  Republican Convention, didn't it?

10  A.  I think technically that's correct, yes.

11  Q.  And how many candidates were still in the race when you got

12  to the 2012 Republican convention?

13  A.  Well, I think it was just Romney and myself.

14  Q.  Everybody else had dropped out by that point?

15  A.  Yes, I believe so.

16  Q.  And did you have any idea how many states' primaries you

17  were in?

18  A.  No, I do not.

19  Q.  Do you think you missed any?

20  A.  Do I think what?

21  Q.  Did you miss any state primaries?

22  A.  Miss any?

23  Q.  Yes.

24  A.  Oh, probably, but I was in a lot of different places.

25  Q.  Do you recall how much money your campaign raised for your

1  2012 campaign?

2  A.  Do I know?

3  Q.  Yes.

4  A.  I think it was around 40 million dollars, which for me I

5  thought it was pretty amazing.

6  Q.  And do you have any idea how many employees your campaign

7  had?

8  A.  No, but it seemed to me a lot, but compared to other

9  campaigns running the same type of campaign probably a lot less

10  because I was trying to practice what I preach.

11  Q.  Now, you came in second in the Iowa Straw Poll in 2011,

12  didn't you?

13  A.  Correct.

14  Q.  And you came in third place in the caucuses; is that

15  correct?

16  A.  In the Iowa caucus?

17  Q.  In the Iowa caucus.

18  A.  We ended up controlling the caucus.

19  Q.  That's what I was going to ask you.

20  A.  Okay.  I may not know the exact sequence of it.

21  Q.  In Iowa the delegates are really given at the Republican

22  Convention; is that correct?

23  A.  I'm really sorry?

24  Q.  Do you recall in Iowa in 2012 --

25  A.  Right.

1  Q.  -- that there was a Republican Convention, State Convention?

2  A.  Right.

3  Q.  And they elected delegates.  Do you recall that?

4  A.  Yes.

5  Q.  Do you recall how many delegates you got?

6  A.  Well, that eventually went to the National Convention?

7  Q.  Yes.

8  A.  I would have to sort of guess.  It was sort of like 22 out

9  of 29, in that range; but, you know, the publicity was all over

10  everybody else and sometimes we're excluded from that; but all

11  of a sudden, you know, when the dust settled, we had total

12  control of the Iowa caucus at the major convention, but then the

13  rules changed.

14          MR. MILLS:  Great.  Dr. Paul, thank you very much.

15          THE WITNESS:  Thank you.

16                    CROSS-EXAMINATION

17  BY MS. CAMPBELL:

18  Q.  Good morning, Dr. Paul.

19  A.  Good morning.

20  Q.  My name is Angela Campbell, and I represent Jesse Benton.

21          Sir, do you know Jesse Benton?

22  A.  I do.

23  Q.  And how do you know him?

24  A.  Well, the first thing that comes to my mind, he's my

25  grandson-in-law, but he's also been somebody that's been working

1  in my campaign and working on my efforts since maybe 2007 if I

2  had to guess when he started working for me.

3  Q.  Okay.  And you said he's your grandson-in-law?

4  A.  Yes.

5  Q.  He's married to your granddaughter?

6  A.  My granddaughter, right.

7  Q.  Is she here today?

8  A.  She's here today.

9  Q.  Is it the lady seated in the back here?

10 A.  She is.

11 Q.  And what's her name?

12 A.  Valerie.

13 Q.  What's her last name?

14 A.  Pyeatt.

15 Q.  And is she your daughter's daughter?

16 A.  She's my daughter, Lori's daughter, right.

17 Q.  And Lori Pyeatt, did she work for your campaign as well?

18 A.  Yes.  And Lori is the treasurer.

19 Q.  And you said a little bit earlier that the treasurer was

20 working out of Texas; is that right?

21 A.  Huh?

22 Q.  The treasurer was working out of Texas; is that right?

23 A.  I'm really sorry?

24 Q.  Did Lori live in Texas?

25 A.  Yes, Lori lives in Texas.  I'm sorry.

1  Q.  At one point did Jesse Benton and Valerie live in Texas?

2  A.  Yes, they did.

3  Q.  Did Jesse Benton work for you on the 2012 campaign?

4  A.  Yes, he did.

5  Q.  And what did he do for you?

6  A.  Well, he did a lot of things.  Basically when you looked at

7  his job he was really an assistant to John, but he was also a

8  political director and worked a lot with the media and traveled

9  with me a lot.  So he had many jobs a couple of times.

10 Q.  Do you know what his titles were?

11 A.  Well, he -- I know he was a national political director, and

12 a lot of times it ended up in the paper that he was the

13 assistant campaign manager and also campaign chairman; but

14 basically he was a political director and assistant campaign

15 manager to John.

16 Q.  Was it common for other campaigns to have titles for their

17 people that were working for them?

18 A.  I think it is common.

19 Q.  Was your campaign different?

20 A.  It was different that I didn't pay enough attention to it

21 because, you know, I expected people to come, understand me,

22 understand what we're doing and that titles were essentially

23 irrelevant; but they are important, and if you take that

24 attitude, sometimes it was a negative political thing because

25 people like to get credibility and get a title to it.  But I

1  would say in the political sense I was guilty of not boosting

2  people by emphasizing a big title.

3  Q.  So titles weren't important to you in your campaign?

4  A.  They --

5  Q.  Titles weren't important to you?

6  A.  No.  What was important to me is whether or not they

7  understood the message and that's what they were working for.

8  Q.  Why -- who made the decision to hire Jesse Benton for the

9  2012 campaign?

10  A.  My guess it would have been Kent Snyder, and I think he had

11  met him.  He came in as a press person in probably '07, but, he

12  of course, at that time was not married to Valerie.

13  Q.  So in -- you're talking about the 2007, 2008 race is when he

14  was first hired; is that right?

15  A.  Yeah.  He would have worked through '08.

16  Q.  How does he become your campaign chairman or political

17  director, whatever title you would like to use, in the 2012

18  campaign?

19  A.  Well, in the interim, the Campaign for Liberty was getting

20  active, and he worked in the Campaign for Liberty.

21  Q.  And did you choose him to work for you in 2012?

22  A.  Yes, specifically.

23  Q.  And why did you choose him to work for you?

24  A.  Well, because I saw him as an expert on politics and I

25  didn't consider myself an expert on political organizations and,

1  you know, such things.  He was really well known in the media,

2  and that's helpful, too, to have somebody that knows that and

3  guide.  I was concentrating on other things.

4  Q.  Okay.  Did he travel with you when you traveled?

5  A.  Did he --

6  Q.  Did he travel with you when you traveled?

7  A.  Oh, yes, very much so.  Whether it was traveling on the

8  airplane together all the time, not necessarily, but, you know

9  when I had an event, which were quite frequent, he probably

10  would have been one of the individuals that would have been

11  there a day before to make sure everything was okay; but he was

12  always available there and certainly during many debates.  I

13  think we had a lot more debates back then than we have in this

14  cycle.

15  Q.  So he would attend the debates?

16  A.  Pardon me?

17  Q.  So he would attend the debates?

18  A.  Oh, yes, he would attend the debates.

19  Q.  And he would travel ahead of time to make sure things were

20  arranged for you; is that right?

21  A.  He would travel --

22  Q.  Ahead of you?

23  A.  Yeah.  Most of the time I think he was ahead, but it doesn't

24  mean it happened that we went together.

25  Q.  Do you know how many events you did total?

1   A.   No.  There was a lot.

2   Q.   Do you even have an estimate?

3   A.   In fact, I get confused sometimes between the visits -- you

4   know, it's too bad I didn't keep a diary just for personal

5   reasons.  The things we did in the '08 campaign and '12

6   campaign, they sort of blended together.  I have to stop and

7   sort out the dates.

8   Q.   Did you talk to him daily?

9   A.   Daily?  My guess is probably, but that doesn't mean every

10  single day, but it was quite frequent, and our communications

11  were usually done by direct conversation on the phone.

12  Q.   You're not a big texter?

13  A.   No, but I'm working at it.  No, we didn't text.  Matter of

14  fact, I didn't -- I had an e-mail address at the congressional

15  office but never opened it because it just wasn't my thing at

16  the time.  So, no, we didn't communicate by e-mail nor by text.

17  It was probably 90 -- well, a lot of it was personal

18  conversation and the other was by telephone.

19  Q.   How big of a deal was Kent Sorenson to your campaign?

20  A.   How big a deal?

21  Q.   Yeah.

22  A.   Well, it depends on -- it's a big negative deal right now,

23  but --

24  Q.   How about in 2011, how big a -- did you even know Kent

25  Sorenson?

1  A.  You know, if I had met him, I totally forgot about it.  When

2  he sort of barged in, I imagine somebody on the staff knew he --

3  called to say that he was coming over to endorse me; but no, I

4  was in a way a bit shocked about it and, quite frankly, I was a

5  little bit annoyed because I wasn't psychologically prepared.

6  We were having a rally, and I have to get prepared and think

7  about what I'm going to say and all this stuff, and all of a

8  sudden, well, this is going to change, he is going to come in.

9  He came in, and it was short, and then I didn't think much about

10  it again I guess until Wallace brought it up to my attention.

11  Q.  Okay.  So in 2011 had you been involved in discussions about

12  we need to get Kent Sorenson?

13  A.  I never heard of that, and if they had said that name, I

14  would have said, who's that?  No, it was never discussed.  And I

15  probably never met him, but in politics maybe, you know,

16  Republican events, you know, I might go through a crowd, but I

17  do not recall ever having met him before that.

18  Q.  And you said that you don't pay -- or you don't think that

19  it's a big deal about getting endorsements, right?

20  A.  Don't think --

21  Q.  You don't think it's a big deal to get endorsements, right?

22  A.  No, not at all.  I don't see any purpose in it.

23  Q.  And so you wouldn't want to pay for endorsements, right?

24  A.  Not for an endorsement, but people come and go on campaigns.

25  Just look at the current campaign.  There's 16 candidates and

1   people who work in campaigns and they have talents in certain

2   areas.  They may not be philosophically in tune, but they go

3   from one to the other and they get paid, you know, for service.

4   But they don't get paid to endorse somebody.

5          So, no, I wouldn't -- so over the years I'm sure there

6   are people that left one campaign.  You know, even in my

7   congressional races, I remember one individual leaving a

8   campaign that sort of lost, you know, the primary and came over

9   and worked for me; but that was -- it was not an endorsement.

10  It was somebody who came with political knowledge and might have

11  known a little bit about the district or what was going on.

12  Q.  And so you knew people were getting paid to work on the

13  campaign, right?

14  A.  Knew who was getting paid?

15  Q.  You knew that people were getting paid?

16  A.  I knew people were getting paid.

17  Q.  And did you know everybody that got paid?

18  A.  Pardon me?

19  Q.  Do you know everyone that got paid?

20  A.  Everyone?

21  Q.  Yeah.

22  A.  No.  We had a lot of volunteers.

23  Q.  So if someone asked you, you wouldn't necessarily know who

24  was a volunteer and who was getting paid?

25  A.  No.  And, once again, I thought some people were getting

1  paid and they weren't and they were volunteers.  They were so

2  energetic.  We had a lot more volunteers than paid personnel.

3  At some point it was all spontaneous.  They would organize

4  themselves, even on fund-raising.  We didn't have to spend money

5  on fund-raising.  It was sort of a spontaneous thing because

6  they were endorsing what we were doing.

7  Q.  I know you said endorsements weren't a big deal to you, but

8  you got a lot of endorsements, didn't you?

9  A.  A lot of --

10  Q.  Endorsements?

11  A.  I imagine so, yes, because the last thing you would do --

12  just by common sense, if somebody comes and says, you know, I'm

13  a state rep and we have a group of state reps and they're

14  conservative Libertarians and they would like to endorse you,

15  no, we would say fine.  And a lot of times they're motivated by

16  the fact if they think a particular candidate is doing well,

17  they get a little benefit, too.

18       So, no, we probably had a significant number,

19  especially in the early primaries, I think there were quite a

20  few probably in New Hampshire that did the endorsements; but it

21  wasn't like that was, you know, the main theme of the campaign.

22  It was very minor.

23  Q.  And so would you agree that if someone wanted to get paid

24  for an endorsement, you wouldn't want them to be paid for an

25  endorsement?

1  A.  Not for the endorsement, no.

2  Q.  If they worked, it was okay to get paid; is that right?

3  A.  To get paid for the endorsement?

4  Q.  No; if they worked.

5  A.  Oh, yeah.  If somebody has a service to do or provide

6  something for you which is legitimate, yeah, I think you can pay

7  them for that.  It's gone on, it happens all the time, and

8  that's how the process works.

9  Q.  And you actually had some national politicians endorse you.

10       Do you remember that?

11  A.  I did?

12  Q.  Yes.

13  A.  You would have to refresh my memory.

14  Q.  Do you know who Justin -- I'm probably going to kill some

15  names here; Justin Amash, do you know him?

16  A.  Yes.  He's a Congressman.

17  Q.  He's a Congressman.  Did he endorse you?

18  A.  Yes, I think so.  We worked closely together, so I would

19  have just assumed that he did.

20  Q.  How about Walter Jones?

21  A.  Yes, Walter, he's a very good friend, and he's somebody that

22  was very specific because I knew him well from being a

23  Congressman.

24  Q.  He was also a Congressman?

25  A.  He was a Congressman, right.

1 Q. Tim Johnson, did he endorse you?

2 A. Tim Johnson, right. By refreshing my memory, yeah, that's

3 true.

4 Q. And you also had -- so those are national politicians. You

5 also had governors endorse you; is that right?

6 A. Who?

7 Q. Governors of states and former governors of states, do you

8 remember?

9 A. Maybe I should, but I can't remember right now. I would

10 have to have my memory refreshed; but don't tell them I forgot.

11 Q. How about Gary Johnson, do you remember him?

12 A. Yeah, I remember Gary Johnson.

13 Q. Former Governor of New Mexico?

14 A. Former Governor of New Mexico, and he was a very special

15 Governor.

16 Q. How about Jesse Ventura, did he --

17 A. I think he does some wrestling. He doesn't play baseball.

18 Yes, he endorsed me.

19 Q. And he was the former Governor from Minnesota?

20 A. Yeah, okay.

21 Q. And a wrestler, huh?

22        How about some judges, some judges endorsed you?

23 A. Judges?

24 Q. Former judges.

25 A. Your research is better than my memory.

1  Q.  My point is, how big of a deal is Iowa State Senator Kent

2  Sorenson's endorsement to you, sir?

3  A.  How big, how important?

4  Q.  Yeah.

5  A.  Well, on a scale of what, one to a hundred?

6  Q.  Sure.

7  A.  Well, now it's a little bit different.  But I would have

8  said if I had known nothing, that it wasn't part of a dirty

9  trick and a vendetta type of thing, I would have given it a two

10  out of a hundred, just because I didn't know him.  That would be

11  the main reason.  But that's fine.  If he wants to endorse me,

12  that's good.  Maybe it will help him.

13  Q.  And you were actually present, getting ready to go on the

14  stage when he showed up to give his endorsement, right?

15  A.  I was getting ready to give a presentation, correct.

16  Q.  And do you remember what the type of rally it was?

17  A.  Not for sure.  It might have been something military, but I

18  can't remember.

19  Q.  Veterans, do you remember --

20  A.  Veterans very possibly.  I thought it had a military

21  connotation to it.

22  Q.  Do you know how many events you did that day?

23  A.  No, I don't.

24  Q.  Was it common to do more than one a day for you?

25  A.  Oh, sometimes we would do five or six.  That's why I say I

1    should have kept some notes.

2    Q.  Okay.  So you might remember it now, but at the time was it

3    a memorable event?  At the time was there anything special about

4    that event, the veterans rally?

5    A.  About what?

6    Q.  About the veterans rally in Des Moines where Kent Sorenson

7    showed up unannounced?

8    A.  Kent Sorenson, no.  Let me get it straight.  Was there

9    anything special about him coming?

10   Q.  Was there anything special about the event itself?

11   A.  No, I don't remember that.  That was -- you know, that was

12   sort of -- I remembered it because I was sort of knocked off

13   speed, you know, I was slightly interrupted to change the

14   schedule; but no, I don't, because, frankly, people say I get

15   pretty boring, I say the same thing every time.  I'm always

16   consistent.  So I probably said the same thing about, you know,

17   our foreign policy and monetary policy.

18          MS. CAMPBELL:  Your Honor, at this point we would

19   offer Government's Exhibit 170 and ask for permission to publish

20   a clip, 19:40 to 21.

21                                (Government Exhibit 170 was

22                                 offered in evidence.)

23          THE COURT:  Received.

24          MR. COONEY:  I apologize, Your Honor.  I was just

25   thinking.  May I inquire of Ms. Campbell one quick question?

1          THE COURT:  Yes.

2          (Counsel conferring.)

3          MR. COONEY:  No objection, Your Honor.

4                              (Government Exhibit 170 was

5                              received in evidence.)

6          MS. CAMPBELL:  It won't come up.

7          THE CLERK:  It's not showing he was connected.

8          MS. CAMPBELL:  It's not coming through the microphone.

9          (Pause.)

10          MS. CAMPBELL:  We can just do the mic then.

11          THE COURT:  There you go.

12          (Clip from Government Exhibit 170 was played.)

13   BY MS. CAMPBELL:

14   Q.  Sir, do you remember that endorsement?

15   A.  Yeah, but I probably didn't remember the words; but yeah, I

16   do remember that.

17   Q.  Was that a 10- to 15-minute endorsement, in your opinion?

18   A.  Is that what?

19   Q.  That was a 10- to 15-minute endorsement?

20   A.  Fifteen minutes?

21   Q.  Yeah.  Did that take 15 minutes?

22   A.  What lasted 15 minutes?

23   Q.  Kent talking, Kent Sorenson talking.

24   A.  He talked 15 minutes?

25   Q.  Did he?  Was that 15 minutes long?

1  A.  Oh, no, that was short and snappy.  That was the whole

2  speech.  Yes, I think it sounded like the whole thing.

3  Q.  Do you know of any other speech that he gave at that event?

4  A.  That day?

5  Q.  Yeah.

6  A.  No, I don't remember it.  It doesn't mean there wasn't any.

7  Q.  Okay.  So that was the entire endorsement, in your opinion?

8  A.  That's what I remember, yes.  I don't remember anything

9  else.

10  Q.  Okay.  Do you remember what your reaction was?

11  A.  To that?

12  Q.  Yeah.

13  A.  I think I've described it pretty well.  I was sort of

14  surprised, I was taken aback, and I was anxious to get started

15  and give my talk and didn't think a whole lot more about that

16  and --

17          MS. CAMPBELL:  Permission to publish 22:40 to 24.

18          MR. COONEY:  No objection.

19          THE COURT:  Received.  Are they already in evidence?

20          MS. CAMPBELL:  Yes.

21          MR. COONEY:  Actually I don't think they are.

22          MS. CAMPBELL:  The whole video would be offered.

23          MR. COONEY:  Subject to these redactions that you're

24  playing for the court?

25          MS. CAMPBELL:  Yes.

1      MR. COONEY:  No objection.

2          (A clip was played from Government Exhibit 170.)

3  BY MS. CAMPBELL:

4  Q.  Sir, was that the entirety of your response to Kent Sorenson

5  coming to the rally, to your recollection?

6  A.  I would assume so because it sounds like I was going into my

7  talk, what I was waiting for.

8  Q.  Your prepared remarks, right?

9  A.  Yes.

10 Q.  So you just thanked him for stopping by; is that right?

11 A.  I thanked him?

12 Q.  For stopping by.  Do you remember?

13 A.  Yeah.

14 Q.  Sir, did you know the campaign was spending money?

15 A.  Paying money?

16 Q.  Spending money.

17 A.  Spending money?

18 Q.  Yeah.

19 A.  Yeah.  We raised a lot and spent a lot.

20 Q.  Do you know where they were spending it in detail?

21 A.  In no detail at all.  I mean, those FEC reports, I did see

22 them and thousands, if not hundreds of thousands of pages that

23 we reported to the FEC.  So there was a tremendous amount.  No

24 one person would have any idea.  So you have to have computers

25 to go and check.  No, I didn't keep up with it on a daily basis,

1  so I wouldn't know precisely where it was going, no.

2  Q.  In 2011, in the first part of 2012, did you talk to Jesse

3  Benton about trying to falsify FEC reports?

4  A.  Heavens, no.

5  Q.  Did he ever even talk to you about FEC reports?

6  A.  No.

7           MS. CAMPBELL:  Nothing further, Your Honor.

8           THE COURT:  Mr. Binnall, do you have questions?

9           MR. BINNALL:  Not at this point, Your Honor.

10           THE COURT:  Mr. Cooney.

11                        CROSS-EXAMINATION

12  BY MR. COONEY:

13  Q.  Good morning, Dr. Paul.

14  A.  Good morning.

15  Q.  My name is J.P. Cooney.  I'm an attorney for the government.

16  We met downstairs for the first time maybe just an hour ago.

17  Does that sound right?

18  A.  That's correct.

19  Q.  Dr. Paul, I want to just go back to where you just left off

20  about that veterans event that you were at.

21  A.  What?  To where?

22  Q.  The event where Kent Sorenson showed up to endorse you; is

23  that right?

24  A.  He stood up and endorsed me, right.

25  Q.  Now, before Kent Sorenson stood up to endorse you that day,

1  he was a supporter of Michelle Bachmann, right?

2  A.  That's my understanding, yes.

3  Q.  And when he showed up to endorse you that day, you had no

4  idea he was coming?

5  A.  No, I didn't know he was coming.  Maybe moments before

6  somebody -- because I don't think staff would allow me to go out

7  there.  Yeah, probably within the period of time, a short period

8  of time before the thing because I don't know whether the staff

9  even knew for sure.

10 Q.  But, in fact, when he showed up, you were a little annoyed

11 by it, weren't you?

12 A.  I was, but it was a personal annoyance.  It wasn't, you

13 know, what was going on because it wouldn't be totally unusual

14 for a local elected official to get up and say a few words.

15 But, no, I think it was the surprise and I was anxious to get my

16 talk going.

17 Q.  You were annoyed because you don't actually really think

18 that much of endorsements in the first place, though, right?

19 A.  Because I don't think much of endorsements?  No, I don't

20 think a lot of them because, like I said earlier, that, you

21 know, endorsements aren't turned down.

22 Q.  There's endorsements that you've turned down before; is that

23 what you said?

24 A.  No.  I said we don't -- I might not think a whole lot of

25 endorsements.  That's not part of our program, but we didn't

1 turn down an endorsement from an elected official that was

2 volunteering and saying I would like to endorse your campaign.

3 Q.  But you were annoyed because you were getting ready to

4 address a group of veterans there in your campaign for the

5 presidency; is that right?

6 A.  I didn't hear all of your words, but I was annoyed because

7 it was an interruption.

8 Q.  An interruption to you speaking to a group?

9 A.  To me personally because I was getting ready to give a talk.

10 Q.  And that was just a few days before the Iowa caucuses; is

11 that right?

12 A.  I think that's right.

13 Q.  And apart from maybe a few minutes before that, as you said,

14 you had no idea that Kent Sorenson was going to show up and

15 endorse you that day, right?

16 A.  No, I didn't know that.

17 Q.  Nobody on your staff ever talked to you about Kent Sorenson,

18 trying to get his endorsement, right?

19 A.  No, but that wouldn't be unusual either.  That's the way any

20 state rep or state senator, who we had quite a few, they

21 wouldn't necessarily say, hey, you know what, somebody is coming

22 to do -- so it was not unusual the way they treated Sorenson.

23 Q.  And, in fact, you never told any of your staff members to go

24 out and get the Sorenson endorsement, right?

25 A.  No, no.

1  Q.  And, in fact --

2  A.  I never told them to get it from anybody.

3  Q.  You took the next question out of my mouth.

4        You never told your staff to go get any endorsement,

5  right?

6  A.  No, not specifically.

7  Q.  Because you think, for the most part, endorsements are

8  worthless?

9  A.  Not worthless, but qualified, not very valuable as I

10  described in my previous campaign that I was able to beat the

11  Republicans, and they had 50 major endorsements, so that was my

12  political lesson.

13  Q.  But, for the most part, you don't think they're valuable?

14  A.  For the most part --

15  Q.  You don't think they're valuable?

16  A.  Only in a relative sense.

17  Q.  In fact, for the most part, you think it's outlandish to go

18  get endorsements?

19  A.  Pardon me?

20  Q.  You think it's outrageous to go get endorsements, to spend

21  the time on it?

22  A.  What is outrageous?

23  Q.  To go spend the time getting endorsements.

24  A.  Well, I think if it's excessive, yes.  But, I mean, if

25  somebody calls up and says, I would like to talk to you, I would

1  like to endorse Ron and the staff talks to them, that wouldn't

2  mean that they treated them as an outrageous request.

3  Q.  But it's outrageous for your staff to spend the time to go

4  out and try and recruit an endorsement?

5  A.  Unless they have somebody that calls them and they're

6  volunteering to endorse so they might.  They might do it.  We're

7  going to be courteous.  But to have a program, I imagine other

8  campaigns have programs that see how many here and numbers count

9  and the more we have, you know, the bigger deal.

10  Q.  It's outrageous to spend the time to recruit endorsements?

11  A.  To go and go out of your way --

12          MR. MILLS:  Objection.

13          THE COURT:  Overruled.

14  A.  -- to facilitate inquiries is a little bit different.

15  BY MR. COONEY:

16  Q.  Facilitating inquiries is different?

17  A.  Yes.

18  Q.  But it's outrageous to invest the time and the resources to

19  go out and get an endorsement?

20          MR. WARRINGTON:  Objection; asked and answered.

21          THE COURT:  You can't make objections.  Only Mr. Mills

22  can.

23          MR. COONEY:  May I re-ask the question, Your Honor?

24          THE COURT:  Go ahead.

25  BY MR. COONEY:

1  Q.  Dr. Paul, I'm not talking about soliciting -- or excuse me,

2  responding to inquiries.  I'm talking about investing the time

3  and the resources and the capital to go out and recruit

4  endorsements, that's something you viewed as outrageous?

5  A.  They may recruit supporters or employees or different

6  things, but, no, they wouldn't -- yes, I think it's not right, I

7  said it earlier in my testimony, to just go and pay for an

8  endorsement and that's all you're getting.  No, that would have

9  never been encouraged.

10 Q.  And no one on your staff would ever come ask you if they

11 should do something like that, would they?

12 A.  To do that?

13 Q.  To pay for an endorsement.

14 A.  Oh, no, they would have never asked me that.

15 Q.  Because they know that you would have told them no way?

16         MR. BINNALL:  Objection; calls for speculation.

17         THE COURT:  Overruled.

18         Answer the question, sir.

19 BY MR. COONEY:

20 Q.  Do you need me to repeat it, Dr. Paul?  I'm happy to.

21 A.  Yes, I need it repeated, and if you would speak up a little

22 bit.

23 Q.  Certainly, absolutely.  Dr. Paul, no one on your staff would

24 have ever come asked you if they should pay for an endorsement

25 because they know that you would have said no way?

1  A.  Well, I would think so, but I don't believe they would have

2  gone around and said, hey, will you endorse Ron, we'll pay up

3  money.  That's just not conceivable.

4  Q.  It's not conceivable because they know that there's no way

5  you would ever approve it?

6  A.  Yes.  And there's no way that one of my employees, would I

7  expect them to do it.

8  Q.  When you went on Fox News and you were asked by Chris

9  Wallace about the Sorenson payment, you believed what you were

10  saying to be absolutely true, correct?  When you denied the

11  Sorenson payments, you believed that to be absolutely true?

12  A.  What is absolutely true?

13  Q.  That Sorenson was not paid for an endorsement.

14  A.  Well, sure.  That was my opinion and it's still my opinion

15  and --

16  Q.  And, to the best of your knowledge, Kent Sorenson did no

17  work for your campaign?

18  A.  He did no work?

19  Q.  He did no work for your campaign?  You never saw him doing

20  any work for your campaign?

21  A.  I think that's a false assumption.  What do you mean he

22  never did any work?  He came on the staff and he contributed is

23  my understanding.

24  Q.  But you never saw Kent Sorenson do any work?

25  A.  Did I personally see him?  I didn't see 99 percent of our

1  workers doing work.  I mean, that would make no sense.  Just

2  because I didn't see it doesn't mean it didn't happen.

3  Q.  And no one at the time of that veterans rally, though, told

4  you that Kent Sorenson was coming on to do any work for your

5  campaign?

6  A.  Okay.  You're going to have to help me on that.  Nobody told

7  me --

8  Q.  That Kent Sorenson was coming on board to do work for your

9  campaign.

10  A.  Yeah.  They treated him like other people who came on and

11  didn't necessarily tell me about it because that would be very,

12  very average.

13  Q.  And so this is my point.  To your knowledge, Kent

14  Sorenson -- to your personal knowledge, Kent Sorenson did no

15  work for your campaign?

16  A.  Well, I think that's making a false assumption that I didn't

17  see him do it, but --

18  Q.  Well, that's my question.  You didn't see him do any work?

19  A.  No, I didn't see him; but the important thing is I didn't

20  see anybody else.

21  Q.  The only thing --

22  A.  I mean, there were many other people.  I didn't witness the

23  thousands of people that were working for me.  If you just asked

24  me the same question and you said, did you see so and so work,

25  no, I don't even know what state he was in.

1  Q.  The only thing you saw Kent Sorenson do was that speech that

2  you just watched?

3  A.  The only thing that I know about?

4  Q.  Yes.

5  A.  Personally, yes, that was the only time; but that's pretty

6  average because we did have other endorsements.

7       MR. COONEY:  Thank you, Dr. Paul.

8       THE COURT:  Mr. Mills, do you have anything else?

9       MR. MILLS:  Nothing for me.

10      THE COURT:  Anything else?

11      MS. CAMPBELL:  Just briefly, Your Honor.

12                    RECROSS-EXAMINATION

13 BY MS. CAMPBELL:

14 Q.  Just to clear up, sir, do you remember Kent Sorenson going

15 around Iowa and campaigning with you after that event?

16 A.  Do I remember him going around?  I remember people talking

17 about it, but I don't know when they talked about it.  But I

18 didn't personally on one of my trips see him.  He could have

19 been at events.  He might have missed me or something.  So, no,

20 I don't recall, you know, specific events where I saw him

21 involved.

22 Q.  And do you know if he recorded any calls on your behalf?

23 Did he record calls on your behalf, would you know?

24 A.  Calls?

25 Q.  Like robo calls?

1  A.  Did he do robo calls?  I have no idea, but I wouldn't keep

2  up on that.

3  Q.  Do you keep track of who's making calls on your behalf?

4  A.  No.  That was pretty much detail that I -- I had other

5  things.  I was trying to save the world, you know, so I didn't

6  know about robo calls.  That was campaign management business.

7  Q.  How about e-mail blasts, did you know who was sending e-mail

8  blasts on your behalf?

9  A.  No, I do not know.

10 Q.  Were there thousands of them in the campaign?

11 A.  Thousands of e-mails?

12 Q.  Yes.

13 A.  I don't know.  There were probably more than thousands, but

14 no, e-mails, that was a bit of a common practice; but I'm not

15 aware of how many went out and that sort of thing.  I didn't

16 read e-mails.  I don't have a good sense of that.

17 Q.  And we just watched what Kent Sorenson said at the

18 endorsement.  Did you hear him say, we're going to be working

19 over the next few days?

20 A.  I think I do remember hearing him say that.

21         MS. CAMPBELL:  Thank you.

22         THE COURT:  Anything else, Mr. Cooney?

23         MR. COONEY:  No, Your Honor.

24         MR. BINNALL:  Your Honor, based on the government's

25 cross, I do have a few questions.

1    THE COURT:  Go ahead.

2    MR. BINNALL:  Your Honor, with the court's permission,

3  I have had some problems with the echoes in this room.  I'm

4  going to go up a little closer to Dr. Paul.

5    THE WITNESS:  Thank you.

6    MR. BINNALL:  I'm having the same problem.

7                   CROSS-EXAMINATION

8  BY MR. BINNALL:

9  Q.  Dr. Paul, were you focused on the mechanics of how the

10  campaign worked on the day-to-day political level, or were you

11  more focused on the ideas that you were supporting?

12  A.  Well, I would say about 90-some percent was the ideas, the

13  ideas and promoting something.  We always called it promoting

14  the cause of liberty, but I also recognized the importance of

15  organizations.  You know, if you're in politics, I want

16  verification of the things I believed in by doing well and

17  getting people, and that's where I felt good because the young

18  people especially were enthusiastic, you know, involved in these

19  ideas.  So that's what I was concentrated on.  I just loved

20  going to the universities and talking to the young people and

21  like this event with the veterans.  So that's what I was

22  involved with; but I don't know how many work was put into.  You

23  know, that event that I just watched, I imagine there was a lot

24  of work involved in that, notifying people and getting people

25  out.  But I wasn't involved in that.  Like I said before,

1 sometimes maybe I didn't show my appreciation for the hard work

2 that so many people put into it.

3 Q. Did you hire people to actually do the political work and

4 mechanical work on your behalf?

5 A. I wouldn't have hired them directly, but the campaign I'm

6 sure has to have organizers; but we also know that there were a

7 lot of volunteers. But even the people who were employed came

8 to us because they were volunteers or they would come because

9 they were enthusiastic, you know, about our message, and then

10 they would come over and they would say, look, you're working so

11 much, we're going to start paying you expenses and they would

12 get a little bit of money, and it would be that sort of thing.

13 Though you can never have perfect protection, for the most part,

14 you know, I was very pleased with the enthusiasm of the people

15 we hired.

16 Q. And did you feel betrayed in any way that the people on your

17 staff recruited Senator Sorenson into the campaign?

18 A. No, in no way, you know. I didn't feel betrayed. I feel

19 betrayed by the system right now on all that's going on because

20 I think this all started with a political dirty trick in a

21 campaign that was failing and it's morphed into something

22 horrendous as far as my family is concerned.

23 Q. I'm sorry for the trouble that you've gone through, Dr.

24 Paul.

25         And you are aware -- are you aware that Mr. Sorenson

1    did do work on your behalf after he endorsed you?

2    A.  Not in the sense that I personally saw him do it, but yes,

3    I've been -- it's been told to me and explained that he did

4    certain things, yes.

5            MR. BINNALL:  Dr. Paul, thank you so much for coming

6    today.

7            THE WITNESS:  Thank you.

8            THE COURT:  Anything else?

9            MR. COONEY:  Nothing further.

10           THE COURT:  Thank you, sir.  You're excused.

11           Thank you.

12           MR. MILLS:  Your Honor, is he released?

13           THE COURT:  Yes, he's released.  He can go home.

14           THE WITNESS:  Thanks.

15                                  (Witness excused.)

16           THE COURT:  So back to Agent LoStracco?

17           MR. COONEY:  Yes, Your Honor.

18           THE COURT:  Come forward, ma'am.

19                       KAREN LOSTRACCO,

20   resumed her testimony as follows:

21               DIRECT EXAMINATION (Continued)

22   BY MR. COONEY:

23   Q.  Good morning, Agent LoStracco.

24   A.  Good morning.

25   Q.  I am returning to you the binder that you had yesterday,

1    Government's Exhibits 1 through 100, for your reference.

2              And, Ms. Draughn, if you could just please put back on

3    the screen Government's Exhibit 63, which has been admitted into

4    evidence.  And if you could just blow that up.  Thank you.

5              And I just want to center, remind the jury where we

6    left off yesterday.  Agent LoStracco, you had just read

7    Government's Exhibit 63 into evidence; is that right?

8    A.   Yes.

9    Q.   And if you could just recenter the jury and go ahead and

10   read this chain, starting with the bottom e-mail.

11   A.   From Dimitri Kesari to Fernando Cortes, cc'ing Jesse Benton,

12   cc'ing John Tate.  Subject:  Wire needed.  Sent December 28,

13   2011, at 7:36 p.m.

14             I will need a wire for 25,000 first thing in the

15   morning.  Jesse has approved.

16             I will get you the wire info tonight.

17             Could you send me the form, question mark?

18             And then John Tate responded to, Dimitri Kesari,

19   Fernando Cortes and cc'ing Jesse Benton, subject:  Regarding

20   wire needed, on December 29, at 1:38 a.m. yep approved.

21   Q.   Ms. Draughn, if you could now please put up Government's

22   Exhibit 48.

23             MR. COONEY:  And I'll offer Government's Exhibit 48.

24                            (Government Exhibit 48 was

25                             offered in evidence.)

1      THE COURT:  Received.

2                           (Government Exhibit 48 was

3                           received in evidence.)

4      MR. COONEY:  Ms. Draughn, could you please blow up the

5  bottom e-mail here from Beth Fouhy.

6  BY MR. COONEY:

7  Q.  All right.  Agent LoStracco, could you please read this

8  e-mail beginning with the from and the to and just center the

9  jury on the date.

10  A.  Sure.  From Beth Fouhy.  Subject: Need your help.  Date:

11  December 28, 2011, at 10:33 a.m., Eastern Time.  To:

12  Trygve@vikingsstrategies.com.

13          Hey, Trygve, I'm trying to track down Jesse or James

14  and no one is returning my call.  We need to get a comment from

15  someone on your campaign re: Bachmann's claim that you paid Kent

16  Sorenson to throw his support to Paul.  Jesse spoke to Politico

17  and I think I few other folks but I can't reach him or James.

18          Can you help me?

19          Much appreciated.

20          Beth.

21          And there's a phone number.

22  Q.  And I believe we saw the name "Trygve" -- excuse me, I

23  believe I mispronounced that yesterday -- did we not?

24  A.  Yes, correct.

25  Q.  Who is that?

1  A.  Trygve Olson is someone that worked either as a staffer or

2  as a consultant with the Ron Paul 2012 Campaign.

3  Q.  All right.  Could we please slide up on the e-mail,

4  Ms. Draughn.

5        And what happened next with this message, Agent

6  LoStracco?

7  A.  Trygve Olson forwards the message to John Tate, Gary Howard

8  and Jesse Benton, forward:  Need your help, on December 28,

9  2011, at 9:38 Central Time.

10        FYI.  We should get on this story ASAP.  She is

11  friendly obviously.  Jesse can you call her?

12  Q.  Just to go back to some of the exhibits we looked at

13  yesterday, Exhibits 170a through h, those are some of the photos

14  from the veterans rally?

15  A.  Yes.

16  Q.  Are these e-mails after the veterans rally on December 28,

17  2011?

18  A.  Yes, that's correct.  Trygve Olson is forwarding to John

19  Tate, Gary Howard and Jesse Benton approximately an hour after

20  the veterans event.

21  Q.  All right.  And is there another e-mail exchange?

22        Keep moving up.  Thank you, Ms. Draughn.

23        Can you go ahead and read this e-mail?

24  A.  Yes.  John Tate responds to Jesse Benton only.  Sent

25  December 28, 2011, 10:43 a.m.  Subject:  Forward:  Need your

1    help.

2           Jesse, brings up a thought.  We need to make sure

3    anyone asked about this, including Drew, Kent, et cetera, is

4    prepared to say the same thing.

5           I would assume that is something like:  The Ron Paul

6    Campaign has not and is not paying Kent for his endorsement.

7    Kent decided to endorse Ron because blah, blah, blah.

8           Short sweet and truthful.

9           John.

10   Q.  Let's turn now to Government's Exhibit 49, an e-mail on the

11   same date.

12          MR. COONEY:  I would offer Government's Exhibit 49.

13                         (Government Exhibit 49 was

14                          offered in evidence.)

15          (Pause.)

16          MR. COONEY:  Is that received, Your Honor?

17          THE COURT:  Yes.

18                         (Government Exhibit 49 was

19                          received in evidence.)

20   BY MR. COONEY:

21   Q.  Agent LoStracco, while that's coming up on the screen for

22   the jury, can you please tell them what this document is?

23   A.  Yes.  This is an e-mail exchange between Jesse Benton and

24   Rachel Weiner for the Washington Post.  I may be mispronouncing

25   her name.

1  Q.  What is the date?

2  A.  December 28, 2011.

3  Q.  At what time?

4  A.  Rachel Weiner's e-mail is at 9:12 p.m. and Jesse Benton's

5  e-mail is at 10:29.

6  Q.  Can you read the e-mail at the bottom?

7  A.  On December 28, 2011, at 9:12 p.m., Rachel Weiner wrote:

8  For your response to the Bachmann charges re:  Money offered to

9  Sorenson.

10        And then there's Rachel Weiner, The Fix,

11  PostPolitics.com, the Washington Post with a phone number and

12  e-mail address.

13        Jesse Benton responds to Rachel Weiner, December 28,

14  2011, at 10:29 p.m.  subject:  Re:  Should have also asked.

15        We are not paying Senator Sorenson.  He has realized

16  that Dr. Paul is the only viable conservative alternative to

17  establishment, status quo Mitt Romney, and is now working to

18  help us succeed in Iowa.

19  Q.  And why don't we move now to Government's Exhibit 50.

20        MR. COONEY:  And I offer Government's Exhibit 50.

21                           (Government Exhibit 50 was

22                            offered in evidence.)

23        THE COURT:  Received.

24                           (Government Exhibit 50 was

25                            received in evidence.)

1  BY MR. COONEY:

2  Q.  And, again, this is now -- can you tell the jury -- wait

3  until this comes up on the screen.

4         All right.  What is Government's Exhibit 50, Agent

5  LoStracco?

6  A.  This is an e-mail exchange between Linda Feldmann, the CS

7  Monitor and Jesse Benton.

8  Q.  All right.  Would you read that to the jury?

9  A.  Yes.  On December 29, 2011, at 8:53 a.m., Linda Feldmann

10  wrote:  Jesse, will Kent Sorenson be getting a salary from the

11  Paul Campaign?

12         Best, Linda Feldmann, CS Monitor, and then there's a

13  phone number.

14         Jesse Benton replied to Linda Feldmann on December 29,

15  2011, at 2:53 p.m.  Subject:  Regarding question.

16         No, he will not.

17  Q.  All right.  And that e-mail is the day after the two e-mails

18  that we just looked at previously, Government's Exhibits 49 and

19  48?

20  A.  Yes, correct.

21  Q.  All right.  Let's keep moving ahead now to Government's

22  Exhibit 51.

23         MR. COONEY:  I would offer Government's Exhibit 51.

24                        (Government Exhibit 51 was

25                         offered in evidence.)

1          THE COURT:  Received.

2                              (Government Exhibit 51 was

3                               received in evidence.)

4    BY MR. COONEY:

5    Q.  All right.  Now, Agent LoStracco, what I would like to do

6    is --

7          Ms. Draughn, if you could please highlight the bottom

8    e-mail on this chain.

9          All right.  Now, Agent LoStracco, just if we can maybe

10   summarize a little bit, this bottom e-mail is another press

11   inquiry concerning whether Senator Sorenson was being paid by

12   the Ron Paul Campaign; is that right?

13   A.  Yes, that's correct.  It's directly in regards to

14   Representative Michelle Bachmann's allegations about Kent

15   Sorenson being paid for his switch to the Paul Campaign, and

16   it's from a KCCI reporter here in Des Moines.

17   Q.  All right.  And who actually received -- or who was this

18   e-mail sent to by the KCCI reporter?

19   A.  Kent Sorenson.

20   Q.  Can we scroll up, please, Ms. Draughn.

21          And, incidentally, Agent LoStracco, what date and time

22   was that e-mail sent out?

23   A.  December 29, 2011, at 12:06 p.m., Central Time.

24   Q.  All right.  And if I could draw your attention now to the

25   December 29, 2011, 12:16 p.m. e-mail.

1  A.  Yes.

2  Q.  From Kent Sorenson.

3        What happens there?

4  A.  Kent Sorenson forwarded this e-mail approximately ten

5  minutes after he received it.

6  Q.  Who did he forward it to?

7  A.  It looks like Megan Stiles.  She's the one that responds in

8  the above e-mail.

9  Q.  Who is Megan Stiles?

10 A.  Megan Stiles again worked for the Ron Paul Campaign doing

11 press and media.

12 Q.  All right.  Can we go ahead and scroll up, Ms. Draughn.

13       What does Megan Stiles write?

14 A.  Megan Stiles it looks like also forwarded this message and

15 wrote:  Can we help him with a statement?

16 Q.  And what is the next e-mail in the chain?

17 A.  Jedd Coburn wrote:  When do they need, question mark.

18 Q.  Can you go ahead and scroll up, Ms. Draughn.

19       All right.  And what happens next?

20 A.  Megan Stiles wrote:  Response that endorsement was

21 financially motivated.

22 Q.  Go ahead and keep moving up, please.

23       What's next in this chain?

24 A.  Gary Howard saying:  Okay.  Jedd, do you have time to write

25 up?

1  Q.  And then next?

2  A.  Jedd Coburn responding:  Sure.  Why not.

3  Q.  Now, on all of those e-mails we just looked at, it's not

4  entirely clear on each of those who was in each of those

5  e-mails?

6  A.  No, not entirely clear.  I mean, if somebody is forwarding

7  the message or they're replying to that message, then I would

8  assume that it was sent to them in some capacity; but other

9  people who may have received that message, I can't tell from

10  this e-mail.

11  Q.  All right.  Let's move to the top e-mail, please.

12         All right.  Who is this e-mail sent from and to and

13  what is the date and time and whatnot?

14  A.  From Jedd Coburn to Gary Howard, Jesse Benton, John Tate,

15  cc'ing Megan Stiles.  The date is December 29, 2011, at 3:07

16  p.m.  Subject:  Regarding:  Forward:  KCCI request - 12/29 at

17  noon.  Attachment:  Sorenson statement on dollar sign.

18         Sorenson statement for press.  He has taken a look at

19  this and has approved.

20         See what you think.  Probably need to wrap up ASAP.

21  Q.  All right.  Is there an attachment to this e-mail?

22  A.  Yes.

23  Q.  What is that title again?

24  A.  The title of attachment is Sorenson Statement on $.docx.

25  Q.  Ms. Draughn, would you please go to page 2 of this exhibit.

1          All right.  Agent LoStracco, could you please read the

2  first five paragraphs of this exhibit, on page 2 of the

3  attachment of Sorenson's statement?

4  A.  Sorenson statement on money.

5          I have to say, I've been saddened by the way

6  Congresswoman Bachmann's campaign has decided to handle my

7  decision to endorse Ron Paul for President of the United States.

8          Like many folks here in Iowa and throughout the

9  country, I simply came to the realization that Ron Paul is the

10  candidate for true pro-life, pro-gun, pro-limited government

11  conservatives.

12          The recent smears from the media and the national

13  political establishment motivated me to rush to Congressman

14  Paul's aid because he did the same for me in both of my races

15  for the Iowa General Assembly.

16          As for the ridiculous allegation that Congresswoman

17  Bachmann and her surrogates have made, I was never offered money

18  from the Ron Paul Campaign or anyone associated with them and

19  certainly would never accept any.

20          Financial reports come out in just days which will

21  prove what I'm saying.

22  Q.  Let's move to Government's Exhibit 52.

23          MR. COONEY:  And offer Government's Exhibit 52.

24                          (Government Exhibit 52 was

25                           offered in evidence.)

1          THE COURT:  Received.

2                         (Government Exhibit 52 was

3                         offered in evidence.)

4          MR. COONEY:  Ms. Draughn, could you highlight from the

5    very top here down to about halfway down the page.  Little bit

6    less than that.

7          That's great.

8    BY MR. COONEY:

9    Q.  All right.  And, Agent LoStracco, I would like to draw your

10   attention specifically to the Jedd Coburn e-mail here,

11   December 29, 2011, at 2:07 p.m., stating:  Sorenson statement

12   for press.  He has taken a look at this and has approved.

13         That's the e-mail we just looked at, correct?

14   A.  Yes, that's correct.

15   Q.  And is the e-mail working up just a continuation of that

16   e-mail thread?

17   A.  Yes.

18   Q.  All right.  Can you read to the jury the remainder of that

19   thread, please?

20   A.  So Jesse Benton responded to that e-mail that is redacted

21   and then -- also on December 29, 2011 and then on December 29,

22   2011, Jedd Coburn wrote:  Let me know when approved, and I'll

23   get to James and he can distribute as needed.  Unless someone

24   has a better idea.

25         Jesse Benton then responded to Jedd Coburn, cc'ing

1  Gary Howard, John Tate and Megan Stiles.  Subject:  KCCI

2  request - 12/29 at noon.

3        Approved but I can't edit.

4  Q.  All right.  Let's move on to Government's Exhibit 53,

5  please, which is another e-mail in this thread.

6        MR. COONEY:  Offer Government's Exhibit 53.

7                          (Government Exhibit 53 was

8                          offered in evidence.)

9        THE COURT:  Received.

10                          (Government Exhibit 53 was

11                          received in evidence.)

12  BY MR. COONEY:

13  Q.  Agent LoStracco, can you please pick up here starting with

14  the e-mail from --

15        I'm sorry, Ms. Draughn, can you please highlight the

16  top two e-mails?

17        All right.  Agent LoStracco, could you please read the

18  top -- or excuse me, could you go ahead and read the two new

19  e-mails in this chain?

20  A.  Yes.

21  Q.  I believe one of them may have been the redacted e-mail from

22  the last chain, but go ahead.

23  A.  And you want me to read that?

24  Q.  Yes, go ahead.

25  A.  From Jesse Benton to Jedd Coburn, cc'ing Gary Howard, John

1  Tate, and Megan Stiles, on December 29, 2011.  Subject:

2  Regarding KCCI request - 12/29 at noon.

3        Make sure to send Wes Enos's statement too.

4        John Tate responds to Jesse Benton, Jedd Coburn,

5  cc'ing Gary Howard, Megan Stiles.

6        Per Jesse.  Issue nationally.  And make sure to

7  include Wes Enos statement.

8  Q.  What time did John Tate send that reply to Jesse Benton and

9  others?

10  A.  At 4:33 p.m.

11  Q.  And that e-mail was in the same thread as the one in which

12  we looked at the Sorenson statement attachment, correct?

13  A.  Yes.

14  Q.  All right.  Now let's move to Government's Exhibit 54.

15        MR. COONEY:  Offer Government's Exhibit 54.

16                          (Government Exhibit 54 was

17                           offered in evidence.)

18        THE COURT:  Received.

19                          (Government Exhibit 54 was

20                           received in evidence.)

21        MR. COONEY:  And if you could blow that up, please,

22  Ms. Draughn.

23  BY MR. COONEY:

24  Q.  What is Government's Exhibit 54, Agent LoStracco?

25  A.  This is an e-mail from Gary Howard, and the subject:

1  Senator Kent Sorenson Statement on Bachmann Allegations, and

2  it's sent to Dimitri Kesari, and there's a bunch of numbers

3  before Dimitri Kesari's e-mail address.  It's also sent December

4  29, 2011, about a half hour after the last e-mail thread.

5  Q.  All right.  What is contained in the text of this e-mail?

6  A.  This is a press release from the Ron Paul Campaign.

7  Q.  What is the subject of the press release?

8  A.  Senator Kent Sorenson Statement on Bachmann Allegations.

9  Calls Bachmann's untrue claim a last-minute effort to salvage

10 what's left of her campaign.

11 Q.  Have you had an opportunity to review this statement?

12 A.  Yes.

13 Q.  Is this substantially the same as the statement that you

14 read, the draft statement that you read into evidence just a few

15 minutes ago?

16 A.  Yes.  There's some additional paragraphs and wording added;

17 but, in essence, Kent Sorenson's statement that was in the

18 previous e-mail attached is inserted into this press release.

19 Q.  I want to draw the jury's attention to one portion of this

20 just briefly.

21        Ms. Draughn, if you could go down to the very last

22 paragraph and highlight that, the last portion.

23        All right.  Could you go ahead and read that into

24 evidence, please.

25 A.  Quote, as for the ridiculous allegations that Congresswoman

1    Bachmann and her surrogates have made, I was never --

2    Q.  Ms. Draughn, could you please go to page 2 and blow up the

3    top.

4    A.  -- offered money from the Ron Paul Campaign or anyone

5    associated with them and certainly would never accept any.

6    Q.  And could you please continue to scroll down, Ms. Draughn.

7    A.  Quote, financial reports come out in just days which will

8    prove what I'm saying is true.

9    Q.  I would like to move now to Government's Exhibit 55.

10              MR. COONEY:  I'll offer Government's Exhibit 55.

11                              (Government Exhibit 55 was

12                              offered in evidence.)

13              THE COURT:  Received.

14                              (Government Exhibit 55 was

15                              received in evidence.)

16              MR. COONEY:  If you could highlight that top part

17   there, Ms. Draughn, all of the text that is available.

18              Thank you.

19   BY MR. COONEY:

20   Q.  All right.  Now, first of all, can you read the bottom

21   e-mail here and then move up in the chain one by one, please?

22   A.  On December 29, 2011, at 6:06 p.m., Dimitri Kesari wrote:

23   Senator Bill Dix is on the phone with Kent - someone is going to

24   file ethics charges against Kent in the IA Senate.  Probably

25   financial.

1          Doug Stafford replied to Dimitri Kesari, cc'ing John

2    Tate.  Subject:  Regarding Kent.  Sent December 29, 2011, at

3    5:07 p.m.

4          Well that sounds bad for Michelle since RP isn't

5    paying Kent and MB was.

6    Q.  All right.

7    A.  John --

8    Q.  Go ahead.

9    A.  John Tate responded to Doug Stafford and Dimitri Kesari,

10   subject:  Regarding Kent on December 29, 2011 at 6:09 p.m., yep.

11   Q.  All right.  Now, was this e-mail sent before or after the

12   statement that we just looked at was released?

13   A.  It's about an hour after.

14   Q.  All right.  Can we go back, Ms. Draughn, to Government's

15   Exhibit -- can you remind the jury real quick of the date and

16   time of this e-mail?

17   A.  Yes.  December 29, 2011, at 6:09 p.m.

18   Q.  All right.  Can we go back real quick to Government's

19   Exhibit 63?  And if you could just blow that up for the jury.

20          This is an e-mail that you've already read into

21   evidence.  On December 28th and 29th, I will need a wire for

22   $25,000 first thing in the morning from Dimitri Kesari,

23   responded to by John Tate, cc'ing Mr. Benton, yep approved.

24          What time was the December 29, 2011 response from John

25   Tate to Dimitri Kesari sent?

1    A.   At 1:38 a.m.

2    Q.   And is Doug Stafford on that e-mail?

3    A.   No.

4    Q.   Let's move now to Government's Exhibit 64, which has not yet

5    been offered into evidence.

6            MR. COONEY:  And I would offer Government's Exhibit

7    64.

8                              (Government Exhibit 64 was

9                              offered in evidence.)

10            THE COURT:  Received.

11                             (Government Exhibit 64 was

12                             received in evidence.)

13            MR. COONEY:  Can you please go to page 2 of

14   Government's Exhibit 64, Ms. Draughn?

15   BY MR. COONEY:

16   Q.   All right.  And, you know, I realize that the time and

17   whatnot of this is cut off, but why don't we go ahead and read

18   this anyway, and then we'll get back to that.  So, Agent

19   LoStracco, could you please read the e-mail in the chain in

20   Government's Exhibit 64?

21   A.   Yes.  Can we expand it a little bit more?  This is -- You

22   just want me to read the one thing without the header?

23   Q.   The other part is on page 1.  We can get to that after you

24   read that.

25   A.   All right.  Is this invoice still on for today?  Please send

1   when you get.

2           Wire window closes at 3:00 p.m. Central/4 p.m.

3   Eastern.

4           Thanks.

5           Fernando.

6           And it's Fernando Cortes, Deputy Controller.

7   Q.  All right.  Ms. Draughn, could you please go to page 1 of

8   this exhibit at the bottom?

9           All right.  So first, can you read just that first

10  line there of the bottom e-mail?

11  A.  Dimitri, comma.

12  Q.  And is that the first part of the e-mail that you just read?

13  A.  Right.

14  Q.  Dimitri, comma?

15  A.  Right.

16  Q.  And what time did Fernando Cortes send that e-mail?

17  A.  12:28 p.m. on December 29th.

18  Q.  What happens next in that e-mail thread?

19  A.  Fernando Cortes follows up with another e-mail at 2:20 p.m.:

20  40 minute left in the window if we need to get this out today.

21  Q.  All right.  Can you go ahead and expand this, Ms. Draughn?

22  And why don't we highlight from below sent from my iPad.  Keep

23  going down, please, down further, further, further.  That's

24  great.  Then you can highlight up from there.

25          You can actually move up.  There we go.  Thank you.

1          All right.  Now, if you could, just remind the jury

2     again what time Fernando Cortes wrote 40 minutes left in the

3     window if we need to get this out today.

4     A.  2:20 p.m.

5     Q.  What comes next in this e-mail thread?

6     A.  Jesse Benton writes Fernando Cortes, cc'ing Dimitri Kesari,

7     himself, Jesse Benton, John Tate.  Subject:  Regarding 25k wire.

8          Hold for a couple days.

9     Q.  Now, this e-mail, was this sent on the same day as the

10    exchanges were going back and forth about the Sorenson statement

11    about money in the Bachmann Campaign?

12    A.  Yes.

13    Q.  What happens next in this e-mail thread?

14    A.  John Tate responds to Jesse Benton, Fernando Cortes, cc'ing

15    Dimitri Kesari and Jesse Benton.  Subject:  Regarding 25k wire.

16         Yep.  We are going to.

17    Q.  Can you please scroll up, Ms. Draughn?

18         What comes next in this thread, Agent LoStracco?

19    A.  Dimitri Kesari responds to John Tate, Jesse Benton, Fernando

20    Cortes, cc'ing Dimitri Kesari and Jesse Benton.  Subject:

21    Regarding 25k wire.  Also sent December 29, 2011.

22         We are holding till after the filing.

23    Q.  Ms. Draughn, could you please put this exhibit, Government's

24    Exhibit 64, up on split screen with Exhibit 54, the Sorenson

25    statement?  And can you just go ahead and zoom in on the date

1  and time of the e-mail in Government's Exhibit 64 -- excuse me,

2  54, Ms. Draughn.

3        Are you able to read that, Agent LoStracco?

4  A.  Yes, I can read that.

5  Q.  All right.  What time was that Sorenson statement issued

6  again?

7  A.  5:02 p.m. on December 29.

8  Q.  All right.  And approximately what time is this e-mail

9  thread in Government's Exhibit 64?

10  A.  It's approximately 4:03, so there's several different

11  e-mails here actually.  They range from the first e-mail sent

12  from Fernando Cortes around 12:28 p.m. and Dimitri Kesari's last

13  e-mail at around 4:03.

14  Q.  Is that in approximately the same range as the e-mails back

15  and forth about the Sorenson statement preceding the final

16  statement that was issued that we looked at?

17  A.  Yes, that's correct.

18  Q.  Let's move on to Government's Exhibit 65, please.

19        MR. COONEY:  Offer Government's Exhibit 65.

20                    (Government Exhibit 65 was

21                    offered in evidence.)

22        THE COURT:  It's received.

23                    (Government Exhibit 65 was

24                    received in evidence.)

25        MR. COONEY:  Ms. Draughn, if you could please

1  highlight from the top e-mail down through -- keep going down.

2  That's good, right there.

3       All right.  You know what, actually you don't need to

4  change your highlight, but just scroll down a little bit just so

5  we can get a look at the e-mail at the very bottom of

6  Government's Exhibit 65.

7  BY MR. COONEY:

8  Q.  All right.  In Government's Exhibit 65 here, this bottom

9  e-mail from Fernando Cortes to Dimitri Kesari, Jesse Benton,

10  John Tate on December 29, 2011, at 11:29 a.m., Agent LoStracco,

11  that's an e-mail we've already taken a look at; is that right?

12  A.  Yes, that's correct.

13  Q.  That's the one that you read on the two pages:

14       Dimitri, is this invoice still on for today?

15  A.  Yes.

16  Q.  Now if you can read the next e-mail in the chain, including

17  the date and time.

18  A.  December 29, 2011, at 4:32 p.m., Dimitri Kesari wrote:  I

19  will send later for Jan 1 payment.

20  Q.  What happens next in this chain?

21  A.  Fernando Cortes responds to Dimitri Kesari also on December

22  29, 2011, at 3:58 p.m.  Subject:  Regarding 25k wire.

23       Banks aren't open till the 3rd.

24  Q.  All right.  And then you can move up.

25       And now this last e-mail in the chain?

1  A.  Dimitri Kesari responds to Fernando Cortes, subject:

2  Regarding 25k wire, also on December 29, 2011.

3          I don't want it showing up on this quarter filings.

4          Can we program it in for the 2nd?

5  Q.  All right.  What time did Dimitri Kesari write to Fernando

6  Cortes "I don't want it showing up on this quarter filings"?

7  A.  Approximately 4:01 p.m.

8  Q.  And if you could just look back in your notebook at the

9  exhibit that we just looked at which was the chain, the thread

10 that involved not just Dimitri Kesari and Fernando Cortes but

11 also John Tate and Jesse Benton, what time was the last e-mail

12 in that thread that Dimitri Kesari wrote to John Tate, Jesse

13 Benton and Fernando Cortes, "We are holding it until after the

14 filing"?

15 A.  That was sent at approximately 4:03 p.m.

16 Q.  So --

17 A.  So they were within minutes of each other.

18          THE COURT:  With that, we're going to take our

19 mid-morning recess and come back at 10:50.

20          Be ready to go then.

21          (Recess at 10:30 a.m., until 10:50 a.m.)

22          THE COURT:  Be seated.

23          MR. COONEY:  May I continue?

24          THE COURT:  Yes, please.

25          MR. COONEY:  Please excuse me, ladies and gentlemen.

1    I had to put a lozenge in my mouth.  You probably heard that I

2    have a little bit of a cough, so I apologize.

3    BY MR. COONEY:

4    Q.  Agent LoStracco, I just want to recenter with where we

5    stopped, which is Government's Exhibit 64 and Government's

6    Exhibit 65, which was the subsequent e-mail; but these -- this

7    is the chain that ended with Dimitri Kesari writing to John

8    Tate, Jesse Benton and Fernando Cortes, we are holding till

9    after the filing.

10             Can you just remind the jury what date and time that

11   was sent at?

12   A.  December 29, 2011, approximately 4:03 p.m.

13   Q.  Now, Agent LoStracco, as part of your investigation, were

14   you able to uncover any public statements that were made by Kent

15   Sorenson, other than the one that we looked at, but on video,

16   from Fox News, regarding the allegation by Michelle Bachmann?

17   A.  Yes.

18   Q.  Were you able to obtain video footage of an interview that

19   he gave to Megyn Kelly on December 29, 2011?

20   A.  Yes, that's correct.

21   Q.  Were you able to authenticate the date of that interview?

22   A.  Yes.

23   Q.  All right.  How were you able to do that?

24   A.  Through subpoena to Fox News.

25             MR. COONEY:  All right.  I would like to move

1    Government's Exhibit 150 into evidence.

2                              (Government Exhibit 150 was

3                              received in evidence.)

4          THE COURT:  Received.

5                              (Government Exhibit 150 was

6                              received in evidence.)

7    BY MR. COONEY:

8    Q.  All right.  Before we hit play on that, have you had an

9    opportunity to watch that video?

10   A.  Yes.

11   Q.  You did not see that in real-time, though, correct?

12   A.  No.

13   Q.  Why don't we go ahead and play Exhibit 150.

14         THE COURT:  Before you do, why don't you describe the

15   purpose for which you're offering.

16         MR. COONEY:  Certainly.  May I just describe it, Your

17   Honor?

18         THE COURT:  Yes.

19         MR. COONEY:  So this is not being offered for the

20   truth of any matter asserted, but rather it's being offered for

21   two purposes:  To show what the Bachmann allegation was and to

22   show what Kent Sorenson's response to that allegation was.

23         THE COURT:  Thanks.

24         Okay.  So you know we have rules about -- you hear the

25   objection hearsay.  Ordinarily we don't allow people to relate

1    in court what they heard outside the court.  We want the person

2    who saw it, heard it, felt it, smelled it, whatever, to be here

3    in court to relay it for themselves.  So we get sensitive about

4    playing communications in court that happen outside of court.

5    So when Mr. Cooney says it's not offered to prove the truth of

6    the matters asserted, he means we don't care in this video

7    whether anything in particular that was said was true or not,

8    just to show what the context of these other e-mails and things

9    was at the time and to show, as he said, Mr. Sorenson's reaction

10   to it.

11           Go ahead and play it.

12           MR. COONEY:  Thank you.

13           You can go ahead, Ms. Draughn, and play Government's

14   Exhibit 150.

15           It looks like we've got a sound issue.

16           Let's try that again.

17           (A clip from Government Exhibit 150 was played.)

18   BY MR. COONEY:

19   Q.  All right.  In the interview -- there are other parts of the

20   interview that obviously aren't shown on that clip, right?

21   A.  Yes, that's correct.

22   Q.  And just to confirm, the date of that interview was

23   December 29, 2011?

24   A.  Yes.

25   Q.  And did you see that time stamp on there, 1:35 p.m. Central

1    Standard Time?

2    A.  Yes.

3    Q.  I would like to show now Government's Exhibit 67.

4           Ms. Draughn, there should be no redaction on that.

5    Sorry.  Show the unredacted Government Exhibit 67.  In fact,

6    Government's Exhibit 67 is already in evidence.

7           Can you blow that up?  All right.  Can we start with

8    the -- and actually can you go ahead and blow up a little bit,

9    Ms. Draughn, the bottom e-mail where it says on December 29,

10   2011, at 5:40 p.m.?

11          Thank you.

12          All right.  Could you please go ahead and read this

13   e-mail to the jury, including the date and time?

14   A.  On December 29, 2011, at 5:40 p.m., Fernando Cortes wrote:

15          "COH - 135k.

16          "Reserves - 400k (will cover cc fees and payroll on

17   1/15).

18          "Outstanding invoices:

19          "927k - Saber" --

20   Q.  And I'm going to -- I apologize, I'm going to interrupt you,

21   Agent LoStracco, to kind of keep moving; but there are numbers

22   like that listed and other words, correct, for the next few

23   lines?

24   A.  Correct.

25   Q.  And what's down at the bottom?

1 A. 25k - Dimitri's mystery wire. And it's signed Fernando

2 Cortes, deputy controller.

3 Q. All right. Can you scroll up now, Ms. Draughn?

4 What comes next in this thread?

5 A. John Tate sends an e-mail response to Fernando Cortes

6 regarding COH, December 29, 2011, 6:41 p.m.

7 Thanks. There will not be the 25k Dimitri wire for

8 now. Wipe it off the books.

9 Q. Was that e-mail sent before or after the press statement

10 issued by the Paul Campaign that we looked at a little bit

11 earlier on?

12 A. It's been an hour and 40 minutes after the press release.

13 Q. And did John Tate say to Fernando Cortes, "thanks. There

14 will not be the 25k Dimitri wire for now. Wipe it off the

15 books" before or after the Kent Sorenson interview with Megyn

16 Kelly that you just looked at?

17 A. It was about five hours after Kent Sorenson was on Fox News.

18 Q. Now, Agent LoStracco, were you able as part of your

19 investigation to find, identify any public statements made by

20 Ron Paul in particular regarding the allegation by the Bachmann

21 Campaign that Sorenson was paid money to switch his endorsement?

22 A. Yes.

23 Q. Where did you obtain that video footage from?

24 A. That was also from Fox.

25 Q. And was that an interview between Chris -- or an interview

1  of Dr. Ron Paul by Chris Wallace?

2  A.  Yes, correct.

3  Q.  In fact, was that the interview that was referred to earlier

4  today here in court?

5  A.  Yes.

6  Q.  On what date did that occur?

7  A.  January 1, 2012.

8       MR. WARRINGTON:  Objection, Your Honor.  We have a

9  witness here that was interviewed there who testified to this

10  earlier so --

11       THE COURT:  He hasn't offered it yet.

12  BY MR. COONEY:

13  Q.  I'm sorry, what date was that interview?

14  A.  January 1, 2012.

15  Q.  All right.  And were you able to authenticate the date of

16  that particular interview on Fox News?

17  A.  Yes, through a subpoena sent to Fox News requesting

18  interviews done with Ron Paul on January 1, 2012.

19       MR. COONEY:  I'm going to move Government's Exhibit

20  171, which is that clip of Ron Paul, into evidence.

21                           (Government Exhibit 171 was

22                            offered in evidence.)

23       THE COURT:  Same objection?

24       MR. WARRINGTON:  Same objection, Your Honor.

25       MS. CAMPBELL:  We join, Your Honor.

1          MR. BINNALL:  We do, too, Your Honor.

2          THE COURT:  Overruled.  It's received.

3                              (Government Exhibit 171 was

4                              received in evidence.)

5          (A clip from Government Exhibit 171 was played.)

6          THE COURT:  Let's stop there for a minute.

7          So there's another good example.  Obviously, Chris

8   Wallace's questions aren't offered to prove that anything was

9   true and Dr. Paul's statements were not offered to prove that

10  they were true.  In fact, it's the government's statement in

11  this case that those statements were not true, so they're

12  offered to provide context for the e-mails and other things that

13  were going on in the course of the case and not to prove that

14  anything that was said by Mr. Wallace or Dr. Paul was true.

15          Go ahead.

16          MR. COONEY:  All right.  Thank you, Your Honor.

17  BY MR. COONEY:

18  Q.  Agent LoStracco, you already testified that interview

19  occurred on January 1, 2012; is that right?

20  A.  Yes, that's correct.

21  Q.  What date was the Iowa caucuses again that year?

22  A.  January 3, 2012.

23  Q.  I would like to move ahead a few weeks to Government's

24  Exhibit 56, which has not yet been admitted into evidence.

25          And if you would blow that up.

1          MR. COONEY:  I would offer Government's Exhibit 56.

2                        (Government Exhibit 56 was

3                        received in evidence.)

4          THE COURT:  Received.

5                        (Government Exhibit 56 was

6                        received in evidence.)

7     BY MR. COONEY:

8     Q.  Agent LoStracco, while that's coming up, could you tell the

9     jury what that is?

10    A.  Yes.  This is e-mail exchange between Dimitri Kesari and

11    Jesse Benton on January 16, 2012.

12    Q.  All right.  Can we start with the first e-mail on the bottom

13    and read up?

14    A.  Yes.  On January 16, 2012, at 12:50 a.m., Dimitri Kesari

15    wrote:  You want Kent to come down to SC, question mark.

16          He can be there Wednesday night through the weekend.

17          Jesse Benton responded to Dimitri Kesari, subject:

18    Kent Sorenson, also on January 16, 2012:  What would he do?

19    Q.  There was a primary in South Carolina around that time?

20    A.  Yes.

21    Q.  Do you know the date of the primary?

22    A.  I believe it was January 21, 2012.

23    Q.  All right.  I would like to move forward a couple of days to

24    Exhibit 57, Government's Exhibit 57, which also has not been

25    admitted into evidence yet.

1          MR. COONEY:  I offer Government's Exhibit 57.

2                         (Government Exhibit 57 was

3                         offered in evidence.)

4          THE COURT:  It's received.

5                         (Government Exhibit 57 was

6                         received in evidence.)

7          MR. COONEY:  Ms. Draughn, if you could blow up the

8    bottom e-mail.

9          Yep, perfect.  Thank you.

10   BY MR. COONEY:

11   Q.  All right.  Agent LoStracco, what is this?

12   A.  This is an e-mail exchange between Gary Barrett, who's an

13   anchor reporter with WHO Radio, Iowa Radio Network, and Kent

14   Sorenson and, I'm sorry, Megan Stiles, with the subject Kent

15   Sorenson.

16   Q.  What is the date of that e-mail?

17   A.  The date is January 20, 2012.

18   Q.  Can you go ahead and read the e-mail?

19   A.  Yes.  From Gary Barrett dated January 20, 2012.  Subject:

20   Kent Sorenson to Megan Stiles.

21          Sorry to bug you about this but you're the only e-mail

22   contact that I have.

23          I understand that Iowa State Senator Kent Sorenson has

24   been in South Carolina campaigning for Representative Paul.  I

25   need to speak to someone who can confirm or deny that he's being

1  paid for this work on behalf of the Ron Paul Campaign by the

2  campaign itself.

3         Thanks.

4         Gary Barrett, Anchor/Reporter, WHO Radio/Iowa Radio

5  Network/Clear Channel Communications.

6  Q.  Can you go ahead and scroll up, Ms. Draughn?

7         What happens next in this e-mail chain?

8  A.  Megan Stiles forwards that message to Gary Howard on

9  January 20, 2012 also.

10 Q.  You can keep going, Ms. Draughn.

11 A.  On January 20, 2012, Gary Howard wrote:  Is Sorenson being

12 paid?

13 Q.  And scroll up.

14        What's next?

15 A.  John Tate responds to Gary Howard, cc'ing Dimitri Kesari

16 also on January 20, 2012, subject:  Regarding Kent Sorenson.

17        No, he is not.  He is volunteering as I understand it.

18        John.

19 Q.  Just to recenter the jury, back when we were looking at

20 Government's Exhibit 63 -- that was the e-mail about the $25,000

21 wire dated December 28, 2011 --

22 A.  Yes.

23 Q.  -- was Gary Howard on that e-mail chain?

24 A.  No.

25 Q.  All right.  I would like to skip ahead now to Government's

1  Exhibit 74, which is a few weeks after this.

2          MR. COONEY:  Move Government's Exhibit 74 into

3  evidence.

4                          (Government Exhibit 74 was

5                           offered in evidence.)

6          THE COURT:  Received.

7                          (Government Exhibit 74 was

8                           received in evidence.)

9  BY MR. COONEY:

10  Q.  Agent LoStracco, what is Government's Exhibit 74?

11  A.  This is an e-mail exchange between Dimitri Kesari and John

12  Tate on February 7, 2012.

13  Q.  All right.  Read the first e-mail in the chain.

14  A.  Yes.  February 7, 2012, Dimitri Kesari wrote:  Did Jesse get

15  Kent paid?

16          He said he would handle it and Kent is texting me

17  today.

18          John Tate replies February 7, 2012 to Dimitri Kesari.

19  Subject:  Regarding.  No idea.  Ask him.

20  Q.  And the last e-mail that we looked at regarding South

21  Carolina, that was January 20, 2012; is that right?

22  A.  I believe it was around January 16th when they were

23  questioning whether he was going to go, or the news report?

24  Q.  Why don't you look at -- why don't you look in your book so

25  we can be precise.  The last one that we looked at was

1    Government's Exhibit 57.

2    A.  Yes.  Government Exhibit 57 was January 20, 2012.

3    Q.  All right.  Ms. Draughn, if we could please move to

4    Government's Exhibit 75.

5              MR. COONEY:  Offer Government's Exhibit -- sorry.  I'm

6    offering Government's Exhibit 75.

7                                      (Government Exhibit 75 was

8                                       offered in evidence.)

9              THE COURT:  Received.

10                                     (Government Exhibit 75 was

11                                      received in evidence.)

12   BY MR. COONEY:

13   Q.  Agent LoStracco, while that's coming up for the jury -- all

14   right.  What is this?

15   A.  This is an e-mail exchange between Dimitri Kesari and Jesse

16   Benton on February 7, 2012.

17   Q.  All right.  Is that the same day as the last exhibit we just

18   looked at, Government's Exhibit 74?

19   A.  Yes.

20   Q.  How does it compare in time to the last exhibit that we just

21   looked at, approximately?

22   A.  So the last exhibit we just looked at, the exchange between

23   Dimitri Kesari and John Tate was between 5:19 p.m. and 7:22

24   p.m., and this e-mail exchange is between 6:31 p.m. and 7:36

25   p.m.  So it's occurring approximately around the same time,

1  between 5:00 and 7:00 p.m. -- or 5:00 and 7:30 p.m. I should

2  say.

3  Q.  Agent LoStracco, could you please start with the bottom

4  e-mail?

5  A.  On February 7, 2012, at 6:31 p.m. Dimitri Kesari wrote:

6          Did you get Kent paid?

7          Or should I submit the payment and pay him?

8          Jesse Benton replies to Dimitri Kesari February 7,

9  2012, 7:36 p.m., "Yo handle."

10 Q.  Agent LoStracco, I'm going to shift gears for just a few

11 minutes here.  First, during the course of your investigation,

12 were you able to obtain any documents from the Federal Election

13 Commission?

14 A.  Yes.

15 Q.  All right.  I would like to hand you now what's been marked

16 for identification as Government's Exhibits 160 and 161.  Pardon

17 me.  And, Agent LoStracco, what do these two CD's contain?

18 A.  These CD's contain copies of the FEC's report filed by the

19 Ron Paul 2012 Presidential Campaign.

20 Q.  All right.  Are those the ones that you obtained during your

21 investigation?

22 A.  Yes, correct.

23          MR. COONEY:  All right.  Move Government's Exhibits

24 160 and 161 into evidence.

25

1          (Government Exhibits 160 and 161

2                  were offered in evidence.)

3          MS. CAMPBELL:  Your Honor, could we just know what

4    dates they are?  I don't --

5          MR. COONEY:  The Bates --

6          MS. CAMPBELL:  The dates.

7          MR. COONEY:  They would be all of the ones which we

8    obtained in the investigation, which --

9          MS. CAMPBELL:  Okay.  So everything?

10         MR. COONEY:  It's everything.

11         MR. BINNALL:  Your Honor, I have previously made an

12   objection on this issue regarding authenticity and the way these

13   reports were authenticated and I believe that that violates the

14   Sixth Amendment.  I just renew that objection.

15         THE COURT:  Authentication, Mr. Cooney?

16         MR. COONEY:  Certainly.

17   BY MR. COONEY:

18   Q.  Agent LoStracco, I'm showing you Government's Exhibits 160

19   and 161, and could you take -- I'm sorry, they are photocopies.

20   Could you take the disk, 160, all right, and here, is this a

21   photocopy of that disk that I'm showing you here on paper?

22   A.  Yes, it is.

23   Q.  All right.  And could you please read below that disk?

24   A.  I hereby certify that the documents contained in the disk

25   identified by this document are complete and accurate copies of

1    the original documents on file with the Federal Election

2    Commission.

3              It's dated April 18, 2016, and it's signed by Eileen

4    Leamon.

5    Q.  And right here where I'm drawing your attention is there a

6    raised seal?

7    A.  Yes, there is.

8    Q.  All right.  And then we don't need to read the entire thing,

9    but the one -- the photocopy labeled Government's Exhibit 161,

10   is that a photocopy of the disk 161 that you have there?

11   A.  Yes, it is.

12   Q.  All right.  And is the same certification here?

13   A.  Correct.

14   Q.  And is there also a raised seal?

15   A.  Yes, there is.

16             MR. COONEY:  Your Honor, pursuant to Federal Rule of

17   Evidence 902(11), these are self-authenticating public records.

18             THE COURT:  Anything else on that, Mr. Binnall?

19             MR. BINNALL:  My position is those are testimonial.

20             THE COURT:  Okay.  Thank you.

21             The authentication is satisfactory under 902.  They

22   are not testimonial in nature pursuant to the Crawford decision.

23             The exhibits are received.  The objection is

24   overruled.

25

1           (Government Exhibits 160 and 161

2           were received in evidence.)

3  BY MR. COONEY:

4  Q.  All right.  Now, Agent LoStracco, I would like to approach

5  with Government's Exhibits 143 through 148.

6           And if you could just thumb through these, please.

7  And, Agent LoStracco, my question as you're looking through them

8  is, are these excerpts of the FEC reports that you -- that are

9  contained on the two disks that you just -- that we just moved

10  into evidence, Government's Exhibits 160 and 161?

11  A.  Yes.

12  Q.  All right.  And to be more specific real quick here, with

13  Government's Exhibits 143 and 144, these are statements of

14  organization FEC form 1s; is that right?

15  A.  Correct.

16  Q.  And then 145 through 148 are what is referred to as FEC form

17  3Ps referred to as report of receipts and disbursements?

18  A.  Yes, that's correct.

19  Q.  All right.  And does each of these have the same

20  certification from Eileen Leamon that you read before with a

21  different date?  If you need to look at them.

22  A.  Yes, they do.

23  Q.  And do these also all have raised seals?

24  A.  Yes, they all have raised seals.

25           MR. COONEY:  So I move Exhibits 143 through 148 into

1    evidence pursuant to Federal Rule of Evidence 902(11), Your

2    Honor.

3                              (Government Exhibits 143 through

4                              148 were offered in evidence.)

5              MR. BINNALL:  Same objection, Your Honor.

6              THE COURT:  Overruled.

7              They're received.

8                              (Government Exhibits 143 through

9                              148 were received in evidence.)

10   BY MR. COONEY:

11   Q.  All right.  We're going to return to those in a few minutes,

12   but I want to go back to a few e-mails.  Could we turn to

13   Government's Exhibit 68, moving back to I believe the month of

14   January now, Agent LoStracco.

15             MR. COONEY:  Offer Government's Exhibit 68.

16                              (Government Exhibit 68 was

17                              offered in evidence.)

18             THE COURT:  Received.

19                              (Government Exhibit 68 was

20                              received in evidence.)

21   BY MR. COONEY:

22   Q.  Excuse me.  Agent LoStracco, could you please identify this

23   for the jury?  If you could go ahead and read this e-mail.

24   A.  This is from Kent Sorenson to Dimitri Kesari, sent

25   January 24, 2012.  Subject:  Invoice.  There's an attachment.

1          Dimitri.

2          I really need to get this taken care of ASAP.  Hope

3    you understand, smiley face.

4          Thanks.

5          Kent.

6    Q.  All right.  You said there's an attachment to this?

7    A.  Yes.

8    Q.  All right.  Ms. Draughn, could we please go to page 2 of

9    this exhibit?  All right.  Can you please zoom in at the top of

10   this?

11         Thank you.

12         What is this, Agent LoStracco?

13   A.  This is an invoice from Grassroots Strategy, Inc., and it's

14   to the attention of ICT, Inc., in Hyattsville, Maryland.

15   Q.  Who was that e-mail sent to from Kent Sorenson that this was

16   attached to?

17   A.  That was sent to Dimitri Kesari.

18   Q.  What is the date of this invoice from Grassroots Strategy to

19   ICT?

20   A.  July 22, 2011.

21   Q.  During your investigation, were you able to determine what

22   Grassroots Strategy is?

23   A.  Yes.

24   Q.  What is it?

25   A.  Kent Sorenson's consulting company.

1  Q.  During your investigation, were you able to determine what

2  ICT is?

3  A.  Yes.  It's a media video production company located in

4  Hyattsville, Maryland.

5  Q.  What is the date on this invoice?

6  A.  The date is July 22, 2011.

7  Q.  What was the date of that e-mail again?

8  A.  February 7, 2012 (sic).

9  Q.  Actually do you want to take a look at that?

10 A.  I'm sorry, I was looking at the previous e-mail.  I

11 apologize.  January 24, 2012.

12 Q.  Can you go ahead, Ms. Draughn, and rather than scroll down,

13 if you could actually start over again?  Why don't you go in and

14 highlight the entire thing and I think we'll be able to walk

15 through it.

16        All right.  You know what, I'm sorry, Ms. Draughn, it

17 is a little bit small.  I apologize.  I'm going to ask you if

18 you could take from project below which we read, which is

19 7/22/2011 on down.

20        All right.  And what is this?  Could you read down the

21 project title and project description?

22 A.  Sure.  Project title:  Consulting services.

23        Project description:  Provide consulting services.

24        Invoice No.:  831.

25        Terms:  Upon receipt.

1  Q.  I want to go ahead and move down to the table that has a

2  description, quantity, unit price, and cost.

3          Could you go ahead and read through that?

4  A.  Yes.  Description one, retainer to provide services;

5  quantity 1, unit price $25,000, cost $25,000.

6          Description two, provides monthly service for month of

7  January 2012, quantity 1, unit price $8,000, cost $8,000,

8  subtotal $33,000, for a total of $33,000.

9  Q.  And during the course of your investigation, were you able

10  to determine who the owner of ICT is?

11  A.  Yes.  It's Noel Izon.  He's also known as Sonny Izon.

12  Q.  Let's move on to Government's Exhibit 69.

13          MR. COONEY:  We move Government's Exhibit 69 into

14  evidence.

15                              (Government Exhibit 69 was

16                              offered in evidence.)

17          THE COURT:  Received.

18                              (Government Exhibit 69 was

19                              received in evidence.)

20  BY MR. COONEY:

21  Q.  All right.  What is Government's Exhibit 69, Agent

22  LoStracco?

23  A.  This is an e-mail from Dimitri Kesari to his brother, Pavlo

24  Kesari, also known as Paul Kesari.

25  Q.  What is the date of this e-mail?

1  A.  January 24, 2012.

2  Q.  And what is the time?

3  A.  9:30 p.m.

4  Q.  And if you could just flip back in your binder, Government's

5  Exhibit 68, what time and date was that e-mail?

6  A.  The e-mail from Kent Sorenson with invoice attached was

7  January 24, 2012, at 9:19 p.m.

8  Q.  Can you go ahead and read this e-mail to the jury?

9  A.  From Dimitri Kesari, sent Tuesday, January 24, 2012, 9:30

10  p.m.  To:  Pavlo Kesari.  Subject:  Invoice.  Attachment:

11  Invoice 012412.

12          Here is the invoice that needs to be taken care of.

13          Send me an invoice for video services.  33k plus.

14  Q.  All right.  And was there an attachment to this e-mail?

15  A.  Yes.

16  Q.  Ms. Draughn, could you go to page 2, please?  And if you

17  could just blow up the whole thing.

18          And just one question for you, Agent LoStracco.  Is

19  this the same invoice that was attached to Government's Exhibit

20  68, the e-mail from Kent Sorenson to Dimitri Kesari sent out

21  about nine minutes earlier than this one?

22  A.  Yes.

23          MR. COONEY:  Ms. Draughn, could we please move to

24  Government's Exhibit 70?

25          Move Government's Exhibit 70 into evidence.

1                    (Government Exhibit 70 was

2                    offered in evidence.)

3          THE COURT:  Received.

4                    (Government Exhibit 70 was

5                    received in evidence.)

6   BY MR. COONEY:

7   Q.  Agent LoStracco, what is Government's Exhibit 70 as it comes

8   up here?

9   A.  E-mail exchange between Kent Sorenson and Dimitri Kesari on

10  January 26, 2012, so approximately two days later.

11  Q.  What did Kent Sorenson write to Dimitri Kesari two days

12  later on January 26?

13  A.  Dimitri, I am attaching an invoice that contains my EIN.  My

14  address is included in the bill.

15          Thanks.

16          Kent.

17  Q.  All right.  Is there an attachment?

18  A.  Yes.

19  Q.  Ms. Draughn, let's look at page 2.

20          All right.  Agent LoStracco, what is the attachment to

21  Government's Exhibit 70 to this e-mail?

22  A.  This is, in essence, the same invoice that we saw

23  previously.  The only difference is that there's an EIN number

24  listed under the description header, and that is where the black

25  redaction is.

1    Q.  Is everything else on this invoice the same?

2    A.  Yes.

3    Q.  And in particular I want to draw your attention to the date

4    up top.  If you could zoom in on that, Ms. Draughn.  It's in the

5    top half.

6            Still July 22, 2011?

7    A.  Yes.

8    Q.  Let's move on to Government's Exhibit 71, please.

9            MR. COONEY:  Move 71 into evidence.

10                            (Government Exhibit 71 was

11                             offered in evidence.)

12           THE COURT:  Received.

13                            (Government Exhibit 71 was

14                             received in evidence.)

15   BY MR. COONEY:

16   Q.  What's Government's Exhibit 71, Agent LoStracco?

17   A.  This is Dimitri Kesari forwarding the invoice attachment

18   from Kent Sorenson to his brother, Pavlo Kesari, approximately

19   not even an hour after he received it from Kent Sorenson.

20   Q.  All right.  Is there an attachment to this e-mail?

21   A.  Yes.

22   Q.  Ms. Draughn, could we look at page 2?

23           What is the attachment to the e-mail that Dimitri

24   Kesari forwarded to his brother, Pavlo Kesari?

25   A.  This is the same invoice that Kent Sorenson had sent to

1    Dimitri Kesari with the EIN number added.

2    Q.  All right.  I would like to take a look now at what's

3    already been admitted into evidence as Government's Exhibit 76.

4    And can you go ahead and, Ms. Draughn, if you could just

5    highlight this so we can read the two e-mails.

6              All right.  And the jury has already seen this, but if

7    you could just read through it briefly, Agent LoStracco, so we

8    can center them on where we are with the first e-mail on the

9    bottom dated February 5, 2012?

10   A.  From Sonny Izon to Dimitri Kesari, February 5, 2012.

11   Subject:  Production services invoice.

12             Hi, Dimitri.

13             Attached is the production services invoice we

14   discussed.  Let me know if you need anything else.  By the way,

15   the web site for my latest holocaust documentary is up.  Please

16   check it out when you come up for air.  There's a Web site

17   listed.

18             Let me know what you think.

19             Thanks for the business.

20             Sonny Izon.

21             Dimitri Kesari forwards to Fernando Cortes production

22   services invoice on February 8, 2012, with the attachment

23   INVDKesari.

24             Please wire tomorrow morning.

25             This is approved by Jesse.

1  Q.  And is there an attachment?

2  A.  Yes.

3  Q.  Ms. Draughn, would you please turn to page 2 of this

4  exhibit?  And if you could highlight the top portion there.

5          I would like to walk through this one carefully.

6          First of all, what is this page?

7  A.  This page is an invoice from Interactive Communication

8  Technology to the Ron Paul Campaign.

9  Q.  All right.  And does it state where Interactive

10 Communication Technology is located?

11 A.  Yes; Hyattsville, Maryland.

12 Q.  All right.  Ms. Draughn, could you give us just a little bit

13 more?  You don't have to scroll down, but actually -- well,

14 that's fine.  You can scroll down.  That's fine.  That's good,

15 right there to the customer area.

16          All right.  Could you please read for the jury what's

17 in that customer category there?

18 A.  Ron Paul PCC Inc., Attention:  Dimitri Kesari.

19 Q.  You don't have to read the address actually, but is Dimitri

20 Kesari's phone number and address listed there?

21 A.  Yes.

22 Q.  And what is --

23 A.  Phone number and e-mail address.

24 Q.  I'm sorry, thank you for correcting me.

25          And on the right-hand side, there's a misc. category.

1    There's a date there.  What's the date?

2    A.  February 2, 2012.

3    Q.  All right.  Ms. Draughn, could you rather than scroll down

4    actually just blow up the description?

5            Excuse me, ladies and gentlemen.

6            All right.  There's that table that says quantity,

7    description, unit price.

8            Could you please read that to the jury, Agent

9    LoStracco?

10   A.  Yes.  Quantity 1, description production services, unit

11   price $38,125, total $38,125.

12           Due upon receipt.

13           Account name:  ICT, Incorp.

14           Bank:  Bank of America, and then there are routing

15   numbers and account numbers.

16           Branch:  College Park, Maryland.

17           Subtotal $38,125.

18   Q.  Thank you.

19           Ms. Draughn, could you please blow up the entire

20   invoice?  So just do the best you can to get rid of all of the

21   white space but reflect the entire invoice.

22           Thank you.

23           Is the name "Kent Sorenson" anywhere on this invoice?

24   A.  No.

25   Q.  What about the name "Grassroots Strategy"?

1   A.   No.

2   Q.   What about consulting services?

3   A.   No.

4   Q.   What about political consulting?

5   A.   No.

6   Q.   How about the word "endorsement"?

7   A.   No.

8   Q.   Ms. Draughn, could you please put up on the split screen the

9   attachment to Government's Exhibit 71?

10          I'm sorry, could you put up the attachment to 71, so

11  page 2?  I'm sorry.  And do the same thing, blow that up.

12          All right.  Agent LoStracco, Government's Exhibit 71,

13  that was the invoice from Grassroots Strategy to ICT on the

14  right-hand side?

15  A.   Correct.

16  Q.   What is the total amount for services there?

17  A.   $33,000.

18  Q.   And what about the total amount in Government's Exhibit 76?

19  A.   $38,125.

20  Q.   So about a 5,000-and-some-change difference, correct?

21  A.   Correct.

22  Q.   All right.  On the invoice on the right, Government's

23  Exhibit 71 from Grassroots Strategy to Interactive Communication

24  Technology, is the name "Ron Paul" anywhere on there?

25  A.   No.

1    Q.  Was the Ron Paul 2012 Campaign?

2    A.  No.

3    Q.  Ms. Draughn, if you would please take a look at Government's

4    Exhibit 77, which has already been admitted into evidence.  And

5    if you could just blow that up, please.

6           What is this, Agent LoStracco?

7    A.  This is an e-mail exchange between Dimitri Kesari and Sonny

8    Izon, Fernando Cortes and Lori Pyeatt, Deana Watts, Katie

9    Koerber.

10   Q.  So I would like to start at the bottom, and simply the

11   bottom e-mail of February 5, 2012, from Sonny Izon to Dimitri

12   Kesari --

13   A.  Yes, correct.

14   Q.  -- is that the e-mail in which Sonny Izon forwarded Dimitri

15   Kesari the invoice from ICT that we just looked at attached to

16   Government's Exhibit 76?

17   A.  Yes.

18   Q.  And then what happens next in this chain?

19   A.  Dimitri Kesari forwards that message from Sonny Izon to

20   Fernando Cortes.

21   Q.  On what date?

22   A.  On February 8, 2012.

23   Q.  And then what is this final e-mail up top?

24   A.  This is Fernando Cortes e-mailing Lori Pyeatt, Deana Watts,

25   Katie Koerber, and Dimitri Kesari.  Subject:  Forward:

1  Production services invoice, with an invoice attached on

2  February 8, at 11:08 a.m.

3  Q.  Could we please move to page 3, Ms. Draughn.

4          If you could just blow that up.

5          Agent LoStracco, simply is that the same invoice from

6  ICT to the Ron Paul Campaign that was attached to Government's

7  Exhibit 76 which was the e-mail that Dimitri Kesari sent to

8  Fernando Cortes with that invoice attached saying that this was

9  approved by Jesse?

10  A.  Yes.

11  Q.  Ms. Draughn, could you please put -- oh, and I'm sorry.

12  Could we just remind the jury again of the date on this invoice?

13  A.  Yes.  The date on the invoice is February 2, 2012.

14  Q.  And the e-mail, we don't need to -- Ms. Draughn, you don't

15  need to go back to it.

16          But could you please go back to the e-mail from

17  Fernando Cortes to Lori Pyeatt and Deana Watts, copying Dimitri

18  Kesari, what was the date of that e-mail?

19  A.  February 8, 2012.

20  Q.  All right.  Ms. Draughn, could you please put up

21  Government's Exhibit 145, which has been admitted into evidence?

22          And if you could just blow up the top portion here.

23          And these have been admitted, but I don't think the

24  jury has seen this yet.  Could you please just describe what

25  this is to the jury?

1  A.  Sure.  This is a report of receipts and disbursements filed

2  with the FEC on behalf of the Ron Paul 2012 Presidential

3  Campaign Committee, Incorporated.

4  Q.  All right.  And I would like to -- if you could scroll down,

5  please, Ms. Draughn, to paragraph 5 here.  All right.  That's

6  good, right there.

7          There's a portion -- Ms. Draughn, could you please

8  blow up where it says covering period, paragraph 5 there?

9  Perfect.  Thank you.

10          All right.  Could you please read that to the jury?

11  A.  Yes.  Covering period February 1, 2012, through February 29,

12  2012.

13  Q.  What is the covering period?

14  A.  That's basically the time frame in which the expenses and

15  disbursements are reported from the Ron Paul Campaign to the

16  FEC.

17  Q.  Could we please move to page 2 of this exhibit, Ms. Draughn?

18  And if you could highlight, zoom in on box C at the bottom of

19  this.

20          What is box C?

21  A.  Box C is itemized disbursement to Interactive

22  Communications, Inc., listed as the date February 8, 2012, in

23  the amount of $38,125.

24  Q.  Is that the same amount as the ICT invoice to the Paul

25  Campaign?

1  A.  Yes, that's correct.

2  Q.  And February 8, 2012, is that the same date as the e-mail

3  from Cortes to Pyeatt and Watts, cc'ing Kesari?

4  A.  Yes, that is correct.

5  Q.  Underneath Interactive Communications, Inc., if you move

6  about halfway down, there's a purpose of disbursement listed.

7        Do you see that?

8  A.  Yes.

9  Q.  Ms. Draughn, could you please blow that up?

10       What does the purpose of disbursement say?

11  A.  It is listed as audio/visual expenses.

12  Q.  Anywhere there in box C, this disbursement to Interactive

13  Communications, Inc., does the name "Kent Sorenson" appear

14  anywhere there?

15  A.  No.

16  Q.  Does the word "endorsement" appear anywhere there?

17  A.  No.

18  Q.  Grassroots Strategy, Inc.?

19  A.  No.

20  Q.  Political consulting or anything like that?

21  A.  No.

22       MR. COONEY:  All right.  I would like to shift gears

23  and show some e-mails and invoices from February and move

24  Government Exhibit 78.

25       (Pause.)

1       I'm offering Government Exhibit 78.

2                               (Government Exhibit 78 was

3                               offered in evidence.)

4       THE COURT:  Received.

5                               (Government Exhibit 78 was

6                               received in evidence.)

7   BY MR. COONEY:

8   Q.  Agent LoStracco, what is Government's Exhibit 78?

9   A.  This is an e-mail from Kent Sorenson to Dimitri Kesari on

10  March 4, 2012.  Subject:  Invoice for February.  And there's an

11  attachment which is an invoice.

12  Q.  Can you go ahead and read the e-mail that Kent Sorenson sent

13  to Dimitri Kesari?

14  A.  Hey, Dimitri.

15          Hope all is well.

16          I have attached the invoice for February.

17          Thanks.

18          Kent.

19  Q.  Ms. Draughn, could you please go to page 2 and blow this up?

20          All right.  What is the attachment, Agent LoStracco?

21  A.  The attachment is an invoice from Grassroots Strategy, Inc.,

22  Attention:  ICT, Inc., Hyattsville, Maryland.  The date is

23  March 1, 2012.

24          Keep going?

25  Q.  Well, if you could go ahead and read the project title,

1   please.

2   A.   Sure.   The project title is consulting services.

3   Q.   If you could go down to the description and tell the jury

4   that and unit price and cost?

5   A.   The description is provides monthly service for month of

6   February 2012, quantity 1, unit price $8,000, cost $8,000.

7   Q.   All right.   If you could scroll down just a little bit,

8   Ms. Draughn?

9            Sincerely yours?

10  A.   Sincerely yours, Kent Sorenson.

11  Q.   All right.   And is this essentially an invoice that looks

12  the same as the other Grassroots Strategy to ICT invoice that we

13  looked at a few moments ago?

14  A.   Yes, minus the amount number.

15  Q.   All right.   And, again, who did Kent Sorenson send this

16  e-mail, this invoice to, this invoice to ICT?

17  A.   He sent it to Dimitri Kesari.

18  Q.   Let's move to Government's Exhibit 79.

19            MR. COONEY:   Offer Government's Exhibit 79.

20                          (Government Exhibit 79 was

21                           offered in evidence.)

22            THE COURT:   Received.

23                          (Government Exhibit 79 was

24                           received in evidence.)

25  BY MR. COONEY:

1  Q.  All right.  What is Government's Exhibit 79?

2  A.  This is Kent Sorenson forwarding his original message of

3  March 4, 2012, to Dimitri Kesari.  Again to Dimitri Kesari on

4  March 18, 2012 he forwards the invoice for February.

5  Q.  All right.  Can you go ahead and just read that e-mail,

6  please?

7  A.  Dimitri, I've tried checking in a few time, your VM is full.

8  Would like to check on payment for February.  Am unsure what I

9  am going to do so please stay in touch and don't go dark on me,

10  smiley face.  Hope you're doing well.

11          Thanks.

12          Kent.

13          P.S.  Do I need to send this to Sonny since he was the

14  one that wired the funds last time?

15  Q.  And is there an attachment to this e-mail?

16  A.  Yes.

17  Q.  And we don't need to put it up, but if you could look at it

18  yourself, please.

19  A.  What is the exhibit number again?

20  Q.  Oh, sorry; Government Exhibit 79.

21          And my question to you simply, is it the same

22  Grassroots Strategy, Inc., to ICT invoice dated March 1, 2012

23  that was attached to Exhibit 78?

24  A.  Yes.

25  Q.  Let's move on to Government's Exhibit 80.

1      MR. COONEY:  Offer Government's Exhibit 80.

2                          (Government Exhibit 80 was

3                          offered in evidence.)

4      THE COURT:  Received.

5                          (Government Exhibit 80 was

6                          received in evidence.)

7  BY MR. COONEY:

8  Q.  Agent LoStracco, what is Government's Exhibit 80?

9  A.  This is Dimitri Kesari forwarding the invoice he received

10  from Kent Sorenson to Paul Kesari, also known as Pavlo Kesari,

11  his brother, on March 18, 2012.

12  Q.  Pardon me.  And what is the text of the e-mail?

13  A.  Can you send me a bill?

14  Q.  And was this sent the same day that Kent Sorenson sent the

15  invoice to Dimitri Kesari?

16  A.  Yes.

17  Q.  Government's Exhibit 79?

18  A.  Yes.

19  Q.  All right.  And, again, if you could just look at the

20  attachment yourself.  It's Government's Exhibit 80.

21      Is that the same invoice attached to Government's

22  Exhibit 80, this exhibit, that was attached to Government

23  Exhibit 79 which Kent Sorenson e-mailed Dimitri Kesari that same

24  day?

25  A.  Yes.

1  Q.  Let's move to Government's Exhibit 81, please.

2           MR. COONEY:  Offer Government's Exhibit 81.

3                          (Government Exhibit 81 was

4                          offered in evidence.)

5           THE COURT:  Received.

6                          (Government Exhibit 81 was

7                          received in evidence.)

8  BY MR. COONEY:

9  Q.  Agent LoStracco, when it comes up on the screen, what is

10 Government's Exhibit 81?

11 A.  This is an e-mail from Sonny Izon to Dimitri Kesari dated

12 March 21, 2012.  Subject:  February invoice.

13 Q.  Go ahead and read that e-mail.

14 A.  Yes.

15           Hi, Dimitri.

16           Attached is the invoice for services rendered in

17 February.  Let me know if you need anything else.

18           Best, Sonny.

19 Q.  All right.  And is there an attachment to that e-mail?

20 A.  Yes.

21 Q.  Ms. Draughn, could you please go to page 3?  And if you

22 would just blow up the entire thing.

23           Thank you.

24           All right.  What is the attachment to this e-mail,

25 Agent LoStracco?

1 A. This is an invoice from Interactive Communication Technology

2 to the Ron Paul Campaign in the amount of $8,850.

3 Q. What is the date of this invoice?

4 A. March 21, 2012.

5 Q. And under the description, what is the description?

6 A. Production services, parentheses February.

7 Q. What is the total amount?

8 A. $8,850.

9 Q. How does that compare to the invoice from Grassroots

10 Strategy to ICT that Kent Sorenson sent Dimitri Kesari?

11 A. It's $850 more.

12 Q. Does this invoice essentially have all of the same parts as

13 the other ICT to Ron Paul invoice that we looked at a few

14 moments ago related to the January invoice?

15 A. Yes.

16 Q. And, Agent LoStracco, again, is Kent Sorenson's name, does

17 it appear anywhere in this invoice?

18 A. No.

19 Q. Or consulting services?

20 A. No.

21 Q. Or political consulting?

22 A. No.

23 Q. Or the word "endorsement"?

24 A. No.

25 Q. If we could please go to Government's Exhibit 84b,

1   Ms. Draughn, which has already been admitted into evidence.

2         All right.  Agent LoStracco, that bottom e-mail from

3   Sonny Izon to Dimitri Kesari dated March 21, 2012, is that the

4   same one we were just looking at in Government's Exhibit 81?

5   A.  Yes.

6   Q.  All right.  Could we now move up the chain from there and

7   could we explain to the jury what happens in this thread?

8   A.  Yes.  Dimitri Kesari forwards that e-mail with the

9   attachment from Sonny Izon to Fernando Cortes on April 3, 2012.

10   It says:  Approved by Jesse.

11         Fernando Cortes responds:  Approved?

12         I'm sorry, did not respond, forwards it.

13         John Tate replies to Fernando Cortes on April 3, 2012,

14   regarding February invoice:  Approved.

15   Q.  All right.  And I would like to turn now if we could -- I'm

16   sorry, what was the date of John Tate's e-mail to Fernando

17   Cortes writing approved?

18   A.  April 3, 2012.

19   Q.  Let's move now to Government's Exhibit 82.

20         MR. COONEY:  Offer Government's Exhibit 82.

21                   (Government Exhibit 82 was

22                   offered in evidence.)

23         THE COURT:  Received.

24                   (Government Exhibit 82 was

25                   received in evidence.)

1  BY MR. COONEY:

2  Q.  All right.  Pardon me, ladies and gentlemen.

3         Agent LoStracco, what is Government's Exhibit 82?

4  A.  This is an e-mail from Kent Sorenson, and the subject is

5  invoicing on March 26, 2012.

6  Q.  And can you read the text?

7  A.  Yes.  Dimitri/Sonny.

8  Q.  And is there an attachment?

9  A.  Yes.

10  Q.  All right.  Ms. Draughn, can you please go to page 2?

11         All right.  Is this another Grassroots Strategy to ICT

12  invoice?

13  A.  Yes.

14  Q.  Does it contain all the same constituent parts that we

15  looked at in the other Grassroots to ICT invoices?

16  A.  It's the same format, yes.

17  Q.  All right.  What is the date of this invoice?

18  A.  March 25, 2012.

19  Q.  The project title?

20  A.  Project title is consulting services.

21  Q.  And can you please read the descriptions on these and

22  prices?

23  A.  Provides monthly service for month of February 2012, unit

24  price $8,000, cost $8,000.

25         Provides monthly service for month of March 2012, unit

1    price $8,000, cost $8,000, subtotal $16,000, for a total of

2    $16,000.

3    Q.  I just recognized something.  Could you please turn in your

4    book to Government's Exhibit 82, Agent LoStracco, and just turn

5    to the last page.

6              Do you see that there?

7    A.  Yes.

8    Q.  What is that?

9    A.  That is, it looks like the rest of the e-mail that I had

10   read the beginning of Dimitri/Sonny.

11   Q.  Could you go ahead and read that e-mail to the jury?

12   A.  I am sending a new invoice that now includes March as well.

13   Please let me know when this will be paid.

14              Sincerely, Kent Sorenson.

15   Q.  Let's move on to Government's Exhibit 83, please.

16              MR. COONEY:  I offer Government's Exhibit 83.

17                                (Government Exhibit 83 was

18                                 offered in evidence.)

19              THE COURT:  Received.

20                                (Government Exhibit 83 was

21                                 received in evidence.)

22   BY MR. COONEY:

23   Q.  Agent LoStracco, what is Government's Exhibit 83?

24   A.  This is an e-mail from Sonny Izon to Dimitri Kesari on

25   March 26, 2012.  Subject is March invoice.

1  Q.  Why don't you go ahead and read it for the jury.  We're

2  still waiting on it to come up, but you can go ahead and read

3  it, Agent LoStracco.

4  A.  Hi, Dimitri.

5          Here is the invoice for March.

6          Peace, Sonny.

7  Q.  All right.  And there it is for the jury.

8          All right.  Is there an attachment to this e-mail?

9  A.  Yes.

10 Q.  Please go to page 2, Ms. Draughn.

11         What is the attachment to Government's Exhibit 83?

12 A.  This is an invoice also from Interactive Communication

13 Technology, Inc., to the Ron Paul Presidential Campaign,

14 attention:  Dimitri Kesari, in the amount of $8,850 for

15 production services in March.

16 Q.  All right.  And does this have essentially the same

17 constituent parts that we've looked at in the other ICT to Ron

18 Paul Campaign invoices?

19 A.  Yes.

20 Q.  All right.  Can you please just tell the jury what the

21 description of these services are?

22 A.  Production services, parentheses March.

23 Q.  What's the unit price?

24 A.  $8,850.

25 Q.  All right.  And what is the date of this?

1    A.   March 27, 2012.

2    Q.   All right.  Ms. Draughn, could you please just put up on

3    split screen real quick page 2 of Government's Exhibit 82?

4            I see in Government's Exhibit 82, Agent LoStracco,

5    that there are actually two descriptions, both for an $8,000

6    unit.

7    A.   Yes.

8    Q.   Do you see what I'm talking about?

9    A.   Yes.

10   Q.   What are those two units -- or the description of those two

11   units?

12   A.   Provides monthly service for month of February 2012,

13   provides monthly service for month of March 2012.

14   Q.   The invoice from Interactive Communication Technology to the

15   Ron Paul Campaign on the left, Government's Exhibit 83, what is

16   the description there?

17   A.   Production services, parentheses March.

18   Q.   So just March in that one?

19   A.   Yes, correct.

20   Q.   The very last invoice that we looked at from Interactive

21   Communication Technology to the Ron Paul Campaign which was

22   attached to Government's Exhibit 81, what month was that service

23   for?  If you need to look back, please go ahead and do that.

24   A.   That was for production services, parentheses February.

25   Q.   Let's go to Government's Exhibit 85, which has already been

1  admitted into evidence.

2          And if you could just look at the bottom e-mail.  It's

3  an e-mail from Sonny Izon to Dimitri Kesari March 26, 2012,

4  subject:  March invoice.  Is that the e-mail that we just looked

5  at a moment ago in Government's Exhibit 83?

6  A.  Yes.

7  Q.  All right.  Now can you go ahead and read up from there?

8  A.  Dimitri Kesari forwards that message to Fernando Cortes on

9  April 3, 2012, approved by Jesse.

10         Fernando Cortes forwarded that message and wrote:

11 Approved?

12         John Tate responds to Fernando Cortes on April 3,

13 2012:  Approved.

14 Q.  Ms. Draughn, could you please put this exhibit up on split

15 screen with Government's Exhibit 84b?  And can you put up the

16 one on the left so we can look at that, too?

17         Thank you very much.

18         Thank you very much for following along on all of

19 this, Ms. Draughn.

20         All right.  Government's Exhibit 85, which is on the

21 left, what is the subject of that e-mail, the top e-mail from

22 John Tate to Fernando Cortes that says, approved?

23 A.  Regarding March invoice.

24 Q.  How about the one on the right-hand side, that's

25 Government's Exhibit 84b, what is the subject of that e-mail?

1    A.   Regarding February invoice.

2    Q.   So we have two different e-mails, correct?

3    A.   Yes.  The timing is very similar between the two e-mail

4    chains, but they are two separate e-mails.

5    Q.   And what is the date and time of those e-mails?

6    A.   Of the top e-mails?

7    Q.   Yes.

8    A.   April 3, 2012, at 12:03 p.m., and the one on the right is

9    April 3, 2012, also at 12:03 p.m.

10   Q.   Let's take the one labeled March invoice, Government's

11   Exhibit 85, on the left-hand side, you said that John Tate's

12   e-mail to Fernando Cortes was at 12:03 p.m., correct?

13   A.   Correct.

14   Q.   What time did Fernando Cortes write to John Tate with the

15   question "approved?"

16   A.   At 12:00 p.m.

17   Q.   So the response came three minutes later?

18   A.   Correct.

19   Q.   How about Government's Exhibit 84b on the right-hand side?

20   When did Fernando Cortes write the same question on the e-mail

21   subject:  February invoice approved?

22   A.   11:59 a.m.

23   Q.   And when did John Tate's response come?

24   A.   Four minutes later at 12:03 p.m.

25            THE COURT:  Are you done with that one?

1        MR. COONEY:  I am.  Could I show one more document

2   or -- is that all right?

3        THE COURT:  Yes.

4        MR. COONEY:  Then we will be done with that.  Thank

5   you, Your Honor.  Thank you, ladies and gentlemen.

6   BY MR. COONEY:

7   Q.  Government's Exhibit 146, which has already been admitted

8   into evidence.  And just for the jury's benefit, what is

9   Government's Exhibit 146?

10  A.  This is the front page of a report of receipts and

11  disbursements to the -- reporting the expenses and disbursements

12  from the Ron Paul 2012 Presidential Campaign Committee.

13  Q.  And if you need to -- well, actually you're going to need to

14  look at the screen.  Are you able to read the covering period,

15  what this covers?

16  A.  April 1, 2012 to April 30, 2012.

17  Q.  Thank you, Ms. Draughn.

18        Could you now go to page 2, Ms. Draughn, and blow up

19  box C?

20        Thank you.

21        What is box C?

22  A.  This is a disbursement listed -- I previously misspoke.

23  It's receipts and disbursements on the form.  This is a

24  disbursement to Interactive Communications, Inc., on April 3,

25  2012.  The purpose of disbursement is audio/visual expenses, and

1  the amount is -- I'm sorry, I'm trying to find the amount on

2  here.

3  Q.  Do you see it there on the right-hand side?

4  A.  I see amount of each disbursement this period.

5  Q.  And underneath there.  Do you want Ms. Draughn to go ahead

6  and blow it up?

7  A.  $17,700.

8  Q.  Those two invoices that we looked at from John Tate attached

9  to the April 3, 2012 e-mails, how much were each of those

10  e-mails for?

11  A.  One was for $8,850, the other was for $8,850.

12  Q.  What's the sum of those two figures?

13  A.  $17,700.

14  Q.  And what is the date of this report -- excuse me, what was

15  the date of that disbursement?

16          Ms. Draughn, if you can zoom out?

17  A.  April 3, 2012.

18  Q.  And, again, Agent LoStracco, does Kent Sorenson's name

19  appear here anywhere?

20  A.  No.

21  Q.  Does the word "endorsement" appear here anywhere?

22  A.  No.

23          MR. WARRINGTON:  Objection.

24          THE COURT:  Overruled.

25  BY MR. COONEY:

1   Q.  Does the phrase "consulting services" appear anywhere here?

2   A.  No.

3   Q.  Or anything like that?

4           MR. WARRINGTON:  May I be heard, Your Honor?

5           THE COURT:  No.  I said overruled.

6   A.  No.

7   BY MR. COONEY:

8   Q.  And, finally, in fairness, Agent LoStracco, this is one page

9   in the FEC report, correct?

10  A.  That is correct.

11  Q.  The FEC report itself is hundreds or even thousands of

12  pages, correct?

13  A.  Correct.

14          MR. COONEY:  This would be a good breaking point, Your

15  Honor.

16          THE COURT:  We'll do that.

17          We'll start again at 1:15.  See you then.

18          (Recess at 11:58 a.m., until 1:15 p.m.)

19

20

21

22

23

24

25

1              AFTERNOON SESSION  1:20 p.m.

2              (In open court, out of the presence of the jury.)

3              THE COURT:  Be seated.

4              Mr. Warrington.

5              MR. WARRINGTON:  Mr. Mills.

6              THE COURT:  Yeah, come on up.

7              MR. MILLS:  Your Honor, just very briefly.  The issue

8    concerns the examination on the FEC reporting exhibits, in

9    particular, the examination about what goes in the description

10   of services box.  I don't have any problem with Mr. Cooney

11   examining Agent LoStracco on things that the e-mails say or

12   documents say.  I think it's completely inappropriate, however,

13   to have her opine on things that aren't there because it implies

14   they should be there.  She's not competent to make such a

15   determination, and it's prejudicial.  And many of the things

16   that they're implying should be there are just wrong as a matter

17   of law.

18              And so she's an e-mail reader.  She's not an

19   eyewitness to any of these events, and it's entirely

20   inappropriate to cross-examine her -- to examine her on things

21   that are not here and implying that they should be.

22              THE COURT:  Mr. Cooney?

23              MR. COONEY:  I think that's what this entire case is

24   about, which is that that statement that we're talking about on

25   the FEC form is a false statement because it's ICT and

1    audiovisual expenses and not something else that would be a

2    truthful description of what the services were rendered.

3            THE COURT:  Okay.  Every one of these documents in

4    some sense speaks for itself, and the court would be within its

5    power to simply say it's in evidence, you can't just have a

6    witness on the stand just simply reading from them.  The problem

7    in a case like this that has hundreds of e-mails is that no

8    juror could ever be expected to absorb that kind of -- that

9    amount of information in an hour-and-a-half closing argument.

10           And so to aid the jury's understanding as we go along,

11   I permit someone without personal knowledge of the contents of

12   the e-mails to read them, and it's appropriate.  In some sense,

13   in a highly theoretical sense, it's all argumentative because

14   she doesn't have personal knowledge of it.  I think that's one

15   portion you can save for your closing argument.

16           I agree, don't ask them what's not in there.  I don't

17   think it necessarily implies that something should be, but we'll

18   save that --

19           MR. MILLS:  Is there a way for a limiting instruction

20   because you've made --

21           THE COURT:  No.  What would you have me say?

22           MR. MILLS:  That there's no requirement to --

23           THE COURT:  No.  No, no, no, no.  That's going to be

24   for the final jury instructions.

25           Thank you.

1          Call the jury, please.

2          MR. COONEY:  Your Honor, does that apply to the

3   invoices as well or just the FEC reports?

4          THE COURT:  No, no; just the FEC reports.

5          MR. COONEY:  Got it.

6          (In open court, in the presence of the jury.)

7          THE COURT:  Please be seated.

8          MR. COONEY:  Ms. Draughn, if you would show the

9   witness Exhibit 86 --

10         THE COURT:  I just want to first apologize for

11  starting a little late.  You can tell how important punctuality

12  is to me.  Greenwich Mean Time calls Ms. Walling and asks what

13  time it is sometimes.  We like to start on time.  I had a

14  meeting about the new federal courthouse that I had to be on the

15  other side of the East Village on, and so that's why I was a

16  little late, and I apologize for it.

17         Go ahead, Mr. Cooney.

18         MR. COONEY:  Thank you, Your Honor.

19                    KAREN LOSTRACCO,

20  Resumed her testimony as follows:

21              DIRECT EXAMINATION (Continued)

22  BY MR. COONEY:

23  Q.  I would like to look at invoices from January, February, and

24  March, Agent LoStracco, and I would like to move now to April of

25  2012 and some associated e-mail communications.

1          Before you on the screen is Exhibit 86, which I will

2    move in.

3                              (Government Exhibit 86 was

4                              offered in evidence.)

5          MR. COONEY:  Ms. Draughn, would you please -- thank

6    you.

7          THE COURT:  Received.

8                              (Government Exhibit 86 was

9                              received in evidence.)

10   BY MR. COONEY:

11   Q.  While that's being published to the jury, Agent LoStracco,

12   could you just tell them what Government's 86 is?

13   A.  This is an e-mail communication between Sonny Izon, Kent

14   Sorenson, and Dimitri Kesari.

15   Q.  All right.  And if you could just start with the bottom

16   e-mail and read the dates and the other information.

17   A.  May 1, 2012, at 10:07 a.m., Sonny Izon wrote:

18          Hi, Kent, just checking in to see if you will be

19   forwarding invoices for April and beyond.  Hope you are well.

20          Cheers, Sonny.

21   Q.  Kent Sorenson then responded to Sonny Izon and Dimitri

22   Kesari regarding additional invoices with an attachment.

23          Hey, Sonny.  I'm attaching the invoice for April.  I

24   have been caught up trying to wrap up a few things with session

25   and just have not had time to submit it.  Thanks for the e-mail.

1          We're doing great.  Hope you are as well.

2          Blessings, Kent.

3   Q.  Now was there an attachment to this e-mail?

4   A.  Yes.

5   Q.  Could we turn to page 2 of this exhibit, please,

6   Ms. Draughn?  And if you could blow that up.

7          Agent LoStracco, could you please describe this

8   exhibit to the jury?

9   A.  This is a Grassroots Strategy invoice submitted to ICT,

10  Inc., and it is for providing monthly service for the month of

11  April 2012 in the amount of $8,000.

12  Q.  And if you could just look at the top, the date of the

13  invoice?

14  A.  May 1, 2012.

15  Q.  What is the project title?

16  A.  The project title is consulting services.

17  Q.  And the project description?

18  A.  Provides monthly service for month of April 2012.

19  Q.  And, Agent LoStracco, is this identical, except for the

20  description in the services provided and whatnot, but is this

21  otherwise identical in terms of the constituent parts to the

22  other Grassroots Strategy invoices to ICT that we've been

23  looking at over the course of your testimony?

24  A.  Yes, same format.

25  Q.  Like those other invoices, is there any reference on this

1  Grassroots Strategy to ICT invoice of the Ron Paul Campaign?

2  A.  No.

3  Q.  And is there any reference to production services on this

4  invoice?

5  A.  No.  There's consulting services.

6  Q.  What about audiovisual services?

7  A.  No.

8  Q.  Is that the same for the other Grassroots Strategy, Inc.

9  invoices we've been looking at?

10  A.  That's correct.

11  Q.  Let's move now to Government's Exhibit 87a.

12          MR. COONEY:  All right.  I move Government's Exhibit

13  87a into evidence.

14                          (Government Exhibit 87a was

15                           offered in evidence.)

16          THE COURT:  I'm sorry; you moved it?

17          MR. COONEY:  I'm sorry, Your Honor, yes.

18          THE COURT:  It's received.  Sorry.

19                          (Government Exhibit 87a was

20                           received in evidence.)

21  BY MR. COONEY:

22  Q.  Agent LoStracco, could you please as it comes up just

23  describe for the jury what that is?

24  A.  This is an e-mail from Sonny Izon to Dimitri Kesari dated

25  May 2, 2012.  Subject:  April invoice.

1  Q.  What date was Government's Exhibit 86 that we just looked

2  at?

3  A.  I'll check, but I believe it's May 2, 2012 as well.

4         Yes.

5  Q.  What time were those two -- was the e-mail that we just

6  looked at from Kent Sorenson to Sonny Izon?

7  A.  Kent Sorenson to Sonny Izon and Dimitri Kesari is 1:55 a.m.

8  This e-mail is May 2, at 9:01 a.m.

9  Q.  All right.  Could you please read this e-mail to the jury?

10 A.  Hey, Dimitri.

11        Here's the production services invoice for April 2012.

12 Hope you are doing well.

13        Peace, Sonny Izon.

14 Q.  What is the subject of this e-mail?

15 A.  April invoice.

16 Q.  Is there an attachment?

17 A.  Yes.

18 Q.  Would you move, Ms. Draughn, to page 2 of the exhibit?  And

19 if you could blow that up.

20        What is the attachment?

21 A.  This is, again, an invoice from Interactive Communication

22 Technology to the Ron Paul Presidential Campaign, attention:

23 Dimitri Kesari for production services in April in the amount of

24 $8,850.

25 Q.  In terms of its constituents parts, all of the pieces of it,

1   is this identical, except for different services, but otherwise

2   identical to the Interactive Communication Technology to Ron

3   Paul Campaign invoices we've been looking at?

4   A.  Yes; different services and different date.

5   Q.  And what is the description of services in this invoice?

6   A.  Production services, parentheses, April.

7   Q.  How does it compare in the amount to the invoice that we

8   just looked at from Grassroots Strategy to ICT?

9   A.  This is $850 more.

10  Q.  Is that the same increase, the $850 as those other invoices

11  we've been looking at at least with respect to February and

12  March?

13  A.  Yes, correct.  The first invoice had a bigger difference,

14  but the last few have had $850 difference.

15  Q.  And on this invoice, is there any reference to Kent

16  Sorenson?

17  A.  No.

18  Q.  Or to Grassroots Strategy?

19  A.  No.

20  Q.  Or to consulting services?

21  A.  No.

22  Q.  Let's move on to Government's Exhibit 87b, please.

23          MR. COONEY:  Move Government's Exhibit 87b into

24  evidence.  Actually -- yes; no, I move this into evidence.

25

1                              (Government Exhibit 87b was

2                              offered in evidence.)

3          THE COURT:  Received.

4                              (Government Exhibit 87b was

5                              received in evidence.)

6   BY MR. COONEY:

7   Q.  All right.  If we can move first at the bottom when it comes

8   up for the jury, this bottom e-mail, May 2, 2012 at 9:01 a.m.

9   from Sonny Izon to Dimitri Kesari, is that the same e-mail that

10  we just looked at in Government's Exhibit 87a?

11  A.  Yes, correct.

12  Q.  All right.  Which contained the attachment with the invoice

13  we just looked at, correct?

14  A.  Yes.

15  Q.  All right.  Can you please read up from there?

16  A.  On May 2, 2012, at 9:42 a.m., Dimitri Kesari wrote:  Kent's

17  bill.

18          Pay?

19          On May 2, 2012, at 10:30 a.m., Jesse Benton wrote:

20  Yes - last time.

21          Dimitri Kesari to Jesse Benton on May 2, 2012, at

22  10:38 a.m.:  Okay.

23  Q.  Is there an attachment to this e-mail?

24  A.  Yes.

25  Q.  Ms. Draughn, can you please turn to page 2 of Government's

1  Exhibit 87b?

2         Agent LoStracco, is this the exact same invoice from

3  ICT to the Ron Paul Campaign for production services in April

4  that was attached to Sonny Izon's e-mail to Dimitri Kesari that

5  we looked at in Government's Exhibit 87a?

6  A.  Yes.

7  Q.  Could you please go back to the e-mail, page 1 of the

8  exhibit, Ms. Draughn?  And if you could highlight just the top

9  three e-mails there.  Go down.  That's good right there.

10         After Dimitri Kesari wrote at 9:42 a.m.:  Kent's bill.

11  Pay, question mark, how long after that e-mail is Jesse Benton's

12  response?

13  A.  About 45 minutes.

14  Q.  Let's move on to Government's Exhibit 88, which is already

15  in evidence.

16         We'll just blow that up.

17         What's Government's Exhibit 88?

18  A.  This is an e-mail exchange between Dimitri Kesari and

19  Fernando Cortes where Dimitri Kesari is forwarding the e-mail he

20  received from Sonny Izon with the attachment for the April

21  invoice.

22  Q.  What is it Dimitri Kesari writes to Fernando Cortes?

23  A.  Approved by Jesse.

24  Q.  What is the date and time of this?

25  A.  May 2, 2012, at 10:39 a.m.

1   Q.  And if you want to just look back yourself at Government's

2   Exhibit 87b, the e-mail from Jesse Benton to Dimitri Kesari,

3   yes - last time.

4   A.  That was at 10:30 a.m.  This is about nine minutes later.

5   Q.  And is there an attachment to Government's Exhibit 88?

6   A.  Yes.

7   Q.  And I'll just ask you, Agent LoStracco, is it a copy of the

8   exact same Interactive Communication Technology to Ron Paul

9   Campaign invoice for production services in April that we looked

10  at that was attached to the last couple of e-mails?

11  A.  Yes.

12  Q.  And if we could just real quick, Agent LoStracco, look at

13  Government's Exhibit -- actually let's just move on to

14  Government's Exhibit 147.

15          Agent LoStracco, what is Government's Exhibit 147?  I

16  think we've seen a couple of forms that look like this before?

17  A.  Correct.  This is the first page of a report of receipts and

18  disbursements filed by the Ron Paul 2012 Presidential Campaign

19  Committee with the FEC.

20  Q.  Ms. Draughn, could you please highlight paragraph 5, the

21  covering period?

22          And, Agent LoStracco, could you please tell the jury

23  what the covering period is for this report?

24  A.  May 1st of 2012 through May 31st of 2012.

25  Q.  Could we please move to -- and actually let's do one thing.

1  Ms. Draughn, could you please highlight the upper right-hand

2  corner of Government's Exhibit 147?

3          What is that, Agent LoStracco?

4  A.  This is a date stamp and a time, as well as page 1 out of

5  200 -- sorry; 1 out of 2,827.

6  Q.  All right.  So that page that we just looked at of the FEC

7  form 3P, is that page 1 of the report?

8  A.  Yes.

9  Q.  All right.  So now let's move, Ms. Draughn, if you would, to

10  page 2 of this exhibit.  And, first, before we look at some of

11  the substance of it, could you just highlight that upper right

12  and corner, please, with the page number?

13          What page is this?

14  A.  2,459 of 2,827.

15  Q.  Now, we haven't looked at the page numbers of those other

16  two FEC reports that you showed the jury, but are they similar

17  in terms of the number of pages in each of these reports,

18  meaning thousands?

19  A.  Yes.  The reports typically filed by the Ron Paul

20  Presidential Campaign were thousands of pages.

21  Q.  So if you were to print those reports out, are we talking

22  about a volume that would fill all of those finders back behind

23  Ms. Campbell there?

24  A.  If you were to print all of the reports out, including the

25  amended reports, yes, I could see where that would happen.

1  Q.  Could we move to box B on this report?

2          All right.  Agent LoStracco, could you please tell the

3  jury what box B is?

4  A.  This is a disbursement to Interactive Communications, Inc.

5  The purpose of disbursement is audio/visual expenses.  The date

6  of disbursement is May 2, 2012, and the amount is $8,850.

7  Q.  What is the date of the e-mail that -- actually let's just

8  look at Government's Exhibit 89, which is already in evidence.

9          Ms. Draughn, could you please go ahead and highlight

10  that top e-mail from Dimitri Kesari to Fernando Cortes.

11          What is the date of this e-mail?

12  A.  May 2, 2012.

13  Q.  Is this the e-mail that Dimitri Kesari sent to Fernando

14  Cortes approximately nine minutes after his e-mail exchange with

15  Jesse Benton?

16  A.  Yes.

17  Q.  What is the date again that we just looked at on

18  Government's Exhibit 147 of the date of disbursement to

19  Interactive Communications, Inc., for an audiovisual expense?

20  A.  May 2, 2012.

21  Q.  Let's move now to some invoices in May of 2012.

22          Government Exhibit 90, please, Ms. Draughn.

23          MR. COONEY:  Move Government's Exhibit 90 into

24  evidence.

25

1                          (Government Exhibit 90 was

2                          offered in evidence.)

3          THE COURT:  Received.

4                          (Government Exhibit 90 was

5                          received in evidence.)

6    BY MR. COONEY:

7    Q.   What is Government Exhibit 90, Agent LoStracco?

8    A.   So the entire e-mail chain actually starts with an e-mail

9    from Sonny Izon to Kent Sorenson back on February 10, 2012, and

10   then includes Sonny Izon's e-mails to Kent Sorenson on May 1,

11   2012, where he is just checking in to see if he will be

12   forwarding invoices for April and beyond.

13   Q.   Ms. Draughn, could you please go to page 2 of this

14   exhibit -- well, actually before we do that -- that's all right.

15   If you could just tell the jury -- oops.  That's all right.

16          If you could point out for the jury, Agent LoStracco,

17   the last e-mail in the chain, so the top one for Re:  May

18   invoice, who's on that e-mail?

19   A.   Kent Sorenson to Sonny Izon and Dimitri Kesari.

20   Q.   Why don't we just go down to the middle of this page.

21          Thank you, yes.

22          All right.  And actually is this an mail that we've

23   already looked at?  No, hold on.

24   A.   No.

25   Q.   What is the date of this e-mail?

1  A.  May 2, 2012.

2  Q.  Who is this e-mail from?

3  A.  Kent Sorenson.

4  Q.  And can you go ahead and tell the jury to who?

5  A.  Yes; to Sonny Izon and to Dimitri Kesari.

6  Q.  All right.  And what does Kent Sorenson write?

7  A.  Regarding:  Additional invoices, question mark.

8          Hey, Sonny.

9          I am attaching the invoice for April.  I have been

10 caught up trying to wrap up a few things with session and just

11 have not had time to submit it.  Thanks for the e-mail.

12         We're doing great.  I hope you are as well.

13         Blessings.

14 Q.  Hold on just a second.  I want to make sure we're centered

15 on something.

16         All right.  Can you now move up to the next e-mail in

17 this chain dated May 17, 2012?

18 A.  On May 17, 2012, at 9:11 p.m., Sonny Izon wrote:

19         Hi, Kent.

20         I know you are wrapping up work on the campaign.  I

21 was wondering if you will be sending a full or partial invoice

22 for May.  Please advise.

23         Peace, Sonny.

24 Q.  Now, that last e-mail we looked at, May 2, that's the same

25 date of some of the e-mail exchanges we were looking at just a

1   moment ago with respect to the April invoice, correct?

2   A.  Correct.

3   Q.  All right.  Now, is there any response to that May 17

4   invoice?

5   A.  Yes.  So Kent Sorenson replies to Sonny Izon and Dimitri

6   Kesari on May 17, 2012, "I ha an agreement with Dimitri that

7   went through the month of June.  Thanks.

8           "Kent."

9   Q.  All right.  Can we now move to Government's Exhibit 87 --

10  I'm sorry, Ms. Draughn; to Government's Exhibit 92.

11          MR. COONEY:  Offer Government's Exhibit 92.

12                              (Government Exhibit 92 was

13                               offered in evidence.)

14          THE COURT:  Received.

15                              (Government Exhibit 92 was

16                               received in evidence.)

17  BY MR. COONEY:

18  Q.  Agent LoStracco, what is the date of this e-mail?

19  A.  May 24, 2012.

20  Q.  So how long after the last e-mail we just looked at?

21  A.  One week.

22  Q.  Who is this e-mail from and to?

23  A.  From Sonny Izon to Dimitri Kesari.

24  Q.  What is the subject?

25  A.  May invoice, and there's an attachment.

1  Q.  Could you please go ahead and read this e-mail to the jury.

2  A.  "Hi Dimitri,

3          "I hope this finds you well and not too crazy as you

4  wind down your operations for Ron.  I don't know when you guys

5  are going into closeout mode so I though I'd better send this

6  sooner than later.  I will have one last one to send for June

7  which I can also send ahead of time if that is helpful.  Please

8  advise.

9          "Peace, Sonny."

10 Q.  Let's move to Government's Exhibit 92, please -- excuse me,

11 to page 2 of Government's Exhibit 92.

12          What is Government's Exhibit -- or page 2 of

13 Government's Exhibit 92?

14 A.  This is, again, an invoice from Interactive Communication

15 Technology, Inc. to the Ron Paul Presidential Campaign,

16 attention:  Dimitri Kesari.  The date is May 25, 2012, for

17 production services, parentheses May, for the amount of $8,850.

18 Q.  And does this invoice from Interactive Communication

19 Technology to the Ron Paul Campaign have all of the same

20 constituents parts as the other invoices we've been looking at?

21 A.  Yes.

22 Q.  Is there any mention of Grassroots Strategy on this invoice?

23 A.  No.

24 Q.  Or Kent Sorenson?

25 A.  No.

1    Q.  Or consulting services?

2    A.  No.

3    Q.  I would like to back up to one that I missed, Government's

4    Exhibit 91, please.

5           MR. COONEY:  Move Government's Exhibit 91 into

6    evidence.

7                              (Government Exhibit 91 was

8                                offered in evidence.)

9           THE COURT:  Received.

10                             (Government Exhibit 91 was

11                               received in evidence.)

12   BY MR. COONEY:

13   Q.  You're going to have to look carefully at this one, Agent

14   LoStracco.  It's small.

15   A.  Yes.

16   Q.  What is Government's Exhibit 91?

17   A.  This is an e-mail from Kent Sorenson to Sonny Izon on

18   May 21, 2012, and it includes an attachment.

19   Q.  All right.

20   A.  Two attachments I believe.

21   Q.  Can you please read what Kent Sorenson wrote to Sonny Izon?

22   A.  Sonny, I wasn't real clear on your invoice request.  I am

23   attaching one that just has May and one that includes May and

24   June.

25           Thanks.

1          Kent.

2  Q.  And are there attachments to this?

3  A.  Yes.

4  Q.  Ms. Draughn, can we look at page 2?

5          And this e-mail was sent about three days before

6  Government's Exhibit 92 that we just looked at, correct, that

7  Sonny Izon sent to Dimitri Kesari with the ICT invoice?

8  A.  Yes, that's correct.

9  Q.  All right.  And what is this, Agent LoStracco?

10 A.  This is an invoice from Grassroots Strategy, Inc., to ICT,

11 Inc., with a date of May 31, 2012.

12 Q.  What is the project title?

13 A.  Consulting services.

14 Q.  What is the description of work?

15 A.  Provides monthly service for month of May 2012 in the amount

16 $8,000, cost $8,000.  Provides monthly service for the month of

17 June 2012, and the unit price is $8,000, cost $8,000, for a

18 total of $16,000.

19 Q.  And can we, please, move to page 3 of this exhibit,

20 Ms. Draughn?

21         And briefly, Agent LoStracco, what is this?

22 A.  This is an invoice from Grassroots Strategy also to ICT,

23 Inc., also dated May 31, 2012, only including in the description

24 the monthly service for the month of May 2012 in the amount of

25 $8,000.

1 Q. These two invoices that we've looked at, other than the

2 month that they are billing for services, do they look the same

3 as the other Grassroots to ICT invoices we've looked at?

4 A. Correct. The month that they're billing, the description,

5 and the unit price is different, and total price.

6 Q. Is there any mention on these invoices of audiovisual

7 services?

8 A. No.

9 Q. Or production services?

10 A. No.

11 Q. Or the Ron Paul Campaign?

12 A. No.

13 Q. Let's move to Government's Exhibit 93, please, which is

14 already in evidence.

15         What is Government's Exhibit 93 if you could just

16 remind the jury?

17 A. This is an e-mail from Dimitri Kesari to Fernando Cortes on

18 May 24, 2012, subject: Forward: May invoice, and there's an

19 attachment.

20 Q. What does it say?

21 A. This should be the last one.

22 Q. All right. If we could please look at page 2, the

23 attachment.

24         All right. Is this invoice that is attached from

25 Interactive Communication Technology to the Ron Paul Campaign

1  the same one that we saw in Government's Exhibit 92 that Sonny

2  Izon sent to Dimitri Kesari?

3          Go ahead and look back if you need to.

4  A.  Yes.

5  Q.  Again, what is its description?

6  A.  The description is production services, parentheses May.

7  Q.  So there's no mention of June on this one?

8  A.  No.

9  Q.  How much is it for?

10  A.  $8,850.

11  Q.  So how much more than the Grassroots Strategy did ICT

12  invoice this one?

13  A.  $850.

14  Q.  Is that the same increase that we saw in February, March and

15  April invoices that we've looked at?

16  A.  Correct.

17  Q.  Could we please take a look at Government's Exhibit 94.

18          MR. COONEY:  Mr. Starnes, do you have another notebook

19  there with Government's Exhibit 94 in it?

20          I move Government's Exhibit 94 into evidence.

21                              (Government Exhibit 94 was

22                               offered in evidence.)

23          THE COURT:  Received.

24                              (Government Exhibit 94 was

25                               received in evidence.)

1    BY MR. COONEY:

2    Q.  Agent LoStracco, could you please go down to -- actually I

3    think we need to go to page 2 of this exhibit.  Start at the

4    beginning, Ms. Draughn.

5              Thank you.

6              I just wanted to make sure I get the order right.

7              You know what, could I go ahead and take the Elmo for

8    this one, please?  I'm going to go ahead and take the Elmo for

9    this one, Ms. Draughn.

10             All right.  Here is what I would like to draw your

11   attention to, Agent LoStracco, on Government's Exhibit 94 is

12   this bottom e-mail right here from Fernando Cortes to John Tate.

13             Do you see that?

14   A.  Yes.

15   Q.  What is the date of that e-mail?

16   A.  May 29, 2012, at 9:38 a.m.

17   Q.  And if you could just look back yourself at Government's

18   Exhibit 93, what date was it that Dimitri Kesari sent that

19   invoice to Fernando Cortes?

20   A.  May 24, 2012, at 8:25 p.m.

21   Q.  So this is about five days later?

22   A.  Correct.

23   Q.  All right.  Could you please read this bottom e-mail here to

24   the jury?

25   A.  Fernando Cortes to John Tate:  Approved?  Dimitri said it is

1   the last one.

2   Q.  All right.  Now, is there an attachment to this e-mail?

3   A.  Yes.

4   Q.  I'm showing you page 3 of this exhibit.  And actually, you

5   know what, I'm not going to show you page 3 of this exhibit

6   because it's not redacted.

7            Is it in your notebook?

8   A.  Yes, and this one is redacted.  It just has the last four of

9   the routing and account number.

10  Q.  Great.  Thank you.

11           All right.  And my question to you, Agent LoStracco,

12  is simply this:  What is this attachment?

13  A.  It's another invoice from Interactive Communication

14  Technology, Inc., to the Ron Paul Presidential Campaign,

15  attention:  Dimitri Kesari, dated May 25, 2012, again for

16  production services in May for the amount of $8,850.

17  Q.  Is this the same attachment that was attached to

18  Government's Exhibit 93, the e-mail from Dimitri Kesari to

19  Fernando Cortes forwarding the May invoice on May 24, 2012?

20  A.  Yes.

21  Q.  What I would like to do now is move to what's already in

22  evidence, Government's Exhibit 95.

23           Thank you.

24           All right.  And, Ms. Draughn, if you could just focus

25  on the top two e-mails of this chain.

1          First, that bottom e-mail from Fernando Cortes to John

2     Tate dated May 29, 2012, is that the same e-mail we just looked

3     at in Government's Exhibit 93?

4     A.  Yes.

5     Q.  Excuse me; 94?

6     A.  94, correct.

7     Q.  With the attachment that we just looked at?

8     A.  Yes.

9     Q.  Is there a response reflected here now in Government's

10    Exhibit 95?

11    A.  Yes.  John Tate responds to Fernando Cortes May 29, 2012,

12    11:03 a.m., approved.

13    Q.  If we could now -- and what is the date of that e-mail

14    again?

15    A.  May 29, 2012.

16    Q.  Why don't we go back to Government's Exhibit 147, please,

17    Ms. Draughn.

18          And you have already identified this, Agent LoStracco,

19    as an FEC report for the Ron Paul Campaign covering the period

20    of May 1 through May 31, 2012?

21    A.  Correct.  This is the first page of that report, yes.

22    Q.  And you remember a few minutes ago we looked at page 2,459?

23    A.  Around there, yes.

24    Q.  All right.  Ms. Draughn, let's look at page 3 of this

25    report, please.  And if you could show -- actually before you

1    get there, Ms. Draughn, if you could just give the page number.

2           What is this page?

3    A.  2,801 out of 2,827.

4    Q.  Ms. Draughn, could you please highlight box A?

5           What is this?

6    A.  An itemized disbursement to Interactive Communications,

7    Inc., for the purpose of audio/visual expenses.  The date is

8    May 29, 2012, and the amount is $8,850.

9    Q.  Let's move on to one last set of invoices in June of 2012.

10          Ms. Draughn, if you could turn now to Government's

11   Exhibit 97.

12          MR. COONEY:  All right.  Move Government's Exhibit 97

13   into evidence.

14                              (Government Exhibit 97 was

15                              offered in evidence.)

16          MR. COONEY:  Is that received, Your Honor?

17          THE COURT:  Yes.

18                              (Government Exhibit 97 was

19                              received in evidence.)

20   BY MR. COONEY:

21   Q.  If you could go ahead and publish that, Ms. Draughn.

22          Agent LoStracco, what is this?

23   A.  This is e-mail chain between Sonny Izon and Dimitri Kesari.

24   Q.  And what does this e-mail chain reflect?

25   A.  Sonny Izon sending to Dimitri Kesari on June 18, 2012, a

1  June invoice.

2  Q.  Can you go ahead and read that, please?

3  A.  Yes.

4       Hi, Dimitri.

5       Hope you are well.  Since I will be on travel for the

6  for most of the rest of the month, I'm sending you the June

7  invoice.

8       Peace, Sonny.

9  Q.  Is there another e-mail in this chain from Sonny Izon to

10 Dimitri Kesari?

11 A.  Yes.  Sonny Izon to Dimitri Kesari on June 25, 2012,

12 forwarding the e-mail called June invoice.

13      Hey, Dimitri.

14      Here it is.  Thanks for everything.

15      Sonny.

16 Q.  All right.  Is there an attachment to this?

17 A.  Yes.

18 Q.  All right.  Ms. Draughn, could you please turn to page 3?

19      All right.  And what is this attachment?

20 A.  This attachment is again an Interactive Communication

21 Technology, Inc. invoice to the Ron Paul Presidential Campaign,

22 attention:  Dimitri Kesari.  The date is June 18, 2012 for

23 production services, parentheses, June, in the amount of $8,850.

24 Q.  All right.  A few minutes ago we looked at an invoice from

25 Grassroots Strategy, Inc., to ICT that contained a description

1  for services in May and in June?

2          Do you recall that?

3  A.  Correct.

4  Q.  Do you recall how much that one for June was in the exhibit

5  we looked at just a few minutes ago?

6  A.  $8,000.

7  Q.  All right.  How much is this invoice from ICT to the Ron

8  Paul Campaign?

9  A.  $8,850.

10  Q.  So that's a difference of $850?

11  A.  Correct.

12  Q.  Is that the same difference that we saw in invoices in

13  February, March, April, and May?

14  A.  Correct.

15  Q.  And, again, Agent LoStracco, is there any mention in this

16  ICT invoice of Kent Sorenson?

17  A.  No.

18  Q.  Or Grassroots Strategy?

19  A.  No.

20  Q.  Or consulting services?

21  A.  No.

22  Q.  Or political consulting?

23  A.  No.

24  Q.  Let's move to Government's Exhibit 98, which is already in

25  evidence.

1          That's great.  Thank you, Ms. Draughn.

2          Agent LoStracco, these bottom two e-mails starting

3  with the June 25 one from Sonny Izon and Dimitri Kesari, here it

4  is, thanks for everything, that's the e-mail we just looked at,

5  correct?

6  A.  Correct.

7  Q.  What happens after that?

8  A.  Dimitri Kesari forwards that e-mail or those two e-mails

9  from Sonny Izon to Fernando Cortes on June 25, 2012, at 5:24

10  p.m.

11  Q.  What does Dimitri Kesari write to Fernando Cortes?

12  A.  This is the last one.

13  Q.  What is the subject of this e-mail?

14  A.  Forward:  June invoice.

15  Q.  Is there an attachment?

16  A.  Yes.

17  Q.  Ms. Draughn, can we look at page 2?

18          Agent LoStracco, is this the exact same invoice that

19  was attached to Government's Exhibit 97 that we just looked at

20  that Sonny Izon sent to Dimitri Kesari?

21  A.  Just checking on the number.

22          Yes.

23          MR. COONEY:  Ms. Draughn, could you please put up

24  Government's Exhibit 99?

25          Mr. Starnes, could I have 99 in that book, please?

1          Thank you.

2          I would go ahead and move Government's Exhibit 99 into

3   evidence.

4                              (Government Exhibit 99 was

5                               offered in evidence.)

6          MR. COONEY:  You know what, do you mind if I take the

7   Elmo with this again?  I think it's a little bit easier?

8          THE COURT:  Received.

9                              (Government Exhibit 99 was

10                              received in evidence.)

11         MR. COONEY:  Thank you, Your Honor.

12  BY MR. COONEY:

13  Q.  All right.  So I want to start here with this e-mail, Agent

14  LoStracco, that I'm pointing at here from Fernando Cortes to

15  John Tate.

16         Do you see that e-mail?

17  A.  Yes.

18  Q.  All right.  What is the date of this e-mail?

19  A.  June 25, 2012, at 5:49 p.m.

20  Q.  What does the e-mail state?

21  A.  According to Dimitri is this the last one, parentheses again.

22         Approved?  8k.

23  Q.  Now, just prior to this e-mail, I want to bring you up to a

24  separate e-mail exchange between Katie Koerber and Fernando

25  Cortes on June 25, 2012, at 5:42 p.m.

1          Do you see that?

2   A.  Yes.

3   Q.  All right.  And do you see this information from Katie

4   Koerber here?

5   A.  Yes.

6   Q.  I want to just draw your attention real quick to the invoice

7   No. 201206515.

8   A.  I believe it's 615.

9   Q.  Thank you.

10          Your eyes I believe are better than mine.

11          Could you just go back to Government Exhibit 98 in

12  your book and just tell the jury whether that's the same invoice

13  number that is on the June production services invoice from ICT

14  to the Ron Paul Campaign?

15  A.  Yes; 20120615.

16  Q.  All right.  Let's go back down, and I'm going to turn to the

17  next one.  Fernando Cortes writes to John Tate at 5:49 p.m.,

18  correct?

19  A.  Correct.

20  Q.  I'm going to go to the next page.  Actually hold on for one

21  sec.

22          Is there an attachment reflected on the June 25, 2012,

23  5:49 e-mail from Fernando Cortes to John Tate?

24  A.  Yes.  It's ICT_JuneInvoice.

25  Q.  I'm going to show you the attachment associated with this.

1  And my question for you, Agent LoStracco, is that the exact same

2  invoice from ICT to the Ron Paul Campaign that is contained in

3  Government's Exhibit 98 that we just looked at a moment ago?

4  A.  Yes.

5  Q.  And this invoice number at the top, is that the same invoice

6  number on Katie Koerber's e-mail that we just looked at?

7  A.  It is.

8  Q.  So that invoice went to John Tate?

9  A.  Yes.

10  Q.  All right.  I'm going to go back to the e-mail chain.  All

11  right.  Right here, this is an e-mail from John Tate to Fernando

12  Cortes.

13          Do you see that at the top?

14  A.  Yes.

15  Q.  What does John Tate write to Fernando Cortes?

16  A.  I will find out what it is.

17  Q.  And that's at 5:59 p.m., correct?

18  A.  Correct.

19  Q.  Now, is there another e-mail from John Tate to Fernando

20  Cortes down below that here?

21  A.  Yes, at 6:24 p.m., about a half hour later.

22  Q.  What did John Tate write at 6:24 p.m., about a half hour

23  later?

24  A.  Approved.

25  Q.  Could we get back to Sanctions, please.

1      I want to go back in time before we continue with this

2  chain to an exhibit that's already in evidence, Government's

3  Exhibit 58.

4      Could you please put that up?  This is an e-mail from

5  February 16, 2012.  And could you please isolate the top e-mail

6  for us?

7      Do you recognize this e-mail, Agent LoStracco?

8  A.  Yes.

9  Q.  All right.  It's an e-mail from John Tate to Fernando Cortes

10  on February 16, 2012, that's already been presented to the jury,

11  right?

12  A.  Correct.

13  Q.  Can you go ahead and read that?

14  A.  From John Tate to Fernando Cortes, February 16, 2012, 12:47

15  p.m.  Subject:  Regarding COH with outstanding bills through

16  2/29.

17      To you only.  I just authorized one million dollars in

18  mail, and $750,000 dollars in TV ads.  Of course not all payable

19  now, or even this week.  But let's keep in mind.  Hold off

20  taking whatever invoices we can hold off on.

21      Cando can wait.  Wentzel can wait.  Dumas can wait.  I

22  think MPrinting can wait, question mark, question mark.

23  Valkyrie can wait.  Don't know what Interactive Communication

24  Technology is.

25  Q.  All right.  Now, let's go back now to the June e-mails,

1   Exhibit 101, which has not yet been admitted into evidence.

2                MR. COONEY:  I offer Government's Exhibit 101.

3                            (Government Exhibit 101 was

4                            offered in evidence.)

5                THE COURT:  Received.

6                            (Government Exhibit 101 was

7                            received in evidence.)

8   BY MR. COONEY:

9   Q.  All right.  I would like to draw your attention now -- Ms.

10  Draughn, if you could just go ahead and isolate from about

11  halfway down up.  Yep, that's perfect.

12               All right.  We're back to June 25, 2012.  This is the

13  e-mail from Fernando Cortes to John Tate; is that right?

14  A.  Correct.

15  Q.  All right.  That's the one we just looked at a minute ago?

16  A.  I believe so, yes.

17  Q.  Actually about two minutes ago, before the one I just showed

18  you, Government's Exhibit 99?

19  A.  Right.

20  Q.  What happened after the e-mail from Fernando Cortes to John

21  Tate stating, according to Dimitri, this is the last one again?

22  A.  John Tate responds to Dimitri Kesari -- or I'm sorry,

23  forwards to Dimitri Kesari the e-mail from Fernando Cortes on

24  June 25, 2012, at 6:00 p.m., attaching the June invoice.  What

25  is this?  What is it for, who is it?  Why do we keep paying

1  them?  The last payment was supposedly the last.

2          John.

3  Q.  And can we turn to page 3 of this exhibit?

4          Is that the exact same invoice we've been talking

5  about about June services attached to several of the last

6  e-mails we've been looking at?

7  A.  Yes.

8  Q.  So John Tate forwarded that on to Dimitri Kesari with his

9  question?

10  A.  Correct.

11  Q.  All right.  Now let's look at Government's Exhibit 102.

12          MR. COONEY:  Offer Government's Exhibit 102 in

13  evidence?

14                              (Government Exhibit 102 was

15                               offered in evidence.)

16          MR. WARRINGTON:  Objection, Your Honor;

17  authentication, and I would like to be heard.

18          THE COURT:  Go ahead.

19          MR. WARRINGTON:  Mr. Cooney is going to try to get

20  Agent LoStracco to offer this as an e-mail that was from one

21  individual to another individual, and there's a question as to

22  whether that was actually even received or sent on this e-mail

23  in particular, and there's expert testimony that's going to be

24  put on in this case that deals with this under (2)(E) Bell.

25          THE COURT:  Thank you.

1          The objection is overruled.

2          102 is received.

3          MS. CAMPBELL:  Your Honor, I actually have a separate

4     objection; hearsay for the first part.  I would just ask for a

5     limiting instruction that it not be offered for the truth of the

6     matter asserted against Mr. Benton.

7          THE COURT:  801(d)(2)(B) there.  So it's overruled.

8                              (Government Exhibit 102 was

9                              received in evidence.)

10          MR. COONEY:  You can go ahead and publish it,

11    Ms. Draughn.

12    BY MR. COONEY:

13    Q.  And, Ms. Draughn, can you just go ahead and highlight the

14    top half?

15          All right.  Now, Agent LoStracco, this bottom e-mail,

16    June 25, 2012, 5:59 p.m., from John Tate, what is this, what is

17    it for, et cetera, that's an e-mail that we just looked at,

18    right?

19    A.  Yes.

20    Q.  Is there a response from Dimitri Kesari to John Tate?

21    A.  Yes.  Dimitri Kesari responded also on June 25, 2012, within

22    20 minutes.

23    Q.  What did Dimitri Kesari write to John Tate?

24    A.  This the last payment for Kent Sorenson.

25          The deal Jesse agreed to with Kent.

1  Q.  I want to go back to some questions I asked you yesterday

2  about sources of documents and whatnot.

3       In this particular case some of the documents we've

4  been looking at, have you found them from multiple sources?

5  A.  Yes.

6  Q.  Would that include the Ron Paul Campaign?

7  A.  Yes.

8  Q.  And Dimitri Kesari's personal computer?

9  A.  Correct.

10  Q.  And the AOL and Gmail search warrants we talked about

11  yesterday?

12  A.  Yes.

13  Q.  This particular e-mail, where did you find this e-mail?

14  A.  If I could just look at the bottom to identify it.  I'm

15  sorry; page 2 or 3.

16       Yes.  So this came from Dimitri Kesari's computer.

17  Q.  Were you able to find this e-mail in -- or excuse me, was

18  this e-mail in the Ron Paul production?

19  A.  No, not that I'm aware of.

20  Q.  Was this the only source that you found this e-mail from?

21  A.  No.  We also received this from the AOL search warrant

22  production for Dimitri Kesari's e-mail.

23  Q.  Now, other e-mails that we have been looking at, were they

24  found from multiple sources?

25  A.  Yes, most of them.

1  Q.  So they might be found in Dimitri Kesari's computer?

2  A.  Yes.

3  Q.  In some of them, and the same e-mail might have very well

4  been produced by the Ron Paul Campaign, correct?

5  A.  Correct.

6  Q.  Or produced as well by the Jesse Benton grand jury subpoena?

7  A.  Yes.  Some e-mails we received multiple copies of.

8  Q.  But this particular one you only found in Dimitri Kesari's

9  computer and from the AOL search warrant?

10  A.  Yes, the AOL search warrant for Dimitri Kesari's e-mail.

11  Q.  Now, can we go back to page 1 of this e-mail and can you

12  just highlight the top, Ms. Draughn, so we can look at the date

13  and time?

14          What is the date and time of this e-mail?

15  A.  June 25, 2012, 6:22 p.m.

16  Q.  Could you please put up on split screen, Ms. Draughn,

17  Government's Exhibit 103 -- actually we can't do split screen

18  yet because it's not in evidence.  So just put up Government's

19  Exhibit 103 for Agent LoStracco.

20          MR. COONEY:  And I offer Government's Exhibit 103.

21                              (Government Exhibit 103 was

22                              received in evidence.)

23          THE COURT:  Received.

24                              (Government Exhibit 103 was

25                              received in evidence.)

1          MR. COONEY:  Ms. Draughn, could you please just

2    highlight the kind of first half?

3          Great.

4    BY MR. COONEY:

5    Q.  All right.  And just looking back down to June 25, 2012 at

6    5:59 p.m., that first e-mail from John Tate, what is this, what

7    is it for, that's one we've looked at; is that right?

8    A.  Correct.

9    Q.  All right.  Is there a response to that e-mail from Dimitri

10   Kesari in this thread?

11   A.  Yes.  Approximately 24 minutes later Dimitri Kesari responds

12   to John Tate:  It was for six months.

13   Q.  And is there a response from John Tate?

14   A.  John Tate replied to Dimitri Kesari, June 25, 2012, about a

15   minute later, at 6:24 p.m.:  Okay.  Thanks.

16   Q.  All right.  Now, this particular e-mail, Government's

17   Exhibit 103, from where did you obtain this e-mail?

18   A.  Again, I just need to see the last page.

19   Q.  If you want to look at --

20   A.  I don't have the binder up here.

21   Q.  I'm sorry.

22   A.  That's okay.

23          From the Ron Paul Campaign.

24   Q.  Pardon me.

25          Ms. Draughn, could you please put up Exhibit 103 and

1  102 split screen with each other?  And could you please just

2  isolate the top e-mails, the top two on both of them?

3          Thank you.

4          All right.  First, let's look at Government's Exhibit

5  102.  When Dimitri Kesari wrote to John Tate, this the last

6  payment for Kent Sorenson, the deal Jesse agreed to with Kent,

7  what time was that e-mail sent on June 25th?

8  A.  At 6:22 p.m.

9  Q.  And then if you could look above that at Government's

10 Exhibit 103 -- and I'm just going to draw the jury's attention

11 to it because it's kind of small there -- what time did Dimitri

12 Kesari write to John Tate in response to the same e-mail, it was

13 for six months?

14 A.  Approximately 6:23 p.m., a minute later.

15 Q.  And how long after that did John Tate respond to Dimitri

16 Kesari:  Okay, thanks?

17 A.  Approximately a minute later.

18 Q.  So all three of these e-mails occurred within approximately

19 two minutes of each other?

20 A.  Yes.

21 Q.  All right.  Let's look now, Ms. Draughn, at Government's

22 Exhibit 159.

23          MR. COONEY:  Offer Government's Exhibit 159.

24                          (Government Exhibit 159 was

25                           offered in evidence.)

1      THE COURT:  Received.

2                          (Government Exhibit 159 was

3                          received in evidence.)

4  BY MR. COONEY:

5  Q.  All right.  And you're going to have to blow it out a little

6  bit because of the question I'm going to ask, Ms. Draughn.

7          But could you just tell the jury what this exhibit is,

8  Government's Exhibit 159?

9  A.  Yes.  This is the e-mail exchange between Fernando Cortes

10  and John Tate, as well as John Tate and Dimitri Kesari, asking

11  about the invoice from ICT.

12  Q.  With the response that it was for six months?

13  A.  Correct.

14  Q.  So the same e-mail thread that we just looked at?

15  A.  Yes.

16  Q.  All right.  From where did you obtain Government's Exhibit

17  154 (sic)?

18  A.  Again, if we could blow it up.

19  Q.  I think you're going to have to go to page 2, Ms. Draughn.

20  A.  Yes.  This is from Dimitri Kesari's computer.

21  Q.  So this, for example, is a computer you found from more than

22  one source?

23  A.  Yes.

24  Q.  You got this one from the AOL search warrant as well as the

25  Ron Paul Campaign?

1  A.  Correct.

2  Q.  All right.  Let's move to Exhibit 104, which is already in

3  evidence.

4  A.  Well, we got it from Mr. Kesari's computer as well as from

5  the Ron Paul Campaign.

6  Q.  I misspoke when I said AOL search warrant, didn't I?  I'm

7  sorry.

8        So let's go to Exhibit 104, which is already in

9  evidence.  If you could just blow this up, and you could

10  actually just blow up the top half if you would.

11        Great.

12        All right.  This is already in evidence, but

13  June 25th, at 5:49 p.m., the e-mail from Fernando Cortes to John

14  Tate, according to Dimitri Kesari this is the last one, that's

15  what we looked at, correct?

16  A.  Correct.

17  Q.  Is there a response here from John Tate to Fernando Cortes?

18  A.  Yes.  John Tate responds to Fernando Cortes at 6:24 p.m.:

19  Approved.

20  Q.  And 6:24 p.m., that's the same time as the e-mail in

21  Government Exhibit 103, the response, okay, thanks, from John

22  Tate to Dimitri Kesari, right?

23  A.  Yes.

24  Q.  All right.  Then, finally, on these June invoices, let's

25  look at Government's Exhibit 148, please, Ms. Draughn.

1          And what is this again, Agent LoStracco?

2  A.  Again, this is the first page of a report of receipts and

3  disbursements from the Ron Paul 2012 Presidential Campaign to

4  the FEC.

5  Q.  What is the covering period?

6          Paragraph 5, Ms. Draughn.

7  A.  It's June 1, 2012, through June 30, 2012.

8  Q.  All right.  If we go to page 2 of this exhibit and if you

9  could go ahead and highlight box C.

10          What is box C, Agent LoStracco?

11  A.  This is an itemized disbursement to Interactive

12  Communications, Inc., in Hyattsville, Maryland.  Purpose of

13  disbursement, audio/visual expenses.  Date of disbursement,

14  June 27, 2012, and the amount is $8,850.

15  Q.  That amount of $8,850, is that the same amount in the

16  invoice from ICT to the Ron Paul Campaign that we just looked at

17  a few minutes ago?

18  A.  Yes.

19  Q.  And what is the date of this disbursement?

20  A.  June 27, 2012.

21  Q.  And the e-mail exchange between Dimitri Kesari and John Tate

22  that we just looked at, that was on June 25th of 2012, right?

23  A.  Correct.

24          MR. COONEY:  Your Honor, with the court's indulgence,

25  I've just got a few more questions for Agent LoStracco, but we

1    do have a witness travel issue, and so we would like to, if we

2    could, pause her, we'll bring on two witnesses that need to

3    travel, and then we'll finish her up.

4              THE COURT:  Any objection to that?

5              MR. BINNALL:  No objection.

6              MR. WARRINGTON:  No objection, Your Honor.

7              THE COURT:  That's what we're going to do.

8              You can step down.  Thank you, ma'am.

9              MR. PILGER:  The United States calls Michael Hartsock.

10             THE COURT:  So, sir, if you would come forward and

11   approach this woman, she'll administer your oath.

12             THE CLERK:  Please raise your right hand.

13             MICHAEL HARTSOCK, GOVERNMENT'S WITNESS, SWORN

14             THE CLERK:  Please be seated.

15                          DIRECT EXAMINATION

16   BY MR. PILGER:

17   Q.  Good afternoon.

18             Please state your name for the record.

19   A.  Michael Hartsock.

20   Q.  How do you spell Hartsock?

21   A.  H-A-R-T-S-O-C-K.

22   Q.  Where do you work?

23   A.  The Federal Election Commission.

24   Q.  And what's your job title?

25   A.  Branch chief.

1  Q.  Do you have a unit you're assigned to?

2  A.  Excuse me?

3  Q.  Is there a particular unit that you are assigned to?

4  A.  Yes; the reports analysis division.

5  Q.  And how long have you worked at the FEC?

6  A.  Twelve years.

7  Q.  And from your personal knowledge and experience at the FEC,

8  can you tell the jury whether or not the FEC publishes reports

9  that it gets?

10  A.  Yes.

11  Q.  How does it publish them?

12  A.  It publishes the reports as they are filed.

13  Q.  In what form?  They've got posts or do they do mail out

14  copies?  What do they do?

15  A.  They post those from the FEC's web site.

16  Q.  Okay.  And when do they post them?  Do they post them right

17  away or sometime later?

18  A.  Generally within one to two business days.

19  Q.  Okay.  And do the things that get posted by the FEC include

20  statements of organization?

21  A.  Yes.

22  Q.  Do they include form 3s reporting receipts and expenditures?

23  A.  Yes.

24  Q.  Ms. Draughn, if you could bring up 143 in evidence.  And if

25  we could focus on the very top block 1.

1          Preliminarily, is this a statement of organization as

2   we just discussed?

3   A.  Yes.

4   Q.  And does this statement of organization apply to a

5   particular campaign committee?

6   A.  Yes.

7   Q.  And what committee is that?

8   A.  Ron Paul 2012 Presidential Exploratory Committee.

9   Q.  And is there an e-mail address for contact of this

10  committee?  If we could scroll down a little bit, Ms. Draughn.

11          There we go.

12  A.  Yes.

13  Q.  And read that out for the jury.

14  A.  Deanawatts@comcast.net.

15  Q.  Thank you.

16          And, Ms. Draughn, if you could go down to block 2 of

17  this form.

18          Is that the date this form was filed?

19  A.  Yes.

20  Q.  And what date was that?

21  A.  April 26, 2011.

22  Q.  Ms. Draughn, could you go to block 4, please.

23          Does block 4 inform the FEC who the treasurer of the

24  campaign is?

25  A.  Yes.

1  Q.  And who is it in this case?

2  A.  Lori Pyeatt.

3  Q.  Ms. Draughn, if you could go to page 3 of this form, please,

4  block 7, does this form designate in block 7 a custodian of

5  records with the title assistant treasurer?

6  A.  Yes.

7  Q.  And who is listed?

8  A.  Deana Watts.

9  Q.  And does the next block, block 8, again list the treasurer?

10        That's good.  Thank you, Ms. Draughn.

11  A.  Yes.

12  Q.  Who is that?

13  A.  Lori Pyeatt.

14  Q.  And can we go to the last page, Ms. Draughn, to finish block

15  8?

16        Does this list a designated agent for the campaign

17  with the title assistant treasurer?

18  A.  Yes.

19  Q.  And who is that?

20  A.  Deana Watts.

21  Q.  Ms. Draughn, if we could go to Government's Exhibit 144 in

22  evidence, the first block and the caption.  Can you just capture

23  the very top as well?

24        Thank you, Ms. Draughn.

25        Is this another statement of organization?

1  A.  Yes.

2  Q.  And these are filed with the FEC and published on the

3  Internet, correct?

4  A.  Yes.

5  Q.  Is this for a different campaign entity?

6  A.  Yes.

7  Q.  And what is this campaign entity?

8  A.  Ron Paul 2012 Presidential Campaign Committee, Inc.

9  Q.  So the first one was an exploratory committee and this one

10  is a presidential campaign committee?

11  A.  Correct.

12  Q.  And, again, let's just make the whole page appear,

13  Ms. Draughn, and we'll see if Mr. Hartsock can read this.

14         You tell me if you have problems with this.  I want to

15  go quickly.  I know you have a flight.

16         Is deanawatts@comcast.net again listed for the e-mail

17  address?

18  A.  Yes.

19  Q.  Was this filed on May 13, 2011?

20  A.  Yes.

21  Q.  Is that when the exploratory committee shifted over to a

22  presidential campaign committee according to these forms?

23  A.  Yes.

24  Q.  Is Lori Pyeatt again listed as the treasurer at the bottom?

25  A.  Yes.

1  Q.  If we could go to page 3, Ms. Draughn, blocks 7 and 8.

2          There's block 7 to begin with.  Is Deana Watts again

3  listed as the custodian of records with the title assistant

4  treasurer?

5  A.  Yes.

6  Q.  And let's look at block 8 again quickly.  Is Lori Pyeatt

7  again designated as the treasurer?

8  A.  Yes.

9  Q.  And go to page 3 finally, completing block 8 at the top.  Is

10 Deana Watts the designated agent for this campaign with the

11 title assistant treasurer?

12 A.  Yes.

13 Q.  Thank you, sir.

14          Now, let's look at some reports of receipts and

15 disbursements.  Ms. Draughn, if you could bring up 145 in

16 evidence.

17          This is the front page of a report of receipts and

18 disbursements, correct?

19 A.  Yes.

20 Q.  And this is a form of the FEC?

21 A.  Yes.

22 Q.  Is this the kind of form that the committee would file to be

23 published immediately on the Internet?

24 A.  Yes.

25 Q.  When I say "immediately," that's my characterization.  You

1  said within how long?

2  A.  Generally one to two business days to allow for processing.

3  Q.  Okay.  Now, this is a report of the Ron Paul 2012

4  Presidential Campaign Committee, right?

5  A.  Yes.

6  Q.  And if we go to page 2 of this exhibit, block -- actually

7  the whole page, please, Ms. Draughn.

8       Hopefully it's big enough for you to see, but this is

9  page 5,858 of 6,676 pages, right?

10  A.  Yes.

11  Q.  And if we go to block C, is this filled in with all of the

12  information that the FEC requires to leave this published on the

13  Internet?

14  A.  Yes.

15  Q.  Turning to Government's Exhibit 146 in evidence.

16       Is this another form 3 of the Ron Paul 2012

17  Presidential Campaign Committee?

18  A.  Yes.

19  Q.  Turning to the second page of this exhibit at block C, is

20  this a report of an expenditure filled in with sufficient

21  information to remain published on the Internet?

22  A.  Yes.

23  Q.  Turning your attention to Government's Exhibit 147, is this

24  another form 3 report of receipts and disbursements from the Ron

25  Paul 2012 Presidential Campaign Committee?

1   A.  Yes.

2   Q.  Turning to page 2, block B.

3           Is this report of disbursements sufficiently filled

4   out to remain published on the Internet?

5   A.  Yes.

6   Q.  Lastly, turning to Government's Exhibit 148 in evidence.

7           Is this another report of receipts and disbursements

8   for the Ron Paul 2012 Presidential Campaign Committee?

9   A.  Yes.

10  Q.  Turn to the second page of this exhibit at block C.

11          Is this report of receipts and disbursements

12  sufficiently filled out to remain on the Internet?

13  A.  Yes.

14          MR. PILGER:  No further questions.

15          THE COURT:  Mr. Mills.

16          MR. MILLS:  If you'll bear with me while I get plugged

17  in.

18          (Pause.)

19                      CROSS-EXAMINATION

20  BY MR. MILLS:

21  Q.  Good afternoon, Mr. Hartsock.  My name is Laurin Mills, and

22  I'm counsel for John Tate.

23          You mentioned that the FEC posts campaign reports on

24  the Internet soon after they're filed; is that correct?

25  A.  Correct.

1  Q.  And let's go back to the fourth quarter of 2011.

2  Presidential campaigns were required to file reports on a

3  quarterly basis; is that correct?

4  A.  Presidential -- could you restate the question, please?

5  Q.  Presidential campaigns were required to file the reports on

6  a quarterly basis; is that correct?

7  A.  In 2011?

8  Q.  Yes.

9  A.  Yes.

10 Q.  And so the report for the fourth quarter ending December 31,

11 2011, when would that have been due?

12 A.  I believe that would be due January 31st of 2012.

13 Q.  And it's your testimony that would have been posted on the

14 Internet within a day or two of being filed; is that correct?

15 A.  Through the normal course of business, yes.

16 Q.  So that would be February 1st or February 2nd, 2012,

17 correct?

18 A.  Generally within that time frame.

19 Q.  And that would have been after the Iowa caucuses in early

20 January of 2012, correct?

21 A.  I do not know the date of the Iowa caucus in 2012.

22 Q.  And it would have been after the New Hampshire and South

23 Carolina primaries also held also in January of 2012, correct?

24 A.  Correct.

25 Q.  Now, you used the term sufficient to be published.  I would

1  like to explore that with you for a few moments, if you would.

2          The FEC is a federal regulatory agency, correct?

3  A.  Correct.

4  Q.  And one of the things that federal regulatory agencies do is

5  issue statements of policy; is that correct?

6  A.  Correct.

7  Q.  Okay.  And the FEC has position statements of policy,

8  correct?

9  A.  Yes.

10  Q.  And it publishes statements of policy in the Federal

11  Register?

12          MR. PILGER:  Objection; relevance, scope.

13          THE COURT:  What does the policy have to do with this?

14          MR. MILLS:  He's talking about sufficiency to be

15  published.  I want to explore that with him because there's

16  actually standards governing that.

17          THE COURT:  Well, then ask him first what he meant by

18  sufficiency when he used that term.

19          MR. MILLS:  Okay.  And also, Your Honor, I would like

20  a little latitude.  He's on our witness list, and I would like

21  latitude to explain these things with him beyond the scope of

22  cross.

23          THE COURT:  You know what I'm concerned about here.

24          MR. MILLS:  I'm not going to get into the law.

25          THE COURT:  Okay.  Thank you.

1    MR. MILLS:  I'm not going to get into the law.

2    THE COURT:  Then ask him what he meant by sufficient

3 because I think that will guide the rest of the legitimate

4 questions that are here.

5 BY MR. MILLS:

6 Q.  Okay.  When you said sufficient, what did you mean?

7 A.  I meant that if the committee files the report with the

8 information provided on the report, the FEC will publish it.  It

9 will go up on the Internet for public consumption.

10 Q.  So is it your testimony that regardless of what's on there

11 the FEC will publish it?

12 A.  Yes.  Whatever the committee files, the report will be

13 available for the public to see.

14 Q.  So there's no review by the FEC at that point?

15 A.  I did not say that.  The FEC does conduct review of the

16 reports after it is filed.

17 Q.  After it's filed.  And how long after?

18 A.  That would depend upon our internal policies.

19 Q.  Okay.  And for 2012, first quarter of 2012, when would the

20 FEC have reviewed the Ron Paul Campaign's report?

21    MR. PILGER:  Objection; relevance of when it would be

22 reviewed.

23    THE COURT:  Overruled.

24    Answer the question.

25 A.  I could not say for certain when the report was reviewed.

1  BY MR. MILLS:

2  Q.  I don't want this published to the jury yet, but I would

3  like to direct your attention to what has been marked as Tate

4  Exhibit No. 1.

5           Do you see that in front of you yet?  You'll see I

6  culled out the title of this.

7           MR. PILGER:  Objection.  Objection to anything to do

8  with this.

9           THE COURT:  He can ask the question.  Let's wait until

10 he asks the question.

11 BY MR. MILLS:

12 Q.  This is called Statement of Policy:  Purpose of disbursement

13 entries for filings with the commission.

14          Do you see that?

15 A.  I do see it on my screen.

16 Q.  Okay.  And are you familiar with the statement of policy?

17 A.  Not offhand, no, I'm not.

18 Q.  So you're with the reports and analysis division; is that

19 correct?

20 A.  That is correct.

21 Q.  And you're not familiar with the FEC statement -- with the

22 FEC's policies on the purpose of disbursement entries?

23          MR. PILGER:  Objection as to this policy, which is not

24 in evidence, which we'll object coming into evidence on the

25 court's prior rulings.

1    THE COURT:  He answered that question.  He said he's

2 not familiar with this document.

3 BY MR. MILLS:

4 Q.  Okay.  Are you -- let me ask you this.  I'll show you a

5 different document.

6    In front of you is Tate Exhibit No. 2.

7    Have you ever seen Tate Exhibit No. 2 before?

8 A.  Yes.

9 Q.  And, in fact, it's published on the Internet, isn't it?

10 A.  Yes, I believe so.

11 Q.  And it's titled Examples of Adequate Purposes, right?

12    MR. PILGER:  Objection.  This goes to the law.  It's

13 for the court.

14    THE COURT:  I don't think this is the law.  Why is

15 this the law?

16    MR. PILGER:  Because he's taking internal policy type

17 documents from the FEC and trying to make that define what the

18 offense is.

19    THE COURT:  Overruled.

20 BY MR. MILLS:

21 Q.  The document is entitled Examples of Adequate Purposes,

22 isn't it?

23 A.  Yes.

24 Q.  And it gives a listing of adequate purposes; is that

25 correct?

1  A.  Yes.

2  Q.  And if you -- can you review the list of adequate purposes

3  and just let me know if audiovisual expenses is considered one

4  of the adequate purposes by the Federal Election Commission?

5  A.  That purpose of disbursement is not on this list.  However,

6  this list is considered to be non-exhaustive.

7  Q.  It's non-exhaustive.  So you have a secret list that the FEC

8  keeps?

9        MR. PILGER:  Objection; argumentative.

10        THE COURT:  No.

11        Answer the question.

12  A.  We have internal policy clarifications that we also follow

13  that are not shared with the public.

14  BY MR. MILLS:

15  Q.  They're not shared.  So Ms. Pyeatt and Ms. Watts would have

16  no idea of knowing what those were, correct?

17  A.  Correct.

18  Q.  And if you turn to the second page of Tate Exhibit No. 2 --

19  and I'm going to cull out a section called Adequate

20  Consultant/Consulting Purposes.

21        Do you see that?

22  A.  Yes.

23  Q.  And it says, while consulting is not an acceptable purpose,

24  specifying the type of consulting services provided can help to

25  ensure that the purpose is considered adequate.

1       Do you see that?

2  A.  Yes.

3  Q.  Okay.  So if someone merely puts consulting in the

4  description block, the FEC does not consider that adequate,

5  correct, according to this policy?

6  A.  Correct.

7  Q.  Does the FEC keep a list of inadequate descriptors?

8  A.  Excuse me, inadequate what?

9  Q.  Of inadequate descriptors.

10  A.  Purposes of disbursement?

11  Q.  Yes.

12  A.  They also post a list on the web site such as this for

13  inadequate purposes, and, again, it is a non-exhaustive list.

14  Q.  And audiovisual expenses isn't on that list, is it?

15  A.  I don't know.  I don't have that in front of me.

16  Q.  Well, let me go back.  Let's go back to Tate Exhibit No. 1.

17        And if you turn to the second page -- and let me know

18  if you need me to cull something out here; but this has a list

19  of inadequate purposes, doesn't it?

20  A.  Yes.  It does have a list contained in the document.

21  Q.  And do you see audiovisual expenses being listed as an

22  inadequate category?

23  A.  I do not see that listed here.

24  Q.  Okay.  So under the FEC's policies, the term "audiovisual

25  expenses" is neither considered a de facto adequate purpose or

1  an inadequate purpose; is that right?

2  A.  We would not consider it to be an inadequate purpose.

3  Q.  You would not consider it to be an inadequate purpose?

4           MR. PILGER:  Asked and answered.

5  BY MR. MILLS:

6  Q.  Okay.  Is that because it's on your secret list of adequate

7  purposes?

8           MR. PILGER:  Argumentive.

9           THE COURT:  Sustained.  He said there wasn't one.

10          Go ahead.

11 BY MR. MILLS:

12 Q.  Okay.  Do you have an internal list of inadequate purposes?

13 A.  We have internal confidential policy clarifications.

14 Q.  And those are not shared with the public?

15 A.  That is correct.

16 Q.  Okay.  So a member of the public or a treasurer of a

17 campaign committee would have no way of knowing what the FEC

18 regulators consider inadequate; is that correct?

19          MR. PILGER:  Objection; relevance.

20          THE COURT:  Sustained.

21 BY MR. MILLS:

22 Q.  It's true that the term "audiovisual expenses" -- strike

23 that.

24          The FEC has never published any document available to

25 the public that says that audiovisual expenses are an inadequate

1  descriptor, have they?

2       MR. PILGER:  Objection.  Same objection.  This is

3  entirely irrelevant.

4       THE COURT:  Sustained on foundation grounds.

5       MR. MILLS:  Okay.  Your Honor, I have nothing further

6  of the witness.

7       THE COURT:  Okay.  Do you, Mr. Binnall?

8       MR. BINNALL:  No, Your Honor, not at this time.

9       THE COURT:  Do you, Ms. Campbell?

10      MS. CAMPBELL:  Yes, Your Honor.

11      May I have one moment to confer with counsel?

12      THE COURT:  You may.

13      (Defense counsel conferring.)

14      MR. MILLS:  Your Honor, one moment.

15      I would like to move Tate Exhibit No. 2 into evidence.

16                      (Defendant's Exhibit T2 was

17                       offered in evidence.)

18      MR. PILGER:  I don't have that on the screen in front

19  of me.  If it's any of what we saw, we object.

20      THE COURT:  It's not the Code of Federal Regulations.

21  Part 2 is received.

22      MR. MILLS:  Thank you, Your Honor.

23      MR. WARRINGTON:  We would move Tate 2, Your Honor, on

24  our part.

25

1          (Defendant's Exhibit T2 was

2          received in evidence.)

3          CROSS-EXAMINATION

4  BY MS. CAMPBELL:

5  Q.  Good afternoon, sir.  I'm Angela Campbell.  I represent

6  Jesse Benton.

7          Did you review the entirety of the Ron Paul

8  Presidential Committee FEC reports?

9  A.  No.

10 Q.  How many pages of it did you review?

11 A.  I reviewed the pages that were shown in court here today.

12 Q.  Okay.  And do you have any idea how many pages the fourth

13 quarter filings from 2011 were for the Ron Paul Presidential

14 Campaign Committee?

15 A.  I could not say for certain.

16 Q.  Are they often very long, these reports?

17 A.  They certainly can be very long reports.

18 Q.  Tens of thousands of pages?

19 A.  In some cases.

20 Q.  And then once they file in 2011, you said that those are

21 quarterly.  In 2012, they're filed monthly; is that right?

22 A.  That is correct.

23 Q.  And those are often thousands of pages each month, right?

24 A.  They can be.

25 Q.  And is it common to file amendments to FEC reports?

1  A.  Amendments can be filed to reports.

2  Q.  Now, on the pages that you looked at on the FEC report, did

3  you ever see the name "Jesse Benton"?

4  A.  No.

5  Q.  Okay.  Do you even know Jesse Benton?

6  A.  No.

7  Q.  Have you ever talked to him?

8  A.  No.

9  Q.  Have you ever asked him any questions about these FEC

10 reports?

11 A.  No.

12 Q.  To your knowledge, has he signed any of these FEC reports?

13 A.  No.

14 Q.  Now, you said that a presidential campaign files its reports

15 electronically and they go up on the web site of the FEC; is

16 that right?

17 A.  Yes.

18 Q.  And is that all automated?

19 A.  If the committee files electronically, yes, there is an

20 automated process.

21 Q.  Okay.  So Lori Pyeatt pushes a button and submits the report

22 to the FEC server.  Is there anything else that happens before

23 it shows up on the Internet?

24 A.  I believe it goes through certain specification checks for

25 our servers to make sure that it can be accepted by our web

1  site.  However, that is not my job at the FEC.

2  Q.  Okay.  So is that a person or a computer that is checking

3  that?

4  A.  We have automated systems and we also have individuals that

5  are looking at these issues as well at the FEC.

6  Q.  So do you know whether or not there's any review of the

7  substance of the reports in that process?

8  A.  No.

9  Q.  You don't know?

10  A.  I'm not sure what goes into that as far as the person

11  looking at the reports.

12  Q.  Okay.

13  A.  I believe it is an automated process.

14  Q.  And then you said that your division reviews reports; is

15  that right?

16  A.  Yes.

17  Q.  How do you get the job to be the person to review the

18  report?  Is there training involved?

19  A.  Yes.

20  Q.  Do you have to have a four-year degree?

21  A.  That is one of the requirements for the campaign finance

22  analyst position.

23  Q.  And does a campaign financial analyst have to do special

24  training other than the four-year degree?

25  A.  They receive training when they begin their employment at

1  the FEC.

2  Q.  And what kind of training is that?

3  A.  They learn how to be an analyst and they learn our policies

4  and our procedures.

5  Q.  Your internal policies and procedures; is that right?

6  A.  Yes.

7  Q.  Those are the secret ones that we don't get to know about?

8  A.  Our policy is posted on the web site.  The reports analysis

9  division policy is posted on the web site.  However, certain

10  portions of it are redacted.

11  Q.  So there are parts of the policies and procedures that the

12  public doesn't get to know?

13  A.  Yes.

14  Q.  Now, an analyst then reviews the report; is that right?

15  A.  Yes.

16  Q.  And after they've gotten their training, right?

17  A.  Excuse me?

18  Q.  After they've gotten their training; is that right?

19  A.  They begin review of reports after they have been trained,

20  correct.

21  Q.  How many weeks long is the training?

22  A.  It is generally two to three months of training.

23  Q.  And then once they start reviewing reports, you said we have

24  two exhaustive lists; is that right?  An adequate purposes list

25  that's non-exhaustive and an inadequate purposes list that is

1  non-exhaustive; is that right?

2  A.  Both lists are non-exhaustive.

3  Q.  And then there's another list that is redacted and the

4  public doesn't know?

5  A.  We have internal policy clarifications and procedures that

6  are not shared with the public.

7  Q.  And we've seen the adequate purposes list --

8         MR. PILGER:  The government renews its objection on

9  these lists.  The court has already ruled this is irrelevant to

10  the topic being addressed by this witness and to this case.

11         THE COURT:  This isn't the law.  This is what the

12  agency is telling people is a sufficient purpose.

13         MR. PILGER:  I'm not arguing that point with the

14  court.

15         THE COURT:  Okay.

16         MR. PILGER:  The inexhaustive list of adequate or

17  inadequate purposes --

18         THE COURT:  It says examples on it and from that you

19  can argue what you want and they can argue what they want.

20  BY MS. CAMPBELL:

21  Q.  I'm going to hand you what I've marked as B27.

22         Do you recognize that document, sir?

23  A.  Yes.

24  Q.  And what is B27?

25  A.  B27 is Defendant's Exhibit.

1    Q.  Yes.  What is the list of?

2    A.  It's examples of inadequate purposes.

3    Q.  Are those examples that are posted on the FEC web site?

4    A.  I believe this is the list that is posted on the web site.

5    Q.  And that is what is available to the public; is that right?

6    A.  I believe so.

7            MS. CAMPBELL:  We would offer Defendant's Exhibit B27.

8                         (Defendant's Exhibit B27 was

9                          offered in evidence.)

10           MR. PILGER:  No further objection.

11           THE COURT:  Received.

12                       (Defendant's Exhibit B27 was

13                        received in evidence.)

14   BY MS. CAMPBELL:

15   Q.  Now, sir, once the analyst reviews the report, it's already

16   been on the web site for how long approximately?  Give me a

17   range.  I know it varies probably, but --

18   A.  Several days to several months.

19   Q.  Okay.  And do they review every page of the report?

20   A.  Yes.

21   Q.  A person reviews every page of the report?

22   A.  Yes.

23   Q.  How long does that take?

24   A.  That would depend upon the size of the report.

25   Q.  Okay.  How about one that is 7,433 pages, how long would

1  that take?

2  A.  I could not give you the specific amount of time that would

3  take to review the report.

4  Q.  More than an hour?

5  A.  Yes.

6  Q.  More than two hours?

7  A.  Yes.

8  Q.  More than ten hours?

9  A.  I cannot say for certain.  I do not know.

10 Q.  But you've done it before, though, right?

11 A.  I have reviewed reports.

12 Q.  I mean, these things are -- I mean, have you ever printed a

13 17,000 page report before?

14 A.  Yes.

15 Q.  How long does it take to print?

16 A.  A long time.

17 Q.  Have you ever reviewed a 17,000 page report on an iPhone?

18 A.  No.

19 Q.  And how long would it take to --

20          MR. PILGER:  Objection; cumulative.  I think we get

21 the point.

22          THE COURT:  Overruled.

23 BY MS. CAMPBELL:

24 Q.  How long then would it take to complete the review of a

25 monthly report during a presidential campaign?

1 A.   I cannot say for certain.

2 Q.   Fair to say that someone with a different full-time job

3 working on the campaign probably wouldn't be reviewing this in

4 the same detail as an analyst?

5 A.   I couldn't say for certain.

6 Q.   Now, when you said that analysts review it using their

7 secret policy, let's pull up Government's Exhibit 146 if we can.

8           Are you plugged in?  It's already admitted.

9           And go to the second page.  Now, if you could blow up

10 that top so we can see how many pages up here on the top right.

11 Do that whole box, though.

12           So this is a 4,661 page report; is that right?

13 A.   Yes.

14 Q.   And this is on page 4,317; is that right?

15 A.   Yes.

16 Q.   Now, we see for line number, check one only.  Is that an

17 area that the analyst would review?

18 A.   Yes.

19 Q.   And what's it mean that it's checked box 23?

20 A.   For this specific form, it means that it is a federal

21 operating expenditure of the committee.

22 Q.   Okay.  What's box 24 mean?

23 A.   I believe that is transfers between unauthorized committees;

24 but I do not have those instructions in front of me.

25 Q.   Okay.  So you think it is, but you're not sure?

1  A.  That is correct.

2  Q.  Do you know box 25?

3  A.  I would need the form instructions in front of me.

4  Q.  26?

5  A.  I do not know.

6  Q.  They're for other things, would that be right, other than

7  operating expenses?

8  A.  I do not know.

9  Q.  Okay.  Let's then go to -- but that's the area that the

10  analyst reviews, right?

11  A.  They would be checking the line item.

12  Q.  So they would be making sure that our operating expenses

13  have box 23 checked, for example, right?

14  A.  Yes.

15  Q.  Okay.  Let's blow up in the Interactive Communication

16  Technology's box there C.  There you go.

17         Do they check through the name that's in box C there

18  under full name?

19  A.  Yes.

20  Q.  Now, sometimes are there reports that have that line blank?

21  A.  Not to my knowledge.

22  Q.  So there has to be a name in that blank, right?

23  A.  The full name is one of the required fields of the form.

24  Q.  Okay.  So the analyst is checking for that box; is that

25  right?

1  A.  Yes.

2  Q.  And then the address and city and all of that has to be

3  filled in?

4  A.  Yes.  Those are required by the form.

5  Q.  And then the purposes of disbursement has to be filled in?

6  A.  Yes.

7  Q.  How about category type?

8  A.  This is not required by the form.

9  Q.  Because the form has it on it, right?

10  A.  Yes.

11  Q.  But it's not required?

12          MR. PILGER:  Asked and answered.

13          THE COURT:  Overruled.

14          Answer the question.

15  BY MS. CAMPBELL:

16  Q.  But it's not required?

17  A.  It is not.

18  Q.  But this one has a code in it.  Do you know what that means?

19  A.  Yes, I do.

20  Q.  And what does it mean?

21  A.  It's an internal tracking code that the committee's filing

22  software uses to categorize different types of transactions.

23  Q.  So that's something that the software is doing for the

24  committee for them to track; is that right?

25  A.  Correct.

1  Q.  And then what happens -- you said if someone checks it.  Are

2  you looking for something?

3  A.  Checks what?

4  Q.  Checks every page, every entry.  Is there a threshold that

5  you're looking for?

6  A.  The analyst is looking to make sure that all of the

7  information is provided.

8  Q.  Okay.  My question is, is there some sort of threshold that

9  would cause the analyst to do something?

10 A.  Yes.

11 Q.  Okay.  And is that threshold something that you're able to

12 tell us?

13 A.  No.

14 Q.  So there's a threshold by which the FEC decides whether or

15 not they're going to do anything with the report, but you won't

16 tell anybody what the threshold is?

17        MR. PILGER:  Objection; relevance.  If it's not

18 applicable to this entry, it's irrelevant.

19        THE COURT:  Pose a new question.  That was compound.

20 So I don't know what he's going to answer and I don't know which

21 one the objection went to either.

22        MS. CAMPBELL:  Okay.

23 BY MS. CAMPBELL:

24 Q.  So there's a threshold by which an analyst might do

25 something with an entry; is that right?

1  A.  Yes.

2  Q.  And that threshold is not public; is that right?

3  A.  Correct.

4  Q.  And so you're not able to tell us whether or not this even

5  meets the threshold?

6  A.  Those policy thresholds are considered confidential and not

7  shared with the public.

8  Q.  So even if it was -- had -- and the threshold, is that in

9  the amount of disbursement area?  Is that where the threshold

10  comes in?

11  A.  I'm not comfortable discussing the policy thresholds.  I've

12  been advised by FEC counsel that that is privileged information.

13          MR. PILGER:  For the record, Your Honor, myself,

14  Ms. Campbell, Mr. Hartsock attended meetings with FEC counsel,

15  and he was instructed by them not to reveal certain thresholds.

16          MS. CAMPBELL:  Can I keep going?

17          THE COURT:  Yes.  What are you looking at me for?

18          MS. CAMPBELL:  I don't know.  He talked to you so I

19  was waiting for you to talk.

20          THE COURT:  Yeah, okay.

21  BY MS. CAMPBELL:

22  Q.  So what's the law?  So you're just following the advice of

23  FEC counsel?

24  A.  Yes.

25  Q.  Okay.  So your testimony is you can't tell us whether or not

1    the analyst would do something different on this or whether it

2    even meets the threshold?

3    A.  I cannot tell you.

4          MS. CAMPBELL:  No further questions, Your Honor.

5          THE COURT:  Anything else, Mr. Pilger?

6          MR. PILGER:  Yes.  May it please the court.

7                      REDIRECT EXAMINATION

8    BY MR. PILGER:

9    Q.  You testified on direct when you had those blocks in front

10   of you that the blocks were sufficient to remain published.

11         Do you recall that?

12   A.  Yes.

13   Q.  And then we took a long detour through possibilities of

14   thresholds not being met, right?

15   A.  Yes.

16   Q.  Okay.  Let's get 145 back up, please, Ms. Draughn, page 2,

17   block C.

18         Mr. Hartsock, if you're reviewing this page by page,

19   item by item, is it going to take you any longer than it did

20   when you looked at it on direct?

21   A.  No.

22   Q.  And can you tell by looking at this whether either your

23   confidential thresholds or any other policy would lead you to

24   take this down from publication or take any other action that

25   might lead it to stop being published this way?

1          MR. MILLS:  Objection, Your Honor.  There's no

2    foundation.  He's refused to testify to it.

3          THE COURT:  Okay.  You finally got me on wanting a

4    side-bar.

5          We're having a side-bar.  We'll be right back in three

6    or four minutes.

7          (At side-bar, out of the hearing of the jury.)

8          THE COURT:  All right.  Here is what I understand to

9    be going on, and I think I'm right; but that's why we're having

10   a side-bar.  When he examines this, he's looking to make sure

11   all of the appropriate boxes are filled in and he's not looking

12   behind it, he's not second guessing whether Interactive

13   Communication Technology was the real payee.  He's not second

14   guessing whether $17,700 was paid.  He's just making sure that

15   all of the boxes are filled in, right?

16         MR. PILGER:  There's a little more to it, so I have to

17   proffer.  I do not know the thresholds, but the FEC has -- there

18   might be a financial amount that would trigger further review

19   even if it was filled in, but this doesn't do it.  So this is

20   irrelevant.

21         THE COURT:  Of course, this is like the Internal

22   Revenue Service or any other regulatory agency; there's some

23   things that get their attention.

24         MR. PILGER:  Exactly.

25         THE COURT:  And some things that don't.  But the point

1   of his examination of it is they're simply looking to make sure

2   all of the boxes are filled.  Yeah, there might be something in

3   there that causes someone to say, hey, this looks fishy and so a

4   regulator would look at that.  Is it more than that?

5           MS. CAMPBELL:  It is, Your Honor, because one of the

6   elements of one of the charges is that they have to prove and

7   they've alleged that the FEC would have done something

8   differently if they had accurately reported it, and we're just

9   trying to explore what the agency would have done differently.

10          MR. PILGER:  That's not what we've alleged and have to

11  prove.  We have to prove that there's a false statement in

12  there.

13          MR. MILLS:  It's got to be material.

14          MR. PILGER:  Okay.

15          MS. CAMPBELL:  There's one of them that says that the

16  agency has to act differently.

17          THE COURT:  But the materiality is provided by the FEC

18  statute which says that they have to list the recipient and the

19  purpose.

20          MR. MILLS:  That's not what your instruction said in

21  the last case.  The instruction was they would have to do

22  something different, and that's the standard materiality

23  instruction.

24          THE COURT:  Now we're talking about two different

25  things.  Materiality is whether it has the ability to affect an

1    agency decision.

2              MS. CAMPBELL:  Right.

3              MR. MILLS:  Uh-huh.

4              THE COURT:  But when he's looking to make sure that

5    all of the boxes are filled in, he's simply saying that he's not

6    going to second guess whether Interactive Communication

7    Technology was really the recipient of this money.

8              MR. MILLS:  I agree with that.

9              MR. WARRINGTON:  And if it's below the threshold, it's

10   never going to affect agency decision.

11             MR. MILLS:  And he won't say -- what I objected to,

12   Mr. Pilger, without giving us what the secret standard is,

13   letting him express an opinion, you know, if checking the box is

14   fine, but anything else I think he's either got to come out with

15   a standard or he can't answer it.

16             MR. PILGER:  You're way off in the weeds.  Our theory

17   is this is entirely false, but it was done in a way that it

18   would go through and get published.

19             MS. CAMPBELL:  But it's going to get published anyway.

20   It's auto published.  So if we're going the next step, we're

21   trying to disprove, which is harder, that anything else would

22   have happened.  If they would have put Kent Sorenson's

23   endorsement on that, nothing different would have happened.

24             MR. PILGER:  I don't think I have to say anything

25   different unless the court wants me to say so.

1          THE COURT:  It's about lying about $200 worth of

2   income on your tax return.  You're not going to trigger anything

3   from the IRS about lying about $200 worth of income, but it

4   still is a false statement made to the IRS.

5          MR. BINNALL:  But the difference there is that can

6   actually increase the amount that you owe due to the IRS.

7   There's nothing here in this record that would suggest anything

8   would be different at all just based on the face of these

9   records.

10          THE COURT:  And it's a difference of who cares.  I

11  mean, in the FEC case, it's the public as well.

12          MR. WARRINGTON:  And here is the other point, Your

13  Honor -- and this is a fine distinction; it's a factual

14  distinction -- is that the payment actually was made to ICT.

15  That is correct, and we've gone over that, we've argued that.  I

16  understand your ruling on that; but at the end of the day, when

17  you get down to whether the report is sufficient to meet that

18  threshold, if you don't know what the threshold is, how can you

19  possibly have any way of complying with the law?

20          MR. PILGER:  We're back in the weeds, Your Honor.

21          MS. CAMPBELL:  It has to affect the action of the

22  agency.  You have to intend to be causing the agency to do

23  something they wouldn't have done.

24          MR. MILLS:  If they had listed campaign consulting on

25  that, they wouldn't know anything more about Grassroots Strategy

1   or Kent Sorenson or anybody else, and so that's the issue here.

2           MR. PILGER:  With the tax analogy, Your Honor, if the

3   IRS gets a false return with understated income by a hundred

4   thousand dollars and it doesn't find out about it, it doesn't do

5   anything, and the government comes along later and finds out by

6   an FBI search warrant, brings a tax charge, that's a viable

7   false statement on a tax return.

8           THE COURT:  So what do you yet intend to do on

9   redirect?

10          MR. PILGER:  I'm going to spend a couple of minutes

11  cleaning this up.

12          THE COURT:  More specific than cleaning it up.  What

13  do you want him to say?

14          MR. PILGER:  I'm going to establish that the process

15  of reviewing this particular kind of item takes seconds; that

16  when he talks about the varying amounts of time, that would

17  depend on whether problems arose with other types of entries

18  that are not like this and establish that this one just gets a

19  pass just in the few seconds that he did, and that's about it.

20          THE COURT:  Okay.  We'll do that.

21          Thanks.

22          (In open court, in the presence of the jury.)

23          MR. PILGER:  May it please the court.

24          THE COURT:  Yes.

25  BY MR. PILGER:

1  Q.  Taking up right where we left off, Mr. Hartsock, so you

2  talked about this particular block and several others on direct

3  testimony, correct?  This is block C of Government's Exhibit 145

4  for the record, right?

5  A.  Yes.

6  Q.  You took a couple of seconds to look at it, right?

7  A.  Yes.

8  Q.  And then you told the jury that this would be sufficient to

9  remain published on the Internet, correct?

10  A.  Yes.

11  Q.  And as sufficient, there would be no further action that you

12  would take on this, right?

13  A.  The reports analysis division would take no further action.

14  Q.  So that few seconds is all that we're talking about?

15  A.  Yes.

16  Q.  This doesn't involve any of the thresholds that the defense

17  counsel was talking to you about?

18  A.  Yes.

19          MR. PILGER:  If I may, Ms. Campbell, may I borrow one

20  of those books?

21          MS. CAMPBELL:  Right here.

22          MR. PILGER:  Last question, Your Honor.

23  BY MR. PILGER:

24  Q.  If someone wanted to hide a false entry in its reports to

25  the FEC, is putting it into one line item in a book like this a

1    good way to do it?

2              MR. MILLS:  Objection, Your Honor.

3              THE COURT:  Overruled.

4              Answer the question.

5              Did you finish your question?

6              MR. PILGER:  Yes, sir.

7              THE COURT:  Answer it.

8    A.  Yes.

9              MR. PILGER:  No further questions.

10             THE COURT:  Mr. Mills, anything else?

11             MR. MILLS:  Nothing from me, Your Honor.

12             THE COURT:  Mr. Binnall?

13             MR. BINNALL:  Nothing from me, Your Honor.

14             THE COURT:  Ms. Campbell?

15             MS. CAMPBELL:  Just one question, Your Honor.

16                        RECROSS-EXAMINATION

17   BY MS. CAMPBELL:

18   Q.  Sir, if someone wanted to hide a payment, wouldn't they just

19   not put it in the book at all?

20   A.  That's a possibility.

21             MS. CAMPBELL:  Thank you.

22             THE COURT:  Thank you, sir.  You're excused.

23                              (Witness excused.)

24             THE COURT:  Call your next witness, please.

25             MR. COONEY:  Pavlo Kesari.

1          THE COURT:  Come forward, sir.  If you'll approach the

2    clerk here, she'll administer your oath.

3          THE CLERK:  Please raise your right hand.

4           PAVLO KESARI, GOVERNMENT'S WITNESS, SWORN

5          THE CLERK:  Please be seated.

6          MR. COONEY:  Your Honor, while Mr. Kesari sits down,

7    if I could just let you know, we have enough time to get this --

8    I don't know if since we've been at this a couple of hours, I

9    appreciate that we're trying to get this witness out for travel

10   circumstances; but we've got plenty of time to do that.  His

11   travel is later in the day.

12         THE COURT:  Okay.  We'll go about 15 minutes and then

13   we'll take a break.

14         MR. COONEY:  No, that's fine.  I just wanted to make

15   sure you knew.

16         THE COURT:  Thank you.

17                      DIRECT EXAMINATION

18   BY MR. COONEY:

19   Q.  Mr. Kesari, could you please state and spell your name for

20   the record.

21   A.  Pavlo Kesari, P-A-V-L-O K-E-S-A-R-I.

22   Q.  Mr. Kesari, who is Dimitri Kesari?

23   A.  Dimitri Kesari is my brother.

24   Q.  What do you do for a living?

25   A.  I own a video production company.  I produce live events.

1  Q.  I'm sorry; could you say that again?

2  A.  I produce live events.

3  Q.  And I think you said something about a video production

4  company.  Did I --

5  A.  Yes; video production company.

6  Q.  What is a video production company?

7  A.  Well, I do a little bit of -- I do LED screens, displays,

8  cameras, little bit of audio, little bit of lighting.

9  Q.  Do you currently have your own video production company?

10 A.  I do.

11 Q.  What is the name of your current company?

12 A.  My current company is called Control Video.

13 Q.  I would like to turn now to January of 2012.  All right.

14 Was there a time around then that your brother, Dimitri Kesari,

15 asked you to help him with something related to the 2012 Ron

16 Paul Presidential Campaign?

17 A.  Yes.  He stopped by my office in January 2012.

18 Q.  Where is your office?

19 A.  It's in Bladensburg, Maryland.

20 Q.  Was it unusual that he came in person to your office?

21 A.  He didn't normally come because he lives pretty far away,

22 but he would stop by, yeah.

23 Q.  Was it notable to you that he would stop by in person?

24 A.  Yeah.  I mean, we just saw each other at Christmas, so it

25 was a few days after, I guess.  Yeah, it was January.

1  Q.  Did he call before he came or did he show up?

2  A.  I don't recall if he called.  I don't remember exactly, but

3  he did show up.

4  Q.  Now, at that time were you working for the video production

5  company then?

6  A.  I owned another company called Performance Video Systems.

7  Q.  What did you and Dimitri Kesari talk about when he came to

8  your office?

9  A.  He asked me to do him a favor, if I could pay a designer for

10  some work that he's been working on for the campaign.

11  Q.  What did he tell you that that person had done?

12  A.  He said he's been working for them and they have internal

13  politics, so graphic design, design work, which could mean lots

14  of things, I guess.

15  Q.  How did you respond when he asked you if you could help pay

16  somebody for design work that had been done for the campaign?

17  A.  Again, he asked that I think about it.

18  Q.  Did you say yes when he asked you the first time?

19  A.  I did not.  I just decided maybe he wouldn't ask it again.

20  Q.  I'm sorry; what?

21  A.  Maybe he wouldn't ask it again.  I said I would think about

22  it.  My pace is slower than his pace.

23  Q.  What did you understand it to mean when he said would you

24  pay somebody who is doing graphic design work for the campaign?

25  A.  In my industry, like a paymaster to pay somebody.

1  Q.  Prepare invoices for him?

2  A.  To make sure that people got paid, yes, and there's

3  paperwork involved.

4  Q.  Now, what happened after you told Dimitri Kesari that you

5  would think about it?

6  A.  Not much.

7  Q.  Did he get back in touch with you?

8  A.  He did get back in touch with me.

9  Q.  What did he say when he got back in touch with you?

10 A.  He asked me if I could do it, I don't know how many days

11 later, a week, a little bit of time.  I said I couldn't do it.

12 Q.  What was Dimitri Kesari's response when you told him that

13 you couldn't pay?

14 A.  He asked me why --

15 Q.  I'm sorry, Mr. Kesari.  I don't mean to interrupt you.

16 A.  I know I'm talking --

17 Q.  I want to make sure I finish the question, and really the

18 reason is to make sure the jury hears my question --

19 A.  I get it.

20 Q.  -- and your answer, as well as the court reporter.

21 A.  I understand.

22 Q.  So what was Dimitri Kesari's response when you told him that

23 you couldn't help him pay this graphic designer?

24 A.  I mean, of course, he asked why, and I said because at the

25 time I had some partners that we weren't really getting along in

1 our business so I didn't think it was a good thing to do.

2 Q.  What did he do?

3 A.  Well, he asked me if I knew somebody that could do it.

4 Q.  Did you?

5 A.  I did.

6 Q.  Did you put your brother in touch with anybody?

7 A.  I told him about it and, yes, eventually they got in touch

8 with each other.

9 Q.  All right.  Who did you put your brother in touch with?

10 A.  Well, Sonny Izon, but Noel Izon is his name.

11 Q.  Do you call him Sonny?

12 A.  I call him Sonny.

13 Q.  Who is Sonny?

14 A.  Sonny is a good friend of mine.  He is an independent

15 filmmaker.  He's made a lot of documentaries that you've

16 probably seen on TV.

17 Q.  Does he have an independent film making company or something

18 like that?

19 A.  He does.  He has many films he's made.

20 Q.  What is his company called?

21 A.  ICT.

22 Q.  Where is ICT located?

23 A.  It's right up the street from where I'm located.  It's in

24 Hyattsville, Maryland.

25 Q.  Do you know what ICT stands for?

1  A.  Interactive something, technologies or something.  We just

2  called it ICT.

3  Q.  How did you get your brother in touch with Sonny Izon?

4  A.  Through e-mail, I guess.

5  Q.  Ms. Draughn, could you please put up for the witness

6  Government's Exhibit 69, which has not yet been admitted into

7  evidence.

8        Actually, Mr. Starnes, do you know if Exhibit 69 has

9  been admitted into evidence?

10        MR. STARNES:  It has.

11        MR. COONEY:  Could you go ahead and publish

12  Government's Exhibit 69, Ms. Draughn.

13  BY MR. COONEY:

14  Q.  Are you able to see that on your screen, Mr. Kesari?

15  A.  I am, I am.

16  Q.  All right.  Now, this is an e-mail dated January 24, 2012;

17  is that right?

18  A.  Yes, 2012, yes.

19  Q.  All right.  In the to line, there's an e-mail address

20  there.

21        Do you recognize that?

22  A.  That's my e-mail.

23  Q.  Who is this e-mail from?

24  A.  Dimitri Kesari.

25  Q.  All right.  And it reads:

1          Here is the invoice that needs to be taken care of?

2          Send me an invoice for video services.  33k plus,

3    right?

4    A.  That's what it says, right?

5    Q.  What is this?

6    A.  Well, it looks like there's an attachment here, of course,

7    but it's a short e-mail.  I guess this is the first

8    correspondence like a few weeks after we talked asking if I

9    could basically forward this to Sonny.  I mean, I imagine that's

10   what he means.

11   Q.  Why don't we take a look at the attachment, page 2.

12          All right.  We see that this is an invoice from

13   Grassroots Strategy, Inc. to ICT; is that right?

14   A.  That's what it says, yes, in Hyattsville.

15   Q.  Now, at that time you were not working for ICT, right?

16   A.  No.  I don't work for ICT.

17   Q.  In fact, you don't now, right?

18   A.  I do not now.

19   Q.  This is Sonny Izon's company?

20   A.  Yes.

21   Q.  At that time back in 2012, did you have any idea what

22   Grassroots Strategy, Inc., was?

23   A.  No, I have no idea what it is.

24   Q.  What did you do with this e-mail after you received it?

25   A.  I forwarded it on to Sonny.

1  Q.  Do you remember if Sonny responded to your e-mail?

2  A.  He had some questions about there's no EIN number on this,

3  like if you're a business, you have an identification number for

4  the government.

5  Q.  What was his concern?

6  A.  That there was no EIN --

7          MR. BINNALL:  Objection, Your Honor; hearsay and

8  speculation.

9          THE COURT:  Overruled.

10          Go ahead and answer the question.

11  A.  That there was no EIN number.

12  BY MR. COONEY:

13  Q.  So what did you do?

14  A.  I asked for an EIN number.

15  Q.  From who?

16  A.  Dimitri.

17  Q.  Ms. Draughn, can you put up Government's Exhibit 71, which

18  has also been admitted into evidence?

19          All right.  And do you see this top e-mail?  It's an

20  e-mail from Dimitri Kesari to you; is that right?

21  A.  That's correct.

22  Q.  Three days after the last one we looked at?

23  A.  I don't remember the date of the one before.  It was January

24  something.  24th did you say?  Yes, it's three days after to me,

25  and it says -- contains EIN and address included.

1 Q. All right. We're going to get to that in one second; but

2 down here at the bottom, the original message that was forwarded

3 to you, see where it has the name "Kent Sorenson"?

4 A. Oh, yeah, the original message, yeah.

5 Q. At that time, January 27, 2012, did you have any idea who

6 Kent Sorenson was?

7 A. No. I have no idea who he is.

8 Q. Why don't we go ahead and take a look at the attachment.

9 All right. And what's different about this invoice

10 from the one we looked at just a minute ago?

11 A. Not much. It says basically the same thing. It's

12 consulting services and there's a blacked out EIN number. Looks

13 like -- all the numbers seem the same.

14 Q. So this fixed the issue that Sonny Izon had with the first

15 invoice?

16 A. Well, yes. It's still the same date, yes, 7/22.

17 Q. What was that date again?

18 A. Says 7/22/2011, which was a while ago.

19 Q. I'm sorry?

20 A. It was a long time ago.

21 Q. All right. Why don't we now move to Government Exhibit 72,

22 which I don't believe has been admitted into evidence. Let's

23 just show that to Mr. Kesari.

24 All right. Mr. Kesari, do you recognize this

25 document?

1  A.  I do.  It's from myself to Sonny.

2  Q.  And what's the subject of the e-mail?

3  A.  Invoices.

4  Q.  And the date is February 2, 2012; is that right?

5  A.  February 2nd, yeah.

6  Q.  All right.  Is there an attachment to this?

7  A.  Not on the paper I'm looking at.

8  Q.  All right.  Ms. Draughn, can you go ahead and just show him

9  page 2?

10  A.  It has Performance Video Systems as I said before.

11  Q.  I'm sorry?

12  A.  It has Performance Video Systems on that one.

13  Q.  Is that the company you used to work for that you used to

14  own with a couple of partners?

15  A.  It is, yeah.

16  Q.  Actually go to page 3, Ms. Draughn.

17        All right.  See that invoice there?

18  A.  I do.

19  Q.  All right.  And attached to that are a couple of other

20  invoices like that.

21        Do you recall that?

22  A.  Yes.  I made this invoice here.

23  Q.  All right.  And you sent that to Sonny Izon?

24  A.  I did, for consulting services --

25  Q.  We'll get to that in just a second.

1  A.  Okay.

2      MR. COONEY:  Move Government's Exhibit 72 into

3  evidence.

4              (Government Exhibit 72 was

5              offered in evidence.)

6      THE COURT:  It's received.

7              (Government Exhibit 72 was

8              received in evidence.)

9      MR. COONEY:  All right.  Ms. Draughn, if you would go

10 back real quick to page 1 so the jury can see that.  We'll do it

11 fast.

12 BY MR. COONEY:

13 Q.  All right.  This is your e-mail to Sonny Izon, right?

14 A.  From me to Sonny, yes.

15 Q.  All right.  Ms. Draughn, let's go to page 3.

16      All right.  Who did you say prepared this invoice?

17 A.  I prepared this invoice.  I thought maybe it made it more

18 clear because it to me it seemed kind of strange it was a big

19 number and a small number.  So I thought if the person was

20 working for several months, I just kind of broke it down to make

21 it easier.

22 Q.  Now, who is this invoice from and who is it to?

23 A.  Well, it's from Grassroots Strategy with the EIN number to

24 ICT.

25 Q.  Why is it that you prepared this and sent it to Sonny Izon?

1  A.  Well, I was told that the person had been working for

2  several months, and I just tried to make it more clear.

3  Q.  Now, who is it that had told you that this person had been

4  working for several months as of February 2, 2012?

5  A.  Well, my brother, Dimitri, said the gentleman had been

6  working for several months, so I just kind of took it upon

7  myself to break it down.

8  Q.  All right.  Ms. Draughn -- or actually you can probably look

9  at it, Mr. Kesari.  The job dates, July 22, 2011 to January 30,

10  2012 --

11  A.  Yes.

12  Q.  -- where did you get those dates?

13  A.  I made it up because I saw the one -- if you go back to the

14  other one, it said $8,000 for one month, and I just kind of

15  broke it up.  That was my reasoning.

16  Q.  What was your reasoning?

17  A.  Like, if you go back to the other one, it said something and

18  then $8,000 per month.

19  Q.  So you just kind of divided it up by the months?

20  A.  Yeah.  I did some division, you know, a little bit of math

21  and did this, like one week, four weeks, four weeks.

22  Q.  And that was based on your brother, Dimitri Kesari, telling

23  you that this guy had been working for a few months?

24  A.  He didn't say exactly how much month.  He didn't say how

25  many months.  I just thought $33,000 was a lot of money for one

1 month.

2 Q. And down here, this one week July 11, four weeks September

3 11, four weeks October 11, all listing consulting services --

4 A. Yes.

5 Q. -- did you make all of that information up?

6 A. I did, on these lines here; but I worked off of the old

7 invoice. I worked off the invoice that I had before.

8 Q. Which invoice was that?

9 A. Well, the one that had the EIN number on it because it's

10 marked out at the top.

11 Q. So let's go ahead and take a look at that real quick,

12 Government's Exhibit 71, the attachment, please.

13 Is this the invoice that you're talking about that

14 you're working off it?

15 A. Yeah. So it says -- I mean, it says retainer, so I thought,

16 you know, a retainer could be for several months. So it says

17 one month $8,000. So all of this information I gathered was off

18 of this invoice.

19 Q. Got it?

20 A. Even the 831 number.

21 Q. Where is the 831 number?

22 A. Oh, it says invoice number 831.

23 Q. Right.

24 A. I think that's on the one before.

25 Q. So let's go back then to Government's Exhibit 72, page 3.

1  A.  Maybe 831 is not on this one.

2  Q.  I see that this adds up to $34,000 down at the bottom?

3  A.  Right.

4  Q.  Is that right?

5  A.  Yeah.

6  Q.  The other one we looked at added up to --

7  A.  33.

8  Q.  -- 33.  So this was just because of the number of months?

9  A.  No.  I mean, when you do payroll or paymaster service, you

10  get a commission.

11  Q.  Ah, tell the jury about that.

12  A.  Well, when you're a paymaster, I mean, it's like if you work

13  for XY -- in my industry like if you hire -- your client wants

14  some people and you get them for them, then there's a commission

15  towards my services getting them for the job.  I just made this

16  number of up for a guideline for Sonny that maybe, you know, a

17  thousand dollars would be fine.

18  Q.  And that would go to Sonny Izon for processing the invoice?

19  A.  Or at least a guideline, yes.  He would make some profit for

20  doing it, yes.

21  Q.  For at least the who?

22  A.  He would make money for processing it, yes.

23  Q.  Got it.

24  A.  Just like Bank of America charges me.

25  Q.  Let's go to page 6 of this exhibit.

1          THE COURT:  Let's take our mid afternoon recess and

2   come back at 3:50 p.m.

3          Thank you.

4          (Recess at 3:30 p.m. until 3:50 p.m.)

5          THE COURT:  Please be seated.

6   BY MR. COONEY:

7   Q.  All right.  Mr. Kesari, I want to move now to page 6 of

8   Government's Exhibit 72.

9          And if you could just -- all right.

10         Now, Mr. Kesari, this was also attached to that e-mail

11  from February 2nd of 2012; is that right?

12  A.  That's correct.

13  Q.  That you sent to Sonny Izon?

14  A.  Yes.

15  Q.  What is this invoice?

16  A.  This is an invoice I did for services.  I provided audio, a

17  small audio package for the campaign about eight, ten months

18  earlier.

19  Q.  Eight, ten months earlier from when?

20  A.  From when this was sent to Sonny.

21  Q.  So roughly if that was February, I don't know, roughly

22  August, July, something like that?

23  A.  Yeah, maybe the fall.  Maybe spring.  It was awhile, a long

24  time.

25  Q.  Of 2011?

1  A.  Well, this says 2010, I thought -- or January 10th, so yes,

2  yes, 2011.

3  Q.  All right.  Now, who prepared this again?

4  A.  I prepared this one here.

5  Q.  And who did you provide this invoice to?

6  A.  I sent it to Sonny.

7  Q.  Let's just look at the line items here.  It says job site,

8  Iowa; is that right?

9  A.  That's correct.

10  Q.  Small audio package?

11  A.  Yes.

12  Q.  What are all of these things listed here; the audio --

13  A.  Audio mixer is like the board; two 15-inch speakers; speaker

14  stands; multbox, which is for like press; four wireless mics,

15  which are like lavalieres or handhelds; and audio snake.

16  Q.  Why did you do that?

17  A.  Because they rented this package from me.

18  Q.  Who is "they"?

19  A.  Well, the Ron Paul Campaign.

20  Q.  Did you check with your brother before you submitted that

21  invoice to Sonny Izon?

22  A.  We probably spoke about it, yes.

23  Q.  Are you sure?

24  A.  Well, I was thinking that since he hadn't paid in awhile and

25  he wanted something done, I would just pass the invoice on to

1   Sonny and hopefully I would get paid for this invoice as well

2   because I hadn't been paid in many months.

3   Q.  Did you view this as an opportunity to maybe get some money

4   that the Paul Campaign owed you?

5   A.  Well, yeah.  I mean, they already owed me the money, so

6   since it hadn't been paid yet, I kind of submitted it as well.

7   Q.  Was this work in any way related to the $34,000 that Dimitri

8   Kesari asked you to prepare?

9   A.  This is a different invoice altogether.  This was for

10  services provided way prior to the conversations.

11  Q.  So it has nothing to do with the last $34,000 invoice that

12  we looked at?

13  A.  This invoice has nothing -- is not part of that invoice.

14  Q.  It has nothing to do with it?

15  A.  Yes.

16  Q.  So you just sent it along because you wanted to get paid?

17  A.  Well, again, I wanted to get paid.  I figured it was time to

18  get paid for the invoice that had not been paid.

19  Q.  This would be a way to do it?

20  A.  This would be a way to do it.

21  Q.  Let's move on to Government's Exhibit 80.

22          Can you blow that up, Ms. Draughn?

23          THE COURT:  Did you want 8 or 80?

24          MR. COONEY:  I said 80.  Is that 8?  Oh, yes.  I

25  wanted 80.  Thank you, Your Honor.

1    BY MR. COONEY:

2    Q.   And that's already been admitted into evidence.

3              And, Mr. Kesari, this is an e-mail from you to --

4    excuse me; from your brother, Dimitri Kesari, to you; is that

5    right?

6    A.   Uh-huh, that's correct.

7    Q.   On March 18, 2012?

8    A.   Yes.

9    Q.   And is there -- there's an attachment with this, correct?

10   A.   That's what it says in the attachment.

11   Q.   Let's look at the attachment, please.  Page 1, Ms. Draughn.

12             And the e-mail we just looked at said, can you send me

13   a bill from your brother, right?

14   A.   Yes, I guess so.

15   Q.   You didn't get a good look at it?

16   A.   We can go back if that's what it said.

17   Q.   Can we go back?  I should highlight that.

18             Thanks, Ms. Draughn.  There we go.

19             What did Dimitri Kesari write to you?

20   A.   Can you send me a bill?

21   Q.   All right.  Let's look at the invoice.

22             And this is already in evidence, but this is another

23   invoice from Grassroots Strategy to ICT?

24   A.   Attention:  ICT, 3/1, consulting services, yes.

25   Q.   How much is this one for?

1 A. $8,000.

2 Q. And, again, at that time you did not work for ICT, correct?

3 A. I did not work for ICT.

4 Q. What did you do with this invoice when you received it?

5 A. I just forwarded it to Sonny or Noel Izon.

6 Q. After receiving this invoice for services for the month of

7 February 2012, did you receive any more invoices from your

8 brother, Dimitri Kesari?

9 A. I did not.

10 Q. Now, Mr. Kesari, your line of work again is what?

11 A. I own a video production company. I produce shows, events.

12 Q. I'm sorry?

13 A. Events, yes.

14 Q. And your industry does not report to the Federal Election

15 Commission, right?

16 A. We do not.

17          MR. COONEY: I have no further questions.

18          THE COURT: Mr. Binnall.

19                    CROSS-EXAMINATION

20 BY MR. BINNALL:

21 Q. Good afternoon, Mr. Kesari.

22 A. Good afternoon.

23 Q. Mr. Kesari, at the time that you were helping your brother

24 out with the paymaster services with ICT, you were still owed

25 money from the Paul Campaign, correct?

1  A.  That's correct.

2  Q.  And that's the bill that you were talking about with counsel

3  for the government here earlier?

4  A.  Yes, that bill.

5  Q.  All right.  And the total that you were owed on that was

6  $3,125?

7  A.  Sounds about right.

8  Q.  And you actually did get paid that from Mr. Izon, correct?

9  A.  I did not.

10  Q.  But you submitted it to him?

11  A.  I did submit it.  I don't remember getting paid, but I would

12  have thought I would remember if I had got paid.

13  Q.  And you talked a little bit about what a paymaster does in

14  your industry.  Is that a common service in your industry?

15  A.  It is a common service, a lot to do with the unions.  If you

16  want to hire union labor, you go to a paymaster for the union,

17  and they hire labor and you can send them anywhere.

18  Q.  And is that like a payroll company of sorts?

19  A.  Kind of like payroll, yes.

20  Q.  And where it's a third party that pays things out?

21  A.  That's correct.

22  Q.  Mr. Kesari, on the e-mail that you were shown earlier from

23  your brother, Government's Exhibit 69 -- I want to go ahead and

24  use the Elmo here.

25         Do you see that in front of you, sir?

1  A.  I do.

2  Q.  And it says, send me an invoice for video services.  Your

3  business does -- you described it as a video service company,

4  correct?

5  A.  That's correct.

6  Q.  And Mr. Kesari knew that he owed your company money,

7  correct?

8  A.  I would imagine, yes.

9  Q.  And it does say 33k plus there, correct?

10  A.  That's what it says.

11  Q.  Mr. Kesari, is there anything that happened specifically

12  with your family situation in December of 2011?

13  A.  Well, our mother passed away December 7th that month that

14  year.

15  Q.  I'm very sorry for that loss, sir.

16        And had she been ill long?

17  A.  No, not really.  She had a stroke on Thanksgiving, and then

18  she was in the hospital until December 11th -- I mean, December

19  7th when she passed.  She was in a hospital and then a hospice,

20  I guess.

21  Q.  Was that a difficult time period for you?

22  A.  It's always difficult when somebody dies, especially your

23  parents.

24  Q.  And being you're his brother, you know my client,

25  Mr. Kesari's immediate family, right?

1  A.  I do know them very well.

2  Q.  And he has a wife?

3  A.  Yes.  He's married.

4  Q.  And what's her name?

5  A.  Yolanda.

6  Q.  And then do they have any kids?

7  A.  They have three children.

8  Q.  All right.  And are you close with them?

9  A.  I am.  I'm a godfather to his oldest child, Anna.

10        MR. BINNALL:  Sir, thank you very much.

11                    CROSS-EXAMINATION

12  BY MR. WARRINGTON:

13  Q.  Good afternoon, Mr. Kesari.  My name is David Warrington.  I

14  represent Mr. Tate.  I just have a few questions for you.

15        You had mentioned when you were examining Government's

16  Exhibit Nos. 70 and 71 that one of the differences -- if you

17  need to --

18  A.  No, that's fine.

19  Q.  One of the differences that you needed to fix in that was

20  the EIN.  Can you tell me what an EIN number?

21  A.  It's an identification number that the government issues

22  businesses so they can track whatever your taxes -- for your

23  taxes.

24  Q.  So the tax man gets his money, right?

25  A.  I imagine.  They always get their money.

1  Q.  Okay.  When you were putting these invoices together, did

2  you ever talk to anybody on the Paul Campaign during that time?

3  A.  No.

4  Q.  Okay.  And the only person you ever dealt with on the Paul

5  Campaign was your brother, correct?

6  A.  That's correct.

7  Q.  And you didn't speak with anyone else related to the

8  campaign?

9  A.  One time I talked to somebody about the audio package and

10  explaining what it was, that one package, the other invoice, to

11  explain what I was sending them; but I'm not sure if it was a

12  technical guy.  I don't know their name.

13  Q.  And the audio package was for speakers and --

14  A.  You know, a small PA for like a room this size.

15  Q.  You never spoke to an individual named John Tate, have you?

16  A.  I have not.

17  Q.  Have you ever spoken to John Tate in your life?

18  A.  Not that I know of, no.

19  Q.  Do you even know who John Tate is?

20  A.  I do not know who John Tate is.

21          MR. WARRINGTON:  Thank you.

22          Nothing further.

23          THE COURT:  Ms. Campbell, do you have questions?

24          MS. CAMPBELL:  Yes, Your Honor.

25

1                    CROSS-EXAMINATION

2  BY MS. CAMPBELL:

3  Q.  Sir, did you ever talk to a Jesse Benton?

4  A.  No, I've never talked to a Jesse Benton.

5  Q.  Do you know who Jesse Benton is?

6  A.  I do.

7  Q.  You do now?

8  A.  I do now.

9  Q.  Did you then?

10 A.  I did not know who he was.

11 Q.  In 2012, January of 2012, did you know who Jesse Benton was?

12 A.  I did not.

13 Q.  Did you ever speak with him about ICT?

14 A.  No, never.

15 Q.  And you told us that there was a reason why you were -- or

16 Dimitri Kesari told you a reason why he needed help with

17 paymaster.  And what was that reason?

18 A.  Well, he said the person was very talented and he didn't get

19 along with internal politics with people in the campaign or

20 something.  That was -- and I can understand that because people

21 with great talent sometimes don't get along with everybody.

22 Q.  And specifically he said that there was a guy, someone

23 within the campaign that didn't like the person that needed to

24 be paid?

25 A.  Well, he didn't say exactly those words.  He said there was

1 internal politics.  He didn't say dislike or like, but I just

2 took it -- I took it for maybe there was some people who didn't

3 like the services, I guess.

4          MS. CAMPBELL:  I have nothing further, Your Honor.

5          THE COURT:  Anything else, Mr. Cooney?

6          MR. COONEY:  Very briefly.

7                          REDIRECT EXAMINATION

8 BY MR. COONEY:

9 Q.  Mr. Kesari --

10 A.  Yes.

11 Q.  -- that great talent that your brother, Dimitri Kesari, told

12 you about, that was a great talent in designer graphics, right?

13 A.  Yes.

14          MR. COONEY:  No further questions.

15          THE COURT:  Thank you, sir.

16          You're excused.

17          THE WITNESS:  Thank you.

18                                    (Witness excused.)

19          THE COURT:  Back to Agent LoStracco?

20          MR. COONEY:  Yes.

21          THE COURT:  Come forward, ma'am.

22                          KAREN LOSTRACCO,

23 resumed her testimony as follows:

24          MR. COONEY:  Bear with me for one moment.  I'm looking

25 for one document here.

1        (Pause.)

2                DIRECT EXAMINATION (Continued)

3   BY MR. COONEY:

4   Q.  All right.  Agent LoStracco, I would just like to clean up a

5   few housekeeping matters here.

6                First I want to draw your attention to what's already

7   been admitted into evidence as Tate Exhibit 14.

8                MR. COONEY:  And could I just get the Elmo?

9                MR. STARNES:  She's got it on Sanctions.

10               MR. COONEY:  Oh, Tate 14.

11               That's okay.  I'll take it on the Elmo.  I've got it

12  right here.

13  BY MR. COONEY:

14  Q.  And just to reset for the jury, this is an e-mail that came

15  up earlier in the testimony of Fernando Cortes.

16               Do you recall this, Agent LoStracco?

17  A.  Yes.

18  Q.  This is an e-mail from Fernando Cortes to Lori Pyeatt, Deana

19  Watts, copying Katie Koerber with the subject:  Wire - DGI -

20  $25,657.

21               Do you see that?

22  A.  Yes.

23  Q.  All right.  If you will zoom in a little bit.

24               What is the date of this e-mail?

25  A.  February 16, 2012.

1  Q.  All right.  About how long after the e-mail we looked at

2  involving a $25,000 wire is this?

3  A.  This is about a month-and-a-half.

4  Q.  All right.  And what amount does this reflect again?

5  A.  $25,657.

6  Q.  Not $25,000 on the dot?

7  A.  No.

8  Q.  I want to turn now to the attachments.

9          And the invoice is from DGI; is that right?

10  A.  Yes.

11  Q.  And what does it read under description?

12  A.  Targeted list rentals, NV, MN, ME.

13  Q.  And the date of this invoice up here in the right-hand

14  corner?

15  A.  February 15, 2012.

16  Q.  Right around the same time as the e-mail?

17  A.  Right.

18  Q.  Pardon me.

19          NV, is there any state with that abbreviation?

20  A.  Nevada.

21  Q.  What about MN?

22  A.  Minnesota.

23  Q.  What about ME?

24  A.  Maine.

25  Q.  In the 2012 presidential election cycle, did those states

1  have anything in common?

2  A.  Yes.  They all had caucuses around the February time period,

3  so between the time period between February 2nd, I would say, to

4  about February 11th, Republican caucuses.

5  Q.  What time zone is Nevada in?

6  A.  It is in the Pacific time zone.

7  Q.  What time zone is Minnesota in?

8  A.  The Central time zone.

9  Q.  What about Maine?

10  A.  Eastern time zone.

11  Q.  Agent LoStracco, during the course of your investigation,

12  did you ever have the opportunity to go to Kent Sorenson's home?

13  A.  Yes.

14  Q.  Where is his home located?

15  A.  His home at that time and still is in Milo, Iowa.

16  Q.  And what time frame was his home in Milo, Iowa, when you say

17  that?

18  A.  I believe he moved sometime in 2012 from Indianola.

19  Q.  All right.

20  A.  And he's presently there today.

21  Q.  At the time of the events that we've been talking about,

22  late 2011 and early 2012, where did Mr. Sorenson live?

23  A.  I'm sorry, can you repeat that?

24  Q.  In the time frame that we've been talking about in 2011 and

25  2012, in the e-mails that I've been showing you, where did

1  Mr. Sorenson live?

2  A.  Actually he lived in Milo.  He moved in 2011, I remember

3  that now.  He was living in Indianola and --

4          MS. CAMPBELL:  Your Honor, actually I think this is

5  all hearsay.

6          THE COURT:  Why isn't that hearsay?

7  BY MR. COONEY:

8  Q.  Have you been to his current home?

9  A.  Yes.

10 Q.  All right.  And how is it that you know -- without stating

11 where, but how is it that you know where he used to live?

12 A.  From talking with Mr. Sorenson.

13 Q.  Okay.

14 A.  And also from records determining where he lived in order to

15 get a search warrant.

16 Q.  How did you obtain those records?

17 A.  I obtained those records I believe through public records.

18 Q.  Public records here in Iowa?

19 A.  I'm trying to think back of how I found his address.

20         THE COURT:  Let's move on because he's coming and he's

21 going to tell us his address.  This isn't going to be secret.

22 But if you need it for the purpose of your next few questions,

23 just go ahead and do it.

24 BY MR. COONEY:

25 Q.  How about this:  Indianola and Milo, are they located within

1  the Southern District of Iowa?

2  A.  Yes.

3  Q.  Are you familiar with the bank, Center City Bank, here in

4  Iowa?

5  A.  It's City State Bank.

6  Q.  Thank you.

7          And where is that located?

8  A.  There is -- depending where the headquarters is, but there's

9  a branch in Indianola.

10  Q.  Is that within the Southern District of Iowa?

11  A.  Yes.

12  Q.  What about the State Fairgrounds of Iowa, where is that?

13  A.  That is in Des Moines.

14  Q.  And is that within the Southern District of Iowa?

15  A.  Yes.

16  Q.  And, finally, Ankeny, Iowa, is Ankeny located within the

17  Southern District of Iowa?

18  A.  Yes, it is.

19  Q.  All right.  We're going to wrap up now with just more

20  documents.  I've still got -- could I get the Elmo, please?

21          All right.  I'm showing you what's already been put

22  into evidence as Government's Exhibit 84b, and this top e-mail

23  is an e-mail from John Tate to Fernando Cortes dated April 3,

24  2012, at 12:03 p.m., subject:  February invoice.

25          Approved.

1            Do you remember looking at that e-mail?

2  A.  Yes.

3  Q.  Below that is this e-mail from Fernando Cortes just four

4  minutes earlier with a question, approved?

5            Do you remember that?

6  A.  Yes.

7  Q.  Now, when we looked at those e-mails here in court earlier

8  today, was there an attachment with this particular version that

9  we're looking at?

10  A.  No.

11  Q.  And this document, where did you receive this from?

12  A.  From the Ron Paul Campaign.

13  Q.  Since serving your grand jury subpoena, have you obtained

14  any additional documents from the Ron Paul Campaign?

15  A.  Yes.  We issued a trial subpoena to the Ron Paul Campaign

16  for specific attachments to e-mails.

17  Q.  Did you receive a response to that subpoena?

18  A.  We did on the first day of trial.

19  Q.  That was Tuesday of this week?

20  A.  Correct.

21  Q.  All right.  I'm going to show you -- I'm just going to

22  approach and do it -- Government's Exhibit 84c.

23            Do you recognize Government's Exhibit 84c?

24  A.  Yes.

25  Q.  All right.  Is this one of the documents that you obtained

1   on Tuesday from the Ron Paul Campaign?

2   A.  Yes, it is.

3   Q.  All right.  And is this the e-mail chain -- or excuse me,

4   the e-mail from Fernando Cortes to John Tate on April 3, 2012,

5   at 11:59 a.m.?

6   A.  Yes, at 11:00 a.m.

7           MR. COONEY:  Yep.  And I move Government Exhibit 84c

8   into evidence.

9                              (Government Exhibit 84c was

10                             offered in evidence.)

11          THE COURT:  Received.

12                             (Government Exhibit 84c was

13                             received in evidence.)

14  BY MR. COONEY:

15  Q.  And is there an attachment to this document?

16  A.  Yes.  Actually there are two attachments to this document.

17  Q.  All right.  And they are noted right here; is that right?

18  A.  Yes, correct.

19  Q.  And, again, what is the subject of this?

20  A.  Forward:  Forward:  February invoice.

21  Q.  And the attachment?

22  A.  Yes, one of the attachments is the invoice from -- I'm

23  sorry; can you put it up?

24  Q.  Oh, yes.  Sorry.

25  A.  From ICT to the Ron Paul Presidential Campaign, attention:

1   Dimitri Kesari, date March 21, 2012.  The description is

2   production services, parentheses, February, and the total price

3   is $8,850.

4   Q.  And I'm sorry, is this one of the invoices that we looked

5   at, the February invoice that we -- excuse me; yes, the

6   production services February invoice from ICT to the Ron Paul

7   Campaign that we looked at earlier?

8   A.  That is correct.

9   Q.  The same one attached to the e-mail exchanges between

10  Dimitri Kesari and Fernando Cortes?

11  A.  Yes.

12  Q.  So this invoice was forwarded by Fernando Cortes to John

13  Tate?

14  A.  Yes, twice, meaning there are two attachments attached to

15  the e-mail and it's the same invoice.

16  Q.  All right.  And now I'm going to put up -- oh, and actually

17  I want to show you one thing about this, this version of 84c, if

18  I could.

19          This version of 84c, the one you testified you just

20  obtained from the Ron Paul Campaign --

21  A.  Correct.

22  Q.  -- I see this one says that it's at 11:00 a.m. on Tuesday,

23  April 3, 2012; is that right?

24  A.  Yes, that's what it says.

25  Q.  Below that is the e-mail from Dimitri Kesari.  What time is

1  that?

2  A.  11:58 a.m.

3  Q.  So there's a difference between the two in terms of this one

4  would seem to indicate that this was sent at 11:58, one was

5  actually sent after the 11:00 a.m. one?

6  A.  Correct.  I mean, that's what it looks like if you just look

7  at the time.

8  Q.  Now, if we go to 84b, the one we looked at before, the time

9  of the Fernando Cortes e-mail to John Tate is listed here as

10  what?

11  A.  11:59 a.m.

12  Q.  Which is different than the one we just looked at; is that

13  right?

14  A.  Correct.

15  Q.  But that 11:59 here on 84b, how does that relate to the

16  Dimitri Kesari e-mail at 11:58 a.m.?

17  A.  The Dimitri Kesari e-mail looks like it's one minute before

18  the e-mail from Fernando Cortes.

19  Q.  All right.  I would like to show you what's already been

20  marked in evidence as Government's Exhibit 85.

21          And this is the e-mail exchange between Mr. Tate and

22  Mr. Cortes from April 3, 2012 involving the March invoice; is

23  that right?

24  A.  Yes.

25  Q.  And this is one of the ones that we put up split screen to

1   show how close this was to Government's Exhibit 84b, right?

2   A.  Yes.

3   Q.  All of this happened within a few minutes of each other?

4   A.  Yes.

5   Q.  Now, when we showed this one in court earlier with the

6   original version that you obtained, was there an attachment?

7   A.  No.

8   Q.  And where did you obtain this one?

9   A.  The Ron Paul Campaign.

10  Q.  All right.  I'm going to approach and show you Government's

11  Exhibit 85a.

12          And Government's Exhibit 85a, is this one of the

13  documents that you obtained from the trial subpoena served on

14  the Ron Paul Campaign that you obtained Tuesday?

15  A.  Yes.

16  Q.  All right.  And what is this top e-mail in Government's

17  Exhibit 85a in connection with Government's Exhibit 85 which is

18  showing on the screen right now?

19  A.  So the top e-mail in 85a is the e-mail from Fernando Cortes

20  to John Tate forwarding the March invoice and asking if it's

21  approved.  That is the second e-mail in the chain of the one up

22  on the screen.

23          MR. COONEY:  Move 85a into evidence.

24                          (Government Exhibit 85a was

25                           offered in evidence.)

1          THE COURT:  Received.

2                              (Government Exhibit 85a was

3                              received in evidence.)

4    BY MR. COONEY:

5    Q.  So I'm showing this, now publishing this to the jury, and as

6    you just described, this is the e-mail from Fernando Cortes to

7    John Tate forwarding the March invoice; is that right?

8    A.  Correct.

9    Q.  And, again, this says that it's at 11:00 a.m.?

10   A.  Yes.

11   Q.  On Government's Exhibit 85, the one we looked at before, I

12   see 12 -- excuse me, 12:00 p.m.; is that right?

13   A.  Correct.

14   Q.  All right.  And how long after Dimitri Kesari sent the

15   e-mail to Fernando Cortes did Fernando Cortes send that e-mail

16   to John Tate?

17   A.  Two minutes.

18   Q.  And that's 11:58 a.m. here?

19   A.  Yes, correct.

20   Q.  And on Government's Exhibit 85a, it's listed at what time?

21   A.  11:58 a.m.

22   Q.  Is that the same time?

23   A.  That is the one where Dimitri Kesari says approved by Jesse.

24   Q.  Yes.  And is that the same time as reflected on Government's

25   Exhibit 85?

1   A.  Yes.

2   Q.  So this still has -- the point being this is the same time

3   discrepancy as this other one that you received on Tuesday,

4   correct?

5   A.  Correct.

6   Q.  When I say time discrepancy, I'm talking about between this

7   Fernando Cortes e-mail to John Tate here and e-mail from Dimitri

8   Kesari to Fernando Cortes, right?

9   A.  Correct.

10  Q.  It looks like based on the time, the time would make it seem

11  that the top one was sent before the bottom one?

12  A.  Or they were different time zones, correct.

13  Q.  And does it make sense the top one could have been sent

14  before the one below it in the e-mail chain?

15  A.  No.

16  Q.  Is this -- what I'm showing you now, page 2 of the exhibit,

17  is that what was attached to that e-mail that Fernando Cortes

18  sent to John Tate?

19  A.  Yes.  This was attached twice also.

20  Q.  And is this a production services in March invoice from ICT

21  to Ron Paul?

22  A.  Yes.

23  Q.  So Fernando Cortes e-mailed this invoice to John Tate?

24  A.  Correct.

25  Q.  And what did John Tate write back to Fernando Cortes?

1   A.   Approved.

2   Q.   And so for the e-mails that we looked at between Fernando

3   Cortes and John Tate where he sought approval for invoices from

4   ICT in March, in February and in June 2012, did Fernando Cortes

5   send the ICT invoices along to John Tate?

6   A.   Yes.

7           MR. COONEY:  I don't have any further questions.

8           THE COURT:  Who wants to go first?

9           MS. CAMPBELL:  I will, Your Honor.

10          THE COURT:  Thank you.

11                          CROSS-EXAMINATION

12  BY MS. CAMPBELL:

13  Q.   Good afternoon, ma'am.

14  A.   Good afternoon.

15  Q.   You're an FBI agent, right?

16  A.   Yes.

17  Q.   And you're assigned to do election crime; is that right?

18  A.   No.  That's not correct.  I was assigned to a public

19  corruption squad.  We did a lot more than election crime.

20  Q.   And you're based out of Washington?

21  A.   Currently or --

22  Q.   At the time, in 2011 and 2012.

23  A.   At the time I was in the Washington field office, yes, in

24  the Northern Virginia resident agency.

25  Q.   And you're the case agent; is that right?

1 A. Correct.

2 Q. And you're the case agent on this case, right?

3 A. Correct.

4 Q. And this case involves an allegation about Kent Sorenson

5 making an endorsement for money, right?

6 A. Correct.

7 Q. And in your previous testimony, you told the jury that that

8 endorsement was ten to fifteen minutes long.

9 Do you remember that?

10 A. Yes, I do remember that. I misspoke. It was about a minute

11 long.

12 Q. Okay. I mean, you had just watched it, right?

13 A. I had watched the video several times and done several

14 different time stamp analyses of where people were at different

15 times. So, yes, I misspoke how long he was on the stage; but it

16 was a short time period. It was about one minute.

17 Q. Now, you said you served a whole bunch of search warrants

18 and you did productions from Gmail and you asked for productions

19 from the Ron Paul Campaign, and so you had a whole bunch of the

20 different sources; is that right?

21 A. Correct.

22 Q. And some of the sources you received documents and then

23 asked for more information from them; is that right?

24 A. Yes. It would depend on what was produced and what we had

25 asked in the original subpoena, yes.

1  Q.  And I think that when you asked for some of it in the search

2  warrants, did you ask for search terms or all e-mails?

3  A.  Are you asking about search warrants or subpoenas?

4  Q.  Let's do subpoenas.  Subpoenas for the e-mails, did you ask

5  for search terms?

6  A.  I mean, we issued many, many different subpoenas on many

7  different individuals and organizations, so sometimes you would

8  use search terms.  Other times you would just say e-mails

9  between this particular date and this particular date pertaining

10  to Senator Kent Sorenson, for example, or that type of thing.

11  Q.  And so when you got back all of those responses, how many

12  total e-mails did you receive?

13  A.  I have no idea.  Thousands.

14  Q.  And did you receive all of the e-mails that Jesse Benton had

15  sent?

16  A.  Did I receive all of the e-mails Jesse Benton had sent?

17  When?

18  Q.  In 2011, 2012.

19  A.  No.  I received a production from Mr. Benton pursuant to a

20  subpoena that we issued to him, and we received documents that

21  were -- we were told were responsive to that subpoena.

22  Q.  Okay.  And did that subpoena have limitations by search term

23  and dates?

24  A.  Definitely dates.  I don't remember if it had specific

25  search terms on it.

1  Q.  So are you able to answer how many e-mails Jesse Benton

2  would receive on any particular day?

3  A.  Well, in regard to when we received responses back from the

4  subpoena on Jesse Benton, his attorneys at the time had produced

5  a log of his e-mails during the time period that we had asked

6  for during the subpoena, and they didn't produce those e-mails.

7  It was just a description, I guess, of e-mails sent and received

8  by Mr. Benton on those days.

9  Q.  And so do you have any idea how many total e-mails then you

10 received as sent on any particular day?

11 A.  I mean, I would have to look at the log; but I don't know

12 off the top of my head, no.

13 Q.  Okay.  Hundreds?

14 A.  On some days, yes.

15 Q.  I mean, several hundreds?

16 A.  On some days I recall there being a couple hundred e-mails,

17 yes.

18 Q.  Just a couple hundred; not, I don't know, 580?

19 A.  I didn't count up how many e-mails Mr. Benton received on

20 every single day that the log was produced.  It was about 55,000

21 plus pages long, the log.

22 Q.  Okay.  The log was 55,000 plus pages?

23 A.  Correct.

24 Q.  And that's just listing one line of the e-mail; is that

25 right?

1  A.  Well, to say it's one line of an e-mail, I mean, one page of

2  the log may have, you know, say, eight different e-mails on it.

3  There were a lot of times when somebody -- say Mr. Benton was

4  included in the to line, there were others included in the to

5  line, so it would make the log very large, for example.

6  Q.  But multiple e-mails per page?

7  A.  Yeah.  There was definitely more than one, yeah.

8  Q.  And 55,000, is that what you said?

9  A.  It was, I think, about 55,000 pages approximately, the log,

10 yes.

11 Q.  And do you know what time period that covered?

12 A.  I would have to look back at the subpoena, but I'm guessing

13 it covered a time period from 2011 into -- well into 2012.

14 Q.  And do you know how many pages they fit into one of those

15 binders?

16 A.  I have no idea.

17 Q.  So 55,000 pages of the log.  That's not counting how many

18 pages the actual e-mail is, right?

19 A.  Correct.

20 Q.  So let's assume one page per e-mail and eight e-mails per

21 page, so at least eight pages times 55,000?

22 A.  Um, yes.  I would guess that there would be several pages of

23 e-mails included over that, say, two-plus year time span.

24 Q.  Hundreds of thousands of pages?

25 A.  I'm not -- I don't know how to do the math in my head, but

1  yes, there would be several, probably thousands of pages, yes.

2  Q.  Hundreds of thousands of pages of data that Jesse Benton is

3  receiving during this campaign?

4  A.  I don't know that I can say that.  I mean, an e-mail could

5  be three pages long and the last two pages could be, what we

6  saw, metadata as you saw on Mr. Kesari's e-mail, and it could be

7  an e-mail from Joseph Banks, which is an advertisement, and that

8  could take up several pages the way it prints out.

9  Q.  Or could it be an e-mail with a 77-page attachment of all of

10  the expenditures for the month of February?

11  A.  Yes.  Jesse Benton could have received a 77-page attachment

12  at some point, yes.

13  Q.  Or he could have received ten of those types of attachments?

14  A.  He could have.

15  Q.  Or a hundred?

16  A.  He could have.  I'm guessing it probably would have filled

17  his inbox.

18  Q.  Have you ever looked at his inbox?

19  A.  I have not looked at his inbox.  I have looked at the

20  response that we got back pursuant to these search warrants for

21  jesserbenton@gmail.com.

22  Q.  Do you even know how many unread e-mails are still sitting

23  in his inbox?

24  A.  No.  I did not have access to Jesse Benton's inbox.

25  Q.  So when you're putting up one page at a time of an e-mail, I

1  want to put this in context.  I mean, we could have an e-mail at

2  7:30 and another e-mail at 8:30, and you have no idea -- or you

3  at least haven't testified to how many e-mails are in between

4  7:30 and 8:30; is that fair?

5  A.  No, because I was not shown those e-mails in between those

6  time periods.  My testimony was the e-mail -- the second e-mail

7  would be an hour later than the first e-mail.

8  Q.  Okay.  And you don't know how many e-mails he got in between

9  in that hour?

10  A.  Well, again, it would depend what time period you're talking

11  about, and I would not know that without looking at some record

12  or log or his inbox of what Jesse Benton received during that

13  time, no.

14  Q.  Do you know how many e-mails he sent?

15  A.  No.  I mean, I know we did -- I did look at a couple of

16  particular days, the days that he had appeared to have approved

17  invoices relating to this, and there was a smaller amount of

18  sent versus the incoming.  So, say he received -- I'm

19  approximating -- 300 e-mails that day, he sent approximately 68.

20  Q.  Okay.  So he's not responding to every e-mail?

21  A.  No.

22  Q.  And fair to say he's not reading everything in every e-mail?

23  A.  No.  A lot of e-mails actually from the days that I looked

24  at specifically, I would say at least a third were what I would

25  classify as junk mail or spam, advertisements, Google or that

1  kind of thing.

2  Q.  I would like to show the redacted version that was admitted

3  as Government's Exhibit 29.

4         And you recall that you testified to this e-mail; is

5  that right?

6  A.  Yes, I recall this e-mail.

7         MS. CAMPBELL:  Your Honor, we would actually move to

8  admit -- if you would take it off the screen -- the unredacted

9  version of Government's Exhibit 29.

10        MR. COONEY:  If I could just have a moment, Your

11 Honor, to take a look.  Oops, wait.

12        MS. CAMPBELL:  Don't put it up, don't put it up.  Take

13 it off.

14        MR. COONEY:  Can you actually put the unredacted up?

15 I just want to confirm with the --

16        No, we don't object.

17        THE COURT:  The unredacted version of 29 will be

18 substituted for the redacted one.

19        MS. CAMPBELL:  Could we publish, please.

20 BY MS. CAMPBELL:

21 Q.  Now, ma'am, we talked about just this one line, stick a fork

22 in Michelle, by the way.  Sorenson is endorsing Ron on Monday,

23 right?

24 A.  Right.

25 Q.  Sometimes, would you agree with me, it's important to

1  understand text in context; is that correct?

2  A.  Yes, that's correct.

3  Q.  Just like it's important to understand getting an e-mail and

4  then another e-mail an hour later in context of how many e-mails

5  are received in between, right?

6  A.  Yes.

7  Q.  So context is important, right?

8  A.  In those instances I would say yes, depending on the

9  circumstance.

10  Q.  And in this particular case, in Exhibit 29, let's zoom in

11  maybe -- I guess it really doesn't matter -- anywhere on there.

12  Let's look at some of this context.  I mean, they're talking

13  about all of the candidates, right?

14  A.  I mean, I'm looking at a portion of the e-mail here.

15  Q.  Well, you can look at the whole e-mail if you want.

16          Back it out.

17  A.  Okay.

18  Q.  I mean, they're talking about Perry, right?  They're talking

19  about Newt, and they're talking about Mitt, and they're talking

20  about rejection rates and Romney and Gingrich, right?

21  A.  And, again, I don't know the complete list off the top of my

22  head of who was still a candidate at this time, but I do see

23  reference to Ron, Romney, Perry, and Gingrich.

24  Q.  And then as an afterthought, we've got, oh, and stick a fork

25  in Michelle, by the way, right?

1  A.  I don't know that I would classify that as an afterthought.

2  It's an e-mail.

3  Q.  But it's after all of these other e-mails, right?

4  A.  It's the last e-mail in this chain.

5  Q.  After they've been talking about all the other candidates?

6  A.  The other candidates I referred to were in one e-mail from

7  John Tate, and then I believe Jesse Benton responds specific to

8  Ron and Mitt, and then there's another reference from Mike

9  Rothfeld.  There's three e-mails in this chain where they're

10  talking about other candidates, and this one at the top that

11  you're referring to is a fourth one that doesn't have to do with

12  Ron, Mitt or -- I'm sorry, Romney or Perry or Gingrich.  It has

13  to do with Michelle Bachmann who's also a candidate at that

14  time.

15  Q.  But in the context of their conversation about Michelle

16  Bachmann --

17  A.  Right.

18  Q.  -- the people in this e-mail were discussing other

19  Republican candidates?

20  A.  Yes.  Michelle Bachmann was a Republican candidate at that

21  time as well.

22  Q.  Now, we have how much time?  About five minutes.  I think we

23  have time for one more point.

24       Let's do Exhibit 105 previously admitted.  Now, you

25  remember on direct you had a -- we went through painstakingly

1  every e-mail, except you omitted a whole bunch all at once.

2        Do you remember that?

3  A.  Yes, the e-mails that were sent and received on

4  December 25, 2011, correct.

5  Q.  And one of those included Exhibit 105, right?

6  A.  Yes.

7  Q.  Okay.  Can you zoom in on the middle, begin forwarded

8  message?

9        This is one of the e-mails that we didn't read, right?

10 A.  Correct.  This was a forwarded message from Dimitri Kesari

11 to Jesse Benton and Jesse Tate --

12 Q.  Okay.

13 A.  I'm sorry; John Tate.

14 Q.  And it's actually from an Alfred Pennyworth, right?

15 A.  Yes.

16 Q.  We didn't talk about Alfred Pennyworth on your direct, did

17 we?

18 A.  No.

19 Q.  Who is Alfred Pennyworth?

20 A.  This was a ghost e-mail account, I guess you would call it,

21 that Kent Sorenson used specifically to send this e-mail to

22 Dimitri Kesari.

23 Q.  A ghost e-mail is kind of kind.  It's a fake name he's

24 using, right?

25 A.  Yes.  Kent Sorenson's name is Kent Sorenson, not Alfred

1  Pennyworth.

2  Q.  And he sends, this Alfred Pennyworth, he's using Alfred

3  Pennyworth ironically using the e-mail Iowans for truth, right?

4  A.  Right.

5  Q.  But really the name isn't even the truth, right?

6  A.  I'm sorry; the name isn't the truth?

7  Q.  Right.

8  A.  Correct.  Kent Sorenson sent this under the name "Alfred

9  Pennyworth," and Alfred Pennyworth is not his name.

10  Q.  Let's do a side by side of 105 -- actually let's do the date

11  on this first.  It's sent from Dimitri Kesari to John Tate,

12  Jesse Benton and Jedd Coburn on December 25, 2011; is that

13  right?

14  A.  Yes, that's correct.

15  Q.  Okay.  So now let's do a side by side of 105 and

16  Government's Exhibit 44 previously admitted.

17          If we could zoom down at the bottom where we were

18  talking about with -- where Jesse Benton is talking about

19  wanting to forward a draft of Alfred -- or sorry; of Kent

20  Sorenson's statement from his e-mail account.  He's asking

21  Dimitri Kesari for that; is that right?

22  A.  Yes.  Jesse Benton is stating he assumed that Kent Sorenson

23  forwarded the draft of his statement from the e-mail account and

24  he wants it forwarded to him at that time.

25  Q.  Okay.  Let's zoom in above this header over here from

1    December 25th.  Actually the one where -- yeah, there you go.

2              Actually December 25th, two days prior, he had

3    already -- Jesse Benton had already received a forward from Kent

4    Sorenson, right?

5    A.  Correct.

6    Q.  Fair to say that now two days later he's asking for someone

7    to send him what Kent Sorenson actually sent, right?

8    A.  Yes.

9    Q.  Because he doesn't know who Alfred Pennyworth is?

10   A.  He doesn't say it's because he didn't know who Alfred

11   Pennyworth is.  He's saying he assumed the statement was sent at

12   some point and he would like it sent to him.

13   Q.  But he had already gotten it, right, on December 25th?

14   A.  He had received this e-mail on December 25th from Dimitri

15   Kesari, correct.

16   Q.  And it didn't say Kent Sorenson on it; it said Alfred

17   Pennyworth?

18   A.  Well, Dimitri Kesari says Kent's first draft press release,

19   and the press release I believe mentions Sorenson, but I would

20   have look.

21   Q.  Okay.  So you're saying he does know that it's Alfred

22   Pennyworth is Kent Sorenson?

23   A.  I don't know whether Mr. Benton knew Alfred Pennyworth was

24   Kent Sorenson or not, if he specifically paid attention to the

25   header on that forwarded e-mail at the time.

1  Q.  All you can tell is that on December 25th, two days later,

2  he's saying forward me something from Kent's e-mail address that

3  he had already been forwarded?

4  A.  He's saying, yes, forward me a draft of his statement.  I

5  assume you received it by e-mail.

6  Q.  Is that the only fake name, to your knowledge, that Kent

7  Sorenson is using?

8  A.  That's the only one to my knowledge, and it was specifically

9  for this purpose.

10  Q.  Okay.  Now, let's do one more comparison before we end for

11  the day.

12       Let's compare Government's Exhibit 90 with

13  Government's Exhibit 102.  Zoom in on what Kent Sorenson says on

14  90 at the top, just what Kent Sorenson says.  And then let's

15  zoom in on what Dimitri Kesari says to John Tate from 102.

16       So on May 17th, Kent Sorenson tells Sonny Izon he had

17  an agreement with Dimitri that went through the month of June,

18  right?

19  A.  Correct.

20  Q.  And on June 25th, Dimitri tells John Tate not this is the

21  deal I had with Sorenson, but this is the deal Jesse had with

22  Sorenson?

23  A.  Correct.  My understanding is Sonny Izon does not know who

24  Jesse Benton is.

25  Q.  And neither of them are cc'ing Jesse Benton?

1  A.  Kent Sorenson only communicated with Dimitri Kesari about

2  his employment with the Ron Paul Campaign, and you're talking

3  about the Dimitri Kesari didn't cc Jesse Benton --

4  Q.  Right.

5  A.  -- in the e-mails with John Tate?  Right, on this e-mail on

6  June 25th, he did not cc Jesse Benton that I can see here.

7  Q.  Now, we had a lot of discussion about where you get

8  documents and from what source, and it looks like here, the one

9  that's sent to John Tate is coming from dimitri@ronpaul2012.com,

10 right?

11 A.  I don't know if I received that document from the Ron Paul

12 Campaign if that's what you're asking.  I would have to look at

13 the bottom.

14 Q.  I'm just asking -- having you look at the e-mail addresses.

15 You have dimitri@ronpaul 2012.com?

16 A.  Yes, that's correct.

17 Q.  And ronpaul2012.com is the Ron Paul Campaign server; you

18 know that, right?

19 A.  Yes, correct.

20 Q.  How about the one from Kent Sorenson to Dimitri, is that on

21 the Ron Paul server?

22 A.  No.  It's on Dimitri's aol.com

23 Q.  So the Ron Paul Campaign can't produce things from AOL,

24 right?

25 A.  I would assume they have difficulty unless someone accessed

1  their AOL account on the Ron Paul server.  I don't know if there

2  is a way to do that, if they were able to download their AOL

3  e-mails into their -- or sync their AOL account with their Ron

4  Paul account, for example.  I know Dimitri did that on his

5  laptop.  I don't know if it's possible to do that on the Ron

6  Paul server or not.

7  Q.  Okay.  But you agree there are two different e-mails?

8  A.  There are two different e-mails used by Dimitri Kesari.

9  There are also two different e-mails used by John Tate and also

10 by Jesse Benton, at least -- but, again, I would have to see the

11 sources of these e-mails to know whether they came from the Ron

12 Paul Campaign or elsewhere.

13 Q.  And you don't know, right?

14 A.  I don't know what?

15 Q.  The sources of each e-mail.

16 A.  I do if I can see the bottom of the e-mail.  I can't by

17 looking at the top.

18 Q.  But you don't remember?

19        MR. COONEY:  I'm sorry.  I think the witness is just

20 asking to see the bottom of the e-mail, and I do think she's

21 entitled to answer that question.

22 BY MS. CAMPBELL:

23 Q.  The only point I have, the only point I have is there's so

24 many e-mails, you would have to go look?

25 A.  Well, yes.  Of course, I would have to look at the bottom of

1  the e-mail to find out where I got that specific e-mail because

2  not only were there several different e-mails, but I got several

3  different e-mails from several different sources.  So these

4  particular copies you have here all I need to do is look at the

5  bottom to see if there's a Bates stamp and I can tell you where

6  that came from.

7  Q.  Okay.  All I'm saying is you have so much data, you have to

8  look to figure out where things are coming from, right?

9  A.  Yes, of course.

10          THE COURT:  All right.  We're going to wrap it up for

11  the day.  Somebody needs to go to a visitation on the jury, so

12  we'll accommodate that.  We'll start promptly at 9:00 in the

13  morning.

14          You remember the cautions I've earlier given you about

15  not discussing the case, not reading or listening to any news

16  accounts about it.  Keep an open mind.  And by the end of the

17  day tomorrow, I'll give you a good idea about where we are in

18  the process so you can plan for how long we're going to be here

19  for next week.

20          Thank you.

21          See you ready to go at 9:00 a.m.

22          (In open court, out of the presence of the jury.)

23          THE COURT:  You can step down.

24          We don't need the rest on the record.

25          (Discussion off the record.)

1           (Recess at 4:50 p.m., until 8:30 a.m., Friday,

2    April 29, 2016.)