IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
         Plaintiff,        :     Criminal No. 4:15-103
                           :
     vs.                   :
                           :
JESSE R. BENTON,           :     TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and   :         VOLUME IV
DIMITRIOS N. KESARI,       :
                           :
         Defendants.       :
- - - - - - - - - - - - - -X


                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Friday, April 29, 2016
                         9:00 a.m.



BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.









                Terri L. Martin, CSR, RPR, CRR
                United States Court Reporter
                 Room 189, U.S. Courthouse
                  123 East Walnut Street
                  Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                JOSEPH P. COONEY, ESQ.
                                  RICHARD C. PILGER, ESQ.
                                  Public Integrity Section
                                  Criminal Division
                                  U.S. Department of Justice
                                  1400 New York Avenue NW
                                  Suite 12100
                                  Washington, D.C.  20005

For Defendant Benton:             ANGELA L. CAMPBELL, JR., ESQ.
                                  Dickey & Campbell Law Firm
                                  301 East Walnut, Suite 1
                                  Des Moines, Iowa  50309

For Defendant Tate:               DAVID A. WARRINGTON, ESQ.
                                  LAURIN H. MILLS, ESQ.
                                  LeClair Ryan
                                  2318 Mill Road, Suite 1100
                                  Alexandria, Virginia  22314

                                  JESSE LINEBAUGH, ESQ.
                                  Faegre Baker Daniels
                                  801 Grand Avenue, 33rd Floor
                                  De Moines, Iowa  50309-8011

For Defendant Kesari:             JESSE R. BINNALL, ESQ.
                                  Harvey & Binnall
                                  717 King Street
                                  Suite 300
                                  Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

  For the Government:

| Karen LoStracco (Resumed) | | 636 Campbell 649 Warrington 690 Binnall | 695 | 718 Campbell 722 Warrington |
|---|---|---|---|---|
| Deana Watts | 723 | 735 Campbell 742 Warrington 742 Binnall | | |
| Kent Sorenson | 744 | 873 Campbell | | |

E X H I B I T S

| GOVERNMENT EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 3 - Unredacted Benton e-mail | 636 | 637 |
| 19 - Unredacted e-mail | 638 | 638 |
| 27 - Unredacted e-mail | 640 | 640 |
| 60 - 8/7/13 Sorenson/Kesari e-mail | 864 | 864 |
| 76 - Photo of Designer Goldsmith's, Inc. | 770 | 770 |
| 153 - City State Bank statement | 843 | 843 |
| 172 - Photo of Kesari and Sorenson | 793 | 793 |
| 173 - Photo of Paul and Sorenson | 790 | 790 |
| 182 - Sorenson phone records | 641 | 641 |

| DEFENDANT EXHIBIT NUMBERS: | | |
|---|---|---|
| B28 - Public Appeal excerpt of FEC report | 739 | 739 |
| B29 - Ben Eastmam e-mail | 875 | |

1          P R O C E E D I N G S

2               (In open court, in the presence of the jury.)

3               THE COURT:  Please be seated.

4               Members of the jury, good morning.

5               Continuing on, Ms. Campbell was examining Agent

6     LoStracco when we left off yesterday.

7               MS. CAMPBELL:  Thank you, Your Honor.

8                         KAREN LOSTRACCO,

9     resumed her testimony as follows:

10              CROSS-EXAMINATION (continued)

11    BY MS. CAMPBELL:

12    Q.  If we could please show what has not been admitted to the

13    jury Exhibit 3, unredacted version --

14              MR. COONEY:  Sorry, Ms. Campbell.  Government 3?

15              MS. CAMPBELL:  Government 3, yes.

16    BY MS. CAMPBELL:

17    Q.  Is this one of the e-mails that you received in your

18    investigation?

19    A.  Yes, from Jesse Benton.

20              MS. CAMPBELL:  Okay.  We would offer the unredacted

21    version of Government's Exhibit 3.

22                              (Government Exhibit 3 unredacted

23                               was offered in evidence.)

24              MR. COONEY:  No objection.

25              THE COURT:  Received.

1                    (Government Exhibit 3 unredacted

2                    was received in evidence.)

3  BY MS. CAMPBELL:

4  Q.  And, ma'am, this is as far back as February 10, 2011; is

5  that right?

6  A.  Yes, that's the date on the last e-mail at the top.

7  Q.  And I actually want to just focus on the bottom for right

8  now.

9          If you could please read this to the jury.

10  A.   John and Jesse,

11          Kent Sorenson called me tonight to check on Ron's

12  status.  I shared that Ron will be using Liberty PAC at this

13  time.  Kent has been offered to chair the Bachmann Campaign in

14  Iowa.  They have asked him to give them an answer next week.

15          Pawlenty also made him a job offer and Newt is the

16  high bidder at $8,500 a month.  Don't think we need to worry

17  about Newt.  I brought up the Patriot Act vote by Michelle to

18  him and he rebutted with Ron's DADT vote.  I think Kent would

19  like some work when the legislature is out at the end of April.

20          Thoughts?

21          A.J. Spiker.

22  Q.  Thank you.

23          Could you back out and show Jesse Benton's response?

24          On February 10, 2011, what did Jesse Benton respond to

25  that?

1    A.  It says, Jesse Benton writes:  We certainly aren't going to

2    pay him, so if he wants money, that makes it pretty simple.

3    Q.  Thank you, Agent.

4            Now, could we actually show the unredacted version --

5    and this is not in evidence -- to the witness of Government's

6    Exhibit 19.

7            And, ma'am, Government's Exhibit 19 is the unredacted

8    version of an e-mail that we've already seen, is that right, if

9    you remember?

10   A.  Sorry, just give me a minute to look through it.

11           (Pause.)

12           I recall this e-mail, yes.

13           MS. CAMPBELL:  We would offer Government's Exhibit 19,

14   the unredacted version.

15                                  (Government Exhibit 19 was

16                                   offered in evidence.)

17           MR. COONEY:  Ms. Campbell, is there a second page to

18   this?

19           MS. CAMPBELL:  Sort of.

20           MR. COONEY:  I see, got it.

21           No objection.

22           THE COURT:  Received.

23                                  (Government Exhibit 19 was

24                                   received in evidence.)

25   BY MS. CAMPBELL:

1  Q.  Ma'am, just to offer some context here, we heard some

2  evidence about Mr. Benton asking about Mr. Sorenson.  He's

3  actually talking about some other things with Mr. Kesari as

4  well; is that right?

5  A.  Are you talking about in this e-mail or the last one we

6  looked at?

7  Q.  In this e-mail.  Can you read that or do you need me to blow

8  it up?

9  A.  No, I'm fine.  I just need a moment to look through it.

10 Q.  Okay.

11         (Pause.)

12 A.  Yes, the bottom e-mails are talking about polling.

13 Q.  Okay.  And that's at the same day and time that they're

14 talking about polling in, Iowa, right?  Or maybe not even Iowa,

15 but they're talking about polling?

16 A.  They're talking about polling, I don't know where; but it is

17 the same day around the same time.

18 Q.  Okay.  Thank you.

19         If we could actually also have -- it's not in

20 evidence -- the unredacted version of Government's 27.

21         Ma'am, do you recognize the unredacted version of

22 Government's Exhibit 27?

23 A.  Yes, I do.

24         MS. CAMPBELL:  We would offer the unredacted version

25 of Government's 27.

1                              (Government Exhibit 27 was

2                              offered in evidence.)

3          MR. COONEY:  No objection.

4          THE COURT:  Received.

5                              (Government Exhibit 27 was

6                              received in evidence.)

7   BY MS. CAMPBELL:

8   Q.  And just to show the context of, we heard earlier about do

9   we even want Kent's endorsement on -- thank you -- on December

10  20th.  That was in response to some information that came to

11  Mr. Tate and Mr. Benton, right?

12  A.  Yes.  Jedd Coburn was asking if they still wanted Kent's

13  endorsement after some things had come out in the press about

14  some things that he had said, and Mr. Tate was asking if they

15  still wanted Kent's endorsement, and Mr. Benton replied, yes, we

16  still do.

17  Q.  In response to some negative sounding press, right?

18  A.  Yes.

19  Q.  Now, part of your being an investigator I think you said on

20  direct is you like to check facts from multiple sources, right?

21  A.  Yes.

22  Q.  And I know we've been through so many e-mails, we know that

23  you can read e-mails, and I want to switch to reading phone

24  records.

25  A.  Okay.

1   Q.  Could you pull up Government's Exhibit 182?

2          And the way we have it loaded, just scroll down to

3   page 4, if you will, to start with.

4          MR. COONEY:  For the record, I don't think 182 is

5   actually admitted, but we don't object.

6          MS. CAMPBELL:  I think you offered it.  Did you not

7   offer it as --

8          MR. COONEY:  I think we just offered the record.  We

9   don't object to it coming in, so it's a nonissue.  I just wanted

10  to make sure there's a record of it.  That's all.

11         MS. CAMPBELL:  We'll offer Government's Exhibit 182.

12                           (Government Exhibit 182 was

13                           offered in evidence.)

14         MR. COONEY:  No objection.

15         THE COURT:  Received.

16                           (Government Exhibit 182 was

17                           received in evidence.)

18  BY MS. CAMPBELL:

19  Q.  And this is the -- if you know, Agent, this is the detail of

20  Kent Sorenson's phone records?

21  A.  Yes.  This is a portion of the phone records for Kent

22  Sorenson's number, yes.

23  Q.  And if you could zoom up on the top here.

24         That's telling us sort of the number that Kent

25  Sorenson was using in these records, is that right, a phone

1  number?

2  A.  Correct.  That's showing the phone number that is registered

3  to Kent Sorenson through Verizon.

4  Q.  Okay.  And then we have these columns, date, time.  And the

5  date would be the date of the call; is that right?

6  A.  Yes.

7  Q.  And the time would be the time of the call?

8  A.  Correct.

9  Q.  And the number would be the number either called or calling

10 him; is that right?

11 A.  Correct.

12 Q.  And then the rate would be how much they're charging him,

13 whether it's peak or off peak?

14 A.  Sure.

15 Q.  Do you know?

16 A.  I would assume -- that would be my assumption reading these

17 records, but that's not something I would focus on.

18 Q.  Okay.  Let's get over to the origination.  That would be

19 where the call is coming from, right?

20 A.  Yes.

21 Q.  So if Kent Sorenson is making the call, it's where his cell

22 phone is?

23 A.  I don't know.  We didn't specifically ask Verizon for cell

24 phone tower information.  I know that can get a little bit more

25 detailed, so I'm not sure how detailed their record is with

1  regards to where the phone is at a particular time.

2  Q.  I think you testified on direct that he was living in Milo;

3  is that right?

4  A.  He was living in Milo, yes.  For a while he was living in

5  Indianola, and then moved to Milo.

6  Q.  So if we look here at Milo, Iowa, on our outgoing calls down

7  at the bottom there, like at 7:42 a.m., for example, Milo, Iowa,

8  we can't tell where he is in Milo, but we can generally tell

9  what town he's in?

10  A.  I mean, it would give a general geographic area, correct,

11  somewhere around Milo.

12  Q.  And then it would generally tell perhaps where that number

13  is that he's calling, the destination; is that right?

14  A.  Generally, correct.

15  Q.  And then for the incoming calls, like that third one down,

16  it's still telling us where Mr. Sorenson's phone is for the

17  incoming call?

18  A.  Well, again, it may be telling us where the tower is that

19  his phone is hitting on.  It may not necessarily say where his

20  phone is at that time.  I don't know if there's a cell phone

21  tower in Milo and he could be in a surrounding town and be on

22  the Milo tower.  I don't know anything about that.

23  Q.  Okay.  Just in general that's what those lines mean?

24  A.  In general, yes, it would be somewhere in that vicinity of

25  Indianola.

1  Q.  And you can get more specific if you requested cell phone

2  data?

3  A.  I'm sure we probably could, yes.

4  Q.  And no one did that in this case, did they?

5  A.  No.

6  Q.  Okay.

7  A.  We didn't see the need to do that in this case.

8  Q.  Okay.  Now I want to move to actually do a side by side of

9  182, page 59 of that one, if you would.

10        So if you could blow up so we have the last call on

11 December 27th.  Actually can you highlight at the very top so we

12 know that we're talking about 2011, up at the very top, that

13 header.

14        So these are the phone bills that are due in February

15 of 2012; is that right?

16 A.  Correct.

17 Q.  Okay.  So the calls from December would be from December

18 2011?

19 A.  Yes.

20 Q.  Okay.  So could you now blow up some of those last calls for

21 December 27th there.

22        So let's do -- you know, sort of towards the end

23 there.  So it kind of looks like he's in Milo here, right,

24 generally?

25 A.  Yes.  There's a lot of Milo, Iowa, calls.

1  Q.  Where his home is?

2  A.  Correct.

3  Q.  Where was Michelle Bachmann's office?

4  A.  I'm trying to remember where Michelle Bachmann's

5  headquarters were.  I don't know that I know that off the top of

6  my head right now.

7  Q.  Not Milo?

8  A.  It's not Milo.

9  Q.  Somewhere in the Des Moines area?

10  A.  Correct.

11  Q.  And then if we could do a side by side and put up

12  Government's Exhibit 44 previously admitted.  If you could just

13  blow up the middle one there on December 27, at 10:08 p.m.

14       If you remember, Agent, this is where Dimitri Kesari

15  is telling Jesse Benton and John Tate about Kent Sorenson's cold

16  feet and they're getting kind of mad about it?  Do you recall

17  those e-mails, generally?

18  A.  Yes.

19  Q.  And this is where he's saying that he was sending his press

20  release from that ghost account, that's that Alfred Pennyworth

21  account, right?

22  A.  I'm sorry, could you repeat that?

23  Q.  This is the e-mail where he's telling them that, yeah, he

24  was using the ghost e-mail, which ends up being Alfred

25  Pennyworth, right?

1  A.  Yes.

2  Q.  Could you blow up that last sentence there for her?

3       Dimitri Kesari also tells John Tate and Jesse Benton

4  that Kent Sorenson is sitting in the Bachmann office waiting to

5  talk with her and he has been texting me from there; is that

6  right?

7  A.  That's what he says, yes.

8  Q.  And can you highlight the date there?

9       December 27, 2011, at 10:08 p.m.; is that right?

10 A.  Yes.

11 Q.  And then if you could make it so that you could see also the

12 phone records.  Maybe go up and down?  I think you have to go on

13 the tool.  I think you need to do like the zooming tool and then

14 move it up, yes.  And then highlight that last number down here,

15 the 10:05 p.m. would be the closest.

16      10:05 p.m., December 27, kind of looks like Kent

17 Sorenson is not really sitting in Bachmann's office, right?

18 A.  The e-mail from Dimitri mentions that Sorenson had been

19 texting him, and the phone records don't indicate text messages.

20 Q.  Right.

21 A.  So he said he's been texting him.  I don't know when

22 Sorenson had said he's been sitting in the Bachmann office,

23 whether it was right then or it was at an earlier time.

24 Q.  Okay.  It says he is sitting, right?

25 A.  That's what Dimitri Kesari said, yes.

1    Q.  I mean, we can look up and see for at least, what have we

2    got, five hours, he's not sitting in Michelle Bachmann's office,

3    right?

4    A.  I don't know if Michelle Bachmann had another staff -- I

5    mean, someone from the campaign, they had a main campaign office

6    and then if they had other satellite offices around the

7    Des Moines area.  I don't know if there's another one around

8    there.  I don't know the answer to that question.  But these

9    calls on December 27th are coming from Milo, the Milo area, yes.

10   Q.  Okay.  And you don't know where Michelle Bachmann's offices

11   are?

12   A.  I know where her main campaign office was.  I can't think of

13   it off the top of my head.  Somewhere in the Des Moines area,

14   yes.

15   Q.  But you'll agree with me that Kent Sorenson is in Milo on

16   the phone at 10:05 p.m.?

17           And if you could expand that over, we know he's

18   actually covering that 10:08 p.m.  Move the cell phone records

19   so we can see.

20           I mean, on 12/27 when he's actually -- at 10:05 p.m.,

21   he's actually on the phone for 15 minutes, which is actually

22   covering the time when Dimitri Kesari is sending the e-mail,

23   right?

24   A.  Well, Dimitri Kesari is sending John Tate an e-mail.

25   Q.  Right.

1  A.  Saying that Kent has been texting him.

2  Q.  Now, you can text and talk on the phone at the same time,

3  right?

4  A.  I can't text and talk on the phone at the same time.

5  Q.  You can't?

6  A.  On the same phone?

7  Q.  Yes.

8  A.  I'm sure there's a way to do it, but I've never done that

9  before.

10  Q.  Do you know who Kent Sorenson is talking to at 10:05 p.m.?

11  Do you know that phone number?

12  A.  I don't know that phone number off the top of my head, no.

13  Q.  (712) 461-1401, you don't know who that is?

14  A.  I don't know off the top of my head.  I have several numbers

15  that I've written down and associated with different people; but

16  I'm -- if you had something to refresh my recollection, I could

17  look at it.

18  Q.  Do you know if it's Aaron Dorr's phone number?

19  A.  Again, I don't know off the top of my head.  That sounds

20  right, but I'm not a hundred percent positive.

21  Q.  And, Agent, we can tell where Kent Sorenson goes after the

22  endorsement, too, can't we, from these phone records, or at

23  least we can tell where his phone was; is that right?

24  A.  Well, the endorsement was on the 28th, so if you want to

25  look at the records for December 28th.

1  Q.  Let's look at the records for December 30th, page 64 from

2  Exhibit 182.

3          You can hit escape and it will all go away.  Let's

4  just highlight that top part up there, the very top with the

5  phone number so we can just see.

6          So December 30th in the evening, Kent Sorenson's phone

7  at least looks to be in the Sioux City area; is that right?

8  A.  On the 30th, yes.

9  Q.  Do you know what Ron Paul event was happening in Sioux City

10 on December 30th?

11 A.  No, I do not.

12          MS. CAMPBELL:  No further questions, Your Honor.

13          THE COURT:  Mr. Warrington.

14          MR. COONEY:  Excuse me, Mr. Warrington, before you

15 start, are you going to use that Elmo?

16          MR. WARRINGTON:  No.

17          MR. COONEY:  Could you turn that light off?  If you

18 hit that lower button there, power.

19          There we go.

20          MR. WARRINGTON:  It will take a few seconds for

21 Mr. Mills to get set up.

22                          CROSS-EXAMINATION

23 BY MR. WARRINGTON:

24 Q.  Good morning, Agent LoStracco.  How are you?

25 A.  Good morning.

1  Q.  You weren't in Iowa in December of 2011, were you?

2  A.  No, I wasn't.

3  Q.  You weren't in Des Moines for the Iowa caucuses in January

4  of 2012, were you?

5  A.  No, I wasn't.

6  Q.  And you weren't at the Ron Paul headquarters at any time in

7  Des Moines in 2012, were you?

8  A.  No, I was not.

9  Q.  And you never visited the Ron Paul headquarters in

10  Springfield, Virginia, in 2011 or 2012, did you?

11  A.  No.

12  Q.  And you didn't know Kent Sorenson in 2011?

13  A.  No.

14  Q.  Or 2012?

15  A.  No.

16  Q.  And you didn't know Dimitri Kesari in 2011?

17  A.  No.

18  Q.  Or 2012?

19  A.  No.

20  Q.  You didn't know Jesse Benton in 2011?

21  A.  No.

22  Q.  Or 2012?

23  A.  No.

24  Q.  And you didn't know John Tate in 2011?

25  A.  No.

1  Q.  Or in 2012?

2  A.  No, I did not.

3  Q.  And you're not a sender or recipient on any of the e-mails

4  that you've been reading for Mr. Cooney and Ms. Campbell here

5  today?

6  A.  No, I'm not.

7  Q.  Or yesterday?

8  A.  Correct.

9  Q.  You weren't copied on any of those e-mails, correct?

10  A.  No.

11  Q.  So, in fact, you don't have any personal knowledge of

12  anything in those e-mails other than just reading them?

13  A.  Well, other than receiving them from the sources from which

14  they came and reading them and analyzing them, correct.

15  Q.  Okay.  So for the past few days you've just been reading

16  e-mails to the jury essentially?

17  A.  There's been some analysis of where people were at

18  particular times, but, in essence, reading things to the jury,

19  correct.

20          MR. WARRINGTON:  Your Honor, may I approach?

21          THE COURT:  Yes.

22  BY MR. WARRINGTON:

23  Q.  I'm going to show you the government's indictment this case.

24          Have you seen this before?

25  A.  Yes.

1 Q.  Okay.  And the language at the top of this indicates that

2 it's been filed with the court's electronic filing system?

3 A.  Yes.

4 Q.  And the stamp here at the upper right-hand corner indicates

5 that the indictment has been received by the Clerk of Court --

6 A.  Yes.

7 Q.  -- of this district?

8 A.  Correct.

9 Q.  Okay.  I want to turn your attention to the orange highlight

10 there.  I would like you to read for yourself only paragraph D.

11        Let me know when you've had a chance to read that.

12        (Pause.)

13 A.  Okay.

14 Q.  Thank you.

15        Now, the indictment is a document that's available to

16 the public, correct?

17 A.  Yes, that's correct.

18        MR. COONEY:  Objection.  I'm not sure what we're

19 doing.

20        THE COURT:  Well, there's no objection to the question

21 right now.  Overruled.

22        MR. WARRINGTON:  Mr. Mills, could you pull up

23 Government Exhibit 74.

24        MR. MILLS:  It's up.

25 A.  Yes, I can see it.

1       MR. WARRINGTON:  Maybe we could publish that for the

2  jury if it's all right.

3  BY MR. WARRINGTON:

4  Q.  Now, isn't this the only e-mail Mr. Tate is on that mentions

5  Kent Sorenson or Kent on February 7, 2012?

6  A.  It's the only e-mail I recall him being on that day at this

7  time about the campaign, correct.

8  Q.  Isn't it a fact that paragraph D of the government's

9  indictment says that --

10      MR. COONEY:  Objection.

11      THE COURT:  Finish your question.

12      MR. COONEY:  The indictment is not evidence.

13      MR. WARRINGTON:  I'm not offering it for evidence,

14  Your Honor.

15      THE COURT:  Yeah.  We read it to the jury at the

16  beginning of the trial.  He's simply asking if there's evidence

17  to support that paragraph.  Overruled.

18  BY MR. WARRINGTON:

19  Q.  Isn't it a fact that paragraph D, which you just read,

20  states that Mr. Tate approved a payment to Kent Sorenson on

21  February 7th?

22  A.  That is what the language says, correct.

23  Q.  And that Mr. Tate approved that payment by e-mail?

24  A.  Yes.

25  Q.  It doesn't say tacitly approved, does it?

1  A.  It does not use the word "tacitly."

2  Q.  Doesn't say impliedly approved, does it?

3  A.  No.

4  Q.  Just says approved?

5  A.  Correct.

6  Q.  And this is the only e-mail that Mr. Tate is on that

7  mentions Kent or Kent Sorenson on February 7, 2012, that you're

8  aware of, correct?

9  A.  I'm not a hundred percent certain about that, but that's --

10  this is the one e-mail I remember from February 7th where they

11  talk specifically about getting Kent paid.

12  Q.  And this is the only e-mail you recall you've testified to

13  over the last day and this morning?

14  A.  That I recall, correct.

15  Q.  But the word "approved" doesn't appear anywhere in this

16  e-mail?

17  A.  No.

18  Q.  The words "go ahead and pay" don't appear anywhere in this

19  e-mail, do they?

20  A.  No.

21  Q.  What Mr. Tate actually says in response to Mr. Kesari's

22  question, did you get Jesse paid, is "No idea.  Ask him,"

23  correct?

24  A.  Correct.

25  Q.  Now, no idea is not tacit approval of anything, is it?

1    A.   It's not.  I would say it's --

2    Q.   And it's not implied approval of anything, is it?

3    A.   It's implying that Mr. Tate knows what Dimitri Kesari is

4    asking about Kent's payment.

5    Q.   But it's not approving anything, is it?

6    A.   He's not saying the word "approved."

7    Q.   But that's what the indictment says?

8    A.   The indictment says that he approved the payment through

9    e-mail.

10   Q.   So paragraph D on page 8 of the indictment is false,

11   correct?

12   A.   I would not say it's false.

13   Q.   It's untrue?

14   A.   No, I would not say it's untrue.

15   Q.   If it says he approved it by e-mail and this is the e-mail

16   we're talking about --

17   A.   Uh-huh.

18   Q.   -- and the word "approval" doesn't appear in there, the

19   words "go ahead and pay" don't appear in there, it's not tacit

20   approval, it's not implied approval as you just testified --

21   A.   I believe the government's argument is Mr. Tate --

22   Q.   I'm not asking for the government's argument, Agent

23   LoStracco.

24            MR. COONEY:  Objection.  The witness is entitled to

25   answer a fair -- a fair question is entitled to a fair answer.

1          THE COURT:  Pose a new question.

2     BY MR. WARRINGTON:

3     Q.  Your statement was that this e-mail did not contain the word

4     "approved," correct?

5     A.  It does not contain the word "approved," but there are

6     various ways of proving something --

7     Q.  I'm just asking the question.

8     A.  Correct, it does not.

9     Q.  I'm asking simple questions here, Agent LoStracco.  I know

10    you have a story --

11         THE COURT:  Go ahead and just ask the next one.

12    BY MR. WARRINGTON:

13    Q.  And it doesn't say "go ahead and pay," does it?

14    A.  It does not say go ahead and pay.

15    Q.  So you would agree with me that paragraph D is false?

16    A.  No, I would not agree with you.

17    Q.  And it's a false statement submitted to the court by the

18    government, correct?

19    A.  No.

20    Q.  Let me show you a couple other February 7th e-mails.

21         I'm going to reference what comes up on the screen

22    here.  I believe you can see it, right?

23    A.  I'm still looking at 75.

24    Q.  That's the one I want.

25    A.  Oh, okay; sorry.

1  Q.  So this is from Dimitri Kesari to Jesse Benton, the first

2  e-mail, correct?

3  A.  Correct.

4  Q.  Okay.

5  A.  Well, from what I can tell in here, correct.  Jesse Benton

6  responds.  I don't know if there are other people on this

7  e-mail.

8  Q.  Okay.  And this bottom message asks Mr. Benton if someone

9  named Kent got paid, correct?

10 A.  Yes.

11 Q.  And Mr. Benton writes back, it looks like from his iPhone,

12 you handle it, "yo handle it"?

13 A.  Yes.

14 Q.  Mr. Tate is not on this message, is he?

15 A.  No.  At least the response that Jesse Benton sends is not,

16 from what I can see.

17 Q.  On this e-mail, he's not on this e-mail, correct?

18 A.  Correct.  From what I can see in the header information,

19 Mr. Tate is not on there.

20 Q.  There's no mention of ICT or Interactive Communication

21 Technology on this e-mail, is there?

22 A.  No.

23 Q.  There's no mention of how to code any payment for FEC

24 reporting purposes on this e-mail, is there?

25 A.  No.

1    Q.  I want to show you Government Exhibit 77.  I want to start

2    with the message at the bottom.

3          (Pause.)

4          My tech guy is a little slow with his fingers.

5    A.  That's okay.

6    Q.  I'll start with this message at the bottom.  And attached --

7    or actually the last page of the exhibit is an attachment.

8    Actually let's look at that.

9          And this is one of the invoices from -- has it caught

10   up with you?

11   A.  It was on there one moment ago.  I believe it's page 3 of

12   75.

13   Q.  It's actually --

14   A.  Or, sorry; 77.

15   Q.  That's what you get when you get a couple of old guys on

16   technology.

17          MR. MILLS:  Page 3.

18   BY MR. WARRINGTON:

19   Q.  Okay.  Page 3 --

20   A.  Yes, I can see it now.

21   Q.  -- this is one of the invoices from ICT that you talked

22   about yesterday, correct?

23   A.  Yes.

24   Q.  And it's dated February 2nd in the upper right-hand corner,

25   correct?

1  A.  Yes.

2  Q.  And the description you testified to Mr. Cooney was that it

3  was for production services, correct?

4  A.  Yes.

5  Q.  And it was sent to the attention of Dimitri Kesari at the

6  Ron Paul PCC, correct?

7  A.  Yes.

8  Q.  Let's go back to the first page and highlight over it.

9        So this is the bottom part of the e-mail.  And this is

10 where Mr. Izon is forwarding the invoice to Mr. Kesari, correct?

11 A.  Correct.

12 Q.  And then Mr. Kesari, if we can move up the invoice -- or

13 e-mail, Mr. Kesari then forwards that one to Mr. Cortes, right?

14 A.  Right.

15 Q.  And Mr. Cortes then sends this e-mail to Lori Pyeatt, Deana

16 Watts, Katie Koerber, and Dimitri Kesari, correct?

17 A.  Yes.

18 Q.  And in that e-mail he directs them to wire the following to

19 Interactive Communication Technology, $38,125, code 60110,

20 correct?

21 A.  Correct.

22 Q.  And Mr. Cortes testified that he was the author of this

23 e-mail, correct?

24 A.  Yes.

25 Q.  Now, there's no instruction from Mr. Cortes how to code this

1  invoice on an FEC report in this e-mail, is there?

2  A.  No, other than the code that he assigned at the 60110.

3  Q.  Right.  And that's from their accounting chart of account

4  codes that Mr. Cortes testified to on Tuesday, correct?

5  A.  That was from the -- I don't know if he called it a chart of

6  account codes.  It was from the code list that he had received

7  from Texas.

8  Q.  Right.  He had a list, he picked a number, and he put it on

9  here and sent it to Texas, correct?

10  A.  Right.  I believe he testified that he picked the number

11  based upon the information from the invoice.

12  Q.  Now, there's no mention of Kent Sorenson on this e-mail or

13  on the attached invoice, is there?

14  A.  No.

15  Q.  Now, Jesse Benton was not copied on this, is he?

16  A.  No.

17  Q.  John Tate is not copied on this, is he?

18  A.  No.

19  Q.  And actually there's no mention of the Federal Election

20  Commission on this at all, is there?

21  A.  The words "FEC" or "Federal Election Commission" do not

22  appear on this, correct.

23  Q.  Let's see Government's Exhibit 76.

24         Now, this is a February 8th e-mail from Dimitri Kesari

25  to Fernando Cortes from February 2012, correct?

1    A.   Yes.

2    Q.   And John Tate is not on this e-mail, is he?

3    A.   No, not on that I see.

4    Q.   And it's instructions from Mr. Kesari to Mr. Cortes to wire

5    this invoice -- wire payment for this invoice tomorrow morning,

6    correct?

7    A.   Yes.

8    Q.   Let's go to Government Exhibit 145.  Let's go to I believe

9    it's the next page of the exhibit.

10            Do you recall testifying about these FEC reports, the

11   excerpts from these reports?

12   A.   Yes.

13   Q.   Do you recall yesterday testifying that this was reflective

14   of a payment made to Interactive Communications, Inc., on

15   February 8, 2012?

16   A.   Right.

17   Q.   In the amount of $3,825, correct?

18   A.   Actually $38,125.

19   Q.   Oh, I'm sorry; $38,125?

20   A.   Yes.

21   Q.   And this reflects that this payment was reported to have

22   been paid on February 8, 2012, right?

23   A.   Yes, that's the date of disbursement.

24   Q.   Okay.  Let's go to Government Exhibit 59.

25            Do you recall testifying about Exhibit 59 yesterday?

1  A.  Yes.

2  Q.  And you will recall that this is an e-mail that had an

3  attachment from -- an e-mail Mr. Cortes to Mr. Benton and

4  Mr. Tate that had an attachment for the breakdown of expenses

5  that have been paid by the Paul Campaign from January 1, 2012 to

6  February 22, 2012, correct?

7  A.  Yes.  I don't -- I'm not a hundred percent certain we

8  covered this in my testimony.

9  Q.  Fair enough.

10  A.  Or if I'm remembering this from Mr. Cortes.

11  Q.  You were sitting here and you do remember this exhibit?

12  A.  I do remember the exhibit.  I don't recall talking about it

13  in my testimony, but I could be wrong.

14  Q.  In any event, you're familiar with this?

15  A.  Yes.

16  Q.  And attached to this e-mail is the printout of 77 pages,

17  correct?

18  A.  I remember, yes, it's about 77 pages.

19  Q.  And about 2,300 line items?

20  A.  I don't know how many line items.  I remember the number of

21  pages.

22  Q.  And the number of pages, do you remember that there were

23  about approximately 30 entries on each of the pages?

24  A.  Probably approximately that amount.

25  Q.  And somebody here did some simple math and it was about

1  2,300 line item entries?  Do you recall that?

2  A.  I don't remember that number, but --

3  Q.  But you do recall that at the end this showed that the

4  campaign had paid about 7.8 million dollars in expenditures

5  between January 1st of 2012 and February 22nd of 2012?

6  A.  Right.  That amount would be reflected on the last page.  I

7  could look at it.

8  Q.  Let me show you that.  I'm not going to ask you to do any

9  math.

10  A.  Yeah, it says 7.8 million.

11  Q.  Right.  Now I'm going to show you the indictment again, and

12  I'm going to ask you to read paragraph 8 (sic) to yourself,

13  please.

14  A.  Paragraph 8?

15  Q.  Yes.  I'm sorry; G, G.

16  A.  Oh.

17  Q.  My eyes aren't what they used to be.

18          (Pause.)

19  A.  Okay.

20  Q.  Thank you.

21          Now, you don't know if John Tate ever read this

22  spreadsheet?

23  A.  I know that he received it.  I don't know whether he read

24  it, correct.

25  Q.  Now, that paragraph I just asked you to read states that on

1  February 22, 2012, Mr. Tate caused the Ron Paul Campaign to list

2  the $38,125 February payment to Interactive Communication

3  Technology as audiovisual expenses on the campaign expense

4  report, correct?

5  A.  It says on or about February 22, yes.

6  Q.  And Mr. Tate received this expense account accounting on

7  February 22nd, correct?

8  A.  Yes.

9  Q.  You don't know if Mr. Tate did anything with this expense

10  report, do you?

11  A.  I don't know if he replied to it.

12  Q.  Okay.  And he didn't create this, did he?

13  A.  Fernando Cortes created this.

14  Q.  So he didn't do anything to cause how this was listed on

15  this expense report, this expenditure to ICT, did he?

16  A.  Fernando Cortes listed how it was categorized on -- in the

17  coding, correct, which was audiovisual.

18  Q.  So, again, paragraph G in the government's indictment is

19  false?

20  A.  No.

21  Q.  It's untrue?

22  A.  No, it's not untrue.

23  Q.  It's unclear?

24  A.  I believe Mr. Cortes testified that he produced this report

25  on behalf of Mr. Tate and Mr. Benton at their request.

1  Q.  But you just testified that Mr. Cortes is the one that

2  created the report and put the codings in, correct?

3  A.  He's the one that put the coding in pursuant to the invoice,

4  what the invoice said.

5  Q.  Okay.  So paragraph G at best is unclear?

6  A.  I wouldn't say it's unclear either.

7  Q.  But you wouldn't say it's untrue?

8  A.  No, I would not say it's untrue.

9  Q.  Just like you wouldn't say that February 7, paragraph D is

10  untrue, right?

11  A.  Correct.

12  Q.  Let's go to Exhibit 58, February 16th.

13         Do you recall this exhibit?

14  A.  Yes.

15  Q.  All right.  At the bottom of the -- pull out here.

16         This is Fernando Cortes sending to John Tate, Deana

17  Watts, and Lori Pyeatt a list of outstanding bills through

18  February 29, 2012, correct?

19  A.  Well, the date of the e-mail is February 16th so -- oh, I

20  see, yes, outstanding bills through February 29th.

21  Q.  This is an e-mail of February 16th?

22  A.  Yes.

23  Q.  And let's go to page 2, Mr. Mills.  And let's highlight the

24  top part.

25         And the third entry down you see 38k, Interactive

1    Communication Technology, correct?

2    A.  Yes.

3    Q.  So Mr. Cortes was listing this as an outstanding amount as

4    of February 16th?

5    A.  Yes.

6    Q.  But didn't we just establish that that $38,000 amount had

7    already been paid by the campaign on February 8th?

8    A.  Right, correct.  And I do not --

9    Q.  Let me finish my question.

10   A.  Yes; I'm sorry.

11   Q.  As reflected on the FEC report, correct?

12   A.  Correct.

13   Q.  Yet Mr. Tate is told that this is still an outstanding debt

14   owed to the campaign on February 16th even though it's already

15   been paid, correct?

16   A.  I do not know what Fernando Cortes knew at the time about

17   whether it had actually gone through, the payment.

18   Q.  But he had instructed it to be paid, right?

19   A.  He had instructed it to be paid, correct.

20   Q.  Now, I want you to look right below that.  You see an entry

21   for 26k, DGI - list rentals - NV/MN/ME - state consulting - per

22   Dimitri/Jesse?

23   A.  Yes.

24   Q.  So this is another outstanding debt as of this date?

25   A.  Yes.

1   Q.  And I think you testified yesterday that you understood the

2   abbreviations there to obviously be for the three states,

3   Nevada, Minnesota and Maine, correct?

4   A.  Correct.

5   Q.  And this is for state consulting?

6   A.  Yes.

7   Q.  Per Dimitri and Jesse, correct?

8   A.  Yes.

9   Q.  And DGI is the abbreviation for Designer Goldsmiths,

10  Incorporated, correct?

11  A.  Yes.

12  Q.  And that's the jewelry shop of Mr. Kesari's wife, correct?

13  A.  Yes, that's correct.

14  Q.  Let's go back to the top of the first page of Exhibit 58.

15         Now, Mr. Tate tells Mr. Cortes in this e-mail that he

16  just authorized one million dollars in mail, correct?

17  A.  Yes.

18  Q.  And $750,000 in TV ads?

19  A.  Correct.

20  Q.  And he tells him, of course it's not all payable now or even

21  this week?

22  A.  Yes.

23  Q.  And he asks him to hold off paying whatever invoices we can

24  hold off?

25  A.  Yes, he makes that statement.

1  Q.  He says Cando can wait?

2  A.  Correct.

3  Q.  Or "Cando," I don't know what --

4  A.  I don't know either.

5  Q.  Wentzel can wait?

6  A.  Correct.

7  Q.  Dumas can wait?

8  A.  Correct.

9  Q.  He thinks that MPrinting can wait?

10 A.  Correct.

11 Q.  Valkyrie can wait?

12 A.  Yes.

13 Q.  And do you know who Valkyrie is?

14 A.  I don't.

15 Q.  Do you recall Mr. Trygve Olson that you testified about

16 yesterday?

17 A.  Yes.

18 Q.  Do you remember his e-mail address?

19 A.  I thought it was Viking Strategies.

20 Q.  Okay.  Would it refresh your recollection that Valkyrie is

21 Valkyrie Communications or Viking Strategies?

22 A.  If I saw something that, yeah, I would confirm that with

23 Trygve Olson, yes.

24 Q.  And then Mr. Tate says, don't know what Interactive

25 Communication Technology is, doesn't he?

1  A.  That's what he states here, right.

2  Q.  He doesn't instruct Mr. Cortes to do anything with this

3  payment to Interactive Communication Technology, does he?

4  A.  No.  He just says that he does not know what it is.

5  Q.  Mr. Mills, let's go to Exhibit 67, please, Government

6  Exhibit 67.  All right.  Let's highlight the lower, the December

7  29th part of that.

8         Now, this is an e-mail from Mr. Cortes -- actually

9  let's show the header.

10         Now, this is Mr. Cortes sending an e-mail to Mr. Tate?

11  A.  Right.

12  Q.  And you will recall this is cash on hand report as of

13  12/29/2011?

14  A.  Oh, as the subject line?  I remember it being cash on hand

15  or COH.

16  Q.  Yes, yes.  Do you recall talking about the campaign

17  having -- and I believe this was Mr. Cortes's testimony, but you

18  recall this e-mail?

19  A.  Yes.

20  Q.  So the testimony of Mr. Cortes was that it was cash on hand

21  for the campaign was 135k, correct?

22  A.  Correct.

23  Q.  But this e-mail also shows if you add up all of the

24  outstanding invoices, that the campaign had about a million-one

25  in outstanding debts as of 12/29, correct?

1  A.  Yeah.  They had --

2  Q.  Sound about right?

3  A.  Definitely more than 135k.

4  Q.  Yes.  So you can't pay a million-one in debts with 135k

5  cash, right?

6  A.  Right.  Well, it also lists 400k in reserves, but I don't

7  know enough about the accounting to know about that.

8  Q.  But even if you added the two together, you couldn't cover a

9  million --

10  A.  Right.

11  Q.  -- 400 and 135?

12  A.  Right.

13  Q.  So let's go back to Exhibit 58.  And let's go back to

14  page 2.

15       Now, you testified that this was for Nevada, Maine,

16  and Minnesota statements -- or this is what this says, right?

17  A.  Right.  I'm assuming those abbreviations are for states.

18  Q.  Okay.  And do you recall the discussion yesterday that you

19  had with Mr. Cooney referencing another e-mail?  If you need

20  your memory refreshed on that, we'll pull that up, too.  But I'm

21  just asking if you remember the invoices that were attached to

22  the $25,657 payment to DGI on February 8th that had two invoices

23  attached?

24  A.  Yes, I remember those.

25  Q.  Do you remember those?

1  A.  Yes.

2  Q.  And one of those invoices listed Nevada -- NV, MN, ME for

3  targeted list rental?

4         Do you remember that?

5  A.  Yes.

6  Q.  So in your work with campaigns, you understand target list

7  rental to be rental of direct lists, e-mails lists, phone lists

8  that campaign workers use to target voters and supporters?

9  A.  Yes.

10 Q.  You also understand that a campaign would want to get that

11 information, get those names to get information of people well

12 ahead of any event that they were trying to get people to,

13 correct?

14 A.  I don't know the timing of when they would, but I would

15 assume that it would be helpful to have it as much in advance as

16 they could.

17 Q.  Right.  Doesn't make sense to get the list after the event

18 has already occurred?

19 A.  No, right, unless it was for a different purpose other than

20 the caucus.

21 Q.  Okay.  And if you want to try to get people out -- and you

22 just mentioned the caucuses.  So Nevada, Minnesota, and Maine

23 had caucuses in February of 2012?

24 A.  Right.

25 Q.  So wouldn't it be fair to say if you wanted to -- if the

1    campaign wanted to target people to get them out to those

2    caucuses, they would want to reach out to them probably multiple

3    times before the caucuses occur?

4    A.  I -- I mean, again, I don't know how that works.  I don't

5    know how many times a campaign would reach out to an individual

6    before to caucus.

7    Q.  Okay.  But they would want to reach out ahead of time,

8    right?

9    A.  I would assume so, yes.

10   Q.  Okay.

11   A.  Again, if the listing was -- or if the mail list was

12   specifically for the caucus.

13   Q.  But if you wanted to do that in late December of 2011 and

14   you needed to rent those lists and you didn't have the cash on

15   hand, that's a problem, right?

16   A.  I'm sorry, can you repeat the question?

17   Q.  So for a February caucus in Nevada, let's say --

18   A.  Correct.

19   Q.  -- and the campaign wanted to reach out with Nevadans to get

20   them out to the caucus in February and they needed to do that

21   ahead of time and they needed to pay for the expense late

22   December, early January and you only had $135,000 on hand, but

23   a million-one in outstanding bills, that's a problem, right?

24         MR. COONEY:  Objection.  First of all, that's a multi

25   compound question.  Second of all, there's a lot of questions

1  being asked here about what campaigns do and why they would do

2  it, and I think Special Agent LoStracco testified she's an FBI

3  agent not somebody in campaigns.

4          THE COURT:  Overruled.

5          Answer if you know.

6  A.  Can you break it down just a little bit?  I'm sorry.  That

7  was a lot of info.

8  BY MR. WARRINGTON:

9  Q.  That's okay.  I'm a little longwinded, and lawyers get paid

10  by the hour, so --

11          If the campaign wanted to reach out to people using,

12  let's say, direct mail --

13  A.  Right.

14  Q.  -- they would need to buy -- assuming they would need to buy

15  that list ahead of time to meet a mail schedule to get the mail

16  to people before the caucus in enough time to convince them to

17  go to the caucus?

18  A.  Right.

19  Q.  And if during that time you needed to get the list, let's

20  say, late December, early January for a February caucus but you

21  didn't have the money on hand to pay for it, that would be a

22  problem, wouldn't it?

23  A.  Yes.  I don't know how the campaign would deal with that.

24  Q.  And in your experience in investigating campaigns, have you

25  found that it's often the consultants and vendors and

1  contractors that work for the campaign that front those expenses

2  and later get reimbursed for those?

3  A.  I don't know that I know that through my investigations on

4  campaigns.

5  Q.  So if Mr. Kesari decides to get lists for the presidential

6  campaign to deal with the Nevada, the Maine, and Minnesota

7  caucuses in February, he needed that a few weeks prior, six,

8  seven weeks prior so there can be mail scheduled, e-mail

9  scheduled, robo calls scheduled?

10  A.  Again, I'm assuming they would want those lists prior to the

11  caucus, yes.

12  Q.  Okay, fair enough.

13        Now let's go to a couple of other e-mails that you

14  read from Mr. Cooney yesterday.  And, specifically let's look at

15  84b.

16        Do you recall that e-mail?

17  A.  Yes.

18  Q.  Do you recall there being several iterations of this e-mail

19  or versions?

20  A.  There are several copies of this e-mail from different

21  sources.

22  Q.  Different sources?

23  A.  Yes.

24  Q.  Rather than read through every single different e-mail, I'm

25  just going to deal with this one for simplicity.

1   A.  Well, they're all the same e-mail.  They're just from

2   different sources.

3   Q.  So there's a series of e-mail exchanges in this one e-mail

4   on the page -- or one page that begin with Sonny Izon sending an

5   invoice for services rendered in February to Mr. Kesari,

6   correct?

7   A.  Correct.

8   Q.  It says services rendered, correct?

9   A.  It says services rendered.

10  Q.  And then Mr. Kesari sends an e-mail to Mr. Cortes on

11  April 3rd and says, this is approved by Jesse, correct?

12  A.  Yes.

13  Q.  And then later on Mr. Tate ultimately approves this after

14  Mr. Cortes sends him this e-mail chain, correct?

15  A.  Correct.

16  Q.  Mr. Benton isn't copied on this e-mail anywhere, is he?

17  A.  Not that I can see.

18  Q.  There's no mention of Kent Sorenson in this e-mail or the

19  attachment?

20  A.  No.

21  Q.  The only thing -- only representation in here is that this

22  has been approved by Jesse, correct?

23  A.  The only representation?

24  Q.  Well, let me rephrase that.

25          Mr. Kesari in this e-mail represents to Mr. Cortes

1  that this is approved by Jesse, correct?

2  A.  Yes.

3  Q.  And then Mr. Cortes forwards that on to Mr. Tate?

4  A.  Yes.

5  Q.  Asks him, "Approved?"

6  A.  Right.

7  Q.  And then Mr. Tate approves it?

8  A.  Yes.

9  Q.  And Mr. Benton is not on this e-mail from Mr. Kesari where

10  it says approved by Jesse, is he?

11  A.  Correct, not that I can see.

12  Q.  Okay.  But Mr. Tate gets the e-mail where Mr. Kesari is

13  telling Mr. Cortes that this expenditure has been approved by

14  Jesse?

15  A.  I'm sorry; Mr. Tate gets the e-mail?

16  Q.  Yes.

17  A.  Yes.

18  Q.  Look at the e-mail chain.

19  A.  Yes.

20  Q.  So you see that Mr. Kesari's representation ultimately that

21  it's approved by Jesse ultimately gets to Mr. Tate, correct?

22  A.  Correct.

23  Q.  And there's no discussion in this e-mail or the attachment

24  about how to report this payment to the FEC, correct?

25  A.  No.

1  Q.  Let's go to Exhibit 95.

2          And, again, Agent LoStracco, I believe there are a

3  number of versions of this that have come from different

4  sources.  And for simplicity sake and time, I'm just going to

5  use 95, all right?

6  A.  Okay.

7  Q.  This is an e-mail at the bottom from Katie Koerber to

8  Fernando Cortes with wiring instructions for payment to

9  Interactive Communication Technology in the amount of $8,850,

10  correct?

11  A.  Yes.

12  Q.  Then Mr. Cortes gets that e-mail and he forwards it to

13  Mr. Tate, and he says, approved?  Dimitri says this is the last

14  one, correct?

15  A.  Correct.

16  Q.  And the last one of what?  Would that be the last payment

17  he's requesting to be approved to ICT that Mr. Kesari says has

18  already been approved by Jesse?

19  A.  That was a long question.  I'm assuming when he said this is

20  the last one, that he's referring to the last ICT invoice.

21  Q.  Right.  And that was the one where Mr. Kesari represented to

22  Mr. Cortes that it was approved by Jesse?

23  A.  Yes.

24  Q.  And Mr. Cortes then forwarded that information on to

25  Mr. Tate, correct?

1  A.  Correct.

2  Q.  And Mr. Benton wasn't on any of that exchange, correct?

3  A.  No, not that I can see.

4  Q.  So that was Mr. Kesari's representation only that was

5  getting forwarded on in that last e-mail exchange, correct?

6  A.  Mr. Kesari's representation that the last one?

7  Q.  No?

8  A.  I'm sorry.

9  Q.  I'm not trying to confuse you.  In the last e-mail, it was

10  Mr. Kesari's representation that got forwarded on to Mr. Tate?

11  A.  That Jesse had approved?

12  Q.  That's correct.

13  A.  Yes.

14  Q.  And Mr. -- to be clear, Mr. Benton is not on any of these

15  e-mails?

16  A.  No, not that I can see from the header information.

17  Q.  So the only thing that Mr. Tate is getting the last e-mail

18  essentially from Mr. Kesari is Mr. Kesari's representation that

19  Mr. Benton had approved this, correct?

20  A.  Well, he's getting that in the invoice, correct.

21  Q.  In the invoice; but the representation from Mr. Kesari, he's

22  not saying anything else?

23  A.  He stated that Jesse had approved, yes.

24  Q.  Right.  So this e-mail, the one in the middle where it says

25  approved, Dimitri says this is the last one, I think you agreed

1  with me earlier that would be referencing the e-mail that we

2  just talked about?

3  A.  I believe so.  I mean, I would have to see the two e-mails

4  together because there are several e-mails going around around

5  this time about several invoices.

6  Q.  Okay.

7  A.  Because I know the March, April, June time period, they get

8  kind of tangled up.

9  Q.  Can we do -- the other one is 84b.  Maybe the split screen

10  would help.

11  A.  Yes, oh, definitely will help, yeah.

12        (Counsel conferring.)

13  BY MR. WARRINGTON:

14  Q.  Can you see that, Agent LoStracco?

15  A.  Yes, I can see that.

16  Q.  Now, Agent, you're referencing, you and I can talk about

17  this?

18  A.  Yes.  The only thing that might be helpful is if I could see

19  the invoice that's attached to 95 to see if it's actually the

20  February invoice that we were referring to.  So it would either

21  be page 2 or page 3 of 95.

22        MR. MILLS:  Why don't you try the question.

23  BY MR. WARRINGTON:

24  Q.  Okay.  The only question I was really getting to was in the

25  84b e-mail, there's a representation that ultimately makes its

1   way to Mr. Tate that says -- you now, representation from

2   Mr. Kesari saying that Mr. Benton had approved this?

3   A.  Yes, that's what Mr. Kesari says.

4   Q.  And the only question I have with this is when Mr. Cortes

5   says approved, Dimitri says this is the last one, that that's

6   referring to the last payment for who was in the last e-mail?

7   A.  Right.  And all I'm trying to do is confirm that the invoice

8   that is being paid here is that February invoice that they're

9   talking about from the previous amount.  That's the only thing I

10  just need to confirm.

11          MR. MILLS:  There's no attachment to that.

12          MR. WARRINGTON:  Okay.

13  BY MR. WARRINGTON:

14  Q.  Like I said, there's various versions, so I'll just move on

15  with that.

16  A.  All right.

17  Q.  But Mr. Tate approves this, correct?

18  A.  Yes.

19  Q.  And there's no reference to Kent Sorenson anywhere in this?

20  A.  No.

21  Q.  And there's no discussion how to characterize this report on

22  the FEC expenditure reports?

23  A.  No, other than, again, the code that Mr. Cortes --

24  Q.  But as you testified, that is the code that Mr. Cortes had

25  from his list?

1  A.  Right, provided from Texas, from the treasurer and

2  controller.

3  Q.  Let's go to Government Exhibit 100, please.  Let's go to the

4  middle of the page, Mr. Cortes's message.

5           Now, again, this is another series of e-mails.  As we

6  just discussed before, I think there are two versions that came

7  from different productions, so I'm just going to deal with just

8  this exhibit.

9  A.  The only clarification I would say is different copies as

10  opposed to different versions.

11  Q.  Different copies.  And this is an e-mail from Katie Koerber

12  to Mr. Cortes on June 25, 2012, with the same information that

13  was in prior e-mails about wiring instructions for payment of

14  $8,850 to Interactive Communication Technology, correct?

15  A.  Correct.

16  Q.  And as you move up -- and I think the headers come off in

17  the blow out.  So reading up from Ms. Koerber's message,

18  Mr. Cortes sends a message to Mr. Tate that says, according to

19  Dimitri this is the last one, and in parenthesis he said again.

20  Approved?  8k.  Right?

21  A.  Correct.

22  Q.  And then above that Mr. Tate responds, I will find out what

23  it is?

24  A.  Yes.

25  Q.  So below that Mr. Cortes is referencing the series of

1    invoices that we just talked about in 84b and 95; would that be

2    fair to say?

3    A.  When he's saying this is the last one again --

4    Q.  Yes.

5    A.  -- he is referring to the previous invoice with the

6    representation that was the last one again.

7    Q.  All right.  So Mr. Tate responds to Mr. Cortes, I will find

8    out what this is for or what this is.

9            Can we bring up Exhibit No. -- Government Exhibit No.

10   101.  And let's highlight the top.

11           And this is an e-mail from Mr. Tate to Mr. Kesari

12   shortly after Mr. Cortes asked him to approve this payment where

13   Mr. Tate asks Mr. Kesari, what is this, what is it for, who is

14   it, why do we keep paying them, the last payment was supposedly

15   the last, correct?

16   A.  Correct.

17   Q.  Sounds like Mr. Tate is a little frustrated with Mr. Kesari,

18   doesn't it?

19   A.  I don't know if he's frustrated.  He's asking questions

20   about the invoice.

21   Q.  Okay.  Now, you're aware that there are two e-mails that

22   respond to this, correct?

23   A.  Yes, that's correct.

24   Q.  Let's go to Exhibit No. 102.

25           This is Government's Exhibit 102.  Let's look at the

1  top of this.

2          Now, this is Mr. Tate -- the last e-mail we just

3  discussed Mr. Tate writing to Kesari, what is this, what is it

4  for, why do we keep paying them, the last payment was supposedly

5  the last, this is a response from Mr. Kesari to Mr. Tate.  This

6  says, this is the last payment for Kent Sorenson.  The deal

7  Jesse agreed to with Kent, correct?

8  A.  Correct.

9  Q.  Now, once again, Mr. Kesari is telling Mr. Tate that this is

10 an expenditure already approved by, Mr. Benton, the campaign

11 chairman, correct?

12 A.  In reference to the deal Jesse agreed to with Kent.

13 Q.  But he's telling Mr. Tate this is Jesse's deal with Kent,

14 right?

15 A.  Yes.

16 Q.  Mr. Kesari doesn't tell Mr. Tate anything else about that in

17 this e-mail, does he?

18 A.  About?  What's that?  I'm sorry.

19 Q.  The deal that Jesse had with Kent.

20 A.  No.  Other than it's a payment for Kent Sorenson.

21 Q.  Okay.  There's nothing in this e-mail about Kent Sorenson's

22 relationship with ICT, is there?

23 A.  No.

24 Q.  And there's nothing in this e-mail telling John about the

25 details of any Jesse deal with Kent, is there?

1   A.   No.

2   Q.   And Mr. Benton is not on this e-mail, is he?

3   A.   Not that I can see, no.

4   Q.   Well, we can take a look at it.

5   A.   Right.  I'm just saying from the header information.  When I

6   say not that I can see, I just mean from the header information

7   it does not appear that Jesse Benton is on this e-mail.  I would

8   assume that if they were bcc'd, that would show up.  You know

9   what I mean, like if somebody is blind copied --

10  Q.   So you're assuming that there's a bcc, but you don't see any

11  bcc, right?

12  A.   No, I don't.  That's why I said from what I see, he's not on

13  this e-mail, correct.

14  Q.   So all you can see is this is Dimitri Kesari sending an

15  e-mail to John Tate, right?

16  A.   Correct.

17  Q.   Let's blow the whole thing up.

18          Let's go to the next page.

19          Down at the bottom of this page?

20  A.   Yes.

21  Q.   You testified yesterday that that's what is called metadata?

22  A.   Correct.

23  Q.   In the metadata don't bcc's show up?

24  A.   I believe so.  I'm not an expert in metadata.  I probably

25  would go to one of our computer people.

1  Q.  I'm not asking you to be an expert.

2  A.  Okay.

3  Q.  You don't -- when you look at this, you don't see anything

4  saying bcc Jesse Benton, right?

5  A.  Well, there's no e-mail addresses in here from what I can

6  see.

7  Q.  So there's a return path --

8  A.  There's a lot of literally metadata, which is, I think, IP

9  addresses.

10  Q.  But there's a return path e-mail address up at the top,

11  correct?

12  A.  Correct, which shows Dimitri's e-mail.

13  Q.  Okay.  So let's go back to the beginning of the e-mail now.

14          Now, you didn't find this e-mail -- or the only place

15  you found this e-mail was Mr. Kesari's laptop; is that correct?

16  A.  No.  I believe we also got this from the search warrant on

17  the AOL account.  I'm not positive.

18  Q.  That would be Mr. Kesari's AOL account?

19  A.  Right.  I'm not positive about that, though.  I do know this

20  particular document that we're showing here came from

21  Mr. Kesari's computer.

22  Q.  Okay.  But it didn't come from the Ron Paul Campaign?

23  A.  I did not get a copy of this from the Ron Paul Campaign.

24  Q.  And it didn't come from Mr. Benton's e-mail account,

25  correct?

1  A.  Mr. Benton's?

2  Q.  Mr. Benton's.

3  A.  No.

4  Q.  So it was only Mr. Kesari's computer or AOL account that you

5  found this?

6  A.  I believe that's correct.

7  Q.  But there's no response to this particular e-mail that

8  you're aware of?

9  A.  Not that I'm aware of.

10  Q.  Let's go to Exhibit 103.  Let's blow up the first half of

11  this.

12          Again, the bottom part of the blowout there it says --

13  this is the e-mail Mr. Tate sent to Mr. Kesari, what is this,

14  what is it for, who is it, why do we keep paying them, the last

15  payment was supposedly the last, correct?

16  A.  Correct.

17  Q.  Mr. Kesari responds to Mr. Tate, it was for six months -- or

18  "is was for 6 months"?

19  A.  Yes.

20  Q.  But it was for six months?  It's just a typo.

21  A.  Yes.  I assume it was a typo.

22  Q.  Mr. Tate does respond to this e-mail, correct?

23  A.  Correct.

24  Q.  He says, okay.  Thanks?

25  A.  Yes.

1  Q.  Now, this e-mail Mr. Tate responded to -- and actually let's

2  keep that blowout up.

3          Mr. Kesari's e-mail to Mr. Tate, it was for six

4  months, in the date line -- do you see where I'm referring to?

5  A.  Yes.

6  Q.  -- it says Monday, 25 June, 2012, 18:23:45?

7  A.  Yes.

8  Q.  Do you understand that to mean 6:23 p.m. and 45 seconds?

9  A.  Correct.

10  Q.  If you look up at the top where it says sent Monday,

11  June 25, 2012, 6:24 p.m., do you understand that to be 6:24

12  p.m.?

13  A.  Correct.

14  Q.  So that's about 15 seconds after Mr. Kesari sent this

15  e-mail, right?

16  A.  Well, anywhere from 15 seconds to a minute, correct.

17  There's no seconds, just to be accurate.

18  Q.  Right.  That all depends on what software and what e-mail

19  service and where you all are and all of that, right?

20  A.  I believe so, yes.

21  Q.  Would you blow that back out.

22          In this response to Mr. Tate, Mr. Kesari doesn't say

23  anything else other than it was for six months, correct?

24  A.  Correct.

25  Q.  There's nothing in this e-mail other than -- in Mr. Kesari's

1   response that tells Mr. Tate about ICT, right?

2   A.  Correct.

3   Q.  There's nothing in this e-mail from Mr. Kesari to Mr. Tate

4   that says this was for ICT?

5   A.  No.  No, that was in a previous --

6   Q.  Right.  He just says it was for six months, correct?

7   A.  Right.

8   Q.  And Mr. Kesari is the deputy campaign manager for the Ron

9   Paul 2012 Campaign, correct?

10  A.  Yes.

11  Q.  And there's no mention in this e-mail about Jesse's deal

12  with Kent, right?

13  A.  No.

14  Q.  Again, Jesse Benton is not copied on this e-mail, is he?

15  A.  No.

16  Q.  So the only thing we have is Mr. Kesari representing

17  something to Mr. Tate in this e-mail exchange between those two?

18  A.  Representing that it was for six months?

19  Q.  Yes.

20  A.  Yes.

21  Q.  And there's no discussion of having that e-mail in the top

22  two e-mail exchanges how this is going to be reported on the FEC

23  report?

24  A.  No.

25  Q.  There's no discussion of how to characterize a payment on

1  the FEC report?

2  A.  No, again, unless you go down to the code.

3  Q.  But, again, that's Mr. Cortes's information he put there or

4  Ms. Koerber's, this is her information that she put there?

5  A.  Right.  Based on the information that they had, correct.

6  Q.  Right.  But we do know John Tate received this e-mail,

7  correct?  What I'm talking about is -- let me rephrase that

8  question so it's clear.

9         Mr. Kesari's response, it was for six months, we know

10  Mr. Tate received that because he responded to it, correct?

11  A.  Yes.

12  Q.  Let's go to Government Exhibit 104.  Blow out just the top.

13         And Government Exhibit 104 is Mr. Tate's response to

14  Mr. Cortes after his exchange with Mr. Kesari, right?

15  A.  Yes.

16  Q.  And Mr. Tate approves this expenditure?

17  A.  Yes, correct.

18  Q.  There's no instructions from John Tate to Mr. Cortes on how

19  to report this payment to the FEC in this response, is there?

20  A.  No.

21  Q.  And there's no instructions from Mr. Tate to characterize

22  this payment on the FEC reports, correct?

23  A.  No.

24  Q.  The only thing that this e-mail does is approve the payment

25  that Mr. Cortes asked him to approve, correct?

1  A.  Right.  By the information at the bottom, yes.

2  Q.  And, once again, this is based on Mr. Kesari's

3  representations to Mr. Tate, correct?

4  A.  Mr. Kesari's representations to Tate in what regard?

5  Q.  Either that it was Jesse's deal with Kent or it was for six

6  months, either way, it's Mr. Kesari telling him that it's okay

7  to pay?

8  A.  Yes.

9          MR. WARRINGTON:  Nothing further, Your Honor.

10          THE COURT:  Mr. Binnall.

11                      CROSS-EXAMINATION

12  BY MR. BINNALL:

13  Q.  Good morning, Agent LoStracco.

14  A.  Good morning.

15  Q.  Agent LoStracco, you were just talking about Exhibit 102.

16          Could we get that?  And I'm going to go right to page

17  2 of that.  And could we just expand the metadata at the bottom?

18          Agent LoStracco, yesterday you testified, and briefly

19  with Mr. Warrington, that you believed you got that from an AOL

20  production from Mr. Kesari's computer?

21  A.  I said I wasn't sure.  I do know this came from Mr. Kesari's

22  computer, this particular document.

23  Q.  Yesterday you said it came from both, right?

24  A.  I would have to recall back.  I mean, I would have to look

25  at the AOL production.  I believe we got it from both.  I'm not

1  positive.

2  Q.  Okay.  Well, can you review that metadata and -- well,

3  strike that.

4          First of all, you're aware that Mr. Kesari had two

5  different e-mail addresses during this time, correct?

6  A.  I believe Mr. Kesari had a few.  More than two, but yes.

7  Q.  At least two?

8  A.  Yes.

9  Q.  He had the official Ron Paul e-mail address?

10  A.  Yes, the Ron Paul 2012.

11  Q.  And then he also often used a DKesari@aol.com address,

12  correct?

13  A.  Yes, that's correct.

14  Q.  And the Ron Paul 2012 account, that was based on a Google

15  type platform, correct?

16  A.  That I don't know what the platform was for the Ron Paul.

17  Q.  All right.  That's fine.  But if you could look at that

18  metadata, does that at least refresh your recollection that

19  there was nothing in the metadata that suggests that came

20  through any AOL servers at all?

21  A.  Again, I am not an expert on metadata, so if this came from

22  an e-mail account, there may be some numbers associated with

23  that.  I'm not an expert on metadata at all.

24  Q.  And that's fair.  Is it fair to say that AOL -- that there's

25  nothing on there that we can see that says AOL.com?

1    A.   I mean, if you can give me a minute, I'll look through it.

2    Q.   Certainly.  Take your time to look through it.

3    A.   I don't see any reference to AOL.com.

4    Q.   Thank you.

5            In talking about what you're not an expert on, it's

6    also correct to say that you don't know exactly how time stamps

7    work on e-mails, too; isn't that correct?

8    A.   Other than a user of e-mail, no, and through investigations

9    that I've done previously where there have been time stamp

10   issues.

11   Q.   But as far as the e-mail stamp that comes from e-mail

12   servers --

13   A.   Correct.  I'm not forensically trained like a lot of -- some

14   of our agents are forensically trained to specifically do

15   computer issues.  I'm not trained in that area.  But just from

16   doing other investigations with other e-mails and other time

17   stamps, I do know that there can be e-mails sent from different

18   time zones reflecting different time stamps.

19   Q.   Okay.  And, Agent LoStracco, in the course of your

20   investigation, you looked into whether payments through

21   intermediaries is a normal part of political campaigns, didn't

22   you?

23   A.   I'm sorry, could you repeat the question?

24   Q.   In the course of your investigation, you looked into whether

25   payments through intermediaries is a normal part of expenditures

1  in political campaigns?

2  A.  I would say it's a little bit more narrow than that.  So

3  it's whether a payment to an entity that is not doing business

4  with a campaign would be something that would be illegal, which,

5  I'm sorry --

6  Q.  I'm not asking about what's legal and what's not.

7  A.  Okay.  So whether a payment to an entity that is not doing

8  business with a campaign and then that payment going to a third

9  party would be something that was involved in my investigation.

10  Q.  Okay.  And so you looked into that, whether that was normal

11  in political campaigns?

12  A.  I don't know if I would use the word "normal," but yes, I

13  would have looked into that.

14  Q.  And you investigated whether Mr. Sorenson worked on behalf

15  of Michelle Bachmann's efforts in 2011; isn't that correct?

16  A.  Yes, that's correct.

17  Q.  And you determined -- or you're aware that Mr. Sorenson was

18  being paid on behalf of Senator Bachmann; isn't that correct?

19  A.  That he was being --

20       MR. COONEY:  Objection; relevance.

21       THE COURT:  What's the relevance that he was paid by

22  Senator Bachmann?

23       MR. BINNALL:  I'm sorry, it's not Senator Bachmann.

24  It should be Representative Bachmann, Your Honor.  But this has

25  to do with the payment structure that Mr. Sorenson was receiving

1  from Congresswoman Bachmann in similarity to the structure on

2  the Paul Campaign.

3          THE COURT:  The objection is sustained.

4  BY MR. BINNALL:

5  Q.  You met with Mr. Sorenson on many occasions; isn't that

6  correct?

7  A.  Yes, that's correct.

8  Q.  And during some of those sessions, you took notes, right?

9  A.  Yes.

10 Q.  And during others of those sessions, you did not take notes,

11 right?

12 A.  I think I usually take at least some notes.  I don't recall

13 an occasion where I didn't take notes.  If I wasn't taking

14 notes, somebody else was taking notes, meaning another agent.

15 Q.  Okay.  Thank you.

16          And then those notes were taken and put into a form

17 302; is that correct?

18 A.  Well, the notes aren't put -- oh, you're saying we take the

19 notes and then use that to write up a report?

20 Q.  Right.

21 A.  Correct.

22 Q.  Can you explain to the jury what a form 302 is?

23 A.  Yes.  A 302 is just our standard form that we use when we

24 interview an individual, and we use the information from our

25 notes to write up an interview report called a 302.

1  Q.  And in your experience, it's not a policy of the FBI to show

2  a witness a 302 and allow him to change it; isn't that correct?

3  A.  We don't change existing 302s, correct.

4  Q.  It's not the policy of the FBI to show a witness a witness

5  statement at all and allow them to change it, correct?

6          MR. COONEY:  Objection; scope of cross-examination,

7  scope -- outside the scope of direct, and relevance.

8          THE COURT:  Does this have something to do with Kent

9  Sorenson's testimony?

10         MR. BINNALL:  Yes, Your Honor.

11         THE COURT:  Well, then let's do it after he testifies.

12         MR. BINNALL:  That's fine.  I'm trying to save some

13  time.

14         THE COURT:  Well, I get it, but thank you.

15 BY MR. BINNALL:

16 Q.  Do you remember how -- well, I'll come back to that and we

17 can do all of that at the same time.

18         MR. BINNALL:  So at this point I don't have any

19 further questions.

20         THE COURT:  Okay.  Anything else, Mr. Cooney?

21         MR. COONEY:  Yes, Your Honor.

22                      REDIRECT EXAMINATION

23 BY MR. COONEY:

24 Q.  Bear with me for one moment, Agent LoStracco, and ladies and

25 gentlemen.

1          (Pause.)

2          All right.  First of all, Agent LoStracco, you were

3   asked a number of questions by Ms. Campbell about cell phone

4   records and location data and whatnot, correct?

5   A.  Yes, correct.

6   Q.  First of all, do you have any training or experience in cell

7   record data location?

8   A.  No.

9   Q.  Do you have any training or experience in the location of

10  cell towers or anything like that?

11  A.  No.

12  Q.  Do you have any training or experience in how it is that a

13  cell phone company like Verizon generates the originating

14  information from a cell phone?

15  A.  No, I do not.

16  Q.  All right.  So as I understood your testimony, those records

17  indicate that the originating area in each of those is Milo or

18  Ankeny, or wherever it is; but other than that, you have no idea

19  where the cell phone was or even how that information was

20  recorded?

21  A.  Correct.

22  Q.  And is that information that you sought in this particular

23  investigation from Verizon?

24  A.  No, we did not.

25  Q.  All right.  Ms. Draughn, could you please put up

1    Government's Exhibit 75, which has already been admitted into

2    evidence.

3          And I want to return you to some testimony that --

4    some cross-examination testimony that you gave to Ms. Campbell

5    regarding -- do you remember she asked you a series of questions

6    about the volume of e-mail and whatnot that her client, Jesse

7    Benton, engaged in on a daily basis; is that right?

8    A.  Yes, that's correct.

9    Q.  And I believe she also specifically referenced you to, I

10   think it was described as a several thousand page table of

11   e-mails that was provided by Jesse Benton to the FBI.

12          Do you remember that testimony?

13   A.  Yes, that's correct.

14   Q.  All right.  I'm going to show you what's been marked as

15   Government's Exhibit 187.

16          What is Government's Exhibit 187?

17   A.  This is a CD containing that 55,000 or so page log that we

18   had received from Jesse Benton's attorneys.

19   Q.  And are these your initials here on it?

20   A.  Yes, those are my initials.

21   Q.  Now, during the course of -- and actually if you could just

22   explain for the jury what that log contained generally.

23   A.  So from what I can tell, the log contained just a running

24   list of the e-mails Mr. Benton had received, I believe, from the

25   time period somewhere around 2011 and into -- well into 2012.  I

1  could not tell from that data whether they were pulling e-mails

2  from an inbox, a junk mailbox or send box.  It was just all the

3  e-mails listed altogether.

4  Q.  Did you have an opportunity to review that data?

5  A.  Yes, I did.

6  Q.  Were you able to review that entire table from the first

7  line all the way to the last line?

8  A.  No.

9  Q.  What exactly did you do in your review?

10  A.  So I went to specific dates in which Mr. Benton sent e-mails

11  of particular interest and looked at those dates in terms of how

12  many e-mails he had received that day, how many e-mails he had

13  sent, that type of thing.

14  Q.  All right.  So now I want to draw your attention to

15  Government's Exhibit 75, and this is an exhibit that you -- the

16  one that's up there.

17  A.  Oh, I still have it, yes.

18  Q.  You still have it?

19  A.  Yes.

20  Q.  It's in evidence.  It should be --

21  A.  Yes, I have it.

22  Q.  Sorry.  Okay.  Thank you.

23       And this is an e-mail that you read into evidence

24  yesterday or maybe the day before; is that right?

25  A.  Yes.

1    Q.  Okay.  And the top one in particular from Jesse Benton to

2    Dimitri Kesari dated February 7, 2012, "yo handle," do you see

3    that e-mail?

4    A.  Yes.

5    Q.  And that was in response to an e-mail saying just about an

6    hour-and-a-half earlier -- or an hour earlier rather from

7    Dimitri Kesari stating, did you get Kent paid or should I submit

8    the payment and pay him?

9    A.  Yes.

10   Q.  All right.  Did you take a look at the chart regarding the

11   e-mail volume on that particular day, February 7, 2012?

12   A.  Yes.  So looking at the chart I was able to determine how

13   many e-mails had either been sent, received -- sent or received,

14   I guess, on that day with Mr. Benton, and there were, I believe,

15   approximately 319 e-mails sent or received that day.  Out of

16   those 319, 61 I believe approximately were sent e-mails, and out

17   of the remaining -- I'm trying to do the math off of the top of

18   my head -- approximately 258 e-mails were received, and I would

19   say just over half of those were what I call spam mail, like

20   Joseph Banks or a Listserv that he got 45 e-mails from in one

21   day, that kind of thing.

22   Q.  So as you sit here right now, do you remember the exact

23   number of what you described as spam or junk e-mail?

24   A.  I don't.  I just remember it being a little less than half

25   of the number of incoming, received e-mails.

1   Q.  Did you write down that information?

2   A.  I did, yes.

3   Q.  Did you write it down as you conducted that analysis?

4   A.  I did, yes.

5   Q.  At the time that you wrote it down, was the information that

6   you wrote down correct?

7   A.  Yes.

8   Q.  Did you do the same for the sent and received e-mails?

9   A.  Right.

10  Q.  And the total e-mails?

11  A.  Yes.

12          THE COURT:  We're going to take our morning recess.

13          We'll take 20 minutes.

14          (Recess at 10:30 a.m., until 10:50 a.m.)

15          THE COURT:  Please be seated.

16          MR. COONEY:  Ms. Draughn, if you could put

17  Government's Exhibit 74 back on the screen that we were looking

18  at when we broke -- excuse me 75, yes, you got it.  I apologize.

19  It was 75.  You had the right one.

20  BY MR. COONEY:

21  Q.  And, Agent LoStracco, I'm going to hand you what's been

22  marked as Government's Exhibit 187a.

23          And are those the notes that you talked about that you

24  wrote down when you did the analysis of the e-mail volume on

25  February 7, 2012, for Jesse Benton?

1  A.  Yes.

2  Q.  All right.  I would just like to break down this day.  On

3  this particular day, February 7, 2012, according to that chart

4  that Jesse Benton's attorney provided you, how many e-mails did

5  Jesse Benton send and receive -- send or receive on that day?

6  How many came into his box?

7  A.  319, approximately.

8  Q.  All right.  And you categorized some of those as junk or

9  spam e-mails; is that right?

10  A.  Correct.

11  Q.  How many did you categorize that way?

12  A.  113.

13  Q.  Can you just give the jury a sense of what kind of e-mails

14  you categorized as spam or junk?

15  A.  Yeah.  So, I mean, I tried to be as underinclusive I guess

16  in what would be considered a spam e-mail.  So if it was

17  something like from a store, like I had mentioned Joseph A.

18  Banks -- I'm trying to recall specific e-mail addresses -- there

19  was a Listserv that I can, like, probably 40 e-mails a day came

20  from Google Alerts, I think.  I'm trying to remember --

21  Q.  Do you know who Joseph A. Banks is?

22  A.  Yes.  It's a clothing store for men.

23  Q.  So if you take out those 113 junk e-mails from the 319

24  total, how many e-mails did Jesse Benton receive that day?

25  A.  Approximately 258.

1  Q.  How many e-mails did he send on February 7, 2012?

2  A.  61.

3  Q.  Now, those sent e-mails, do those -- are those all replies

4  or does that include replies and e-mails that he started or he

5  started the thread?

6  A.  It includes both.

7  Q.  So the number of replies is somewhere as many as 61 to less

8  than 61?

9  A.  Correct.

10 Q.  And that February 7, 2012 e-mail that we're looking at right

11 now, is that one of the 61 e-mails that he decided to send that

12 day?

13 A.  Yes.

14 Q.  Ms. Draughn, could we please now look at Government's

15 Exhibit 87c?

16         All right.  I just want to, as this comes up, this is

17 an e-mail that you've already put into evidence, Agent

18 LoStracco, and down here at the bottom, May 2, 2012, Dimitri

19 Kesari sent Jesse Benton an e-mail that said, "Kent's bill.

20 Pay?"  And on May 2, 2012, Jesse Benton responded, "Yes - last

21 time."

22         Do you remember that e-mail?

23 A.  Yes.

24 Q.  All right.  Did you conduct an analysis of e-mails that he

25 sent and received on May 2, 2012?

1  A.  Yes.

2  Q.  All right.  And when you conducted that analysis, as you sit

3  here right now, do you remember the number of e-mails that he

4  sent and received and everything that day?

5  A.  I believe it's approximately 377, but I can look at my

6  notes.

7  Q.  Well, at the time did you write down all of that

8  information?

9  A.  Yes.

10  Q.  And at the time that you wrote it down, are you confident it

11  was correct?

12  A.  Yes.

13  Q.  All right.  If you want to go ahead and refer to 187a then,

14  which is the exhibit you have in front of you, which is your

15  notes; is that right?

16  A.  Correct.

17  Q.  All right.  On May 2nd when Jesse Benton wrote the e-mail

18  "yes - last time," what was the total number of e-mails he

19  received that day?

20  A.  377 sent and received.

21  Q.  And of that, of those 377 sent and received e-mails, how

22  many did you categorize as junk?

23  A.  167.

24  Q.  So that leaves how many e-mails when you take the junk out?

25  A.  That he received 339 -- I'm sorry; that he received a total

1  of 339.  167 of those were junk.

2  Q.  Got it, got it.  So he received 339 that day?

3  A.  Right.

4  Q.  And 167 of them were junk e-mail?

5  A.  Correct.  There were 38 sent, so that brings the total to

6  377 total e-mails sent and received.

7  Q.  Got it.  So I want to focus on those 38 sent e-mails.  For

8  those 38 sent e-mails, were those all replies or do they include

9  replies and original e-mails?

10  A.  No.  It would include replies and original e-mails.

11  Q.  All right.  So of the 339 e-mails that he received that day,

12  167 of them which were junk, 38 of them or less were replies,

13  right?

14  A.  38 of the total of the 377 e-mails were sent, yes.

15  Q.  Of the 38 e-mails that Jesse Benton sent on May 2, 2012, was

16  "yes - last time" one of those 38?

17  A.  Yes.

18  Q.  So just to clarify one thing because I think I may have

19  asked a confusing question or even misunderstood something with

20  respect to February 7th.  You said that Jesse Benton received

21  how many e-mails that day?

22  A.  He received 258.

23  Q.  And of those received, how many of those were junk?

24  A.  113.  So a little less than half.

25  Q.  Got it.  So the total number of e-mails sent and received

1  was 319?

2  A.  Correct.

3  Q.  But to wrap up on this point, on February 7 and May 2, of

4  those sent e-mails that he sent on those days, these two e-mails

5  that we looked at were two of the ones that he chose to send?

6  A.  Yes.

7  Q.  Now, you were asked a lot of questions by Ms. Campbell about

8  all of the volume of material that you received in this

9  investigation.

10         Do you remember all of those questions?

11 A.  Yes.

12 Q.  Were you able to look at all of this information, all of

13 these e-mails, all of these documents and things like that?  Was

14 this something you were able to do by yourself?

15 A.  No.  Several times in the investigation, I had a co-case

16 agent, I had an investigative analyst, sometimes a financial

17 analyst helping me cull through all of the material.

18 Q.  And did those people help bring items of more or less

19 interest to your attention?

20 A.  Yes.

21 Q.  Now, when you moved to Boston, what happened with your role

22 as the lead case agent?

23 A.  So I still retained the lead in terms of being the person

24 who handled the investigation and knows about the investigation.

25 The case administratively had to be handed over to a case agent

1   in D.C., and the purpose for that is in our case system a case

2   cannot transfer -- doesn't typically transfer with the agent.

3   So it would stay with the Washington field office.

4           So for the purposes of our case system, a case agent

5   needs to be assigned that is also within the Washington field

6   office, and that was done.  That agent that was assigned sort of

7   took on, I guess what you would describe as an administrative

8   role in terms of helping to compile evidence in terms of getting

9   ready for indictment and trial.  But in terms of the knowledge

10  of the case, that remains with me I would say.

11  Q.  Who is that person?

12  A.  Frank D'Amico.

13  Q.  Was Frank D'Amico one of the agents who you just described a

14  minute ago, who -- one of the analysts or anything like that

15  that helped you look at the information as you brought it in

16  during the course of this investigation?

17  A.  No, he was not.  He was assigned when I moved from the

18  Washington field office to Boston approximately a year ago.

19  Q.  All right.  I would like to shift gears now and address some

20  of the questions that you were asked by Mr. Warrington on

21  cross-examination.

22          Ms. Draughn, could you please put up Government's

23  Exhibit 74.

24          Thank you.

25          This is the exhibit that you were asked about by

1  Mr. Warrington, February 7, 2012, the e-mail from Dimitri

2  Kesari, "Did Jesse get Kent paid?"  Response from Mr. Tate, "No

3  idea.  Ask him."

4          Do you recall this?

5  A.  Yes.

6  Q.  And do you recall being shown the indictment and whatnot?

7  A.  Yes, I do.

8  Q.  And specifically the paragraph in the indictment that

9  alleges that Mr. Tate and Mr. Benton approved by e-mail the

10  payment to ICT on February 7, 2012.

11          Do you recall that?

12  A.  Yes.

13  Q.  Does this e-mail -- anywhere in this e-mail did John Tate

14  object to getting Jesse -- excuse me, to getting Kent paid?

15  A.  No.

16  Q.  Did he ask any questions about getting Kent paid?

17  A.  No.

18  Q.  Did he express any confusion in this e-mail about what Kent

19  would get paid for?

20  A.  No.

21  Q.  Ms. Draughn, could you please put up on the split screen

22  Government's Exhibit 57.  Actually you can, Ms. Draughn, just so

23  the jury can see it, if you don't mind highlighting just the top

24  two e-mails.  So is Sorenson being paid, you can stop there.

25  Yep.

1          Thank you.

2          And to center the jury on Government's Exhibit 57,

3   this is an e-mail that you read into evidence where a question

4   was posed to Mr. Tate by Gary Howard.  This was in response to a

5   media inquiry.  Is Sorenson being paid?  And, Agent LoStracco,

6   what did John Tate respond on January 20, 2012?

7   A.  No, he is not.  He is volunteering as I understand it.

8   Q.  And that e-mail is dated what?

9   A.  January 20, 2012.

10  Q.  So about how long before the February 7 e-mail?

11  A.  Two weeks.

12  Q.  And about two weeks later when Dimitri Kesari wrote the

13  e-mail "Did Jesse get Kent paid," did John Tate respond anything

14  about volunteering?

15  A.  No.

16  Q.  Did he ask any questions about why would we pay a volunteer?

17  A.  No.

18  Q.  Did he express any objection in that e-mail to paying Kent

19  Sorenson?

20  A.  No, he did not.

21  Q.  And since you were asked questions about the indictment, the

22  indictment alleges a conspiracy, does it not?

23  A.  Yes, it does.

24  Q.  And one of the parts of the conspiracy is agreement,

25  correct?

1  A.  Correct.

2  Q.  And in a conspiracy charge, when people agree together,

3  they're held responsible for each other's actions, correct?

4          MS. CAMPBELL:  Objection, Your Honor; asking for a

5  question about the law.

6          THE COURT:  Sustained.

7  BY MR. COONEY:

8  Q.  All right.  Let's move on to Government's Exhibits 102 and

9  103 actually.  I'm sorry, if you could put those up on the split

10  screen, Ms. Draughn.  And while you do that, I'll give you a

11  minute to get that set up.

12          Let me ask you a question about a completely different

13  topic that we can just get it out of the way.

14  A.  Okay.

15  Q.  Agent LoStracco, you were asked some questions by

16  Mr. Binnall about e-mail addresses that Mr. Kesari used.

17          Do you remember that?

18  A.  Correct.

19  Q.  And you were asked questions by Ms. Campbell about a ghost

20  account Kent Sorenson used called Alfred Pennyworth.

21          Do you remember that?

22  A.  Yes.

23  Q.  During the course of your investigation, did you discover

24  any e-mail accounts that Dimitri Kesari used that were not in

25  his name?

1    MR. BINNALL:  Objection; relevance.

2    THE COURT:  Overruled.

3    Answer the question.

4  A.  Yes.

5  BY MR. COONEY:

6  Q.  Similar to the Alfred Pennyworth one that Kent Sorenson

7  used?

8  A.  Correct.

9  Q.  Ghost e-mail account?

10 A.  Well, that they would not identify from the e-mail account

11 that it was Dimitri Kesari, correct.

12 Q.  All right.  Ms. Draughn, could you please highlight --

13 actually you can go up from there.  That's great right there.

14 Let's see how that looks.

15    All right.  Great.  Thank you.  And then I think you

16 can move up a little bit.  Let's try right there and see.  Okay.

17 This will work.

18    All right.  Now, first, you were asked questions by

19 Mr. Warrington about both Government's Exhibits 102 and 103.  I

20 think 102 is the top e-mail and 103 is the bottom e-mail; is

21 that right?

22 A.  Yes.

23 Q.  Yes.  And so we're clear, the only place that you were able

24 to uncover Government's Exhibit 102, the top e-mail, the one

25 that read, this is the last payment for Kent Sorenson, the deal

1   Jesse agreed to with Kent, that was found on Dimitri Kesari's

2   computer, correct?

3   A.  Correct.

4   Q.  That was not produced by the Ron Paul Campaign?

5   A.  No, it was not.

6   Q.  Why is it, again, that in the course of your investigation

7   you attempt to obtain documents and e-mails and things of that

8   nature from multiple sources?

9   A.  Because, like I described before, people have different

10  retention methods, I guess, with their e-mails.  So some people

11  tend to delete everything and empty their deleted files fairly

12  often so they may not have something on their laptop.  They may

13  keep things in folders, for example, in their laptop that they

14  would have for an extended period of time or not empty their

15  deleted folder or keep it in an inbox.  You know, Mr. Kesari

16  kept several e-mails, several e-mails on his laptop that we do

17  not see elsewhere.

18  Q.  So if the e-mail "this is the last payment for Kent

19  Sorenson" was deleted from the Ron Paul server, you wouldn't

20  have obtained it?

21        MR. WARRINGTON:  Objection, Your Honor.  She's not

22  competent to testify with regard to this.

23        THE COURT:  It's argumentative.  Sustained.

24  BY MR. COONEY:

25  Q.  All right.  Now, looking at Government's Exhibits 102 and

1    103 and addressing some of the questions Mr. Warrington asked

2    you -- Ms. Draughn, on the bottom of Exhibit 103, if you could

3    give us a little more text.  Actually I think you're going to

4    need to start over and expand.  I would like to see all of those

5    e-mails.

6         I want to be specific, down to the questions John Tate

7    asked.  So where it ends "John" halfway down.  Above that,

8    please.  So from where he ends his e-mail with a question with

9    the name "John," up from there.

10        Thank you, Ms. Draughn.

11        All right.  In both of these e-mails, so 102 and 103,

12   we can see that on June 25, 2012, Mr. Tate asked the question,

13   what is this, what is it for, who is it, why do we keep paying

14   them?  The last payment was supposedly the last.  Right?

15   A.  Yes.

16   Q.  All right.  Let's look at the bottom one.  What is it?  What

17   is it for?  Who is it?  And the response from Dimitri Kesari at

18   the bottom is, it was for six months.

19        Does that respond to the question, who is it?

20   A.  No.

21   Q.  Does that respond to the question, why do we keep paying

22   them?

23   A.  No.

24   Q.  Now let's look up at this e-mail, the top one, Government's

25   Exhibit 102.  This is the last payment for Kent Sorenson.  The

1  deal Jesse agreed to with Kent.

2        Does that respond to the question, what is this?

3  A.  Yes.

4  Q.  Does that respond to the question, what is it for?

5  A.  Yes.

6  Q.  Does that respond to the question, who is it?

7  A.  Yes.

8  Q.  Does that respond to the question, why do we keep paying

9  them?

10  A.  Yes.

11  Q.  Mr. Tate's response in Government's Exhibit 103, "Okay,

12  thanks," does that make any sense at all without the information

13  contained in Government's Exhibit 102?

14        MR. WARRINGTON:  Objection.

15        THE COURT:  Sustained.

16        MR. COONEY:  Your Honor, if I may just say, I think he

17  opened the door with the questions that he asked Agent

18  LoStracco.

19        THE COURT:  Yeah, we've gone too far afield on it.

20        MR. COONEY:  Okay.

21  BY MR. COONEY:

22  Q.  All right.  Two final topics, Agent LoStracco.

23        You were asked some questions by Ms. Campbell about

24  the FEC investigation -- or excuse me, about FEC investigations

25  and reporting to the FEC.

1          Do you remember those questions?

2     A.  Yes.

3     Q.  All right.  Now, have you been the case agent on other cases

4     or investigations that involved campaign finance crimes?

5     A.  Yes, I have.

6     Q.  In your experience, when the FBI starts a criminal

7     investigation of a campaign finance matter, what, if anything,

8     does the FEC do with respect to any action it might take?

9               MS. CAMPBELL:  Objection, Your Honor.  This is

10    irrelevant and calls for hearsay.

11              MR. COONEY:  This is well within the scope of

12    questions that Ms. Campbell asked regarding whether the FEC was

13    doing anything.

14              THE COURT:  Overruled.

15              Answer the question.

16              MS. CAMPBELL:  I don't believe I asked a question like

17    that, but maybe --

18              THE COURT:  Overruled.

19              Answer the question.

20    A.  I'm sorry, could you just repeat that?

21    BY MR. COONEY:

22    Q.  Certainly.  In your experience as an FBI agent investigating

23    campaign finance matters, when the FBI starts an investigation

24    into campaign finance, what, if anything, does the FEC do with

25    respect to any action it may be contemplating taking?

1  A.  They basically stand down.

2  Q.  Whose investigation takes precedence, in your experience?

3  A.  The FBI, the criminal investigation.

4  Q.  And is that consistent with your experience with other

5  administrative agencies who may have parallel investigations

6  moving when the FBI is investigating?

7  A.  Yes.

8  Q.  I'm sorry, I've got to go back to Government's Exhibit 103

9  for one matter.  If you could put that one up on full screen,

10  Ms. Draughn.

11          Thank you.

12          All right.  And if you recall, you were asked a

13  question by Mr. Warrington regarding this e-mail and whether

14  there was anything about the FEC in this e-mail.

15          Do you remember that?

16  A.  Yes.

17  Q.  All right.  And there's nothing about FEC or FEC reporting

18  or anything like that here in this e-mail; is that right?

19  A.  Correct.

20  Q.  And, in fact, in all of the e-mails that you looked at

21  regarding this, there's no discussion about -- from Mr. Tate or

22  Mr. Benton or Mr. Kesari or anything about how to report the ICT

23  invoices and whatnot to the FEC specifically, correct?

24  A.  Correct.

25  Q.  All right.  Now, you were asked questions specifically down

1  here about the code, and it's at the very bottom of the e-mail,

2  60110?  I think I just marked on it.

3  A.  60110.

4  Q.  Thank you.

5        And you were asked questions about Mr. Cortes's

6  testimony about the fact that he was the one that came up with

7  that coding; is that right?

8  A.  Correct.

9  Q.  And you were asked questions about the fact that he came up

10 with that coding based on the information in the invoice that he

11 received from Mr. Kesari, correct?

12 A.  Correct.

13 Q.  And so that code for audiovisual services was based on what

14 was read in the invoice for ICT, correct?

15 A.  Correct, what ICT had put in its invoice as a description.

16 Q.  So for this particular one here, that would be the same

17 invoice that Mr. Tate wrote approved for June 25, 2012, correct?

18 A.  Yes.

19 Q.  And that process is the same process for all of the invoices

20 that we looked at in January, February, March, April, and May,

21 correct?

22 A.  Correct.

23 Q.  All right.  Finally, Agent LoStracco, going back to what we

24 were talking about -- and, Ms. Draughn, if you could please put

25 up Government Exhibit 145, page 2.  And if you could highlight

1    box C, please.

2            Now, you testified on direct and were asked questions

3    in cross about your investigation of campaign finance matters,

4    right?

5    A.  Yes, correct.

6    Q.  And you testified that the FBI has jurisdiction to conduct

7    investigations of campaign finance crimes, right?

8    A.  Yes.

9    Q.  Now, does that also include false reporting to the FEC?

10   A.  Yes, it does.

11   Q.  Now, you were asked a lot of questions about context by

12   Ms. Campbell, and I think you were cross-examined about putting

13   e-mails in context by Mr. Warrington.

14           Do you recall that cross-examination?

15   A.  Yes.

16   Q.  Without all of the information that you gathered in this

17   investigation, the e-mails, the documents, all the things that

18   we've looked at in the last couple of days, without any of that

19   information, simply standing alone on its face, would you have

20   any reason to suspect that there was anything wrong with what is

21   in the FEC report, the audiovisual expenses of Interactive

22   Communications, Inc., that you looked at in Government's Exhibit

23   145?

24           MS. CAMPBELL:  Objection.

25           MR. WARRINGTON:  Objection, Your Honor.

1        MS. CAMPBELL:  It's calling for a legal conclusion.

2   It's also calling for testimony on ultimate issues.

3        MR. COONEY:  I'm not asking that.  I'm asking reason

4   to suspect the force of the context of all of the e-mails.

5        THE COURT:  The objection is sustained.

6        MR. COONEY:  No further questions, Agent LoStracco.

7        THE COURT:  Anything else?

8        MS. CAMPBELL:  Mine is very short.

9                     RECROSS-EXAMINATION

10  BY MS. CAMPBELL:

11  Q.  Agent LoStracco, you've never worked on a campaign, right?

12  A.  I have not.

13  Q.  You've never been a political director of a campaign?

14  A.  No.

15  Q.  Your job has never included evaluating what's important to

16  politicians?

17  A.  I'm not really sure what that means, but I would say no.

18  Q.  And you testified about what you classified were junk

19  e-mails, right?

20  A.  Yes.

21  Q.  And that included e-mails from a Listserv?

22  A.  Yes.  I'm trying to remember the exact e-mail address,

23  but --

24  Q.  Perhaps it was from the NRSC Listserv?

25  A.  Yes.

1  Q.  Do you know what that is?

2  A.  I forgot what that stands for.  I'm sorry.  If you would

3  refresh my recollection.

4  Q.  Is it a -- hold on, National Republican Senatorial

5  Committee?

6  A.  Yes, that's correct.

7  Q.  Do you know what the National Republican Senatorial

8  Committee is?

9  A.  I mean, a national committee that represents senators.

10  Q.  And do you know what their list clip service does?

11  A.  I would assume it's news blasts related to Republican

12  issues.

13  Q.  And as a political director of a Republican candidate

14  running for President, do you think Mr. Benton would classify

15  NRSC Listserv as junk?

16  A.  I think the reason I put that in that category was because

17  of the number of blasts that he was getting per day.  If

18  Mr. Benton is reading those, then Mr. Benton is reading those if

19  that's what you're saying.

20  Q.  I mean, that's his job is to read about politics and reports

21  of presidential nominees, right -- or presidential candidates?

22  A.  His job as campaign manager is to report to the candidate.

23  Q.  And I think you also said that Google Alerts are included in

24  that junk e-mail, right?

25  A.  I do recall some Google Alerts, yes.

1  Q.  And do you know what a Google Alert is?

2  A.  Yes.

3  Q.  And is that where you set up so that if certain words hit

4  the news you get an alert?

5  A.  Correct.

6  Q.  And do you know what he set up for his Google Alert?

7  A.  No.  I do recall -- I'm trying to remember the log exactly

8  and why I would classify those as spam or junk.  I don't know

9  because I didn't see anything related to Ron Paul or the Ron

10  Paul Campaign.  I can't recall at this time.  I never looked at

11  the log.

12  Q.  Okay.  But you did classify Google Alerts as junk?

13  A.  I wouldn't say all of them, but I do recall some of them

14  being in that category, correct.

15  Q.  And you don't know whether or not the word he used for his

16  Google Alerts was Ron Paul?

17  A.  Again, if I looked at the log and looked at the description,

18  I could tell you if I saw any of those in there.

19  Q.  Okay.  You don't know, though?  You don't remember?

20  A.  Well, again, if I looked at the log, I could tell you.

21  Q.  Okay.  I don't think we have the ability to play the log --

22  A.  Okay.

23  Q.  -- because it's 55,000 pages and it's on a CD.

24  A.  Certainly if I saw something related to Ron Paul on a Google

25  Alert, I would not classify that as spam.

1    Q.   Okay.  And do you know where Jesse Benton was on February 7,

2    2012?

3    A.   I do not.

4    Q.   Do you know whether or not there was a Ron Paul event in

5    Minnesota?

6    A.   I do not.  I know that there were -- the caucuses were

7    between the 2nd and the 11th.  I don't remember the exact dates

8    for Minnesota.

9    Q.   Okay.  And you don't know whether or not he was on a plane

10   on that day?

11   A.   I do not know whether he was on plane, no.

12            MS. CAMPBELL:  I don't have anything further, Your

13   Honor.

14            THE COURT:  Anybody else?

15            MR. WARRINGTON:  Thank you, Your Honor.

16            I'm going to take the offer of help from the law

17   clerk, if she would put up Government Exhibit No. 57, please.

18            THE CLERK:  You misunderstood.  I don't put up the

19   exhibits.

20            MR. WARRINGTON:  Oh, I'm sorry.

21            MS. CAMPBELL:  We can put it up.

22            MR. WARRINGTON:  I apologize.  I thought I was

23   actually going to get through quickly.

24            MS. CAMPBELL:  What number?

25            MR. WARRINGTON:  57, Government's Exhibit 57.

1                    RECROSS-EXAMINATION

2   BY MR. WARRINGTON:

3   Q.  Just highlight the top, please.

4           Agent LoStracco, you're aware that the South Carolina

5   Republican Primary was on January 21, 2012, right?

6   A.  Yes.

7   Q.  And this is the e-mail Mr. Cooney asked you about that you

8   testified yesterday about that responded to Mr. Howard's inquiry

9   whether Mr. Sorenson was being paid for being in South Carolina,

10  correct?

11  A.  Correct.

12  Q.  And Mr. Tate responded by saying, no, he's not, he is

13  volunteering as I understand it, correct?

14  A.  Correct.  That is his response.

15  Q.  Do you know if Mr. Sorenson paid for his own expenses going

16  to South Carolina?

17  A.  I do not.

18  Q.  Can we see Government's Exhibit 74, please?  And just

19  highlight the top, please.

20          This is the e-mail that Mr. Cooney also referenced,

21  Government Exhibit No. 74, on February 7th, correct?

22  A.  Correct.

23  Q.  And this e-mail doesn't contain the word "approved," does

24  it?

25  A.  It does not.

1        MR. WARRINGTON:  Nothing further, Your Honor.

2        THE COURT:  Okay.  Thank you, ma'am.

3        You're excused.

4                                  (Witness excused.)

5        THE COURT:  Call your next witness, please.

6        MR. PILGER:  The United States calls Deana Watts.

7        THE COURT:  Come forward, ma'am.  If you will approach

8   the clerk, she'll administer your oath.

9        THE CLERK:  Please raise your right hand.

10        DEANA WATTS, GOVERNMENT'S WITNESS, SWORN

11        THE CLERK:  Please be seated.

12                    DIRECT EXAMINATION

13   BY MR. PILGER:

14   Q.  Good morning, Ms. Watts.

15   A.  Good morning.

16   Q.  Would you state your name?

17   A.  My name?

18   Q.  Your name.

19   A.  Deana Watts.

20   Q.  Spell your full name for the record.

21   A.  D-E-A-N-A W-A-T-T-S.

22   Q.  Ms. Watts, how are you employed?

23   A.  I worked for the presidential campaign committee as

24   assistant treasurer.

25   Q.  I can't hear you very well.  Could you just keep your voice

1   up a little bit?

2   A.   Okay.  Better?

3   Q.   Yes.

4   A.   Okay.

5   Q.   Which presidential campaign did you work for?

6   A.   The last one was Ron Paul 2012 Campaign.

7   Q.   Are you still employed regarding matters concerning that

8   campaign?

9   A.   Yes.

10  Q.   And in that job do you work with Lori Pyeatt?

11  A.   Pyeatt, yes.

12  Q.   Pyeatt.  And who is she?

13  A.   She was the treasurer for the committee.  She is Dr. Ron

14  Paul's daughter.

15  Q.   And is she your superior in that organization?

16  A.   Yes.

17  Q.   Is she related to anyone sitting in the courtroom today?

18  A.   Yes.

19  Q.   Who is that?

20  A.   Jesse Benton is her son-in-law.

21  Q.   Now, Ms. Watts, you and I were not able to prepare ahead of

22  this proceeding, correct?

23  A.   Correct.

24  Q.   And you have counsel in this matter, right?

25  A.   Yes.

1  Q.  That's the same counsel for Dr. Ron Paul and his 2012

2  committee, right?

3  A.  Yes.

4  Q.  And are you aware that counsel declined to allow you to

5  prepare with us?

6          MS. CAMPBELL:  Objection, Your Honor.  This is calling

7  for hearsay.

8          MR. PILGER:  It's a preliminary matter.

9          MR. BINNALL:  Also objection on relevance.

10         THE COURT:  The fact is that you haven't had a chance

11  to talk to her.  That's sufficient.

12         Pose your next question.

13         MR. PILGER:  Yes, Your Honor, I'll move along, asking

14  permission under rule 611(c) to lead the witness as identified

15  as an adverse party.

16         THE COURT:  Go ahead.

17  BY MR. PILGER:

18  Q.  Ms. Watts, turning your attention to 2012, were you working

19  for the Ron Paul Campaign at that time?

20  A.  Yes.

21  Q.  Were you aware of whether or not -- did you know that Jesse

22  Benton was the campaign leader?  Did you know his title?

23  A.  I don't remember his actual title.  I know he was in the top

24  level.

25  Q.  Okay.  And did you know that John Tate was the campaign

1  manager?

2  A.  Yes.

3  Q.  Did you know that Dimitri Kesari was the deputy campaign

4  manager?

5  A.  I don't remember his title, but I know he was in the top

6  level.

7  Q.  The top level of leadership of the campaign, correct?

8  A.  Yes.

9  Q.  And was your role to be the custodian of records for the

10  campaign?

11  A.  Yes.

12  Q.  Was your role also to be the designated agent for the

13  campaign?

14  A.  I believe so.

15  Q.  If we could bring up Government's Exhibit 144 in evidence.

16  And if we could go to I think page 3.  Actually the next page,

17  completing box 8, Ms. Draughn.

18          Ms. Watts, can you see that?

19  A.  Yes.

20  Q.  So you were, in fact, the designated agent of the Ron Paul

21  Presidential Campaign, correct?

22  A.  Yes.

23  Q.  As the designated agent, you had the role of making FEC

24  filings, correct?

25  A.  Correct.

1  Q.  In preparation for making FEC filings, you interacted with

2  Fernando Cortes, correct?

3  A.  Correct.

4  Q.  And Mr. Cortes was in a financial office of the campaign

5  somewhere other than your office, right?

6  A.  Yes.

7  Q.  He was in Virginia, right?

8  A.  Yes.

9  Q.  And you were where; in Texas?

10 A.  Texas.

11 Q.  And in Texas you would receive information from Fernando

12 Cortes, right?

13 A.  Yes.

14 Q.  And Fernando Cortes had assistants, including one Katie

15 Koerber, correct?

16 A.  Yes.

17 Q.  And after receiving information from Mr. Cortes, would you

18 use that information to prepare FEC filings?

19 A.  Yes.

20 Q.  Now, on the information that comes in from Mr. Cortes, first

21 of all, is that information in the form of a campaign record?

22 A.  It was usually by e-mail.

23 Q.  Right.  You're the custodian of records for the campaign,

24 right?

25 A.  Yes.

1  Q.  And Mr. Cortes would send you records concerning

2  expenditures of the campaign to you, right?

3  A.  Correct.

4  Q.  And those would be records of the campaign, right?

5  A.  Yes.

6  Q.  Now, in those records of the campaign, there would be coding

7  for the purpose of expenditures, right?

8  A.  Yes.

9  Q.  There were lots of expenditures, right?

10 A.  Yes.

11 Q.  And you had to report all of them to the FEC, right?

12 A.  Yes.

13 Q.  In fact, if you look over there behind the table -- I don't

14 know if you can see sitting down; you can stand up if you need

15 to -- there's a whole rack of binders.

16        Do you see them?

17 A.  Uh-huh.

18 Q.  You have to say "yes" or "no" for the court reporter.

19 A.  Yes.

20 Q.  If you printed out the FEC reports with all of the

21 expenditure details, would they fill up a rack of binders like

22 that?

23 A.  I don't know how many pages fit in one of those binders, but

24 the reports were thousands and thousands of pages long.

25 Q.  And so some of the reports -- well, let's say one of those

1  binders has a couple thousand pages.  If you did all of the

2  reports, there would be even more binders than that, right?

3  A.  There would be a lot.

4  Q.  Now, other -- the campaign records that came in from

5  Fernando Cortes, there was coding for the purpose of the

6  expenditures, right?

7  A.  Yes.

8  Q.  And the coding was done by numbers, and was that for

9  efficiency?

10  A.  Those numbers matched up with the chart of accounts.

11  Q.  And the chart of accounts, was that something that you

12  distributed to people?

13  A.  Not to people, only to the people that needed it, which

14  would have been the accounting staff, which would have been

15  Fernando and Virginia.

16  Q.  Okay.  And where they distributed it after that you don't

17  know?

18  A.  Correct, not for sure.

19  Q.  Okay.  Coding expenses, there's lots and lots of expenses,

20  right?

21  A.  Yes.

22  Q.  And they all need a code, right?

23  A.  Correct.

24  Q.  And is it really hard to code something, or can you do it

25  quickly and get that done?

1  A.  If you know the expenditure codes and you're familiar with

2  them, it shouldn't be that difficult.

3  Q.  And, to your knowledge, would you expect that the codes

4  generated from Mr. Cortes and his assistants rely on the

5  invoices that they receive?

6  A.  Ask that again, I'm not sure exactly what you're asking me.

7  Q.  To your knowledge, did Mr. Cortes get expense reports and

8  invoices from other people in the campaign?

9  A.  Yes.

10  Q.  And he would apply the coding chart that you provided?

11  A.  Yes.

12  Q.  And he would -- and he and his assistants would take all of

13  that voluminous expense reporting and code it from your chart,

14  right?

15  A.  I don't know if the assistants coded for him specifically;

16  but, yes, someone coded.

17  Q.  Okay.  You know he coded?

18  A.  He oversaw it.

19  Q.  He oversaw it.  And was the coding rocket science or did it

20  go pretty fast if you had to do it?

21  A.  Not rocket science, no.

22  Q.  And the codes and the campaign records that come in with the

23  codes come from Mr. Cortes to you, right?

24  A.  Yes.

25  Q.  You don't expect Mr. Cortes to go out and investigate every

1  expense that's on there, do you?

2  A.  No.

3  Q.  Would it make any sense for him to go around calling all of

4  the recipients of expenditures in those giant binders over there

5  investigating whether or not someone paid for a meal on a

6  certain day?

7  A.  No.

8  Q.  You wouldn't expect that at all, would you?

9  A.  No.

10 Q.  If he got an invoice from a hotel and he coded it for

11 lodging, would you expect him to go and call that hotel and make

12 sure that person stayed in that hotel on that night?

13 A.  No.

14 Q.  If he tried to do that, it would be impossible to get these

15 records to you in time to get the FEC reports out, right?

16 A.  Yeah, it would be.

17 Q.  Would it be difficult or would it be impossible?

18 A.  I don't know that anything is impossible, but time wise it

19 would be close to impossible.

20 Q.  Well --

21        THE COURT:  That's enough.

22        MR. PILGER:  All right.  I'll move on.

23 BY MR. PILGER:

24 Q.  It's not his job to do that, right?

25 A.  No.

1  Q.  Now, in Texas did you rely on what you got from Mr. Cortes

2  to put together the FEC filings?

3  A.  Yes.

4  Q.  Did you have a job to go investigate whether there might be

5  something wrong with the information he gave you?

6  A.  No.

7  Q.  So we've talked about how there's an operation in Texas and

8  there's an operation in Virginia, right?

9  A.  Yes.

10  Q.  And we've talked about it as the financial operation,

11  correct?

12  A.  Correct.

13  Q.  And is it fair to say that the campaign had an

14  infrastructure to deal with all of these masses of expenditures?

15  A.  Yes.

16  Q.  And was that infrastructure designed to keep track of

17  expenditures both internally and to the FEC?

18  A.  Yes.

19  Q.  Is that what your job was about?

20  A.  My job was to record the revenues and the expenditures and

21  report them to the FEC.

22  Q.  Fair point.  So you also had to deal with revenues, and I

23  haven't asked about that, right?

24  A.  Yes.

25  Q.  But expenditures was handled by the infrastructure you have

1  described, correct?

2  A.  Yes.

3  Q.  And the infrastructure at least as to expenditures, was it

4  designed for the purpose of making sure that expenses were

5  tracked and accounted for?

6  A.  Yes.

7  Q.  It was designed to allow someone to write a check of

8  campaign funds to someone without accounting for it?

9  A.  No.

10  Q.  Would that be a big problem if someone spent $25,000 and did

11  not account for it?

12  A.  Yes.

13  Q.  Would it be difficult for someone to spend $25,000 and

14  not -- of campaign funds and not have it end up in one of those

15  books?

16  A.  Yes.

17  Q.  If someone spent $25,000 of campaign funds and it didn't get

18  in those books, did you have systems to detect that and correct

19  it?

20  A.  Well, my bank account balanced to the penny, so there's

21  nothing that would have come in and out without some kind of

22  record.  The revenue either came in or the expenditure was made

23  and went in and out of the bank account.

24  Q.  So you had bank account records where you could check the

25  balances and see if someone had failed to account for some

1  number, right?

2  A.  Correct.  The bank account was reconciled every month.

3  Q.  And so if someone, let's say, stole $25,000, the balance is

4  going to be off, right?

5  A.  Correct.

6  Q.  And you would be looking to see what happened to that,

7  right?

8  A.  Correct.

9  Q.  Even $8,000 is something you're going to inquire about,

10  right?

11  A.  There would be a record of the expenditure.

12  Q.  There should be, right?

13  A.  There should be a record of the expenditure.

14  Q.  But if your balances are off and there's $8,000 a month

15  going out and no record of why --

16  A.  That wouldn't happen.  Lori Pyeatt and I were the only two

17  signatures that I remember on that account.  No one else had

18  access to the bank account.  It was in Texas.

19  Q.  Exactly.  So there's not a way for someone to spend the

20  campaign money without it going into those books, right?

21  A.  Right.

22        MR. PILGER:  No further questions.

23        THE COURT:  Questions?

24        MS. CAMPBELL:  Yes, Your Honor.

25

1                        CROSS-EXAMINATION

2    BY MS. CAMPBELL:

3    Q.  Good morning, Ms. Watts.

4    A.  Good morning.

5    Q.  How is it that you're still working for a campaign that is

6    no longer a campaign?

7    A.  Well, we're here, so that's the biggest reason.  I'm

8    employed by that campaign; but I've worked for Dr. Paul for 26

9    years, and I do the accounting for various activities that he

10   still has going.

11   Q.  And the campaign keeps spending money even after the

12   candidate withdraws from the race?

13   A.  It takes a long time to shut a committee down.

14   Q.  And reports are still generated?

15   A.  Correct.

16   Q.  Now, did Jesse Benton ever tell you what to put in the

17   reports?

18   A.  Specifically what to put in the report?

19   Q.  Yes.

20   A.  No, I do not remember him ever doing that.

21   Q.  Did Jesse Benton ever tell you to change a code on an FEC

22   report?

23   A.  No.

24   Q.  Did Jesse Benton ever tell you how to code an FEC report?

25   A.  No.  If there was any kind of conversation, it might have

1  been what kind of travel was this, you know.

2  Q.  Now, you were talking a little bit about the chart of

3  accounts.  Where did the chart of accounts come from?

4  A.  Chart of accounts is a listing, it's an account listing to

5  keep up with types of revenue, types of expenditures to use in a

6  software program.  And you usually start with a basic standard

7  term of accounts and you can add or delete depending on what you

8  need for your purposes.  The FEC puts out a listing of adequate

9  expenditure codes and inadequate codes, and I use that as the

10  basis of our target accounts.

11  Q.  And so the FEC's public information about acceptable

12  purposes and unacceptable purposes were something that you

13  relied on?

14  A.  Yes.

15  Q.  And your actual accounting software, what kind of software

16  was that?

17  A.  We used QuickBooks for the initial software, but our FEC

18  software was Bill Pack.

19  Q.  So you had two different sets of software?

20  A.  Yes.

21  Q.  One for the accounting of the campaign and one for the FEC

22  reporting?

23  A.  They mimic each other.  They were the same accounting, but

24  QuickBooks, I can't report to the FEC off of that, so I had to

25  use an FEC program to file the reports.

1  Q.  Now, when you actually filled out the FEC reports, did you

2  put the date and time of the payment in the report?

3  A.  Yes.

4  Q.  And did you do it for the day and time that the payment

5  actually was paid?

6  A.  Yes.

7  Q.  And was that your understanding that you put in the day the

8  payment was paid --

9  A.  Yes.

10  Q.  -- in an FEC report?

11  A.  Yes.

12  Q.  And you put in the payee if it was a check; is that right?

13  A.  Yes.

14  Q.  And the payee if it was a wire; is that right?

15  A.  Yes.

16  Q.  And then when you put in the purposes, you said you were

17  following lists from the FEC; is that right?

18  A.  The acceptable codes?

19  Q.  Yes.

20  A.  Yes.

21  Q.  And where did audiovisual expenses come from, do you know,

22  as a purpose?

23  A.  I don't recall.  That could have been QuickBooks.  It could

24  have been that was already in the system, or it could have been

25  a code that we added later when we needed one with that kind of

1  a description.

2  Q.  And you used audiovisual expenses for other expenses as a

3  code, right?

4  A.  Yes.

5  Q.  It's not unique to this particular ICT code, right?

6  A.  No.

7  Q.  And do you independently recall the name of any of the other

8  companies that you used audiovisual expenses for?

9  A.  It could have been something as simple as Best Buy if they

10  had to purchase a piece of equipment that was that type of

11  equipment.

12  Q.  Could it have been a company that was doing some other type

13  of audiovisual?

14  A.  Yes.

15  Q.  Do you know what the company Public Appeal is?

16  A.  No.  I recognize the name, but I couldn't tell you exactly

17  what they do.

18  Q.  And do you know whether or not you coded them as audiovisual

19  expenses?

20  A.  I can't be certain.

21  Q.  Would it refresh your recollection to see page 17,556 --

22  A.  Sure.

23  Q.  -- of the 2011 fourth quarter report?

24  A.  If it's on my report, then we paid them.

25        Uh-huh.

1  Q.  And does this look like a page from your report?

2  A.  It does.

3  Q.  And does it show a payment for audiovisual expenses to

4  Public Appeal?

5  A.  Yes.

6        MS. CAMPBELL:  We would offer Defendant Benton's

7  Exhibit B28.

8                              (Defendant's Exhibit B28 was

9                              offered in evidence.)

10        MR. PILGER:  As redacted to Public Appeal, no, Judge,

11  no objection.

12        THE COURT:  It's received.

13                              (Defendant's Exhibit B28 was

14                              received in evidence.)

15        MR. PILGER:  To be clear, the rest of the document we

16  would ask to redact.

17        MS. CAMPBELL:  We can take that up later, Your Honor.

18        THE COURT:  Yeah, good.  We'll take it up later.

19  BY MS. CAMPBELL:

20  Q.  And you testified that these were thousands and thousands of

21  pages; is that right?

22  A.  Correct.

23  Q.  And do you recall independently how many pages for each

24  report?

25  A.  No, not exactly, but this one was 17 plus.

1  Q.  17,901?

2  A.  17,000 plus.

3  Q.  Just so we get it on the record, let me show you one of

4  these binders.

5  A.  Yeah, I've never actually seen one printed in paper because

6  that's insane.

7  Q.  My law clerk agrees with you.

8  A.  Yeah.

9  Q.  So you didn't print these all out on paper?

10 A.  No.

11 Q.  You did them electronically?

12 A.  Yes.

13 Q.  And you've done FEC reports before, right?

14 A.  Yes.

15 Q.  For other types of campaigns?

16 A.  Yes.

17 Q.  And other types of campaigns actually require you to file

18 them in paper; is that right?

19 A.  Years ago it was paper filing.  I'm not sure that's an

20 option anymore.  It's not for this size of an organization.

21 Q.  And does that refresh your recollection as to -- could you

22 tell me what report that is?  Could you just look at the front

23 page?

24 A.  Yes.  It's for the month of January 2012.

25 Q.  Okay.  And how many pages if you look at the top corner?

1  A.  7,433.

2  Q.  And that's just January?

3  A.  Just January.

4  Q.  So you were reporting quarterly in 2011; is that right?

5  A.  I believe so, and then it went to monthly.

6  Q.  And then monthly in 2012?

7  A.  Yes.

8  Q.  So you had to do these things every month?

9  A.  Yes.

10 Q.  And is this, so we have it, these binders that we've been

11 talking about, could you just look at approximately how many

12 pages are in each binder?

13         MR. PILGER:  So, in the interests of time, objection;

14 cumulative.

15         THE COURT:  Overruled.

16         MR. PILGER:  We'll stipulate it's huge, Your Honor.

17 A.  I thought that was the whole report at first.  That's a

18 thousand pages.

19 BY MS. CAMPBELL:

20 Q.  So that's just a thousand pages of the 7,000 plus page

21 report?

22 A.  Right.

23         MS. CAMPBELL:  I don't have anything further, Your

24 Honor.

25         THE COURT:  Anybody else?

1                     CROSS-EXAMINATION

2  BY MR. WARRINGTON:

3  Q.  Good morning, Ms. Watts.

4  A.  Good morning.

5  Q.  You ever talk to John Tate about how things were to be

6  reported on the FEC reports?

7  A.  I don't ever recall directly talking to him, no.

8          MR. WARRINGTON:  Thank you.

9          Nothing further.

10         THE COURT:  Mr. Binnall?

11                    CROSS-EXAMINATION

12 BY MR. BINNALL:

13 Q.  Good morning.

14 A.  Good morning.

15 Q.  Once an expenditure is coded for a particular vendor, does

16 it usually stay that way for other payments to that same vendor?

17 A.  Not necessarily.  It could change.

18 Q.  Is there anything that is a default in the system?

19 A.  No.

20 Q.  And was Mr. Kesari -- did you ever speak with him about how

21 expenditures should be coded?

22 A.  I do not remember speaking to him directly.

23         MR. BINNALL:  All right.

24         Thank you.

25         THE COURT:  Anything else?

1          MR. PILGER:  Nothing further, Your Honor.

2          THE COURT:  Thank you, ma'am.  You're excused.

3                                  (Witness excused.)

4          THE COURT:  We'll break and start at 1 o'clock.

5          See you at 1 o'clock.

6          (Recess at 11:50 a.m., until 1:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION  1:00 p.m.

2                (In open court, in the presence of the jury.)

3                THE COURT:  Please be seated.

4                Mr. Sorenson, remain standing, the clerk will

5    administer your oath.

6                THE CLERK:  Please raise your right hand.

7                  KENT SORENSON, GOVERNMENT'S WITNESS, SWORN

8                THE CLERK:  Please be seated.

9                      DIRECT EXAMINATION

10   BY MR. PILGER:

11   Q.  Good afternoon, sir.

12              Please state your name for the record.

13   A.  Kent Sorenson.

14   Q.  And spell your last name, please, for the court reporter.

15   A.  S-O-R-E-N-S-O-N.

16   Q.  Mr. Sorenson, how are you employed at this time?

17   A.  I work for a small car lot as a buyer and a wholesaler.

18   Q.  Do you have a family to support?

19   A.  Yes.

20   Q.  And so are you married?

21   A.  Yes.

22   Q.  Do you have children?

23   A.  Six.

24   Q.  How many are at home?

25   A.  Four.

1  Q.  How old are they?

2  A.  The ones at home or all of them?

3  Q.  The ones at home.

4  A.  16; 14, soon to be 15; 12; and 11.

5  Q.  Mr. Sorenson, turning your attention back a few years, did

6  there come a time where you were elected to a legislative house

7  of government in the State of Iowa?

8  A.  Yes.

9  Q.  When was that, the first time?

10  A.  2008.

11  Q.  And what job were you elected to at that time?

12  A.  The Iowa House of Representatives.

13  Q.  And what area did you represent?

14  A.  It was called District 74, which is part of Warren County,

15  the bulk of Warren County.

16  Q.  And then were you subsequently elected to any other offices

17  in the State of Iowa?

18  A.  Yes.

19  Q.  When was that?

20  A.  Two years later.

21  Q.  So that would be 2010?

22  A.  Yes.

23  Q.  What office were you elected to at that time?

24  A.  The Iowa Senate.

25  Q.  In your elections in 2008 and 2010, did you receive

1  assistance from other groups and persons?

2  A.  Yes.

3  Q.  Tell the jury whether or not those groups and persons

4  included an organization called Right to Work?

5  A.  Yes, it did.

6  Q.  And did you come to know various people at the organization

7  Right to Work?

8  A.  Yes.

9  Q.  Do you see any of those people in the courtroom today?

10  A.  Yes.

11  Q.  Who's that?

12  A.  Dimitri Kesari, which is directly behind you, and I believe

13  in 2008 at that time, John Tate was also employed by Right to

14  Work, but I'm not confident of that.  I know he was part of

15  Right to Work.  I think he was on the board.

16  Q.  Okay.  It's fair for you to estimate.  Just make sure you

17  are clear to the jury if you are estimating, all right?

18  A.  Okay.

19  Q.  So do you see John Tate in the courtroom today?

20  A.  He's -- I saw him before we started.  He's directly behind

21  you, so I can't see him at this time, but yes.

22  Q.  So let's talk about the 2012 presidential election, okay?

23  A.  Yes.

24  Q.  Directing your attention to that time period.  The 2012

25  presidential elections, they play out over two years, 2011 and

1  2012; is that fair?

2  A.  Yes.

3  Q.  And Iowa has a special role in presidential elections; is

4  that fair?

5  A.  Correct.

6  Q.  Can you explain that to any member of the jury who might not

7  know it?

8  A.  Iowa is first in the nation as the caucus state.  So we're

9  actually the first state to have the election process started.

10  Q.  And let's be clear, at least on the Republican side, there's

11  a couple of events that Iowa does first, right?

12  A.  At that time there was, but I believe since then it's been

13  suspended.

14  Q.  Fair enough.  Let's just talk about at that time.

15  A.  Okay.

16  Q.  What were the events in Iowa for the Republican side?

17  A.  Early in the process, I think it was in August of that year,

18  there was a straw poll in Ames, and Iowa is famously known for

19  the Ames Straw Poll.  And then after that was the caucuses.

20  Which I believe that year was in January.

21  Q.  Okay.  And maybe everyone knew that, but we've got it clear

22  in the record.

23        The Ames Straw Poll didn't happen this go-around,

24  right?

25  A.  Correct.

1  Q.  The Ames Straw Poll in the 2012 cycle, which would be, I

2  think you just said was August 2011; did I get that right?

3  A.  Yes.

4  Q.  Who won that?

5  A.  Michelle Bachmann.

6  Q.  The Michelle Bachmann Presidential Campaign was up and

7  running in Iowa in 2011, correct?

8  A.  Yes.

9  Q.  Did you come to have a role in that campaign?

10  A.  Yes, I did.

11  Q.  And what was your title with that campaign?

12  A.  Iowa Chair.

13  Q.  While you were working for the Michelle Bachmann Campaign,

14  did people from any other campaign approach you about coming to

15  work or coming to endorse their campaign?

16  A.  Yes.

17  Q.  And who was that?

18  A.  Dimitri Kesari with Ron Paul.

19  Q.  So the candidate was Ron Paul?

20  A.  Correct.

21  Q.  And you mentioned Dimitri Kesari approached you about

22  endorsing Ron Paul?

23  A.  Yes.

24  Q.  Did other people associated with the Paul Campaign approach

25  you about endorsing him?

1  A.  Well, I spoke with them before I went to work with Michelle,

2  so I'm not sure at what time period you're talking about; but I

3  spoke to them before that and then following the endorsement,

4  originally it was Dimitri that just spoke to me, but there were

5  some other people from Iowa who were talking to me as well.

6  Q.  Okay.  There were a few things in there.  I want to pull

7  them apart and make them clear for the record.

8       So are you saying before you went to work for Michelle

9  Bachmann in her campaign that you were in contact with Paul

10  people?

11  A.  Yes.

12  Q.  And were they seeking your endorsement?

13  A.  Um, actually at that time I reached out to them and asked

14  them if they were -- if Ron was going to run because I had been

15  a Paul supporter in the past and I had relationships with a lot

16  of the Paul people.  So I wanted to find out what his intentions

17  were before I went to support Michelle Bachmann.

18  Q.  Thank you.

19       So let's make this clear.  Your first inclination was

20  to try and work for the Paul people; is that fair?

21  A.  Correct.

22  Q.  And you reached out to them you said?

23  A.  Yes.

24  Q.  And at that time could you tell whether or not Ron Paul was

25  going to get into the race or not?

1  A.  Yes.  And part of the reason why I reached out to them is

2  because during the 2010 campaign cycle, I saw people with Right

3  to Work laying groundwork for the Paul Campaign, so I thought he

4  was going to get in, but I wasn't certain.

5  Q.  So when you reached out prior to going to work for the

6  Bachmann Campaign, did you sound out the Paul people about

7  whether he was going to run?

8  A.  Yes.

9  Q.  Okay.  And did you come away with an understanding about

10  whether that decision was going to be made in time for you?

11  A.  I was asked to wait a couple of weeks to decide and they

12  would get back to me, and a couple of weeks went by and at that

13  time I reached out to Dimitri and told him that it was getting

14  to the point where I was going to have to make a decision.  So I

15  let him know that I decided to support Michelle.

16  Q.  And when was this?  What date are you talking about?

17  A.  I believe the first time I met Michelle was in February of

18  that year, and shortly after that she began talking to me about

19  becoming a part of her presidential campaign should she decide

20  to run.  So there was a ramping up process and originally we

21  believed that there was going to be a May announcement --

22  Q.  I'm sorry, I didn't hear that.

23  A.  Originally we believed there was going to be a late April,

24  May announcement, but it was actually postponed to June.  But

25  early in the year I knew she was going to run.  So I can't give

1   you an exact date of when that happened, but I can tell you it

2   was sometime between February and March.

3   Q.  Between February and March that you were talking to the

4   Bachmann Campaign?

5   A.  Yes.

6   Q.  And so the Bachmann Campaign, to your recollection, gets up

7   and running approximately June of 2011?

8   A.  Officially it was in June, I believe.  I would have to -- I

9   would need something to -- I don't remember the exact date, but

10  I know we were ramping up for an announcement in Waterloo.

11  Q.  Fair enough if you're approximating, if you're making that

12  clear.

13          So at the time that you went on board with the

14  Bachmann Campaign, had you decided something about whether you

15  would have an opportunity with the Paul Campaign?

16  A.  At that point I decided that I was going to support Michelle

17  and I thought that that chapter was closed, but obviously it

18  wasn't.

19  Q.  Excuse me.  Bear with me, Mr. Sorenson.  I have a cough.

20          And you did work for the Bachmann Campaign, correct?

21  A.  Correct.

22  Q.  And did you work full time, part time, a little, a lot?

23  A.  It would be more than full time.

24  Q.  So more than 40 hours a week?

25  A.  Yes.  Seventy to eighty hours a week on any given week.

1  Q.  And you did get paid for that work, correct?

2  A.  Correct.

3  Q.  Now, you've entered into a cooperation agreement with the

4  government; is that right?

5  A.  Yes.

6  Q.  And without saying what you said, have you been debriefed

7  several times about the payments that you received from the

8  Bachmann Campaign?

9  A.  Yes.

10  Q.  So you mentioned Dimitri Kesari.  After you were working for

11  Michelle Bachmann 70 to 80 hours a week, did Dimitri Kesari

12  remain in contact with you about the possibility of endorsing

13  Ron Paul?

14  A.  Dimitri and I stayed in contact a lot because he was also

15  still -- I viewed him as being associated with the Right to Work

16  movement.  I wasn't sure if he was employed by Right to Work

17  at -- actually I believe he still was when I first went on with

18  Michelle Bachmann.  So we stayed in contact about that.  So we

19  talked about a lot of things, but Ron Paul was actually brought

20  up frequently.

21  Q.  By you or by him?

22  A.  We both talked about it early on and he continually reminded

23  me at that point in time that I was at the wrong place.

24  Q.  When you say "at the wrong place," where were you?

25  A.  Supporting Michelle Bachmann.

1  Q.  And who did he think was the right place, if he told you

2  that?

3  A.  Well, early on -- I don't remember when Ron Paul announced

4  his candidacy, so -- but I know that he was not satisfied with

5  my support of Michelle Bachmann, and gradually as time

6  progressed it became more evident that Ron was announcing his

7  candidacy, and then once he announced, he spoke to me about

8  switching over early on.

9  Q.  So let's come at it that way.  Do you remember when or

10  approximately when Ron Paul became a candidate for President of

11  the United States?

12  A.  I don't.  I'm not sure if it was before Michelle officially

13  announced or if it was after Michelle officially announced but,

14  I do remember it was -- everybody was announcing between March

15  and June, and then there was one late comer in July, I believe,

16  or August even.

17  Q.  Okay.  So would it be fair to say in the summer of 2011?

18  A.  Late spring, early summer, I believe.

19  Q.  Somewhere in there Ron Paul became a candidate?

20  A.  Yes.

21  Q.  And that's after you had gone on board to work 70 or 80

22  hours a week for Michelle Bachmann?

23  A.  Correct.

24  Q.  When Dimitri Kesari was talking to you in the period after

25  Ron Paul was a candidate, was he expressing to you who you

1  should endorse going forward?

2  A.  Yes.  He was very explicit that I should be with the Paul

3  camp.

4  Q.  Okay.  And remind the jury, was Dimitri Kesari still

5  associated with the Right to Work movement?

6  A.  I believe he was associated with the Right to Work movement

7  officially until he joined the Paul Campaign, but even after

8  that I viewed him as part of the Right to Work committee because

9  of the ties that he had there.

10 Q.  And the Right to Work Committee had been important in

11 supporting you for your election to the Iowa State offices as

12 you talked about, correct?

13 A.  Yes.  Actually in 2008 the Right to Work Committee was the

14 only committee that supported me -- well, let me take that back.

15 There was two groups that supported me.  The Right to Work did

16 the bulk of the support.

17 Q.  And was that important or not important to you getting

18 elected?

19 A.  I would not have gotten elected to the House in 2008 if it

20 was not for Right to Work.

21 Q.  I want to turn your attention to the time period around

22 Reformation Day or Halloween or all Hallow's Eve, October 31,

23 2011.  Were you aware of an e-mail exchange concerning who you

24 should be endorsing?

25 A.  Sometime around that time frame I became aware of an e-mail

1  exchange of who I should endorse.  I can't tell you for sure if

2  it was the 31st or if this was the 1st of November.

3  Q.  Okay.  Bear with me a second.

4       (Pause.)

5       If we could get 70 in evidence, not that one, the

6  reply.

7       While that's coming up, let's do some preliminary work

8  for the jury.  Were you aware of someone named Aaron Dorr

9  talking to the Paul Campaign on your behalf at that time?

10 A.  I knew Aaron very well.  I knew he was communicating with

11 people in the Paul Campaign on a continual basis.  I believe he

12 was doing mail for them as well.  And he was a vocal opponent of

13 me being with Michelle Bachmann.  He actually was constantly

14 urging me that I should be with the Paul camp.

15 Q.  And you know he made a proposal to the Paul camp, right?

16 A.  Yes.

17 Q.  And do you know what was in that proposal?

18 A.  I honestly don't believe I knew the full details of what was

19 in the proposal.  He was talking to me about it until after he

20 had sent it and I read it, and that was after I had received an

21 e-mail that I was carboned on that it was from Jesse Benton.

22 Q.  But will you admit to this jury you know he was working --

23 A.  Yes.

24 Q.  We talked over each other for a second.

25      You knew before he did it that he was working on it?

1    A.  Yes.

2    Q.  Okay.  And then the proposal, do you know if it went out?

3    A.  I didn't know if -- I wasn't sure when it went out.  I just

4    knew that I received a reply from Jesse Benton.

5    Q.  Fair enough.  So do you know from the fact that there was a

6    reply that it went to at least Jesse Benton?

7    A.  Yes.

8    Q.  Okay.  And looking at Government's Exhibit 70 in evidence.

9            MR. COONEY:  10.

10   BY MR. PILGER:

11   Q.  Sorry; Government's Exhibit 10.  That's on the screen and

12   the jury can see it.

13          Is this the reply that Jesse Benton sent to both Aaron

14   Dorr and yourself on Halloween 2011?

15   A.  Yes.

16   Q.  And this is addressed to Aaron, Kent, and Chris.  Who is

17   Aaron?

18   A.  Aaron Dorr is somebody that -- he's somebody that worked on

19   my campaign.  He's also a Director of Iowa Gun Owners here in

20   Iowa, and he had close ties to the Right to Work group and

21   myself.

22   Q.  Is Kent you?

23   A.  Yes.

24   Q.  Is this an e-mail address that you used?

25   A.  Yes.

1  Q.  And who's Chris?

2  A.  Chris Dorr at that time was working for the Bachmann

3  Campaign as well, but was also my legislative assistant and had

4  helped my campaign.

5  Q.  So we're talking about Chris Dorr, right?

6  A.  Correct.  That's Aaron's brother.

7  Q.  It's Aaron's brother, and he worked for you in the

8  Legislature?

9  A.  Yes.

10  Q.  Was that a full-time job or part-time?

11  A.  It was part time.

12  Q.  And I think you just said that he worked for the Bachmann

13  Campaign as well?

14  A.  Yes.

15  Q.  Was he receiving a salary there?

16  A.  Yes.

17  Q.  Was he actually doing work?

18  A.  Yes.

19  Q.  And then who's copied on this e-mail from Jesse Benton to

20  yourself and Aaron Dorr?

21  A.  John Tate, Jedd Coburn and Freedom Enterprises, LLC, which

22  I'm not sure who that is.

23  Q.  Okay.  If you don't know, don't guess, okay.

24        But there's two e-mail addresses in here, right?

25  A.  Yes.  There's actually four if you count mine.

1  Q.  I'm sorry; in the to line.

2  A.  Oh, I'm sorry, yes.

3  Q.  There's two e-mail addresses, and one is you?

4  A.  Yes.

5  Q.  And then there's a salutation to Aaron Dorr, yourself, and

6  Chris Dorr, right?

7  A.  Correct.

8  Q.  Directing your attention to the paragraph I'm highlighting,

9  can you read that to the jury, please?

10 A.  The proposal you sent us was, however, surprising.  It

11 appeared that you were trying to sell Kent's endorsement for

12 hundreds of thousands of dollars and other in-kind support for

13 future political ventures.  That would be unethical and illegal.

14 Dr. Paul, John and I, would never engage in such dealings.

15 Q.  Then coming down a little bit, if you could start at the

16 sentence that says Michelle Bachmann -- actually -- excuse me,

17 sir.  Could you read the paragraph that I just put a dot on that

18 says that?

19 A.  Yes.  Actually there's --

20         MR. COONEY:  Mr. Pilger, press the arrow in the upper

21 right-hand corner.

22         MR. PILGER:  Thank you, Mr. Cooney.

23         MR. COONEY:  Yep.

24 BY MR. PILGER:

25 Q.  Go ahead and read that.

1    A.   That said, we would be pleased to have your support.  If you

2    join our team and lend your efforts to our campaign, we would be

3    happy to employ you at fair market value.  Michelle Bachmann has

4    set that value at 8,000 per month for Kent and 5,000 per month

5    for Chris Dorr.  We would plan to keep you on retainer for the

6    duration of the Paul Campaign, however long that may be.  We

7    would expect you both to lend your considerable talents to our

8    winning team in Iowa and, post caucus, in other states across

9    the country.

10   Q.   And, Ms. Draughn, could I have the full document back?

11        So you received this, right?

12   A.   Yes.

13   Q.   And you read it?

14   A.   Yes.

15   Q.   And did you have any particular reaction to the fact that

16   they were calling the proposal unethical and illegal?

17   A.   Um, I don't recall that.

18   Q.   Trying to think back, was that a nothing to you?  Was it

19   startling?  Did it annoy you?  What?

20   A.   I was startled by it and I wasn't fully aware at that time

21   what was in the proposal.  I knew that we had talked about me

22   going to work for the Paul Campaign, so I wasn't sure what Aaron

23   had officially put in the letter.

24   Q.   Fair enough.  Does the letter, to your understanding,

25   despite calling the proposal illegal and unethical, go on to

1  tell you something about whether the campaign is willing to pay

2  you?

3  A.  Yes.

4  Q.  And what was your understanding what they were going to pay?

5  A.  They were willing to pay me $8,000 per month.

6  Q.  Okay.  What were you making for the Bachmann Campaign

7  working 70 to 80 hours a week?

8  A.  I made $7,500 a month and out-of-pocket expenses and a cell

9  phone allowance.

10  Q.  So 7,500 and change?

11  A.  Yes.

12  Q.  So after this proposal, did you continue talking or

13  communicating with the Ron Paul Campaign in any way?

14  A.  Yes.  I'm not sure at this time -- after the straw poll,

15  there was a -- or actually prior to the straw poll, there was a

16  split between Dimitri and I, and we didn't speak very much from

17  August until this, and then this kind of -- at this time I

18  remember starting to have conversations with him again.

19  Q.  Okay.  So there was an incident?

20  A.  Yes.

21  Q.  And tell the jury what that incident was.

22  A.  Um, I -- there was just -- you know, I was in politics, and

23  to me your image is very important in your politics because

24  everything is about your next election or the public perception

25  of you, and there was a lot of things being said about me for

1  being compromised by supporting Michelle on blogs, social media

2  by the Ron Paul supporters, and I believe that Dimitri was -- I

3  blamed him for instigating that, I blamed the Paul Campaign.  We

4  had people showing up at softball games with my kids and

5  complaining to me about it.

6          So I would call Dimitri and voice my opposition to

7  that, and it really came to a head at the Iowa Straw Poll, and

8  there was just a lot of tension between the two campaigns

9  because, obviously, if you're in politics, you're very

10 competitive and we were competing against each other, and

11 actually one of my -- one of the people that worked for the

12 campaign ran Dimitri's foot over with a golf cart at the straw

13 poll and I believe his foot was fractured.  I'm not sure.  And

14 that was really the -- it was like just the tension of

15 everything that was happening at the straw poll and they were

16 having people drop our -- when you're at the straw poll,

17 everything is set up in tents, so it's like a little community

18 of your campaign supporters, and you provide food and concerts

19 and different things for people to come to your area of this

20 community.

21         So it's -- they were sending people that I knew were

22 from the Paul Campaign were coming over and dropping in our

23 area, and I remember having a verbal argument with people from

24 the Paul Campaign and with Dimitri particularly, and that was --

25 it just -- there was so much tension that I just said I was done

1   talking to him at that time.

2   Q.  Then coming forward in time to after Halloween, so into

3   November of 2011, did you pick up and start talking to Dimitri

4   Kesari again?

5   A.  Yes.

6   Q.  Okay.  And did you become close again?

7   A.  Yes.  I mean, there was always that tension there because we

8   were supporting opposite candidates at that time, but we became

9   close and we went to dinner a few times and we talked on the

10  phone on a regular basis.

11  Q.  On a regular basis.  And did it happen on a regular basis

12  that Dimitri Kesari talked about coming over to endorse Ron

13  Paul?

14  A.  Yes.

15  Q.  Okay.  Moving ahead into December, were those conversations

16  continuing with Dimitri Kesari?

17  A.  Yes, it was.

18  Q.  Was there ever a time you met with Dimitri Kesari where he

19  didn't bring up endorsing Ron Paul?

20  A.  No.

21  Q.  And going into December, did you personally from your

22  observations have a belief about the viability of Michelle

23  Bachmann's campaign?

24  A.  Yes.  There was actually a situation in October that caused

25  me to really just -- I saw Michelle -- I became -- it became

1  clear to me that she had no business being President.  So I

2  really lost --

3  Q.  I want to interrupt you just to keep the record clear.

4  A.  Okay.

5  Q.  So I was just asking about December.

6  A.  I'm sorry.

7  Q.  So if that leads to an unfair answer, you let me know and

8  we'll go back to October; but in December did you have a view

9  about the viability of Michelle Bachmann's campaign?

10 A.  Yes.

11 Q.  And what was that?

12 A.  She was not going to be the nominee, nor did I really want

13 her to be at that point in time.

14 Q.  And simultaneously with having that view -- was it

15 simultaneously as having that view that Dimitri Kesari was

16 regularly asking you to endorse Ron Paul?

17 A.  Yes.

18 Q.  Was Dimitri Kesari talking to you about whether there would

19 be money involved for you if you endorsed Ron Paul?

20 A.  Yes.

21 Q.  And what was your understanding from Dimitri Kesari about

22 whether you would get money for doing that?

23 A.  That I would be compensated $8,000 a month.  That was the

24 ongoing offer, I believe, to that time.

25 Q.  And let me turn your attention to Christmas of 2011, okay?

1  A.  Yes.

2  Q.  Now, Christmas in Iowa right before a caucus period is a

3  busy time for politicians, right?

4  A.  Correct.

5  Q.  So people such as yourself who were in politics might be

6  working on Christmas Day, right?

7  A.  Unfortunately.

8  Q.  Okay.  Let me ask you this.  If you had to do work on

9  Christmas, would you work on things that were really important

10 or just everything that was there to be worked on?

11 A.  Really important.

12 Q.  And would you try and cut down to a minimum the amount of

13 time that you were working on the holiday at Christmas?

14 A.  Yes.

15 Q.  In fairness, though, some work does have to happen, though,

16 when the caucuses are coming up in January of 2012, right?

17 A.  Yes.  I believe that year we were seven, eight days away

18 from the caucuses.  Maybe nine.  I'm not sure.

19 Q.  Okay.  You're estimating?

20 A.  Yes.

21 Q.  Do you remember the date of the caucuses?

22 A.  I believe it was January 2nd, but it could have been the

23 3rd.

24 Q.  Okay.  If you estimate, just make sure you tell the jury

25 that you're doing that.

1          Now, we just talked about Christmas Day.  Let's talk

2    about the day after Christmas.  Did you have dinner out that

3    night?

4    A.  Yes.

5    Q.  And tell the jury what you remember about dinner out the day

6    after Christmas 2011.

7    A.  Um, we met, Dimitri, my wife, and I at a restaurant in

8    Altoona, Iowa, named Claxton's.

9    Q.  And Claxton's is -- I'm sorry, where is that in Iowa?

10   A.  It's in Altoona.

11   Q.  Altoona.  What county is that?

12   A.  Pardon me?

13   Q.  What county is that?

14   A.  Oh, Polk County.

15   Q.  And, to the best of your recollection, who was there?

16   A.  Myself, my wife, and Dimitri.

17   Q.  Those people you definitely remember being there?

18   A.  Yes.

19   Q.  Okay.  And what did Dimitri say to you, if anything, about

20   the Ron Paul Campaign during that dinner?

21   A.  At that point in time, he was still trying to get me to

22   support Ron and trying to get me to endorse Ron and that his

23   campaign was more viable, and I acknowledged that.  I told him

24   that I would like to support Ron but I don't believe it would be

25   the right thing to do because of how far late we were in the

1  process and I just needed to see the process through.

2  Q.  Okay.  Did you leave and go to the bathroom at some point?

3  A.  Yes.

4  Q.  What happened next?

5  A.  He had given my wife --

6        MR. BINNALL:  Objection; lack of personal knowledge.

7        THE COURT:  Overruled.

8        Answer the question.

9  A.  He presented my wife a check at the restaurant while I was

10  in the rest room.

11  BY MR. PILGER:

12  Q.  And when did you become aware of that check?

13  A.  I believe it was in the car after he left.

14  Q.  And how did you become aware of it?  Without saying anything

15  anybody said, tell us how you became aware of it.

16  A.  My wife showed it to me.

17  Q.  So you personally saw it?

18  A.  Yes.

19        MR. PILGER:  Could you put 133 on the screen, please,

20  Ms. Draughn?  133 is in evidence.

21  BY MR. PILGER:

22  Q.  Is this a copy of the check?

23  A.  Yes.

24  Q.  And that's the check that you saw your wife produce in the

25  car after the dinner at Claxton's, right?

1   A.  Yes.

2   Q.  And the check is in what amount?

3   A.  $25,000.

4   Q.  What's the date of the check?

5   A.  12/26 of 2011.

6   Q.  You've already said the amount, $25,000.

7           Do you see where it says pay to the order of?

8   A.  Yes.

9   Q.  Do you see where it says Grassroots Strategy?

10  A.  Yes.

11  Q.  What's Grassroots Strategy?

12  A.  It was an LLC that I had for myself.

13  Q.  For anybody on the jury who doesn't know, tell them what an

14  LLC is.

15  A.  Actually let me correct that.  It was not an LLC.  It was an

16  S Corp., which is a corporation.

17  Q.  An S Corp.  The letter S Corp.?

18  A.  Yes.

19  Q.  And why did you create that corporation?

20  A.  I had sold my business sometime -- I'm not sure of the year,

21  if it was 2009 or 2010.  I had sold my business, and after that

22  I formed a corporation.  I believe it was formed in late 2010,

23  but I'm not sure on the date of that.  My accountant did it for

24  me.

25  Q.  And let's go back and capture a couple of the facts you had

1 there.  The business that you're talking about, was that a

2 political business, commercial business?  What kind of business

3 was it?

4 A.  The business I sold?

5 Q.  Yes.

6 A.  It was a commercial cleaning company.

7 Q.  Commercial cleaning company?

8 A.  Yes.

9 Q.  And you sold that when?

10 A.  I'm not sure if it was 2009 or 2010 because I still worked

11 for them.  I was still employed by them and I still ran the

12 business, but during that time period my life was so busy, I

13 struggle remembering dates, but I believe it was late 2009.  In

14 late 2010 I formed the corporation, but because of some -- the

15 way the law is written, you could backdate it for the whole

16 year.  I'm not sure, my accountant took care of it.  So the

17 corporation was for the year 2010 is when I formed it, the

18 Grassroots Strategy.

19 Q.  You said your accountant created it.  That was for tax

20 purposes concerning the sale of your business?

21 A.  Yes.  Well, I was planning on doing some consulting work and

22 I was going to -- originally my intention was to start helping

23 with mailers for legislative races and different issues, so I

24 created that for tax purposes after I sold the business.

25 Q.  Fair enough.  So you had a couple of purposes.  Whatever the

1 tax reason was concerning the sale of the business was one; yes?

2 A.  Yes.

3 Q.  And using the corporation for political business was

4 another?

5 A.  Correct.

6 Q.  Okay.  And, again, the name was Grassroots Strategy, right?

7 A.  Yes.

8 Q.  And this check is drawn on whose account?

9 A.  Designer Goldsmiths, Inc.

10 Q.  What's the address for Designer Goldsmiths Inc.?

11 A.  203-A Harrison Street Southeast, Leesburg, Virginia 20175.

12 Q.  And let's come down to this signature here, and let me ask

13 you a couple of questions first.

14        You talked about working with Dimitri Kesari with the

15 Right to Work movement?

16 A.  Yes.

17 Q.  In working with him previously in the Right to Work movement

18 or on your campaigns, were you exposed to his signature on a

19 regular basis?

20 A.  Yes.

21 Q.  And do you recognize the signature on this check from

22 Designer Goldsmiths, Inc.?

23 A.  Yes, I do.

24 Q.  Whose is it?

25 A.  Dimitri Kesari's.

1  Q.  Have you personally been to the company Designer Goldsmiths,

2  Inc.?

3  A.  Yes.

4  Q.  Okay.  Ms. Draughn, if you could bring up -- court's

5  indulgence -- what's not in evidence as Government's Exhibit 76.

6          Can you see that, Mr. Sorenson?

7  A.  Yes.

8  Q.  Is that a fair and accurate picture of Designer Goldsmiths,

9  Inc.?

10  A.  Yes, it is.

11          MR. PILGER:  We move Government's 76 into evidence.

12                          (Government Exhibit 76 was

13                           offered in evidence.)

14          MR. BINNALL:  No objection.

15          THE COURT:  Sorry?

16          MR. BINNALL:  No objection.

17          THE COURT:  It's received.

18                          (Government Exhibit 76 was

19                           received in evidence.)

20  BY MR. PILGER:

21  Q.  Now let's come back to Christmastime 2011.  You're in a car

22  with your wife.  She has shown you this check.  What did you

23  understand was the meaning of that check?

24  A.  That was my wife --

25  Q.  Don't say what anybody said to you except you can talk about

1  what Dimitri Kesari said.  Don't talk about what your wife said.

2  A.  Okay.  I was under the impression that it was to go to work

3  with the Ron Paul Campaign.

4  Q.  Had you, in fact, decided to go to work for the Ron Paul

5  Campaign at that point or not?

6  A.  I had told him no.

7  Q.  And despite the fact that you told him no, that check ended

8  up with your wife?

9  A.  Yes.

10  Q.  Who then gave it to you?

11  A.  Correct.

12  Q.  And then what happened?

13  A.  My wife and I argued about if I should support the Paul

14  Campaign or not.  She was very -- she had, along with everybody

15  else, had been encouraging me to support Ron Paul for some time.

16  Q.  So you argued about supporting Ron Paul at that time, right?

17  A.  Correct.

18  Q.  Did you have any understanding that this check was meant to

19  be a loan to help you out with any kind of financial hardship?

20  A.  No.

21  Q.  Were you, in fact, suffering financial hardship at that

22  point in your life?

23  A.  No.  I had some outstanding credit card debt from the

24  Bachmann Campaign, but that was it.  I was planning on paying it

25  off.  But at that point in time, we had just gotten -- just

1  bought a second home.  I mean, I want to be clear I don't have

2  two homes.  We have a rental property and we moved to an

3  acreage, so --

4  Q.  Fair enough.

5  A.  We moved from our previous house, rented it out as an

6  acreage and then moved to -- then moved from town to an

7  acreage.

8  Q.  Fair enough.  You didn't have a home and then a house in the

9  mountains?

10  A.  No.

11  Q.  But you did have the financial wherewithal to own two

12  resident properties, right?

13  A.  Actually no.  We rented one out.  I was approved for a loan.

14  We couldn't afford to make two house payments on our own; but my

15  intention was to rent it out.  I rented the property out.  I was

16  able to upgrade our house in value and move into a nicer home

17  with more land.

18  Q.  So that's December 26 and you argued with your wife.  I'm

19  not going to ask you what you and your wife argued about beyond

20  the fact it was about Ron Paul.

21  A.  Correct.

22  Q.  And you said you had decided not to switch your support to

23  Ron Paul, right?

24  A.  I had said I had decided not to.

25  Q.  And you had said that out loud to Mr. Kesari, right?

1    A.   Yes.

2    Q.   Who happened next?

3    A.   During the dinner he --

4    Q.   No.  So after you got your check and you were going home,

5    was that evening pretty much over?  I'm not getting into your

6    personal life here.  Did anything else happen with the Ron Paul

7    Campaign?

8    A.   I don't remember if it was on the 26th or 27th, I had

9    conversations with people after that dinner.

10   Q.   Okay.  So what's the next thing that happened concerning the

11   Ron Paul Campaign?

12   A.   I spoke to Aaron Dorr, I believe.

13   Q.   Okay.  And did you make him aware of the check?

14   A.   Yes.

15   Q.   What happened next?

16   A.   I believe at some point, I don't remember if it was on the

17   26th or the 27th, but I also spoke to Dimitri and I told him

18   that I was not going to support Ron even after the check was

19   written.

20   Q.   Okay.  Let's be clear.  Maybe still on the 26th, maybe on

21   the 27th you told Dimitri Kesari that you were not going to

22   switch, right?

23          MR. BINNALL:  Your Honor, I'm giving him some leeway

24   here, but there's been a lot of leading questions.

25          THE COURT:  That's leading.  Sustained.

1          Pose a new question.

2    BY MR. PILGER:

3    Q.  Did you talk to Dimitri Kesari about the switch?

4    A.  Yes, and I told him that I was not going to support Ron

5    Paul.

6    Q.  And tell the jury to the best of your recollection when that

7    happened.

8    A.  Sometime the 26th or 27th.

9    Q.  Before what?

10   A.  After the dinner, sometime after the dinner.  I told him

11   before the dinner, I told him during the dinner.  I told him --

12   even after the check was presented to my wife, I told him that I

13   was not going to support Ron Paul.

14   Q.  What happened next?

15   A.  Well, my wife and I had an argument and --

16   Q.  Well, we're past that.

17   A.  Well, we had multiple arguments about it.  So it then kind

18   of put me mentally into a tailspin a little bit.

19   Q.  Were these arguments about whether you should endorse Ron

20   Paul or not?

21   A.  Yes.

22   Q.  Okay.  What happened next with people other than your wife

23   concerning the Ron Paul Campaign?

24   A.  I had spoke to a group of people about the check, and

25   sometime after my conversations with my wife, I began

1  entertaining the thought of supporting Ron Paul, but I wasn't --

2  I was still saying no, but in my head I already started going

3  down that process.  Now that I look back, I realize that.

4  Q.  How many people do you recall telling about the check?

5  A.  I remember specifically speaking to Aaron Dorr, Dennis

6  Fusaro.  I'm trying to remember if Dennis was before or after

7  that.  But I remember speaking to Aaron Dorr, Eric Woolson, who

8  was with the Bachmann Campaign, and at some point in time, I'm

9  not quite sure if it was the 27th, I think it was the 27th, I

10 had conversations with Guy Short as well.

11 Q.  And so at least that group of people knew about the Designer

12 Goldsmiths check?

13 A.  Yes.

14 Q.  The check drawn on that jewelry shop in the picture in front

15 of you?

16 A.  Correct.

17 Q.  Could we put that check back up, Ms. Draughn?  It's Exhibit

18 133 in evidence.

19       This check, does it say anywhere on it Ron Paul

20 Presidential Campaign 2012?

21 A.  No.

22 Q.  Does it say -- well, we'll leave that there.

23       So you were telling people about the check after you

24 received it, and you've identified some of those people, right?

25 A.  Correct.

1  Q.  But you were still -- you had still said no, you're not

2  going to switch your endorsement, correct?

3  A.  Correct.

4  Q.  What happened next with regard to whether you were going to

5  switch your endorsement?

6  A.  On the 27th I had been vacillating on it, just thinking

7  about it, talking to my wife, talking to people with the

8  Bachmann Campaign, talking to -- I believe I spoke to Dimitri

9  that day, and I was saying no, but I was having an internal

10  struggle because I also -- I felt a draw to a lot of the people

11  in the Paul Campaign, and I felt like it was my last chance to

12  make them happy or -- and when I say that, I don't mean the Paul

13  Campaign nationally.  I'm talking about the people in Iowa that

14  was part of the Paul Campaign.  So I was struggling with my

15  decision.  But ultimately I said, you know, I can't do this,

16  it's going to -- I just had this gut feeling that if I did it,

17  it was going to ruin my political career; but I was having just

18  a moral fight inside of myself if I should do it or if I

19  shouldn't.

20         So ultimately I had talked to people in the Bachmann

21  Campaign and late that night on the 27th I said I am absolutely

22  not going to switch.

23  Q.  So on the 27th --

24  A.  Yes.

25  Q.  -- at the end of the day, your position was to the Bachmann

1  Campaign I'm sticking with you guys, I'm not switching?

2  A.  Correct.

3  Q.  Okay.  Let's freeze the time at December 27.  We're going to

4  come back to that and pick up, but now I want to reach back and

5  cover something.

6          You already told the jury that Dimitri Kesari was

7  talking to you on a regular basis about coming over to the Paul

8  Campaign and endorsing Ron Paul for money, right?

9  A.  Correct.

10 Q.  Were you talking to the Bachmann Campaign and people in the

11 Bachmann Campaign about that fact during that time frame leading

12 up to Christmas?

13 A.  Yes.  And they also knew -- part of my concern was, you

14 know, I wasn't sure -- I mean, I knew Michelle's campaign was

15 going to end.  I wasn't sure what I was going to do after the

16 campaign was over, and I actually told Guy Short that I was

17 struggling because I said, you know, I'm not sure -- I know

18 Michelle's viability and it's not going to go past Iowa, and I

19 was explaining to him that I was concerned about what I was

20 going to do after that because while we weren't struggling

21 financially, behind in our bills or in need of $25,00 or even

22 $10,000 at that time to pay any debt, I still knew that I had to

23 support my family, and I was struggling inside with what to do,

24 and a lot of that stems from the conversations that I had with

25 my wife.

1          So I told Guy that and Guy related that to people in

2    the Bachmann Campaign, actually Michelle and Marcus.

3    Q.  And did you have conversations with Michelle Bachmann

4    herself in the period leading up to Christmas about this issue?

5    A.  I talked to Michelle, but I did not talk to her about the

6    money.  But I did talk to Marcus about it.

7    Q.  And when you say you did talk to Marcus about it, who

8    exactly is Marcus?

9    A.  Marcus Bachmann is Michelle's husband.

10   Q.  When you spoke to Marcus Bachmann about something, what was

11   your understanding about whether it was going to go to Michelle

12   or not?

13   A.  There really was no understanding, but looking back I know

14   my wife and I -- I mean, I've been married 27 years and people

15   ask me not to say something to my wife; but you're not married

16   27 years and do that.  So I have a very good relationship with

17   my wife, so I'm assuming Marcus and Michelle would have that

18   same relationship as long as they've been married.

19   Q.  And you knew that at the time, right, even if it wasn't said

20   out loud?

21   A.  Correct.

22   Q.  So now let's come back to the 27th.  We left off with you

23   having told the Bachmann people you weren't going to switch.

24   What happened next?

25   A.  I just want to clarify something.  It will be 27 years in

1  September, so I don't want to mislead anybody.  It's 26 years

2  right now, but in September it will be 27, so sorry.

3  Q.  Fair enough.  Come back to December 27th.  What happened

4  next?

5  A.  December 27th I told -- pretty much I told everybody that I

6  was not leaving the campaign, and I went home and was with my

7  wife and kids that night after I left the Bachmann campaign

8  office.

9  Q.  What happened next?

10  A.  I woke up on the 28th and -- oh, actually late on the 27th

11  there was discussions if I should go to -- they wanted me -- I

12  had grown really frustrated with the Bachmann rallies and I did

13  not want to go.  But on the 27th -- I mean, on the 28th it was

14  in my hometown in Indianola and they really wanted me there.  So

15  I agreed to go; but that morning I had a dental appointment.  I

16  believe I was getting prepped either for a crown or a root

17  canal, I'm not sure which because I had both done that year, so

18  when I --

19  Q.  Let me just make the record clear.  That's the morning of

20  December 28th, right?

21  A.  Yes, they wanted me to go and speak.

22  Q.  So this is two days after you got the check?

23  A.  Correct.

24  Q.  Okay.  So you wake up in the morning to do dental work.

25  What happens next?

1  A.  I went to the dentist.  I came -- I went back to -- and then

2  from the dentist I went straight to the Pizza Ranch in

3  Indianola, and I had a blowup with the campaign staff, the

4  national campaign staff because they wanted me to speak.  I did

5  not want to speak.  I was really frustrated with the campaign.

6  They were frustrated with me.  We had a large -- a very verbal

7  argument in the parking lot.  Then we went into the event, and I

8  didn't speak for her, but I did shake hands with her, with the

9  people in the restaurant and walked beside her.

10  Q.  "Her" being Michelle Bachmann?

11  A.  Correct.

12  Q.  All right.  Then what happened?

13  A.  Then we went outside, and I was really upset with the way

14  the national campaign staff was treating people in Iowa,

15  treating myself, treating the Iowa staff, and I left.  And at

16  that point in time in my brain, I really -- I mean, looking

17  back, at that moment, even at that second, I probably didn't

18  realize what I was going to do that night; but looking back now

19  I realize what I set in motion when I left the Bachmann event.

20          And I went to Des Moines to pick up Guy Short from the

21  airport and --

22  Q.  Who is Guy Short?

23  A.  Guy Short was the person that I worked with at the Bachmann

24  Campaign.  That's actually who I billed, and then he paid me and

25  he billed the Bachmann Campaign.

1  Q.  And to be clear, this is the person that you billed for the

2  70-to-80 hour work weeks?

3  A.  Yes, yes.  But actually that week it was probably a lot more

4  than the 70 to 80 hours, but -- I don't remember being home much

5  during those final weeks, and anybody who's been part of the

6  caucus cycle would attest to that.

7  Q.  Okay.  You billed Guy Short for actual work done?

8  A.  Yes.  He was actually a -- he was a consultant with the

9  Bachmann Campaign.

10  Q.  And a lot of work, okay?

11  A.  Yes.

12  Q.  So you pick up Guy Short at the airport on December 28th;

13  yes?

14  A.  Yes.

15  Q.  Then what happened?

16  A.  I don't remember exactly the conversation we had word for

17  word, but I do remember sharing our frustration --

18  Q.  Don't say what he said to you, but go ahead.

19  A.  We were sharing our frustration about the campaign.  We had

20  many times before.  He shared the same views I had with how the

21  campaign was being run by the national team.

22          I picked him up from the airport.  I drove him to

23  where he was staying, which was in West Des Moines, and on the

24  way there I told him how frustrated I was with what happened

25  that morning, and he knew about the check at the time, and he

1  knew that the Paul Campaign had been recruiting me for some

2  time.  So I drove him to his hotel and I dropped him off.  I

3  told him I was sorry for what I was about to do, and I genuinely

4  felt that because Guy was somebody that I had a great

5  relationship with and that despite my behavior, I viewed myself

6  as a Christian man and we were -- he was also, and it was a

7  common bond that we had, I told him I was sorry for what I was

8  about to do and I left.

9  Q.  Okay.  And what were you sorry for being about to do?

10  A.  At that point in time, I had made up my mind that I was

11  going to support Ron Paul.

12  Q.  Then what happened?

13  A.  I just shut my phone off and I started driving around

14  Indianola -- I mean, driving around Des Moines, and I think it

15  was -- the event for Bachmann I think was early in the morning

16  and the rally for Ron Paul that night wasn't until 7:00, I

17  believe, or 6:00.  And I drove around all afternoon and I shut

18  my phone off, and I don't believe -- I don't know who I spoke to

19  that afternoon.  Looking back, everything was just a haze

20  because I was so upset, and I knew what I was going to do was

21  wrong and I knew it wasn't -- even though I didn't support

22  Michelle at that time or believed that she should be President,

23  I felt like I was mistreating her, and I had spent a year of my

24  life with these people, so it was a big deal for me.

25          I ended up at the fairgrounds in Des Moines, the Iowa

1    State Fairgrounds at the veterans rally for Ron Paul.

2    Q.  Okay.  Let's pause there for a second.

3              So you've driven around and -- you're driving around

4    and talking to Guy Short, you decide what?

5    A.  That I was going to take the offer and support Ron Paul.

6    Q.  At that time, on December 28th, were you still Michelle

7    Bachmann's Iowa State Chair?

8    A.  I was up until the second that I went on stage and

9    denounced -- I mean, actually --

10   Q.  Well, let's get there in a second.

11   A.  Okay.

12   Q.  So as you're driving around and you're talking about how

13   you're -- I don't know, would you be conflicted?

14   A.  Very.  I was very conflicted, very emotional.  I knew what I

15   was about to do was wrong, but I just -- I was very -- at that

16   point in my life, I was a real hothead.  I mean, I was

17   somebody -- I mean, I just was.  I was just -- I was offended by

18   the Bachmann Campaign, I was upset.  I was probably bigger in my

19   own mind than I really was.

20   Q.  Did you realize that as the Iowa State Chair for Michelle

21   Bachmann that switching your support from her and all of those

22   Iowa staffers you had been working with to Ron Paul that night

23   would have any particular effect on her and those staffers that

24   you had been working with?

25             MR. BINNALL:  Objection; leading.

1      THE COURT: Overruled.

2      Answer the question.

3  A.  Yes.  Yeah, I knew that it would -- I knew she was already

4  going to lose that night, but I knew it would be a dagger into

5  her campaign.

6  Q.  Okay.  So December 28th, you've been driving around.  I

7  think you told us you got to a particular place.  Where was

8  that?

9  A.  It was at the Iowa State Fairgrounds in a parking lot.  I'm

10 not sure of the name of the building, but it was outside one of

11 the new buildings at the fairgrounds.

12 Q.  And then what happened?

13 A.  I called Dimitri and I told him -- I asked him if he still

14 wanted me, and he said absolutely.  He asked where I was at, and

15 I said I was in the parking lot.

16 Q.  Then what happened?

17 A.  He came running out of the building, was waving his arms,

18 looking for me.  He called me and asked me where I was at, and I

19 think he told me to flash my lights, and I flashed my lights,

20 and then he came to me in the parking lot.

21 Q.  Then what happened?

22 A.  I got out of my car and I said, are you sure that you guys

23 still want me?  And he said yes.  And at that point I asked him

24 if John and Jesse were on board with it, and he said yes.

25 Q.  Then what happened?

1  A.  He led me into the building and took me behind the stage,

2  and at that time when I walked in, I saw --

3  Q.  Hold on a second.  So you come in the building?

4  A.  Yes.

5  Q.  Does Dimitri Kesari stay with you or peel off and go

6  somewhere else?

7  A.  He was with me.  He was stuck on me the whole night.

8  Q.  Okay.  So you come in the building --

9  A.  I viewed him as my handler, not that -- I mean, that's just

10  how -- in politics a lot of times the politician is viewed by

11  operatives as a tool or incapable of making decisions, simple

12  decisions.  So I viewed Dimitri as trying to handle me that

13  night and he stayed right next to me because -- it's just hard

14  to explain in politics the way an operative believes that even

15  in a campaign that the politician is better off going on

16  vacation and letting them run the campaign.

17          So that's the demeanor that Dimitri had towards me, so

18  he stuck on me that night the whole night.

19  Q.  I hear you saying you felt handled, but let me ask you this.

20  I mean, you had been kind of volatile around this, right,

21  whether you were going to support Ron Paul or stay with Michelle

22  Bachmann, right?

23  A.  Absolutely.  When I said I felt handled, I wasn't saying I

24  felt like I was being forced to make that decision.  I just felt

25  like he was worried that I was going to leave and not make the

1  decision at that point in time.  So his purpose was to get me on

2  stage as soon as possible --

3  Q.  Okay.

4  A.  -- so I was committed.  That's how I viewed it.

5  Q.  All right.  So you come into the building.  Did you say you

6  went back stage or what?

7  A.  He brought me back stage because there was a large crowd,

8  and at that time I was well known with a lot of people in Iowa,

9  and so I believe that they didn't want people up front to see me

10  until I walked up on stage.

11  Q.  Okay.

12  A.  So I was brought behind the stage.

13  Q.  Okay.  Who do you remember seeing there?

14  A.  I remember seeing Congressman Paul, a lot of staffers from

15  the Paul Campaign.  Specifically I remember seeing John Tate,

16  Dimitri, and Jesse Benton.

17  Q.  Okay.  As to John Tate, has your memory been refreshed on

18  whether he was there by viewing photographs recently?

19  A.  Yes, yes.  I always thought he was there, but I couldn't

20  remember; but then when I saw the photographs, it refreshed my

21  memory.

22  Q.  Okay.  We're going to get to that in a minute.  When you

23  came in, did you talk to John Tate or Jesse Benton back stage?

24  A.  I shook their hands, and I remember specifically asking, I

25  remember having conversation with Jesse Benton and I asked

1   him -- and John was there.  I remember that more clearly now,

2   but I specifically remember having a conversation with Jesse and

3   Dimitri, and I remember asking him, I said, you know, are you

4   guys on board?  Are you sure about this?  And I said, are you

5   guys going to take care of me?  And he said -- I remember Jesse

6   saying that you bled for us, we'll take care of you or you're

7   bleeding for us and we'll take care of you, something like that.

8   I'm not sure it was bleeding or bled or -- I believe it was

9   bleeding, which means politically I was sacrificing myself for

10  the campaign.

11  Q.  Now, in fairness, you're saying only Jesse Benton said that

12  to you, right?

13  A.  Yes.  But Dimitri and John Tate was in that -- they were all

14  right there.

15  Q.  Okay.  When you asked about being taken care of and Jesse

16  Benton said that about bleeding or bled, and so on, did you have

17  an understanding about whether you were going to get paid from

18  that conversation?

19  A.  Yes.

20  Q.  What was your understanding?

21  A.  That I was going to be financially taken care of and

22  politically taken care of.

23  Q.  And tell this jury -- you've alluded to it -- was it

24  important to you to have income from your political work going

25  forward?

1  A.  Yes, because I had sold my business, and my time with my

2  business was -- actually at that time I was no longer employed

3  by the business, I believe.  So I knew that after the

4  legislative session -- because in the Legislature you get paid

5  $25,000 a year as a state senator, but you make about a hundred

6  dollars a day for a per diem.  Well, I live in Indianola, so I

7  go home every night.  So a hundred dollars a day for me goes a

8  long ways to pay my bills, and so I -- I knew following

9  legislative session I had no idea what I was going to do.  So,

10  yeah, it was important for me to have an income.

11  Q.  So, in fairness, you had it in your mind that you liked Ron

12  Paul better than Michelle Bachmann politically, right?

13  A.  Yes.

14  Q.  But were you or were you not also concerned very much with

15  getting paid?

16  A.  Yes, at that time I was.

17  Q.  Now, at that time you lived in Indianola; is that right?

18  A.  No.

19  Q.  Where did you live?

20  A.  I believe it was September of 2011 we moved from Indianola

21  to Milo, to our acreage.

22  Q.  What county is Milo in?

23  A.  Warren County as well.  Indianola and Milo are both in

24  Warren County.

25  Q.  So you come back stage, you ask if you're going to be taken

1  care of, Jesse Benton says what he said to you, and then what

2  happened?

3  A.  Shortly after that I was -- I remember shaking hands with

4  some people from Iowa that I had known that were the chairs of

5  the campaign, and I remember getting shuffled to the stage.

6  Q.  Okay.  Let's -- and then let me do a couple of preliminary

7  questions for Government's Exhibit 173 not yet in evidence.

8          So I think you said Ron Paul was back stage, right?

9  A.  Yes.  I remember Ron Paul being there, and I remember

10  shaking his hand and talking to him; but I don't recall if it

11  was before I spoke or after I spoke.

12  Q.  Okay.

13  A.  But I do remember him being there when I walked in.

14  Q.  I'm a little confused.  So do you remember that he was there

15  when you walked in, right?

16  A.  Yes.

17  Q.  Okay.  And was he there after the event, too?

18  A.  Yes.

19  Q.  And are you looking at a photograph?

20  A.  Correct.

21  Q.  Is it a fair and accurate picture of yourself and someone

22  else back stage at that event?

23  A.  Yes.

24  Q.  Do you know approximately when it was taken?

25  A.  I can probably begin within an hour --

1  Q.  Let me ask it this way.  Was this taken either before or

2  after the events on stage, one or the other?

3  A.  I'm not sure.

4  Q.  Okay.  So were you at that location with this person on any

5  other occasion?

6  A.  No.  This picture was taken behind the stage.  I just don't

7  remember if it was after I spoke or before I spoke.

8  Q.  That's all I'm looking for.  Is it a fair and accurate

9  picture of yourself and this person either before you spoke or

10 after you spoke?

11 A.  Correct.

12 Q.  And who is that person?

13 A.  Congressman Ron Paul.

14         MR. PILGER:  We offer Government's Exhibit 173 into

15 evidence, Your Honor.

16                         (Government Exhibit 173 was

17                          offered in evidence.)

18         THE COURT:  Received.

19                         (Government Exhibit 173 was

20                          received in evidence.)

21 BY MR. PILGER:

22 Q.  Then if we could bring up Government's Exhibit 170b, which

23 is in evidence.

24         Bear with us a second.

25         Okay.  Do you see this photograph with the yellow

1  circle?

2  A.  Yes.

3  Q.  Okay.  This is already in evidence.  And where the yellow

4  circle is, tell the jury what's happening there.

5  A.  I'm going to turn around because the screen is dark.

6  Q.  Whichever is easier for you.

7  A.  Okay.

8  Q.  Let me clarify.  You previously reviewed this up close and

9  personal, right?

10  A.  Correct.

11  Q.  What's going on in that circle?

12  A.  That's when I'm -- after I finished speaking, I was exiting,

13  I believe it would be to the left of the stage, and I was

14  walking down, and waiting for me after I walked off is Dimitri

15  Kesari and John Tate.

16  Q.  Okay.  Let me just clarify.  To the right of the stage, as

17  we're looking at it in the photograph, right?

18  A.  Yes; I'm sorry.  I was thinking as I was facing out I walked

19  to the left, but as you're looking at it, it would be to the

20  right.

21  Q.  Okay.  So yourself -- John Tate is there waiting for you at

22  the bottom of the steps?

23  A.  Actually there's a lady, and I believe her last name was

24  Hopper.  She's there.  John Tate -- if you look at the shadow,

25  John Tate is directly on the edge of the shadow from the back

1 curtain, and then Dimitri Kesari would be at the bottom

2 (indicating), the bottom of the circle.  It would be on the

3 right of this exhibit.

4 Q.  And let's put Exhibit 170h in evidence up there, which is in

5 evidence.

6          Okay.  Is this also at the event that we've been

7 talking about?

8 A.  Yes.

9 Q.  And is this before or after you spoke at the event?

10 A.  It's after.  It's a photo line for people to get their

11 picture taken with Congressman Paul.

12 Q.  There's two circles on this photograph, right?

13 A.  Yes.

14 Q.  And the circle on the right, do you see Mr. Tate in there?

15 A.  Yes.

16 Q.  Do you see Mr. Benton in there?

17 A.  Yes.

18 Q.  Can you describe the clothing they're wearing?

19 A.  Jesse Benton is wearing a dark suit, I believe black, with a

20 white shirt, open collar.

21          John Tate is wearing a dark suit with a blue shirt,

22 and it appears he has a tie on.

23 Q.  What's happening in the circle on the left of the screen?

24 A.  You see myself pictured there, you can see the top of my

25 head, and what's going on is after people are meeting

1  Congressman Paul, some people wanted to meet me and shake my

2  hand because they were happy that I had supported Congressman

3  Paul.  And then directly behind me underneath the sign you can

4  see the top of Dimitri, and I remember that because I remember

5  him standing next to me.

6  Q.  Okay.  And let's put up 172, which is not yet in evidence.

7         Can you see it?

8  A.  Yes.

9  Q.  Is this a picture taken at the time of that same event?

10  A.  Yes.

11  Q.  And is it a picture under the small Ron Paul sign to the

12  left in the last photograph we looked at?

13  A.  Yes, it is.

14  Q.  Is it a fair and accurate picture of you and someone else at

15  that time in that place?

16  A.  Yes.

17  Q.  And who was the other person?

18  A.  Dimitri Kesari.

19         MR. PILGER:  We offer 172 into evidence.

20                       (Government Exhibit 172 was

21                        offered in evidence.)

22         THE COURT:  Received.

23                       (Government's Exhibit 172 was

24                        received in evidence.)

25         MR. PILGER:  So, Ms. Draughn, can you split screen

1  that with 170h, please?

2  BY MR. PILGER:

3  Q.  Mr. Sorenson, I'm going to make an indication on

4  Government's Exhibit 170h (indicating).  Is the line that I just

5  drew there over the small Ron Paul sign depicted in Government's

6  172 in the top frame?

7  A.  Yes.

8  Q.  So we've been looking at these photographs of the event and

9  the people that were there.  We haven't really talked about what

10  happened at the event after you met with Jesse Benton and asked

11  if you would be taken care of.  What did he say to you?

12  A.  He said that I -- you're bleeding for us, or bled -- I

13  believe it was bleeding; that you're bleeding for us, so we'll

14  take care of you.

15  Q.  What happened next?

16  A.  I was shuffled onto stage and was asked to endorse Ron Paul

17  publicly, and that's what I did.

18  Q.  And after you endorsed Ron Paul, after you finished

19  speaking, what happened next?

20  A.  I was -- I left the stage, I went back.  I remember shaking

21  Dimitri and John Tate's hand, and they -- and Dimitri walked

22  around stage with me with his hand on my back, and we went

23  behind and I remember being back there, and then I believe at

24  that time Congressman Paul spoke, but I'm not certain.  And then

25  sometime after that was the photo line.

1   Q.   Okay.  And then what happened?

2   A.   And then Dimitri wanted me to come back to the campaign

3   office in Ankeny and meet some volunteers.

4   Q.   And Ankeny, Iowa, what county is that in if you know?

5   A.   Ankeny, Iowa, is in Polk County.

6   Q.   Okay.  Then what happened?

7   A.   I went back, we met with some volunteers.  I believe that

8   the Des Moines Register showed up and took a picture of me

9   shaking some people's hands, and I was really -- I remember just

10  being really upset, distraught with myself.  I was not all

11  there.  And I talked to Dimitri, and they wanted to do a press

12  release and get it out to the media right away.

13  Q.   Could we see 54 in evidence, Ms. Draughn?  And if you could

14  blow up not the e-mail header but just the top of the release

15  through the headline and the byline.

16       Okay.  Was there a release?

17  A.   Yes, but this is not that release.

18  Q.   I'm sorry, let me get the right exhibit up.

19       Let's go to 47.  We're going to come back to 54 in a

20  second.

21       Would you blow that up in the same way, Ms. Draughn?

22       Okay.  Is that a release for a media -- a press

23  release for a media release on December 28th?

24  A.   Yes.

25  Q.   And just read the headline to the jury.

1  A.  "Iowa State Senator Kent Sorenson endorses Ron Paul for

2  President.  Former Iowa Chairman for U.S. Representative

3  Michelle Bachmann pivots to Paul camp citing Ron Paul has

4  established himself as the clear choice."

5  Q.  And then if we could see the whole thing, Ms. Draughn?

6         So is this the press release that you were just

7  talking about?

8  A.  Yes.

9  Q.  Have some water, please.

10        You okay?

11 A.  Yes.

12 Q.  All right.  So that was on the same night that you had made

13 your speech endorsing Ron Paul, the press release goes out,

14 right?

15 A.  Yes.

16 Q.  Then happened?

17 A.  I remember having conversations with Dimitri that night.  I

18 was concerned about the media.  I was concerned about the people

19 from the Bachmann Campaign.  I was really concerned if I made

20 the right decision or not, which looking back, I mean, I always

21 knew I wasn't doing the right thing; but I can't go back now.

22 And I stayed at the campaign office for some time, and then I

23 remember going home.  I don't even remember how I got home, but

24 I don't remember driving back from the event to the campaign

25 office.  I was just -- looking back, I was just so emotional.  I

1  wasn't really -- I can't remember how I got there.  I just

2  remember being in the campaign office.  I remember asking to

3  come over there and to meet people.  There was discussions on if

4  I should take my phone home or not because Dimitri didn't want

5  me talking to the media, didn't want me to talk to anybody at

6  the Bachmann Campaign.

7  Q.  At some point did he give you a different phone to use so

8  the press couldn't -- did he give you a different phone to you?

9  A.  Yes.

10 Q.  Do you understand why he did that?

11 A.  So I wouldn't feel concerned about answering my phone or

12 using my phone, that I could use the -- whatever you call it,

13 the Tracfone.

14 Q.  And do you remember exactly when that was?

15 A.  It was before I left on the 28th, before I left the campaign

16 office in Ankeny.

17 Q.  Okay.  And so you didn't have to answer your own phone.  Do

18 you remember whether or not you might have had your own phone?

19 A.  I don't remember.  I mean, I -- you know, I racked my brain

20 because I thought he took my phone from me.  I'm not sure if he

21 did or not.  I don't know; but I think he did, but I'm not sure.

22 I know he did not want me to use the phone.  I know he wanted me

23 to use the Tracfone and he wanted to be able to get ahold of me

24 and me not being concerned about answering the phone.

25 Q.  So if you had your phone, you could choose whether or not to

1  answer it.  The other phone was something Dimitri Kesari would

2  call you on, could call you on and you would know it was him?

3  A.  Yes.

4          MR. BINNALL:  Objection; leading.

5          THE COURT:  It is leading.

6          Pose a new question.

7  BY MR. PILGER:

8  Q.  What was your understanding of the purpose for having a

9  second phone?

10 A.  Um, it was -- I mean, it's like even today, I wanted to call

11 my wife.  I was waiting to come up here to testify.  At my house

12 my family is trained not to answer the phone if I'm on the news,

13 if I'm in court because that's just -- I mean, the news calls

14 and we don't want to talk to them.

15         So the same thing -- just like today when I tried

16 calling my wife from the courthouse, I couldn't.  I had to go

17 out to the car and call my wife from my cell phone so she would

18 answer the phone.  So that night it was the same thing.  If

19 somebody called me from a number I didn't know, I wouldn't have

20 to answer the phone, but nobody knew that Trac number but

21 Dimitri.

22 Q.  Okay.  Thank you.

23         So you went home at some point --

24 A.  Yes.

25 Q.  -- after the endorsement of Ron Paul?

1    A.   Yes.

2    Q.   Did you go home with an understanding about how you were

3    going to get taken care of?

4    A.   Yes.

5    Q.   What was that understanding?

6    A.   That I was going to be compensated for my time.

7    Q.   How much?

8    A.   I was under the impression I was going to get the $8,000 a

9    month and the $25,000.  Actually -- no, that wasn't that night.

10   I'm sorry.

11        I was going to go somewhere else, but it wasn't that

12   night.  That night I was going to be -- I was under the

13   impression that I was going to get the $8,000 a month.

14   Q.   Then what happened?

15   A.   Well, on the 28th I went home, and I believe immediately

16   that night Bachmann started -- it was either that night or the

17   morning of the 29th that she started claiming that I was being

18   paid by the Paul Campaign.  And I know I had conversations with

19   Dimitri, and I don't believe it was the night of the 28th, I

20   believe it was the 29th, but I'm not sure, and I was asked not

21   to cash the check because I had told too many people about it.

22   Q.   So what happened next?

23   A.   I left on the 28th.  I was asked to come back on the 29th,

24   that morning and --

25   Q.   Let me interrupt you.

1  A.  I'm sorry.

2  Q.  You said, I was told not to cash the check.  I want to go

3  back to that.  Who told you that?

4  A.  Dimitri.

5  Q.  Dimitri Kesari?

6  A.  Yes, but I'm not sure if that was on the 28th or the 29th.

7  Q.  Fair enough.  If you're estimating, tell the jury.

8          Keep going.  What happened next?

9  A.  I remember on the 28th that I left.  I remember going home.

10  I remember my wife at that point was really upset.  She didn't

11  know that I was going to the rally on the 28th before I went.

12  She actually talked to me afterwards, and she was upset because

13  she saw it on C-SPAN and saw what I looked like and said that

14  she could tell I wasn't doing well.  I think at that point she

15  even regretted it as well.  We knew that we had made a horrible

16  mistake, and I was -- I went back to the campaign office on the

17  morning of the 29th.  And that's really all I remember about the

18  evening of the 28th after I left.  Actually I believe it was --

19  I did have another conversation with Wes Enos, but I'm not sure,

20  who was the former --

21  Q.  Let me stop you there because you've lost me.

22  A.  Okay.  I'm sorry, I'm sorry.

23  Q.  It's all right, it's all right.  Just go slow.

24          Tell us about it.  What date was it, the 28th or the

25  29th, if you know?

1  A.  I believe it was on the night of the 28th that I had had a

2  conversation with Wes Enos, and he was actually Bachmann's -- I

3  don't even remember his title, but he was on the Iowa campaign.

4  He was like the operations guy for the campaign in Iowa.

5  Q.  Was this before or after the Bachmann allegations that you

6  spoke briefly about?

7  A.  After, it was after the allegations.

8  Q.  Okay.  And before you weren't sure if that was the night of

9  the 28th or the morning of the 29th, right?

10 A.  Yes.

11 Q.  But you know that happened?

12 A.  Yes.

13 Q.  And it was after that that you spoke to Wes Enos?

14 A.  Yes.  But while I'm sitting here talking out the events, I

15 remember I believe it was the night of the 28th that I spoke to

16 Wes Enos because he was upset because he really believed in me

17 and he thought that --

18 Q.  Try to keep your voice up.

19 A.  I'm sorry.

20 Q.  Take as much water as you need.  The night of the 28th or

21 the 29th?

22 A.  I believe it was the night of the 28th, after the Bachmann

23 allegations.  Wes was really somebody who had believed in me,

24 and I knew that if he knew about the check, if he knew that I

25 was getting paid, I would have let him down.  So he actually

1  came out and said he was offended that -- he was upset with

2  Bachmann for the allegations and that he knew that I wouldn't do

3  that.

4  Q.  I think you might have skipped over something there.  Did

5  you tell Wes Enos about the check or not?

6  A.  No.

7  Q.  You did not tell him?

8  A.  No.  Wes did not know.

9  Q.  Did you lie to him about it?

10 A.  Yes.

11 Q.  Okay.

12 A.  I lied a lot at that time, unfortunately.

13 Q.  Yeah, we're going to cover that, so don't leave that out.

14       So you lie to Wes Enos, and then what happens?

15 A.  He issued a press release denouncing Bachmann's allegations,

16 and he actually lost his job because of it, and that would be

17 the first time -- that was the first time that that had

18 happened, but he actually -- and he was a good friend, he was a

19 good friend, and later he lost his job again at another place

20 because of this, and it's horrible because I caused that, and I

21 realize that now.

22 Q.  Okay.  So let's pick up with the chronology.

23       So do you recall now that Michelle Bachmann's

24 allegations that you switched for money came out on the 29th or

25 the 28th?

1  A.  The 28th.

2  Q.  Then what happened after you talked to Wes Enos?

3  A.  He did the press release and --

4  Q.  Wes Enos did a press release?

5  A.  Yes.

6  Q.  Then what happened?

7  A.  The Paul Campaign distributed the press release.

8  Q.  Now, if we could put up Government's Exhibit 54, Ms.

9  Draughn, and if you would blow it up the same way you did before

10  when I was on it earlier.

11          This is in evidence.  Just wait for it to come up on

12  the big screen.

13          This is a press release, correct?

14  A.  Yes.

15  Q.  And it's for media release, right?

16  A.  Yes.

17  Q.  On what date?

18  A.  The 29th of December, 2011.

19  Q.  It's a press release from what entity?

20  A.  The Ron Paul Campaign.

21  Q.  And please -- and if you could just please read the headline

22  to the jury.

23  A.  Senator Kent Sorenson Statement on Bachmann allegations

24  calls Bachmann's untrue claim a last-minute effort to salvage

25  what's left of her campaign.

1  Q.  And you were aware of this press release coming out?

2  A.  Yes.

3  Q.  Is that something that you talked to people at the campaign

4  about?

5  A.  At the Paul Campaign?

6  Q.  Yes.

7  A.  Yeah, on the morning of the 29th.

8  Q.  And this press release, if we could blow it up to a full

9  page, does it include a long quote from you?

10  A.  Yes.

11  Q.  And if you could blow up the quote, Ms. Draughn.  So that

12  starts at the bottom third of the page, the first quotation

13  mark.  We can just scroll from there.

14          This quote goes on for a little bit.  I'm going to ask

15  you to please read the whole thing to the jury.  What did you

16  say in this press release?

17  A.  I have to say, I've been saddened by the way Congresswoman

18  Bachmann's campaign has decided to handle my decision to endorse

19  Ron Paul for President of the United States.

20          Like many folks here in Iowa and throughout the

21  country, I simply came to the realization that Ron Paul was a

22  candidate for true pro-life, pro-gun, pro limited government

23  conservatives.

24          The recent smears from the media and the national

25  political establishment motivated me to rush to Congressman

1  Paul's aid because he did the same for me in both of my races

2  for the Iowa General Assembly.

3          As for the ridiculous allegations that Congresswoman

4  Bachmann and her surrogates have made, I was never --

5  Q.  We've got to switch pages.  Just wait on it for a second.

6          Can you read that?

7  A.  -- offered money from the Ron Paul Campaign or anyone

8  associated with them and certainly would never accept any.

9          Financial reports come out in just days which will

10 prove what I'm saying is true.

11         Even Congresswoman Bachmann's political director

12 issued a statement defending my character.  Since then, he's

13 been fired by the Bachmann Campaign for daring to tell the

14 truth.

15         Sadly, the values I most appreciated in Congresswoman

16 Bachmann appear to have gone out the window in a last-minute

17 effort to salvage what's left of her campaign.

18         On the other hand, Congressman Ron Paul's track record

19 of standing up for constitutional principles and traditional

20 values is unmatched.

21         He's proven he is the one candidate who can take on

22 and defeat both Mitt Romney and Barack Obama.

23 Q.  Okay.  We're going to talk about these statements.

24         You said you were never offered money from the Ron

25 Paul Campaign or anyone associated with it, right?

1    A.  Correct.

2    Q.  Was that true?

3    A.  No.

4    Q.  Who had offered you money?

5    A.  Dimitri Kesari.

6    Q.  Who had given you a $25,000 check?

7    A.  Dimitri Kesari.

8    Q.  Who had told you you would be taken care of before you

9    endorsed Ron Paul at the event?

10   A.  Dimitri Kesari and Jesse Benton.

11   Q.  Then you said, financial reports come out in just days which

12   will prove what I'm saying is true.

13          First of all, it's not true, right?

14   A.  It's not true that I was not being paid.  No, I was being

15   paid.

16   Q.  And when you said financial reports, what were you referring

17   to?

18   A.  FEC filings for the presidential campaign.

19   Q.  Then you talked about Congresswoman Bachmann's political

20   director.  Who was that?

21   A.  Wes Enos.

22   Q.  And you betrayed him, didn't you?

23   A.  Yes.

24   Q.  You lied to him?

25   A.  Yes.

1  Q.  He lost his job because of you?

2  A.  Twice.

3  Q.  In fairness, you did believe part of this.  You liked Ron

4  Paul's politics, right?

5  A.  Yes.  I believe Ron Paul is a good man.  I stood up for his

6  political views.

7  Q.  If we could go back to the headline, Ms. Draughn.

8        Just from the headline, the whole point of this was to

9  tell the world a lie; is that fair?

10  A.  Correct.

11  Q.  All right.  So I believe we left off with December 28th.

12  What's the first thing that happens on December 29th that you

13  recall?

14  A.  I remember going to the campaign office and having a meeting

15  with Dimitri and a group of people at the campaign office about

16  the allegations, and they actually wanted me to do media that

17  day and we were talking about that.

18  Q.  To the best of your recollection -- well, first of all, let

19  me back up.  You said the office.  What office?

20  A.  The office in Ankeny that we discussed earlier, the campaign

21  office.  It was Ron Paul's headquarters in Iowa.

22  Q.  Okay.  Let's talk a little bit about that environment so the

23  jury understands what kind of environment it was.  How big a

24  room or rooms was this?

25  A.  It was in a strip mall.  I believe there was a Subway.

1    There was a sub shop, I believe it was Subway, that was next to

2    it.  It took up two sections in the center of the strip mall.

3          The office was probably -- the main office was

4    probably half the size of this courtroom, and then there was

5    another building that was attached to it or -- and there was a

6    hallway that went between it, and it was a call center, and it

7    was always just really busy there.  There was a lot of people

8    there, which in political realms, that was much different than

9    what we were experiencing in the Bachmann Campaign.

10          So it was really hectic.  There was a lot of activity.

11   In the main office there was a front door and a back door.  The

12   back door backed up to a hotel that they also had rooms in and a

13   conference area.  When you walked in there was a big open area,

14   and then to the right from the front door there was, I believe,

15   one or two offices that were private offices, and then there's a

16   kitchenette back in the back of the building.

17   Q.  Okay.  So when you came in, do I understand you correctly

18   that you went there the morning of the 29th?

19   A.  Yes.

20   Q.  Okay.  Did you go with anyone in particular?

21   A.  That's another one I don't recall.

22   Q.  That's fair.  Did you meet anybody there?

23   A.  Yes.  I mean, I don't recall if I drove myself there or if

24   my wife drove me, I don't remember, or if somebody picked me up;

25   but I went to the campaign office and I met with Dimitri, and

1  Dimitri greeted me there that morning.

2  Q.  Okay.  And when you came into the office, was it business

3  hours?

4  A.  Well, it's a campaign.  There's no business hours.

5  Something is going on all the time.

6  Q.  Okay.  That's a fair point.  Let's tell the jury a little

7  bit more about that in case they don't already fully understand

8  it.  This is December 29th with the caucus happening on the 2nd

9  or 3rd you said?

10  A.  Yes.

11  Q.  So we are days away from the Iowa caucuses for presidential

12  election, right?

13  A.  Correct.

14  Q.  And was the place busy?  Was it slow?  Was it packed?  Was

15  there hardly anyone there?  Describe that.

16  A.  It was always packed.  There was always people there when I

17  was there.  I never saw it empty.

18  Q.  Was it hard to move around?

19  A.  In the main office it wasn't so bad, except, you know, if

20  somebody important is coming like Congressman Paul, I remember

21  he came the night of the caucuses, and it was busy; but I mean,

22  you could move around, but there was a lot of activity.  It was

23  very chaotic.

24  Q.  Did that activity include people coming and going a lot?

25  A.  Yes.

1  Q.  Did people have lots of different things to do?

2  A.  Yes.

3  Q.  As to Dimitri Kesari, was he working with you while you were

4  there?

5  A.  Was he with me or was he working with me?

6  Q.  Well, let's start with you.  Was he with you the whole time

7  you were there?

8  A.  For the most part, the whole time I was in the office I was

9  in the vicinity of Dimitri.

10 Q.  Okay.  Fair enough.  He may have been away from you from

11 time to time?

12 A.  Yes.

13 Q.  Okay.  Let's make that clear to the jury.

14        Did he ever leave you for a long period to your own

15 devices in that office?

16 A.  Not while I was in the office, no.

17 Q.  Okay.  Did you have conversations while you were in the

18 office concerning Congresswoman Bachmann's allegations?

19 A.  Yes.

20 Q.  Did the conversations involve how to respond to those

21 allegations?

22 A.  Yes.

23 Q.  Did they culminate in the press release that we see on

24 December 29th stating, Senator Kent Sorenson statement on

25 Bachmann allegations calls Bachmann's untrue claim a, quote,

1   last-minute effort to salvage what's left of her campaign, end

2   quote?

3   A.   I'm not sure if this is a culmination or the media events

4   that I went to; but yes, this was part of it.

5   Q.   Was it an important part of it?

6   A.   Yes.

7   Q.   What were the other parts of it?

8   A.   I went to -- I had been up all night, and I'm horrible at --

9   I struggle with public speaking to begin with, and when I'm up

10  all night, I really struggle with it.  And I remember telling

11  Dimitri I did not want to go to do media events.  I said, I was

12  up all night, I don't want to do it, I don't think I will do a

13  good job.  And he was very adamant that I needed to go.

14          So we had a meeting discussing what I would say and

15  what I would do, and then I was -- the plan was for me to go and

16  do Megyn Kelly on Fox News and do somebody -- I don't remember

17  her name on CNN, but I really didn't really watch a lot of CNN

18  then, so -- but I don't remember her name.

19  Q.   Fair enough if you don't remember the name.

20          You do remember that they wanted you to do media with

21  CNN and Fox News, Megyn Kelly?

22  A.   Correct.

23  Q.   Do you remember if you did both of those media appearances?

24  A.   I did.

25  Q.   Did you do both of them?

1  A.  Yes.

2  Q.  Do you know which order they were in?

3  A.  Yes.  I did CNN first.  And it was taped above the Iowa

Supreme Court building.  And then I did -- and then I appeared

on Megyn Kelly and -- it wasn't taped actually.  They were both

live.  I appeared on Megyn Kelly, and I was standing alongside a

road downtown a few blocks from the Supreme Court and from the

Capitol.

9  Q.  And in your media appearances, did you lie about whether you

were going to get paid by the Paul Campaign?

11  A.  I lied about multiple things in the media appearances, about

being paid, about -- and I was trying to craft my words because

I didn't want to lie, but I was struggling inside, so I was

trying to craft my words and try to put a play on my words so I

could justify myself for lying.

16  Q.  Well, let's be clear, you lied?

17  A.  I lied, yeah.  I'm saying I -- I'm not denying I lied.  I

lied a lot during that period, but I was trying to justify in my

mind, so I was trying to put a play on words.  I remember on

Megyn Kelly I said, I wasn't paid a nickel.  Well, of course, I

wasn't paid a nickel, but I was trying to justify it in my mind

because I was guilty.

23  Q.  You're telling the jury you were trying to justify in your

mind that you could say I wasn't paid a nickel because you got a

$25,000 check and you were going to get $8,000 a month?

1   A.  I'm telling you I was not under -- I wasn't being honest at

2   that time, and I regret that, and I lied, and I lied a lot and I

3   lied about being paid.  I was -- at that point I felt like I had

4   become everything that I despised in politics, and I was -- but

5   I felt like I had let down my kids, the people that supported

6   me.

7   Q.  So not to pile on, Mr. Sorenson, but I'm going to make

8   another point on this, too.  You didn't just say something that

9   was maybe literally true about you didn't get a nickel because

10  you actually got a check for $25,000 and $8,000 a month, you

11  even said you weren't even offered money?

12  A.  Correct.  I was being very deceitful.

13  Q.  There's no way that wasn't a lie, right?

14  A.  No.

15  Q.  Okay.  Because you had been offered $8,000 a month as far

16  back as Halloween?

17  A.  Correct.

18  Q.  And you already had a $25,000 check?

19  A.  Correct.

20  Q.  Okay.  So you went on CNN and you went on Megyn Kelly, and

21  then what happened?

22  A.  I remember coming back to the campaign office after I

23  appeared on those, and I remember feeling like I did terrible,

24  and everybody was like, no, you did exactly as we talked about,

25  and they were trying to reassure me that I did a good job --

1  Q.  Hold on.  Let's just take a moment with this.

2            Conversations at the campaign office, I think you said

3  you had conversations before you went out to do the media?

4  A.  Yes.

5  Q.  Let's just sharpen up the record here.

6            Was Dimitri Kesari part of those conversations?

7  A.  Yes.

8  Q.  Was he on the phone during those conversations?

9  A.  Yes.

10 Q.  At one point did he tell you who he was on the phone with?

11 A.  Yes.

12 Q.  And who did he say he was on the phone with?

13 A.  Jesse Benton.

14 Q.  Now, I think you said he was not with you all the time but

15 in and out?

16 A.  Yes.

17 Q.  If he was on the phone with someone else during the time of

18 those conversations, did he tell you who that was?

19 A.  No.  I know there was phones ringing everywhere in the

20 campaign office and it was chaotic in there.

21 Q.  I'm just asking you about Dimitri Kesari.

22 A.  Oh, I'm sorry, I'm sorry.

23 Q.  Did Dimitri Kesari when you saw him, was he always using his

24 phone?

25 A.  Yes.

1  Q.  And let's take up a technical point.  Did Dimitri Kesari

2  normally use a Bluetooth earpiece?

3  A.  Yes.  And I'm laughing because I remember wanting the same

4  Bluetooth, but you couldn't buy it in Iowa.

5  Q.  Did he wear it, use that Bluetooth that day?

6  A.  I don't believe he did.  I believe it was dead.

7  Q.  What do you mean it was dead?

8  A.  Well, Bluetooth earpieces have to be charged, and I believe

9  that it was dead that day because he didn't charge it.  I

10  just -- the reason why that sticks out in my brain is because I

11  remember I need this Bluetooth.  It was just, you know, one of

12  those things, like I want that Bluetooth, because I use a

13  Bluetooth as well.

14  Q.  Okay.  So when you say he was on the phone, do you remember

15  he had the phone up to his head?

16  A.  Yeah, yes, yes.

17  Q.  Okay.  And at one point he told you he was talking to Jesse

18  Benton?

19  A.  Yes.  At some point he might have had it on speakerphone,

20  but I never heard anybody else speak.

21  Q.  Okay.

22  A.  I just remember I don't think he had it directly up to his

23  ear all the time.

24  Q.  Okay.  Fair enough.  Be accurate, but don't leave any

25  misimpressions.

1        The only identification you ever heard from

2   Mr. Kesari about --

3        MR. BINNALL:  Objection; impressions.

4        THE COURT:  The same thing that you criticized them

5   for.  No commentary; just questions.  Let's go.

6        MR. PILGER:  Yes, Your Honor.

7   BY MR. PILGER:

8   Q.  Who is the only other person identified to you as being on

9   the other end of that phone?

10  A.  Jesse Benton.

11  Q.  Now, before you did the media, was there discussion about

12  whether or not you should lie?

13  A.  Yes.

14  Q.  And what was that discussion?  Who said what?  Who was

15  there?

16  A.  Dimitri was there.  Jedd Coburn was there.  I believe there

17  was an Andy -- I don't remember his last name.  He was there.

18  There was another guy that was -- I mean, we were in this office

19  having this conversation, and there was people coming and going,

20  and he never really participated in a conversation; but I

21  remember him being there, and I don't remember his name.  He was

22  Greek and he was from the East Coast, and I believe -- well, can

23  I go back because I actually made an inaccurate statement?

24        We were talking about who said I should lie.  I don't

25  believe Jedd knew I was -- I wasn't sure Jedd knew I was getting

1  paid at that time, but we were talking about denying the

2  allegations.

3  Q.  Okay.  If you're aware of any inaccuracy like that,

4  definitely bring it up.

5  A.  Yeah.  I just wanted to be clear on that.  I'm not sure if

6  Jedd knew at that time that Dimitri had given me a check or not

7  or that I had asked if I was going to be taken care of.  I'm not

8  sure what Jedd knew, what Jedd didn't know.  I didn't know who

9  in the room knew other than Dimitri.

10 Q.  In your mind, who was the most important campaign person in

11 that room?

12 A.  Dimitri.

13 Q.  Okay.  So you come away from that meeting with an

14 understanding that you should lie; yes?

15 A.  Yes, that I should deny all of the allegations, and to me

16 that means lying.  To the other people in the room, other than

17 Dimitri, I'm not sure what that meant.

18 Q.  Did you come away with an understanding that you were still

19 going to get paid?

20 A.  Yes.

21 Q.  Did you understand what happened to the Designer Goldsmiths

22 check or by some other particular means at that time?

23 A.  At that time I wasn't sure where it was going to come from.

24 I was confident at that time that it was not going to come from

25 Designer Goldsmiths because I was asked not to talk about the

1   check because I told too many people about the check and that

2   they were concerned about who knew about the check.  And there

3   was conversations going on between the Bachmann Campaign and the

4   Ron Paul Campaign.

5   Q.  Hold on a second.

6   A.  Okay.

7   Q.  Just be careful about saying they and were told.

8   A.  Okay.

9   Q.  Who told you not to cash the check?

10  A.  Dimitri.

11  Q.  Did anyone else tell you not to cash the check?

12  A.  No.

13  Q.  Okay.  So then you did the media.  And then you said you

14  came back and there was discussion?

15  A.  When I came back they just -- they told me I did a good job

16  that I did as we planned.  I remember feeling like I didn't do

17  well in the interviews.  I remember feeling just -- I really

18  felt sleazy at that time.

19  Q.  Okay.  Bear with me a second.

20          (Pause.)

21          Just before we leave the 29th, the statement that's

22  reflected in the press release --

23          Ms. Draughn, if you could scroll down to where it says

24  financial reports on the second page?

25          So where I'm indicating -- oh, Ms. Draughn is doing it

1  for me.

2          Where you say in the press release, financial reports

3  come out in just days which will prove what I'm saying is true,

4  you've already explained you're referring to the FEC reports,

5  right?

6  A.  Correct.

7  Q.  Did you talk about or not talk about telling that lie when

8  you were at the campaign headquarters?

9  A.  Yes.  I was asked if I was able to work that into the

10  interviews to do that.

11  Q.  I'm trying to say if you were asked.  Who asked you to do

12  that?

13  A.  Dimitri.  And at that point I believe there's other people

14  in the conversation, I believe maybe Jedd, maybe Brian Gentry.

15  I'm not sure.  But I believe the only person that for sure knew

16  that was a lie then was myself and Dimitri that was in the

17  office physically.

18  Q.  So let's move forward in time.  Did you actually get paid

19  by --

20  A.  Yeah.

21  Q.  Now --

22  A.  I'm sorry.

23  Q.  Did you get paid by the Ron Paul 2012 Campaign?

24  A.  Yes.  I was paid --

25  Q.  Well, just "yes" or "no."

1    A.   Yes.

2    Q.   Okay.  And was there a particular way you were told to get

3    paid?

4    A.   Yes.

5    Q.   Who told you to do it?

6    A.   Dimitri Kesari.

7    Q.   Okay.  What did Dimitri Kesari tell you to do in order to

8    get paid by the campaign?

9    A.   He told me to bill a company that was run by Sonny.  It was

10   a video production company.

11   Q.   When you say "Sonny," can you give a whole name for Sonny?

12   A.   I believe it was Sonny Izon now, but at that time I wasn't

13   sure.  I thought it was Sonny Spanos from the campaign.  I

14   didn't realize that it was somebody that I didn't know.

15   Q.   So --

16   A.   And I'm not even sure if I'm pronouncing his name right.  If

17   he walked in here, I wouldn't even know who he was.

18   Q.   Fair point.  To your knowledge, have you ever met him and

19   talked to him?

20   A.   No, no.

21   Q.   Did you ever actually do any work --

22   A.   Well, let me take that back.  I did speak to him on the

23   phone.

24   Q.   Okay.  Don't reference any proceedings in this courthouse,

25   okay, in that time frame.  You think you might have talked to

1   him on the phone once?

2   A.  Well, not prior to me billing them; but after I started

3   going in, I believe I might have spoke to him on the phone.

4   Q.  Okay.

5   A.  And we communicated via e-mail by the invoices, but we never

6   spoke other than that.

7   Q.  Okay.  And whose idea was it for you to communicate with

8   Sonny Izon?

9   A.  Dimitri knew him.

10  Q.  And Dimitri told you to communicate with that person, Sonny

11  Izon, or not?

12  A.  Yes, yep.

13  Q.  Did you have any other way to know to communicate with Sonny

14  Izon?

15  A.  No, no.

16  Q.  Okay.  Let's take a look at Government's Exhibit 68 in

17  evidence.

18          Okay.  If we can go to page 2, we'll start with the

19  attachment to this, which is an invoice, I believe.  And,

20  Ms. Draughn, if you could just blow up down through the line

21  items ending 2012, up through 2012.  If you get the very top,

22  we'll get the name of the company that this is drawn from.

23          Just for a clear record, this is a company called

24  Grassroots Strategy, Inc., right?

25  A.  Correct.

1  Q.  Whose company is this?

2  A.  That would be the company that I was running, that I was

3  talking about earlier.

4  Q.  Then it says, attention:  ICT, Inc., Hyattsville, Maryland,

5  with a date of July 22, 2011, right?

6  A.  Yes.

7  Q.  Then it proceeds to list a project title of consulting

8  services, right?

9  A.  Yes.

10  Q.  With two line items, right?

11  A.  Yes.

12  Q.  The first line item says what?

13  A.  Retainer to provide services.

14  Q.  What's the amount?

15  A.  $25,000.

16  Q.  And then there's a second line item that says what?

17  A.  Provides monthly service for month of January 2012.

18  Q.  In what amount?

19  A.  $8,000.

20  Q.  And, Ms. Draughn, if you could scroll down to the bottom and

21  just show the total on this invoice.

22          What's the total?

23  A.  $33,000.

24  Q.  And then if we could bounce back to page 1.

25          MR. PILGER:  Your Honor, may I lead to go faster?

1          THE COURT:  I was just thinking we would take our

2   recess.

3          MR. PILGER:  Yes, sir.

4          THE COURT:  But do you have a little area you want to

5   finish right now before we go?

6          MR. PILGER:  If I could finish this exhibit, yes.

7          THE COURT:  Go ahead.

8   BY MR. PILGER:

9   Q.  The first page is an e-mail from yourself to Dimitri Kesari,

10  right?

11  A.  Yes.

12  Q.  On January 24, 2012, correct?

13  A.  Yes.

14  Q.  In the invoice you referenced July 2011, right?

15  A.  Yes.

16  Q.  That was a lie, right?

17  A.  Yes.  I mean, it wasn't the 11th of July, but -- I'm not

18  sure if it was a lie or if it was by mistake on that particular

19  invoice.

20  Q.  Did you have an arrangement with the Paul Campaign in July

21  of 2011?

22  A.  No, no.  I'm saying I'm not sure why it's dated the 11th of

23  July.

24  Q.  Okay.  But you aren't sure whether it's true or not, right?

25  A.  Correct.

1  Q.  And which is it; true or not?

2  A.  No, I did not bill them on the 11th of July -- or July of

3  2011.

4  Q.  And you sent this invoice for $33,000 -- that's 25,000 plus

5  8,000, this 33,000 -- you sent that invoice to Dimitri Kesari,

6  right?

7  A.  Yes.

8  Q.  Why?

9  A.  Because he's the one that told me I was going to get paid

10  and he told me to bill him, to just send it to him.

11  Q.  Okay.  And then what did you say in the e-mail?

12  A.  Dimitri, I really need to get this taken care of ASAP.  Hope

13  you understand, smiley face, Kent.

14  Q.  Was it important you get paid, right?

15  A.  Yes.

16  Q.  And you couldn't cash that $25,000 check, right?

17  A.  Yes.

18          MR. PILGER:  Is this a good time to break, Your Honor?

19          THE COURT:  Yes.  We'll come back at 3:20.

20          (Recess at 3:00 p.m., until 3:20 p.m.)

21          THE COURT:  Please be seated.

22          MR. PILGER:  May it please the court.

23          Ms. Draughn, Exhibit 78, please, page 2, the invoice.

24  BY MR. PILGER:

25  Q.  So just before we broke, you covered the e-mail to which

1  this is an attachment.

2       Do you remember that?

3  A.  Actually I believe it was -- this is the March invoice.  I

4  believe that was for the -- this one is for March invoice.  I

5  believe the one we were talking about, was that not the one in

6  question with the date?

7  Q.  Bear with me a minute.  You might be right.

8       I'm sorry, Ms. Draughn; 68.

9       Okay.  Let's stop there.

10      So this is an e-mail, the cover that has an attachment

11  to it, right?

12  A.  Yes.

13  Q.  It's from you to Dimitri Kesari.  We covered that.  Let's go

14  to the invoice one more time quickly, and with Ms. Draughn's

15  help, we're just going to focus on two things.  Who told you

16  that the invoice from your company should be to ICT?

17  A.  Dimitri Kesari.

18  Q.  And let's move on now to Government's Exhibit 70,

19  Ms. Draughn.

20      Is this another e-mail from yourself to Dimitri

21  Kesari?

22  A.  Yes.

23  Q.  Is it dated Thursday, January 26, 2012?

24  A.  Yes.

25  Q.  Does it also have an invoice?

1  A.  Yes.

2  Q.  And does the text say that you are this time including an

3  EIN?

4  A.  Yes.  Dimitri had asked me to forward him my EIN or attach

5  it on the invoice.

6  Q.  Okay.  Dimitri asked you for an EIN.  For anyone who doesn't

7  know on the jury, what is an EIN?

8  A.  Employee identification number.

9  Q.  Why is that important?

10 A.  For tax purposes.

11 Q.  Okay.  And, again, if we would look at the invoice on page

12 2, Ms. Draughn.

13         Why did you send this to ICT?

14 A.  Because that's what I was told to by Dimitri Kesari.

15 Q.  And this is the same invoice as we just looked at with

16 Government Exhibit 68, except that you have added the EIN

17 number, correct?

18 A.  Yes.

19 Q.  Because Dimitri Kesari asked you to, right?

20 A.  Yes.

21 Q.  Ms. Draughn, if we could have 78, please.

22         Is 78 an e-mail from yourself again to Dimitri Kesari?

23 A.  Yes.

24 Q.  And you include two Dimitri Kesari e-mail addresses there?

25 A.  Yes.

1   Q.  Is one at the Ron Paul committee and one at AOL.com?

2   A.  Yes.

3   Q.  And what's the date of this e-mail?

4   A.  March 4, 2012.

5   Q.  The subject?

6   A.  Invoice for February.

7   Q.  And the text references invoice for February as well,

8   correct?

9   A.  Yes.

10  Q.  Could we see page 2, please, Ms. Draughn?

11          Like the first two invoices, you are sending this to

12  Dimitri Kesari from your -- it's an invoice from your company,

13  Grassroots Strategy, right?

14  A.  Yes.

15  Q.  To ICT, right?

16  A.  Yes.

17  Q.  Whose idea was that?

18  A.  Dimitri's.

19  Q.  And this time the amount is what?

20  A.  For $8,000.

21  Q.  What does $8,000 for a month represent?

22  A.  It was for the month, for the month of February.

23  Q.  So bear with me if this is an obvious question to you.  I

24  want to make it clear for the record.  What was your

25  understanding of why you should be billing $8,000?

1  A.  Because I was supporting Congressman Paul for the switch in

2  December.

3  Q.  Was that $8,000 related or not related to the negotiation

4  that you had had back to Halloween with Jesse Benton?

5  A.  Yes, it did.

6  Q.  If we could look at 79, Ms. Draughn.

7          Is this -- bear with us a second.

8          (Pause.)

9          MR. PILGER:  Excuse us, Your Honor.  We're checking to

10  see if the redacted is in evidence.

11          MR. COONEY:  Could you take it off the screen, please?

12          I'm sorry, I don't recall if it went into evidence

13  redacted or unredacted.

14          MR. BINNALL:  It went into evidence redacted.

15          THE COURT:  So keep the redacted on the screen.

16          MR. BINNALL:  Your Honor, may we approach?

17          THE COURT:  No.  What do you want?

18          MR. BINNALL:  I think it's important and I think

19  that --

20          THE COURT:  Are you objecting to the exhibit?

21          MR. BINNALL:  I'm objecting to what just happened.

22          MR. COONEY:  Your Honor, I'm sorry, I can tell you for

23  a moment it went onto the screen, not to the jury but to the

24  witness unredacted, but we took it there.

25          MR. BINNALL:  I believe I saw it on the big screen,

1    Your Honor.

2           THE COURT:  It wasn't blown up.  There's no way you

3    could see it.

4           Move on.

5    BY MR. PILGER:

6    Q.  Mr. Sorenson, if we blow up the e-mail for you sufficiently,

7    you can read that, right?

8    A.  Yes.

9    Q.  This is an e-mail from yourself on March 18th to Dimitri

10   Kesari concerning the February invoice we just talked about,

11   right?

12   A.  Yes.

13   Q.  And you give a salutation to Dimitri, and then what did you

14   say?

15   A.  I've tried checking in a few times -- time, your voicemail

16   is full, and then it's blacked out.  Would like to check on

17   payment for February, and then it's blacked out.  I am unsure

18   what I am going to do, so please stay in touch and don't go dark

19   on me.

20          Hope you're doing well.

21          Thanks.

22          Kent.

23          P.S.  Do I need to send this to Sonny since he was the

24   one that wired the funds last time?

25   Q.  And then below that is the e-mail we talked about from

1    Government's Exhibit 78, which was the first one on March 4th to

2    get paid for February?

3    A.  Right.

4    Q.  So on March 18th, some time has gone by, two weeks, right?

5    A.  Correct.

6    Q.  Does that have something to do with why you sent another

7    message to Dimitri?

8    A.  Yes, because I needed paid for the month of February.

9    Q.  And to be clear, this money was important to you, right?

10   A.  Yes.  I became dependent upon it.

11   Q.  Were you dependent upon it at the dinner in Altoona?

12   A.  No.

13   Q.  At this point are you?

14   A.  Yes.

15   Q.  On March 18th you say, I tried checking in a few times and

16   your voicemail is full.

17           Did you try to call him?

18   A.  Yes.

19   Q.  Were you not getting a response from him?

20   A.  Correct.

21   Q.  Were you not -- were you working 70 to 80 hours a week with

22   him where you could talk to him directly or not?

23   A.  At that point I was not working at all and I had not heard

24   from him.

25   Q.  On the issue of work, in fairness, did you make something

1   called a robo call for the Paul Campaign?

2   A.  Yes, I made a robo call, I believe it was probably the 28th

3   or 29th.

4   Q.  Of what month?

5   A.  Of December.

6   Q.  And is that a big deal to make a robo call, small deal,

7   medium deal?  How much effort does it take?  Tell the jury what

8   goes into that.

9   A.  They gave me a script, I read it over a phone call to a

10  recording device, and then it went out to people in the state of

11  Iowa.  And typically I did a lot of robo calls and they usually

12  took 15 to 20 minutes to do.  Sometimes -- what would happen is

13  you would call in, you would start.  If you screw up, you push a

14  button, you start over again.  And then when you're done, you

15  listen to it, and if it sounds good, you approve it, and then it

16  goes out.  But I think on this particular robo call I listened

17  to it and Dimitri also listened to it before it went out.

18  Q.  Okay.  So this isn't where you have to travel somewhere and

19  go into a studio with glass walls, and so on, right?

20  A.  No, actually did it in the campaign office in that private

21  office that I was talking about.

22  Q.  Okay.  And to make a robo call takes less than an hour?

23  A.  Fifteen to twenty minutes.

24  Q.  Do you need any special equipment that has to be set up?

25  A.  No.

1  Q.  Okay.  What other work, if any, did you actually do for the

2  Paul Campaign?

3  A.  I actually -- the only other thing that I did that was

4  significant I remember -- it really wasn't significant -- is

5  that I went to South Carolina and I went to some rallies, but I

6  didn't really -- when I was with the Bachmann Campaign, I was

7  organizing the rallies, I was working the crowd, I was courting

8  people.  With the Paul Campaign I didn't do that.  I just went

9  and smiled and had my picture taken.

10  Q.  So other than that trip and a robo call, do you remember

11  doing any other work for the campaign?

12  A.  No.

13  Q.  The one robo call you remember making for the Paul Campaign,

14  you didn't have to train up for that, did you?  You made lots of

15  other robo calls for other people in your life, right?

16  A.  Correct.  They just gave me a script and I read it, and it

17  was exactly in the same form.

18  Q.  What I'm getting at is the amount of effort it took.  It

19  didn't require any training at that point, did it?

20  A.  No.  It literally took 15 to 20 minutes.

21  Q.  And just for the record, I'm going to approach and show you

22  Government's Exhibit 133, the original check in evidence.

23        Is that the check that you got on the 26th after the

24  dinner in Altoona?

25  A.  Yes.

1  Q.  You didn't cash that check, right?

2  A.  No.

3  Q.  We're going to come back to what happened with the check,

4  but for right now let's keep going with these invoices, and

5  let's look at the attachment -- I'm sorry, before we go to the

6  attachment, let me ask you about the text at the top of the

7  e-mail.

8         This is your second time trying to get paid for

9  February, and you say, please stay in touch and don't go dark on

10  me.  And then there's a smiley face emoticon, right?

11  A.  Yes.

12  Q.  What do you mean by "don't go dark on me"?

13  A.  Well, we would say that to each other often.  Dimitri would

14  say that to me if I didn't return his calls, if we hadn't spoke

15  for a while, and I was saying the same thing to him because we

16  hadn't spoken since -- at that time -- well, it had for sure

17  been from the 4th to the 18th, but it may have been even prior

18  to that.

19  Q.  Because you were -- were you or were you not in there elbow

20  to elbow with Dimitri Kesari in that busy headquarters?

21  A.  Not at that time.  They had left Iowa and I really wasn't

22  serving a purpose.

23  Q.  Were you doing anything for them?

24  A.  No.

25  Q.  Ms. Draughn, could we get 70 -- I'm sorry; 82?

1    Now, this time your e-mail doesn't have a to line

2  filled in from the source we got it from, but the subject is

3  invoicing, and there's an attached invoice.

4    Do you see that on the header?

5  A.  Yes.

6  Q.  And the salutation is to Dimitri/Sonny.

7    Do you see that?

8  A.  Yes.

9  Q.  And you referenced Sonny a moment ago with Government's

10  Exhibit 79 concerning the first wire you had gotten, right?

11  A.  Correct.

12  Q.  And who did you understand Sonny to be?

13  A.  At that point in time?

14  Q.  Yes.

15  A.  I thought it was Sonny Spanos still who was part of the

16  campaign.  I didn't realize it was someone I hadn't met.

17  Q.  Okay.  Did you know who Sonny was in a personal way?

18  A.  The Sonny I was e-mailing or the Sonny I thought I was

19  talking to?

20  Q.  The Sonny you were e-mailing.

21  A.  I did not know him, no.

22  Q.  Was there any reason besides what you were told for

23  e-mailing Dimitri?

24  A.  No.

25  Q.  And who told you to do that?

1  A.  Dimitri.

2  Q.  I'm sorry; was there any reason for you to e-mail Sonny

3  besides what you were told?

4  A.  No.

5  Q.  Who told you to do that?

6  A.  Dimitri.

7  Q.  If we could go to the attachment.

8      Again, your company is invoicing ICT, right?

9  A.  Yes.

10 Q.  Did you understand Sonny to have some role with ICT?

11 A.  Yes.

12 Q.  What was that?

13 A.  I believed he -- I actually don't know what he did there.  I

14 just knew he was a film production company and that was who I

15 was to bill.  I wasn't really sure of his role.

16 Q.  Fair enough.  I'm asking what your understanding is.

17 A.  To bill Sonny at ICT for the agreement that I had with

18 Dimitri and the Paul Campaign or the people in the Paul

19 Campaign.

20 Q.  And just to drill down a little bit more, when you said you

21 had an understanding that Sonny was a film production company

22 person or ICT was -- I'm not sure which -- where did you get

23 that understanding?

24 A.  From Dimitri.

25 Q.  This time you have two months on the invoice; is that right?

1    A.  Yes.

2    Q.  February and March; is that right?

3    A.  Yes.

4    Q.  So you're still trying to get paid for February here, right?

5    A.  Correct.

6    Q.  Let's go to 86, please, Ms. Draughn.

7            So, Ms. Draughn, if you could focus in on the last

8    e-mail down at the bottom.  It starts on February 10th.

9            So this is in evidence, and it says on February 10 at

10   5:12 sonnyizon@aol.com wrote:

11           Hi, Kent.  Good morning.

12           Just wanted to confirm your receipt of wire transfer.

13   Let me know if you need anything else.

14           Peace, Sonny.

15           At this point are you in touch directly with Sonny?

16   A.  Only via e-mail.

17   Q.  Fair enough.  You're in touch via e-mail?

18   A.  Yes.

19   Q.  And do you recognize this as the e-mail address to reach

20   Sonny Izon?

21   A.  Yes, but at that time I wasn't really sure Izon was his last

22   name because I was still under -- on February 10th I was still

23   under the impression it was somebody I met in the Paul Campaign

24   under the name Sonny Spanos.

25   Q.  Okay.  So fair point.  At this point you don't even know if

1   this person's real name is Sonny Izon, but you know to contact

2   them at that address, right?

3   A.  Correct.

4   Q.  Fair enough.  If we could scroll up to the next e-mail.

5           So you reply to sonnyizon@aol.com.  You said you got

6   the wire; thanks, Sonny, to paraphrase.

7           You did that, right?

8   A.  Yes.

9   Q.  And if you could scroll up.

10          Then on May 1, 2012, sonnyizon@aol.com wrote:

11          Hi, Kent.

12          Just checking in to see if you will be forwarding

13  invoices for April and beyond.  Hope you are well.

14          Cheers, Sonny.

15          And then if we scroll up from that message from Sonny

16  to the top, we see that you wrote back to sonnyizon@aol.com and

17  who else?

18  A.  Dimitri Kesari.

19  Q.  Concerning what?

20  A.  Additional invoices.

21  Q.  And what did you say to Sonny about additional invoices?

22  A.  Hey, Sonny.

23          I am attaching the invoice for April.  I have been

24  caught up trying to wrap up a few things with session and just

25  have not had time to submit it.  Thanks for the e-mail.

1          We're doing great.  I hope you are as well.

2          Blessings, Kent.

3    Q.  And is there an invoice attached?

4    A.  Yes.

5    Q.  Ms. Draughn.

6          Again to ICT, correct?

7    A.  Yes.

8    Q.  And, Ms. Draughn.

9          And this is another $8,000, right?

10   A.  Yes.

11   Q.  And that would be for April, right?

12   A.  Yes.

13   Q.  Ms. Draughn, if we could go to 91.

14         So this one is a little hard to read.  Ms. Draughn, if

15   you could expand from -- yeah, there you go, right there.

16         Can you see that, Mr. Sorenson?

17   A.  Yes.

18   Q.  So it's from you, right?

19   A.  Yes.

20   Q.  To sonnyizon@aol.com?

21   A.  Correct.

22   Q.  On May 21, 2012, right?

23   A.  Yes.

24   Q.  What did you say to Sonny at that time?

25   A.  I wasn't real clear on your invoice request.  I am attaching

1  one that just has May and one that includes May and June.

2  Q.  Okay.  And then attached there's two invoices, right?

3  A.  Yes.

4  Q.  Ms. Draughn, if we could get those side by side, the two

5  invoices, please, Ms. Draughn.

6          So as indicated in the e-mail, you've given alternate

7  options here, correct?  You've given an invoice with two $8,000

8  line items for May and June and you've given one for just May,

9  correct?

10  A.  Yes.

11  Q.  Could we get 90, Ms. Draughn?  90 is in evidence.

12          So, Ms. Draughn, if you could start from the top "Re:

13  May invoice" and go down through the first "Peace, Sonny."

14          On May 17, sonnnyizon@aol.com wrote to you saying:  I

15  know you're wrapping up work on the campaign.  I was wondering

16  if you will be sending a full or partial invoice for May.

17  Please advise.

18          And then you wrote back to sonnyizon@aol.com and you

19  copied someone.  Who was that?  You copied another person in the

20  to line.  Who was that?

21  A.  Dimitri Kesari.

22  Q.  And what did you say to Sonny Izon and Dimitri Kesari on

23  May 17, 2013?

24  A.  "I ha an agreement," but that was actually a typo.  I meant

25  to say I had an agreement with Dimitri that went through the

1  month of June.

2           Thanks.  Kent.

3           It was sent from my iPhone.

4  Q.  Okay.  Is it fair to say that as far as you know, the link

5  to Sonny is through Dimitri?

6  A.  Yes, absolutely.

7  Q.  You didn't reference Jesse Benton in here, right?

8  A.  No.

9  Q.  Or John Tate?

10 A.  No.

11 Q.  Does that mean -- tell the jury whether or not that means

12 you had an understanding in your mind of whether the deal was

13 with them or just with Dimitri Kesari?

14          MS. CAMPBELL:  Objection, Your Honor; calls for

15 speculation.

16          MR. PILGER:  It's what's in his mind, Your Honor.

17          THE COURT:  Overruled.

18          Answer the question.

19 A.  It goes back to the night of the 28th when I asked

20 specifically if I was going to be taken care of and I asked

21 Dimitri in the parking lot if John and Jesse was okay with it.

22 So to me the agreement was with all of them.

23 BY MR. PILGER:

24 Q.  And then you had a personal conversation with Jesse Benton

25 on the night of the 28th, correct?

1  A.  Correct.  And that's when I asked him if he was going to

2  take care of me, and I meant both financially, the commitment,

3  and politically.  And that's when he said, yes, you're bleeding

4  for us, we'll take care of you.

5  Q.  And John Tate was there that night also?

6  A.  Pardon me?

7  Q.  John Tate was there that night, too?

8  A.  Yes.

9  Q.  In fairness, though, you did not say that you remember him

10 participating and saying something during that conversation with

11 Jesse Benton, right?

12 A.  Correct.

13 Q.  So when you got -- did you get paid as a result of the

14 invoices that we've just been talking about?

15 A.  Yes.

16 Q.  Did those payments come through your bank for Grassroots

17 Strategy?

18 A.  It came as a wire transfer to my bank.

19 Q.  What's the name of your bank for Grassroots Strategy?

20 A.  I'm trying to remember.  It's a little bank in Norwalk and

21 Indianola.  I no longer use them.

22 Q.  Hold on.  Let me show you something.  Do not read aloud from

23 it.

24      Does this refresh your recollection about the bank?

25 A.  Yes.

1  Q.  What's the name of the bank?

2  A.  City State Bank.

3  Q.  What branch did you use?

4  A.  The Indianola branch.

5  Q.  What county is Indianola in?  We've already done that.

6       Do you know where Norwalk is?

7  A.  Yes.

8  Q.  Where is that?

9  A.  It's about eight miles north, a little north and west of

10 Indianola.  It's in Warren County also.  It was part of my

11 district.

12 Q.  Ms. Draughn, could you put page 1 of -- actually, hold on a

13 second.

14      This is not yet in evidence.  Could you put the last

15 page of 153 in front of the witness, counsel and the judge?

16      MR. COONEY:  Mr. Pilger, could you repeat that one

17 more time?

18      MR. PILGER:  Yes.  Could we have the last page of 153?

19      MR. COONEY:  Mr. Pilger, to clarify, is it

20 Government's Exhibit 153?

21      MR. PILGER:  Yes.  I can switch to the Elmo.

22      MR. COONEY:  No, that's all right.

23      Your Honor, 153, page 11.

24      MS. CAMPBELL:  Your Honor, to speed this up, we're not

25 going to be objecting to this.

1    MR. PILGER:  Thank you, Ms. Campbell.

2    MR. BINNALL:  No objection.

3    MR. PILGER:  We'll offer 153.

4                         (Government Exhibit 153 was

5                         offered in evidence.)

6    THE COURT:  153 is received.

7                         (Government Exhibit 153 was

8                         received in evidence.)

9  BY MR. PILGER:

10  Q.  So let's go to page 1, Ms. Draughn.

11       And if you could just zoom in on the top third, from

12  the logo down -- from the very top up where it says City State

13  Bank down through 7622.

14       That's fine.

15       Directing your attention, Mr. Sorenson, to a beginning

16  balance of -- I'm sorry, the deposit of $33,000 on February 1st

17  of 2012.  Do you know what that was the result of?

18  A.  The wire transfers from Sonny.

19  Q.  From Sonny or his company, ICT, or both, or what?

20  A.  From the company, ICT.

21  Q.  Turning to page 4, please, Ms. Draughn.

22       That's good.

23       In these bank records there's a deposit on April 9th

24  of $16,000.  Do you know what that was the result of?

25  A.  The wire transfer I believe of two invoices, but I'm not

1  sure.

2  Q.  Okay.

3  A.  But it was a wire transfer from the invoices.

4  Q.  Just bear with me while I make a record.

5          Was that from ICT?

6  A.  Yes.  That's the only deposits that's going to be in this

7  bank account -- I shouldn't say that, other than my wife and I

8  making deposits from an ATM, but --

9  Q.  Okay.  So wait for the questions.

10 A.  Okay.  I'm sorry.

11 Q.  And we'll get through faster.

12          The next page is 6, Ms. Draughn.

13          On May 4th there's a deposit of $8,000.  Is that or is

14 that not a result of your invoicing to ICT?

15 A.  Yes, it is.

16 Q.  Do you understand it to be a wire transfer from ICT?

17 A.  Yes.

18 Q.  Could we go to page 8, Ms. Draughn?

19          Just two more to go.

20          On June 12th is there another $8,000 deposit?

21 A.  Yes.

22 Q.  Same bank account, right?

23 A.  Correct.

24 Q.  Same process, a wire transfer from ICT or not?

25 A.  Yes, it is.

1  Q.  Lastly, page 10, Ms. Draughn.

2        On July 27, 2012, there's another $8,000.  Is that the

3  same thing, a wire transfer from ICT?

4  A.  Yes, it is.

5  Q.  Were all of these wire transfers a result of the invoices

6  that we talked about just before these bank records?

7  A.  Yes.

8  Q.  And, Ms. Draughn, if you could back out and show us just the

9  full page of this one page of the exhibit and highlight the very

10 top.

11       Thank you.  Thanks very much.  There we go.

12       We have Grassroots Strategy, Inc., listed as the

13 account holder, and then these are your bank records for that

14 corporation, correct?

15 A.  Yes, it is.

16 Q.  Now, those invoices that you sent to ICT, the first ones you

17 sent through Dimitri Kesari?

18 A.  Yes.

19 Q.  And then you switched over to e-mailing them to Sonny Izon

20 or Sonny Izon and Dimitri Kesari, right?

21 A.  Correct.

22 Q.  And I believe your testimony is all of that was some

23 specific person's idea, and who was that?

24 A.  It was Dimitri Kesari's.

25 Q.  Now, the invoices that you're sending from Grassroots

1   Strategy indicate that you were doing consulting services,

2   consulting for ICT in July of 2011.

3            Do you remember that?

4   A.  Yes.

5   Q.  That was the first one for $33,000, right?

6   A.  Yes.

7   Q.  And that was false, correct?

8   A.  Correct.

9   Q.  And, in fact, you never actually provided any services to

10  ICT, or did you?

11  A.  No, nothing.

12  Q.  When you created those invoices to ICT for things happening

13  in July that didn't happen, for work you didn't do, did you know

14  you were creating false records?

15  A.  Yes.

16  Q.  Mr. Sorenson, you've pled guilty in this very courthouse,

17  have you not?

18  A.  Yes, I have.

19  Q.  You pled guilty to two counts of a criminal information,

20  correct?

21  A.  Yes.

22  Q.  And you have specifically pled guilty to willfully causing

23  the authorized campaign committee of a candidate for the Office

24  of President of the United States to falsely report to the

25  Federal Election Commission the disbursements to persons to whom

1  that committee made expenditures, correct?

2  A.  That was one count, yes.

3  Q.  You are guilty of that or not?

4  A.  Yes.

5          MR. BINNALL:  Your Honor, I object.  That is a legal

6  conclusion that's unfairly prejudicial.

7          THE COURT:  Overruled.

8  BY MR. PILGER:

9  Q.  You pled guilty to a second count here in this courthouse,

10  right?

11  A.  Yes.

12  Q.  You pled guilty to knowingly and with the intent to impede,

13  object, and influence, in relation to and in contemplation of

14  the investigation and proper administration of matters, within

15  the jurisdiction of departments and agencies of the United

16  States, concealed, covered up, falsified and made a false entry

17  in a record document and tangible object, correct?

18  A.  Yes.

19  Q.  You did that?  You're guilty, right?

20  A.  Yes, I am.

21          MR. BINNALL:  Same objection, Your Honor.

22          THE COURT:  Overruled.

23          Members of the jury, guilty pleas from other persons

24  alleged to have been involved in the same series of acts aren't

25  evidence of the guilt of other defendants.  You can only use

1    that information to determine whether it affects the credibility

2    of the witness.

3            Go ahead.

4            MR. PILGER:  Thank you, Judge.

5    BY MR. PILGER:

6    Q.  Now, you made that guilty plea pursuant to an agreement with

7    both the United States and the State of Iowa, correct?

8    A.  Yes.

9    Q.  And I want to go over the terms of your plea agreement with

10   you so that the jury understands exactly what benefits you got

11   and exactly what obligations you have.

12           First of all, this was, to be clear, a global

13   agreement with both the Federal Government and the State of

14   Iowa, correct?

15   A.  Yes, it was.

16   Q.  And in this agreement you got -- you agreed you would plead

17   guilty to the offenses that we just talked about, right?

18   A.  Yes.

19   Q.  And then you got a benefit in that the Federal Government

20   and the State of Iowa agreed to something regarding any further

21   charges, right?

22   A.  Correct.

23   Q.  What was the agreement?

24   A.  That I would not be charged with any further crimes related

25   to this case, that it was not part of a violent act, I believe.

1  Is that correct?  I mean, I know the first part was correct.  I

2  don't remember if the other part was part of the violent act.  I

3  just remember that being in the plea agreement.

4  Q.  So I'm happy to refresh your recollection if you want to

5  talk more about it.

6  A.  I'm comfortable with it, that I answered it.  I'm sorry.

7  Q.  Just --

8          THE COURT:  Ask questions, no comments.  Ask

9  questions.  Let's go.

10  BY MR. PILGER:

11  Q.  Just don't talk over each other.

12          So you also got a benefit as to whether or not your

13  spouse might be prosecuted by the Federal Government or the

14  State of Iowa, correct?

15  A.  Correct.

16  Q.  And what was that benefit?

17  A.  That she would not be charged.

18  Q.  And you understood the maximum punishments that you would

19  face under the guilty plea that you made, correct?

20  A.  Yes.

21  Q.  That under the statute you could potentially get up to 20

22  years for the obstruction count and under the causing false

23  statements you could get up to five years, right?

24  A.  Yes.

25  Q.  And for both counts you could get up to a $250,000 fine,

1   right?

2   A.  I believe it was $250,000 per count.

3   Q.  That's right.

4   A.  Yes.

5   Q.  All right.  In your plea agreement there is a statement

6   among all of the parties, including yourself, about

7   understanding who decides your sentence.  And what is your

8   understanding about who decides your sentence under this plea

9   agreement?

10  A.  The judge that sentences me.

11  Q.  Does the government decide your sentence?

12  A.  No.

13  Q.  Does the State of Iowa decide your sentence?

14  A.  No.

15  Q.  Which judge?  I'm sorry, do you know, is this a federal

16  judge?

17  A.  Yes.

18  Q.  And that judge will decide your sentence?

19  A.  Correct.

20  Q.  You also signed a cooperation agreement, right?

21  A.  Yes.

22  Q.  And pursuant to that cooperation agreement, you have

23  obligations to the Federal Government under your -- that are

24  incorporated into your plea agreement, right?

25  A.  Yes.

1  Q.  And you -- what's your understanding about whether you have

2  to fully cooperate with the government or not?

3  A.  I believe I have to fully cooperate with the government.

4  Q.  And does that involve both the matter we're in court on and

5  any other matter we ask you about?

6  A.  Correct.

7  Q.  I gave you an either/or.  Which is it?

8  A.  Oh, I'm sorry.  I thought you said about the case.

9  Q.  Let me ask it again.

10          Do you have to cooperate on just this matter that

11  we're in court on or anything we ask you about?

12  A.  Anything that you ask me about.

13  Q.  Do you have an obligation regarding whether you have to give

14  truthful testimony?

15  A.  Yes.

16  Q.  What is that?

17  A.  That I have to tell the truth.

18  Q.  Do you have to tell the truth just when I'm talking to you?

19  A.  No.  I have to tell the truth whether the judge asks me, the

20  defense, or you.

21  Q.  Now, under your cooperation agreement, there is the

22  possibility of something called substantial assistance.  What's

23  your understanding of that?

24  A.  That if I cooperate and the government feels that I fully

25  cooperated that they have the option to make a request that I

1  benefit from my cooperation.

2  Q.  Benefit in what way?  Just make it clear to the jury.

3  A.  A sentence reduction.

4  Q.  And you're hoping for that, right?

5  A.  Of course.

6  Q.  Has anyone made any promise or representation to you about

7  whether you're going to get that?

8  A.  No.  It's just the opposite.

9  Q.  What do you mean by "the opposite"?

10  A.  Well, you know, I mean, I've never been through this

11  process.  When you see on TV, there's all these deals that are

12  cut beforehand.  It doesn't work that way, at least it didn't in

13  my case.  I trusted my lawyer to give me good advice, and I

14  believe I'm doing the right thing --

15  Q.  Let's not talk about --

16  A.  I'm sorry.

17  Q.  I'm sorry, too.  If you want to talk about what your lawyer

18  said, that's up to you.

19  A.  No.  I'm just saying his -- I'm sorry, I spoke over you.

20  Q.  No.  Keep telling the jury, what's your understanding here?

21  A.  That I made this decision -- and I'm sorry, where were we on

22  this?  I got distracted with the lawyer.

23  Q.  We're talking about your understanding of the possibility --

24  A.  Oh, yes.

25  Q.  -- of the substantial assistance credit.  And just to center

1  you and the jury, you were talking about whether or not anyone

2  has promised you you will get that, and you said no; but then

3  you said just the opposite, and I want to clarify that.

4       Nobody told you you're not getting it either, right?

5  A.  No, no one has told me that.  It's been very clear from the

6  beginning that it's not guaranteed, it's not promised.  There's

7  no -- like I was saying, when you see it on TV, you expect it to

8  be all cut out.  It's not like that.  I just have to trust my

9  fate to a man -- actually trust my Lord, but it's the judge who

10 ultimately makes the decision, and I took it under my advice of

11 counsel, but there's no preset agreement.  I have no idea what

12 the sentence is going to be and I have no idea if Mr. Pilger or

13 anybody from the government will make a recommendation on my

14 behalf.  I'm just hopeful that if I'm truthful and honest that

15 it will happen.

16 Q.  So I had my head up when you said you trusted and you kind

17 of opened your arms up to the jury.  It's not up to them, right?

18 A.  No, not at all.

19 Q.  It doesn't depend on the outcome of this case?

20 A.  No, no.  It depends on if I'm truthful and honest and

21 cooperative.

22 Q.  So there's also an understanding about the amount of any

23 credit that you might get, if you get any at all, right?

24 A.  Yes.

25 Q.  Okay.  And who decides the amount of credit that you might

1  get, the ultimate decider?

2  A.  The judge.

3  Q.  Are there certain factors listed in your cooperation

4  agreement where you state you understand these will go into the

5  judge's decision about what final sentence you get?

6  A.  I'm sure there's other factors.  The only one I'm fully

7  aware of is the truth.

8  Q.  Let's start with "yes" or "no."

9  A.  Yes.

10  Q.  And then I'll show you something to see if it refreshes your

11  recollection.

12  A.  Sorry.

13  Q.  Just start here (indicating) and read to here (indicating)

14  and then I'll ask you some questions.  Tell me if that refreshes

15  your recollection and then I'll ask you some questions.

16  A.  Okay.  Starting with A?

17  Q.  Yes.

18  A.  The court's evaluation of the --

19  Q.  No, no, no.  To yourself.

20  A.  Oh, I'm sorry.

21          (Pause.)

22  Q.  Does that refresh your recollection about the factors?

23  A.  Yes.

24  Q.  Let me ask you some questions.

25          Is one factor the judge's evaluation of the

1   significance and usefulness of your assistance?

2   A.  Correct.  Yes, it is.

3   Q.  Not just the government, right?

4   A.  Right.

5   Q.  Is another factor the truthfulness, completeness and

6   reliability of the information and testimony you provide?

7   A.  Yes.

8   Q.  Is the nature and extent of your assistance a factor?

9   A.  Yes, it is.

10  Q.  And I'll leave it there.

11          And those are factors for whom?

12  A.  For the judge to take into consideration.

13  Q.  Now, there's a list of additional factors that I didn't ask

14  you to look at, and you know they're there, right?

15  A.  Yes.

16  Q.  Do you remember them off the top of your head?

17  A.  No.

18  Q.  Take a look here (indicating).  I'm just going to ask you

19  about this one.

20          Does this refresh your recollection about one of those

21  factors?

22  A.  Yes.

23  Q.  Is one factor whether you violate any criminal statute or

24  ordinance after entering your plea agreement?

25  A.  Yes.

1  Q.  Mr. Sorenson, you have been found guilty of a misdemeanor

2  while you've been cooperating with the government; is that

3  correct?

4  A.  Yes.

5  Q.  State the name of that misdemeanor, please.

6  A.  Um, disorderly conduct.

7  Q.  The government did not end your cooperation agreement after

8  you made -- or you were found guilty of that offense, correct?

9  A.  Correct.

10  Q.  Mr. Sorenson, are you a graphics designer?

11  A.  No.

12  Q.  Do you have any particular talent as a graphics designer?

13  A.  No.

14  Q.  Could you even begin to perform graphic design if you tried?

15  A.  No.

16  Q.  Have you used the name Alfred Pennyworth for e-mail accounts

17  before?

18  A.  Yes, e-mail and Twitter.

19  Q.  I'm sorry?

20  A.  E-mail and Twitter.

21  Q.  E-mail and Twitter?

22  A.  Yes.

23  Q.  Why did you do that?

24  A.  When you're in politics, sometimes you want to post on a

25  blog or comment and you don't want to be known who you are.  So

1  I made an account with just Alfred Pennyworth, which is the name

2  of Batman's butler.

3           MR. PILGER:  One moment, Your Honor.

4           (Pause.)

5  BY MR. PILGER:

6  Q.  We're almost done, Mr. Sorenson.

7           So we talked about your invoicing to ICT and that you

8  got paid, and we've rounded that out and gone over all of that.

9  That was all in 2012, correct?

10 A.  The invoicing was in 2012, yes.

11 Q.  And the payments were all in 2012, too, right?

12 A.  Yes.

13 Q.  The original Designer Goldsmiths check, that was in Altona

14 on December 26, 2011, right?

15 A.  Yes.

16 Q.  But you never cashed that, right?

17 A.  No.

18 Q.  But you didn't throw it away either, did you?

19 A.  No.

20 Q.  What happened to it?

21 A.  Well, I put it in my safe and held onto it.

22 Q.  Is that the only thing that you did with it?

23 A.  Um, yeah, until I gave it to my attorney that was handling

24 my case and when I was before the Ethics Committee.

25 Q.  Okay.  You mentioned the Ethics Committee.  There was a

1  complaint against you in the Iowa State Ethics Committee,

2  correct?

3  A.  Correct.

4  Q.  And there were proceedings against you by the Iowa State

5  Ethics Committee, correct?

6  A.  Yes.

7  Q.  And, in fact, they went so far as to hire special counsel to

8  investigate you, right?

9  A.  Yes.

10 Q.  And do you remember his name?

11 A.  Mark Weinhardt.

12 Q.  Okay.  And he investigated you, right?

13 A.  Yes.

14 Q.  In fact, he called you in for a deposition; is that right?

15 A.  Correct.

16 Q.  What happened when you came in to that deposition?

17 A.  I believe the first day I testified, and I lied under oath,

18 and then the second day I came in and took the Fifth.

19 Q.  So let's be really clear.  That's before you were

20 cooperating with the government, right?

21 A.  Yes.

22 Q.  Did you know the government was out there poking around?

23 A.  Yes.

24 Q.  The Federal Government?

25 A.  Yes.  That's why I took the Fifth.  I actually stated that

1  when I took the Fifth on the second day.

2  Q.  I know some of this is obvious to you, but the jury hasn't

3  heard all of this before.  So before you were cooperating with

4  the government, you told all the lies that you've already

5  testified about, including the lies that got Wes Enos fired,

6  right?

7  A.  Yes.

8  Q.  And you lied to cover up the payments from the campaign

9  after Michelle Bachmann's allegations?

10 A.  Yes.

11 Q.  And then -- and you did that in a variety of ways, correct?

12 A.  Yes, yes.

13 Q.  Including the invoices that we talked about?

14 A.  Yes.

15 Q.  And then when Mark Weinhardt on behalf of the State of Iowa

16 and the Senate and the Ethics Committee called you and swore you

17 under oath, you lied then, too, right?

18 A.  Yes.  Yeah, I lied a lot.  I lied to my parents.  I lied to

19 the Ethics Committee.  I lied to my constituents.  I lied to my

20 family.  I lied to friends.  I lied to the FBI.  I told a lot of

21 lies, and I regret every one of them.

22 Q.  Right.  But I need the jury to understand the lies you told.

23 They have to fully assess what's going on.

24         So you lied to Mark Weinhardt under oath, right?

25 A.  Yes.

1  Q.  You said you lied to the FBI?

2  A.  Yes.

3  Q.  The FBI executed a search warrant at your house, right?

4  A.  Yes.

5  Q.  And Agent LoStracco was there, correct?

6  A.  Yes.

7  Q.  And you were told by the FBI because you had a lawyer they

8  weren't going to ask you any questions, right?

9  A.  Yes.

10  Q.  But you went ahead and talked at them anyway, didn't you?

11  A.  Yes.

12  Q.  And you lied?

13  A.  Yes.

14  Q.  What did you say?

15  A.  I told them I didn't know why they were investigating me,

16  that I had done nothing wrong, and I just continually told Agent

17  LoStracco that early on.

18  Q.  So you told her when she was there at your house, right?

19  A.  Yes.

20  Q.  And did you have a phone call with her later?

21  A.  Yes.  I don't recall the date, but I do remember calling

22  her, and I lied to her on the phone as well.

23  Q.  That was shortly after the search warrant?

24  A.  Correct.

25  Q.  You had a lawyer, right?

1  A.  It was a different lawyer at that time, yes.

2  Q.  You had a lawyer?

3  A.  Yes.

4  Q.  And Agent LoStracco told you over and over again, I'm not

5  asking you any questions, right?

6  A.  Yes.

7  Q.  But you went out of your way to talk at her, right?

8  A.  Yes.

9  Q.  And you lied to her, didn't you?

10  A.  Yes.

11  Q.  What did you say?

12  A.  I told her that I wasn't guilty and that I had done nothing

13  wrong.

14  Q.  Okay.  Subsequently, did time pass -- after you had lied to

15  Agent LoStracco twice, did time pass?

16  A.  Yes, time had passed and I --

17  Q.  Just follow the questions for a minute.

18  A.  Okay.

19  Q.  If I leave something out you feel you need to say, just let

20  me know.

21         Did you change counsel?

22  A.  Yes.  That was a big turning point for me.

23  Q.  Okay.  And did there come a point after those lies that you

24  had just explained to the jury that you entered your cooperation

25  agreement?

1    A.   Yes.

2    Q.   Okay.  Since that cooperation agreement, to your knowledge,

3    have you lied to the FBI?

4    A.   No.

5    Q.   Have you lied to the government in any way?

6    A.   No.

7    Q.   You've had debriefings with both the government and the

8    State of Iowa, correct?

9    A.   Correct.

10   Q.   Did you lie to the people of the State of Iowa?

11   A.   No.

12   Q.   Particularly the Warren County prosecutor?

13   A.   No.

14   Q.   I'm sorry, the Polk County prosecutor.  Did you lie to the

15   Polk County prosecutor?

16   A.   I haven't lied to either one of them.

17   Q.   So let's go back to that check.  So you had that check going

18   into 2013, right?  January 1, 2013 --

19   A.   Yes.

20   Q.   -- you still had that check?

21   A.   Yes.  I still had the check, yes.

22   Q.   And going through 2013, did you become aware of various

23   investigations of what had happened with your switch from

24   Michelle Bachmann to Ron Paul?

25   A.   Yes, I had.

1    Q.  And that included the Iowa State Senate, right?

2    A.  Yes.

3    Q.  Or I should say the Ethics Committee; yes?

4    A.  Yes.

5    Q.  Included the FBI?

6    A.  Yes.

7    Q.  Included the FEC?

8    A.  Yes.

9    Q.  Included the Office of Congressional Ethics?

10   A.  Yes.

11   Q.  And you're aware of all of that, right?

12   A.  Yes.

13   Q.  Now, directing your attention to August of 2013, was there

14   some media about you and the payments to you here in Iowa?

15          MR. BINNALL:  Your Honor, at this point, just for the

16   record, we're renewing our objections we previously made

17   including Rule 403.

18          THE COURT:  Overruled.

19   A.  Yes, there was.

20   BY MR. PILGER:

21   Q.  Did that cause you to draft something?

22   A.  Yes.

23   Q.  What did it cause you to draft?

24   A.  We drafted a -- my legislative assistant and I, Chris Dorr,

25   drafted a press release entitled "The Check."

1      MR. PILGER:  Bear with me a moment, Your Honor.

2      (Pause.)

3      So if we could get 60 not in evidence.

4      Now, pursuant to the court's prior practice, we would

5  offer 60 in.

6                              (Government Exhibit 60 was

7                              offered in evidence.)

8      THE COURT:  Received.

9                              (Government Exhibit 60 was

10                             received in evidence.)

11  BY MR. PILGER:

12  Q.  We're just waiting for it to come up on the big screen,

13  Mr. Sorenson.

14      Okay.  What is 60?

15  A.  You're asking me what this is?

16  Q.  Yeah.  Let's help you out a little bit.

17      Ms. Draughn, we'll go from the top down, "Re:" through

18  "media release."  That's good.

19      Okay.  This is an e-mail from you to whom?

20  A.  To Dimitri Kesari.

21  Q.  On what day?

22  A.  The 7th of August, 2013.

23  Q.  Okay.  Do you know where Dimitri Kesari was at that time?

24  A.  He was overseas.  I believe he was in -- I'm not sure if he

25  was in Albania or Greece.  I'm not sure.  He was overseas,

1 though.

2 Q.  So overseas, continent of Europe?

3 A.  Yes.

4 Q.  Greece or Albania?

5 A.  Yes.

6 Q.  You're not sure?

7 A.  Yes.

8 Q.  If you're not sure, tell the jurors you're not sure.

9            MR. BINNALL:  Object again, Your Honor.

10            THE COURT:  You seem incapable of just asking

11 questions.  I said no more comments, just proceed with

12 questions.  Please, just questions.

13            MR. PILGER:  Yes, Your Honor.

14 BY MR. PILGER:

15 Q.  So on August 7, 2013, you e-mail this document to Dimitri

16 Kesari, right?

17 A.  Yes.

18 Q.  Why did you do that?

19 A.  Because of the media that was being circulated about there

20 was a recording from Dennis Fusaro that was talking about the

21 check and it was being circulated through the media, and I

22 believe a web site, the Iowa Republic, was the first one to

23 break that, and I was wanting to come public with the check,

24 trying to curtail the media stories.

25 Q.  So without getting into the details of it, there was media

1  attention to the check; is that accurate?

2  A.  Yes.

3  Q.  Did you still have it in your possession or not?

4  A.  Yes, I did.

5  Q.  And did you have communications with Dimitri Kesari about

6  whether you should respond to what the media were saying?

7  A.  It was very clear -- yes I had, yes.

8  Q.  And is this one of them?

9  A.  Yes.

10 Q.  Okay.  And so you have this e-mail from yourself to Dimitri

11 Kesari on August 7, and the text is "The Check," and then it

12 says:  For media release.  Date:  August 7, 2013, right?

13 A.  Yes.

14 Q.  So is this date -- the date you sent it to Dimitri Kesari,

15 is that the day you're thinking you want to push this out to the

16 media?

17 A.  Yes.

18 Q.  Okay.  Go head and read this to the jury, please.  And

19 Ms. Draughn will scroll for you as we get further down.

20 A.  From the week or two after I started advocating for the

21 Michelle Bachmann Campaign back in the early part of 2011,

22 people close to what would soon become the Ron Paul Campaign

23 approached me about supporting Congressman Ron Paul instead.

24        It made sense for them to do so.  Several of these

25 people were friends of mine from previous campaigns and had

1   helped with the organization of my own legislative race.

2          On one occasion, an Iowa staff member for Congressman

3   Paul did suggest a payment to switch ranks.

4          The check was offered to a family member; however, I

5   felt strong ethical and legal deficiencies in accepting it.  I

6   ignored the check and never deposited nor cashed such.

7          Hence, I was never paid.

8          This check was turned over to my attorney for the

9   event that a day such as this should ever arrive.  My attorney

10  can verify that the check was real, the check was intact and

11  that the check was unendorsed.

12         The fact of the matter is that, with the Bachmann

13  Campaign crashing down around itself, with their refusal to

14  listen to the advice and counsel of members of the Iowa staff,

15  including myself, and with the surging support for Dr. Paul,

16  whom was my next closest ideological candidate and many of whose

17  supporters I considered my own, my move to the Paul Campaign at

18  the time was a natural fit.

19  Q.  And that's the end, right?

20  A.  Yes.

21  Q.  Okay.  And you sent this to Dimitri Kesari?

22  A.  Yes.

23  Q.  And what happened next?

24  A.  I don't remember the exact e-mail I received back, but I

25  know he was very adamant he did not want me to send the press

1  release out.

2  Q.  Okay.  Let me pick up on something you said.  The media

3  accounts had related to something regarding Dennis Fusaro.  What

4  was that?

5  A.  Dennis Fusaro was -- do you want me to go into detail who

6  Dennis Fusaro is?

7          MR. BINNALL:  Your Honor, I do object to any media

8  account on this.

9          THE COURT:  What's the question?

10 BY MR. PILGER:

11 Q.  Did Dennis Fusaro make a tape of you?

12 A.  Yes.

13 Q.  In that tape did you lie to Dennis Fusaro?

14 A.  Yes.

15 Q.  And when did you lie to Dennis Fusaro on that tape?

16 A.  Well, I believe one of the specific times I told him I

17 hadn't seen the check.

18 Q.  Okay.  And in that check (sic) did you refer to the check as

19 leverage concerning Dimitri Kesari?

20 A.  Yes.

21 Q.  Did you refer to it as having something over him?

22 A.  Yes.

23 Q.  What did you mean by those two things?

24 A.  I was concerned that -- at this point I was concerned that

25 all of this was going to come down on me and me specifically,

1  and I felt that the check was evidence that Dimitri had given

2  that to me.

3  Q.  At the time you were recorded, tell the jury whether or not

4  you were thinking of coming clean, not going through with

5  getting paid?

6  A.  Yes.  Yes, I had.  I had thought about coming clean.  I had

7  thought about -- and the recording, the recording took place way

8  before the media story.  The recording took place immediately

9  after the endorsement.  So that's why I was thinking about

10  coming clean because Congresswoman Bachmann was out in the media

11  saying this, and Dennis called me, and I remember him saying

12  that he was told that I was going to jump on a grenade, and I

13  said yes.  And what he meant by that was he was told that I was

14  thinking about coming clean because I had felt guilty early on

15  about the lie that I started that ended up steamrolling.  And I

16  felt really guilty about it because I felt like even though I

17  didn't agree with Michelle and wanted her to be the nominee at

18  the time, I still felt like I treated her poorly as a person and

19  the campaign and the people that I brought on to the campaign

20  and my constituents.

21        So I was feeling very guilty early on and I thought

22  about coming clean, and I had told Dennis that and I told Aaron

23  Dorr that, and he relayed that to Dennis.

24  Q.  Okay.  So come back to August of 2013 with me.

25  A.  Yes.

1  Q.  The tape is sprung shortly after the endorsement, and now

2  we're over a year later in August of 2013 when you e-mail

3  Dimitri Kesari?

4  A.  Yes.

5  Q.  And at this time do you still have the check?

6  A.  Yeah, at this time I still had the check.  The guilt was

7  still there, but I had no intentions of coming clean at that

8  point in time because it had snowballed so big that I could not

9  get out of it.

10 Q.  I don't mean to cut off the witness, but I know we need to

11 move a little faster, so just wait for the question and come

12 with me.  If you need to say something else or maybe --

13         MR. BINNALL:  Objection; comment.

14         THE COURT:  It was just five minutes ago.  Ask a

15 question, please.

16         MR. PILGER:  Yes, Your Honor.

17 BY MR. PILGER:

18 Q.  After that e-mail on August 7, 2013, what happened next?

19 A.  I remembered having a phone call, conversation with him.  At

20 this time I don't know if it was before the e-mail or after the

21 e-mail.  He wanted to get on some chat that we could over our

22 phones, and I couldn't figure it out and it never happened; but

23 sometime after this e-mail, within a week or two, I believe,

24 Dimitri came to my house.

25 Q.  Okay.  Do you know how he got to your house?

1  A.  He flew to Omaha, Nebraska.

2  Q.  How do you know that?

3  A.  He told me.

4  Q.  Is it easier to get to your house if you fly into

5  Des Moines?

6  A.  Yes.

7  Q.  Generally?

8  A.  Yes.

9  Q.  He told you he flew to Omaha?

10  A.  He told me he flew to Omaha because he didn't want to be

11  seen in Des Moines and it was less conspicuous if he went to

12  Omaha.

13  Q.  How did he get from Omaha to you?

14  A.  He rented a car.

15  Q.  Okay.  Did he arrive at your house?

16  A.  Yes, yes.  He drove to my house, and on the way there he

17  called and asked what we wanted for dinner.  It was common if

18  Dimitri was coming over he would cook.  He's a good cook.

19  Q.  Okay.  And did he get to your house?

20  A.  Yes.

21  Q.  What happened then?

22  A.  When he first pulled up, I came out and met him in the

23  driveway, he got out, and he was wearing a short sleeve, button

24  up shirt, shorts, and the shirt was untucked.  And he asked me

25  if I was wearing a wire.  And I said, no, and I said, are you?

1  And he said, no.  And then he asked me to lift up my shirt, and

2  I did, and he did as well.

3  Q.  Then what happened?

4  A.  We were in the driveway at my house and he asked me -- we

5  talked about the check.  He asked me for the check.  I told him

6  that -- I lied to him then and told him that my attorney had it.

7  The reason why I lied to him is because he's very persistent and

8  I did not want him to think that the check was at my house

9  because I was concerned that he would leave with it if he knew

10  it was at the house.

11         So I lied to him, told him the check wasn't there.  He

12  asked me if my attorney would be on board with writing the check

13  for a smaller amount, and I said no, that -- I said how would we

14  do that with the check number.  And he said that he carries his

15  own checkbook separate from his wife's, so he doesn't use a lot

16  of checks for the business so it wouldn't be noticeable.  And

17  then when I would not agree to that, he asked if he could -- at

18  first he wanted -- and then he wanted to do it, could we write

19  loan on the memo, and I told him no.  I told him that I, you

20  know -- at that time I thought I probably could convince that

21  lawyer to deceive the government, but I didn't intend to.  I

22  know my current lawyer wouldn't do that; but at that point I

23  thought maybe my current -- the lawyer that I had then would.

24  But what I told him, you know, I told him that wasn't an option,

25  and then he came in and he cooked dinner, and we talked and

1  visited and talked about -- he was just trying to shore me up

2  that I was just going to keep denying this.

3          MR. PILGER:  No further questions.

4          THE COURT:  Do you want to start now or Monday?

5          MS. CAMPBELL:  I can start now.

6          THE COURT:  Do it.  Thank you.

7                      CROSS-EXAMINATION

8  BY MS. CAMPBELL:

9  Q.  Good afternoon, sir.  My name is Angela Campbell, and I

10  represent Jesse Benton.

11  A.  Good afternoon.

12  Q.  Now, you told us you use the name "Alfred Pennyworth,"

13  right?

14  A.  Yes -- well, on an e-mail and Twitter account.

15  Q.  And you use that so people wouldn't know it was you, right?

16  A.  Yes.

17  Q.  And you did that so the public wouldn't know it was you when

18  you comment, right?

19  A.  Correct.

20  Q.  Did you use any other fake name?

21  A.  Not that I know of.

22  Q.  Are you sure?

23  A.  Not that I know of.

24  Q.  How about Ben Eastmam?

25  A.  No, I don't believe so.

1  Q.  You've never used the name "Ben Eastmam"?

2  A.  I don't believe so.  I'm not denying it.  I just don't know.

3  Q.  Would you review this please, sir?

4  A.  Sure.

5         (Pause.)

6  Q.  Have you had a chance to review that, sir?

7  A.  Yes.

8  Q.  You use the name "Ben Eastmam," don't you?

9  A.  No.

10  Q.  You've never used the name "Ben Eastmam"?

11  A.  I don't recall using the name "Ben Eastmam."

12  Q.  You don't recall going on Craigslist and doing postings

13  under the name "Ben Eastmam"?

14  A.  No.

15         MR. PILGER:  Objection; asked and answered and

16  irrelevant.

17         THE COURT:  The question was already answered.

18         Go ahead, pose your next one.

19  BY MS. CAMPBELL:

20  Q.  In fact, you use the name "bygerboy515@gmail.com," don't

21  you?

22  A.  I don't remember using it.

23  Q.  You don't recall at all using it?

24  A.  No.

25  Q.  How exactly does bygerboy515@gmail.com with the name "Ben

1  Eastmam" show up on your iPhone that the FBI seized from your

2  house and made a copy of?

3          MR. PILGER:  Objection.  That's not in evidence.

4          THE COURT:  Overruled.

5          Answer the question if it does, if you know.

6  A.  I'm not denying it or admitting it.  I'm saying I don't

7  recall.

8          MS. CAMPBELL:  Okay.  In fact, let's just mark that

9  then -- what am I on; Benton Exhibit 28 -- 29.

10 BY MS. CAMPBELL:

11 Q.  And you're saying that is not you using that e-mail address

12 on your iPhone?

13 A.  I don't think you heard what I said.  I said I don't recall

14 using it or not doing it.  There was a point in time after all

15 of this happened when my wife and I went through a very

16 depressing stage where we drank a lot and we did things that we

17 regretted and things that we shouldn't have done.  I was so

18 drunk at times that I don't remember doing things.

19         MS. CAMPBELL:  All right.  I would offer Defendant

20 Benton Exhibit 29.

21                         (Defendant's Exhibit B29 was

22                          offered in evidence.)

23         MR. PILGER:  We'll object on 403 grounds.  If -- we'll

24 stipulate he doesn't recall one way or the other using this, but

25 the content of this is highly prejudicial.

1    THE COURT:  The objection is sustained.  He didn't

2  even recognize it.

3  BY MS. CAMPBELL:

4  Q.  Now, sir, any other name?

5  A.  Not that I recall.

6  Q.  It's easy to not recall things, right?

7  A.  Like I said, we went through a very depressing stage where

8  we drank a lot.  I lost my dad in November.  My dad was

9  diagnosed with stage four lung cancer.  I was extremely,

10  extremely depressed because I had put my family through hell

11  because of the lies I told, because of the situation I put

12  myself in.  So, yeah, it's easy to forget things when you're

13  intoxicated and you're in depression.

14    But since then, over the last year, I have really came

15  to deal with what I've done.  I quit telling lies early on, but

16  that doesn't mean you're able to handle the lies that you told,

17  the disappointment to your kids, the disappointment to your

18  parents, the disappointment to your constituents, the horrible

19  choices that I made as a legislator on even policies that I

20  chose.  It doesn't mean that you can go back and undo all of

21  that.

22    So I went through a very depressing stage.  I went

23  through a stage in my life where I regret, and it takes a toll

24  on us.  It's taking a toll on me even today while I'm sitting

25  here, it's taking a toll on my family.  My kids are wondering

1  what's going to happen to their dad.

2         So, yeah, I made mistakes and I screwed up, but I

3  don't recall these e-mails.

4  Q.  How about the rest of these e-mails you sent as Ben Eastmam,

5  do you remember any of those?

6  A.  You can show me as many e-mails as want.  I'm telling you I

7  don't remember using Ben Eastmam.  I'm not denying it.  I'm not

8  saying I did or didn't do it.  I'm saying I went through a phase

9  where I was drunk, intoxicated, depressed late at night, and I

10  was -- my wife and I were in a state that just -- I can't

11  explain it.  Nobody understands what you go through in this

12  situation until you go through it.

13  Q.  So you don't recall at all using bygerboy.com on Craigslist

14  as a fake e-mail address?

15         MR. PILGER:  Your Honor, that's about the seventh time

16  she's asked that.

17         THE COURT:  Sustained.

18         Pose a new question.

19  BY MS. CAMPBELL:

20  Q.  Sir, let's go to -- I believe you said that the meeting on

21  the 26th of December on the Ron Paul Campaign, the one in

22  Altoona, do you remember that?

23  A.  Yes, I remember that.  At Claxton's if you want to be clear.

24  Q.  Okay, let's be clear, at Claxton's with Dimitri Kesari and

25  yourself?

1   A.   And my wife.

2   Q.   And your wife?

3   A.   Yes.

4   Q.   And on the 26th, that's when he wrote out the check and gave

5   it to your wife, right?

6   A.   Correct.

7   Q.   And that wasn't your understanding of the deal, right?

8   A.   I'm sorry, your question is not clear.  I wasn't there so

9   I'm not sure the understanding of the deal.  I was in the rest

10  room.

11  Q.   Well, you didn't have an understanding that there was a deal

12  for $25,000, did you?

13  A.   At that point in time, no.

14  Q.   And you told us earlier on direct that you didn't have a

15  deal at all and you were not going to leave the Bachmann

16  Campaign and you said no on the 26th and you had been saying no;

17  is that right?

18  A.   Correct.

19  Q.   Would you pull up Government's Exhibit 105.

20          Would you highlight that, please.

21          Now, that's your e-mail address, right, Iowan for

22  truth?

23  A.   Yes.

24  Q.   And which you're actually using an untruthful name of Alfred

25  Pennyworth, right?

1  A.  I've been very clear about my untruthful behavior then.

2  Q.  And that's actually sent on December 25, 2011, at midnight

3  Eastern Standard Time, which would actually probably be December

4  24th here; is that right?

5  A.  Yes.

6  Q.  Before the meeting?

7  A.  Yes.  But I can tell you that multiple people used Alfred

8  Pennyworth, both myself and Chris Dorr, and I can tell you if

9  you read this e-mail and you go through my text messages, I

10  don't have that good of grammar.  I'm just honest, I don't, and

11  Chris did a lot of writing for me.

12  Q.  So Alfred Pennyworth, this was not an e-mail that you wrote

13  from your e-mail address?

14  A.  No, but I'm sure I probably saw it at some point in time.  I

15  think I told you that Alfred Pennyworth is an account that both

16  Chris Dorr and I used.  As much as I would like to be able to

17  write this eloquent, Chris is very talented.  That's why he was

18  my legislative assistant.  If you go even through my invoices

19  that I sent out, I'm just not a good writer.  I have typos, I

20  have punctuation errors, and this doesn't have that.

21  Q.  Okay.  So you're saying your legislative aide got into your

22  e-mail account and sent a press release to Dimitri Kesari on

23  national news about the Ron Paul Campaign without your

24  permission about switching over to Ron Paul?

25  A.  That's what you're saying, but that's not what I'm saying.

1   What I said is we both used the account, so was it my account,

2   was it his account, was it our account?  I mean, Chris did a lot

3   of writing for me.

4   Q.  "Yes" or "no," sir, did you send, did you intend to send,

5   did you direct someone to send, did you talk about sending this

6   switch statement on December 25th early in the morning to the

7   Ron Paul people?

8   A.  I did not send that myself, no.

9   Q.  Did you approve it?

10  A.  I don't remember approving it, no.

11  Q.  Did you know it was being sent?

12  A.  There was -- I told -- I made it very clear with everyone

13  there was discussions.  I was entertaining, I was struggling

14  with my wife, but I had no intention of switching at that time.

15  Q.  So you went to the trouble on Christmas -- on Christmas you

16  went to the trouble to have this sent to the Ron Paul Campaign

17  after you just told us that you only do the most important

18  things on Christmas?

19          MR.  PILGER:  Objection.

20  A.  I made it very clear that I didn't send it.

21          MR. PILGER:  Objection; facts not in evidence.  He

22  just testified that he had no way of knowing whether he did

23  that.

24          THE COURT:  Overruled.

25  A.  I made it very clear I didn't send it, so you can accuse me

1   of sending it on Christmas.  I did not send it.

2   BY MS. CAMPBELL:

3   Q.  Someone else sent it?

4   A.  I think I made it very clear that Chris Dorr and I used the

5   same e-mail account.  We both sent out statements on Twitter.

6   We used it for Iowans for Truth against Terry Branstad, and we

7   did all kinds of stuff with it.  Both Chris and I used that

8   account.

9   Q.  Can we back out of that?

10  A.  I would love to see some other writing that came from me

11  that's as good as that.

12  Q.  Let's pull up what Dimitri Kesari tells -- at the very top,

13  tells the Ron Paul people.  I mean, Dimitri Kesari thinks it's

14  from you.

15  A.  I can't help what Dimitri thought.

16  Q.  So you didn't tell Dimitri that was your press release?

17  A.  Like I said, I don't recall.  I know for a fact I did not

18  send that.  I don't recall having conversations with Dimitri.

19  It doesn't mean I didn't.  I had all kinds of conversations with

20  Dimitri, and we had dinner the very next night, so, obviously,

21  we spoke at some time to set up that dinner.

22  Q.  Okay.  So you didn't know that Aaron Dorr was doing this

23  with -- to have it forwarded on to the Chairman of the Ron Paul

24  Committee?

25  A.  Actually --

1    MR. PILGER:  She just said Aaron Dorr.

2    MS. CAMPBELL:  I'm sorry; Chris Dorr.

3  A.  Yeah, I was going to correct her as well.

4  BY MS. CAMPBELL:

5  Q.  I'm sorry; Chris Dorr.  You didn't know, you didn't know

6  that Dimitri Kesari, who was already presenting this as being

7  your statement, that Chris Dorr had drafted it apparently

8  without your knowledge and sending it to the Chairman of the Ron

9  Paul Committee?  You didn't know that?

10  A.  Actually we talked about this before, and I did not write

11  the draft.  Did I know there was discussions going on back on

12  October 31st?  We made that very clear, from October 31st until

13  then.  Actually, from the moment I endorsed Michelle Bachmann,

14  from the moment I joined her campaign, yeah, they were

15  recruiting me, they were talking to me.  People -- like I said

16  during my earlier testimony, there were people showing up at my

17  softball games for my kids when I was trying to enjoy it, yeah,

18  there was a lot of conversations going back and forth, but I

19  didn't write that e-mail.  You know, if Dimitri assumed that was

20  from me, that was probably because I gave Chris Dorr and Aaron

21  Dorr a lot of latitude to write press releases for me.  Chris

22  Dorr used his Iowa Gun Owners to send out numerous, numerous

23  mailings.  I didn't approve them because I gave him that

24  latitude.

25  Q.  Well, let's look at -- sir, you told us you were working

1  with the Bachmann Campaign early on.  Were other campaigns

2  trying to hire you other than Bachmann?

3  A.  I think I said that Ron Paul wanted me to support him.

4  Q.  Okay.  But I said hire.  Were other campaigns trying to hire

5  you?

6  A.  There was one other one.

7  Q.  Which one was that?

8  A.  Tim Pawlenty.

9  Q.  Anyone else?

10  A.  I was approached by Rick Santorum, but I don't remember

11  discussing being hired.  They wanted my support.  I mean,

12  everybody then was approaching all legislators, and at that

13  particular time I had a good reputation, I was popular with the

14  Tea Party group and a lot of Republican grassroots, so I was a

15  desired endorsement.

16  Q.  Okay.  My question is, did anyone else hire you?  So did any

17  other campaigns offer to hire you, pay you money, other than

18  Ms. Bachmann, back in early 2011?

19  A.  As I stated, Tim Pawlenty did and Congressman Paul; the

20  campaign, not them specifically.  I actually remember having a

21  specific conversation with Pawlenty, but not with Congressman

22  Paul.

23  Q.  Could you put up Exhibit 3, please?  To the bottom e-mail,

24  please?

25          Were you aware that the Paul Campaign was being told

1  that Newt was the highest bidder at $8,500 a month?

2  A.  No.

3  Q.  Was that true?

4  A.  No.

5  Q.  Had Newt ever offered you 8,500 a month?

6  A.  No.

7  Q.  Any idea where A.J.@frederickrealty.com would have got that?

8  A.  No idea.

9  Q.  Do you know who A.J. Spiker is?

10  A.  Yes.  He was the Republican Chair -- I'm not sure if he was

11  the Republican Chair at this time; but he was one of the

12  chairmen of Congressman Paul's campaign.  At one time he was the

13  Chair of the Republican Party.

14  Q.  So you're saying you never had a conversation with A.J.

15  Spiker where you told him that you were offered 8,500 a month by

16  Newt Gingrich?

17  A.  I can tell you that is flatly not true.  I never had

18  conversations with Newt's campaign.  Newt was never on my radar.

19  Frankly, we did not align politically.  Pawlenty was never

20  really on my radar, but I had friends that were part of his

21  campaign.  The only two that was ever on my radar legitimately

22  was Ron Paul and Michelle Bachmann.

23  Q.  Did you ask A.J. Spiker to approach the Ron Paul people for

24  you?

25  A.  No.

1  Q.  Could you scroll up to the response?

2          Were you aware, sir, that in February of 2011 the

3  soon-to-be chairman of the Ron Paul Campaign said they were not

4  going to pay you to work for Ron Paul?

5  A.  I've never seen this e-mail.  But that being said, that goes

6  without -- in the time period where I had approached them and

7  asked if Ron was going to run, and they knew that I was being

8  offered a paid position with the Bachmann Campaign.

9  Q.  But you weren't being offered 8,500 with the Bachmann

10  Campaign?

11  A.  No.

12  Q.  You weren't being offered 8,000 by the Bachmann Campaign?

13  A.  I never said that.

14  Q.  You were being offered $7,500 a month by the Bachmann

15  Campaign?

16  A.  And out-of-pocket expenses, yes.

17  Q.  And the 8,500, you have no idea where that came from?

18  A.  No clue.

19  Q.  How about -- and you told us that actually heading into the

20  meeting on the 28th and the -- I'm sorry, the meeting, I'm

21  saying meeting; the rally on the 28th, that you hadn't made up

22  your mind yet, right, that you were going to switch to Ron Paul

23  until you showed up at the rally?

24  A.  At that point I had no intention of doing it, but I was

25  vacillating; but I was vacillating.  Like I said, I was

1   vacillating back and forth because of my wife and other

2   influences in my life, and I was saying -- I was thinking about

3   it, and I was, like, no, and I told everybody no.  But was I

4   still entertaining it in my head?  Of course, I was.  I mean,

5   who wouldn't?  I mean, I was -- just three years prior I was

6   cleaning toilets with a janitorial business.  So to be

7   approached by all of these people with presidential campaigns

8   three years later, it was -- I mean, it was very flattering.  I

9   really -- in my own mind, I got very big; but now looking back,

10  I realize it was all senseless and it didn't mean anything and I

11  got caught up with who I was rather than what I was standing

12  for.

13  Q.  Now, did you ever tell Dimitri Kesari that on the evening of

14  December 27th you were sitting in Bachmann's office waiting to

15  talk with her?

16  A.  When was that?

17  Q.  December 27th.

18          Can you pull that up?

19          Do you have any independent recollection of telling

20  Dimitri Kesari that on December 27th, which would be the day

21  after the meeting at Claxton's, to be precise, that you were

22  sitting in Bachmann's office waiting to talk with her?

23  A.  Yeah, I think I said that to Dimitri.  I'm not sure if I did

24  or not.  I'm not denying that; but I can tell you that if I did

25  say that, I was lying to Dimitri because on December 27th

1  Bachmann was on a bus tour.

2  Q.  Okay.  So there's no way you're sitting in her office?

3  A.  No.

4  Q.  And where exactly is her office?

5  A.  Well, her -- our campaign office was at the corner of --

6  well, do you know where Hickman and, I think it's 22nd is?

7  There's a Panera Bread.  That was where her office was at.

8  Q.  Is that in Urbandale?

9  A.  Yes.

10  Q.  Do they have any branch offices?

11  A.  Does the Bachmann office?  No.  We had one campaign

12  headquarters.

13  Q.  So there's no office in Milo?

14  A.  No.

15  Q.  Never been an office in Milo?

16  A.  A campaign office in Milo?

17  Q.  Yeah.

18  A.  No.

19  Q.  Ever been a campaign work station in Milo?

20  A.  No.

21  Q.  Just your house is in Milo, right?

22  A.  Correct.

23  Q.  Now, so when you told Dimitri that you were sitting in

24  Bachmann's office waiting to talk to her, you were just lying to

25  him?

1   A.  Very possibly, yes.  I'm not sure -- like I haven't seen

2   anything that said I said that; but if I said that, she was on a

3   bus tour, maybe I was on the bus with her.  I'm not sure.

4   Actually I know on the 27th I was not on a bus with her.

5   Q.  And did you commonly lie to Dimitri Kesari along with

6   everybody else you were lying to?

7   A.  At that point in my life, I told a lot of lies; but also

8   Dimitri is very -- I mean, it's -- you know, I mean, if somebody

9   calls me 15 times in two hours, it's sometimes better just to

10  say things to him so he would leave me alone at that point in

11  time.  Yeah, I'm not denying that I lied a lot.  I told the

12  jury, I told you, I told Mr. Pilger, I told the judge, I told

13  everybody in this courtroom I was a liar.

14  Q.  Let's do Government's Exhibit 44, I think was the one that I

15  was looking for.

16          Can you pull up the middle one from Dimitri?

17          December 27, 10:08 p.m., Dimitri Kesari says:  He is

18  sitting in the Bachmann office waiting to talk with her.  He has

19  been texting me from there.

20          Do you see that?

21  A.  Yes, but that's from Dimitri.  That's not from me.  I didn't

22  tell Dimitri I was in the Bachmann office.  Dimitri is telling

23  somebody else this.

24  Q.  But you just told us you might have told him that.  Do you

25  remember?

1  A.  Yeah, I remember saying I might have.  I didn't say I did; I

2  didn't I didn't.  I said I might have.

3  Q.  Right.  Well, you don't actually know what I have, so you

4  have to kind of hedge your bets, right?

5  A.  No.  I'm telling the truth.  You can show me whatever you

6  want because I'll happily admit to my lies because -- not

7  happily.  Honestly, with my life, I lied, I lied, I lied.  I

8  lied then and I lied to my constituents, my parents.  You know,

9  I mean, I'm not denying that.  I'm not lying now and I haven't

10  lied since I pled guilty.

11  Q.  Now, actually at this time you're sitting in your home in

12  Milo talking on the phone with Aaron Dorr; is that right?

13  A.  I have no idea.

14  Q.  Well, then let's pull up Government's Exhibit 182, page 59.

15        THE COURT:  We'll finish this and then quit for the

16  day.

17        MS. CAMPBELL:  Thank you, Your Honor.

18  A.  Oh, actually now that we say that, earlier in my testimony I

19  said that I was on a conference call with Aaron Dorr, his dad,

20  Dennis Fusaro, and Chris Dorr.  I do remember saying that, but

21  I'm not sure which night that was.

22  BY MS. CAMPBELL:

23  Q.  Okay.  Can you highlight that last 10:05 p.m. call there?

24        Is that the conference call, sir?

25  A.  I said I'm not sure which day it was, but I was on a

1  conference call with them; but I spoke with Aaron Dorr on a

2  daily basis every day up until I resigned from office.

3  Q.  And that's his number, (712) 461-1401?

4  A.  I can't tell you from memory.  It's programmed in my phone.

5  I can barely remember my wife's phone number.  I just push a

6  button and it goes to it.

7          MS. CAMPBELL:  We'll finish that on Monday.

8          Thank you, Your Honor.

9          THE COURT:  Good.  Thanks.

10         Okay.  So we're quitting for the day, for the week --

11 you can step down, sir, if you like.

12         THE WITNESS:  Okay.

13         THE COURT:  We'll come back Monday at 9:00.

14         And we'll go through the cautions again.  No -- just

15 leave them there.

16         THE WITNESS:  Okay.

17         THE COURT:  No social media about the case, no reading

18 or listening to news accounts about it, keeping an open mind,

19 wait until you hear all of the evidence, the arguments, the

20 instructions on the law before even beginning to think about how

21 the case should be resolved.

22         We talked last night, the lawyers and I, after you

23 left.  We're shooting for Wednesday, to get the case to you

24 sometime on Wednesday.  Now, when I say that, nine times out of

25 ten it turns out to be accurate.  One time out of ten it

1  doesn't, and you can imagine how disappointed people can be; but

2  I just wanted to give you our best estimate of when we think

3  this case is going be sent to you for your deliberations.

4           Have a great weekend.  Look forward to seeing you on

5  Monday.

6           (In open court, out of the presence of the jury.)

7           THE COURT:  Please be seated.

8           Mr. Binnall, you wanted to make a record early in the

9  day on, I think it was Exhibit 69, the unredacted portion.

10          MR. BINNALL:  Your Honor, just briefly.  That is

11  something that we had previously discussed, the last matter,

12  that Mr. Whitaker's name would be redacted as to -- because he's

13  a high-profile lawyer and does criminal defense work.  It

14  briefly was on the screen in the last trial and briefly in this

15  trial now, and the problem is when it goes back and forth with

16  redacted, not redacted, it kind of might serve as a highlighting

17  at that point.

18          THE COURT:  And that is what was redacted was

19  Mr. Whitaker's name?

20          MR. BINNALL:  Correct.

21          THE COURT:  He's not that high profile.  You want to

22  know about high profile, I'll give you some names.  Matt's not

23  one of them.  He's a fine guy, but it's not like his name is

24  ubiquitous with high-profile lawyer.  Sorry, Matt.

25          MR. BINNALL:  Okay.  The court is going to know much

1  more about that than I will, but that was my concern.  And since

2  we talked about that, that's why I wanted to do it outside the

3  presence of the jury.

4          THE COURT:  Thanks.

5          MR. BINNALL:  Your Honor, just very briefly, the other

6  thing I wanted to bring to the court's attention, I did file the

7  motion under seal regarding the Sixth Amendment issue and my

8  client, and there's going to be an in camera filing next as we

9  discussed.  This is the first time I've done this, and it's a

10 really nervous thing for a lawyer to turn over his client's

11 conversations to someone who, if things don't go exactly as I

12 plan, is still going to be in front of the court for sentencing.

13         THE COURT:  Why don't I send it to Judge Adams for

14 report and recommendation and then I'll review later?

15         MR. BINNALL:  I think that sounds like a good idea.

16         THE COURT:  That's exactly what I'm going to do,

17 because she's the one that did the protective order.  I didn't

18 even know you had one.  I suppose I could have seen it along the

19 way, but I don't think I did.  So, anyway, I was so unfamiliar

20 with your pretrial proceedings as it related to discovery that

21 it meant nothing to me that you have a protective order.  I just

22 didn't see it.

23         So I think that's probably the way to handle it.  And

24 I respect the fact that there might be stuff in there that,

25 depending on how things go, you might not want me to see.

1          MR. BINNALL:  Yes.  We trust the court --

2          THE COURT:  I know.

3          MR. BINNALL:  Yeah.  So we'll do that.  The disk

4    itself then, I guess probably on Monday, we'll just bring that

5    to Judge Adams' chambers directly.

6          THE COURT:  Yes.

7          MR. BINNALL:  And, otherwise, for the paper filing,

8    we'll just file it on ECF unless you think it's best that we

9    just file the paper copy in chambers as well because on ECF

10   there's an ex parte function.

11         THE COURT:  File it on ECF, CM/ECF.

12         MR. BINNALL:  Yes, sir.

13         THE COURT:  I looked at your brief today, and I looked

14   at Ms. Campbell's affidavit, but there's no confidential

15   communications that are in your brief and none in her affidavit.

16         MR. BINNALL:  That's right.  We don't have the record

17   complete for you or anyone to make a decision yet, and I'm well

18   aware of that.

19         THE COURT:  Great.  So tonight or more likely tomorrow

20   morning I'll send everybody a proposed set of the final

21   instructions and look for comments probably by Monday evening on

22   those.  The sooner -- you know, you'll remember from last time,

23   the sooner you get comments to me, the more likely they're going

24   to be strongly considered.  So the earlier, the better.  If you

25   can even just send over the weekend your stream of consciousness

1  sort of thoughts, they do help me, because I have time this

2  weekend to work on it.

3        Other things you want to take up before the weekend?

4        MR. BINNALL:  Is there going to be a working session

5  again for jury instructions like we did last time, Your Honor?

6        THE COURT:  Probably Monday evening.

7        MR. BINNALL:  Okay.

8        THE COURT:  Certainly Tuesday.

9        MR. BINNALL:  Yes, sir.

10        THE COURT:  Okay.  Half a day for cross-examination of

11  him are you thinking on Monday or not a half a day?  Last time

12  it was a total of a little bit more than a day for his

13  examination.

14        MS. CAMPBELL:  I, frankly, don't have that much more,

15  Your Honor, maybe 15, 20 minutes.

16        MR. MILLS:  I think we'll get him done by lunch.

17        THE COURT:  Okay.

18        MR. BINNALL:  I think that's good, Judge.

19        THE COURT:  So you've got Yoo, who's about a half

20  hour, and how many others are you thinking about?

21        MR. COONEY:  I'm sorry; in terms of witnesses?

22        THE COURT:  Yes.

23        MR. COONEY:  The follow-up will be Yoo and DeMarco,

24  who between the two of them, the video deposition and DeMarco's

25  testimony, I think 90 minutes for the two of them; Sonny Izon,

1  about a 20, 30 minute direct; and Spencer Brooks who I think is

2  probably 30, 45.

3        MR. PILGER:  I think that's ten-minute direct.  I

4  can't speak to cross.

5        THE COURT:  So we will quit on Monday after the

6  government rests so that we can handle motions.  I'm saying you

7  don't have to be prepared on Monday to present evidence.

8        Anything else?

9        MR. COONEY:  I'm sorry, Your Honor, just so we can

10  plan accordingly -- and we can talk on Monday, I guess; but

11  should we plan to close on Tuesday if the defense case takes

12  half a day or something like that, or are we --

13        THE COURT:  Can you tell me anything about how much

14  time you're planning to spend?  Last year -- last year; last

15  time you had almost a day worth of stuff.

16        MR. BINNALL:  Actually it was actually less than that

17  for us last time; but, of course, there's one more defendant and

18  this time more charges for the other defendants.  I don't

19  anticipate Mr. Kesari's case in chief is going to take much

20  longer, especially without Mr. Mason; but I'll leave it up to my

21  colleagues as far as any other --

22        MS. CAMPBELL:  I think part of it is determinative on

23  the ruling on Mr. Link.

24        THE COURT:  Yeah.

25        MS. CAMPBELL:  But without him, it's pretty short for

1  us as well.

2       MR. WARRINGTON:  I can't imagine us taking more than

3  half a day, at most.

4       THE COURT:  Combined?  You're saying combined?  Are

5  you saying all of the defendants combined a half a day?

6       MR. WARRINGTON:  No; I'm saying for us.

7       THE COURT:  Okay.  If we got done at noon on Tuesday,

8  we would argue Tuesday afternoon, yeah.

9       Thanks.

10       See you.

11       (Recess at 5:03 p.m., until 8:30 a.m., Monday, May 2,

12  2016.)

13

14

15

16

17

18

19

20

21

22

23

24

25