IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :      Criminal No. 4:15-103
                            :
     vs.                    :
                            :
JESSE R. BENTON,            :      TRANSCRIPT OF TRIAL
JOHN FREDERICK TATE, and    :            VOLUME V
DIMITRIOS N. KESARI,        :
                            :
          Defendants.       :
- - - - - - - - - - - - - -X



                         Second Floor Courtroom
                         United States Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa  50309
                         Monday, May 2, 2016
                         8:30 a.m.



BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge, and a Jury.








                    Terri L. Martin, CSR, RPR, CRR
                    United States Court Reporter
                     Room 189, U.S. Courthouse
                      123 East Walnut Street
                      Des Moines, Iowa  50309

APPEARANCES:

For the Plaintiff:                  JOSEPH P. COONEY, ESQ.
                                    RICHARD C. PILGER, ESQ.
                                    Public Integrity Section
                                    Criminal Division
                                    U.S. Department of Justice
                                    1400 New York Avenue NW
                                    Suite 12100
                                    Washington, D.C.  20005

For Defendant Benton:               ANGELA L. CAMPBELL, JR., ESQ.
                                    Dickey & Campbell Law Firm
                                    301 East Walnut, Suite 1
                                    Des Moines, Iowa  50309

For Defendant Tate:                 DAVID A. WARRINGTON, ESQ.
                                    LAURIN H. MILLS, ESQ.
                                    LeClair Ryan
                                    2318 Mill Road, Suite 1100
                                    Alexandria, Virginia  22314

For Defendant Kesari:               JESSE R. BINNALL, ESQ.
                                    Harvey & Binnall
                                    717 King Street
                                    Suite 300
                                    Alexandria, Virginia  22314

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Kent Sorenson (Resumed) | | 905 Campbell 939 Mills 980 Binnall | 998 | 1019 Campbell 1021 Mills 1023 Binnall |
| | | | 1024 | |
| Noel Izon | 1027 | 1058 Campbell 1060 Binnall 1062 Warrington | | |
| Pavlo Kesari (Recalled) | 1063 | 1067 Binnall | | |
| Gunnar DeMarco | 1068 | 1085 Mills | 1093 | |
| Karen LoStracco (Resumed) | 1096 | 1100 Warrington | | |
| Spencer Brooks | 1103 | | | |

I N D E X

| GOVERNMENT EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 22 - Kesari e-mail to Tate and Benton | 916 | 916 |
| 73 - 2/5/12 Izon/Kesari e-mail | 1035 | 1035 |
| 96 - 6/19/12 Izon/Kesari e-mail | 1054 | 1054 |
| 134 - | 1134 | 1134 |
| 167 - Stipulation | 1132 | 1132 |
| 168 - Stipulation | 1133 | 1133 |
| 169 - | 1115 | 1115 |
| 184 - Tate phone records | 1122 | 1122 |
| 188 - Benton phone records | 1123 | 1123 |
| 189 - Transcript of phone call | 1003 | |
| 190 - Grand Jury subpoena to Paul Campaign | 1097 | 1097 |

| DEFENDANT'S EXHIBIT NUMBERS: | | |
|---|---|---|
| B30 - Screen shots of Megyn Kelly interview | 919 | 919 |
| T3 - Sorenson invoice to C & M | 961 | 961 |
| T4 - Sorenson e-mail to Polyansky | 968 | 968 |
| T12 - Sorenson South Carolina flight info | 951 | 951 |
| T38 - Sorenson marriage script | 955 | 955 |
| T39 - Sorenson e-mail blast | 957 | 957 |
| T40 - DeMarco CV | 1086 | 1087 |

P R O C E E D I N G S

1  (In open court, out of the presence of the jury.)

2  THE COURT:  Please be seated.

3  There are matters you wish to take up before we start
with the jury?

6  MR. MILLS:  Yes, Your Honor, there's two matters.  One
concerns questions about Mr. Sorenson's relationship with his
wife.  We believe he opened the door when he talked about his
wonderful relationship with his wife on the stand.

10  THE COURT:  Would you move to the podium?  It's hard
to hear from that distance.

12  MR. MILLS:  Sorry.  The issue is the defendants would
like some latitude to be able to question Mr. Sorenson about his
relationship with his wife.  We believe he opened the door to
that by talking about his wonderful relationship on Friday, and
we think we should have some latitude to explain that in the
context of his misdemeanor conviction.  And we previously had a
motion in limine on that, but he can't have it both ways.  He
can't talk about a wonderful relationship with his wife and then
have us precluded on a credibility issue.  I think we're
entitled to talk about that.

22  The second issue is we learned last night that the
government intends to recall Pavlo Kesari.  Apparently they're
unsatisfied with his testimony and want to have a do-over.  The
trial is already something of a do-over.  We don't -- we

1 strongly believe that defendants would not have the ability to

2 recall witnesses that -- whose testimony they didn't like.  We

3 think the government should have been prepared to impeach their

4 own witness if he didn't testify as expected and we don't think

5 it should be allowed.

6 　　　　　THE COURT:  Thank you.

7 　　　　　Are there any other matters you wish to take up this

8 morning?

9 　　　　　MR. BINNALL:  Not from us.

10 　　　　　MS. CAMPBELL:  No, Your Honor.

11 　　　　　THE COURT:  Okay.  Mr. Pilger.

12 　　　　　MR. PILGER:  Your Honor, may it please the court.

13 I'll speak to the Sorenson issue.  Mr. Tate's counsel is

14 referring to impeachment on an entirely collateral matter about

15 Mr. Sorenson's personal life, and we think there's really no

16 probative value and it's unfairly prejudicial to him to get into

17 any specific instance of what might be a perfectly wonderful

18 relationship where people have had troubles.

19 　　　　　THE COURT:  Okay.

20 　　　　　MR. PILGER:  Mr. Cooney will speak to the other issue

21 that was raised.

22 　　　　　I alert you we have one question to take up with you.

23 We can do that now or --

24 　　　　　THE COURT:  Go ahead.

25 　　　　　MR. PILGER:  Pending before the court were motions in

1  limine concerning what will be Government's Exhibit 180, a

2  redacted FEC Digest, concerning a particular matter involving

3  one of the Ron Paul campaigns.

4          This is now very much an issue insofar as the defense,

5  at least at side-bar, has made much of an issue, which we think

6  is a small issue, but they're making much of it, and we expect

7  to hear it in argument, about whether the FEC does things about

8  false reports.  In that MUR, which we're happy to project for

9  you if you want to take a look at it --

10          THE COURT:  I remember it.

11          MR. PILGER:  And to be fair, there's a piece that

12  concerns Mr. Tate directly which is not about false reporting,

13  but it also concerns the Ron Paul Campaign at that time with

14  which he's affiliated for a long period of time, and it just

15  shows that the FEC does take up, in particular in that instance,

16  false reports of disbursements for rental companies.

17          Now, this digest will be fair to the defendants in

18  that it will show -- and fair to Mr. Tate in particular -- that

19  the FEC declined in its discretion to take any action against

20  him.  So we're not maintaining that he has committed a prior bad

21  act.  We are offering this to show his knowledge that the FEC

22  does take these matters up and that he has had interactions with

23  FEC enforcement before.

24          So to the extent the defense case has a couple of

25  themes, one being that upper management doesn't really know

1  about FEC matters, and to the extent they also have another

2  theme of false reports about disbursements aren't material, this

3  exhibit has become highly probative.

4          THE COURT:  Thank you.

5          Mr. Cooney.

6          MR. COONEY:  It is our intent to recall Pavlo Kesari

7  this morning to cover one specific point from his testimony from

8  last week.  He was asked a question on direct examination about

9  whether he told his brother about the invoice that he slipped in

10 to Sonny Izon, and he gave a minimally answer of probably so, I

11 think so, yes.  You recall I asked him a follow-up question on

12 that, are you sure, and he gave a nonresponsive answer.  In

13 having looked at this and having thought about it, in the moment

14 it seemed as if it was where it was.  On two prior occasions he

15 has given statements flatly inconsistent with that, and as

16 things have unfolded, we've determined that this is an issue

17 that we want a full and complete record on.  We haven't closed

18 our case.  I think this is an issue you have your discretion to

19 allow us to recall him.  It's just a matter as trial has

20 unfolded is a matter that we want him confronted with his prior

21 statement and give him an opportunity to give an explanation of

22 it.

23         THE COURT:  Thank you.

24         Mr. Mills, what did he say that allegedly opened the

25 door to testimony about the relationship?

1    MR. MILLS:  On several different occasions he talked

2  about his wife and his wonderful relationship with his wife and

3  how close they were, and that's what opened the door to it.

4    THE COURT:  All right.  That's just too tangential.

5  People can say they love their wife without opening every

6  instance of a problem in their life for cross-examination.  It's

7  just too collateral, too tangential and not valuable use of time.

8    The government can reopen on Kesari.

9    I'm reserving ruling on this Tate issue on the MUR.

10    Thank you.

11    We'll see you at 9:00.

12    (Recess at 8:40 a.m., until 9:00 a.m.)

13    (In open court, in the presence of the jury.)

14    THE COURT:  Please be seated.

15    Members of the jury, good morning.

16    We're continuing on.  Ms. Campbell was examining

17  Mr. Sorenson when we left.

18    MS. CAMPBELL:  Thank you, Your Honor.

19                KENT SORENSON,

20  resumed his testimony as follows:

21                CROSS-EXAMINATION (Continued)

22  BY MS. CAMPBELL:

23  Q.  Now, Mr. Sorenson, we left off on Friday, I believe we were

24  speaking about the Alfred Pennyworth e-mail that was sent

25  Christmas Eve late into Christmas morning.

1          Do you recall that?

2  A.   That was one of the discussions we were having, yes.

3  Q.   And do you recall telling us that that release wasn't sent

4  by you, right?

5  A.   I said I did not write the release.  I don't recall sending

6  the release, but those are not my words entirely, so --

7  Q.   And you told us you didn't approve that release, right?

8  A.   I don't recall if I said I didn't approve it.  I said that I

9  did not write it and I think that's the discussion that we were

10  having on --

11  Q.   So did you --

12  A.   On Friday, but I could be mistaken.

13  Q.   Did you or did you not approve the Alfred Pennyworth e-mail?

14  A.   I don't recall approving it, but that's it.  I know I didn't

15  write it.  I can confidently say that by looking at the draft.

16  Q.   But Mr. Kesari had asked you for the press release, right?

17  A.   I don't know.

18  Q.   If we could please display Government's Exhibit 28 already

19  in evidence.  Could you zoom in on that top part?

20          Now, sir, this is Mr. Kesari sending you an e-mail at

21  not the Alfred Pennyworth address but at your

22  kent@kentsorenson.com e-mail address, right?

23  A.   Yes.

24  Q.   Asking you on December 23rd, can you send over the draft

25  press release, right?

1  A.  Correct.

2  Q.  And can we also now show Government's Exhibit 30, which I

3  believe is already in evidence.

4        Now, this is Mr. Kesari the next day, Christmas Eve,

5  at 10:43 p.m. sending you an e-mail at kent@kentsorenson.com

6  telling you not to forget the press release, right?

7  A.  Correct.

8  Q.  And he's not sending that to the Alfred Pennyworth account,

9  right?

10  A.  Correct.

11  Q.  He's sending it to you at your account?

12  A.  Yes.

13  Q.  Sir, if we could now look at Government's Exhibit 31.

14        This is Mr. Kesari now the next day, December 26th,

15  saying that you were editing the press release that Alfred

16  Pennyworth sent out, right?

17  A.  I don't see where it says anything about Alfred Pennyworth.

18  Q.  He would like his reason for switching put back in his

19  statement, right?

20  A.  I see that in there, but you said it was referencing the

21  Alfred Pennyworth e-mail.  I don't see a reference to the Alfred

22  Pennyworth.  I'm not denying that there was communication going

23  on with Dimitri.  There always was.  I mean, he's -- you know,

24  he's a political bully.  That's just part of politics.

25  Q.  So you're saying he's bullying you here; that is what you're

1  saying?

2  A.  I felt bullied a lot in politics.  I bullied in politics.

3  That's just part of it.  Unfortunately, that's the nature of the

4  country that we live in.

5  Q.  So, sir, on December 23rd and December 24th, you were told

6  to send a press release, but it wasn't you that sent the press

7  release on the evening of the 24th; but you went and edited a

8  different press release on December 26th?  Is that what you're

9  saying?

10  A.  I didn't say that.  You're putting words in my mouth.

11  Q.  Okay.  Let's talk about the Dorr memo that we talked about

12  back in October.  You told us that you didn't approve that memo

13  either, right?

14  A.  Correct.

15  Q.  And you told us that on Friday, right?

16  A.  Yes.

17  Q.  And you told us that you didn't see it before it went out,

18  right?

19  A.  I didn't see the final e-mail before it went out, but I knew

20  there was discussions.

21  Q.  And you had talked to Aaron Dorr about what your

22  requirements were, right?

23  A.  He knew what I was getting paid and he knew what I needed.

24  Q.  You talked to him before he sent the memo, didn't you, sir?

25  A.  Yeah.  I had talked to Aaron Dorr every day from the time I

1  got elected until I resigned from office, so, yes, I did talk to

2  Aaron Dorr a lot.

3  Q.  And you talked to him after it was sent, right?

4  A.  I've talked to him every day, from the day I got elected

5  until I resigned.

6  Q.  But you didn't know -- at least according to your own words,

7  you didn't know what was in that memo on the 31st, right?

8  A.  That's what I said.

9  Q.  Okay.  Now, you actually pretended back in November to be

10  shocked by Mr. Benton's response to that Aaron Dorr memo, right?

11  A.  I was shocked by some of the contents of it.  I had no

12  desire for Aaron Dorr to put anything in there about Drew Ivers

13  or Iowa Gun Owners or the stuff with Chris.  I was shocked by

14  that, yes.

15  Q.  So you didn't have any discussions with Aaron Dorr about any

16  of those matters that went into that memo that talked about

17  hiring you before you sent it?

18  A.  That's not what I said.

19  Q.  Could we show Government's Exhibit 22, the bottom of page 1?

20          You actually tell Mr. Kesari back in November of 2011

21  that you were shocked and taken aback by what you referenced as

22  Aaron's black mail letter, right?

23  A.  That's -- if that's what it said I said, that sounds about

24  right.  But like I just said, I was very surprised about the

25  Iowa Gun Owners stuff in the letter.  I was very surprised about

1  Chris Dorr.  I knew there was discussions about myself, but I

2  could give really -- I didn't care if Drew Ivers wanted to

3  apologize for Iowa Gun Owners or not.

4  Q.  And you were surprised that Mr. Benton would e-mail you

5  directly, right?

6  A.  I didn't have a lot of talks with Jesse Benton at that time.

7  Q.  By not a lot, you mean none, right?

8  A.  Yeah, I mean, other than the junk mail that the campaign

9  sent out with his name on it.

10  Q.  I mean, you didn't talk with him on the phone, right?

11  Right?

12  A.  No.  Not with Jesse, no.

13  Q.  And you didn't e-mail with him, right?

14  A.  Correct.

15  Q.  And so you were surprised when he cc'd you on the Aaron Dorr

16  memo, right?

17  A.  Yes.

18  Q.  Now, you told us on Friday that the ongoing offer from

19  Dimitri Kesari to join the Ron Paul Campaign was $8,000 a month

20  leading into December 26th.

21          Do you remember that?

22  A.  Yeah.  I believe that came from that e-mail that Jesse

23  responded to me with.

24  Q.  All right.  So that was your understanding, right?

25  A.  Correct.

1  Q.  And it was your understanding that that was the offer when

2  you showed up at the veterans event on December 28th, right?

3  A.  Yes.

4  Q.  Could we show Government's Exhibit 25?  It was previously

5  admitted.  Could you blow that up, please?

6       On December 27th, sir, were you told that Jesse Benton

7  was upset with you?

8  A.  No.

9  Q.  Were you told that he had told Mr. Kesari to F you, this is

10  absurd?

11  A.  No.

12  Q.  Let's show Government's Exhibit 37.

13       Were you told, sir, that on December 27th Jesse Benton

14  said to pull the offer for you?

15  A.  No.

16  Q.  You didn't know that?

17  A.  No.

18  Q.  And you didn't know that heading into December 28th when you

19  showed up at the veterans rally, right?

20  A.  No.

21  Q.  Now, you showed up unannounced at the veterans rally, right?

22  A.  Yes.  Actually I do remember a period of time where Dimitri

23  told me that if I didn't do it within so many hours that the

24  offer would be pulled, which is why when I showed up at the

25  veterans rally, I asked him if he still wanted me and if he

1 would take care of me.

2 Q. And you --

3 A. But I did not know that this was coming directly from Jesse

4 Benton.

5 Q. You didn't know that the head of the campaign, the political

6 director of the campaign had said pull the offer, we're out,

7 this is absurd, right?

8         MR. PILGER: Asked and answered.

9         THE COURT: Overruled.

10         Answer the question.

11 A. Same answer I said before. Yes, I did not know that.

12 BY MS. CAMPBELL:

13 Q. Now, you showed up unannounced at the veterans rally, right?

14 A. Correct.

15 Q. You hadn't been invited to that veterans rally by Jesse

16 Benton, right?

17 A. No.

18 Q. And you're not a veteran?

19 A. No.

20 Q. And it was a veterans event, right?

21 A. Correct.

22 Q. And they actually had wanted you to do this announcement

23 earlier, hadn't they?

24 A. Yes, yes.

25 Q. And they had specifically wanted you to do it before the

1  debate, right?

2  A.  I don't recall that, but that's possible.

3  Q.  And the debate was earlier in December, wasn't it?

4  A.  There was a lot of debates.  There was a debate in Sioux

5  City.  There was one in New Hampshire.  There was the Straw Poll

6  debate, so I'm not sure which debate you're referencing.

7  Q.  So you don't remember an early December debate between the

8  Republican candidates?

9  A.  I just said I recall multiple dates.

10  Q.  Do you remember the one in December?

11  A.  Could you tell me where it was held at?

12  Q.  In Iowa.

13  A.  Okay.  There was more than one in Iowa.  There was one in

14  Sioux City.  There was one before the Straw Poll.  There was one

15  at the Straw Poll.  They also had the family forum with family

16  leaders.  So I'm not sure specifically which debate you're

17  talking about.

18  Q.  Now, sir, you were playing a game with Mr. Kesari, weren't

19  you?

20  A.  Pardon me?

21  Q.  That you -- we already covered that, that you told him you

22  were sitting at Bachmann's office because you were going to talk

23  to her before you made the switch, right?

24  A.  You said that.  I didn't say that.

25  Q.  You said it was possible, right?

1  A.  But that's not saying I was there.

2  Q.  And you weren't there, right?

3  A.  No, I don't -- well, I was at the Bachmann office a lot, but

4  that wasn't Michelle Bachmann's office.  We had a campaign

5  office, one campaign office in West Des Moines, in Urbandale

6  actually, and there wasn't one in Milo like we talked about last

7  week.  And Michelle was on a bus tour then traveling the state

8  of Iowa, so I'm not sure where that came from.

9  Q.  Now, you told us on Friday that --

10  A.  I actually -- I'm sorry, I'm sorry.  Go ahead.  I was just

11  going to finish a point.

12  Q.  You told us on Friday that the national campaign for

13  Ms. Bachmann wanted you to speak on December 28th, right?

14  A.  Yes.

15  Q.  And that you didn't want to speak?

16  A.  Correct.

17  Q.  And that you were frustrated with them?

18  A.  Correct.

19  Q.  And that they were frustrated with you?

20  A.  Correct.

21  Q.  And you had gotten into a horrible verbal argument with

22  them, right?

23  A.  Yes.

24  Q.  Now, as a result of this frustration, did they ever offer

25  you a promotion?

1  A.  No -- not that day, no.

2  Q.  Did they offer you to be chief of staff?

3  A.  No.

4  Q.  Let me show you Government's Exhibit 22, the second page.

5        Now, if you look at the second-to-last paragraph, sir,

6  is Dimitri Kesari telling John Tate and Jesse Benton that

7  Ms. Bachmann had offered you to be her chief of staff, right?

8  A.  Yes, but she did not offer me to be her chief of staff.  She

9  offered for me to be on staff.

10        But this goes right along with the games that you were

11  talking about earlier.  To me it looks like Dimitri is playing

12  games with them, but that's just my opinion.

13  Q.  So you never said to Mr. Kesari, I'm going to be chief of

14  staff?

15  A.  No.  That was never the plan for me to be chief of staff.

16  Q.  So you weren't trying to take the offer they had given you

17  of $8,000 and turn it around and try and get a better offer from

18  Ms. Bachmann?

19  A.  I did talk to the Bachmanns about that, but not being chief

20  of staff.  I talked to the Bachmanns about Guy Short brought up

21  that they could find a spot for me because he knew I was

22  concerned about what was going to happen after the campaign.  So

23  he talked to me about working with either her congressional

24  office or her congressional campaign, but it was never chief of

25  staff.

1  Q.  So it's your testimony that Mr. Kesari made that up?

2  A.  I have no idea where Dimitri Kesari got that.  I can't say

3  if he made it up, if he believed it in his own mind, if he

4  misunderstood me; but for me to say what was in his head, it

5  would be truthful I don't know because I can only tell you I was

6  never told I was going to be chief of staff.

7  Q.  Just like you were never told -- you never told anybody that

8  Newt Gingrich was going to pay $8,500, right?

9  A.  Correct.

10  Q.  Now, you said -- did you tell Mr. Kesari you were trying to

11  be as nice to Ms. Bachmann as possible?

12  A.  I'm sure I said that because I was concerned about -- I

13  mean, I developed a year long relationship with these people,

14  and that's part of the reason why I felt so guilty after I left.

15          MS. CAMPBELL:  I don't believe -- this is already in

16  evidence.  Could we have it displayed?  It's not?  We would

17  offer this, Government's Exhibit 22.

18                          (Government Exhibit 22 was

19                           offered in evidence.)

20          MR. PILGER:  No objection.

21          THE COURT:  Received.

22                          (Government Exhibit 22 was

23                           received in evidence.)

24  BY MS. CAMPBELL:

25  Q.  So this is an e-mail where we're talking about, sir, where

1  Dimitri Kesari is telling John Tate and Jesse Benton at the

2  bottom that you were offered to be chief of staff which I

3  believe we've established you were not offered, and then where

4  you have said now that you did say that you wanted to do it in a

5  way that was least mean to Ms. Bachmann, right?

6  A.  All along I said that I wanted to -- I mean, from late

7  October until I switched, inside I wanted to support Ron Paul.

8  I was never going to vote for Congressman Bachmann, but yet I

9  respected her as a person and I --

10 Q.  So "yes" or "no."  Did you tell Mr. Kesari that you wanted

11 to be as least mean to Ms. Bachmann as possible?

12 A.  I'm sure I said that at some point in time.

13 Q.  But, in fact, you did it in a way that was the most possible

14 mean to Ms. Bachmann, didn't you?

15 A.  Yeah, I'm not denying that.  I said that all along.  That's

16 part of the guilt that I have.

17 Q.  And Ms. Bachmann reacted sort of negatively towards you,

18 didn't she?

19 A.  Yes.

20 Q.  And, in fact, she went on the news and said that from your

21 lips to her ears you had told her that you were offered a lot of

22 money, right?

23 A.  Correct.

24 Q.  But you hadn't said it directly to her ears, had you?

25 A.  I said it to Marcus.

1  Q.  Not to Ms. Bachmann's ears, right?

2  A.  Correct.

3  Q.  And, in fact, the Bachmann campaign when you went on the

4  news with Megyn Kelly was messing with you, weren't they?

5  A.  Yes.

6  Q.  In fact, they had an SUV that was driving back and forth

7  while you were doing the interview, didn't they?

8  A.  As well as the bus.

9  Q.  So they kept pulling up behind you and then leaving so that

10  all during your interview you had Michelle Bachmann in the

11  background, right?

12  A.  Yes.

13  Q.  Because they were trying to mess with you, weren't they?

14  A.  Correct.

15  Q.  Let me show you what I've marked as Defendant Benton's

16  Exhibit 30.  Those aren't into evidence yet.

17            Sir, do you recognize those screen shots?

18  A.  Yes.

19  Q.  Are those screen shots from your interview with Megyn Kelly?

20  A.  Yes, it is.

21  Q.  Were they capturing the Bachmann bus driving around while

22  you were doing your interview?

23  A.  That does not capture the Bachmann bus, but it does capture

24  the Bachmann truck.

25            MR. PILGER:  No objection.

1          MS. CAMPBELL:  We offer B30.

2                              (Defendant's Exhibit B30 was

3                              offered in evidence.)

4          THE COURT:  Received.

5                              (Defendant's Exhibit B30 was

6                              received in evidence.)

7    BY MS. CAMPBELL:

8    Q.  So that is the Bachmann SUV, I believe, that was driving and

9    then turning around and then driving back, right, during your

10   whole interview with Megyn Kelly?

11   A.  No.  It's the Bachmann truck, not an SUV.

12   Q.  It's a truck?

13   A.  Yes.

14   Q.  And a bus was doing it, too, you said?

15   A.  Correct.

16   Q.  Now, they were making a big deal about you getting paid,

17   right?

18   A.  Yes.

19   Q.  But you were getting paid by them, right?

20   A.  Correct.

21   Q.  Now, you said -- you told us on Friday that you were working

22   more than 40 hours a week, 70 to 80 hours a week; is that right?

23   A.  Yes.

24   Q.  Is that the entire time?

25   A.  From the straw poll on, yeah, yep, that was -- it was pretty

1  intense like that.

2  Q.  Every week from the straw poll on?

3  A.  Yes.  I had one week where I took a vacation after the straw

4  poll; but other than that, we were very busy.

5  Q.  So after the straw poll but before the caucus, you took a

6  vacation?

7  A.  Yes.  It would have been sometime in August or September,

8  right after the straw poll.  In fact, it was -- I think it was

9  directly after the straw poll because I was going out of town

10  the day that Governor Perry announced his presidency, I was

11  headed out of town.

12  Q.  Now, sir, at this entire time, I mean, you were violating

13  the Senate rules, right?

14  A.  Oh, that was up for discussion, but there was a possibility

15  I was violating the Senate rules, so that's why it was

16  structured the way we structured it.

17  Q.  And that's why you structured it to get paid through a PAC

18  from Ms. Bachmann, right?

19  A.  I wasn't aware I was getting paid by a PAC.  Actually the

20  ethics rules is very clear that you can't get paid by a PAC, but

21  there is a provision in the ethics rules where it's up for

22  discussion whether you can get paid from a presidential campaign

23  or not.

24  Q.  And, in fact, you were interviewed by Mr. Weinhardt about

25  that, right?

1   A.  Yes.

2   Q.  And you lied to him?

3   A.  Yes.

4   Q.  And you told him you weren't getting paid?

5   A.  Correct.

6   Q.  So instead of continuing to be interviewed by Mr. Weinhardt,

7   you actually resigned from the Senate, right?

8   A.  No.

9   Q.  You didn't step down from the Senate?

10   A.  Yes, but it wasn't because of being interviewed by --

11   actually he had concluded his investigation before I resigned.

12   You said I resigned because I didn't want to meet with

13   Weinhardt.  That's not the truth.  That's what Dimitri wanted me

14   to do because he didn't want the investigation because he didn't

15   want this exposed.  I actually stayed in office until the ruling

16   came down, and Weinhardt's ruling ruled that there was possible

17   violations but whether or not I could get paid was in question.

18   So I resigned after the report was released, not because of the

19   report.

20   Q.  And, in fact, you went on a rant on Facebook after you

21   resigned, didn't you?

22   A.  Yes.

23   Q.  Where you blamed other people for having to resign, right?

24   A.  Yes.  That was something that my clerk drafted and we

25   released.

1  Q.  So, again, Chris Dorr drafted it for you, not you?

2  A.  It depends on which one you're talking about; but there was

3  one where I believe it was -- when I resigned, Chris Dorr

4  drafted my release.  He did all of my writing for me.  That was

5  the point of Chris.

6  Q.  And you approved it?

7  A.  Yes.

8  Q.  And you blamed the Republican establishment for having to

9  resign from the Senate, right?

10  A.  Correct.

11  Q.  And you blamed the Iowa Supreme Court for having to withdraw

12  from the Senate, right?

13  A.  Correct.

14  Q.  And you blamed Stacy Appel specifically for you having to

15  withdraw from the Senate, right?

16  A.  Correct.

17  Q.  And I think you told us on direct that you quit telling lies

18  early on, right?

19  A.  In the investigation, yes.

20  Q.  But by the time you resigned from the Senate, you're still

21  telling lies?

22  A.  Yes.  I said I stopped telling lies after I started meeting

23  with the FBI and I signed a cooperation agreement.

24  Q.  Now, I want to cover quickly Government's Exhibit 68, which

25  is already in evidence.  I believe you were asked questions

1  about your invoice that said July 22, 2011.

2          Do you remember that?

3  A.  Yes.

4  Q.  And the government wanted you to say that it was a lie,

5  right?

6          Do you remember that?

7  A.  I remember --

8          MR. PILGER:  Objection; what the government wanted him

9  to say.

10          THE COURT:  Sustained.

11          Pose a new question.

12  BY MS. CAMPBELL:

13  Q.  The government asked you if it was a lie, right?

14  A.  I believe so when we first started the questions, yes.

15  Q.  Haven't you already testified that that date was a mistake,

16  sir?

17  A.  Yes.

18  Q.  And, in fact, that date was a mistake, right?

19  A.  Yes.

20  Q.  You used an invoice you had already prepared for something

21  else and then left the date in it; is that right?

22  A.  I believe that's what I did, but I know that it was a

23  mistake.

24  Q.  So you weren't trying to imply that you had been working

25  since July of 2011, right?

1  A.  Correct.

2  Q.  It was a mistake in your invoice?

3  A.  Yes.

4  Q.  Because you had used these type of invoices before?

5  A.  This is a similar invoice that I used to bill the Bachmann

6  Campaign.

7  Q.  Now, you told us -- can you take that down?

8          Now, you told us on direct that you were not having

9  any financial hardships in December of 2011, right?

10  A.  Yes.

11  Q.  But I believe you told us that you had outstanding debts,

12  right?

13  A.  Well, yes.  I mean, even to this day, I have outstanding

14  debts, but more so now than then.

15  Q.  Well, you had credit card debt then, right?

16  A.  Actually I didn't have a lot of credit card debt then.  I

17  had expenses that was owed to me from the Bachmann Campaign.

18  Q.  And you were worried about Ms. Bachmann not paying you,

19  right?

20  A.  Correct.

21  Q.  And you were worried that your outstanding invoices to

22  Ms. Bachmann were not going to be paid, right?

23  A.  Right.

24  Q.  And at the time you were living paycheck to paycheck, right?

25  A.  Yes and no.  I actually -- I was able to put some money in

1  savings, so I had some money in savings.  But did I have a

2  year's worth of money in savings?  No.

3  Q.  And you told the grand jury you were living paycheck to

4  paycheck, right?

5  A.  Yes.

6  Q.  And you actually were using the income that Ms. Bachmann was

7  giving you to apply to get your new house, right?

8  A.  Yes.

9  Q.  And you wouldn't have qualified for that loan without that

10  income from Ms. Bachmann, right?

11  A.  I don't know.  I had multiple sources of income that year.

12  Q.  Well, you had -- you told us that you had 25,000 from

13  Congress, right?

14  A.  From the Iowa House.

15  Q.  I'm sorry, from the Iowa Senate?

16  A.  Or from the Iowa Senate, yes.

17  Q.  And that works out to about 2,000 a month or so?

18  A.  Yes.

19  Q.  And you were under water on your mortgage in Indianola,

20  right?

21  A.  No.

22  Q.  That's not true?

23  A.  No, not then.

24  Q.  You bought the house in Indianola in 2001, right?

25  A.  Yes.

1  Q.  On contract, right?

2  A.  Well, by then I had refinanced and had a loan, but I was not

3  under water at that time.

4  Q.  Well, in fact, sir, you don't refinance until 2005.

5          Do you recall that?

6  A.  Yes.

7  Q.  So in 2001 you bought your house for 114-nine, right?

8  A.  In Indianola, yes.

9  Q.  And you refinance in 2005 for a total of 133, approximately,

10  thousand?

11  A.  Yes.

12  Q.  So you now owe more in 2005 than you did when you bought it

13  in 2001, right?

14  A.  Yes.

15  Q.  And then you refinanced it again in 2008, right?

16  A.  Yes.

17  Q.  For $151,387, right?

18  A.  Correct.

19  Q.  So you're going backwards on your payments in Indianola,

20  right?

21  A.  No.  Actually --

22          MR. PILGER:  Objection.  I don't understand what that

23  means.  Going backwards how?

24          MS. CAMPBELL:  I'll rephrase.

25          THE COURT:  Go ahead.

1  BY MS. CAMPBELL:

2  Q.  You actually owe more in 2008 on the property than you owed

3  when you bought it in 2001, right?

4  A.  With a new roof, new siding, new windows, new floors,

5  new Sheetrock, the basement redone, the garage sided and roofed,

6  new landscaping, new carpet, new hardware floors.  I had the

7  wood restored in the upstairs.  I mean, so if you want to count

8  that going backwards, fine, but I think a lot of people in

9  America use home equity loans to improve their homes.

10  Q.  And then in October 2011, you bought another property for

11  $215,800, correct?

12  A.  Correct.

13  Q.  So as of December 2011, you owe approximately $365,000?

14  A.  Correct.

15  Q.  With virtually no equity in either property?

16  A.  Okay.

17  Q.  And presumably -- I mean, you need income to pay those

18  mortgages, right?

19  A.  Well, the one property was rented out immediately.

20  Q.  So you didn't need income to pay mortgages?

21  A.  I needed income to pay my mortgage.

22  Q.  Which was going to start being paid in December of 2011,

23  right?

24  A.  No.  My first payment was in November.

25  Q.  And about the same time Ms. Bachmann had stopped paying you,

1  right?

2  A.  No.  Bachmann had not stopped paying me.

3  Q.  You just told us in December she stopped paying you?

4  A.  That's not what I told you.  That's what you want me to say.

5  What I said was -- you asked me if I was concerned about getting

6  paid, and I said yes.

7  Q.  So she was paying you in December of 2011?

8  A.  I believe the last payment I received was in December, yes;

9  but I would have to go back through my bank records and look.

10  Q.  And, in fact, you knew that her campaign was coming to an

11  end?

12  A.  Yes.

13  Q.  She was going to lose the caucus?

14  A.  Yes.

15  Q.  And you were not going to be on her staff?

16  A.  Correct.

17  Q.  And you were looking for a way to replace that?

18  A.  I stated that earlier.

19  Q.  Now, you told us that you were bleeding politically, right,

20  for joining Mr. Paul's campaign, Dr. Paul?

21  A.  I didn't say that.

22  Q.  You told us that that's a political phrase, that you were

23  politically taking a hit.

24  A.  Actually that's what Jesse Benton said to me.

25  Q.  That's not true, though, sir, right?

1          MR. PILGER:  Argumentative.

2          THE COURT:  Sustained.

3          Pose a new question.

4   BY MS. CAMPBELL:

5   Q.  You were, in fact, leaving a losing campaign and joining a

6   winning campaign, right?

7   A.  No.  I mean, I was under no impression Ron Paul was going to

8   be President; but on ideological issues he was winning, yes.

9   But nobody in this courtroom believed that Ron Paul was going to

10  be President.

11  Q.  Now, you --

12  A.  They're political operatives.

13  Q.  Now, you said that you then -- on the 29th I believe you

14  told us you were given a Tracfone, right?

15  A.  Yes.

16  Q.  Because you weren't supposed to use your regular phone,

17  right?

18  A.  No, that's not what I said.  What I said was my family and I

19  are all trained to not answer calls from numbers we don't know

20  because of media inquiries, and so Dimitri gave me a Tracfone so

21  if he called me from a number I didn't recognize, Dimitri was

22  the only person that had that number.

23  Q.  But you still used your regular phone, right?

24  A.  I don't recall, but I possibly could have.

25  Q.  You took it home that night on the 29th, right?

1  A.  I don't recall, but I possibly could have.

2  Q.  Well, you told us that you didn't remember using it and you

3  thought that Dimitri took it away from you?

4  A.  Yes, that's -- I remember having that discussion, but I

5  think I made it very clear I'm not sure what happened.

6  Q.  Can you pull out Exhibit 182 previously admitted?  And go

7  down to December 28th into the 29th.

8        You made a lot of calls, didn't you, sir?

9  A.  I always make a lot of calls.  There's a lot of calls on my

10  plan every month.

11  Q.  That will work.

12        In fact, you take your phone home and use it at 11:52

13  p.m.; is that right?

14  A.  I can't answer that.

15  Q.  And 12:20 a.m.?

16  A.  There's phone calls being made from my phone.  I don't know

17  if it's me.  I don't know if it's my wife.  I don't know if it's

18  Dimitri.  I don't know if it's somebody from the campaign

19  office.  I don't know if it's my kids.  I'm not denying calls

20  could have been made from my phone.  I don't recall having

21  conversations that night.

22  Q.  But you recall Dimitri supposedly taking your phone and

23  keeping it from you?

24  A.  No, I don't recall that.  If you remember, I said I remember

25  having a discussion with Dimitri about it, and I don't remember

1  if I left my phone or not; but I do remember taking a Tracfone.

2  Q.  Now, you also told us on the evening of the 27th you did not

3  talk to your wife before you went to the Ron Paul event; is that

4  right?

5  A.  No, that's not accurate.  I said I didn't tell her what I

6  was going to do.

7  Q.  So the phone call you had with her 30 minutes before you

8  arrived at the event, that's not you telling her you're going to

9  the event?

10  A.  No, I didn't tell her.  She didn't know until I went on TV.

11  Q.  So you're talking to your wife as you're driving to the

12  fairgrounds, but you don't tell her, I'm driving to the

13  fairgrounds to take the stage?

14  A.  I didn't know I was going to take the stage even when I

15  arrived at the fairgrounds.  I didn't know Dimitri Kesari was

16  going to run out to the parking lot waving his hands and ask me

17  to flash my lights.  I had no idea what was going to happen that

18  night.

19  Q.  Now, you told us Dimitri was going to be calling you on the

20  Tracfone, right?

21  A.  No.  He didn't tell me he was going to call me.  He said for

22  me to take it so if he wanted to get ahold of me he could.

23  Q.  So let's go to the 29th, which is after you have the

24  Tracfone, right?

25  A.  No; on the 28th -- depends on what time on the 29th.  I got

1  my -- I remember specifically using my phone the next day on the

2  29th; but when I left the campaign office, that was the night of

3  the 28th when he gave me the Tracfone.

4  Q.  So you do or don't have your phone on you on the night of

5  the 28th?

6  A.  I don't recall.

7  Q.  And you do or don't have your phone on you on the night of

8  the 29th?

9  A.  I believe I had it back on me by the night of the 29th.

10 Q.  But your testimony is that you didn't have it at some point

11 on the 28th?

12 A.  At some point in time on the 28th, I didn't have it; but I

13 don't remember if it was when I went home, if I didn't take it

14 with me.  I don't remember that.

15 Q.  Now, you told us that you had a meeting on the 29th, right,

16 at the office, the Ron Paul office?

17 A.  Yes.

18 Q.  You told us that there were a lot of people there, right?

19 A.  Yes.

20 Q.  And there were always a lot of people there?

21 A.  Correct.

22 Q.  And, in fact, I think you told us that Congressman Paul came

23 there on the night of the caucuses, right?

24 A.  I'm sorry, are we talking about the 29th or are we talking

25 about the night of the caucuses?

1   Q.  We're talking about the Ron Paul headquarters.

2   A.  Okay.  You said the 29th, so I was having a hard time

3   following you.

4   Q.  Okay.  I'll be more clear.  How many times were you at the

5   Ron Paul headquarters?

6   A.  Multiple times.

7   Q.  Have an estimate?

8   A.  No.

9   Q.  I mean, you went there somewhat regularly, right?

10  A.  After the 28th?

11  Q.  Yes.

12  A.  Yes.

13  Q.  And, in fact, you were there the night of the caucuses,

14  right?

15  A.  Well, I know he had a party and I believe it was at a hotel

16  that night, I just don't remember the hotel, and he had a party

17  that everybody went to.

18  Q.  So let's go back to this meeting on the 29th, December 29th

19  at the Ron Paul headquarters.

20  A.  Okay.

21  Q.  And that's in where; Ankeny?

22  A.  Yes.

23  Q.  And so we can actually tell when you're at the headquarters

24  based on your cell records, right?

25  A.  I don't know how it works.  If that's what you say.

1  Q.  Now, you said that you were talking to Mr. Kesari at that

2  meeting, right?

3  A.  Which day?

4  Q.  December 29th.

5  A.  In the morning, yes.

6  Q.  So you got there in the morning, right?

7  A.  Yes.

8  Q.  And you were always with Mr. Kesari, right?

9  A.  Yes.

10  Q.  If we could back out and blow up a little bit further the

11  morning of the 29th there for the Ankeny call.

12       Now, sir, you actually called Dimitri Kesari at 11:07

13  a.m., I believe that is; is that right?  Is that his number?

14  A.  Can you mark it?  I believe that's his number, but I'm not

15  sure.  He's just programmed in my phone.  That would have

16  probably been after the CNN interview or before it.  I'm not

17  sure.

18  Q.  Okay.  So 11:07, you're not sure when that is, right?

19  A.  11:07 --

20  Q.  If that's before or after the CNN interview?

21  A.  Yes.  Well, I know it was before the Fox News interview and

22  I believe it was right around the time of the CNN interview, but

23  I'm not sure.

24  Q.  Now, when you said that Mr. Kesari was on his headset -- or

25  wasn't on his headset, was on his phone, you said you remember

1  specifically because you wanted that Bluetooth, right?

2  A.  I wanted -- yeah, I wanted to purchase a Bluetooth like

3  that, but you couldn't get it in Iowa.

4  Q.  Because you wouldn't buy it online?

5  A.  I'm not sure.

6  Q.  Now --

7  A.  We're talking -- you know, I wasn't an online shopper in

8  2011, so, I mean, now I would probably be more apt to go and try

9  and find it online.

10  Q.  And when you're meeting with Mr. Kesari, you told us on

11  direct that he told you he was on the phone with Mr. Benton,

12  right?

13  A.  He told me he was on the phone with Mr. Benton.

14  Q.  And were you on the phone at the time he told you he was on

15  the phone with Mr. Benton?

16  A.  No.  This was the morning of the 29th in the office.

17  Q.  Okay.  So we should be able to look at your cell phone

18  records and find a time when Mr. Kesari is on the phone with

19  Mr. Benton and you are not on the phone, right?

20  A.  I have no idea what you're trying to say.  I'm telling you I

21  was in the office on the morning of the 29th having a meeting

22  talking about going on these television shows, and he told me

23  that during that meeting that he was on the phone with

24  Mr. Benton.  I don't know how, my phone --

25  Q.  Did you hear Mr. Benton?

1  A.  -- plays in the back -- I testified I didn't hear his voice.

2  I was just going by what Dimitri said.

3  Q.  So you never talked to Mr. Benton, right?

4  A.  No.

5  Q.  You never heard Mr. Benton?

6  A.  Not that day, no.

7  Q.  In fact, you said this phone was on speakerphone you

8  thought, right?

9  A.  I said at one time it may have been on speakerphone because

10  he was holding it away.  I don't know.  I wasn't listening to

11  his conversation.

12  Q.  But you didn't hear Mr. Benton?

13  A.  Correct.

14  Q.  Now, you never actually talked to Mr. Benton on that day,

15  right?

16  A.  I don't know if I spoke to him on the 29th.  I know at one

17  time they sent me to somewhere in northwest Iowa to a rally and

18  I had dinner with Mr. Paul and Mr. Benton was there, but I don't

19  believe it was the 29th.

20  Q.  So you were in Sioux City with the Paul Campaign, right?

21  A.  I didn't say it was Sioux City.  I'm not sure where it was

22  at.  It was northwest Iowa, but there's more towns than Sioux

23  City in northwest Iowa; but Sioux City is the largest one in

24  northwest Iowa.

25  Q.  But on the 29th you don't recall talking to Mr. Benton

1  yourself?

2  A.  I don't recall if it was the 29th.  I remember having dinner

3  with him at one time with Mr. Paul.

4  Q.  And you just told us you didn't hear him on Dimitri Kesari's

5  phone, right?

6  A.  Same thing I said the other day in the other hearing.

7  Q.  Now on March 18, 2012, you're having a hard time getting

8  ahold of Mr. Kesari, do you remember that?

9  A.  When was that?

10  Q.  March 18, 2012.

11  A.  Okay.  So now we're going -- okay, I'm sorry, you're

12  bouncing all over the place.

13  Q.  March 18th --

14  A.  I'm a little ADD, so bear with me.

15          March 18th --

16  Q.  2012.

17  A.  -- 2012, okay.

18  Q.  You're trying to get paid by Mr. Kesari?

19  A.  Yes.

20  Q.  And he's not responding?

21  A.  I believe that was the dates that you went over on the

22  invoices, but I'm not sure.

23  Q.  And you said don't go dark on me?

24  A.  I do remember saying that, yes.

25  Q.  And you weren't getting your money, right?

1  A.  Correct.

2  Q.  And you wanted your money?

3  A.  Yes.

4  Q.  But you still don't call Mr. Benton, right?

5  A.  Correct.

6  Q.  And you don't e-mail Mr. Benton?

7  A.  Correct.

8  Q.  Now, I think you told us that -- we covered the plea

9  agreement with the government.

10         Do you recall that?

11  A.  Yes.

12  Q.  And the cooperation agreement with the government, right?

13  A.  Yes.

14  Q.  And that your maximum sentence is, I believe they said was

15  20 years on one count, right?

16  A.  Yes.

17  Q.  And that's 20 years of federal prison, right?

18  A.  Correct.

19  Q.  And the other one was for five years, right?

20  A.  Correct.

21  Q.  That's five years in federal prison, right?

22  A.  Correct.

23  Q.  And you went through the fact that you had been convicted of

24  disorderly conduct, right?

25  A.  Yes.

1 Q. And getting convicted actually made it so that the

2 government could withdraw from the plea agreement, right?

3 A. Correct.

4 Q. And made it so they could withdraw from the cooperation

5 agreement, right?

6 A. Correct.

7 Q. Because that was a direct violation of both of those

8 agreements, right?

9 A. Correct.

10 Q. And it was within their discretion whether or not to

11 withdraw from those agreements?

12 A. Yes.

13 Q. And they didn't?

14 A. Correct.

15 Q. Now, at no time when you were sending the invoices to ICT

16 did you talk to Jesse Benton?

17 A. No.

18          MS. CAMPBELL:  I don't have anything further, Your

19 Honor.

20          THE COURT:  Mr. Mills.

21                    CROSS-EXAMINATION

22 BY MR. MILLS:

23 Q. Good morning, Mr. Sorenson.  I'm Laurin Mills, and I

24 represent John Tate.

25 A. Good morning.

1  Q.  I would like to take you back to December 28, 2011.  That

2  was about four-and-a-half years ago; is that right?

3  A.  Yes.

4  Q.  And is your memory about what happened that night getting

5  better or worse as time goes by?

6  A.  There's things that -- I mean, very rarely do I talk about

7  something four years ago that happened, but there's times where

8  I remember things like oh, yeah, because something sparked a

9  memory.  But did I make mental notes on that date and say, yeah,

10  so I can remember this four years later, no.

11  Q.  In fact, you have discussed the events of that day with

12  numerous investigators, haven't you?

13  A.  Yes.

14  Q.  And one of those investigators was Mark Weinhardt?

15  A.  Yes.

16  Q.  And he was hired to investigate whether you violated State

17  Senate ethic rules, is that correct?

18  A.  Yes.

19  Q.  And you actually sat for a deposition with Mr. Weinhardt?

20  A.  Yes.

21  Q.  You raised your right hand and took an oath?

22  A.  Correct.

23  Q.  Just like you did Friday in this court?

24  A.  Yes.

25  Q.  And you lied to Mr. Weinhardt; is that correct?

1  A.  Yes.

2  Q.  You violated that oath?

3  A.  Pardon?

4  Q.  You violated that oath by lying to him?

5  A.  Correct.

6  Q.  And you lied to him specifically about whether you had been

7  paid by the Ron Paul Campaign, correct?

8  A.  Yes.

9  Q.  But then you left the deposition early; isn't that right?

10  A.  Yes.  I believe that I had a prior engagement, and my lawyer

11  then, I told him, you know, that I needed to go.  I remember

12  that day I wanted to go in, I wanted to plead the Fifth that day

13  from the beginning, but my lawyer encouraged me not to.

14  Q.  And then you actually came back for a second deposition; is

15  that correct?

16  A.  Correct.

17  Q.  At that second deposition you actually asserted your Fifth

18  Amendment rights, correct?

19  A.  Yes, against the advice of my lawyer.

20  Q.  Now, you pleaded guilty to a criminal information in this

21  case; is that correct?

22  A.  Criminal information in this case?

23  Q.  Not in this case.  You pleaded guilty to a criminal

24  information?

25  A.  I pled guilty to causing somebody to file a false report.

1  Q.  You also pled guilty to obstruction of justice?

2  A.  Correct, I'm sorry.

3  Q.  And the justice you obstructed was lying to Mr. Weinhardt;

4  isn't that correct?

5  A.  That was part of it and then I also lied to the FBI.

6  Q.  Yeah.  But isn't that specifically mentioned in the criminal

7  information to which you pleaded guilty?

8  A.  I believe so, yes.

9  Q.  And you pled guilty in August of 2014; is that correct?

10  A.  Yes.

11  Q.  It's 2016 now, isn't it?

12  A.  Yes.

13  Q.  And you haven't even been sentenced yet?

14  A.  Correct.

15  Q.  And you've remained free the entire time?

16  A.  Yes.

17  Q.  Even though you've also been convicted of a misdemeanor

18  while you're waiting to be sentenced for two federal felonies?

19  A.  Correct.

20  Q.  And you're not going to be sentenced until this trial is

21  over; is that correct?

22  A.  I have no idea when I'm going to be sentenced.

23  Q.  Now, federal prosecutors also investigated your wife, didn't

24  they?

25  A.  I honestly don't know if they were investigating her or not.

1   Q.  They questioned her, didn't they?

2   A.  They questioned a lot of people.

3   Q.  Okay.  Didn't they threaten to charge her with obstruction,

4   too?

5   A.  I don't recall that.

6   Q.  And isn't one of the reasons that you pleaded guilty is so

7   that your wife would not be charged?

8   A.  That was something I asked my lawyer if we could include in

9   the plea deal because I was concerned about my wife being drug

10  into this.

11  Q.  Now, you've talked to -- in addition to Mr. Weinhardt,

12  you've talked to federal law enforcement investigators about

13  this case, correct?

14  A.  Yes.

15  Q.  And you lied to them at first, correct?

16  A.  When they came to my house and the phone call afterwards,

17  yes.

18  Q.  You lied directly to Agent LoStracco's face, correct?

19  A.  Yes.

20  Q.  Okay.  And you lied to them repeatedly?

21  A.  Well, I know on two occasions I did.

22  Q.  Yeah.  But then you changed your story after you pleaded

23  guilty?

24  A.  I changed my story and I came clean after I hired Monty

25  Brown.  My first lawyer, Ted Sporer, was encouraging me to lie.

1  Q.  Okay.  You have met with federal prosecutors many times to

2  discuss your story, haven't you?

3  A.  Yes.

4  Q.  In fact, you met with them over a dozen times; is that

5  right?

6  A.  That's safe to say.

7  Q.  And, in fact, you met with them in the days leading up to

8  this trial, correct?

9  A.  Yes.

10 Q.  And you don't discuss the same tactics, the same thing at

11 every meeting, do you?

12 A.  No.  I mean, there's always questions that maybe I didn't

13 get before, but typically it's always this case.

14 Q.  And at some of those meetings, the government does things to

15 try to refresh your recollection; is that right?

16 A.  They just asked me to tell the truth.

17 Q.  But have they ever given you anything, have they ever shown

18 you anything to refresh your recollection about this?

19 A.  Yes.

20 Q.  Isn't it true that one of the things they recently showed

21 you was the C-SPAN videotape of the night that you endorsed Dr.

22 Paul?

23 A.  Yes.

24 Q.  In fact, they showed it to you after FBI agents had gone

25 through it frame by frame; isn't that right?

1  A.  I'm not sure.  I don't know what the FBI agents did and they

2  don't tell me what they're doing.

3  Q.  Well, didn't they show you still frame photos of that event?

4  A.  Yes.

5  Q.  Okay.  And didn't they point out, isn't that John Tate?

6  A.  No, they did not do that.  They asked me who was in the

7  pictures and then I identified them.

8  Q.  So they handed you still photos and they asked you who was

9  in the picture, correct?

10  A.  No.  It was actually video.

11  Q.  It was actually video?

12  A.  Yes.

13  Q.  But isn't it true that until they showed you that video, you

14  couldn't remember whether John Tate was even there?

15  A.  I was conflicted on if John Tate was there or not.

16  Q.  Yeah.  And the second you saw it on the videotape, you

17  slapped your forehead and said, yes, now I remember he was

18  there; is that correct?

19  A.  I did not slap my forehead, but I understand what you're

20  trying to say, and, yes, I did remember him being there.  It

21  refreshed my memory.

22  Q.  Yes.  And not only did it refresh your memory about him being

23  there, it refreshed your memory about shaking hands with him?

24  A.  Yes.

25  Q.  And even speaking with him; is that correct?

1  A.  I always remembered speaking with him.  I just couldn't

2  remember if it was that event or if it was back at the

3  headquarters.  I remembered having a conversation with him.  I

4  remember shaking his hand that night.  I just can't remember

5  where it was at.

6  Q.  So for the first time in four-and-a-half years you could

7  accurately recall the events?

8  A.  Yeah, but I had been -- it had been on and off again if I

9  had a conversation with him at that event because it wasn't --

10  my conversation with John Tate wasn't as meaningful as it was

11  with Jesse Benton or Dimitri.

12  Q.  Let's go back to the morning of December the 28th.  I

13  believe you testified you had some dental work done, right?

14  A.  Yes.

15  Q.  And it was a prep for either a root canal or a crown; is

16  that right?

17  A.  I believe that's what was being done, correct.

18  Q.  That's not pleasant, is it?

19  A.  No.

20  Q.  Okay.  And were you on any pain medication as a result?

21  A.  No.

22  Q.  And after you had the dental work done, you went to a

23  Bachmann rally at the Pizza Ranch in Indianola; is that correct?

24  A.  Correct.

25  Q.  Okay.  And things didn't go well at the Pizza Ranch; is that

1  right?

2  A.  Right.

3  Q.  And then after that you picked up a man by the name of Guy

4  Short at the airport, correct?

5  A.  Yes.

6  Q.  Now, Guy Short owns a consulting company called C & M

7  Strategies; is that correct?

8  A.  Yes.

9  Q.  Then after you dropped Mr. Short off I believe you testified

10  you spent the afternoon just driving around the Des Moines area,

11  correct?

12  A.  I don't remember what I did.  I remember spending time in

13  Des Moines.  I don't remember being with anyone.  I may have

14  been on my phone.  It was just a haze.  It was a very emotional

15  time because I knew what I was going to do.

16  Q.  That's what I want to ask you.  I believe on Friday you said

17  you turned your phone off?

18  A.  I did for a period of time.

19  Q.  But you remember being in a haze as you were driving around?

20  A.  Yes.

21  Q.  So your memory about what you were doing while you were

22  driving around is still hazy four-and-a-half years later?

23  A.  Correct.

24  Q.  And you also said you were not all there as you were driving

25  around; is that correct?

1   A.   I was just emotionally distraught.

2   Q.   Okay.  And you can't even remember whether Mr. Kesari took

3   your phone that night?

4   A.   I remember him wanting to take my phone.  I remember

5   resisting.  I don't remember -- and normally if Dimitri wants

6   something, he gets it.  He's just very persistent.

7   Q.   But the --

8   A.   And so I remember getting a Tracfone, but I don't remember

9   at this time if I left the phone, if I took it with me.

10  Q.   Your memory has never been refreshed on that issue?

11  A.   No.

12  Q.   And you also stayed up all night that night, didn't you?

13  A.   Which night?

14  Q.   The right of the 28th.

15  A.   Yes.

16  Q.   And so you started out -- it was a tough day.  You started

17  out with root canal preparation and finished it by staying up

18  all night; is that correct?

19  A.   Yeah.  I tried sleeping.  I mean, I probably got an hour or

20  two sleep, but it was a tough night.

21  Q.   But somehow four-and-a-half years later you're able to

22  accurately recall events even though you admit that you were in

23  a fog for a portion of the day; is that correct?

24  A.   Yes.  I remember key events that had meaning.

25  Q.   One of the things that you did for the Ron Paul Campaign was

1  to travel to South Carolina; is that correct?

2  A.  Yes.

3  Q.  And in 2012, South Carolina was the third primary of the

4  primary cycle?

5  A.  It was the second primary.

6  Q.  It was the second primary?

7  A.  I'm sorry, we're a caucus state.

8  Q.  That's fair, that's fair.  So there's the Iowa caucus?

9  A.  Yes, and then the New Hampshire Primary, and I believe --

10  now I'm questioning if South Carolina is a caucus state or a

11  primary state, but it was the third event.

12  Q.  It was the third event?

13  A.  Yes.

14  Q.  Isn't it true that the politicians that don't do well in at

15  least one of those three events don't last very long?

16  A.  Yes, I mean, I think it's fair to say that about starting

17  with the straw poll until probably the third event.

18  Q.  So you would agree that the South Carolina Primary was

19  important to the 2012 Ron Paul Presidential Campaign?

20  A.  I think every primary is important.

21  Q.  In fact, it was so important that they flew you to South

22  Carolina to help, didn't they?

23  A.  They flew me to South Carolina to meet with some other

24  legislators that were having cold feet about endorsing --

25  worrying about the political example they would send, I believe

1    Lee Bright and I believe Jeff Davis and there was a third one,

2    and they wanted me to talk with them is what Dimitri asked me to

3    do.

4    Q.  So they flew you from Des Moines to Greenville, South

5    Carolina, on January the 18th of 2012, correct?

6    A.  That sounds about right.

7    Q.  And now January 18, 2012 is before you sent any invoices to

8    ICT for your travel or your services to the Ron Paul Campaign;

9    isn't that correct?

10   A.  Which date?

11   Q.  January the 18, 2012.

12   A.  I believe when we looked at the invoice and reviewed the

13   first invoice was the 22nd, but I'm just speaking from memory,

14   so --

15   Q.  Okay.  Now I'm going to show you what has been marked as

16   Tate Exhibit No. 12.

17          Do you see that?

18   A.  Yes.

19   Q.  And it's dated January the 17th, 2012; is that correct?

20   A.  Correct.

21   Q.  And does Tate Exhibit 12 fairly and accurately summarize

22   your flight plans to and from Iowa?

23   A.  As best I can remember it.

24          MR. MILLS:  Move to admit Tate Exhibit 12, Your Honor.

25

1                          (Defendant's Exhibit T12 was

2                          received in evidence.)

3          MR. PILGER:  No objection.

4          THE COURT:  Received.

5                          (Defendant's Exhibit T12 was

6                          received in evidence.)

7    BY MR. MILLS:

8    Q.  So you admit that you traveled to South Carolina on January

9    the 18th; is that correct?

10   A.  Yes.

11   Q.  And you did not return until January the 22nd?

12   A.  Correct.

13   Q.  So you spent four full days in South Carolina?

14   A.  Yes.

15   Q.  And I believe you testified you met with some people to try

16   to get their endorsements?

17   A.  Yes.

18   Q.  Okay.  And is it fair to say you were in South Carolina to

19   drum up support for Ron Paul, right?

20   A.  That would be safe to say.

21   Q.  It wouldn't be safe to say?

22   A.  No.  I said it would be safe to say.

23   Q.  That would be.  Now, isn't it true that you were once

24   popular with evangelical voters in Iowa?

25   A.  Yes.

1  Q.  Okay.  And South Carolina also has many evangelical voters,

2  doesn't it?

3  A.  Correct.

4  Q.  And so you went to South Carolina to encourage evangelical

5  voters to vote for Dr. Paul; isn't that right?

6  A.  When I was in South Carolina, the only two things that I

7  remember doing is meeting with a group of legislators and

8  attending a pro-life rally.

9  Q.  That's what I was going to get to.  You attended a pro-life

10 rally?

11 A.  Correct.

12 Q.  Filled with evangelical voters, right?

13 A.  Correct.

14 Q.  To encourage them to vote for Ron Paul?

15 A.  I didn't really encourage anybody, but I was there, yes.

16 Q.  But you did that as part of your work for the Paul Campaign?

17 A.  Yes.

18 Q.  You were getting paid for that?

19 A.  That's what I was doing.

20 Q.  And that was right before the South Carolina Primary?

21 A.  Correct.

22 Q.  Now, I believe you already testified you made television

23 appearances on behalf of the Paul Campaign?

24 A.  Two, yes.

25 Q.  One with Megyn Kelly on Fox News?

1   A.  Yes.

2   Q.  Okay.  She's the anchor for Fox News?  It's a station that

3   targets conservative voters; yes?

4   A.  Yes, yes.

5   Q.  And it's broadcast all over the country?

6   A.  Correct.

7   Q.  Same thing, you got interviewed by CNN?

8   A.  Correct.

9   Q.  CNN, national station, broadcasts all over the country,

10  correct?

11  A.  Yes.

12  Q.  Now, you testified on Friday that you also made one robo

13  call --

14  A.  Yes.

15  Q.  -- for the campaign?  Are you sure you just made one?

16  A.  No, I'm not sure.  It may have been one or two, but I

17  remember specifically doing a robo call for Rick Santorum -- or

18  attacking Rick Santorum.

19  Q.  Let me show you what we've marked as Tate Exhibit 38.

20          Now, the first page of Tate 38 is entitled "Sorenson

21  Marriage Script," correct?

22  A.  Yes.

23  Q.  And the first sentence says, "Hello, this is State Senator

24  Kent Sorenson," right?

25  A.  Yes.

1  Q.  "Thanks for taking my call."

2         Does this refresh your recollection that you did a

3  call in addition to the Santorum call?

4  A.  I remember going over these.  I'm not sure which ones I

5  actually ordered or not.

6  Q.  But you do remember the script?

7  A.  Yes.

8  Q.  And you worked at producing the script?

9  A.  Well, I -- producing, can you define what you're --

10 Q.  Help put it together.

11 A.  I did not write it, no.

12 Q.  But then you recorded it?

13 A.  Correct, correct.

14 Q.  And same thing, if you turn to the next page, that's the

15 Santorum RTW robo, correct?

16 A.  Correct.

17 Q.  Is that the one you remember?

18 A.  That's the one I remember, yes.

19 Q.  Okay.  If you turn to the third page, there's something

20 called the Kent Sorenson endorsement script; isn't that right?

21         MR. PILGER:  Your Honor, if he wants to refresh his

22 recollection, that's fine; but let's just offer it.  We have no

23 objection.  This just is not the right way to do it.

24         MR. MILLS:  I'm going to offer it at the end, but I

25 can cross-examine him on it first.

1          THE COURT:  Before you read from it, why don't you

2     offer it into evidence.

3          MR. MILLS:  I offer it.

4                         (Defendant's Exhibit T38 was

5                         offered in evidence.)

6          MR. PILGER:  No objection.

7          THE COURT:  Received.

8                         (Defendant's Exhibit T38 was

9                         received in evidence.)

10    BY MR. MILLS:

11    Q.   Third page is the Kent Sorenson endorsement?

12    A.   Yes.

13    Q.   Do you remember this?

14    A.   Yes.  I'm not sure which ones I recorded, but I do remember

15    looking at all of the scripts.

16    Q.   So right now you're sure you recorded one, but now you're

17    not sure whether you did one or three?

18    A.   I still remember recording the Santorum script because I got

19    a lot of grief about that from people.

20    Q.   Okay.

21    A.   These other ones, I remember looking at it.  I could have

22    done them, I may not have done them.

23    Q.   And if you turn to the page that has the number RP0203 in

24    the bottom right-hand corner --

25    A.   Yes.

1  Q.  -- that's not a robo call, is it?

2  A.  No.

3  Q.  That's what is known in the game as an e-mail blast, isn't

4  it?

5  A.  Yes.

6  Q.  Okay.  And so you forgot to tell people that you also sent

7  e-mail blasts for the Ron Paul Campaign, right?

8  A.  Correct.  I forgot about the e-mail blasts.

9  Q.  Can you tell the jury what an e-mail blast is?

10 A.  An e-mail blast is just a letter that's written with two

11 outcomes is hopeful.  One is that somebody will read it and,

12 two, somebody will donate to the campaign.

13 Q.  And the e-mail blast in Tate Exhibit 38 starts out "Dear

14 Christian Friend," correct?

15 A.  Correct.

16 Q.  So you were targeting evangelicals --

17 A.  Right.

18 Q.  -- with this e-mail blast?

19 A.  Correct.

20 Q.  And you did additional e-mail blasts, didn't you?

21 A.  Possibly.

22 Q.  I'm going to show you what has been marked as Tate Exhibit

23 39.

24        Have you ever seen this e-mail blast, "Ron Paul, the

25 Conservatives' Choice"?

1   A.  This one doesn't -- I don't recall this one, but that

2   doesn't mean it's --

3   Q.  Okay.

4   A.  There's been a lot of e-mails that's been sent.

5   Q.  You did a lot of e-mails for the Ron Paul Campaign?

6   A.  I did a lot of e-mails, period, for a lot of groups.

7   Q.  Okay, but that's not my question.  You did a lot of e-mails

8   for the Ron Paul Campaign, correct?

9   A.  When you say I did them, I didn't write them, I didn't send

10  them out.  Did I approve them, yeah.

11  Q.  And you lent your name to them?

12  A.  Correct.

13          MR. MILLS:  Move to admit Tate Exhibit 39.

14                      (Defendant's Exhibit T39 was

15                      offered in evidence.)

16          MR. PILGER:  No objection.

17          THE COURT:  Received.

18                      (Defendant's Exhibit T39 was

19                      received in evidence.)

20  BY MR. MILLS:

21  Q.  Now, I believe you testified earlier that you were actually

22  paid for the services that you supplied to the Bachmann

23  Campaign; is that right?

24  A.  Correct.

25  Q.  And you were also paid for travel and other expenses; is

1  that right?

2  A.  Correct.

3  Q.  But you were not directly employed by her campaign, were

4  you?

5  A.  No.

6  Q.  And, in fact, you never sent a single invoice to her

7  campaign, did you?

8  A.  Correct.

9  Q.  At the time you were the 100 percent owner of an S Corp.

10 called Grassroots Strategies, right?

11 A.  Correct.

12 Q.  And there's nothing unusual about a political consultant

13 doing business through an S Corp., is there?

14 A.  No.

15 Q.  And lots of political consultants do that; is that correct?

16 A.  Yes.

17 Q.  And I believe you testified earlier that you know Guy Short?

18 A.  Yes.

19 Q.  And he's a political consultant?

20 A.  Yes.

21 Q.  He's a fundraising consultant, isn't he?

22 A.  Well, that's his primary income is fundraising, but he also

23 was -- I mean, he was chief of staff, and he's done a lot of

24 political positions; but his primary position now or at that

25 time period was fundraising.

1  Q.  And Guy Short did business with the Bachmann Campaign; is

2  that correct?

3  A.  Yes.

4  Q.  But he didn't do it directly either, did he?

5  A.  I'm not sure.

6  Q.  He did business through his company C & M Strategies, right?

7  A.  Yes.  Yeah, I'm sorry, but I thought you meant he wasn't

8  directly getting paid from the Bachmann Campaign.

9  Q.  No.  I meant -- I'm not trying to confuse you.

10  A.  Okay.

11  Q.  I actually want to go through it in excruciating detail.

12  A.  That's fine.

13  Q.  Okay.  Now the name of Mr. Short's company is called C & M

14  Strategies, correct?

15  A.  Correct.

16  Q.  Those aren't his initials, are they?

17  A.  I'm not sure if it's Guy's initials, if it's his family

18  from -- I don't know what it stands for.

19  Q.  His name is Guy Short.  That's G.S., correct?

20  A.  Yes, yes, but I'm not sure if it's his kids.  I don't know

21  how he came up with the name.

22  Q.  So if you look at C & M Strategies, you wouldn't actually

23  associate that with Guy Short, would you?

24  A.  Not if you didn't know him, correct.

25  Q.  And, in fact, if you saw the word "strategies," you wouldn't

1  necessarily associate it with consulting?

2  A.  Possibly.

3  Q.  So the company doesn't use his name, does it?

4  A.  I'm not sure.

5  Q.  Doesn't use his name; it says C & M Strategies?

6  A.  Oh, the company?

7  Q.  Yes.

8  A.  Yes, when you say the company doesn't use his name, I'm

9  thinking that does he send out a letterhead with his name on it,

10 so I'm sorry.

11 Q.  That's fair.

12 A.  His name is not in the company, correct.

13 Q.  And you can't tell how many people work for C & M Strategies

14 just by its name, can you?

15 A.  No.

16 Q.  And you can't tell whether C & M Strategies hires

17 subcontractors or sub vendors, can you?

18 A.  No.

19 Q.  Okay.  Now, in 2011 you actually worked as a subcontractor

20 to C & M Strategies; is that correct?

21 A.  Correct.

22 Q.  Okay.  Now, you know personally performed services for the

23 Bachmann Campaign, right?

24 A.  Yes.

25 Q.  And, in fact, you were the Iowa Chairman for the Bachmann

1  Campaign?

2  A.  Correct.

3  Q.  Okay.  But instead of sending an invoice in your name to the

4  Bachmann Campaign, Grassroots Strategies sent an invoice to

5  C & M Strategies; is that how it worked?

6  A.  Correct.

7  Q.  Okay.  And I'm going to show you what we have marked as Tate

8  Exhibit No. 3.

9           Do you see that?

10 A.  Yes.

11          MR. MILLS:  I move to admit Tate Exhibit No. 3.

12                        (Defendant's Exhibit T3 was

13                         offered in evidence.)

14          MR. PILGER:  No objection.

15          THE COURT:  Received.

16                        (Defendant's Exhibit T3 was

17                         received in evidence.)

18 BY MR. MILLS:

19 Q.  Now, Tate Exhibit 3 is an invoice that you sent to C & M

20 Strategies; is that right?

21 A.  Yes.

22 Q.  And the project title is Iowa Consulting?

23 A.  Yes.

24 Q.  And the project description is Provided Iowa Services?

25 A.  Correct.

1  Q.  Were you trying to defraud anybody by putting that

2  description on your invoice?

3  A.  No.

4  Q.  And isn't it true you -- so you billed C & M Consulting

5  $7,500 plus expenses; is that correct?

6  A.  Yes, yes.

7  Q.  Now, when -- isn't it true that when you sent your invoice

8  to Guy Short, he bundled up your charges with his charges and

9  sent a bill to the Bachmann Campaign?

10  A.  I'm not sure how that worked, but that's what I assumed was

11  going on.

12  Q.  And then when the Bachmann Campaign paid C & M Strategies,

13  Guy Short paid you?

14  A.  Correct.

15  Q.  And you thought that the arrangement was legal, didn't you?

16  A.  I know that I was trying to skirt the ethics rules because I

17  didn't want a problem with it, and I knew that it didn't -- one

18  thing that was very clear when I was working with the Bachmann

19  Campaign or with the Paul Campaign when I was getting paid was

20  that they did not want it to be known that their Iowa chair was

21  being paid, at the Bachmann Campaign.

22  Q.  The Bachmann Campaign, they wanted to hide this, right?

23  A.  Yes.

24          MR. PILGER:  I'm sorry, I can't hear you, Mr. Mills.

25          THE COURT:  Speak up.

1   BY MR. MILLS:

2   Q.  True or false, you thought your arrangement with C & M

3   Strategies was legal?

4   A.  Correct.

5   Q.  Now, you know who Andy Parrish is, don't you?

6   A.  Yes.

7   Q.  He was Michelle Bachmann's first campaign manager, right?

8   A.  Correct -- well, he was her chief of staff, then became her

9   campaign manager.

10  Q.  Yes, what I was getting at, he was also her chief of staff?

11  A.  Correct.

12  Q.  Okay.  And he knew about your arrangement with C & M

13  Strategies; isn't that right?

14  A.  Yes.

15  Q.  Okay.  And you also know who David Polyansky is?

16  A.  Yes.

17  Q.  And he was a consultant for Michelle Bachmann's campaign?

18  A.  Correct.

19  Q.  He was also a consultant for Senator Ernst?

20  A.  Yes.

21  Q.  And he's a senior consultant for Ted Cruz right now, isn't

22  he?

23  A.  I was not aware of that.

24          MR. PILGER:  Objection.

25          THE COURT:  Sustained.

1    BY MR. MILLS:

2    Q.   Now, Mr. Polyansky also knew about your payment arrangement

3    with C & M Strategies, correct?

4    A.   Yes.

5    Q.   Now, you are aware that Mr. Parrish ran your payment

6    arrangement with C & M Strategies by the Bachmann Campaign's

7    attorneys?

8              MR. PILGER:  Objection; hearsay.

9              THE COURT:  Sustained.

10             MR. MILLS:  I don't know if it's hearsay or not, but

11   this was --

12             THE COURT:  I sustained the objection.  Maybe I'm

13   wrong.

14             MR. MILLS:  Sorry.

15             THE COURT:  Pose a new question.

16             MR. MILLS:  Thank you, Your Honor.

17   BY MR. MILLS:

18   Q.   Isn't it true that David Polyansky was concerned about the

19   legality of your arrangement with C & M Strategies?

20             MR. PILGER:  Objection; clearly hearsay.

21             THE COURT:  Sustained.

22   BY MR. MILLS:

23   Q.   Did you ever come to have an understanding that your

24   arrangement with the Bachmann Campaign was legal?

25   A.   If it was legal?

1    Q.  Yes.

2    A.  I don't recall ever having a conversation with them in

3    regards to that.

4    Q.  Okay.  Did you ever have a conversation --

5            MR. PILGER:  Objection to this line unless a

6    foundation is laid connecting it to --

7            THE COURT:  Sustained.  That's the point of my ruling

8    on the hearsay question.  I just think we're going someplace

9    that we're not going to go.

10   BY MR. MILLS:

11   Q.  Okay.  Let me ask it, did you ever tell Dimitri Kesari about

12   your arrangement with the Bachmann Campaign?

13   A.  Yes, he knew the arrangement that I had with the Bachmann

14   Campaign.

15   Q.  And you told him it was legal, didn't you?

16   A.  No.  I'm not a lawyer.

17   Q.  I'm going to put a chart that we prepared on the screen just

18   so we understand how your arrangement with the Bachmann Campaign

19   worked.  If you would take a minute to review it and then let me

20   know whether the chart fairly and accurately represents your

21   relationship with the Bachmann Campaign.

22   A.  Okay.

23   Q.  Does it?

24   A.  I'm not sure on the amounts of Guy Short.  This is the first

25   time I've seen the amounts that he was paid, but that -- I

1  believe that looks like an accurate assessment.

2          MR. MILLS:  Your Honor, I move to admit and publish.

3          MR. PILGER:  So we'll object as to the amounts which

4  he has not put in evidence.

5          THE COURT:  Sustained.

6  BY MR. MILLS:

7  Q.  Let me do this.  Let's take a look at the next page.  This

8  is the one that summarizes your relationship with the Ron Paul

9  Campaign.

10          Do you see that?

11  A.  Yes.

12  Q.  Does that fairly and accurately summarize your relationship

13  with the Ron Paul Campaign?

14  A.  Under the same answer, I wasn't sure what ICT was receiving

15  from Ron Paul.

16  Q.  Okay.  But it's true that the way it worked was that you had

17  a company called Grassroots Strategies, correct?

18  A.  Yes.

19  Q.  And you sent a bill to ICT, correct?

20  A.  Correct.

21  Q.  And it was your understanding that ICT was going to pass

22  your bill along to the Ron Paul Campaign, correct?

23  A.  Correct.

24  Q.  And then when the Ron Paul Campaign paid that bill, the

25  money would go to ICT, correct?

1  A.  Yes.

2  Q.  And, of course, then that money would come back to you; is

3  that right?

4  A.  Correct.

5  Q.  And isn't that exactly what you would do with the Bachmann

6  Campaign?

7  A.  Yes, except I was working more closely with Guy Short.

8  Q.  Now, do you have any understanding of how the Bachmann

9  Campaign reported your services to the Federal Election

10  Commission?

11  A.  No.

12  Q.  Did that ever come up?

13  A.  There was a point where I had a conversation with Michelle

14  and -- early on in the campaign, and they were very clear they

15  did not want it to be public that the Iowa chair was being

16  compensated.

17  Q.  Okay.  And so -- but you set this up because of the Iowa

18  Senate ethics rules; is that correct?

19  A.  That was part of it, yes.

20  Q.  Yeah.  You thought that you needed to do this because you

21  couldn't be paid directly under the ethics rules?

22  A.  I think it was in question and it was a fight I just didn't

23  want to have.

24  Q.  We're going to show Tate Exhibit No. 4.

25           And do you see Tate Exhibit No. 4 in front of you?

1    A.  Yes.

2    Q.  And isn't in the middle part of this e-mail stream on Tate

3    Exhibit No. 4, there's a note to you -- from you to David

4    Polyansky saying, I'm unable to bill the campaign due to State

5    Senate rules, which is why I have been billing Guy's S Corp.

6    with my S Corp.

7              Do you see that?

8    A.  Yes.

9              MR. MILLS:  Move to admit, Your Honor.

10                              (Defendant's Exhibit T4 was

11                              offered in evidence.)

12             MR. PILGER:  One moment, Your Honor.

13             If he redacts it down and leaves off the top which

14   isn't showing right now, we have no objection.

15             THE COURT:  I agree.

16             MR. MILLS:  Yeah, I agree with that, too, Your Honor.

17   We'll connect this up with a witness tomorrow.

18             THE COURT:  T4 is received as redacted.

19             MR. MILLS:  Thank you, Your Honor.

20                              (Defendant's Exhibit T4 was

21                              received in evidence.)

22   BY MR. MILLS:

23   Q.  I'm going to show you what's previously in evidence as

24   Government's Exhibit 70.

25             This is a -- Government Exhibit No. 70 is an invoice

1  that you sent directly to Dimitri Kesari, correct?

2  A.  Yes.  I did send that to Dimitri.  I just don't remember on

3  this particular one if I carboned Sonny at that time; but it was

4  sent to Dimitri.

5  Q.  You sent this directly to Dimitri Kesari, not to ICT,

6  correct?

7  A.  Correct, correct.

8  Q.  ICT wasn't even in the picture yet, was it?

9  A.  No.

10 Q.  You thought with your original invoice you were going to

11 bill the campaign directly; is that your testimony?

12 A.  No.  I mean -- I'm not following you.  I knew that I was

13 going to be paid through a third party.

14 Q.  You just didn't know which one?

15 A.  Correct.

16 Q.  Because you knew you needed to do that to comply with the

17 Iowa Senate ethics rules?

18 A.  Yes.  Well, that was in question, but it was a fight we

19 didn't want to have.

20 Q.  So you wanted to have a mirror image of what you had with

21 the Bachmann Campaign; is that right?

22 A.  Correct.

23 Q.  So this was your idea?

24 A.  No.  I told Dimitri that if I was going to work for them,

25 this is how I had to do it.

1  Q.  Had to do it, okay, thank you.

2        And this is something that came up in January after

3  you got back from South Carolina?

4  A.  No.

5  Q.  What's the date of this invoice?

6  A.  Well, this invoice was, but when Dimitri wrote this check

7  from Designer Goldsmiths, Inc., that was a third party.

8  Q.  Okay.  But I'm talking about --

9  A.  When you said the agreement was done after I got back from

10  South Carolina, that's not true.

11  Q.  I misunderstood.  The introduction of ICT into the equation

12  was after you got back from South Carolina?

13  A.  I believe so.  I'm not sure at this time.  I mean, the

14  invoice was obviously.

15  Q.  And you labeled your services on this invoice as consulting

16  services, correct?

17  A.  Correct.

18  Q.  So you didn't label them audiovisual services, did you?

19  A.  No.

20  Q.  And it's similar to the way you labeled them with the

21  Bachmann Campaign; is that right?

22  A.  Correct.

23  Q.  And, in fact, you thought Sonny Izon was a contractor with

24  the Ron Paul Campaign; isn't that true?

25  A.  Yes.

1  Q.  So you didn't know that ICT wasn't doing business with the

2  Ron Paul Campaign?

3  A.  I had no idea who ICT was.  I thought it was Sonny Spanos,

4  the gentleman I met with the Paul Campaign.

5  Q.  And you had no idea that Fernando Cortes was coding the

6  invoices that he received from ICT as audiovisual expenses, did

7  you?

8  A.  I have no idea who Fernando Cortes is.

9  Q.  That's my next question.  You anticipated it.  You don't

10 even know who he is?

11 A.  No.

12 Q.  Okay.

13        MR. PILGER:  Just a housekeeping matter, that EIN

14 should be redacted, if we could take that down.

15        THE COURT:  Right.  You've got a personal identifier

16 on there.

17        MR. MILLS:  And I apologize, Your Honor.

18 BY MR. MILLS:

19 Q.  I want to show you what's previously in evidence as

20 Government's Exhibit 90.

21        This is an e-mail message that you sent to Sonny Izon

22 and Dimitri Kesari on May 17th of 2012, correct?

23 A.  Yes.

24 Q.  And it says that you had an agreement with Dimitri that went

25 through the month of June, correct?

1   A.  Correct.

2   Q.  Okay.  The message does not mention John Tate, does it?

3   A.  No.

4   Q.  Is certainly does not mention any agreement with John Tate,

5   does it?

6   A.  No.

7   Q.  Now, at the end of 2011, you owned a cell phone, right?

8   A.  Yes.

9   Q.  In fact, it was an Apple iPhone?

10  A.  Correct.

11  Q.  And the phone number ended in 4255?

12  A.  Yes.

13  Q.  I'm going to show you records that have previously been

14  admitted as Government Exhibit 182.

15          Do you see those?

16  A.  Yes.

17  Q.  Now, you know a man by the name of Dennis Fusaro, correct?

18  A.  Yes.

19  Q.  In fact, his cell phone number can be found in the contacts

20  of your phone?

21  A.  Correct.

22  Q.  And his phone number ends in 7676?

23  A.  I'm not sure.  I would have to see it.  I don't know

24  people's phone numbers off the top of my head, but I'm assuming

25  that the information you're giving me --

1        MR. PILGER:  Objection; relevance.

2        THE COURT:  Sustained.

3  BY MR. MILLS:

4  Q.  Do you remember having telephone calls with Dennis Fusaro

5  after December 26, 2011, concerning the check you received from

6  Dimitri Kesari?

7  A.  Yes.

8  Q.  And, in fact, one of the phone calls you had with him was on

9  December the 29th; is that correct?

10  A.  I believe so, yes.

11  Q.  He called you and you told him about the check, correct?

12  A.  I think -- if it's the call I'm thinking about, he called

13  me.  I'm not sure if I told him about the check or if it was

14  when he asked me if I was going to jump on a grenade, I'm not

15  sure.  I remember having multiple conversations with Dennis

16  Fusaro.

17  Q.  All right.  But then you called him on January the 2nd,

18  correct?

19  A.  Possibly.  I don't recall.

20  Q.  I mean, can I show you something that would refresh your

21  recollection?

22  A.  Sure.

23  Q.  Do you see at the top of this page two phone calls from you?

24  A.  Could you zoom in on it; is that possible?

25  Q.  I sure can.

1   A.  Yes.

2   Q.  So these are both calls from you to him, correct?

3   A.  Yes.

4   Q.  And each one -- one lasted about six minutes, one lasted

5   about three minutes; is that correct?

6   A.  Yes.

7   Q.  Okay.  Now, January 2nd was right after a very negative

8   article came out about you in the Iowa Republican; isn't that

9   true?

10  A.  Is this in 2012?

11  Q.  2012.

12  A.  Yes, I mean there was a lot of negative articles, but I'm

13  assuming that -- I would have to see the article, but I'm

14  believing that you're probably right.  There was a lot of

15  negative articles.

16  Q.  Well, there was one in particular that was entitled "Kent

17  Sorenson's History of Selling Out;" isn't that correct?

18  A.  Yes.

19  Q.  And that was published on January the 1st by the Iowa

20  Republican?

21  A.  I remember the article.  I don't remember the publish date.

22  Q.  Okay.  And do you recall when --

23          MR. PILGER:  Your Honor, before the next "do you

24  recall" question, if he wants to refresh his recollection, the

25  next time I would ask that he do it properly, show him something

1  and seeing if it refreshes his recollection.

2         THE COURT:  Overruled.

3  BY MR. MILLS:

4  Q.  And do you also recall Ron Paul being interviewed by Chris

5  Wallace on January the 1st, 2012?

6  A.  Yes.  Yes, I believe I do.

7  Q.  And that's when Dr. Paul was questioned about whether his

8  campaign was paying you money?

9  A.  Correct.

10  Q.  I believe you testified on Friday that you saw that

11  interview?

12  A.  Yes.

13  Q.  Because I want to plant these two dates in time because I

14  want to ask you about something that you know is coming.

15  A.  That's fine.

16  Q.  Now, during the call, isn't it true that you told Dennis

17  Fusaro that you had not even seen the check that Dimitri Kesari

18  gave your wife?

19  A.  Yes, I might have said something to Dennis about that.

20  Q.  You didn't know that he was recording the call, did you?

21  A.  No.

22  Q.  But you lied to him anyway?

23  A.  Yeah.  You have to understand the relationship that Dennis

24  had with these guys.  It was very volatile.  I was constantly

25  hearing about how Ron Paul, a Christian conservative, has these

1   guys working with and Dimitri is in a gay relationship with his

2   assistant and Jesse Benton --

3            MR. MILLS:  Move to strike as nonresponsive.

4            THE COURT:  It is nonresponsive.  It's stricken.

5            Go ahead.

6   BY MR. MILLS:

7   Q.  In fact, you told Mr. Fusaro that you had not been paid?

8   A.  I don't recall, but that's possible.  I lied a lot to

9   Dimitri and to Dennis Fusaro.

10  Q.  Okay.  And, in fact, you told Mr. Fusaro you were going to

11  give the check back; isn't that true?

12  A.  I believe I did say that.

13  Q.  You told him that you were not going to cash it?

14  A.  Yes.

15  Q.  Okay.  But then you also discussed whether you should hold

16  onto the check so you could have leverage over Mr. Kesari?

17  A.  Yes.

18  Q.  And you needed the leverage to force him to do a deal with

19  you, right?

20  A.  That wasn't why I said that.

21  Q.  But you said you wanted something to hold over him; isn't

22  that true?

23  A.  Yeah, I'm not denying that.

24  Q.  Okay.

25  A.  It wasn't because I was afraid I wasn't going to be paid.  I

1    knew that they were going to pay me at that point in time.

2    Q.  That something was that uncashed check that you were going

3    to hold over his head, correct?

4    A.  Yes.

5    Q.  Okay.  And you needed that check to hold over his head

6    because as of January the 2nd, 2012, you had no deal with the

7    Ron Paul Campaign?

8    A.  That's not true.

9    Q.  Okay.  The Bachmann Campaign was out of gas, right?

10   A.  Yes.

11   Q.  They were late paying you, you were concerned you weren't

12   going to get paid?

13   A.  Yes.

14   Q.  You had out-of-pocket expenses that the campaign did not

15   reimburse you?

16   A.  Yes.

17   Q.  You had bills to pay, correct?

18   A.  Correct.

19   Q.  So you needed to do a deal, right?

20   A.  Yes.

21   Q.  You needed that check to force Mr. Kesari to do a deal?

22   A.  The deal was already done.  That was done on the 28th.  It

23   was discussed about it back on Halloween.  I mean, I wasn't

24   concerned about that.  I was concerned about the media exposure

25   and everything going south and me being left there trying to

1  explain everything.

2  Q.  But isn't it true you told Dennis Fusaro on January the 2nd,

3  2012, you didn't know what you were going to do?

4  A.  I was talking about -- we were talking about jumping on a

5  grenade.  I was thinking about coming clean with everything

6  because I was feeling like I had become everything that I hated

7  in politics.

8  Q.  Isn't it true when Fusaro asked you what you were going to

9  do, you said, I don't know, I don't know, I don't know?

10  A.  That was -- again, that was not if I was going to -- if I

11  had a deal or not.  It was if I was going to come clean because

12  I had felt horrible for what I had done to Michelle, and Marcus

13  had been calling me repeatedly asking me to come clean.  I had

14  spoke to Marcus a few times where he left multiple voicemails

15  about me, he was concerned about me, and that's Marcus Bachmann,

16  Michelle's husband.  They asked me to come clean and tell the

17  truth that I was being paid, and that's when I didn't know what

18  I was going to do.

19       MR. MILLS:  Your Honor, request permission to play the

20  clip.

21       MR. PILGER:  Objection, Your Honor.  There's nothing

22  to impeach.  He just testified to it.

23       MR. MILLS:  He just said -- he said this tape I don't

24  have a deal, and now he's saying he did have a deal, and I think

25  the jury has a right to hear in his own words whether he has a

1    deal.

2            THE COURT:  Play the tape.

3            Go ahead.

4            MR. PILGER:  If we're going to play the tape, Your

5    Honor, we would ask under the rule of completeness to play the

6    whole thing.

7            MR. MILLS:  I'm going to play the whole thing.

8            THE COURT:  Okay.

9            (Defendant's Exhibits T9 and T10 were played.)

10           THE COURT:  Members of the jury, none of that was

11   admitted to prove any of that was true.

12           We're going to take our mid-morning recess for 20

13   minutes and then come back.

14           See you then.

15           (Recess at 10:35 a.m., until 10:55 a.m.)

16           THE COURT:  Please be seated.

17           Mr. Mills.

18   BY MR. MILLS:

19   Q.  Good morning again, Mr. Sorenson.

20           I just have one question.

21   A.  Sure.

22   Q.  Isn't it true that as of January the 2nd, 2012, you had no

23   deal with the Ron Paul Campaign?

24   A.  That's not true.

25           MR. MILLS:  Thank you.

1          THE COURT:  Mr. Binnall?

2          MR. BINNALL:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4  BY MR. BINNALL:

5  Q.  Good morning, Mr. Sorenson.

6  A.  Good morning.

7  Q.  Mr. Sorenson, you called my client a bully earlier.  Would

8  you mind stepping down off the witness stand and stepping down

9  right over here, please?

10          THE COURT:  What for?

11          MR. BINNALL:  I'm going to have -- Mr. Sorenson called

12  him a bully.  I'm going to have my client stand next to him,

13  Your Honor --

14          THE COURT:  No.

15          MR. BINNALL:  Can I have them both stand up?

16          THE COURT:  Yeah.  Stand up.

17          (The witness and defendant Kesari stood up.)

18          THE COURT:  There you go.

19          MR. BINNALL:  Thank you, Your Honor.

20  BY MR. BINNALL:

21  Q.  How tall are you, Mr. Sorenson?

22  A.  Six foot, but there's a lot of bullies in this world.

23  There's political bullies.  There's bullies on the playground.

24  There's bullies in the business.

25  Q.  All right.

1    A.   Size isn't what I was talking about.

2    Q.   Well, actually Mr. Kesari has been your friend since 2008;

3    isn't that true?

4    A.   Looking back I would question that, but I've known Mr.

5    Kesari since 2008.

6    Q.   You've given prior sworn testimony in this matter, haven't

7    you, sir?

8    A.   Yes.

9    Q.   And in that prior sworn testimony --

10           MR. PILGER:  Objection.

11   BY MR. BINNALL:

12   Q.   -- you said that Mr. Kesari has been your friend since 2008;

13   isn't that correct?

14   A.   I've known Mr. Kesari since 2008; but sometimes friendships

15   are reevaluated relationships over time.  But in 2008 I would

16   have considered Dennis -- I mean Dimitri a friend.

17   Q.   All right.  And from the period of 2008 through at least

18   2011, he had been in your home a number of times, correct?

19   A.   Yes.

20   Q.   He cooked meals for you and your family?

21   A.   Yes.

22   Q.   He was your primary point of contact on the Paul Campaign,

23   right?

24   A.   Correct.

25   Q.   In 2011 you won an award for your work with Right to Work;

1  isn't that true?

2  A.  Pardon me?

3  Q.  In 2011 you won an award for your work with the organization

4  Right to Work?

5  A.  Yes.

6  Q.  And it was something like Legislator of the Year?

7  A.  Yeah.  They had a specific name for it, but that's what it

8  was, it was State Legislator of the Year.

9  Q.  And Mr. Kesari actually flew you down to accept that award,

10  didn't he?

11  A.  Yes.

12  Q.  He was always a good political advisor to you, wasn't he?

13  A.  Correct.

14  Q.  Politically he was always there for you, wasn't he?

15  A.  Politically, yes.

16        MR. PILGER:  I'm sorry, I can't hear Mr. Binnall.

17        THE COURT:  Would you move closer to the microphone or

18  would you adjust the microphone.

19        MR. BINNALL:  Yes.  Thank you, Your Honor.

20  BY MR. BINNALL:

21  Q.  Mr. Sorenson, you talked a little bit earlier about blast

22  e-mails that were sent on your behalf, correct?

23  A.  On my behalf or that I sent out on the Paul behalf?

24  Q.  That was sent out on your behalf for the Paul Campaign.

25  A.  It was actually sent out on behalf of the Paul Campaign from

1  me.

2  Q.  From you?

3  A.  Yes.

4  Q.  And that e-mail address, that was a -- that e-mail address

5  was Kent.Sorenson.for.Ron.Paul@gmail.com, wasn't it?

6  A.  I suppose so.  I'm not sure.  I never used that e-mail

7  address.

8  Q.  But are you aware that e-mail address existed for those

9  blast e-mails?

10  A.  I'm guessing you're going to show me one that does, but

11  prior to that, no, I didn't realize that.

12  Q.  Here I'm going to approach the witness and show him the

13  blast e-mails that were shown to him previously.

14          Does that refresh your recollection, sir?

15  A.  I recognize the e-mails.  I had never noticed that it was

16  Kent.Sorenson.for.Ron.Paul before.

17  Q.  Thank you, sir.

18          Mr. Sorenson, when you had that arrangement with the

19  Bachmann Campaign, your goal was to hide money and continue to

20  serve in the State Senate, right?

21  A.  Yes.

22  Q.  And you told Mr. Kesari that you were paid through Guy

23  Short's company when you were working for the Bachmann Campaign;

24  isn't that right?

25  A.  I believe so, yes.

1   Q.  In fact, you think you might have told him that the Bachmann

2   Campaign had checked and determined it was legal; isn't that

3   right?

4   A.  No.

5   Q.  You've previously gave sworn testimony in this matter,

6   haven't you, sir?

7   A.  No.

8   Q.  You've never given sworn testimony before this case?

9   A.  That -- well, I'm sorry.  You're using a play on words.  Did

10  I use sworn testimony that I said it was legal, no.

11  Q.  No, sir.  That's not what I was asking.

12  A.  Well, that's how I portrayed the question.  I'm sorry.

13  Q.  Okay.  Specifically what I'm asking is if you think that you

14  might have told Dimitri Kesari that the Bachmann Campaign had

15  checked and determined that it was legal?

16  A.  Okay.  But you were talking about sworn testimony.  I don't

17  believe I said that under sworn testimony.

18  Q.  We'll get to the sworn testimony.  That's my specific

19  question.  You think that you might have told Mr. Kesari that;

20  isn't that right?

21  A.  No.

22  Q.  Okay.  Now we'll get to the sworn testimony.

23          Mr. Sorenson, you gave sworn testimony in October of

24  2015, didn't you?

25  A.  Um --

1      THE COURT:  "Yes" or "no."  Just "yes" or "no" on that

2  one.

3  A.  I'm not sure of the dates, but I believe in October I gave

4  sworn testimony.  I'm sorry I didn't answer with a "yes" or "no"

5  answer.

6  BY MR. BINNALL:

7  Q.  All right.  And on that day you were asked --

8      MR. PILGER:  Page and line, Mr. Binnall?

9      MR. BINNALL:  Page 700, line 20.

10  BY MR. BINNALL:

11  Q.  And you don't remember one way or the other if you told

12  Mr. Kesari about that information from the Bachmann Campaign --

13  well, I think I need to go up a little bit further.

14      I'll just do it this way.  I'm going to start at page

15  699.  You were asked on 699, line 16:  In fact, you actually

16  told Mr. Kesari that the Bachmann Campaign people had checked

17  and that it was legal to do it that way, didn't you?

18      You answered:  I don't recall telling Mr. Kesari that.

19  At some point in time it was discussed.

20      Isn't that true, sir?

21  A.  At some point in time with the Bachmann Campaign it was

22  discussed.

23  Q.  And then I asked you specifically:  With Mr. Kesari?

24      And you said:  I don't recall having that conversation

25  with Mr. Kesari, but you said it was the fact, so if you have

1    something to back it up, I would love to see it.

2              Isn't that true?

3    A.  I do believe I said that, but I still don't recall having

4    that conversation with Dimitri Kesari.

5    Q.  And then I asked on page 700, line 20:  And you don't

6    remember one way or the other if you told Mr. Kesari --

7              MR. PILGER:  Objection.  This gets to a sustained

8    objection to a question.

9              MR. BINNALL:  No, Your Honor, it doesn't.

10             THE COURT:  Let me see it.

11             MR. BINNALL:  It's --

12             THE COURT:  Bring it up.  Bring it up here.

13             MR. BINNALL:  Yes, sir, bottom of the page, going on

14   to the next one.

15             MR. PILGER:  If you skipped to line 20, I withdraw the

16   objection.

17             MR. BINNALL:  Thank you, Your Honor.

18   BY MR. BINNALL:

19   Q.  And I asked you:  And you don't remember one way or the

20   other if you told Mr. Kesari about that information from the

21   Bachmann Campaign?

22             And you answered:  I don't recall if I shared that

23   with Mr. Kesari.

24             Isn't that right?

25   A.  Correct.

1  Q.  You were supplementing your income without the State Senate

2  Ethics Committee finding out, right?

3  A.  Correct.

4  Q.  And those ethics committee rules were the rules that were

5  binding on you as a senator but weren't actually laws that could

6  send you to jail, right?

7  A.  Correct.

8  Q.  But Iowa does have a state part-time legislature, correct?

9  A.  Correct.

10 Q.  And you have to find a way to supplement your income; isn't

11 that right?

12 A.  Yes.

13 Q.  Now, Mr. Kesari was working hard to recruit you into the

14 Paul Campaign; isn't that right?

15 A.  Yes.

16 Q.  And you knew you needed a job?

17 A.  At which time?

18 Q.  In December of 2011.

19 A.  Yes.

20 Q.  And he knew that you had other opportunities; isn't that

21 right?

22 A.  In December of 2011, I had one other opportunity that really

23 wasn't going to pan out because it was working for a PAC, and I

24 could not do that.

25 Q.  But Mr. Kesari knew that you had other opportunities; isn't

1  that right?

2  A.  Correct.

3  Q.  And on December 26th you and Mr. Kesari discussed whether

4  the Bachmann Campaign was current in its bills; isn't that

5  right?

6  A.  Yes.

7  Q.  And you told him that you had some out-of-pocket expenses

8  due to the Bachmann Campaign, correct?

9  A.  Yes.

10  Q.  And you think you might have told Mr. Kesari that night that

11  Guy Short was expecting to get $25,000 from the Bachmann

12  Campaign and pay your monthly salary from that; isn't that

13  right?

14  A.  I believe that's accurate.  I believe Guy Short said that he

15  was going to get a check from the Bachmann Campaign.  I wasn't

16  really concerned about myself getting paid for the Bachmann

17  Campaign.  I was more concerned about the Iowa staff because I

18  was getting paid from Guy Short.  The staff was getting paid

19  from the campaign.

20  Q.  In December 2011, you were worried about money, right?

21  A.  I was worried about what I was going to do in the future.

22  Q.  For money?

23  A.  For an income.

24  Q.  You had become financially dependent on your salary from the

25  Bachmann Campaign, hadn't you?

1   A.  Yes.

2   Q.  And when you drove to the fairgrounds in Altoona (sic), you

3   didn't know exactly what the term of the deal was going to be;

4   isn't that true?

5   A.  I had a good indication from previous conversations.

6   Q.  But you just assumed it was going to be the same deal,

7   right?

8   A.  Correct.

9   Q.  So the $25,000 check with Mr. Kesari -- or that you received

10  on the evening of the 26th, you kept that check because you

11  viewed it as leverage over Mr. Kesari; isn't that right?

12  A.  After a period of time, yes.

13  Q.  And you felt that even though Mr. Kesari told you not to

14  cash the check, you could still go to the bank and present it

15  for payment, right?

16  A.  Yes.

17  Q.  Could I get -- actually I'm just going to ask about this

18  directly.  Do you remember seeing the bank statements from your

19  Grassroots Strategy's bank account on Friday?

20  A.  Yes.

21  Q.  And you didn't just use that account for business expenses,

22  did you?

23  A.  No.  It was the secondary account that we had we used for --

24  I mean, we used it for a lot of purposes because that's where my

25  primary income was coming in, other than my legislative salary.

1  Q.  And you used it for personal expenses, too, right?

2  A.  Some, yes.

3  Q.  Sir, I want to talk to you about the meeting that you say

4  happened with Mr. Kesari in August of 2013.  Mr. Kesari was your

5  friend since 2008?  We covered that, right?

6  A.  Yes.

7  Q.  And he was also a political advisor, correct?

8  A.  Correct.

9  Q.  In the summer of 2013, he was advising you about whether or

10  not you should resign your seat in the Iowa State Senate in

11  order to run for U.S. Senate; isn't that right?

12  A.  Yes.

13  Q.  And you thought about doing that, didn't you?

14  A.  Not seriously, no.

15  Q.  But you considered doing it, didn't you?

16  A.  I considered resigning my seat multiple times to get away

17  from this mess that we had created.

18  Q.  And you considered doing that and running for U.S. Senate;

19  isn't that correct?

20  A.  We talked about it, but at that time I was not seriously

21  considering running for the U.S. Senate.  Anytime -- and like I

22  said on Friday, four years prior I was scrubbing toilets and had

23  a commercial cleaning business.  So when someone is telling you

24  you should run for U.S. Senate and you have somebody telling you

25  that, even if it's silly or not viable, it's flattering.  I

1  mean, who wouldn't be flattered by that?  I got wrapped up in a

2  position that was really much bigger in my mind than it really

3  was.

4  Q.  And at that point there's an Iowa State ethics investigation

5  going on, correct?

6  A.  Correct.

7  Q.  And, again, that investigation wasn't geared to determine

8  whether you had broken the law but whether you violated the laws

9  of the State Senate, right?

10  A.  Correct.

11  Q.  And the rule is vague as to whether you could receive money

12  directly from a campaign, correct?

13  A.  Correct.

14  Q.  And you had sent Mr. Kesari a proposed press release that

15  summer, correct?

16  A.  Are we talking about the press release entitled "The Check"?

17  Q.  Yes.

18  A.  Yes.

19  Q.  And in that press release it says that you turned the check

20  over to your attorney, right?

21  A.  Correct.

22  Q.  That was a lie, right?

23  A.  Yeah.  When I said that -- that was my intention, but at

24  that time I had not presented it to my attorney.

25  Q.  In fact, pretty much everything in the press release was a

1  lie, wasn't it?

2  A.  Yes.

3  Q.  And at that point in August 2013, you were still trying to

4  save your political career; isn't that correct?

5  A.  Yes.  I was struggling.  I wanted to resign.  I was being

6  asked not to resign from my colleagues in the Senate because --

7  not because they didn't like me but because they didn't want to

8  have a special election, and so it was a struggle -- I was

9  struggling inside if I wanted to stay in the Senate, if I didn't

10  want to do it.

11  Q.  You were still trying to save your political career?

12  A.  Correct, at that time I was.

13  Q.  Thank you.

14          And at that point you knew -- in August 2013, at that

15  point you knew that Mr. Fusaro was recording people secretly and

16  trying to hurt them?

17          MR. PILGER:  Excuse me.  Who was recording secretly?

18          MR. BINNALL:  Dennis Fusaro.

19  A.  Yes.

20  BY MR. BINNALL:

21  Q.  In fact, as we heard earlier, he recorded you?

22  A.  Correct.

23  Q.  And you knew he recorded other people, too, right?

24  A.  Correct.

25  Q.  And you (sic) actually released those recordings to the

1    media, right?

2    A.  Did you say he --

3    Q.  Mr. Fusaro would often release those recordings to the

4    media?

5    A.  Yes.  I'm sorry, I thought you said I did.

6    Q.  No; my apologies, sir.

7           And then we heard that recording that -- of the call

8    that you had with Mr. Fusaro, and you previously told the grand

9    jury in March of last year that what you said on that recording

10   was the truth; isn't that right?

11   A.  I don't remember if that was -- when we talked about the

12   grand jury, I don't think I had heard the call.  I think I was

13   speaking from memory, and it was about jumping on a grenade, but

14   I can't be sure.

15   Q.  Do you remember telling the grand jury that it was harmful

16   but true?

17   A.  Yes.

18   Q.  Mr. Kesari told you that he was pretty concerned about

19   Mr. Fusaro; isn't that right?

20   A.  We all were, yes.

21   Q.  Mr. Sorenson, you pled guilty to a federal felony charge

22   about a year-and-a-half ago.  We talked about that a little bit

23   today and Friday, correct?

24   A.  Two federal felonies, but yes.

25   Q.  Two, thank you.

1           And you signed that cooperation and substantial

2   assistance agreement with the government, too, correct?

3   A.  Yes.

4   Q.  Not only do you have to help the government, but your help

5   for them has to be substantial; isn't that right?

6   A.  Yes.

7   Q.  You have to fully cooperate with them, correct?

8   A.  Yes.

9   Q.  You have to speak with government prosecutors without your

10  attorneys present, right?

11  A.  I don't believe I have to do that.  Maybe that's part of the

12  agreement, but I always had the opportunity to have my attorney

13  there.

14  Q.  And there have been times that you spoke with them without

15  your attorney there, correct?

16  A.  Correct.

17  Q.  And if you change your story in court today from what you

18  told the government earlier, the government can prosecute you

19  for making a false statement; isn't that right?

20  A.  Correct.

21  Q.  So if you lied to the government earlier, but you're telling

22  the truth today, you could be prosecuted for that; isn't that

23  right?

24  A.  Correct.

25  Q.  That's a tough spot to be in, sir, isn't it?

1          MR. PILGER:  Argumentative.

2          THE COURT:  Overruled.  Do you find it to be a tough

3   spot to be in?

4   A.  Not if I'm being truthful.

5   BY MR. BINNALL:

6   Q.  But you've lied before about this case, haven't you?

7          MR. PILGER:  Objection.  When?

8          THE COURT:  Sustained.

9   BY MR. BINNALL:

10  Q.  Since December 2011, you've lied about the facts in this

11  case, haven't you?

12  A.  Yes.  I made it very clear that when I hired Monty Brown as

13  my attorney it changed a lot of things, and he -- I mean, I had

14  an attorney before that was encouraging me to lie, and then I

15  had an attorney that was encouraging me to do the right thing,

16  so it made it very easy then.

17  Q.  Well, even before you got an attorney, you lied to Megyn

18  Kelly and her Fox News audience, didn't you?

19  A.  Yes.  I didn't deny that.

20  Q.  And you lied to Natalie Allender's CNN audience?

21  A.  In fact, I don't remember who that honestly was, if that's

22  who it was.

23  Q.  A CNN audience you lied to?

24  A.  Correct.

25  Q.  You lied to the government?

1    A.   Early on.

2    Q.   Now, sir, are you aware that the cooperation agreement

3    provides that should the defendant fully comply with all terms

4    and conditions of this plea agreement and the government

5    concludes that the defendant has provided substantial

6    assistance, then the government may file a motion to reduce your

7    sentence below the statutory maximum?

8    A.   Correct.

9    Q.   So you have to please the government in order to get them to

10   ask for a sentence reduction; isn't that right?

11   A.   I have to satisfy the cooperation agreement.

12   Q.   And you agree that the agreement gives you a very strong

13   incentive to testify in a way that pleases the government; isn't

14   that right?

15   A.   It gives me an incentive to tell the truth and cooperate.

16   Q.   It gives you an incentive to please the government though,

17   too, doesn't it, sir?

18   A.   I suppose so.  You could say it that way.

19   Q.   And you have a lot of bills to pay, don't you?

20   A.   Yes.

21   Q.   You have a house that's in foreclosure, correct?

22   A.   No.  The rental property has been foreclosed upon.

23   Q.   So it's already been foreclosed upon?

24   A.   Yes.

25   Q.   And you really can't afford to spend much time in prison,

1 can you?

2 A. No.

3 Q. That puts you under a lot of pressure, doesn't it?

4 A. Yes.

5 Q. And as you talked about with Ms. Campbell on Friday that you

6 don't always react well when you're under a lot of pressure;

7 isn't that right?

8 A. Actually I said, and I made it very clear, that about a year

9 ago, my wife and I went through some stuff together, and we've

10 actually -- since then we've been going to counseling on a

11 regular basis, and we're dealing with things much better than we

12 were.

13 Q. All right. But my question is, you haven't always reacted

14 well to pressure, have you?

15 A. I don't think that's an accurate statement.

16 Q. Do you remember giving that sworn testimony in the fall of

17 last year?

18 A. To what?

19 Q. About the facts in this case.

20 A. You mean the last trial?

21          MR. PILGER:  Objection.

22          THE COURT:  Pose a new question, please.

23 BY MR. BINNALL:

24 Q. Sir, do you remember testifying in October of last year:

25 You haven't always reacted well to that pressure, have you?

1          And you responded:  I made a lot of bad decisions

2    because of pressure.

3          Do you remember testifying to that?

4    A.  I remember testifying to that, even on Friday.

5          MR. BINNALL:  That's all I was trying to get at.

6          One moment, Your Honor.

7          (Pause.)

8          No further questions, Your Honor.

9          THE COURT:  Mr. Pilger?

10         MR. PILGER:  May it please the court.

11                    REDIRECT EXAMINATION

12   BY MR. PILGER:

13   Q.  Mr. Sorenson, Mr. Binnall finished off with questions about

14   pleasing the government.  Have you received instructions from

15   the government about trying to please the government and what

16   that could do in terms of being in trouble or not?

17         MS. CAMPBELL:  Objection, Your Honor; calls for

18   hearsay.

19         THE COURT:  Overruled.

20         Answer the question.

21   A.  No.

22   BY MR. PILGER:

23   Q.  Has the government instructed you whether or not to try to

24   please us?

25   A.  No.

1  Q.  What has the government instructed you to do?

2  A.  Actually, quite the contrary; to tell the truth regardless,

3  if you wanted to hear what I had to say or not, as long as I was

4  telling the truth, and it was very clear that I was to tell the

5  truth to you and to the defense attorneys.

6  Q.  And let's talk about some of the questioning you received

7  about specifics that you hadn't recalled and whether that might

8  have changed over time.  You were asked about that a couple of

9  times.

10          Do you remember that?

11  A.  Yes.

12  Q.  And I think you were specifically asked in terms of

13  recalling that John Tate was at the event identified in

14  photographs that you testified about, correct?

15  A.  Yes.

16  Q.  And do you remember that until you saw those photographs, in

17  the interviews you had with the FBI or government counsel just

18  before that --

19          MR. MILLS:  Your Honor, this is a fairly leading

20  question.

21          THE COURT:  Overruled.

22  BY MR. PILGER:

23  Q.  -- you couldn't specifically remember John Tate being there,

24  right?

25  A.  Correct.

1  Q.  At that time did the government pull out any materials of

2  any kind to refresh your recollection to get you to testify that

3  John Tate had been there?

4  A.  No.

5          MR. PILGER:  Bear with me, Your Honor.

6          (Pause.)

7  BY MR. PILGER:

8  Q.  That didn't happen in preparation, right?  The government

9  didn't pull out materials to refresh your recollection?

10 A.  No.

11 Q.  Didn't try to get you back on that track of saying John Tate

12 was there, right?

13 A.  No.

14 Q.  Excuse me, Your Honor.  This is going to take a moment.

15          I'm going to show you something to refresh your

16 recollection.  Do not read aloud from it.  When you're done

17 reading it, let me know.  It's going to take me awhile to find

18 it.

19          MR. MILLS:  Could we have a reference, Your Honor?

20          THE COURT:  This is refreshing recollection, Your

21 Honor.

22          THE COURT:  For a prior inconsistent statement, he's

23 obligated to do it.  This is just refreshing recollection.

24          (Pause.)

25 BY MR. PILGER:

1    Q.  Okay.  First I want to direct your attention here

2    (indicating) and I want you to read this part to yourself

3    (indicating).

4    A.  Okay.

5    Q.  And I want to direct your attention up here (indicating).

6    Just read the first two lines to yourself.

7    A.  Okay.

8    Q.  Now I would like you to read this paragraph to yourself

9    (indicating), and let me know when you're done.

10             (Pause.)

11   A.  Okay.

12   Q.  Does that refresh your recollection about whether you told

13   the FBI previously years ago that John Tate was at the flip

14   event where you switched your endorsement to Ron Paul?

15   A.  Yes.

16   Q.  So when time passed and you couldn't remember that anymore,

17   did anyone pull that out and say, you've got to testify that

18   way?

19   A.  Actually today is the first time I saw that.

20   Q.  First time you ever saw that?

21   A.  Correct.

22   Q.  Your memory was refreshed as to John Tate being there by

23   what?

24   A.  A video and what's written in the book just now.

25   Q.  Okay.  But what you just read in the book just now refreshed

1    you just now?

2    A.  Correct.

3    Q.  Nobody pulled this out and said, you said this before,

4    you've got to say it again, right?

5    A.  No.

6    Q.  And, in fact, for a while you were giving interviews where

7    you were saying to the FBI and government counsel that you

8    couldn't specifically remember John Tate being there, correct?

9    A.  Correct.

10   Q.  And so we got the photographs from the video?

11   A.  Correct.

12   Q.  Let's talk about the audio that was played, and I need the

13   Elmo for this, please.

14         First I'll approach and I'll ask you, have you

15   previously reviewed a transcript of that recording?  And there's

16   some Post-its on here covering up my notes, and ignore the

17   underlining.

18   A.  I don't believe so.

19   Q.  Can you look it over and tell me if it's a fair and accurate

20   transcript of the conversation you just listened to.

21         (Pause.)

22   A.  Yes, it is.

23         MR. PILGER:  We'll offer 189, Your Honor, for use in

24   court.  We understand the transcript is not evidence, but the

25   tape is, but it would assist the jury.

1    THE COURT:  What are you asking me to do?  I don't get

2  it.

3         MR. PILGER:  Just as a demonstrative.

4         MR. BINNALL:  Your Honor, I think this is the

5  transcript of the phone call.

6         MR. PILGER:  I'm sorry if I didn't make that clear.

7         THE COURT:  Are you offering it or what?

8         MR. PILGER:  I'll offer it in evidence if no one

9  objects.

10                        (Government Exhibit 189 was

11                         offered in evidence.)

12         MR. MILLS:  I object to it being in evidence.

13         THE COURT:  Okay.  We're not going to do that.  What

14  do you want to do next?

15  BY MR. PILGER:

16  Q.  I'm going to work through the transcript to ask him about

17  the call as opposed to trying to start and stop the tape.

18         THE COURT:  It was only used to impeach with a prior

19  inconsistent statement.  Just ask him the questions separate and

20  apart from reviewing it.  If you display it, it would be like

21  offering and admitting it.

22         MR. PILGER:  Not to argue with the court, but just

23  like in a tape case, the tape is in, but we use transcripts to

24  help go through the testimony.

25         THE COURT:  The tape is substantive evidence; this is

1    not.

2            MR. PILGER:  Understood.  I'll just ask questions.

3    BY MR. PILGER:

4    Q.  Mr. Sorenson, when that tape was played and came into

5    evidence, there was a picture of you on the phone.  Was that the

6    actual -- was that an actual picture of you while you were

7    making or taking the phone call at issue?

8    A.  No.  No, that picture was taken some months prior.

9    Q.  So that just spruced up that presentation; it didn't

10   accurately reflect where you were that day?

11   A.  Correct.  I was actually at one of the first Bachmann

12   events, and my buddy took that picture, and since then it's been

13   used multiple times, and it's not a glorifying picture of

14   myself.

15   Q.  Do you remember Dennis Fusaro on that tape asking you, I'm

16   hearing you, ugh, you are going to fall on a grenade here in a

17   second?

18   A.  Yes.

19   Q.  And you mentioned that during cross-examination?

20   A.  Correct.

21   Q.  The way -- tell the jury how you understood that question or

22   that statement that you were going to fall on a grenade?

23   A.  Dennis Fusaro had spoken to Aaron Dorr, and I had told Aaron

24   Dorr that I was going to come clean and tell everything.  This

25   was after the Bachmann allegations, after the interviews I did.

1  I just wanted to -- I just felt -- it was still early enough, I

2  just wanted to come clean and just have it be over with.

3  Q.  So what would that have looked like?  If you had come clean,

4  in your mind, when you're having this conversation with Dennis

5  Fusaro and he says, I hear you're going to fall on a grenade

6  here in a second, you're not going to actually literally explode

7  yourself, but you're going to do something, and what is it going

8  to look like?

9  A.  It would be a political grenade.  It would be the end of my

10  political career, but in turn I felt like --

11  Q.  Why?  Why would it be the end of your political career?

12  A.  Because I was going to come out and say that I was getting

13  paid from the Bachmann Campaign, that even though I didn't have

14  a conversation with Michelle, that the allegations were true and

15  she was hearing from credible sources.

16  Q.  Now, Michelle Bachman accused the Ron Paul Campaign publicly

17  of paying you.  Were you going to admit that that was going on,

18  too?

19  A.  Yes.

20  Q.  And then later on in this transcript, bear with me -- or

21  later on in the tape, bear with me, Dennis Fusaro talks with you

22  about whether you're going to have a job with anyone.  Why would

23  that make sense?  How did you understand that?

24  A.  Because if I was to jump on that political grenade that we

25  were talking about, I wouldn't have a job anywhere, I wouldn't

1    have a job with anyone.  And he also talked about I said

2    something about my friends, and, I didn't want to hurt friends,

3    and that meant I was -- I'm sorry.

4    Q.  Stay with me.  I don't want to ask about your friends right

5    now.

6              What would happen with you if you publicly admitted

7    that you were taking the money from the Bachmann Campaign and

8    you had a deal with the Ron Paul Campaign?

9    A.  My political career would have been over for sure at that

10   moment in time.

11   Q.  Would you have been able to work for the Bachmann Campaign

12   if you did that?

13   A.  No.

14   Q.  Would you be able to work with the Paul Campaign if you did

15   that?

16   A.  No.  And I wouldn't have my legislative job and I wouldn't

17   have anybody who would want to hire me in the political arena at

18   that time.

19   Q.  Is that the grenade, as you understood it, in that

20   conversation?

21   A.  Yes.

22   Q.  And then at one point later on you asked, do you think the

23   whole Paul Campaign and like all of them know, the inside group?

24   And Dennis Fusaro says something about Jesse Benton.  And then

25   you said, oh, I know Jesse knows, I know Jesse knows.

1    What was in your mind when you said that?  How did you

2  know Jesse knew?

3  A.  I knew Jesse knew because the conversation I had with him

4  prior to going on stage and also from the e-mails often that he

5  sent me in October.  When I made that comment, I was talking

6  about just people like Jedd Coburn or Brian Gentry, people in

7  the Paul Campaign, if they knew.  I remember feeling sleazy and

8  dirty at the office.  I'm thinking how many of these people in

9  here know what I did?  Is it just those three?  Is it -- does

10  everybody know?  I remember constantly wondering what people

11  were thinking about me because of what I had done.  And that's

12  why I said that to Dennis, that's why I asked him.

13  Q.  Now, in that phone call you did tell a lie to Dennis Fusaro,

14  correct?

15  A.  Yes.

16  Q.  And what was that lie?  Remind the jury.

17  A.  That I hadn't seen the check.

18  Q.  You had seen the check, right?

19  A.  Correct.

20  Q.  And you lied to Dennis Fusaro about that?

21  A.  Correct.

22  Q.  And Mr. Binnall pointed out that in grand jury, after your

23  cooperation agreement, you had talked about how the tapes

24  were -- tell me if I'm wrong -- untruthful but damaging; is that

25  right?

1  A.  Yes.

2  Q.  Did you have it in your mind at that time that you had told

3  the lie to Fusaro about the check?

4  A.  I didn't realize it until I heard the tape.

5  Q.  And had you heard the tape before October of last year?

6  A.  No.

7  Q.  When you said that in the grand jury, did you misspeak or

8  did you intentionally lie?

9  A.  I misspoke.

10 Q.  And you didn't have that tape to refresh your recollection

11 then, did you?

12 A.  No.  I want to -- I do believe I heard the tape before

13 October because it was released on a web site, but I don't know

14 if the tape was in its entirety or whether they played bits and

15 pieces.

16 Q.  Okay.  Fair enough.  Did you have it in your mind when you

17 were in the grand jury?

18 A.  No.  And it wasn't played and I -- when I said it was

19 truthful, it was talking about me coming clean, and there was a

20 lot of other tapes.  I wasn't specifically thinking about that

21 tape either.

22 Q.  And Mr. Binnall then asked you about whether -- how your

23 substantial assistance would be assessed.  And you talked a lot

24 about the government, right?

25 A.  Yes.

1   Q.  Can you please remind the jury who finally decides whether

2   or not you have given substantial assistance?

3   A.  The federal judge that sentences me, not the federal judge

4   in this courtroom, not the prosecutors, not you, but the judge

5   who sentences me.

6   Q.  And Mr. Binnall asked you this story.  He said, if you

7   change your story, you can be prosecuted.

8         Do you remember that?

9   A.  Yes.

10   Q.  What has the government told you about whether or not you

11   should change your story to reflect the truth if you remember

12   something?

13   A.  You've constantly and the government has constantly told me

14   to be truthful regardless, even if later I realize that I made a

15   mistake to be truthful.

16   Q.  Now, in this tape that we were talking about before, as you

17   testified on direct, you did say to Dennis Fusaro something

18   about the check being leverage, correct?

19   A.  Yes.

20   Q.  And you did say something about having it as something over

21   Dimitri Kesari, correct?

22   A.  Yes.

23   Q.  You talked about that in your direct testimony, right?

24   A.  Correct.

25   Q.  Okay.  Tell the jury how you understood this leverage or

1  having something over him.  Did that have to do with getting

2  yourself paid or anything else?

3  A.  Um, well, I knew that I had the opportunity -- I believed

4  that I had the opportunity to cash the check, but also these are

5  people that -- I mean, you know, I understand at that time I

6  considered them friends, but I also knew they were political

7  operatives and at any time anything can change if it's

8  politically convenient.  And I felt like if I held onto the

9  check, that was proof that that happened, that nobody could take

10  that from me, that that was something that I had.  So that's how

11  I viewed it.

12  Q.  So let me show you something -- let me first ask you.  Do

13  you remember Mr. Kesari (sic) talking about who was a bully?

14  A.  Yes.

15  Q.  And he had you stand up, and you're a big guy, right?

16  A.  Yes.

17  Q.  And Mr. Kesari is a smaller guy, right?

18  A.  Correct.

19  Q.  Okay.  Fair enough.  Now let's pull up, Ms. Draughn, please,

20  Government's Exhibit 35.

21          This is in evidence but I don't believe you've ever

22  seen this before, Mr. Sorenson, but tell us if you have.

23          Can you see that?

24  A.  Yes.

25  Q.  Have you ever seen this before?

1   A.  Yes.  Actually earlier today I believe this was on the

2   screen.

3   Q.  Okay.  Had you seen it before today?

4   A.  I think in October.

5   Q.  Okay.

6   A.  But prior to that I --

7   Q.  Let's leave that alone, leave that alone.

8           Let's read this from the bottom up.  There's an e-mail

9   from Dimitri Kesari writing?  Hold the release.  Kent is getting

10  cold feet.  He wants to meet with me in about 2 hours.  Any

11  advice?

12          Do you see that?

13  A.  Yes.

14  Q.  And that was on December 27, 2011, right?

15  A.  Correct.

16  Q.  The day after your wife got the check in Altoona?

17  A.  Correct.

18  Q.  And is this true, did you have cold feet?

19  A.  Yes.

20  Q.  Had you been in an ongoing conversation with the Paul

21  Campaign through Dimitri Kesari or not?

22  A.  Yes.

23  Q.  And was that ongoing conversation one that always concerned

24  coming over to endorse Ron Paul or did it involve doing

25  something else?

1  A.  It was always endorsing Ron Paul.

2  Q.  Did it always concern you getting paid?

3  A.  Yes.

4  Q.  So if we just go up to the next one, John Tate says

5  something.  He says:  Why is he getting cold feet?  What can we

6  do, say to help him?  What time are you meeting him, and where?

7         Do you see that?

8  A.  Yes.

9  Q.  But Jesse Benton had a different approach, right?

10  A.  Yes.

11  Q.  What did he say?

12  A.  Fuck him.  This is absurd.

13  Q.  And let's pull up Government's Exhibit 39 in evidence.

14         Have you seen this before?

15  A.  Um, I don't believe I have.

16  Q.  So on December 27th, again the day after Altoona, there was

17  an e-mail from Jesse Benton:

18         "In all seriousness I am nto sure what to do about

19  this.  The DMR has his statement, I sent last night since Kent

20  said he wads comfortable.  Mary Stegmier won't check e-mail

21  until 12/28, but she has it."

22         What do you understand the DMR to refer to?

23  A.  Des Moines Register.

24  Q.  And then Jesse Benton sent another message.

25         Do you see that?

1    A.   Yes.

2    Q.   Same day, right, December 27?

3    A.   Yes.

4    Q.   To Dimitri Kesari and John Tate?

5    A.   Yes.

6    Q.   And then just read that to the jury.

7    A.   "I am tempted to say this is hard ball tie.  Either he

8    honors his commitment or we have to expose him as the

9    money-grubbing shakedown artist that he is."

10   Q.   Mr. Sorenson, given the Halloween e-mail where Jesse Benton

11   called the Dorr proposal unethical and illegal and given his

12   e-mail about FU and given this e-mail about hard ball tie or

13   perhaps time; is that how you interpret that?

14   A.   Yes.

15   Q.   And exposing you as a money-grubbing shakedown artist, who

16   had the power in this relationship; you or them?

17   A.   They did.

18   Q.   Is that why you held the check?

19   A.   Yes, it's part of it.

20   Q.   Now, I think you testified on cross with Mr. Mills that

21   lying -- that you lied on TV, right?

22   A.   Yes.

23   Q.   That was all on one day, right?

24   A.   Yes.

25   Q.   Do you remember what day that was?

1   A.   December 29th.

2   Q.   The lying about FEC filings, was that your idea or someone

3   else's idea?

4   A.   Someone else's.

5   Q.   Who was that?

6   A.   It was a group that I was meeting with Dimitri was a part

7   of, and that's when I believe Jesse was on the phone with

8   Dimitri, and we discussed it and we came to the conclusion that

9   I would just go on and deny it and reference that just in a few

10  days the FEC report would be filed.

11  Q.   And was Dimitri Kesari part of that conversation?

12  A.   Yes.

13  Q.   In fairness, you don't know exactly who was on the other end

14  of that line, do you?

15  A.   Correct.

16  Q.   You know one thing, which is Dimitri Kesari told you

17  something about who was on the call at one point, right?

18  A.   Correct.

19  Q.   And who did he say that was?

20  A.   Jesse Benton.

21  Q.   And if he was on the phone with other people, you don't know

22  that?

23  A.   I don't know that.

24  Q.   That's possible?

25  A.   Correct.

1  Q.  You were asked a whole bunch of questions about the work you

2  did on the Bachmann Campaign.

3          Do you recall that?

4  A.  Yes.

5  Q.  And you talked about being paid through Guy Short and his

6  company, right?

7  A.  Right.

8  Q.  Did you do actual work for Guy Short and his company?

9  A.  Yes.

10 Q.  Was the payment you received from Guy Short and his company

11 also compensation for the work you were doing on the Bachmann

12 Campaign?

13 A.  Yes, I believe entirely, but I was answering to Guy Short.

14 We shared an office together at campaign headquarters.

15 Q.  So you were being paid by Guy Short for 70 to 80 hours of

16 actual work on the Bachmann Campaign, at least towards the end,

17 right?

18 A.  Yes.

19 Q.  And it was full time before that?

20 A.  Yes.  I mean, it was never a 40-hour work week.  It was

21 always more.

22 Q.  Did you ever do any of that kind of work, that kind of time,

23 that kind of hours for the Paul Campaign?

24 A.  No.

25 Q.  So you were shown some e-mail material.

1           Do you recall that?

2    A.   Yes.

3    Q.   It's Tate's Exhibit 39, I believe.

4           Did you write this e-mail?

5    A.   No.

6    Q.   This was an e-mail blast, right?

7    A.   Correct.

8    Q.   So it goes out to lots of people?

9    A.   Correct.

10   Q.   Did you sit down and key in all of their e-mail addresses?

11   A.   Not a single one.

12   Q.   Do you remember if you edited this?

13   A.   No, I did not.

14   Q.   Do you remember whether or not you approved any particular

15   one of these?

16   A.   No.

17   Q.   If you did approve it, how long would that take you?

18   A.   Minutes.

19   Q.   You saw a bunch of robo call scripts at Tate's Exhibit 38.

20           Do you remember that?

21   A.   Yes.

22   Q.   How many of these do you actually remember making a

23   recording of?

24   A.   One.

25   Q.   And is this the function where you can dial in on the phone

1    and just read the script?

2    A.  Yes.

3    Q.  How long would it take you to read this first one?

4    A.  To read it, just a few seconds; but to record it, maybe ten

5    minutes because I have to listen to it, push a button, then

6    approve it.

7    Q.  Fair enough.  So you would listen to what you recorded and

8    approve it?

9    A.  Yes.

10   Q.  About ten minutes?

11   A.  Probably, yes.

12   Q.  Ms. Campbell talked to you quite a bit about whether you may

13   have lied to Dimitri Kesari about being with Michelle Bachmann

14   when he was trying to call you, right?

15   A.  Yes.

16   Q.  Would that be a good lie or a bad lie to tell Dimitri Kesari

17   if he's calling you and calling you and calling you about

18   switching to the Paul Campaign?

19   A.  It would have been a good one.

20   Q.  Why?

21   A.  Because he would have left me alone.

22   Q.  And at that time you were lying a lot, right?

23   A.  Yes.

24   Q.  And, to your knowledge, politicians around you and political

25   operators were also lying, correct?

1   A.   Yes.

2   Q.   So when A.J. Spiker was saying how Newt Gingrich was paying

3   large amounts of money for your services, was he lying?

4   A.   Yes.   I never had a conversation with the Newt Gingrich

5   Campaign.   It was never on the radar.

6   Q.   You were also asked on cross-examination about this four-day

7   trip to -- where was it in South Carolina?

8   A.   I don't remember if it was Greenville or Greensville.   I'm

9   not sure.   It was in South Carolina.

10  Q.   It wasn't on the coast?

11  A.   No.

12  Q.   It wasn't Hilton Head?

13  A.   No.

14  Q.   When you were there you said something about legislators,

15  right?

16  A.   Yes.

17  Q.   Did you, like sit and watch a seminar that went on for hours

18  about rolling up your sleeves and --

19  A.   No.   We actually drank a few beers at one of their

20  apartments.

21  Q.   And while you were there, did you inform them that they

22  might be able to get paid by the Ron Paul Campaign if they

23  endorsed him?

24  A.   Yes.

25  Q.   Other than that, did you do any work down there?

1    A.  No.

2    Q.  Somebody said something about a rally.  Did you work at the

3    rally?

4    A.  No.  I attended the rally.

5    Q.  So you were just at a rally; you didn't speak or anything?

6    A.  No.

7           MR. PILGER:  Okay.  No further questions.

8           THE COURT:  Ms. Campbell, anything else?

9           MS. CAMPBELL:  Yes, Your Honor.

10                      RECROSS-EXAMINATION

11   BY MS. CAMPBELL:

12   Q.  Sir, you're saying that today you don't know if Jesse Benton

13   was on the phone with Mr. Kesari, right?

14   A.  Other than Dimitri Kesari telling me that Jesse Benton was

15   on the phone.

16   Q.  But, in fact, you testified under oath in the past that you

17   heard Jesse Benton's voice, right?

18   A.  I don't recall that.

19   Q.  Well, I'll point your attention to prior sworn testimony.

20          I'm going to be showing him page 822, lines 13 through

21   15.

22   A.  Yes.

23   Q.  So now you recall that you said the voice that I heard

24   coming through the phone sounded like Mr. Benton, right?

25   A.  Possibly when I was -- then I did.  I'm just saying now I

1    don't remember, and it's been four years -- five years.

2    Q.  And since then there's been a subpoena for your phone

3    records, right?

4    A.  Correct.

5    Q.  And since then there's been a subpoena for Mr. Kesari's

6    phone records, right?

7    A.  I don't know that.

8    Q.  So we can check and see if there's ever a time when you were

9    on the phone -- or when Mr. Kesari is on the phone with

10   Mr. Benton when you are not on the phone; isn't that right?

11   A.  Pardon me?  I never said I was on the phone.  I was sitting

12   in a room at the campaign headquarters.

13          MR. PILGER:  So whether or not Ms. Campbell can check

14   and see isn't relevant.

15          THE COURT:  Sustained.

16          Pose a new question.

17   BY MS. CAMPBELL:

18   Q.  Sir, you weren't being asked for your advice on how to run

19   the Ron Paul Campaign, were you?

20   A.  No.

21   Q.  They didn't talk to you about their strategy, did they?

22   A.  No.

23   Q.  They didn't ask your opinion on qualities, did they?

24   A.  No.

25   Q.  You recorded phone calls, right?

1   A.  Correct.

2   Q.  Did e-mail blasts, right?

3   A.  Correct.

4   Q.  Went on TV, right?

5   A.  Correct.

6   Q.  Attended events, right?

7   A.  Correct.

8   Q.  And went to South Carolina?

9   A.  Correct.

10          MS. CAMPBELL:  I don't have anything further.

11          THE COURT:  Anything else, Mr. Mills?

12          MR. MILLS:  Just a couple, Your Honor.

13                  RECROSS-EXAMINATION

14  BY MR. MILLS:

15  Q.  Mr. Sorenson, that C-SPAN video that refreshed your

16  recollection about seeing Mr. Tate, you saw that in a conference

17  room filled with FBI agents; is that correct?

18          MR. PILGER:  Objection.  If he wants to refresh

19  recollection, he knows how to do it.

20          THE COURT:  Overruled.  He's just talking about the

21  fact of what happened.

22          Go ahead.

23  A.  There was one FBI agent, one prosecutor.

24  BY MR. MILLS:

25  Q.  They're the ones who showed you the tape, correct?

1   A.  Yes, but it wasn't filled with them.  It wasn't like they

2   were surrounding me and strong arming me.

3   Q.  Okay.  That's fair.

4            The Dennis Fusaro tape, that's been available on the

5   Internet for years, hasn't it?

6   A.  I'm not sure if the whole tape -- I know that the Iowa

7   Republican had part of it on there, but I've learned a long time

8   ago not to Google my name because I don't want to read about it.

9   Q.  And in all of the many meetings that you had with the

10  government agents, you guys never discussed the tape that was

11  publicly available on the Internet?

12  A.  Actually we did discuss it.  I didn't hear the tape.

13  Q.  They never played it for you?

14  A.  No.

15  Q.  They didn't want to refresh your recollection?

16  A.  The last time I heard it was -- or it was -- well, besides

17  this time, was sometime in October.

18           MR. MILLS:  Jake, could you pull up Government's

19  Exhibit 35?  It's already in evidence, Your Honor.

20           And if you could -- thank you.

21  BY MR. MILLS:

22  Q.  Do you see the line where Mr. Tate says, "Why is he getting

23  cold feet?  What can we do, say to help him?"

24           Do you see that?

25  A.  Yes.

1  Q.  Does that sound like he knows anything about a $25,000

2  check?

3  A.  I have no idea what he knows and what he doesn't know at

4  that time.

5  Q.  I mean, he doesn't say, what the heck, Dimitri you gave him

6  $25,000 yesterday, why is he getting cold feet?  He doesn't say

7  that?

8          MR. PILGER:  Asked and answered and argument to the

9  jury.

10          THE COURT:  Sustained.

11          MR. MILLS:  Thank you, Your Honor.

12          THE COURT:  Anything else, Mr. Binnall?

13                  RECROSS-EXAMINATION

14  BY MR. BINNALL:

15  Q.  Mr. Sorenson, how many times have you met with the

16  government since you've been involved in this case?

17  A.  I'm not sure.

18  Q.  More than five?

19  A.  I would say so, yes.

20  Q.  More than ten?

21  A.  Probably.  I'm not sure.  I have no idea how many times.

22  Q.  And since you last gave sworn testimony in October, how many

23  times have you met with the government?

24  A.  Three maybe, four.  I'm not sure.

25  Q.  And when was the last time you met with the government?

1    A.   You mean other than being in court today and Friday?

2    Q.   Correct.

3    A.   It would have been a day before the trial started, I

4    believe, or the day the trial started.  I'm not sure.

5    Q.   All right.

6    A.   But it was last week sometime.

7              MR. BINNALL:  Thank you very much.

8              MR. PILGER:  Your Honor, may I ask a couple?

9              THE COURT:  Just real brief.

10             MR. PILGER:  Yes, sir.

11                  FURTHER REDIRECT EXAMINATION

12   BY MR. PILGER:

13   Q.   Ms. Campbell read part of a transcript of prior sworn

14   testimony.  Let me read you the whole question and answer and

15   see if that refreshes your recollection here.

16             MS. CAMPBELL:  Objection, Your Honor.  This is not

17   proper refreshing recollection.

18             THE COURT:  He hasn't expressed a failure of

19   recollection.  That's the foundation of refreshing recollection.

20             MR. PILGER:  Very well, Your Honor.

21   BY MR. PILGER:

22   Q.   Do you recall the entire question and the entire answer as

23   you are sitting there today?

24   A.   No.

25   Q.   Approaching.  Let me ask you to read silently to yourself

1    from line 11 through line 17.

2    A.   Okay.

3              (Pause.)

4              Yes.

5    Q.   Does that refresh your recollection about the question?

6    A.   Yes, it does.

7    Q.   Did the question have to do with Dimitri telling you whether

8    or not Mr. Benton was on the phone?

9    A.   Yes, it did.

10   Q.   Did you say whether or not you could be sure?

11   A.   No.  I said I could not be sure.

12   Q.   Did you say whether or not you could see through the phone

13   line to be sure?

14   A.   I actually said I could not see through the phone line to be

15   sure.

16   Q.   Okay.  So that didn't get asked before, but that's what

17   happened in that transcript, right?

18   A.   Correct.

19   Q.   Finally, it's come up again that you met with the government

20   many times.  And that is absolutely true, isn't it?

21   A.   Yes.

22   Q.   At the beginning and the end and throughout your interviews

23   with the government, what were you told about what you should do

24   in this case?

25   A.   Actually every time Mr. Pilger -- the first time we met I

1    almost -- it's not that the situation is funny, but

2    repeatedly -- I think last time I said I know I have to tell the

3    truth, and you still didn't take that as being good enough, you

4    had to tell me that again.  So, I mean, it is religiously told

5    to me throughout the entire meetings that I had to tell the

6    truth.

7    Q.  Was it pro forma or did government counsel and/or the FBI

8    get into it with you as to particular matters we're talking

9    about, to make sure that you paid attention to telling the

10   truth?

11   A.  Yes.  You've been very clear that I had to tell the truth.

12   Q.  And was that whether it pleased us or not?

13   A.  It didn't matter if it pleased you or not, I had to tell the

14   truth.

15              THE COURT:  Thank you, sir.  You're excused.

16                                    (Witness excused.)

17              THE COURT:  Members of the jury, we're going to take

18   our noon recess.  We'll come back at 1:15.

19              See you then.

20              (Recess at 11:58 a.m., until 1:15 p.m.)

21

22

23

24

25

1          AFTERNOON SESSION  1:15 p.m.

2              (In open court, in the presence of the jury.)

3              THE COURT:  Please be seated.

4              If we could get the witness to stand, please.

5              We'll have her administer your oath.

6              THE CLERK:  Please raise your right hand.

7               NOEL IZON, GOVERNMENT'S WITNESS, SWORN

8              THE CLERK:  Please be seated.

9                          DIRECT EXAMINATION

10   BY MR. PILGER:

11   Q.  Good afternoon, sir.

12   A.  Good afternoon.

13   Q.  Please state and spell your name for the record.

14   A.  My name is Noel Izon.  It's N-O-E-L I-Z-O-N.

15   Q.  And do you go by the nickname "Sonny"?

16   A.  Yes, sir.

17   Q.  What's your job, sir?

18   A.  I'm a filmmaker.

19   Q.  How long have you been a filmmaker?

20   A.  Over 40 years.

21   Q.  Have you done documentaries?

22   A.  Lately in the past 20 years I've been concentrating on

23   historical documentaries which I produce for Public Television,

24   National Geographic, people like that.

25   Q.  About how many films have you made for television?

1  A.  200.

2  Q.  And do you have a family, sir?

3  A.  Yes, I do.  I'm married, I have two children and three

4  grandchildren.

5  Q.  And let me turn your attention to someone named Pavlo, also

6  known as Paul Kesari.

7          Do you know who that person is?

8  A.  Say that again, sir.

9  Q.  Do you know who Pavlo Kesari is?

10  A.  Yes, sir.  I know him well.

11  Q.  And is he sometimes known as Paul Kesari?

12  A.  I call him Paul.

13  Q.  Is he in your family or is he someone else?

14  A.  No.  He's a business associate, as well as a friend, a very

15  close friend.

16  Q.  And how is he a business associate?

17  A.  I'm sorry?  Repeat that, please.

18  Q.  In what way is he a business associate?

19  A.  Well, we do work for each other because we're in like

20  businesses because he provides audiovisual supports.  Sometimes

21  he needs some of my equipment; sometimes I need some of his

22  equipment.

23  Q.  And how long have you known Pavlo Kesari?

24  A.  About, approximately, ten years.

25  Q.  Do you remember how you met?

1   A.   We were introduced by a fellow filmmaker, Eugene Wooden.

2   Q.   Did there come a time where you met Mr. Pavlo Kesari's

3   brother?

4   A.   There was.

5   Q.   And do you remember that man's name?

6   A.   Yes.  I believe it was August of 2012, I was helping Paul

7   with getting his house, his family home refinanced, and so --

8   because I had some experience with refurbishing or at least

9   making a house look good for appraisal.  So I was helping him

10  with that house, which is a family house, and I believe it was

11  the closing that was held at the house where I met Dimitri

12  Kesari.

13  Q.   So his brother's name is Dimitri Kesari?

14  A.   Yes, sir.

15  Q.   And if I heard you right, you met him in August of 2012,

16  correct?

17  A.   That's correct.

18  Q.   Had you had dealings with Dimitri Kesari by e-mail before

19  that?

20  A.   Yes, I did.

21  Q.   So on that note, turning your attention back from August of

22  2012 when you actually met Dimitri Kesari, turning your

23  attention all the way back to December of 2011, did Pavlo Kesari

24  ask you to handle something regarding some payments?

25  A.   Yes, he did.

1  Q.  What did he ask you to do?

2  A.  He mentioned to me that his brother had needed to hire some

3  person, which was not necessarily a person that -- someone in

4  his organization.  I didn't know the organization at the time,

5  but he wanted to hire this graphic artist who he thought was

6  good for the work that they needed, and he had first asked Paul

7  to handle it for him so that he could hire him without raising

8  any red flags within the organization.  But Paul was in the

9  middle of transitioning, closing one company and opening

10  another, so he asked me, he said, can you handle this for me?  I

11  said, sure, no problem, because, you know, we've done that in

12  our businesses before, handled payments for other things.

13  Q.  And you said you've handled payments for your business.

14  Remind the jury, what is your business?

15  A.  My business is film production.

16  Q.  And in that particular industry, are there issues concerning

17  dealing with labor unions and others who need to be paid

18  carefully?

19  A.  We do oftentimes have what we call paymasters.  For example,

20  I might pay a paymaster to hire all of the talent, and even

21  though that paymaster may not actually do any work, other than

22  pay the talent, we pay them a commission and then they handle

23  the payment of the talent.  So that happens quite a bit in my

24  business.

25  Q.  And your business is a film production business, right?

1    A.  Yes, sir.

2    Q.  Is the film production business in your experience regulated

3    to the FEC?

4            MR. BINNALL:  Objection; relevance.

5            THE COURT:  Overruled.

6            Answer the question.

7    A.  No, sir, it's not.

8    BY MR. PILGER:

9    Q.  Okay.  Now you explained this and I think I understood.  You

10   said "he" a lot, so I'm just going to go back a little bit.

11           Pavlo Kesari talked to you about doing something,

12   right?

13   A.  (Witness nodded his head affirmatively.)

14   Q.  You have to say out loud.

15   A.  Yes.

16   Q.  And what exactly did he ask you to do?

17   A.  He asked me to handle invoicing for a particular company,

18   which was something that his brother needed to do, and the idea

19   was to have us do the billing just so it would not raise any red

20   flags about this particular person.  I was led to believe that

21   there was some intramural kinds of in fighting as to whose

22   favorite person was and all of this, so he wanted to be able to

23   use who he thought was best --

24   Q.  Wait.  Who's "he" there?

25   A.  This is Dimitri, sir.

1  Q.  Okay.  And being told things to cause you to take action,

2  what did you hear about what Dimitri wanted?

3  A.  Well, in the beginning I was told that they needed to hire a

4  graphic artist, but there were other graphic artists, but they

5  didn't want to have any impediment to their hiring this person.

6  So they asked me to handle the billing.

7  Q.  And when this first came up, did Pavlo Kesari explain who

8  "they" were who wanted this graphic artist?

9  A.  I recall that he had mentioned that his brother worked, you

10  know, for a campaign.  Other than that, I didn't -- that first

11  time I don't remember the name of the person.  I just knew he

12  was working a campaign.

13  Q.  And do you remember this coming up in December of 2011?

14  A.  Yes, sir.

15  Q.  And, in fairness, did you talk to Pavlo Kesari, Dimitri

16  Kesari, or both at that time?

17  A.  In December of 2011?

18  Q.  Yes, sir.

19  A.  In December I talked to Paul, but the information I was

20  getting was being relayed through him.  It wasn't until later

21  that I did talk at least by e-mail to Dimitri.

22  Q.  So having heard these representations about what you would

23  do, did you then take action and do something?

24  A.  Yes, I did.  I told him I would do it and I would submit an

25  invoice to Dimitri, Dimitri would pay us, and then we would pay

1    the vendor.

2    Q.   And was it part of your understanding that you would take

3    commission?

4    A.   That's standard in our industry that when you act as

5    paymaster you take a 10 percent fee.

6    Q.   Were there also some -- in that paymaster role, are there

7    sometimes expenses associated with payment?

8    A.   Some small expenses like the wire transfer fees that the

9    banks would charge for both receiving and sending the wire

10   transfers, not large, but typically $25 dollars for each

11   transaction.

12   Q.   And did you end up sending e-mails to Dimitri Kesari about

13   this issue of being what you call a paymaster?

14   A.   I'm sorry, I didn't catch the whole question.

15   Q.   No, that's all right.

16        Did you send e-mails to Dimitri Kesari --

17   A.   Yes, I did.

18   Q.   We can't talk over each other --

19   A.   Sorry.

20   Q.   -- because the court reporter has to get it down.  So let's

21   bear with me for a moment.

22        (Pause.)

23        Did you always communicate only with Dimitri Kesari or

24   did you communicate with other persons about getting these

25   payments for the graphic person?

1  A.  As far as the invoicing to Dimitri Kesari, I only

2  communicated with him.

3  Q.  Did you ever come to communicate with the person

4  supposedly -- the person providing the services?

5  A.  I did by e-mail, yes.

6  Q.  Do you know who that was?

7  A.  I knew -- I did not know the name at first; I knew the

8  company, which was Grassroots Strategy, I believe, and then much

9  later on when I was getting e-mails it was signed by a Mr. Kent

10  Sorenson.

11  Q.  Now, when you say you knew the company, Grassroots Strategy,

12  does that mean you just knew the name from the e-mail or you did

13  business with them or you visited them, or what?

14  A.  No.  I just heard from the e-mail it was the senator's

15  e-mail, so --

16  Q.  Did you receive e-mails back from Dimitri Kesari or only

17  send e-mails to him?

18  A.  Sometimes I received e-mails back, sometimes we would do an

19  e-mailing, basically point of clarification or something like

20  that; but yes, I did receive e-mails from Mr. Kesari.

21  Q.  And on the invoices, you said you sent them to Dimitri

22  Kesari, correct?

23  A.  Correct.

24  Q.  Did you ever send them to Fernando Cortes?  Do you remember

25  ever sending them to one Fernando Cortes?

1  A.  I did not.

2  Q.  Do you remember ever sending them to anyone else affiliated

3  with the Ron Paul 2012 Presidential Election Campaign?

4  A.  No, sir.

5          MR. PILGER:  So, Ms. Draughn, if we could get Exhibit

6  73 not yet in evidence for identification.

7          Under the court's prior procedure, we'll offer this

8  now.

9                          (Government Exhibit 73 was

10                          offered in evidence.)

11          THE COURT:  Received.

12                          (Government Exhibit 73 was

13                          received in evidence.)

14  BY MR. PILGER:

15  Q.  Can you see that on the screen in front of you?

16  A.  It just went out.

17  Q.  Give us a second.

18  A.  I see it.

19  Q.  There we go.

20          So, Mr. Izon, this is in evidence now.  This is from

21  your name @aol.com.  Is that your e-mail address?

22  A.  That is correct.

23  Q.  And it is to DKesari@aol.com.  Did you understand that to be

24  Dimitri Kesari's address?

25  A.  Yes, sir.

1   Q.  What's the subject?

2   A.  Production services invoice.

3   Q.  What's the date?

4   A.  Sunday, February 5, 2012.

5   Q.  And you say:  Hi, Dimitri.  And then what do you say?

6   A.  Attached is the production services invoice we discussed.

7   Let me know if you need anything else.  By the way, the web site

8   for my latest Holocaust documentary is up.  Please check it out

9   when you come up for air.

10  Q.  And then there's a link to that movie, right?

11  A.  Yes, then there's a web site for the movie.

12  Q.  And then continue.

13  A.  Let me know what you think.

14          Thanks for the business.

15          Sonny Izon.

16  Q.  Okay.  You say in this e-mail that attached is the

17  production services invoice we discussed.  Had you discussed it

18  with Dimitri Kesari?

19  A.  My recollection is that the details of the invoice were

20  discussed between Mr. Kesari and Mr. -- Dimitri Kesari and Paul

21  Kesari and they prepared it and then gave me the details when

22  they had it ready.

23  Q.  The term "production services" in particular, though, where

24  did you get that term?

25  A.  Well, it was about as generic as I could make it in terms of

1    what I understood the work to be.  At the time it was presented

2    as the graphic services invoice, so that's what I put in which

3    covers -- it's really more of a generic term because on other

4    invoices I might go ahead and say cinematographer or this or

5    that, but I wanted to come up with something that would cover

6    the services.

7    Q.  And do you remember talking to Dimitri Kesari in this e-mail

8    about production services?

9    A.  Talking to him?  You mean other than the e-mail?

10   Q.  Sure, other than the e-mail.

11   A.  No.

12   Q.  And in the e-mail when you wrote to him and you told him,

13   attached is the production services invoice we discussed, did he

14   ever write back and say, I don't know what you mean about

15   production services?

16   A.  No.

17   Q.  Did he ever question this e-mail in any way?

18   A.  No.

19   Q.  And, Ms. Draughn, if you could move to the attachment, which

20   would be the third page to Government's 73.  Ms. Draughn, could

21   you just highlight the very top from Interactive Communication

22   down to the line item, quantity 1?

23          Thank you.

24          Is this an invoice from your company, Interactive

25   Communication Technology, Inc.?

1  A.  Yes, it is.

2  Q.  And I'll just refer to that as ICT from now on.

3  A.  Uh-huh.

4  Q.  And is this an invoice directed to the Ron Paul PCC, Inc.,

5  attention:  Dimitri Kesari?

6  A.  It is.

7  Q.  And what's the date of the invoice?

8  A.  It's February 2, 2012.

9  Q.  And there's one line item on the invoice, right?  Please

10  tell the jury what that says.

11  A.  Production services.

12  Q.  And what's the unit price?

13  A.  38,125.

14  Q.  And the total is the same, correct?

15  A.  Correct.

16  Q.  If we could zoom out to the whole exhibit, Ms. Draughn.

17        Tell the jury what went into that number of 38,125?

18  A.  It was composed of several elements.  The first was 25,000

19  that was for work already done by the company that they wanted

20  to hire -- that they already hired.  And so 25,000 was for that.

21  Q.  Hold on.  Who's "they"?

22  A.  The Ron Paul Campaign had wanted -- that they had hired this

23  company, Grassroots Strategy; but he had already been working

24  for them prior to my meeting -- you know, prior to my actually

25  in January starting the invoice process, so --

1  Q.  Let me stop you.  So on that $25,000 -- we'll continue with

2  the rest in a second -- your understanding was the Ron Paul

3  Campaign had already hired a company and it needed to be paid

4  for prior services, correct?

5  A.  Correct.

6  Q.  Now, you knew that from representations to you, right?

7  A.  Yes.

8  Q.  You don't know whether those representations were true or

9  not, do you?

10  A.  I believed them to be true.

11  Q.  You don't have any independent knowledge of whether they are

12  true?

13  A.  I do not.

14  Q.  Did those representations cause you to do this invoice,

15  though?

16  A.  That is correct.

17  Q.  Who made those representations?

18  A.  They were made to me by Paul Kesari from his understanding

19  of what his brother told him --

20          MR. BINNALL:  I object to multi levels of hearsay that

21  we're getting into here.

22          THE COURT:  Overruled.

23  BY MR. PILGER:

24  Q.  You kind of trailed off.  The last thing I heard was the

25  representations by Paul Kesari.  And what was the next thing you

1    wanted to say?

2    A.   The representations were made to him and then he conveyed

3    them to me.

4    Q.   And were made to him by who?

5    A.   By Dimitri Kesari.

6    Q.   Did that cause you to be in correspondence with Dimitri

7    Kesari in the e-mail that covers this invoice?

8    A.   Yes.

9    Q.   So we start with the 25,000 of the 38,125.  Just to remind

10   the jury, the 25 was represented to you as work already done,

11   right?

12   A.   Correct.

13   Q.   And what's the rest?

14   A.   Then there was 8,000 for the month of January and then there

15   was the 10 percent on the two amounts, on the 25 and 833, so

16   about $3,300 was the 10 percent, plus the $50 bank charge, and

17   then there was I believe in the vicinity -- I can't remember the

18   exact amount, in the vicinity of $2,000 which was for

19   audiovisual equipment that the campaign had used sometime back

20   in 2011.

21           MR. PILGER:  Court's indulgence.

22           (Pause.)

23   BY MR. PILGER:

24   Q.   Sitting here today, Mr. Kesari -- I'm sorry, Mr. Izon, do

25   you remember who specifically related to you that you should

1  include that last couple of thousand for services provided?

2  A.  I believe it was just basically told to me that this is

3  going to be the content of the first invoice.  Whether it was

4  something that Mr. Paul Kesari discussed with his brother or

5  not, I don't really know.

6  Q.  Turning your attention to Government's Exhibit 83 in

7  evidence -- Ms. Draughn, forgive me; Government's Exhibit 81 in

8  evidence.

9        Mr. Izon, is this another e-mail from yourself to

10  Dimitri Kesari?

11  A.  Yes, sir.

12  Q.  What's the subject?

13  A.  February invoice.

14  Q.  And the date?

15  A.  Wednesday, the 21st of March, 2012.

16  Q.  Just read it to the jury, please.

17  A.  Say that again, sir?

18  Q.  I'm sorry.  Just read it to the jury, please.

19  A.  Okay.  Hey, Dimitri.

20        Attached is the invoice for services rendered in

21  February.  Let me know if you need anything else.  Best, Sonny.

22  Q.  Ms. Draughn, if we could move to the next page.  One more;

23  I'm sorry.

24        Is this another invoice from ICT to the Ron Paul

25  Presidential Campaign Committee, Inc.?

1  A.  Yes, sir.

2  Q.  And is it specifically to the attention of Dimitri Kesari?

3  A.  Yes, sir.

4  Q.  Is there one line item?

5  A.  Yes, sir.

6  Q.  And what's that line item?

7  A.  Production services.

8  Q.  Sorry, bear with me one moment.

9          (Pause.)

10          What's the unit price?

11  A.  8,850.

12  Q.  And the line item description says production services,

13  February, right?

14  A.  Correct.

15  Q.  That corresponds with the cover e-mail?

16  A.  Yes, sir.

17  Q.  How did you get the number 8,850?

18  A.  That was the number that was given to me as the monthly

19  contract that they had, and the 800 is for the 10 percent and

20  the 50 is for the bank charges.

21  Q.  Ms. Draughn, can you just scroll down to -- this is not

22  redacted.

23          I'll just ask you, sir, ICT, where is it located?

24  A.  It's in Hyattsville Maryland, 4316 Hamilton Street.

25  Q.  And what bank did you use at this time?

1    A.   Bank of America.

2    Q.   And what branch did you use?

3    A.   In College Park, Maryland.

4    Q.   Thank you.

5              Ms. Draughn, if we could get 83 in evidence.

6              Is this another e-mail from yourself to Mr. Dimitri

7    Kesari?

8    A.   Yes, sir.

9    Q.   Subject is the March invoice?

10   A.   Yes.

11   Q.   Dated 26 March, 2012, right?

12   A.   Yes, sir.

13   Q.   And then you told Dimitri:  Here is the invoice for March.

14             Peace, Sonny, right?

15   A.   That is correct.

16   Q.   Ms. Draughn, if we could go to the next page.

17             Here -- you can leave the whole thing up, Ms. Draughn.

18             Is this another invoice for $8,850?

19   A.   Yes, sir.

20   Q.   And is the line item description production services, parens

21   March, closed parens?

22   A.   Yes, sir.

23   Q.   And is everything else the same as the last invoice we

24   looked at?

25   A.   That is correct.

1  Q.  Except the date, right?

2  A.  That's correct.  This one goes with the March e-mail.

3  Q.  And so the date on this invoice is March 27, 2012, right?

4  A.  That is correct.

5  Q.  It's, again, directed to the Paul Campaign, attention:

6  Dimitri Kesari, right?

7  A.  Yes, sir.

8  Q.  Turning your attention to Government's 87a in evidence.

9         Is this another e-mail from yourself to Dimitri

10  Kesari?

11  A.  Yes, sir.

12  Q.  Is the subject April invoice?

13  A.  Yes, sir.

14  Q.  Was it sent May 2, 2012?

15  A.  Yes, sir.

16  Q.  Then you say, hey Dimitri, and then what do you say in the

17  text?

18  A.  Here's the production services invoice for April 2012.  Hope

19  you are doing well.

20         Peace, Sonny Izon.

21  Q.  And, again, you use the term "production services," right?

22  A.  Yes, sir.

23  Q.  And you had the understanding this was a graphics designer

24  that was involved, right?

25  A.  Yes, sir.

1  Q.  Did you get any response questioning this?

2  A.  I'm sorry?  Say that again.

3  Q.  Did Dimitri Kesari or anyone else write back to you and say,

4  what's this about?

5  A.  No, sir.

6  Q.  If you would go to page 2, is that another invoice from ICT

7  to the Ron Paul committee, attention:  Dimitri Kesari?

8  A.  Yes, sir.

9  Q.  Is the date of the invoice May 1, 2012?

10  A.  Yes, sir.

11  Q.  What's the description?

12  A.  Production services, April.

13  Q.  And is the amount the same as the last two that we looked

14  at, 8,850?

15  A.  That is correct.

16  Q.  Is the reason for that amount the same?

17  A.  Yes, sir.

18  Q.  Turn your attention to Government's Exhibit 90 in evidence.

19          So this is a longer e-mail string.  And, Ms. Draughn,

20  if you would go to page 2, we can capture the first e-mail in

21  the string.

22          So on February 10, 2012, at 5:12 a.m. -- 5:12 a.m.,

23  are you an early riser?

24  A.  Sometimes when you're a filmmaker, you're up late at night

25  and early in the morning, so we keep all hours.

1 Q. Okay. At 5:12 a.m., Sonny Izon wrote:

2         Hi, Kent.

3         Good morning.

4         Just wanted to confirm your receipt of wire transfer.

5 Let me know if you need anything else.

6         Peace, Sonny.

7 A. Say that again?

8 Q. Do you remember the e-mail?

9 A. Yes, I do.

10 Q. And who is Kent and why are you writing to him?

11 A. That's Kent Sorenson. I did -- after -- must have been

12 between January and February, there was a short e-mail. I can't

13 remember exactly how, but he was introduced as the fellow who

14 owned Grassroots Strategy.

15 Q. And we don't have that e-mail to show you. Do you remember

16 anything else about it?

17 A. No, I do not.

18 Q. Do you remember anything else about it, who it was from?

19 A. Do I remember any e-mails from him?

20 Q. Do you remember who introduced you to Kent Sorenson by

21 e-mail?

22 A. I do not, sir.

23 Q. Okay. Did you ever know Kent Sorenson in any personal way

24 or only by e-mail?

25 A. Only by e-mail.

1  Q.  Okay.  And you say in this first e-mail you want to confirm

2  receipt of wire transfer.

3          What did you mean by that?

4  A.  I was referring to the first payment which was -- I wanted

5  to make sure that it would go through.  That was for the initial

6  38,000, I believe.  I don't have the right amount in front of

7  me, but it was to confirm that he received the wire transfer.

8  Q.  And then, Ms. Draughn, I don't know how you're going to do

9  this, maybe split screen.  If you could go to the next message

10  which starts on page 1 and carries over to page 2.

11          Can you see that, sir?  So there's an e-mail that

12  starts on the top screen, says original message?

13  A.  I don't have the date on that next one.  The May 1, 2012?

14  Q.  We're good right there.

15          Okay.  So do you see there's some dashes and then it

16  says original message?

17  A.  Uh-huh.

18  Q.  You have to say "yes" or "no" for the court reporter.

19  A.  Yes, sir.

20  Q.  And then it says, from Kent Sorenson, right?

21  A.  Yes.

22  Q.  And there's an address of kent@kentsorenson.com?

23  A.  Yes.

24  Q.  Is that the e-mail that you recognize as used by the person

25  called Kent Sorenson?

1    A.  Yes, sir.

2    Q.  And it's to you at your normal e-mail address, right?

3    A.  Yes.

4    Q.  Dated Friday, February 10, 2012; yes?

5    A.  Yes, sir.

6    Q.  And does he respond to your inquiry about receiving the

7    wire?

8    A.  Yes, sir.  He confirmed --

9    Q.  What's he say?

10   A.  It was received, I really appreciate it.

11          Thanks, Sonny.

12   Q.  Ms. Draughn, if you would go just to page 1 now.  If you

13   would just make the box on the bottom third and scroll up.

14          Okay.  Is there an e-mail from yourself, Mr. Izon, on

15   May 1st at 10:00 p.m. to Kent Sorenson?

16   A.  Yes, sir.

17   Q.  It says, Kent.  Did you have any other Kents you were

18   talking to in this e-mail chain?

19   A.  I didn't catch that question.

20   Q.  Kent Sorenson is the only Kent in this e-mail chain, right?

21   A.  That is correct.

22   Q.  And you said:  Just checking in to see if you will be

23   forwarding invoices for April and beyond.  Hope you are well.

24          And then did he respond to that?

25   A.  Yes, sir, he did.

1  Q.  And did he respond to you on May 2nd at 1:54 a.m.?

2  A.  Yes, sir.

3  Q.  And the subject is additional invoices.  He says, hey,

4  Sonny, and then what did he say?

5  A.  I am attaching the invoice for April.  I have been caught up

6  trying to wrap up a -- I don't know, I can't see the last word

7  there.  Final?

8  Q.  We might be able to scroll to the left of it and see it, or

9  maybe not.

10        Now, that's the original, so just read it as it is,

11  please.

12  A.  Trying to wrap up a -- and then there's a letter F, things

13  with session and just have not had time to submit it.  Thanks

14  for the e-mail.  We're doing great.  I hope you are as well.

15        Blessings, Kent.

16  Q.  Moving up to the next e-mail on May 17, 2012, you wrote

17  back:  Hi, Kent.

18        I know you are wrapping up work on the campaign.  I

19  was wondering if you will be sending a full or partial invoice

20  for May.  Please advise.

21        Peace, Sonny.

22        Do you remember doing that?

23  A.  Yes, sir.

24  Q.  And do you remember you got a response from Dimitri

25  Kesari -- I'm sorry, a response from Kent Sorenson?

1    A.  Yes, I did.

2    Q.  Let's scroll up and look at that.

3            So Kent Sorenson wrote to you and copied someone else.

4    Who did he copy?

5    A.  Dimitri Kesari.

6    Q.  What date is that?

7    A.  May 17, 2012.

8    Q.  And what did Kent Sorenson say to you -- and he didn't copy

9    Dimitri Kesari.  He also wrote to Dimitri Kesari, right?

10   A.  Correct.

11   Q.  What did he say to you and to Dimitri Kesari?

12   A.  It says, "I ha," which I think he meant had -- "an agreement

13   with Dimitri that went through the month of June.

14          "Thanks.  Kent."

15   Q.  Moving to 91 into evidence, Ms. Draughn.

16   A.  Sir?

17   Q.  Oh, I was talking to Ms. Draughn.

18   A.  Oh, I thought you were asking me something.

19   Q.  She's running the computer that brings these up to you.

20          We're on 90, Ms. Draughn.

21          I'm sorry, so sorry.  I know this is very small.

22   Ms. Draughn, could you zero in on where it says original

23   invoices down?  Yeah, make that as big as possible.

24          Can you read that, sir?

25   A.  I can read some of it.  The address for Kent Sorenson is not

1  very clear.

2  Q.  Do you remember getting this e-mail?

3  A.  The date?

4  Q.  Do you remember getting it?

5  A.  Yes, I did.

6  Q.  Okay.  I'll approach.

7      Is this a copy that's been blown up bigger?

8  A.  Yes, sir.

9  Q.  Can you see the date on there?

10  A.  May 21st.

11  Q.  2012?

12  A.  2012.

13  Q.  And is there an attachment?  I'm showing you where there's a

14  PDF indicated.

15  A.  Yes, there are two PDFs.

16  Q.  Okay.  And what does it say?

17  A.  It says:  "Sonny, I wasn't real clear on your invoice

18  request.  I am attaching one that has May and one that included

19  May and June."

20  Q.  And it says:  "Thanks.  Kent," right?

21  A.  That is right.

22  Q.  Ms. Draughn, could you split screen the following two

23  invoices within this exhibit?

24      Are these the two invoices you received with that

25  e-mail?

1    A.   These are the two.

2    Q.   And these invoices are from Grassroots Strategy, Inc.,

3    right?

4    A.   That is correct.

5    Q.   Both of them?

6    A.   Yes, sir.

7    Q.   They are dated May 31, 2012, correct?

8    A.   Yes, sir.

9    Q.   And they're to the attention of ICT, right?

10   A.   Yes, sir.

11   Q.   And the one on the left has two line items.  One says

12   provides monthly service for month of May 2012 for $8,000.  The

13   next one says provides monthly service for month of June 2012

14   and provides for $8,000.

15            So there's a total of $16,000 on this invoice, right?

16   A.   Yes, sir.

17   Q.   The one next to it just has one line item for May of 2012

18   for $8,000, right?

19   A.   Yes, sir.

20   Q.   Okay.  Now, these invoices from Grassroots Strategy are

21   billing ICT, Inc., for services, right?

22   A.   Yes, sir.

23   Q.   Did Kent Sorenson ever provide any services to ICT?

24   A.   He did not.

25   Q.   Did he ever do one lick of work for you that you know of?

1    A.  Not at all.

2    Q.  If we could have 92 in evidence, Ms. Draughn.

3         This is another e-mail from yourself to Dimitri

4    Kesari, correct?

5    A.  Yes, sir.

6    Q.  It's sent May 24, 2012; yes?

7    A.  Yes, sir.

8    Q.  And the subject is May invoice?

9    A.  Yes, sir.

10   Q.  Is there an attachment?

11   A.  Say that again.

12   Q.  Is there an attachment?

13   A.  Yes, sir, there is an invoice attachment.

14   Q.  And you said:  Hi, Dimitri.

15        I hope this finds you well and not too crazy as you

16   wind down your operations for Ron.

17        Did you understand that operations were winding down

18   for the Paul Campaign at this point?

19   A.  Yes, sir.

20   Q.  I don't know when you guys are going into close out mode so

21   I thought I'd better send this sooner than later.  I will have

22   one last one to send for June which I can also send ahead of

23   time if that is helpful.  Please advise.

24        Peace, Sonny.  Right?

25   A.  Yes, sir.

1    Q.   And turning your attention to the second page, there's

2    another invoice, again from ICT to the Ron Paul Campaign,

3    correct?

4    A.   Yes, sir.

5    Q.   Again, attention:  Dimitri Kesari, right?

6    A.   Yes, sir.

7    Q.   This one is dated May 25, 2012, right?

8    A.   Yes, sir.

9    Q.   And it's for production services, parens, May, closed

10   parens; yes?

11   A.   Yes, sir.

12   Q.   And the amount, both the unit and the total is 8,850 again?

13   A.   That is correct.

14          MR. PILGER:  If we could go to 96, not yet in

15   evidence.

16          We offer 96, Your Honor.

17                              (Government Exhibit 96 was

18                               offered in evidence.)

19          THE COURT:  Received.

20                              (Government Exhibit 96 was

21                               received in evidence.)

22   BY MR. PILGER:

23   Q.   We're just waiting for it to come up on the big monitor,

24   Mr. Izon.

25          There we go.

1          Is this an e-mail from yourself to Dimitri Kesari,

2    subject:  June invoice?

3    A.  Yes, sir.

4    Q.  Was it sent Monday, the 18th of June?

5    A.  That is correct.

6    Q.  2012?

7    A.  Yes, sir.

8    Q.  And you said:  Hi, Dimitri.

9          Hope you are well.  Since I will be on travel for most

10   of the rest of the month, I'm sending you the June invoice.

11          Good luck with the settlement of the Kennedy Street

12   house.

13          Peace, Sonny.

14          And you attached -- if we go to page 3 -- another

15   invoice, right?

16   A.  Yes, sir.

17   Q.  One more page, Ms. Draughn.  There we go.

18          This invoice is the same as the rest.  It's from ICT

19   to the Ron Paul Presidential Campaign Committee, attention:

20   Dimitri Kesari, right?

21   A.  Yes, sir.

22   Q.  This one is dated June 18, 2012; yes?

23   A.  Yes, sir.

24   Q.  And it's for production services, parens, June, closed

25   parens?

1    A.  Yes, sir.

2    Q.  And the unit price and total price are $8,850, right?

3    A.  That is correct.

4    Q.  And, lastly, if you go to 97 already in evidence -- this

5    should be redacted, Ms. Draughn, I think.

6            This is yet another e-mail from yourself to Dimitri

7    Kesari, correct?

8    A.  Yes, sir.

9    Q.  And its subject is forwarding:  June invoice?

10   A.  Yes, sir.

11   Q.  What's the date?

12   A.  June 25.

13   Q.  2012, correct?

14   A.  2012.

15   Q.  That's actually the second e-mail in this chain, right?

16   A.  Yes, sir.

17   Q.  In the second e-mail you say:  Hey, Dimitri.

18           Here it is.  Thanks for everything.

19           Sonny.

20           And then there was a prior e-mail on June 18th that

21   you forwarded, right?

22   A.  Yes, sir.

23   Q.  And that was also from yourself to Dimitri Kesari; yes?

24   A.  Yes, sir.

25   Q.  Seven days earlier, right?

1   A.  Yes, sir.

2   Q.  Just read that one.  I'm sorry I'll read it.

3           You said, hi, Dimitri.

4           Hope you are well, since I will be on travel for most

5   of the rest of the month, I'm sending you the June invoice.

6           That's the e-mail we just looked at, right?

7   A.  That's correct.

8   Q.  And you forwarded it again on the 25th?

9   A.  Yes, sir.

10  Q.  And if we just look at the invoice on the third page,

11  Ms. Draughn.

12          There's that invoice again, correct?

13  A.  Yes, sir.

14          MR. PILGER:  Just one moment, Your Honor.

15          (Pause.)

16  BY MR. PILGER:

17  Q.  We did talk about whether Grassroots Strategy had done any

18  work for ICT.  Did Kent Sorenson do any work for ICT?

19  A.  No, sir.

20  Q.  Did ICT do any actual audiovisual work for the Ron Paul

21  Presidential Campaign?

22  A.  No, sir, other than paymaster.

23  Q.  And as paymaster, your company served as a passthrough for

24  the payments to get to Kent Sorenson?

25  A.  Yes, sir.

1           MR. MILLS:  I'm going to object.  That's slightly

2    distorting the evidence.

3           THE COURT:  Overruled.

4    BY MR. PILGER:

5    Q.  Well, for tax purposes did you consider it a passthrough?

6    A.  Well, in our business it's really not considered a

7    passthrough.  It's considered a paymaster service, which is

8    essentially handling the accounting and we get paid the 10

9    percent.

10   Q.  So do you remember testifying about this at prior

11   proceedings?

12   A.  Yeah.  I mean, yeah, I was asked about this.

13   Q.  Well, let me ask you this.  Did you pay taxes on the entire

14   amount that came to you from the Paul Campaign or only your

15   commission?

16   A.  Only the commission because we can deduct the payments out.

17   Q.  And so the payments out just passed through your company; is

18   that correct?

19   A.  That is correct.

20           MR. PILGER:  Thank you.

21           No further questions.

22           THE COURT:  Go ahead.

23                       CROSS-EXAMINATION

24   BY MS. CAMPBELL:

25   Q.  Sir, you said paymasters were common in your business?

1   A.   I'm sorry, I can't hear --

2   Q.   Paymasters were common in your business?

3   A.   Yes, they are.

4   Q.   And you would send the 1099 to the people that you paid,

5   right?

6   A.   Yes, we do.

7   Q.   So you could deduct the 1099 payments from your taxes,

8   right?

9   A.   Yes.  You could, yeah.

10  Q.   But you would pay taxes on the commission, right?

11  A.   On the commission, yes.

12  Q.   Now, you said -- you sent an e-mail that talked about work

13  wrapping up on the campaign.  How did you know that work was

14  wrapping up on the campaign?

15  A.   The e-mail that we got basically said that the contract was

16  until June, so we basically surmised that the amount of time was

17  almost time.

18  Q.   So that was something that you surmised yourself?

19  A.   That is correct.

20  Q.   Now, you were told that the purpose of using you as a

21  paymaster was to hide the payment from the people in the

22  campaign, right?

23  A.   No.  What we were told was that they wanted to hire a

24  specific person which may have some other people in the campaign

25  not necessarily in favor of.  So they wanted to be able to use

1   who they thought was best for the job and, hence, there was some

2   intramural politics going on.  I don't really know what the

3   extent of it was.  We were just told we want to use this guy and

4   I think the way we can use it without any hindrance is to have a

5   paymaster to do it.

6   Q.  And the problem was within the campaign itself, correct?

7   A.  That is correct.

8   Q.  Now, you never talked to Jesse Benton, right?

9   A.  No.

10  Q.  You never e-mailed Jesse Benton?

11  A.  No, ma'am.

12  Q.  You never told Jesse Benton who owned ICT, right?

13  A.  No, ma'am.

14  Q.  And you never -- you wouldn't know if he was the problem

15  with getting paid inside the campaign, would you?

16  A.  No, I do not know any of them, anything about Mr. Benton.

17          MS. CAMPBELL:  Thank you.

18          THE COURT:  Mr. Binnall?

19          MR. BINNALL:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. BINNALL:

22  Q.  Good afternoon, Mr. Izon.

23  A.  Good afternoon.

24  Q.  Mr. Izon, you spoke earlier about the time frame of your

25  first contact on this issue as being December 2011.  Could it

1   have been sometime in the January, early January 2012 time frame

2   as well?

3   A.  My recollection is that it happened late 2011.

4   Q.  Okay.  Do you remember testifying under oath previously in

5   this matter?

6   A.  Do I -- I'm sorry?

7   Q.  Do you remember previously giving sworn testimony in this

8   matter?

9   A.  Yes, I did, yes, sir.

10  Q.  All right.  And do you remember if then you were asked, sir,

11  do you think that it was December 2011 that you first heard of

12  this project?  Could it have been January 2012?

13          MR. PILGER:  Page and line, Mr. Binnall?

14          MR. BINNALL:  Sorry.  That's page 797, starting line

15  25 going on to page 798 through line 3.

16  BY MR. BINNALL:

17  Q.  And I'll start again to make this easier.

18  A.  Yes, sir.  Go ahead.

19  Q.  You were asked:  Sir, you think that it was December 2011

20  that you first heard about this project.  Could it have been

21  January 2012?

22          And you answered:  It could have been?

23  A.  Well, it was some time ago, so it's possible.  There's like

24  a two-week, you know --

25  Q.  I understand, sir.  It was over four years ago, correct?

1    A.   Yes.

2    Q.   It's hard to remember exactly the date at that point in

3    time, correct?

4            I'm sorry, I didn't get the answer to that question.

5    A.   What was your question?

6    Q.   It's hard to remember exact dates for over four years,

7    correct?

8    A.   Yes.

9    Q.   Thank you.

10           And, Mr. Izon, on the first invoice, you did include

11   the audiovisual work that was done for Pavlo Kesari, correct?

12   A.   That is correct.

13           MR. BINNALL:  All right.  Thank you very much, sir.

14                       CROSS-EXAMINATION

15   BY MR. WARRINGTON:

16   Q.   Good afternoon, Mr. Izon.

17   A.   Goods afternoon.

18   Q.   Just a few quick questions for you.

19           Dimitri -- you just testified a moment ago that your

20   only contact with the Ron Paul Campaign was Dimitri Kesari?

21   A.   That's correct.

22   Q.   So you didn't speak to John Tate?

23   A.   I didn't speak to anyone other than him.

24           MR. WARRINGTON:  Okay.  Nothing further, Your Honor.

25           THE COURT:  Anything else, Mr. Pilger?

1        MR. PILGER:  No, Your Honor.

2        THE COURT:  Thank you, sir.  You're excused.

3        THE WITNESS:  Thank you.

4                              (Witness excused.)

5        THE COURT:  Call your next witness, please.

6        MR. COONEY:  The United States recalls Mr. Pavlo

7  Kesari.

8   PAVLO KESARI, GOVERNMENT'S WITNESS RECALLED, PREVIOUSLY SWORN

9        THE COURT:  You don't need to be resworn.  You're

10  still under oath.

11        Ms. Draughn, while Mr. Kesari takes his seat, could

12  you please put up Exhibit 72, page 6?

13        And that has already been admitted into evidence.

14                     DIRECT EXAMINATION

15  BY MR. COONEY:

16  Q.  Good afternoon, Mr. Kesari.

17  A.  Good afternoon.

18  Q.  Could you please just state and spell your name for the

19  record?

20  A.  My name is Pavlo Kesari, P-A-V-L-O K-E-S-A-R-I.

21  Q.  Okay.  And you were here to testify in this case last

22  Thursday; is that right?

23  A.  Yes.

24  Q.  I've put up on the screen Government's Exhibit 72, page 6.

25        Is this one of the exhibits that you were shown last

1  week?

2  A.  Yes, it was.

3  Q.  Could you please reidentify for the jury what this exhibit

4  is?

5  A.  This is some invoice for some audio equipment I rented to

6  the campaign for five weeks.  It's a mixer, speakers, speaker

7  stands, multbox, wireless mic, audio snake.

8  Q.  Who prepared this invoice that's up on the screen?

9  A.  I prepared this invoice.

10  Q.  About when did you prepare it?

11  A.  Well, it says 1/31/2012.

12  Q.  What did you do with this invoice after you prepared it?

13  A.  I sent it to Sonny to input it to the campaign.

14  Q.  Now, last week when you were here, I asked you a question

15  about that.  And I asked you specifically the question:  Did you

16  check with your brother before you submitted that invoice to

17  Sonny Izon?

18          And you answered:  We probably spoke about it, yes.

19          Do you remember giving that testimony?

20  A.  I do remember giving that testimony.

21  Q.  Is that testimony correct?

22  A.  I was probably generalizing.  I don't really remember

23  exactly when we talked about this AV invoice, you know, it was

24  four years ago.

25  Q.  So I'm asking you right now as you sit here on the stand,

1   what is your recollection as to whether you cleared this invoice

2   by your brother before you gave it to Sonny Izon?

3   A.   I don't remember exactly clearing it through my brother

4   before.   My recollection is I'm not -- I don't remember.

5   Q.   Now, this is not the first time that you have been asked

6   this question before, is it?

7   A.   That's correct.

8   Q.   Three weeks ago you met in Washington, D.C., at the

9   Department of Justice with an FBI agent and a government

10  attorney to prepare for your testimony, did you not?

11  A.   I did.

12  Q.   Was your attorney present at that meeting?

13  A.   He was.

14  Q.   And the FBI agent was FBI Agent Spencer Brooks; is that

15  right?

16  A.   Okay.   Yes.   I don't remember everybody's name, but yes,

17  there was an agent there with you and another gentleman who I

18  don't see in the room.   Oh, there he is.   He is in the room; I'm

19  sorry.

20  Q.   Now, when you were asked whether you cleared this invoice by

21  your brother, Pavlo Kesari (sic), before sending on to Sonny

22  Izon, did you give the same answer that you gave here in court

23  today?

24  A.   No, I did not.

25  Q.   During that meeting you said that you did not clear this by

1  your brother, didn't you?

2  A.  I did.

3  Q.  Now, you were also interviewed on this subject by Special

4  Agent Karen LoStracco back on September 5, 2013, weren't you?

5  A.  That is correct.

6  Q.  And that was back -- that was actually at your home, was it

7  not?

8  A.  Yes.

9  Q.  And you were also asked during that meeting whether you

10  cleared this invoice by your brother, Pavlo Kesari (sic),

11  weren't you?

12  A.  Dimitri.

13  Q.  Excuse me; by your brother, Dimitri Kesari.  Thank you.  I'm

14  sorry.

15  A.  Yeah.  She said she asked me that.  It was several years

16  ago.  I was refreshed, yes.

17  Q.  When she asked you whether you had cleared this by your

18  brother, Pavlo Kesari, what did -- excuse me.  I apologize,

19  Mr. Kesari.  You're Pavlo Kesari, are you not?

20  A.  Right.

21  Q.  Mr. Kesari, when Special Agent LoStracco asked you back on

22  September 5, 2013, whether you had cleared this particular

23  invoice by your brother, Dimitri Kesari, what did you say?

24  A.  I said, no, I did not.

25          MR. COONEY:  No further questions.

1          THE COURT:  Mr. Binnall?

2                    CROSS-EXAMINATION

3  BY MR. BINNALL:

4  Q.  Sir, the particular invoices in question were sent over four

5  years ago, correct?

6  A.  Yes, four years ago.

7  Q.  And the work that you did for the Paul Campaign as far as

8  the equipment, that was at least as far back as December of

9  2011, correct?

10 A.  Yes, that's correct.

11 Q.  Do you remember one way or another whether or not you talked

12 to Mr. Kesari about giving your invoice to Mr. Izon?

13 A.  I don't remember exactly when.  I know he was aware that

14 money was owed to me.

15         MR. BINNALL:  Thank you, sir.

16         No further questions.

17         THE COURT:  Ms. Campbell, do you have any?

18         MS. CAMPBELL:  No, Your Honor.

19         THE COURT:  Do you, Mr. Warrington?

20         MR. WARRINGTON:  No, Your Honor.

21         THE COURT:  Anything else, Mr. Cooney?

22         MR. COONEY:  No further questions.

23         THE COURT:  All right.  Thank you, sir.  You are

24 excused.

25                         (Witness excused.)

1          THE COURT:  Call your next witness, please.

2          MR. COONEY:  Special Agent DeMarco Gunnar DeMarco

3   please.

4          THE COURT:  Come forward, sir.  She'll administer your

5   oath.

6          THE CLERK:  Please raise your right hand.

7        GUNNAR THOR DEMARCO, GOVERNMENT'S WITNESS, SWORN

8          THE COURT:  Please be seated.

9                     DIRECT EXAMINATION

10  BY MR. COONEY:

11  Q.  Good afternoon, Special Agent DeMarco.

12  A.  Good afternoon.

13  Q.  Could you please state your full name for the court reporter

14  and spell it?

15  A.  Gunnar Thor DeMarco, G-U-N-N-A-R T-H-O-R D-E-M-A-R-C-O.

16  Q.  Where are you employed?

17  A.  I'm employed at the Federal Bureau of Investigation in

18  Manassas, Virginia.

19  Q.  I'm sorry; what was the last part?

20  A.  In Manassas, Virginia.

21  Q.  Thank you.

22          What's your title?

23  A.  I'm a special agent and forensic examiner.

24  Q.  How long have you been with the FBI?

25  A.  Going on 13 years now in August.

1  Q.  How long have you been a forensic examiner?

2  A.  Certified for going on six years now.

3  Q.  What exactly is a forensic examiner?

4  A.  A forensic examiner, I'm part of the Computer Analysis

5  Response Team, so there are many types of forensic examiners.

6  We are detailed to conduct digital evidence from computers,

7  tablets, and phones and preserve them in a way which they won't

8  change it at all possible, to analyze it, to provide a copy of

9  it up for review from case agents, and to assist in any way that

10 we can with reporting of the data that is found on these

11 devices.

12 Q.  And you said earlier, I think, that you're certified as a

13 forensic examiner; is that right?

14 A.  Yes, I am.

15 Q.  How did you become certified?

16 A.  The FBI has a series of courses that they send you through

17 that takes approximately 18 months, two years or so where you go

18 through tools related to the different operating systems on

19 computers, different types of computer systems, whether it be,

20 you know, Windows or Macintosh, as well as cellular devices and

21 tablets.

22      We write file system research papers, and we're sent

23 to moot court process, and we take a competency test to make

24 sure that we can do what we're charged to do.

25 Q.  Did you pass all of that?

1  A.  Yes, I did.

2  Q.  Now, since being certified as a forensic examiner, have you

3  done anything or do you regularly do anything just to stay up to

4  date with changes in technology or changes in the field, things

5  like that?

6  A.  Yes.  We're required to attend at least two annual trainings

7  in different technology.  We continually are trying to keep up

8  abreast of the technology because it's constantly changing.  So

9  once you're certified under the Intel certification, you're

10  expected to take on other platforms, such as MacIntosh.  And

11  I've been certified in memory forensics, cell phones and GPS

12  devices.  I'm McIntosh certified, as well as I've obtained

13  certifications in the private sector as well.

14  Q.  Special Agent DeMarco, in your time as a forensic examiner

15  with the FBI, are you able to give the jury just an idea of how

16  many examinations, how many devices you've examined before?

17  A.  It's in the hundreds.  Probably between two to five, six

18  hundred devices.

19  Q.  All right.  Special Agent DeMarco, let's go ahead and shift

20  gears now.

21       I want to talk about a term called "metadata."  Are

22  you familiar with that term?

23  A.  Yes, I am.

24  Q.  What is metadata?

25  A.  Metadata is simply data describing data.  So oftentimes you

1    may have files such as many people take pictures with their cell

2    phones, right, so they have things called JPEG images on there.

3    Those images have information inside of them that talks about,

4    you know, what the photo was taken with, for instance, like

5    maybe a camera.  It will say -- perhaps give a date.  It may

6    have a GPS location built in there.  That's an example of

7    metadata that's inside the file that describes itself.

8            Metadata can also take the form of other files that

9    sit outside of the file that the operating system on the

10   computer would be used to keep track of the data itself, so, you

11   know, indexing terms and things like that that further describe

12   the information.

13   Q.  Does any of the specialized training that you discussed

14   earlier, does that involve the analysis of metadata?

15   A.  Yes, it does.

16   Q.  Is that something that you undertake regularly in your work

17   as a forensic examiner?

18   A.  Yes.

19   Q.  All right.  Let's just go to some kind of basic principles

20   here.  I want to talk a little bit specifically about how

21   e-mails are sent and received.

22           Is this a subject that you have knowledge on?

23   A.  Yes.

24   Q.  All right.  So specifically, like I type out an e-mail on my

25   computer and I send it from my e-mail address to your e-mail

1  address.

2  A.  Uh-huh.

3  Q.  Can you just give the jury an idea of how it gets from me to

4  you?

5  A.  Essentially, depending on where you are, it traverses to

6  your local network.  So it goes from your computer to your

7  router or your switch, your networking devices in your home.

8  There's certain lookups that occur.  We have domain names look

9  up systems, finds out where the address is supposed to go to,

10  where the e-mail is supposed to go to.

11        The e-mail essentially gets split up into multiple

12  parts and gets sent across the Internet and then it's

13  reassembled by the mail server where it's meant to be sent.

14  That mail server then looks up who the addressee is, and it

15  sends it along, forwards it along to the person in-house.

16  Q.  Now, is there anything that can interrupt that?  So if I

17  send an e-mail from my address to your address, is there

18  anything that could interrupt that path such that it doesn't get

19  there?

20  A.  Sure, yes.  You could have a power outage as simple as that

21  and your Internet service is disrupted; therefore, your e-mail

22  would not be able to be sent.  That is probably the easiest way

23  to describe what would disrupt it.  Most e-mails get through

24  unless you have some sort of hiccup up in your computer

25  networking or the ability to get a Wi-Fi or a wireless signal or

1    simply get out for your Internet service.

2    Q.  And typically for most Internet services, if I type out my

3    e-mail and I send it to you and it's interrupted such that it

4    doesn't get there, am I going to get any kind of a notification

5    of that?

6    A.  Yes.  Normally you would get a failure message, that it was

7    not sent, a bounceback.

8    Q.  All right.  If you have to go back to metadata, are you able

9    to use metadata to make a determination about whether a sent

10   e-mail was received by the e-mail address it was sent to?

11   A.  Yes.

12   Q.  So let's talk about that a little bit specifically with

13   regard to the evidence in this case.

14          Special Agent DeMarco, were you given any e-mails to

15   analyze for this purpose to determine whether they were received

16   by the intended recipient?

17   A.  Yes.

18   Q.  All right.  Let's put up Exhibit 102 and Government's

19   Exhibit 159 as split screen.

20          And, Special Agent DeMarco, I'm going to give you

21   these as well in hard copy so that you have some copies in front

22   of you.  So, for the record, I'm handing you Government's

23   Exhibits 102 and 159.

24          And, first, Ms. Draughn, could you please highlight

25   just the text of these e-mails?  We're going to be talking about

1   some of the other things in them; but if you could start with

2   text so we can tell the jury what these e-mails are.

3          All right.  And, for the record, on the left-hand side

4   is Government's Exhibit 102 and on the right-hand side is

5   Government's Exhibit 159.  And just for the benefit of the jury,

6   Special Agent DeMarco, if you could help me out here.  If you

7   look at Government Exhibit 102, there's an e-mail in the center

8   there on June 25, 2012, at 5:59 p.m. from John Tate.

9          Do you see that?

10  A.  Yes.

11  Q.  Could you just read that e-mail to the jury?

12  A.  What is this?  What is it for, who is it?  Why do we keep

13  paying them?  The last payment was supposedly the last.

14         John.

15         Sent from my iPad.

16  Q.  And if you look at the right, Government's Exhibit 159 and

17  it's approximately the same place, is that same e-mail from John

18  Tate there as well?

19  A.  Yes.

20  Q.  All right.  Now let's look at Government's Exhibit 102.

21         If you could move up the chain and there's a response

22  there from Dimitri Kesari to John Tate, is there not?

23  A.  Yes.

24  Q.  And that is at 18:22:58?

25  A.  Uh-huh, yes.

1  Q.  Can you -- what time is that, 18:22?  Is that 6:22 --

2  A.  6:22 Eastern Time.

3  Q.  And what is it that that e-mail says?

4  A.  This the last payment for Kent Sorenson, the deal Jesse

5  agreed to with Kent.

6          Sent from iPhone.

7  Q.  Now if you could move to Exhibit 159 on the right-hand side,

8  and feel free to use the hard copies if those are easier for you

9  to read.

10         Is there another e-mail sent from Dimitri Kesari to

11 John Tate, this one within a minute at 6:23 p.m. and 45 seconds?

12 A.  Yes.

13 Q.  What does that e-mail say?

14 A.  "Is was for 6 months."

15         Sent from iPhone.

16 Q.  Were you able to analyze the metadata for these two e-mails?

17 A.  Yes.

18 Q.  And from analyzing that metadata, were you able to make a

19 determination about whether the e-mails sent from Dimitri

20 Kesari, both in 102 and 159, were received by the e-mail address

21 for John Tate?

22 A.  Yes.  They were both sent and received, yes.

23 Q.  All right.  What I would like to do is talk through how you

24 did that.  So if we could start --

25         Ms. Draughn, if you could go to page 2 of both of

1    these exhibits.  And, Ms. Draughn, could you please highlight

2    the bottom half of these two e-mails or zoom in on the bottom

3    half?

4         All right.  What is it that we're looking at, Agent

5    DeMarco?

6    A.   That's metadata.  That's e-mail header information.

7    Q.   How is it that you were able to get this e-mail header

8    information?

9    A.   Well, every e-mail that's sent has a header.  That's how it

10   tracks its progress when you send it and receive it.  E-mail

11   header is how the computers communicate and figure out where to

12   deliver the e-mail, so every e-mail has it.

13   Q.   Were these two particular e-mails taken off of a computer?

14   A.   Yes.

15   Q.   And so how is it that you go about actually collecting --

16   actually let me back up.

17        You called it e-mail header information, but is this

18   metadata?

19   A.   It is considered metadata, yes.

20   Q.   How is it you actually go about getting the metadata?

21   A.   Well, you can do it without any sort of forensic process by

22   simply going to an e-mail client such as Outlook or Alphamail,

23   and you can view -- you can change the settings so that you can

24   view the header information.  It's just simply hidden away

25   because most people don't need to see it.

1  Q.  Did you, yourself, go into a particular computer and collect

2  this metadata?

3  A.  I reviewed the information.  I did not collect it, no.

4  Q.  Who collected it?

5  A.  Special Agent Wesley Yoo.

6  Q.  And was Special Agent Wesley Yoo once assigned to this case?

7  A.  Yes.

8  Q.  And is Special Agent Yoo no longer living?

9  A.  He is not.

10  Q.  Now, did you assume his responsibility in this case after he

11  passed away?

12  A.  Yes.

13  Q.  Now, Special Agent DeMarco, is this the information that you

14  used to determine whether these two e-mails were received by

15  John Tate?

16  A.  Yes.

17  Q.  All right.  What I would like to do is, can you talk the

18  jury through, first for Government's Exhibit 102, which is the

19  one on the left-hand side, how it is you were able to make that

20  determination?

21  A.  Okay.

22  Q.  And, you know what, as I'm looking at this, Special Agent

23  DeMarco, I apologize, I'm going to go ahead and take this off

24  split screen if we could.

25          And, Ms. Draughn, could you just put up Government's

1   Exhibit 102, page 2, the first e-mail by itself?  That way it's

2   a little bit bigger and hopefully the jury can see that.

3           All right.  Go ahead, Special Agent DeMarco.

4   A.  Okay.  This has essentially extracted the header information

5   and formatted to this view.  So what is taken out is the

6   pertinent information, such as return path of the e-mail, which

7   is Dimitri@RonPaul2012.com.  If you look at the receipt side of

8   it, it shows the basic track that it took.  You can see it says

9   from 192.168.1.142.  That address is a local address, probably

10  for his local network.  You can see there's extended information

11  that was added there by Comcast which has an identifier at

12  Comcast.net and then the external IP address which is designated

13  by the 71.62 address.

14          You can see that it was received by the MX.Google.com.

15  That's the mail exchange for Google, and that's the definitive

16  designator of the fact that Google at their mail exchange

17  received the message.  There's no bounce back.  There's no error

18  saying it was not received.  So it was received by Google mail.

19  Q.  And if I could, are you talking about this information here

20  (indicating)?

21  A.  Yes.

22  Q.  All right.  Sorry for the rudimentary circle.

23          And why is it significant here -- what is the

24  significance of MX.Google.com having received this?

25  A.  That is the authority for the mail server.  That is what

1  receives all mail for Google is that mail exchange.

2  Q.  And was that the mail server for the John Tate e-mail

3  address or for the Ron Paul Campaign?

4  A.  Yes.  So it's really an internal send because they were both

5  on the Gmail.  Once it gets to Google, it's a matter of just

6  looking up the next mail recipient and it doesn't have to take a

7  hop outside of the network.  It's all done internally.

8  Q.  Is that because both of these addresses were -- the one for

9  Dimitri Kesari was Dimitri@RonPaul2012.com, and then the one for

10 John Tate was JohnT@RonPaul2012.com?

11 A.  Correct.

12 Q.  So they used the same server?

13 A.  Right.  And you can even see on here there's other

14 identifiers added by the Google mail exchange which give it --

15 like the D in D4SM, it's another identifier to help track the

16 message and it even embeds its own little time stamp in there.

17 You can see 2012.06.25.32259.

18 Q.  So what does this show where this particular e-mail was

19 sent, or was it sent or received?

20 A.  That says the mail server received it.

21 Q.  And what time does it reflect?

22 A.  It reflects 15:22:59 or 3:22:59.

23 Q.  Okay.  And that's in contrast -- you said 3:22?

24 A.  Yes, 15 -- military time, 15:22.

25 Q.  And what I want to contrast that with, though, is the front

1    page which shows -- oops, wrong one -- that this e-mail was sent

2    at 18:22 and 58 seconds, if you look at page 1 of Exhibit 102?

3    A.   Uh-huh.

4    Q.   So what is the -- I think the number that you just gave is a

5    3:00 p.m. number; is that right, or was it not even a p.m.

6    number that you were reading in the metadata?

7    A.   Yeah, in the metadata.  Yeah, it's because the Google mail

8    exchange is going to be Pacific time, so there's going to be a

9    difference there.

10   Q.   And what is the time of the date stamp on the main e-mail?

11   Are you able to tell whether that's in the Eastern Time zone or

12   Central Time zone or something else?

13   A.   That's Eastern Time zone.

14   Q.   How is it you're able to tell that?

15   A.   Right there it has dash 0400, which is an adjustment from

16   Greenwich Mean Time.

17   Q.   And, Ms. Draughn, can you please just blow up the header

18   information here on page 1, just point that out for the jury.

19          Is that this right here that you're talking about?

20   A.   Yes.

21   Q.   All right.  And in your experience, Special Agent DeMarco,

22   what time zone are e-mails stamped in in terms of that header

23   information, not the underlying metadata but this header

24   information that we're looking at right now?

25   A.   Time stamped in the time of the sender, when it was sent,

1   the local time of the sender.

2   Q.  All right.  Now I would like to move to Government's Exhibit

3   159, please, Ms. Draughn, and page 2.

4        Is this the metadata for Government's Exhibit 159?

5   A.  Yes.

6   Q.  All right.  And can you walk the jury through your analysis

7   for this particular exhibit?

8   A.  Again, you'll see another local IP address there, 192.168,

9   received by there's another identifier used by the local Comcast

10  server and the external address which was then received by the

11  Google mail exchange again.  You can see the MX.Google.com.  It

12  may even have the same exact -- it even has the same exact

13  internal identifier with an alternate time stamp, with their own

14  internal time stamp.

15  Q.  And this information -- and I just circled it -- that you

16  were relying on, this received path information; is that right?

17  A.  Yes.

18  Q.  And just so that we're clear, this information, this

19  metadata that you're going through for 102 and 159 for the

20  received, this is metadata for the top e-mails in those two

21  exhibits that we're looking at, right; the one sent from Dimitri

22  Kesari to John Tate?

23  A.  Correct.  And that is the metadata of the server, so it's --

24  you know, the server, those time stamps there are from the

25  Google server itself, so that's a clear flag that it was

1    received by the server.

2    Q.  And so we're clear, when you say -- to be fair, when you say

3    received by the server is there any way you can tell whether an

4    e-mail was actually read by the recipient?

5    A.  No.  Not tell from the e-mail headers, no.

6    Q.  But you can tell whether it was received by the server?

7    A.  Yes.

8    Q.  And can you just tell the jury what the length of time

9    between Government's Exhibit 102, the one that Dimitri Kesari

10   sent, and 159 that Dimitri Kesari sent, what the difference in

11   time between the two of them is?

12   A.  Approximately 47 seconds.

13   Q.  And which one was sent first?

14   A.  Government Exhibit 102.

15   Q.  And then 47 seconds later Government's Exhibit 159?

16   A.  Yes.

17   Q.  All right.  Could you please put on split screen page 1 of

18   both of those exhibits, Ms. Draughn?

19          While we're doing that, Special Agent DeMarco, I would

20   like to shift gears and talk a little bit about sending and

21   receiving e-mails from different devices.  Just -- first of all,

22   is it possible to link up multiple devices to the same e-mail

23   address and server?  And when I say multiple devices, I'm

24   talking about like a computer, an iPhone or a BlackBerry, things

25   like that?

1  A.  Yes, absolutely.

2  Q.  What happens if I type out an e-mail to you on my computer

3  and I send it to you and it's received in the server and

4  whatnot, what happens if I take -- instead of doing it on my

5  computer, if I take my BlackBerry, for example, my other device

6  and I go on my BlackBerry and I delete that e-mail.  Is that

7  BlackBerry and that computer, is that going to sync up?

8  A.  As long as they both have network connectivity and

9  communicate with the server, they should sync up, yes.

10  Q.  Now, what if I do that, but I've shut down my computer and I

11  no longer have it connected to the Internet?

12  A.  Well, then the e-mail will not be deleted.  It will be

13  retained.

14  Q.  Be retained by what or by who?

15  A.  By the computer.

16  Q.  But what about the BlackBerry and the server?

17  A.  Well, presumably the BlackBerry has a network connection so

18  it will synchronize with the server using the IMAP protocol and

19  it will clear itself off.

20  Q.  And if my computer is shut down and turned off, but then I

21  turn it back on and it syncs with the server, will it then sync

22  up so that the e-mail gets deleted?

23  A.  Yes.

24  Q.  All right.  Now, this particular -- Government's Exhibit 102

25  and Government's Exhibit 159, assume for a minute the one on the

1   left, Government's Exhibit 102, was not -- was found on Dimitri

2   Kesari's computer but not on the Paul Campaign server.  What are

3   some possible explanations for that?

4   A.   The easiest explanation would be that the computer did not

5   have network connectivity and was unable to synchronize with the

6   server.

7   Q.   What would have happened to that e-mail on the server if it

8   was not found on the server?

9   A.   If it was not found on the server, then it would have had to

10  have been deleted.

11  Q.   Now, with respect to -- were you able to check using

12  metadata when the last time that Dimitri Kesari's computer

13  synced up with the Ron Paul server?

14  A.   Yes.

15  Q.   What was the last date that Dimitri Kesari's computer synced

16  up with the Ron Paul server?

17  A.   January 9th of 2014.

18  Q.   If Government's Exhibit 102 was not found on the Ron Paul

19  server, could it have been deleted from another device sometime

20  after January 9, 2014?

21  A.   Yes.

22          MR. COONEY:  No further questions.

23          THE COURT:  Mr. Mills.

24

25

CROSS-EXAMINATION

1  BY MR. MILLS:

2  Q.  Good afternoon, Agent DeMarco.  I'm Laurin Mills.  I

3  represent John Tate.

4  A.  Good afternoon.

5  Q.  Digital forensics is a field focusing on the recovery and

6  investigation of material found on digital devices; isn't that

7  right?

8  A.  That's correct.

9  Q.  And when I talk about digital devices, I'm talking about

10  things like personal computers, Smart phones, tablet type

11  computers?

12  A.  Yes.

13  Q.  And do you consider yourself to be an expert in the field of

14  digital forensics?

15  A.  I do.

16  Q.  Okay.  But you don't have a college degree in digital

17  forensics, do you?

18  A.  I have a college degree in information systems management.

19  Q.  You have that from the University of Maryland, Baltimore

20  County, correct?

21  A.  Correct.

22  Q.  Now, the University of Maryland, Baltimore County also

23  offers a degree in computer science, don't they?

24  A.  Yes, they do.

1  Q.  And that's in the engineering school, correct?

2  A.  Yes.

3  Q.  And you don't have a degree in computer science, do you?

4  A.  No, sir.

5  Q.  You don't have a degree in forensic science?

6  A.  I have qualifications from the training I received from the

7  FBI.

8  Q.  But that's not what I'm asking.  You don't have a college

9  degree in forensic science?

10  A.  No.

11  Q.  Okay.  Now, you produced a document in this case called a

12  curriculum vitae, correct?

13  A.  Yes.

14  Q.  And people call that a CV?

15  A.  Uh-huh.

16  Q.  And that's a fancy name for a resume; isn't that right?

17  A.  Yes.

18  Q.  If you will look at your screen, your CV should be on there.

19  Do you see it?

20          MR. MILLS:  And, Your Honor, I move to admit his

21  curriculum vitae.

22                              (Defendant's Exhibit T40 was

23                               offered in evidence.)

24          THE COURT:  Mr. Cooney?

25          MR. COONEY:  I'm sorry?

1    THE COURT:  He moved the CV into evidence.

2    MR. COONEY:  No, I do not object.

3    THE COURT:  Received.

4                        (Defendant's Exhibit T40 was

5                        received in evidence.)

6  BY MR. MILLS:

7  Q.  And isn't it true that your curriculum vitae contains a

8  listing of the computer training that you've had, correct?

9  A.  Yes.  I don't see it in front of me, but yes.

10  Q.  Oh, I'm sorry.

11       Do you see that there now?

12  A.  Yes.

13       MR. COONEY:  I apologize, do you have an exhibit

14  number for this?

15       MR. MILLS:  No.

16  BY MR. MILLS:

17  Q.  And it lists all of your training, doesn't it?

18  A.  Yes.

19  Q.  And, in fact, it not only lists the training, but it lists

20  the number of hours of training you've had, correct?

21  A.  Correct.

22  Q.  If you add them up, doesn't the number of hours add up to

23  73?

24  A.  It could very well, yes.

25  Q.  Okay.  And so that's not exactly 18 months of training, is

1   it?

2   A.  Well, it's 18 months over a period of coaching, writing

3   papers, doing forensic examinations and being coached by

4   on-the-job training.

5   Q.  Okay.  And your training is on a wide variety of digital

6   devices; isn't that right?

7   A.  That's correct.

8   Q.  And so you will -- and you've been with the FBI for 12

9   years, right?

10  A.  Thirteen.

11  Q.  But you only started getting your digital forensics training

12  in 2008; is that right?

13  A.  That's correct.

14  Q.  You mentioned the term "IMAP."  Are you familiar with what

15  that is?

16  A.  Yes.

17  Q.  And can you describe for the jury what that is?

18  A.  It's Internet Message Access Protocol.  It's a way for

19  e-mails -- it's an e-mail client allows various e-mails systems,

20  whether you have it on your handheld, your computer, your tablet

21  to synchronize with one mail server so that you can basically

22  copy down e-mails to all of them, and if you read it on one, it

23  will synchronize and update to the others.  So you can look at

24  it on whatever device pleases you.

25  Q.  And IMAP has been a standard since 2003, correct?

1    A.   Yes.

2    Q.   And it's copyrighted by the Internet Society; is that right?

3    A.   Yes.

4    Q.   Have you ever actually read the IMAP standard?

5    A.   Say again?

6    Q.   Have you ever actually read the IMAP standard?

7    A.   I've read portions of it, yes.

8    Q.   When was the last time you read it?

9    A.   Probably about a year ago.

10   Q.   Okay.  This is a copy of the IMAP standard, isn't it?

11   A.   It appears to be.

12   Q.   And if you turn to page No. 11 and in particular Section

13   23.2, do you see that?

14   A.   Yes.

15   Q.   Okay.  That section is entitled "Flags Message Attribute,"

16   correct?

17   A.   Correct.

18   Q.   And you even used the word "flag" in one of your answers to

19   Mr. Cooney, didn't you?

20   A.   I'm not sure if I did or not.

21   Q.   You said something in the metadata flag something.  Maybe I

22   misunderstood you.

23   A.   Okay.  I'm not sure if I said that.

24   Q.   But flags are a term of art in the IMAP standard, correct?

25   A.   Yes.  Flags are just indicators.

1  Q.  Correct.  And, in fact, they have a list of indicators on

2  page 11 of the IMAP standard; isn't that right?

3  A.  Uh-huh, yes.

4  Q.  And one of those indicators is the back slash seen

5  indicator, right, which means the message has been read; is that

6  correct?

7  A.  That's what its intent is.

8  Q.  Yep.  And the next one is back slash answered, which means

9  that the message has been answered, correct?

10 A.  Yes.

11 Q.  And there's one for flagged, there's one for draft.  Do you

12 see all of those?

13 A.  Yes.

14 Q.  Isn't it true none of those flags appear in the metadata

15 that you analyzed?

16 A.  Correct.

17 Q.  So if the messages had been syncing, wouldn't you expect the

18 flags to appear?

19 A.  The flags don't necessarily have to be embedded into the

20 header file.  This is a standard that can be adopted.  You don't

21 have to use all of these.  Every e-mail client and messaging

22 server can adopt different parts of the protocol.

23 Q.  But Google has adopted the IMAP standard; isn't that right?

24 A.  Yes, they have adopted the IMAP standard in this case,

25 uh-huh.

1  Q.  And they've adopted the flags, haven't they?

2  A.  Not all of them.

3  Q.  Not all of them, okay.  Well, the only messages in this case

4  that the jury will be able to analyze are where flags

5  appeared --

6  A.  Uh-huh.

7  Q.  -- and they went through the Gmail server.  So do you know

8  whether or not Google has adopted flags as part of its

9  implementation of the IMAP standard?

10  A.  In the headers that I analyzed, those flags did not exist.

11  Q.  That's correct.  And because they don't exist, you can't

12  tell whether Mr. Tate ever opened -- ever answered or read the

13  exhibit, Government Exhibit 102, can you?

14  A.  Not from the headers, no.

15  Q.  And you're familiar with Gmail, right?

16  A.  Yes.

17  Q.  Gmail has a spam folder, correct?

18  A.  Correct.

19  Q.  And you can't tell whether it ended up in the Gmail spam

20  folder, can you?

21  A.  For whose computer?

22  Q.  For Mr. Tate.

23  A.  No, because I didn't look at Mr. Tate's computer.

24  Q.  Isn't it true no one from the FBI ever looked at his

25  computer?

1   A.   I don't know.

2   Q.   They never looked at his tablet?

3   A.   I don't know.

4   Q.   They never looked at his BlackBerry; is that correct?

5   A.   I don't know.

6   Q.   And it couldn't be found on the Ron Paul server; is that

7   correct?

8   A.   Correct.

9   Q.   Are you aware that the Ron Paul Campaign produced documents

10  in this case in the fall of 2013; are you aware of that?

11  A.   Yes.

12  Q.   So the syncing, if someone was syncing in 2014, it wouldn't

13  have done anything because the Ron Paul server had already been

14  imaged for production in 2013, correct?

15  A.   Correct.

16  Q.   And, in fact, the government found a copy of this e-mail on

17  Mr. Kesari's laptop, correct?

18  A.   Correct.

19  Q.   But it didn't find one on his iPhone, did it?

20  A.   I don't believe so.

21  Q.   So the government can't say whether Mr. Tate received this

22  message or whether it synched with any other device in the Ron

23  Paul Campaign; is that correct?

24  A.   The only thing I can comment on is that it was received by

25  Kesari's computer.

1  Q.  Do you -- and I believe that we have established that

2  Mr. Tate could have received two messages within less than a

3  minute, correct?

4  A.  Correct.

5  Q.  Do you have any idea how many e-mail messages he received

6  between 6 and 7 o'clock on June 25th?

7  A.  No, I do not.

8  Q.  So you don't know whether he responded to the second one

9  rather than the first and never even opened the first, do you?

10  A.  No.

11           MR. MILLS:  Thank you.

12           THE COURT:  Mr. Binnall or Ms. Campbell?

13           MS. CAMPBELL:  No, Your Honor.

14           MR. BINNALL:  No, Your Honor.

15           MR. COONEY:  Ms. Draughn, could you please put up

16  Government's Exhibit 159, page 2.

17                    REDIRECT EXAMINATION

18  BY MR. COONEY:

19  Q.  First of all, Special Agent DeMarco, do you have any idea

20  when the Ron Paul Campaign server was imaged?

21  A.  No.

22  Q.  Do you actually have any idea when grand jury subpoenas were

23  served?

24  A.  No.

25  Q.  Do you actually have any idea as to what date any documents

1  were produced?

2  A.  No.

3  Q.  All right.  This is the metadata for Government's Exhibit

4  159.  So it's 159, page 2.

5          Are any of those IMAP flags that Mr. Mills just asked

6  you about regarding whether an e-mail was read, are any of those

7  flags in this metadata right here?

8  A.  No.

9  Q.  Ms. Draughn, if you would please put up Government's Exhibit

10  103.  And that's already in evidence, Ms. Draughn.  You can go

11  ahead and publish it.

12          And can you please highlight from the second e-mail --

13  so go down.  Okay.  Go ahead and go up from there.  Yep,

14  perfect.  Keep going, all the way up.

15          Thank you.

16          First -- and if you need to refer to the hard copy,

17  you can, Special Agent DeMarco.  But the "Is was for 6 months,"

18  that e-mail, that's the e-mail in Government's Exhibit 159,

19  right?  You can look at the hard copy if you need to.

20  A.  You talking about the bottom portion right there?

21  Q.  Yes, that bottom portion, "Is was for 6 months," that's

22  Government's Exhibit 159 that you were looking at before, right?

23  A.  Correct.

24  Q.  All right.  And that's the one that you just looked at that

25  doesn't have any of the IMAP data showing whether it was read or

1 not, right?

2 A.  Correct.

3 Q.  Right above that, though, there's a response there from John

4 Tate, isn't there?

5 A.  Yes.

6 Q.  A response makes it pretty clear that e-mail was read,

7 right?

8 A.  It would appear so.

9          MR. COONEY:  No further questions.

10          THE COURT:  Anything else, Mr. Mills?

11          MR. MILLS:  Nothing from me, Your Honor.

12          THE COURT:  Thank you, sir.  You're excused.

13                              (Witness excused.)

14          THE COURT:  Who's next?

15          MR. PILGER:  Special Agent Spencer Brooks, Your Honor.

16          THE COURT:  Okay.  Why don't we take our break and

17 come back at 3:15.

18          See you then.

19          (Recess at 2:53 p.m., until 3:15 p.m.)

20          THE COURT:  Please be seated.

21          Mr. Cooney.

22          MR. COONEY:  The government recalls Special Agent

23 Karen LoStracco.

24          THE COURT:  Come forward, ma'am.

25 KAREN LOSTRACCO, GOVERNMENT'S WITNESS RECALLED, PREVIOUSLY SWORN

1                           DIRECT EXAMINATION

2    BY MR. COONEY:

3    Q.  Good afternoon, Agent LoStracco.

4    A.  Good afternoon.

5    Q.  Welcome back to the stand.

6             You understand that you're still under oath, right?

7    A.  Yes.

8    Q.  Now, Agent LoStracco, were you involved in the service of

9    grand jury subpoenas for documents in this particular case?

10   A.  Yes, I was.

11   Q.  And were you involved in the service of a grand jury

12   subpoena on the Ron Paul Campaign?

13   A.  Yes.

14           MR. COONEY:  All right.  If I may approach?

15           I've only got two copies of this.  Oh, here you go.

16   BY MR. COONEY:

17   Q.  Special Agent LoStracco, I'm showing you what has been

18   marked as Government's Exhibit 190, page 1, just the first page.

19           Do you recognize that document?

20   A.  Yes.

21   Q.  What is that document?

22   A.  This is a subpoena to testify before a grand jury ordering

23   the production of documents, issued by the U.S. District Court

24   here in the Southern District of Iowa, and it's issued to the

25   Ron Paul 2012 Presidential Campaign Committee.

1    Q.  All right.  What is the date that that grand jury subpoena

2    was issued?

3    A.  The date it was issued is May 27, 2014.

4    Q.  And what is the date that it calls for the production of

5    documents?

6    A.  June 18, 2014.

7            MR. COONEY:  All right.  I will take that back.  Move

8    Government's Exhibit 190, page 1 into evidence.

9                                  (Government Exhibit 190, page 1

10                                    was offered in evidence.)

11           THE COURT:  Received.

12                                  (Government Exhibit 190, page 1

13                                    was received in evidence.)

14   BY MR. COONEY:

15   Q.  All right.  Now, Special Agent LoStracco, when a grand jury

16   subpoena for documents is served on an individual or an

17   entity -- I asked you about the date for production, and you

18   said it was June 18, 2014 in this case, right?

19   A.  Correct.

20   Q.  -- is that date sometimes renegotiated between the parties

21   so that documents can be produced at a more convenient time for

22   whoever it was served upon?

23   A.  Yes.  It's not unusual for me to get contacted by the

24   attorney representing the individual or the party that we serve

25   the subpoena on to ask for an extended period of time to produce

1   the documents.  And as long as that is okay with the attorneys,

2   the Department of Justice attorneys, then we usually give an

3   extension.

4   Q.  All right.  Special Agent LoStracco, I'm showing you what

5   has been marked for identification purposes -- oh, and I'm

6   sorry, one other question, Special Agent LoStracco.

7            With respect to this particular grand jury subpoena,

8   is there a grand jury subpoena log that is kept of all of the

9   subpoenas that are issued in a case?

10  A.  Yes.

11  Q.  Did you confirm the date of this subpoena against the grand

12  jury log that's kept?

13  A.  Yes.  The date of the subpoena -- I'm sorry, the date on the

14  grand jury log is the date on which I served the subpoena.

15  Which was June 2, 2014.

16  Q.  And did you examine that log to see if there were any

17  productions in response to the grand jury subpoena by the Ron

18  Paul Campaign or any subpoenas served on the Ron Paul Campaign

19  prior to June 2, 2014?

20  A.  Yes.

21  Q.  Were there any?

22  A.  Not that I could see, no.

23  Q.  All right.  I'm showing you, Special Agent LoStracco, grand

24  jury -- excuse me, Government's Exhibit 191.  I'll stay here

25  with you.

1       Do you recognize Government's Exhibit 191?

2   A.   Yes.

3   Q.   What is Government's Exhibit 191?

4   A.   This is an e-mail exchange between myself and Mr. David

5   Warrington and also Laurin Mills.

6   Q.   All right.  And with respect to this particular matter in

7   this e-mail, who are they representing at the time?

8   A.   The Ron Paul 2012 Presidential Campaign.

9   Q.   What does this e-mail reflect?

10  A.   This e-mail reflects that Mr. Warrington was sending me the

11  first production responsive to the subpoena issued on the Ron

12  Paul 2012 Campaign.

13  Q.   And in sending you that transmission, did Mr. Warrington

14  specify the first production?

15  A.   Yes.  He specified that was a first batch of documents

16  responsive to the government's subpoena.

17  Q.   I'm sorry, Special Agent LoStracco, I think there's one

18  question I failed to ask you.

19       What is the date of that e-mail?

20  A.   It is July 2, 2014.

21  Q.   So not 2013?

22  A.   No.

23  Q.   Special Agent LoStracco, during the break that we just had,

24  did you have an opportunity to look at your notes to examine

25  whether there were any productions prior to this date, July 2,

1    2014, by the Ron Paul Presidential Campaign in particular?

2    A.   Yes.   What I was able to see were communications between

3    myself and Mr. Warrington about interviewing witnesses.   I was

4    not able to see anything in regard to a production.

5    Q.   And, Ms. Draughn, could you please put up Government's

6    Exhibit 103, please?   Would you blow that up so -- and this has

7    already been admitted into evidence.

8            Special Agent LoStracco, you recognize this e-mail,

9    don't you?

10   A.   Yes.

11   Q.   Is this the one we were talking about in court just a few

12   minutes ago?

13   A.   Yes.

14   Q.   Was this e-mail produced by the Ron Paul Campaign in

15   response to a grand jury subpoena?

16   A.   Yes, it was.

17           MR. COONEY:   No further questions.

18           THE COURT:   Mr. Warrington.

19                        CROSS-EXAMINATION

20   BY MR. WARRINGTON:

21   Q.   Good afternoon, Agent LoStracco.

22   A.   Good afternoon.

23   Q.   In this production of documents that you referenced -- well,

24   I referenced in this e-mail that the government just introduced,

25   in response to the subpoena, we produced hard copies of

1   documents, correct?

2   A.   I believe they were -- I can't recall.  I would have to look

3   at the e-mail again.  I thought you e-mailed them to me and you

4   asked whether I needed them on a disk.

5   Q.   They were not electronic copies of the documents with

6   metadata, were they?

7   A.   I'm sorry, I would have to look at the e-mail again to see

8   if you attached the actual documents or whether you were

9   referring to something that you Fed Ex'd to me.

10  Q.   Okay.  But as you sit here today, you don't know whether

11  that production contained metadata, do you?

12  A.   I do not recall production coming from the Ron Paul Campaign

13  that contained metadata.

14  Q.   So none of the documents produced by the Ron Paul Campaign

15  contained any metadata, did they?

16  A.   I didn't say that.  I said the early production I recall

17  getting I do not recall it containing metadata.

18  Q.   The production that you received in 2014?

19  A.   Correct.

20  Q.   You are aware that the Ron Paul server was shut down in

21  November of 2012?

22  A.   I do not know when the Ron Paul server was shut down.

23  Q.   Now, I would like to pull up Government's Exhibit 102.  I

24  believe that's already in evidence.  Let's go to the second

25  page.

1          Agent LoStracco, when the Ron Paul Campaign produced

2   documents to you, in the lower right-hand corner did not most of

3   those documents have an RP number on them or a Bates stamp?

4   A.  Yes, correct.

5   Q.  I want you to look at Government Exhibit No. 102 and tell me

6   if you see a Bates stamp on that document.

7   A.  No.  This document came from Dimitri Kesari's computer.

8   Q.  There is no version of this document with an RP Bates stamp

9   on it, is there?

10  A.  That is correct.

11          MR. WARRINGTON:  Nothing further, Your Honor.

12          THE COURT:  Mr. Binnall, do you have questions?

13          MR. BINNALL:  No, Your Honor.

14          THE COURT:  Do you, Ms. Campbell?

15          MS. CAMPBELL:  No, Your Honor.

16          THE COURT:  Anything else for you, Mr. Cooney?

17          MR. COONEY:  Nothing, Your Honor.

18          THE COURT:  Thank you, ma'am.

19                                  (Witness excused.)

20          THE COURT:  Call your next witness, please.

21          MR. PILGER:  The government calls Spencer Brooks.

22          THE COURT:  Come forward, sir.  If you'll approach the

23  clerk, she'll administer the oath.

24          THE CLERK:  Please raise your right hand.

25          SPENCER BROOKS, GOVERNMENT'S WITNESS, SWORN

1        THE CLERK:  Please be seated.

2                    DIRECT EXAMINATION

3   BY MR. PILGER:

4   Q.  Good afternoon, Agent Brooks.

5   A.  Good afternoon.

6   Q.  Please state your name for the record.

7   A.  Spencer Brooks.

8   Q.  Common spelling?

9   A.  Yes.

10  Q.  Is there an E in Brooks?

11  A.  No; B-R-O-O-K-S.

12  Q.  And how are you employed?

13  A.  I'm a special agent with the FBI.

14  Q.  How long have you been with the FBI?

15  A.  I've been with the FBI about 14 1/2 years, been an agent for

16  about 9 1/2 years.

17  Q.  So you had a prior position with the FBI before you were an

18  agent?

19  A.  Yes.

20  Q.  And where are you assigned now?

21  A.  The Washington field office.

22  Q.  Are you assigned to a particular kind of squad?

23  A.  Yes; federal public corruption squad.

24  Q.  Was Special Agent Karen LoStracco previously assigned to

25  that squad?

1  A.  She was.

2  Q.  And concerning the case that brings you to court today, have

3  you assumed some of the duties for that case since Agent

4  LoStracco left for the Boston division?

5  A.  I have.

6          MR. PILGER:  Your Honor, I'm going straight to that

7  matter that you reserved ruling on.  Do you want -- I will just

8  go on with questions or do you want a side-bar?

9          THE COURT:  Why don't you just offer the exhibit.  Is

10 there going to be any contest to that?

11         MR. MILLS:  I'm not a hundred percent what we're --

12         MS. CAMPBELL:  I'm not sure what we're talking about.

13         MR. PILGER:  This would be Government's Exhibit 180

14 redacted.

15         Ms. Draughn.

16         MR. BINNALL:  We do object on behalf of Mr. Kesari

17 under 403 grounds, 401 grounds, 404, 405, and hearsay.

18         THE COURT:  Okay.  There's no objection to

19 authenticity, correct; that it is what it purports to be?

20         MR. BINNALL:  No, Your Honor.

21         THE COURT:  Ms. Campbell.

22         MS. CAMPBELL:  Your Honor, we object to this as not

23 relevant at all to Mr. Benton and should be excluded under 403

24 and 404(b).

25         THE COURT:  Mr. Warrington.

1    MR. WARRINGTON:  Your Honor, same objection as other

2    counsel, and I can speak to this in more detail, but this is

3    actually highly irrelevant.  It has nothing to do with this

4    matter.

5    THE COURT:  The objection is sustained to the exhibit.

6    BY MR. PILGER:

7    Q.  Agent Brooks, are you assigned from time to time to work on

8    campaign finance matters?

9    A.  Yes.

10   Q.  And are you aware of whether or not the FEC and the FBI both

11   have parallel jurisdiction over investigations of false reports

12   to the FEC?

13   MR. MILLS:  Calls for a legal conclusion.

14   THE COURT:  It's part of the burden of proof.

15   Overruled.

16   Answer the question.

17   A.  Yes.  The FBI enforces and investigates criminal violations

18   related to the FEC.

19   BY MR. PILGER:

20   Q.  And the FEC has parallel jurisdiction, correct?

21   A.  Correct.

22   MR. PILGER:  Your Honor, I'm going to go slowly.  I'll

23   alert you I'm going to ask some questions about the exhibit that

24   you just sustained the objection to but without trying to admit

25   it.

1          THE COURT:  Well, why don't we do this outside the

2    presence of the jury.

3          MR. PILGER:  Yes.

4          THE COURT:  Do you have other matters that you wish to

5    examine him about?

6          MR. PILGER:  Yes.

7          THE COURT:  Well, go to the other matters other than

8    the exhibit.

9    BY MR. PILGER:

10   Q.  In your experience, Special Agent Brooks, have you

11   encountered matters where the FEC has taken up and investigated

12   false reports concerning expenditures?

13         MR. MILLS:  Objection, Your Honor, for a whole bunch

14   of reasons, United States versus Litvak that was cited in our

15   request for jury instructions this weekend.  It's absolutely

16   irrelevant.

17         THE COURT:  What issue does this go to?

18         MR. PILGER:  Materiality.

19         MR. MILLS:  And he's not competent.  He's the wrong

20   agency.  He even opined on this.

21         THE COURT:  Sustained.

22   BY MR. PILGER:

23   Q.  Special Agent Brooks, have you had the opportunity to

24   examine Government's Exhibit 59?

25         And, Ms. Draughn, could we have that on the screen?

1  It's in evidence.

2  A.  Yes, I have.

3  Q.  And, Ms. Draughn, can you go to page 2 now?

4         This is a 77-page document, correct?

5  A.  That's correct.

6  Q.  And have you had the occasion to do an analysis of the

7  amounts listed on the various line items of this exhibit?

8  A.  I did.

9         MS. CAMPBELL:  Objection, Your Honor; personal

10  knowledge, cumulative, and the exhibit speaks for itself.

11         THE COURT:  Overruled.

12  BY MR. PILGER:

13  Q.  Have you prepared notes summarizing the amounts by whether

14  they are six figures, five figures, four figures and so on?

15  A.  I have.

16  Q.  Now, as you sit here today, do you remember the exact

17  numbers for those categories?

18  A.  I do not.

19  Q.  Do you have notes that would help you testify about those

20  numbers?

21  A.  I did make notes, yes.

22         MR. PILGER:  Approaching.

23  BY MR. PILGER:

24  Q.  Showing you a set of notes.  Are those your notes?

25  A.  They are.

1   Q.  For the record, these have been provided to the defense.

2           Now, in Government's Exhibit 59, the 77-page report of

3   expenses, can you tell this jury how many line items had six

4   figures?

5   A.  24 line items.

6   Q.  24 items had six figures.  So those would be in the hundreds

7   of thousands of dollars or hundred thousand dollars?

8   A.  A hundred thousand dollars or more, yes.

9   Q.  And under a million?

10  A.  Correct.

11  Q.  Were there any over a million?

12  A.  No.

13  Q.  Okay.  How many line items in this report had five figures?

14  A.  73.

15  Q.  How many had four figures?

16  A.  420.

17  Q.  How many had three figures?

18  A.  496.

19  Q.  And how many had two figures, so that's under a hundred

20  dollars?

21  A.  The count that I did was two figures or less, 2,441.

22  Q.  Okay.  So that's either two figures or one figure, right?

23  A.  Correct.

24  Q.  Or even under a dollar?

25  A.  Correct.

1  Q.  And did you encounter instances where there were line items

2  under a dollar?

3  A.  There were a few instances where they were under a dollar,

4  yes.

5  Q.  What's the lowest one you noticed?

6  A.  50 cents.

7  Q.  Are you approximating?

8  A.  I remember one for 50 cents.

9  Q.  Okay.  So have you done a total and done percentages

10  concerning these numbers?

11  A.  For a few of the categories, yes.

12  Q.  Okay.  Let's just take the six-figure and five-figure

13  categories.  So that's numbers that are -- for example, 25,000

14  would be a five-figure number, 150,000 would be a six-figure

15  number.  What percentage of all of the line items on this report

16  are six figures or five figures?

17  A.  It's approximately two percent.

18  Q.  Two percent?

19  A.  Yes.

20  Q.  And what percentage of the line items on this exhibit were

21  under a hundred dollars?

22  A.  It was approximately 71 percent.

23  Q.  Special Agent Brooks, taking you to Government's Exhibits

24  160 and 161, if I could get those.

25          While we're pulling those, do you recall examining

1   those recently?

2   A.   Yes.

3   Q.   And can you recall from memory what they are for the jury?

4   A.   They are CD's containing some of the reports of the receipts

5   and disbursements for the 2012 Ron Paul Presidential Campaign

6   Committee that were filed with the Federal Election Commission.

7   Q.   Did you run searches on these?

8   A.   I did.

9   Q.   And did you put your initials on the disks?  You can open

10  them up if you need to.

11  A.   Yes.  I ran searches on each one of these disks.

12  Q.   And if you would, just be sure to keep your voice up.

13          MR. WARRINGTON:  Your Honor, pardon me.  I didn't hear

14  what exhibit number it was.

15          MR. PILGER:  For the record, it's 160 and 161.

16  BY MR. PILGER:

17  Q.   And, Agent Brooks, you've identified your initials on both

18  disks, the actual disk surface, correct?

19  A.   That's correct.

20  Q.   And did you run searches on the reports in those disks?

21  A.   I did.

22  Q.   Did those disks contain particular reports of the Ron Paul

23  Presidential Campaign for 2012?

24  A.   Yes.

25  Q.   Are there two organizational statements on there?

1   A.   Yes.

2   Q.   Are there amended reports for February, April, May, and June

3   of 2012?

4   A.   Yes.

5   Q.   And is there an amended quarterly report for the period

6   October to December of 2011?

7   A.   Yes, that's correct.

8   Q.   Okay.  What searches did you run on these disks?

9   A.   I ran Kent Sorenson, by its correct spelling, and also by --

10  Q.   I'm sorry, I don't know that everybody heard that.

11  A.   By the correct spelling, but also did a misspelling with an

12  E-N at the end, and I ran Grassroots Strategy as well.

13  Q.   So you spelled it S-E-N and you spelled it S-O-N?

14  A.   That's correct.

15  Q.   And you ran Grassroots Strategy?

16  A.   I ran Grassroots Strategy and also ran the term "grassroots"

17  to see if it came up with anything else besides Grassroots

18  Strategy.

19  Q.   Did you run anything with strategies plural?

20  A.   I came across the Grassroots Strategies, LLC, entry -- or

21  multiple entries actually when I ran the term "grassroots."

22  Q.   So let's put a pin in that, and I'll come back to that.

23          When you ran the term "Kent Sorenson" through these

24  reports spelling it correctly or incorrectly, did you find

25  anything?

1    A.   No.

2    Q.   When you ran the term "Grassroots Strategy," did you find

3    Grassroots Strategy?

4    A.   No.

5    Q.   Did you find a company with a similar name?

6    A.   Yes.

7    Q.   And what was that company?

8    A.   Grassroots Strategies, LLC.

9    Q.   And where was that company located?

10   A.   That company was located in Falls Church, Virginia.

11   Q.   And anytime you encountered that company, did you see it

12   listed in Iowa?

13   A.   No.  Every time it was listed as listed in Falls Church,

14   Virginia.

15   Q.   Oh, by the way, when you ran these searches, were you able

16   to plug the disk in to the computer and search electronically?

17   A.   Yes.

18   Q.   You wouldn't need to print out a bunch of binders and fill

19   them up with papers to do this, right?

20   A.   No.  I did it all on computer.

21   Q.   But you wouldn't need to fill up a bunch of binders, right?

22   A.   No.

23   Q.   Ms. Draughn, if you can show us 144 in evidence.  And please

24   zero in on the lowest block under the line.

25            Thank you.

1          This is an FEC form 1.  This would be one of the

2    statements of organization, correct?

3    A.  I believe that's correct.

4    Q.  There's a statement above the designation of treasurer that

5    says, I certify that I have examined this statement and to the

6    best of my knowledge and belief, it is true, correct and

7    complete, right?

8    A.  That's right.

9    Q.  And then there's a note underneath it that says, submission

10   of false, erroneous, or incomplete information may subject the

11   person signing this statement to the penalties of 2 U.S.C.

12   Section 437g, right?

13   A.  That's correct.

14   Q.  Could you look at 145, please, Ms. Draughn?

15          This is an FEC form 3, a report of receipts and

16   disbursements, correct?

17   A.  That's correct.

18   Q.  This is in evidence.  Again, looking at the top, it's a form

19   3, report of receipts and disbursements?

20   A.  That's correct.

21   Q.  And if we could zero in on that same bottom block,

22   Ms. Draughn.

23          Again, the FEC has on this form the statement, I

24   certify that I have examined this report and to the best of my

25   knowledge and belief, it is true, correct and complete, right?

1  A.   That's correct.

2  Q.   And then please read the note underneath.

3  A.   Submission of false, erroneous, or incomplete information

4  may subject the person signing this report to the penalties of

5  2, United States Code, section 437g.  All previous versions of

6  this form are obsolete and should no longer be used.

7  Q.   And if we went on to look at Government's Exhibits 146, 147

8  and 148 in evidence, all form 3s, do each and every one of them

9  contain these two statements?

10  A.   Yes.

11  Q.   To your knowledge, has the statutory Section 2, U.S.C., 437g

12  simply had its number changed?

13        MS. CAMPBELL:  Objection, Your Honor; calls for a

14  legal conclusion.

15        THE COURT:  Sustained.

16  BY MR. PILGER:

17  Q.   Do you know the number of the new statute?

18        MS. CAMPBELL:  Objection, Your Honor.

19        MR. BINNALL:  Same objection.

20        THE COURT:  Sustained.

21        MR. PILGER:  We would ask for judicial notice of the

22  number change, Your Honor.

23        THE COURT:  Sure, if you want to talk about that as

24  part of the instructions, we can do that.

25        MR. PILGER:  Okay.

1  BY MR. PILGER:

2  Q.  Now, Special Agent Brooks, turning your attention to

3  Government's Exhibit 169, there's a stipulation that should be

4  in evidence.  There's also a certification.  That's page 1.

5           And, Ms. Draughn, bear with me -- thank you,

6  Mr. Cooney.

7           Judge, for the record this is not admitted in

8  evidence.  We offer it pursuant to a stipulation that can be

9  received in evidence.

10           THE COURT:  169 is received.

11                           (Government Exhibit 169 was

12                           offered and received in evidence.)

13  BY MR. PILGER:

14  Q.  So just continuing, Ms. Draughn, to the next page.  And the

15  next.  Okay.  If you could blow that up as large as possible,

16  including the top, please.

17           Is this what's called a text record?

18  A.  Yes, it is.

19  Q.  Explain to the jury what a text record is.

20  A.  Text is a database from the Department of Homeland Security,

21  specifically Customs and Border Protection, and it primarily

22  tracks an individual when they leave the country and come into

23  the country, come into the United States and leave the United

24  States.

25  Q.  And to be a little more clear about it, does it track the

1   travel of people all through the world or does it only track

2   people coming in and out of the United States?

3   A.   In and out of the United States.

4   Q.   And, Ms. Draughn, if we could zero in on about -- on the

5   first row between the dark captions.  You can go all the way --

6   okay.  Do you want to make that a little wider?

7           MR. BINNALL:  Your Honor, for the record, we would

8   like Mr. Kesari's passport number to be redacted.

9           THE COURT:  Yeah, we'll do that.

10  BY MR. PILGER:

11  Q.   Okay.  So this is a text record concerning what individual?

12  A.   Dimitri Kesari.

13  Q.   And, Ms. Draughn, if you could scroll down to get to the

14  advanced passenger record.

15          MR. COONEY:  If you would go all the way down from

16  there, Ms. Draughn.

17          Thank you.

18          MR. PILGER:  There we go.

19  BY MR. PILGER:

20  Q.   So there's an encounter line type listed, and what is the

21  encounter line type?  Can you read that, Agent Brooks?

22  A.   I'm sorry, I don't see encounter line type.

23  Q.   It's very small type over advanced passenger record?

24  A.   That part is cut off from what I'm looking at.

25          MR. PILGER:  Bear with me, Your Honor.

1          (Pause.)

2   BY MR. PILGER:

3   Q.  Can you read that, Agent Brooks?

4   A.  I can.

5   Q.  So there's an encounter line type of advanced passenger

6   record.

7              Do you see that?

8   A.  I do.

9   Q.  And what is the encountered date?

10  A.  July 20, 2013.

11  Q.  And is this a record of someone going to the United States

12  or from the United States?

13  A.  From the United States.

14  Q.  How can you tell that?

15  A.  It says outbound and departure location is Dulles

16  International Airport and arrival is London outside of the

17  United States.

18  Q.  So when it says outbound on a text record, that's someone

19  leaving the U.S., right?

20  A.  Correct.

21  Q.  And you can tell from this that Dimitri Kesari left from

22  Dulles Airport, right?

23  A.  That's correct.

24  Q.  Do you live near Dulles Airport?

25  A.  I do.

1  Q.  And you can tell this person, Dimitri Kesari, went to a

2  particular airport, and what is that?

3  A.  The Heathrow Airport.

4  Q.  If he went somewhere after that, can you tell that from a

5  text record?

6  A.  I can't.

7  Q.  Ms. Draughn, could we have the next and last text record?

8  And if you could blow up just the body of the record.  If you

9  would scroll up.  It's all right.  Just scroll up, please.

10          Is this another record concerning Dimitri Kesari?

11 A.  It is.

12 Q.  Now if we could get the rest of the record, Ms. Draughn.

13          Is this another encounter advanced passenger record?

14 A.  It is.

15 Q.  What's the date?

16 A.  August 7, 2013.

17 Q.  And what's the location?

18 A.  Toronto.

19 Q.  What country is Toronto?

20 A.  Canada.

21 Q.  And is there a departure airport listed in Toronto?

22 A.  Yes.  It's listed as Pearson International.

23 Q.  And if you look down at the arrival location, what's the

24 arrival place?

25 A.  Dulles International Airport.

1  Q.  And that's August 7, 2013, correct?

2  A.  That's correct.

3  Q.  Ms. Draughn, could you take us to Government's Exhibit 60,

4  which is already in evidence?  If we can go to the second page,

5  please.

6          Agent Brooks, this is a two-page e-mail, correct?

7  A.  Yes.

8  Q.  And more specifically an e-mail chain, right?

9  A.  That's correct.

10  Q.  And if you could please focus on -- there we go.  Thank you,

11  Ms. Draughn.

12          The first e-mail at the bottom is on August 7th of

13  2013.  Is that the same day that Dimitri Kesari traveled back to

14  the United States through Canada?

15  A.  Yes.

16  Q.  And at that time did Dimitri Kesari write an e-mail?

17  A.  Yes.

18  Q.  What did he write?

19  A.  Did not get it yet.  I'm taking off as I write this.  Hold

20  off till I land and review the release.

21          Sent from my iPhone.

22  Q.  And if we go to the first page, please, Ms. Draughn.

23          Is there an e-mail from Kent Sorenson to Dimitri

24  Kesari in this string?

25  A.  Yes.

1  Q.  Is it also dated August 7, 2013?

2  A.  Yes, it is.

3  Q.  The same day Dimitri Kesari returned to the United States

4  through Canada?

5  A.  That's correct.

6  Q.  And the same day that he had written the e-mail you just

7  talked about at the bottom of this string?

8  A.  That's correct.

9  Q.  And in the body of this e-mail, Kent Sorenson said to

10  Dimitri Kesari "the check"?  Yes?

11  A.  That's correct.

12  Q.  And then what comes after that?

13  A.  I'm sorry.  It needs to be expanded so I can see it.

14          Would you like me to read it?

15  Q.  Part of it.  This is a statement that says for immediate

16  release; yes?

17  A.  That's correct.

18  Q.  And it has a date of August 7, 2013, correct?

19  A.  Yes.

20  Q.  Same date that we've been talking about?

21  A.  Yes.

22  Q.  And the location is then listed as Milo, Iowa, right?

23  A.  That is correct.

24  Q.  I would like you to read this one, two, three, just four

25  paragraphs down, just from the beginning to the fourth

1  paragraph.

2  A.  From the beginning to the fourth paragraph?

3  Q.  Yep.

4  A.  "From the week or two after I started advocating for the

5  Michelle Bachmann Campaign back in the early part of 2011,

6  people close to what would soon become th Ron Paul Campaign

7  approached me about supporting Congressman Ron Paul instead.

8         "It made sense for them to do so.  Several of these

9  people were friends of mine from previous campaigns and had

10  helped with the organization of my own legislative race.

11         "On one occasion, an Iowa staff member for Congressman

12  Paul did suggest a payment t switch ranks.

13         "The check was offered to a family member; however, as

14  I felt strong ethical and legal deficiencies in accepting it, I

15  ignored the check, and never deposited nor cashed such."

16  Q.  And the next?

17  A.  "Hence, I was never paid."

18  Q.  And that was sent back to Dimitri Kesari after Dimitri

19  Kesari said, did not get yet.  I'm taking off as I write this.

20  Hold off until I land and review the release.  Yes?

21  A.  Yes.

22  Q.  Then, Ms. Draughn, could you take us to 184 not yet in

23  evidence?  And could you take us to the back page?

24         Agent Brooks, is the back page of this a certification

25  regarding business records?

1   A.  Yes, it is.

2   Q.  Is it executed?

3   A.  Yes, it is.

4   Q.  And, Ms. Draughn, if you could go back to the front page.

5           Are these telephone records that you've previously

6   reviewed?

7   A.  Yes.

8   Q.  And do they establish the telephone number for John Tate?

9   A.  The customer listed for this particular one on this page

10  says Jesse Benton.

11  Q.  Right, but -- so if we can go down, Ms. Draughn, to the user

12  page.

13          And who are these records for?

14  A.  Summary for John Tate.

15          MR. PILGER:  So we'll offer 184, Your Honor.

16                          (Government Exhibit 184 was

17                          offered in evidence.)

18          THE COURT:  Received.

19                          (Government Exhibit 184 was

20                          received in evidence.)

21  BY MR. PILGER:

22  Q.  And does this tell us the phone number -- or a telephone

23  number that John Tate was using?

24  A.  It does.

25  Q.  What was that?

1   A.   (571) 455-6822.

2   Q.   And, Ms. Draughn, would you take us to 188 not yet in

3   evidence, please.

4           Subject to past practice, we'll offer it, Your Honor.

5                           (Government Exhibit 188 was

6                           offered in evidence.)

7           THE COURT:   188 is received.

8                           (Government Exhibit 188 was

9                           received in evidence.)

10          MR. PILGER:   And, Ms. Draughn, if you could take us

11  down to user information, please.

12          If we could go down to the bottom third of this page

13  where there's -- from name down -- no.  Go down further.  There

14  we go.

15  BY MR. PILGER:

16  Q.   And whose phone number does this pertain to?

17  A.   Jesse Benton.

18  Q.   And if we could blow it back up to the top, Ms. Draughn.

19          Does this establish Jesse Benton's -- a number Jesse

20  Benton used for telephone service?

21  A.   I'm sorry, could you repeat that question?

22  Q.   Does this record show a number that Jesse Benton used for

23  his telephone service?

24  A.   Yes.

25          MR. PILGER:   Excuse me, Your Honor.

1        (Pause.)

2   BY MR. PILGER:

3   Q.  So indicating on this record, is there a phone number

4   assigned for use by Jesse Benton?

5   A.  Yes.

6   Q.  And what's that number?

7   A.  (202) 246-6363.

8   Q.  Now, Ms. Draughn, would you take us to Government's Exhibit

9   183c, which is a subset of records already in evidence?  And

10  could you blow up the bottom where there's some color?

11       Special Agent Brooks, if you just look over to the

12  left, are all of the calls in this block dated August 7th?

13  A.  Yes, they are.

14  Q.  Do you remember the year?  If you don't, we can blow it back

15  up to the top.

16  A.  It's 2013.

17  Q.  Okay.  On August 7, 2013, has this exhibit been prepared to

18  show calls involving the numbers of Dimitri Kesari, John Tate,

19  Jesse Benton, and Kent Sorenson?

20  A.  Yes.

21  Q.  First of all, whose phone is this the record for?

22  A.  Dimitri Kesari.

23  Q.  And so there's a color yellow on there.  What color does

24  that indicate?

25  A.  That indicates a call with Kent Sorenson.

1 Q.  And there's a color red on there.  What does that indicate?

2 A.  It indicates a call for Jesse Benton.

3 Q.  And the color green, what does that indicate?

4 A.  Indicates a call with John Tate.

5 Q.  Now, have you reviewed the full set of records for this

6 phone for this time period?

7 A.  No.

8 Q.  Approaching.

9        Have you reviewed the full set of records, 184,

10 concerning the page that we're talking about and specifically

11 roaming?

12 A.  If you're asking if I reviewed -- I apologize if I

13 misunderstood your question.  You're asking if I reviewed all of

14 the roaming section?  Yes.

15 Q.  Were there any other roaming calls from Dimitri Kesari's

16 phone on August 7th besides the ones we see on the screen right

17 here?

18 A.  No.

19 Q.  On August 7th at 2:10 p.m., what's the first call that you

20 see Dimitri Kesari making?

21 A.  That was an outgoing call to Kent Sorenson.

22 Q.  That's the very first roaming call listed, right?

23 A.  That's correct.

24 Q.  What's the very next call that you see on August 7th?

25 A.  An outgoing phone call to Jesse Benton.

1  Q.  And what time was that?

2  A.  2:13 p.m.

3  Q.  What's the very next call that you see that Dimitri Kesari

4  makes on this record?

5  A.  An outgoing call to John Tate.

6  Q.  What time was that?

7  A.  2:14 p.m.

8  Q.  What's the very next call that you see Dimitri Kesari

9  making?

10  A.  An outgoing call to Jesse Benton.

11  Q.  What's the very next call at 2:49 that you see Dimitri

12  Kesari making?

13  A.  An outgoing call to Kent Sorenson.

14  Q.  Between 2:10 p.m. and 2:49 p.m. -- actually in a call that

15  lasted two minutes to 2:51; from 2:10 to 2:51, do you see any

16  other calls, incoming or outgoing?

17  A.  I do not.

18  Q.  From your review of the records today, can you tell the jury

19  whether or not these are the first calls involving Dimitri

20  Kesari's phone in the month of August 2013?

21  A.  I would need to review some additional records.

22  Q.  I can't hear you.

23  A.  I would need to review some additional records.  The first

24  calls of that month?

25  Q.  These are the first calls that happened in August of 2013,

1  correct?

2  A.  I would need to see some additional records.

3  Q.  I'll let you do it.  Tell me when you're done.

4          All right.  Bear with me.

5          (Pause.)

6          So, Ms. Draughn, if we could look at 183d.

7          Are these further records of the use of Dimitri

8  Kesari's phone on August 7th and August 8th of 2013?

9  A.  Yes.

10 Q.  And these are not roaming, are they?

11 A.  No, they're not roaming.

12 Q.  Is the color designation the same?  Does yellow involve Kent

13 Sorenson?

14 A.  Yes.

15 Q.  Does red involve Jesse Benton?

16 A.  Yes.

17 Q.  Does green involve John Tate?

18 A.  Yes.

19 Q.  On August 7th at 5:10 p.m., is there a call involving Kent

20 Sorenson?

21 A.  Yes, there is.

22 Q.  Is that ingoing or outgoing?

23 A.  Outgoing.

24 Q.  And where is the origination for that call?

25 A.  Herndon.  Virginia.

1  Q.  And what is Herndon, Virginia, near?

2  A.  Very close to Dulles Airport.

3  Q.  Okay.  And, Ms. Draughn, if we could briefly flip back to

4  183c.

5          What is the origination location for all of the calls

6  that we talked about earlier on August 7th from Dimitri Kesari's

7  phone?

8  A.  Toronto.

9  Q.  And, Ms. Draughn, just take us back to 183d.  And if you

10  could blow up from the first line item on August 7th down to the

11  last line item on August 7th.

12          So you just testified the first phone call involves

13  Kent Sorenson, and that's at Herndon, Virginia, and near Dulles

14  Airport, right?

15  A.  Correct.

16  Q.  A little less than two hours later on August 7th, at 7:03

17  p.m., what happened?

18  A.  Mr. Kesari made another outgoing call to Kent Sorenson.

19  Q.  And this time the origination is where?

20  A.  Leesburg, Virginia.

21  Q.  And at 7:05 p.m., what happened?

22  A.  Mr. Kesari received an incoming call from Kent Sorenson.

23  Q.  How long did that last?

24  A.  Four minutes.

25  Q.  What was the very next call that happened?

1  A.  Mr. Kesari placed an outgoing call to Jesse Benton.

2  Q.  And that lasted two minutes?

3  A.  Correct.

4  Q.  What's the very next thing that happened?

5  A.  Mr. Kesari received another incoming call from Kent

6  Sorenson.

7  Q.  How long did that last?

8  A.  Two minutes.

9  Q.  What's the next thing that happened?

10  A.  Mr. Kesari placed an outgoing call to Jesse Benton.

11  Q.  And how long did that last?

12  A.  Four minutes.

13  Q.  Okay.  And that's the end of the calls on August 7th, right?

14  A.  Correct.

15  Q.  The very next -- if we could scroll down, Ms. Draughn.

16        The rest of the calls on this page of the records are

17  from August 8th, correct?

18  A.  I can't see them all, but I believe so.

19  Q.  Can you read that?  It's awfully small.

20  A.  Yes.  The rest of the page is from August 8th.

21  Q.  What's the first call involving this phone of Dimitri

22  Kesari's on August 8th?

23  A.  An incoming call from Kent Sorenson.

24  Q.  How many minutes?

25  A.  Eleven minutes.

1  Q.  What's the very next call?

2  A.  An outgoing call to Jesse Benton.

3  Q.  At what time?

4  A.  8:11 a.m.

5  Q.  So the first call is at 7:58 and it lasted 11 minutes,

6  right?

7  A.  Correct.

8  Q.  So within a minute or two of the first call, there's a call

9  with Jesse Benton, right?

10  A.  That's correct.

11  Q.  Ingoing or outgoing?

12  A.  Outgoing.

13  Q.  And what's the very next thing that happened?

14  A.  Mr. Kesari placed an outgoing call to John Tate.

15  Q.  And what time did he do that?

16  A.  8:14 a.m.

17  Q.  So these calls are within minutes of each other; first with

18  Kent Sorenson, then with Jesse Benton, then with John Tate,

19  correct?

20  A.  Correct.

21  Q.  And if you could -- we don't need to change the view, I

22  think; but if you go down to the next red line item, what time

23  is that?

24  A.  8:21 a.m.

25  Q.  What happened then?

1  A.  Outgoing call to Jesse Benton.

2  Q.  How long was that?

3  A.  Nine minutes.

4  Q.  What's the next thing that happened?

5  A.  Outgoing call to Kent Sorenson.

6  Q.  How long was that?

7  A.  Three minutes.

8  Q.  Okay.  And then the last three on this display screen,

9  turning your attention to the time 9:26 a.m., what's the next

10 thing that happened?

11 A.  Incoming call on May 26 from Jesse Benton.

12 Q.  How long was that?

13 A.  Eight minutes.

14 Q.  And then what happened?

15 A.  Incoming call from John Tate at 9:46 a.m.

16 Q.  How long was that?

17 A.  Nine minutes.

18 Q.  And what's the next thing that happened?

19 A.  Incoming call from Kent Sorenson at 9:58.

20 Q.  How long did that last?

21 A.  Fourteen minutes.

22 Q.  And those calls were all within minutes of each other,

23 right?

24 A.  Yes.

25 Q.  Turning your attention to Government's Exhibit 167 not yet

1    in evidence.  It's a stipulation, and we offer it now, Your

2    Honor.

3                        (Government Exhibit 167 was

4                         offered in evidence.)

5         THE COURT:  It's received.

6                        (Government Exhibit 167 was

7                         received in evidence.)

8    BY MR. PILGER:

9    Q.  So the first page is just a certification.  If we go to the

10   second page -- and, Ms. Draughn, if you could make the sort

11   of -- the narrower middlish block, the smallest block, if I

12   could indicate it on here (indicating), if you could make that

13   block as large as possible.

14            Do you know what this is?

15   A.  It's confirming the Expedia record of a ticket for

16   Mr. Kesari.

17   Q.  And a ticket -- Ms. Draughn, if you could scroll down a

18   little bit.

19            A ticket for travel between particular places at

20   particular times, right?

21   A.  That's correct.

22   Q.  Okay.  What's the first travel leg listed on this record?

23   A.  From Dulles to O'Hare on August 10, 2013.

24   Q.  And what's the next leg of the trip?

25   A.  From O'Hare to Omaha, Nebraska, again on August 10th of

1    2013.

2    Q.  And what's the next leg of the trip?

3    A.  From Omaha, Nebraska, to O'Hare Airport on August 11th,

4    2013.

5    Q.  And what's the last leg of the trip?

6    A.  From O'Hare Airport to Dulles International on August 11,

7    2013.

8    Q.  And bear with me a moment.

9            Ms. Draughn, can you put back page 1, please?

10           And this is a certification.  You mentioned Expedia.

11   The certification actually comes from hotels.com.  Are you aware

12   of connection between those companies?

13   A.  Yeah, I believe Expedia owns hotels.com.

14   Q.  Turn now to Government's Exhibit 168.  It's a stipulation,

15   and we offer it into evidence, Your Honor.

16                            (Government Exhibit 168 was

17                             offered in evidence.)

18           THE COURT:  Received.

19                            (Government Exhibit 168 was

20                             received in evidence.)

21   BY MR. PILGER:

22   Q.  It starts with certification, and we'll skip through that to

23   the next page, please, Ms. Draughn, maybe the second or third

24   page.  There we go.

25           Is this a record of United Airlines?

1    A.  Yes, it is.

2    Q.  And Ms. Draughn, if you could blow up just this part that I

3    indicated on the monitor?

4              Thank you, Ms. Draughn.

5              Is this the United record of the same trip that we

6    just talked about?

7    A.  Yes, it is.

8    Q.  And, Ms. Draughn, if you could scroll up to the top of this

9    document to the name of the passenger.

10             There we go.  A little bit more.

11             Who's the passenger?

12   A.  Dimitrios N. Kesari.

13   Q.  Agent Brooks, have you reviewed certain text messages that

14   you know to be received from Dimitri Kesari's cell phone?

15   A.  Yes.

16   Q.  Turning your attention to Government Exhibit 134 not yet in

17   evidence.

18             We'll offer that now, Your Honor.

19                              (Government Exhibit 134 was

20                               offered in evidence.)

21             THE COURT:  Received.

22                              (Government Exhibit 134 was

23                               received in evidence.)

24             MS. CAMPBELL:  Your Honor, we're going to need to make

25   a record on this later outside the presence.

1    THE COURT:  Do you want to object to it?

2    MS. CAMPBELL:  I think so.  It goes to --

3    THE COURT:  You've got to decide.

4    MS. CAMPBELL:  Yes.  It goes to an issue with

5  Mr. Binnall and the exhibit itself, a discovery problem.

6    THE COURT:  What's the issue?

7    MS. CAMPBELL:  Involving privilege, Your Honor.

8    THE COURT:  Oh, oh, oh.  Okay.  Can you -- is this all

9  you have left?

10    MR. PILGER:  I have four of these and that is about

11  it.

12    THE COURT:  And then you're resting?

13    MR. PILGER:  Yes.

14    THE COURT:  All right.  Then we're going to send the

15  jury home for the day.

16    In just a few minutes here the government is going to

17  rest, meaning complete its presentation of evidence.  So after

18  they do that, there's a piece of business I have to do outside

19  your presence, and it takes about a half hour or 45 minutes

20  sometimes, and obviously we are at the end of the day.

21    So I think if that's all he's got for this and then

22  perhaps some cross-examination, we'll do that in the morning.

23  The lawyers and I will work on that piece of business outside

24  your presence, and then we'll also talk about the jury

25  instructions one last time with the lawyers.  So we'll work the

1    rest of the day.  I'm just saying we're going to let you go.

2           So we're getting close or closer.  I still think that

3    this case will be submitted to you on Wednesday for your

4    deliberations, and I think you have to fight that natural

5    tendency that we all have to want to make up our mind.  We have

6    to wait, listen to all of the evidence, and after that there's

7    two important parts of the trial.  If they weren't important, we

8    wouldn't have them; the closing arguments of the lawyers and my

9    instructions on the law.  All of it is important to how this

10   case is resolved.

11          So before you leave, I would just remind you not to

12   read any newspaper account or listen to any radio or television

13   broadcast that might be published about the case.  No research

14   on your own, no social media, and be important to see you ready

15   to go tomorrow morning at 9 o'clock.

16          See you then.

17          (In open court, out of the presence of the jury.)

18          THE COURT:  Please be seated.

19          I would ask you to stay because we might have some

20   questions for you.

21          THE WITNESS:  Okay.

22          THE COURT:  Thanks.

23          Ms. Campbell.

24          MS. CAMPBELL:  Sorry, Your Honor, I was trying to talk

25   in code.

1    THE COURT:  No, I appreciate it, and that's the way to

2  do it because then you got my attention.

3    MS. CAMPBELL:  My problem is that these exhibits

4  appear to have come from extractions of Dimitri Kesari's phone.

5  They also appear to have come from the unredacted version of

6  Mr. Kesari's phone, and I can explain why if you're interested.

7    From my limited review of that phone, I realized

8  there's privileged material in there.  There's Brady material

9  that I would want to use in cross-examining this witness as far

10  as what the content of various text messages mean.  However, I

11  can't do that without violating Mr. Binnall's privilege and

12  continuing to review the unredacted portion of the phone.

13    So I currently would not be able to successfully

14  cross-examine on these exhibits without access to what the

15  government has, which is the unredacted version of the phone.

16    THE COURT:  Thank you.

17    Ms. Pilger.

18    MR. PILGER:  Your Honor, our understanding of what's

19  going on here is that at the deposition of Agent Woo who passed

20  away, there was admitted in evidence an unredacted cell phone

21  report which did have privileged communications on it, accepting

22  defense counsel's representations as accurate.  That, however,

23  was never made available to any member of the prosecution team.

24  It was redacted in a filter process such that the prosecutor

25  team; that is, everyone who you've seen in this courtroom only

1 had access to things where the privileged communications with

2 counsel or even potentially privileged communications were

3 walled off.  There wasn't even an analysis of there's an

4 attorney on here; is it or is it not privileged.  If there was

5 an attorney on there, our privilege crew walled it off, redacted

6 it.

7        So in terms of the discovery problem on the

8 government's side, it's just not there.  Just like Agent

9 LoStracco had potentially access to privileged information when

10 she got the phone from Mr. Kesari, it is true there was a disk

11 that the government could have accessed, but it did not.

12 There's been no exposure and no intrusion.

13        Now, to the extent there are issues on the defense

14 side because they have had access to privileged information

15 about each other, this was something that the government was

16 concerned about from day one in discovery last year and that we

17 addressed to Judge Adams and crafted specific and not routine

18 provisions of the stipulated discovery order because we were

19 aware that there might be Brady in there, that things might have

20 to be shared and things might go across that were inappropriate

21 and there might be mistakes made in the filter process.

22        Again, without the prosecution team being exposed to

23 any of it, we crafted what we call a claw back provision, and

24 every one agreed to it so that it's specific to this situation.

25 As far back as the summer of 2015, Judge Adams put in place an

1  order where if the defendants got ahold of some privileged

2  information about each other, they were given specific

3  instructions by the court on what to do, which was to

4  immediately notify other counsel, lock it down, keep it from

5  going anywhere else.  This was one of the reasons the government

6  was concerned that items not being allowed into the possession

7  of the defendants themselves, lest this happen, and more

8  recently, preparing for this trial, when defendants came back to

9  us and said, we really need our clients to work through this

10 material, it will be more fair, we need to work with this, we

11 said okay, if you hold us harmless if there's any error about

12 privilege between each other leaking over.  And each and every

13 one of them signed on to that, Your Honor.

14         So I don't understand how this should derail any part

15 of this trial.  If there has been a leakage of information to

16 defense, we crafted a specific process to deal with that, and

17 that's what we should implement.

18         MS. CAMPBELL:  Your Honor, if I can address this.

19 First off, I don't have the full redacted version of the phone.

20 That's why I asked for Exhibit 1 because it was offered in the

21 first trial.  It was offered as part of the exhibit of Mr. Yoo.

22 I knew that I had portions of Mr. Kesari's phone that had been

23 redacted various times, but I also knew that I didn't have the

24 complete one because I can tell it based on these little page

25 numbers at the bottom of the file that it had been cut into

1  thirds; the middle third removed, the other two-thirds

2  transposed, and then pinned in consecutive order so that I knew

3  that I wasn't missing any documents on the pin from counsel.

4       Now, I don't know, I'm the second counsel, I don't

5  know how that happened.  I don't know how it was ever appended.

6  All I know is I was missing a big chunk of the phone and the

7  redacted version I got had a pin on it.

8       These exhibits that they're offering now are not from

9  those documents.  They're from the actual extraction.  I can

10  tell that because it does not have a pin number on it.  It just

11  has the page numbers on it which corresponded with the time that

12  I reviewed Exhibit 1.

13       I also know that there's Brady material on there.  If

14  they're going to go in and talk about text messages, I can

15  recall that there's text messages at this exact same time

16  between Mr. Kesari and Mr. Benton about an adoption.  I can

17  tell --

18            THE COURT:  An adoption of what?

19            MS. CAMPBELL:  A baby, they were adopting a baby.

20            THE COURT:  Oh.

21            MS. CAMPBELL:  They were adopting a baby.

22            DEFENDANT BENTON:  My wife and I.

23            MS. CAMPBELL:  His wife was adopting a baby and they

24  were talking to Mr. Kesari about that, and that would be prime

25  material to be crossing the agent about when they're talking

1    about who's calling who when because that text message is at the

2    exact same time about this adoption.  But I would need to have

3    access to that record.

4            THE COURT:  Why would that be privileged?

5            MS. CAMPBELL:  It's not, but the document itself is

6    gone because I turned it back over and I don't have access to

7    all of that material.  I can't offer Exhibit 1 because it

8    contains privileged material.  I can go back and try to find

9    these, but I'm telling you I'm missing a big chunk of the phone.

10   So I'm just raising it because I believe I have a Brady problem.

11           THE COURT:  Thank you.

12           Mr. Binnall.

13           MR. BINNALL:  Your Honor, first of all, regarding the

14   protective order and the amended protective order that happened

15   in the lead up to this trial that they talked about that they

16   were so concerned about for our clients having access to each

17   other's privileged material, the amendment that happened to the

18   protective order leading up to this trial had to do only with

19   witness statements and grand jury testimony.  That's it, witness

20   statements and grand jury testimony.  There's no privilege in

21   that.  That stuff has been shared with the government, either in

22   interviews with the FBI or through the grand jury proceedings.

23   No one has any reason to believe that any privilege was violated

24   or, you know, any inadvertent disclosure made in a grand jury

25   proceeding or in interviews with the FBI, at least not that I'm

1  aware of right now.  So that really is a nonissue and not at

2  play here at all.

3          We certainly don't want the unredacted version of this

4  disk in anyone's hand because of the fact that it has privileged

5  material, most importantly, my attorney-client conversations

6  with my client, but other privileged material, spousal privilege

7  material, clergy privilege, et cetera, that is also important

8  and at issue here.

9          So we don't want that -- this to be at all -- I agree

10 completely with Ms. Campbell that there is probably material on

11 there that's not privileged that her client is entitled to.

12          THE COURT:  Well, then give it to her.

13          MR. BINNALL:  I don't have the ability to go through

14 and redact four out of some odd thousands to do that.  I don't

15 have the resources to do that, Your Honor, I don't.  And I don't

16 know that the way to do that without waiving the privilege to

17 her that I'm not in a position to do.  And, quite honestly, Your

18 Honor, this wasn't our mess-up.  We turned over Mr. Kesari's

19 phone with the explicit understanding at the time that there's

20 going to be a tainting, filter team, whatever you want to call

21 it, that would make sure that privileged material did not get in

22 the prosecution team's hands.  And I understand this is before

23 Judge Adams.  I don't think we need to get into the merits of

24 that, although I think the perfectly acceptable sanction for

25 this violation is just to exclude the text messages in their

1  entirety; but we know that it was the prosecution team that gave

2  that unredacted report to Ms. Campbell, not somebody on the

3  filter team; somebody on the prosecution team gave that to

4  Ms. Campbell, and that's a problem.

5          And so, you know, that is our position.  I don't know

6  how else we can help out on this.  To a certain extent we're

7  willing to do what we can with our resources that are limited,

8  but there's just not a lot I think we can reasonably do here.

9          THE COURT:  Okay.  Anything else, Mr. Pilger or

10  Mr. Cooney?

11          MR. COONEY:  If I may, just to complete the record on

12  it, I'm trying to focus on the discovery issue about access to

13  materials and whatnot, is I just don't know what the issue is

14  that Ms. Campbell has identified about not having access to

15  things because these text messages that we're talking about here

16  come from the redacted Cellebrite report, which was produced to

17  all of the defendants in discovery, and this is the first that

18  I'm hearing about a concern about them not having that redacted

19  Cellebrite report.

20          This disk, Exhibit 1, was only shown to Wesley Yoo in

21  his deposition because it is the true and accurate download that

22  he took of everything, like he went to the phone itself,

23  extracted the information with no filter.  That material was

24  then filtered and provided to the prosecution team.  The only

25  disk that he could identify in his deposition would be his

1   original extraction, like this is what I extracted.  It was

2   purely a chain of custody based exercise with him to identify

3   what he took off.

4        We then produced the extracted Cellebrite which

5   contains all of this.  We provided Exhibit 1 to Ms. Campbell.

6   And, frankly, from -- I had no idea.  It just didn't dawn on me

7   that there was all of this, you know, potentially unredacted

8   information there.  We provided Exhibit 1 simply because she

9   asked for a copy of Exhibit 1.  This is the first I'm hearing

10  that she's saying she did not have material from the redacted

11  Cellebrite report, and I don't think that's correct.  I think

12  that's an issue with transition from private counsel.

13       So if it's a matter of reproducing the Cellebrite

14  report, we'll do that, but I don't think there's a discovery

15  issue here on the government's part.

16       THE COURT:  Okay.  Before you leave today, leave those

17  four text messages that you're going to offer with the clerk.  I

18  want to read those tonight.

19       Did you want to make some sort of offer of proof or

20  something with respect to the objection I sustained earlier?

21       MR. PILGER:  Yes, Your Honor.  So if the defense is

22  going to argue as they have indicated at side-bar, that

23  materiality is definitely an issue here, the exhibit we have to

24  offer is a very short digest showing two things:  One, that it

25  does matter if you make false reports or you don't report

1    disbursements properly, that that does get taken up by the FEC.

2              THE COURT:  What document is that?

3              MR. PILGER:  I'm sorry?

4              THE COURT:  What document is that?

5              MR. PILGER:  It's the digest that Your Honor was

6    familiar with earlier.  It's a short digest of a matter under

7    review that the FEC releases.  Approximately every week or so

8    they release a digest.  It's an official FEC record.  I've got a

9    raised sealed certification of it, and it just recognizes what

10   happened.

11             THE COURT:  Can I have another copy of that right now?

12             MR. PILGER:  Yes.

13             THE COURT:  I think I'm confusing it with what you

14   have with respect to Mr. Tate.

15             MR. PILGER:  So Mr. Tate is in the second one.

16             MR. WARRINGTON:  Your Honor, this is the MUR that they

17   wanted -- this is the digest report regarding the MUR that they

18   wanted to use, and I can explain that if you would like.

19             THE COURT:  No.  I know what I -- we're on the same

20   page.  Thank you.  No; I'm glad it's the same objection.  I

21   think I'm right on that.

22             Jury instructions, you've submitted criticisms and

23   objections and some extra proposals to me.  The last ones came

24   in last evening.  I don't really know what else you want to do

25   in that regard.

1    Do you want to have more or -- more discussion about

2  the jury instructions or not?

3    MS. CAMPBELL:  The only thing we would need, Your

4  Honor, is something on the record about our instructions.

5    THE COURT:  Right.  And here is what I thought I would

6  do, especially in a case where the objections matter.  I mean, a

7  lot of criminal cases the objections, well, I prefer the other

8  reasonable doubt instruction or something like that; but this is

9  more complicated.  I recommend that you do it in writing, and

10  all I would ask -- you can even do it a day after trial.  I just

11  ask that you not object to anything that you didn't put in an

12  e-mail or otherwise tell me beforehand.  Don't you think that

13  would be a better record on the instructions?

14    MS. CAMPBELL:  Sure, Your Honor.  I didn't know

15  whether you wanted to do it in writing.

16    THE COURT:  No.  I think I file instructions and you

17  file objections to them; but, again, I think I'll let you do

18  them a day after we finish the trial.  I just want you to be

19  honest about only things that you've told me about heretofore.

20    MS. CAMPBELL:  Yes, Your Honor.

21    MR. WARRINGTON:  We think that's perfect, Your Honor.

22    MR. BINNALL:  We agree.

23    MR. PILGER:  And we didn't have any problem with the

24  instructions until I thought of one this morning.  So the

25  instructions are perfectly clear and correct on telling the jury

1  that bribery is not charged here.  However, it's not actually

2  legally correct to tell them that paying people for their

3  political support is per se legal.

4          There's a statute, 18 U.S. Code, Section 599 which

5  makes it a misdemeanor, which we didn't bother this court with,

6  and we're not going to argue to them that that's the illegality

7  charged, but I think that is a misstatement.

8          THE COURT:  Okay.  And that's why I included that one

9  section that all of the defendants have objected to.  That's why

10  I included that part that says, in this case the government

11  contends that, because what I'm trying to say is, for example,

12  that was in the vendor, sub vendor situation.  I'm just trying

13  to say that's not what the government is claiming here.  It's

14  kind of a colloquial way of saying that's not what the

15  government is claiming here.  Rather than get into this

16  complicated discussions about the circumstances under which

17  vendor or vendee relationship has to be reported, that's not

18  what the government is claiming.

19          And so to me there's two ways of taking that issue

20  away from the jury.  One is to say, to give them exactly what

21  the law is about whether you have to report a sub vendor's

22  payment to the FEC, or one is to say but that's not at issue in

23  this case.  The government claims they're filing it.  And this

24  seemed to be a more practical and equally effective way of doing

25  it.  And so what I'm saying is with respect to Mr. Pilger's

1  objection, that would be another way of handling that matter, is

2  just like the government isn't claiming in this case that the

3  FEC reports were false because the Ron Paul -- because it claims

4  that the Ron Paul Campaign was paying Kent Sorenson for his

5  endorsement, but rather the government is claiming that they

6  were false for the reasons I've said about a hundred times.

7          Okay.  That's at least just so you understand my

8  philosophy on it.  You don't have to agree that it's the right

9  way to go, but I want you to know that I'm trying to forward

10 that fine line between getting into something that's so

11 tangential and will just muck up and confuse the jury and

12 keeping the case where the government -- you know, their theory,

13 where their theory is.

14         MR. MILLS:  Your Honor, I understand and applaud what

15 you're trying to do.  But in reading it, I thought you confused

16 things.  The way the evidence has come in, that you can't apply

17 the instruction you gave to the evidence as it has come in was

18 my biggest problem with it.

19         THE COURT:  And so in yours you submitted an

20 alternative language to use.

21         MR. MILLS:  That tracks the statute, but I wanted to

22 elaborate about why it was so hard to apply, and you had the

23 evidence -- and you heard it today through Mr. Izon --

24         THE COURT:  You can step down, sir.  Thanks.  We're

25 not going to need you anymore today.

1      MR. MILLS:  You heard it from Mr. Izon.  He sent a

2 bill.  The Ron Paul Campaign paid him.  He kept 10 percent of it

3 and then passed the rest on.  So it's not a clear passthrough.

4 That's why I stood up and objected when Mr. Pilger said it was a

5 clear passthrough.  It wasn't.

6      And under the plain language of the statute, the Ron

7 Paul Campaign had an obligation to report something.  It made a

8 payment to ICT, a portion of which ICT kept.  We don't think

9 there's any -- as a commission for being a paymaster, and

10 there's no evidence as to how we should -- or how the campaign

11 should have reported it.  But it's really confusing the way the

12 evidence has come in, and we think it's simpler just to track

13 the statute.  You report who you pay.  And we think you got it

14 right in your decision prior to trial, that they have to prove a

15 combo, they have to prove a combo, and your instruction confused

16 that.  That is our problem.

17      THE COURT:  Yeah.  Well, and so as I thought of it,

18 the government's position has been that it's false both because

19 it's false in terms of the recipient and false in terms of the

20 purpose; but when you separate them out as false in terms of the

21 recipient, then we get into that issue about whether there's

22 bona fide services that are being offered by the recipient and,

23 boom, it goes directly into the purpose question as well.  So I

24 don't think you can separate out the recipient from the purpose.

25 It just doesn't make sense.

1    MR. MILLS:  Here is where we disagree.  The statute

2  says you just have to report who you pay; the services don't

3  have to be bona fide, just who you pay.  We paid X, Y, Z a

4  hundred dollars.

5    THE COURT:  For a campaign expenditure and the purpose

6  of it?

7    MR. MILLS:  The purposes of it we could have said

8  anything.  We could have said endorsement --

9    THE COURT:  You know, if you're right, you just win as

10  a matter of law; but you're not going to get it from me.

11    MR. MILLS:  I understand that.  But that's what the

12  statute says, and in reading your ruling getting ready for the

13  trial, you said they have to prove in combo, a conspiracy to not

14  only -- to obscure the ultimate payee, but doing it in

15  combination with bad description.

16    THE COURT:  Conspiracies to make false statements

17  because conspiracy is to violate the three criminal code

18  sections.  The false statement is what we're talking about now.

19    MR. MILLS:  Right.  And to be false it would have to

20  be a combination.

21    THE COURT:  Yeah, I understand what you're saying.

22    MR. MILLS:  Okay.

23    THE COURT:  Good.  All right.  So probably by tomorrow

24  morning you'll get a copy of the revised instructions, and from

25  now on I will make it very clear every single change we make to

1    them so you don't have to compare versions.

2         The other thing that was suggested by the defendants

3    that seems to be a good point is that I made my changes based on

4    what we just talked about in the context of Count 3, and it

5    applies to all of them because that's what the alleged false

6    statement is about.  So I might take that out and separate it

7    and put it in another instruction, probably the instruction with

8    the definitions is where it will go.

9         MR. PILGER:  As far as preparation, the ruling on

10   Mr. Link is pending.

11        THE COURT:  If you have more to say about that --

12   who's the proponent of that?

13        MS. CAMPBELL:  That's me, Your Honor.

14        THE COURT:  Yeah.  It just seemed like more Mr. Mason.

15        MS. CAMPBELL:  It's not at all Mr. Mason.  It's

16   actually about the context in which Jesse Benton specifically

17   would be reviewing a payment to a third-party vendor, the common

18   use of paymasters --

19        THE COURT:  You get more specific than that.  On a

20   vagueness level, I can't process.

21        MS. CAMPBELL:  Sure.

22        THE COURT:  He would say that...

23        MS. CAMPBELL:  The government's theory is that

24   Mr. Benton should have known from looking at two things:  One,

25   the ICT invoice; and, two, the 72-page report that it was a

1  fraudulent invoice, it was a fraudulent payment, that it

2  couldn't have possibly been done on the up and up because it was

3  actually Kent Sorenson's bill and he was told, Kent's bill, pay,

4  and attached was an ICT invoice.

5          And what we are offering Mr. Link for was to combat

6  that allegation because it is common in the industry to be using

7  third-party vendors.  It's common in the industry to be using

8  vendors to pay other vendors.  It's all common in the industry.

9  And so because it's common in the industry, you can't say that

10 Mr. Benton knows that it's a fraudulent invoice just because it

11 says ICT on it or just because he's using a third-party vendor.

12 That's the main thing that we need Mr. Link for is to combat

13 that allegation that somehow even if he opened up the

14 attachments, even if he made that connection, that he would have

15 then known that this is a fraudulent scheme to report it to the

16 FEC because no one would ever do that, and that's just simply

17 not the case.  Every campaign is doing that.  Every campaign is

18 using LLCs, S corporations, multiple vendors, sub vendors, super

19 vendors, whatever you want to call it, everyone is doing it.  So

20 if everyone is doing it, then Mr. Benton can't be held to a

21 different standard than what everybody else thinks is okay.  He

22 thinks it's fine.  He thinks it's okay.  And it's not what the

23 government is making it sound.  It's not like he looks at ICT

24 and he knows that it's a fraudulent payment, and that's what we

25 need Mr. Link for, Your Honor.

1          THE COURT:  Thank you.

2          Do you have a response to that?

3          MR. PILGER:  Yes, Your Honor.  The government's case

4   is that Mr. Benton well knew that he was concealing things from

5   the FEC from the evidence.  It's not about whether or not he can

6   properly pay through, for lack of a better word, an umbrella

7   vendor.  That happens in the records we're looking at.  You see

8   big payments to Saber Communications that we're not charging.

9   The government's case, which you've heard a couple of times now,

10  is that from the beginning of the criminal activity there was a

11  willful decision to violate the law by hiding from the FEC the

12  true recipient and purpose of the payments.  It's not just that

13  he saw an ICT invoice.  It's that he knew ICT invoice for

14  production services was nonsense, that this was just a payment

15  to Kent Sorenson for an endorsement and that he did almost -- if

16  he did anything, it was de minimus.  He did a few minutes of

17  work and he took a trip to South Carolina and talked to some

18  legislators about how they could get on the same kind of gravy

19  train.

20          THE COURT:  Yeah.

21          MS. CAMPBELL:  I was just going to say that brings up

22  then -- if that's the argument they're going to make, Mr. Link

23  has to be able to testify there's no requirement, that in the

24  industry there's no requirement that you pay market value for

25  anything, as long as he's doing some work and as long as it had

1  something to do with audiovisual, then it wouldn't raise a red

2  flag for Mr. Benton when reviewing those invoices.  I mean, I

3  think the evidence is clear that he doesn't know ICT, he doesn't

4  know any of that.  So it has to rely on him getting an invoice

5  that says ICT on it and whether or not in the industry that

6  should be raising a red flag to a campaign chairman.

7            THE COURT:  Thanks.

8            It's not the proper subject of expert testimony.  The

9  motion to exclude is granted, and the motion regarding his --

10 the subpoena for him is denied as moot.

11           All right.  One final thing before we go home today.

12 We did this before, and I know Mr. Tate wasn't here when we did

13 it last time, and it's something that I have to do.  We're

14 getting close to the government resting, and so following that

15 there is a decision that the defendants themselves have to make.

16 In the final analysis, only the defendant can make it obviously.

17 We hope that you discuss it with your lawyer, and that's the

18 question as to whether or not to testify.  You have the right to

19 testify in your own defense.  If you do, the court will give a

20 jury instruction that says that your testimony should be

21 considered like any other witness's testimony.  You have the

22 right not to testify.  We talked about it during the jury

23 selection process.  If you do not testify, the court will give

24 an instruction that says that they can't consider that or even

25 discuss it in arriving at their verdict or in doing their

1 deliberations.

2        Mr. Benton, do you understand that?

3        DEFENDANT BENTON:  Yes, sir.

4        THE COURT:  Ms. Campbell, you've talked with him about

5 it?

6        MS. CAMPBELL:  I have, Your Honor.

7        THE COURT:  Have you made a decision yet?

8        MS. CAMPBELL:  Not really.  We're going back and

9 forth, but if I had to guess, no.

10        THE COURT:  Okay.  Mr. Kesari, you understand what the

11 court just explained?

12        DEFENDANT KESARI:  Yes, I do.

13        THE COURT:  All right.  Mr. Binnall, you had

14 discussions with him?

15        MR. BINNALL:  I have, Your Honor.

16        THE COURT:  Have you made a decision yet?

17        MR. BINNALL:  We have not.

18        THE COURT:  Okay.  And, Mr. Tate, you understand that

19 you have the right to testify and the right not to testify?

20        DEFENDANT TATE:  Yes, Your Honor.

21        THE COURT:  Okay.  Mr. Warrington, you've discussed

22 the matter with him?

23        MR. WARRINGTON:  Yes, we have, Your Honor.

24        THE COURT:  Have you made a final decision yet?

25        MR. WARRINGTON:  Not a final decision, but we'll make

1 | that probably tomorrow.

2 | THE COURT: Okay. Good. Well, if we get to the end

3 | of this trial and you wish to testify, you stand up and tell me

4 | because if you don't, I'm going to assume that that is your

5 | decision and that you made it.

6 | Okay. Thank you.

7 | MR. BINNALL: Your Honor, real quick, one more quick

8 | record from me, and that is, Mr. Sorenson rather viciously said

9 | to the jury today that my client was in on a homosexual

10 | relationship. That is something that is just so --

11 | unfortunately, in the day that we live is rather inflaming to

12 | the jury, and we on behalf of -- I think at this point we can

13 | assume it's inflamed the jury beyond the point where we can know

14 | that any guilty verdict they would return would be fair and, we

15 | would move for a mistrial based on that.

16 | THE COURT: Thanks.

17 | It's denied. It was done -- it's unfortunate, but it

18 | was done in the context of politicians saying things that were

19 | not worthy of credibility, and that's -- and he said it in that

20 | vein, and that's how I understood it and that's how I believe

21 | the jury would as well. I struck it. It's irrelevant. I'll

22 | give any further instruction you want on it, but I don't think

23 | it's a good idea. I think it's best just dropped.

24 | Thank you.

25 | See you at 8:30.

1    (Recess at 4:50 p.m., until 8:30 a.m., Tuesday, May 3,

2  2016.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25